UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
C.C.M.S. d/b/a Community Counseling
and Mediation Services,

            Plaintiff,

        - against –

OXFORD REALTY & HOLDINGS LLC, WEST
27TH STREET REALTY, INC., MARC
PATURET, JOSEPH GRILL, MAXIME TOUTON,
F. MICHAEL CONTE, NIGEL SHAMASH, and
other similarly situated BOARD MEMBERS
OF WEST 27TH STREET REALTY, INC.,

            Defendants.

----------------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 3429 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff C.C.M.S. brought suit against defendants Oxford Realty & Holdings, LLC, ("Oxford Realty") and West 27th Street Realty, Inc. ("West 27th Realty") and its board members Marc Paturet, Joseph Grill, Maxime Touton, F. Michael Conte, Nigel Shamash,[1] and other similarly situated board members, alleging that their refusal to sublet an office space located on the 8th floor of 129 West 27th Street in New York, N.Y. (the "Premises") was the result of race-based discrimination in violation of 42 U.S.C. §§ 1981 and 1982. Defendants Oxford Realty and its agent, Shamash (together, the "Oxford Defendants") moved to dismiss C.C.M.S.'s

---

[1] We note that counsel for Oxford Realty and Shamash stated on the record to this Court and in their briefing that Shamash is not a member of the board of West 27th Realty.

claims as against them.  In response to the Oxford Defendant's motion, C.C.M.S. moved to amend its complaint.  For the following reasons, the Oxford Defendants' motion to dismiss is granted and C.C.M.S.'s motion to amend is denied.

**BACKGROUND**

**1. Factual Allegations**

C.C.M.S. is a not-for-profit organization based in New York, which provides social services to its patients to address mental illness and substance and alcohol abuse.  Proposed Amended Complaint, ECF No. 37, Ex. A ("PAC") ¶ 4.[2]  West 27th Realty owns the building located at 129 West 27th Street in New York City, which is operated as a commercial cooperative.  Oxford Realty is a shareholder of West 27th Realty, owning the shares allocated to the Premises.  Id. ¶¶ 6-7.

In August of 2019, C.C.M.S. indicated to the Oxford Defendants through its real estate broker, Bob King, that it was interested in subleasing the Premises.  Id. ¶ 22.  In the same paragraph, it is alleged on information and belief that Shamash told King that he had the votes of the board of West 27th Realty (the "Board") to approve the sublease.  Id.

---

[2] The following facts are drawn primarily from the PAC which, except as noted below, is identical to C.C.M.S.'s original complaint.  We accept these facts as true for purposes of the Court's ruling on the Oxford Defendants' motion to dismiss and C.C.M.S.'s motion to amend.  The Court draws all reasonable inferences in C.C.M.S.'s favor.  See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

In November of 2019, Oxford Realty's lawyer, Etan Harris, presented a written proposal to C.C.M.S. to sublease the Premises, and C.C.S.M.'s lawyer, Diana Lee, began negotiations with Harris over the planned use of the Premises stated in the sublease. Id. ¶¶ 23-24. C.C.M.S. proposed that the Premises would be used, in part, for its "counseling programs, including but not limited to mental health and substance abuse counseling." Id. ¶ 24. Harris replied that the planned use must be changed to delete the phrase "substance abuse counseling" – a sentiment echoed by Oxford Realty's principal Saul Tawil. Id. ¶¶ 24-25. On November 26, 2019, C.C.M.S. agreed to the deletion of the phrase "substance abuse counseling" and agreed not to run any substance-abuse counseling services at the site. Id. ¶ 27.

In relation to the permitted use negotiations, Tawil additionally suggested to King that C.C.M.S. could use the building's freight elevator. King allegedly rejected this proposal, saying that C.C.M.S. would not want to be treated as "second-class citizens," and the proposal was not raised again. Id. ¶¶ 26-27.

After some additional back-and-forth on the language of the sublease, focus shifted to preparing the Premises for C.C.M.S.'s arrival. On December 16, 2019, King sent an email to Shamash inviting him to visit one of C.C.M.S.'s facilities to conduct due diligence. Id. ¶ 31. Thereafter, C.C.M.S. was given access to

the Premises for the purposes of installing and wiring telephone lines and data and IT services. Id. ¶ 38.

As C.C.M.S.'s desired move-in date came closer, King emailed Shamash on a number of occasions, including after C.C.M.S. had been turned away from the Premises after trying to deliver furniture, to confirm whether the Board had approved the sublease or whether a vote had been scheduled. Such approval was required to finalize the sublease, and C.C.M.S. had been aware of this requirement from the outset. Id. ¶¶ 39, 41, 45. Eventually, the Board interview was scheduled for January 14, 2020, even though C.C.M.S.'s lease on their former location would expire on December 30, 2019. Id. ¶¶ 47-48.

On December 18, 2019, C.C.M.S. signed and hand-delivered the sublease to Oxford Realty, along with a $100,000 check constituting the security deposit and a $25,000 check for the first month's rent, which were cashed by Oxford Realty on December 30, 2019. Id. ¶ 37.

At the interview on January 14th, C.C.M.S.'s president, Emory Brooks, explained that the Premises would be used for "psychoanalytic treatment of children ages two to seven years old," and took questions from members of the Board. Id. ¶ 54. Board member F. Michael Conte raised with Brooks a December 28, 2019 incident at which a mentally ill African American man had attacked a group of people celebrating Hanukkah with a machete in Monsey,

New York. Id. ¶ 56. Another Board member raised concerns that C.C.M.S.'s clientele may subject the building's owner to lawsuits if anyone was injured by a mentally ill client of C.C.M.S., while another Board member, Joseph Grill, suggested that his clientele – consisting of young models – would be at risk from attack by C.C.M.S.'s clients. Id.

The next day, Tawil emailed King, "[Y]our tenant[']s rep was an idiot," referring to Brooks, whom C.C.M.S. notes Tawil had never met. Id. ¶ 60. That same day, C.C.M.S. was informed by its broker that the Board had rejected C.C.M.S. as a tenant. Id. ¶¶ 60-61. When C.C.M.S. sought the return of its security deposit and first-month's rent, Oxford Realty's lawyer, Harris, informed C.C.M.S. that the Board had rejected the sublease because Brooks had apparently made statements at the interview that C.C.M.S. would treat patients with substance-abuse diagnoses or disorders, despite agreeing to the prohibition against such treatment in the sublease. Id. ¶ 63. Oxford Realty sought to withhold $4,000 from C.C.M.S.'s deposits to cover expenses arising from the time and efforts spent on the sublease based upon what it called C.C.M.S.'s "fraudulent representation." Id. Brooks denied that he suggested or implied at the interview that C.C.M.S. would be providing substance-abuse counseling at the Premises. Id. ¶ 66.

### 2. Procedural History

C.C.M.S. filed its initial complaint against defendants on

May 1, 2020.  ECF No. 1.  On July 31, 2020, the non-moving defendants filed their answer to the complaint, while the Oxford Defendants filed a letter requesting a pre-motion conference to discuss their proposed motion to dismiss.  ECF No. 31.  The Court held a telephonic conference on September 1, 2020 during which the Oxford Defendants were granted leave to file their motion.  The motion to dismiss was filed on October 12, 2020.  ECF No. 36.  On November 12, 2020, along with its opposition to the motion, C.C.M.S. cross-moved to amend its complaint and attached the PAC as an exhibit.  ECF No. 37.  The PAC supplements C.C.M.S.'s original complaint in two notable ways.  First, without alleging additional facts in support, it theorizes that the Oxford Defendants' intention to close on the sublease changed after they realized C.C.M.S. was an African American-run organization that served a substantial number of African American clients.  Second, it alleges that an interview was not required before Board approval or disapproval of the sublease and speculates that it was scheduled at the behest of the Oxford Defendants after they no longer wished to go forward with the sublease.  On November 27, 2020, the Oxford Defendants filed a memorandum of law in further support of their motion and a memorandum of law in opposition to C.C.M.S.'s motion to amend.  ECF Nos. 42-43.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a

complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In determining whether a claim has facial plausibility, "we accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

In addition, Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to amend pleadings] when justice so requires." Whether to grant leave, however, is ultimately "within the sound discretion of the district court," and a district court may "deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." McCarthy, 482 F.3d 184 at 200. The Court's inquiry into the futility of proposed amendments parallels the analysis on a motion to dismiss pursuant to the Federal Rule of Civil Procedure 12(b)(6). Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002), abrogation recognized on other grounds by Sagaponack Realty, LLC v. Vill. of

Sagaponack, 778 F. App'x 63, 64 (2d Cir. 2019). Therefore, the Court "accept[s] as true all factual allegations in the [proposed amended] complaint and draw[s] all reasonable inferences in favor of the non-moving party." City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017). However, if the proposed amended complaint does not proffer "enough facts to state a claim for relief that is plausible on its face," a motion for leave to amend may be denied. Twombly, 550 U.S. at 547.

**DISCUSSION**

C.C.M.S. claims that each of the defendants violated its rights under 42 U.S.C. §§ 1981 and 1982. As relevant here, section 1981 protects the rights of racial minorities from discrimination in making and enforcing contracts, while section 1982 protects the right to "purchase, lease, sell, hold, and convey real and personal property." "To establish a claim under 42 U.S.C. §§ 1981 and 1982, a plaintiff must prove the following elements: (1) the plaintiff is a member of a racial minority; (2) the defendant acted with the requisite intent to discriminate based on race; and (3) the discrimination concerned one or more of the activities enumerated in the statute including the right to make and enforce contracts such as a real estate contract or lease agreement." Favourite v. 55 Halley St., Inc., 381 F. Supp. 3d 266, 282 (S.D.N.Y. 2019) (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d

-8-

1085, 1087 (2d Cir. 1993)). "While these sections cover different protected activities, they are construed together in light of their common purpose." Id.

The parties do not dispute that C.C.M.S. satisfies the requirement that it be a "member of a racial minority" – as it primarily serves African American clients and its president, Emory Brooks, is African American – or that the right sought to be protected is within the ambit of the statutes. However, the Oxford Defendants contend that C.C.M.S. has not adequately pled that they acted with the requisite intent to discriminate based on race.

We begin with C.C.M.S.'s motion to amend, which the Oxford Defendants oppose on grounds of futility. To survive this challenge, "the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded in the [proposed amended] complaint." Grimes v. Fremont Gen. Corp., 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011) (internal quotations omitted). For its part, C.C.M.S. admits that "there is no direct evidence of discriminatory intent because C.C.M.S. was not part of any conversations among defendants and not privy to their thoughts." ECF No. 38 at 5. Instead, C.C.M.S. asks this Court to infer racial animus from a mere two comments made by the Oxford Defendants, as well as from their theory that the Oxford Defendants plotted to renege on the sublease with C.C.M.S. by

scheduling a Board interview after Shamash visited a C.C.M.S. facility and saw that it served a primarily African-American clientele. These allegations and speculations do not plausibly allege racial animus on the part of the Oxford Defendants.

In the first place, each of the comments C.C.M.S. cites as evidence of the Oxford Defendant's racial animus are no more consistent with racial discrimination than they are with general concerns about C.C.M.S. serving clients suffering from mental illness. When Tawil suggested in November of 2019 that C.C.M.S. could use the building's freight elevator, he did not make reference to anyone's race, and the comment was part of the discussions concerning C.C.M.S.'s use of the Premises to serve mentally ill clients. PAC ¶ 26. Here, C.C.M.S. cannot establish a claim of invidious discrimination because "the pleadings indicate more-plausible, non-[racially] discriminatory explanations for defendants' complained-of actions," i.e., Tawil's concerns about C.C.M.S.'s clients, who suffer from mental illness, interacting with other tenants and visitors to the building. Karim v. New York City Health & Hosps. Corp., No. 17 Civ. 6888, 2019 WL 1495098, at *6 (S.D.N.Y. Mar. 6, 2019), aff'd, 834 F. App'x 651 (2d Cir. 2021) (quoting Kajoshaj v. N.Y.C. Dep't of Educ., 543 F. App'x 11, 15-16 (2d Cir. 2013)). In any event, the proposal apparently was dropped as quickly as it arose, and the negotiation and signing of the sublease ensued.

Further, Tawil's comment to King after the Board interview that Brooks was "an idiot," while unkind, does not point to racial animus. "Idiot" is not a racially charged insult, and, moreover, the criticism would appear to indicate that Tawil was frustrated with Brooks' performance in the interview and disappointed that the efforts the Oxford Defendants spent working on the sublease had come to naught. Even comments made by members of the Board during the interview - which notably were not made by the Oxford Defendants - are entirely consistent with Board members having concerns for issues of behavior, and were not presumptively a matter of race.[3] See Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994) ("[T]he abundance of other possible reasons for the panel's decision combined with the lack of any specific factual support for his claim of a racial motivation illustrates that his claim here is simply a "naked allegation" of racial discrimination."); Miller v. Bridgeport Bd. of Educ., No. 3:12 Civ. 1287, 2013 WL 3936925, at *5 (D. Conn. July 30, 2013) (citing "other reasons discernable from the record . . . suggest[ing] an alternative reason" for the allegedly discriminatory conduct as a basis for dismissing plaintiff's discrimination claim); Tejwani v. United Airlines, Inc., No. 08 Civ. 2966, 2009 WL 860064, at *4

---

[3]  It is not even clear from the PAC that when Board member Conte raised the Monsey incident involving a mentally ill African American man attacking a group of Jewish individuals, he explicitly referred to the man's race.

-11-

(S.D.N.Y. Mar. 31, 2009) (noting, in dismissing § 1981 claim, that complaint "identifies a number of race-neutral factors that may have led" to the allegedly discriminatory conduct).

This is not to say that the Board's concerns were valid, nor, of course, does the Court condone bias against those suffering from mental illness. However, the social stigma surrounding mental illness is not interchangeable with racial animus, and C.C.M.S. cannot sustain their racial discrimination claims merely by pointing to conduct suggesting bias against mental illness. Cf. Gant v. Principi, No. 3-03 Civ. 1209, 2004 WL 2988549, at *4 (N.D. Tex. Dec. 27, 2004) (dismissing racial discrimination claims where plaintiff alleged that mental illness stigma exacerbated stigma plaintiff experienced based on race).

Secondly, regardless of C.C.M.S.'s speculation, an examination of the sequence of events as described in the PAC does not lead to an inference that the Oxford Defendants' conduct was racially motivated. C.C.M.S. posits that the Oxford Defendants changed their minds about subleasing to C.C.M.S. "when they realized that C.C.M.S. was an African American organization with a substantial number of African American clients." PAC ¶ 73. This presumably would have occurred around December 16, 2019 when King invited Shamash to visit a C.C.M.S. facility in Brooklyn. PAC ¶ 31; ECF No. 38 at 6.

To begin, this theory undercuts C.C.M.S.'s reliance on

Tawil's comment in November 2019 regarding C.C.M.S.'s use of the freight elevator – a comment made a month before the site visit – which C.C.M.S. argues was motivated by racial bias.  There is no suggestion that Tawil was aware in November that C.C.M.S. was an African-American organization, and if he somehow was aware, it would make very little sense for the Oxford Defendants to continue working diligently towards negotiating the sublease agreement and then decide only after its execution to attempt to cancel the agreement because C.C.M.S. served minority clients.

Further, the Oxford Defendant's activity through the end of December suggests a clear intention to close on the sublease.  The Oxford Defendants gave C.C.M.S. access to the Premises on December 16, 17 and 18 to install wiring for telephone lines, data and IT services.  PAC ¶ 38.  The sublease itself was signed on the 18th, id. ¶ 37, and the Oxford Defendants cashed C.C.M.S.'s security check and first-month's rent check on December 30, 2019.  Id. ¶ 37.  Rather than indicating that Shamash's visit to C.C.M.S.'s Brooklyn facility led to a change of heart, these actions indicate that the Oxford Defendants had every intention to follow through with subletting the Premises to C.C.M.S.  On the sequence presented, it was the Board's rejection of the sublease which resulted in C.C.M.S. losing its bid on the Premises – not the actions of the

Oxford Defendants.[4]

Apparently recognizing the insurmountable challenges in asserting a discrimination claim against the Oxford Defendants directly – given the innocuousness of the two comments ascribed to Tawil and the complete illogic of the chronology – C.C.M.S. now creates a "conspiracy" between the Oxford Defendants and the Board.[5] That alternative also does not withstand even cursory analysis. First, it is indisputable that the Board had the authority to reject or approve the sublease – a fact that was known to C.C.M.S. from the very outset of the negotiations. Second, C.C.M.S. formulates this theory without any evidence that the Oxford Defendants have any control over the Board: it has no seats on the Board nor was Tawil even present at Brooks' interview. Third, C.C.M.S.'s speculation that an interview was not required nor was not customary is of no moment since it was indisputably the Board's option, and any suggestion that Oxford arranged it as

---

[4] It cannot be forgotten that it was Oxford Realty which would suffer most as a result of the Board's rejection of the sublease. At the time of the Court's first conference in September 2020 – nine months after the Board's rejection – Oxford Realty still had not found a subtenant to take the lease, while C.C.M.S. had signed a lease in April of 2020 and was paying less on rent than they would have had the sublease been approved.

[5] We note that this "conspiracy" is an entirely new creation of the PAC. In the original Complaint, ECF No. 1 ("Compl."), C.C.M.S. alleged that the Oxford Defendants "were interested in consummating the sublease with C.C.M.S., [but] they went along with the Board's decision to unlawfully deny the sublease based on race." Compare Compl. ¶ 73 with PAC ¶ 73. Such a major shift in theory during the briefing of a motion to dismiss is itself cause for concern. See Cohen v. Am. Airlines, Inc., No. 19-cv-653, 2020 WL 6018781, at *4 (E.D.N.Y. Sept. 9, 2020) (rejecting motion to amend as made in bad faith where "Plaintiff raised [a] new claim only after receiving and reviewing Defendants' motion to dismiss, at which point it became clear his claims would not survive the motion to dismiss.").

a cover is speculation without any supporting evidence.[6] In sum, this second theory not only does not withstand analysis, but it does nothing to overcome the hard facts of the chronology which themselves defeat C.C.M.S.'s discrimination claim.

Even assuming arguendo that the Oxford Defendants did want to cancel the sublease, there is simply nothing in the PAC to suggest that the Oxford Defendants sought to have the sublease rejected because of racial animus as opposed to discomfort with C.C.M.S. serving mentally ill clients. "It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was the product of racial animus. The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus." Dickerson v. State Farm Fire & Cas. Co., No. 95 Civ. 10733, 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996). Here, the PAC fails to plausibly allege either. C.C.M.S., therefore, does not adequately plead in the PAC violations of its rights under 42 U.S.C. §§ 1981 and 1982 by the Oxford Defendants and its motion to amend is denied as futile.

---

[6] Even were we to accept C.C.M.S.'s bare assertion that the Oxford Defendants scheduled the interview despite having no control over the Board, nothing would prevent Board members from making inquiries into C.C.M.S. prior to exercising their right to approve or reject the sublease. Nor is it at all apparent that the Board would have needed an interview to create a pretext to reject the sublease. The PAC details how members voiced serious concerns with C.C.M.S. serving mentally ill patients and the potential for those patients to harm the Board members' clients.

<u>Dougherty</u>, 282 F.3d at 88.

Having denied C.C.M.S.'s motion to amend, the operative complaint is the one originally filed. Thus, we turn to the Oxford Defendants' motion to dismiss C.C.M.S.'s original complaint. Based on our earlier discussion, the motion must be granted. C.C.M.S.'s original complaint simply contains even less support for its claims than the PAC. The original complaint alleges that rather than planning to renege on the sublease, the Oxford Defendants remained "interested in consummating the sublease with C.C.M.S., [but] went along with the Board's decision" to reject C.C.M.S.'s tenancy. Compl. ¶ 73. Clearly, this does not adequately allege that the Oxford Defendants acted with the requisite intent to discriminate based on race, since their intent would have been to consummate the sublease. Thus, we are left only with C.C.M.S.'s allegations of Tawil's two comments in November 2019 and January 2020, which, for the reasons discussed above, likewise do not support C.C.M.S.'s claim of racial animus. C.C.M.S.'s original complaint must therefore be dismissed as to the Oxford Defendants.

## CONCLUSION

For the foregoing reasons, the Oxford Defendants' motion to dismiss is GRANTED and C.C.M.S.'s motion to amend is DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at ECF No. 36 and ECF No. 37.

**SO ORDERED.**

Dated:   New York, New York
         July 12, 2021

                                             _____
                                             NAOMI REICE BUCHWALD
                                             UNITED STATES DISTRICT JUDGE