# EXHIBIT A

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| C.C.M.S. d/b/a COMMUNITY COUNSELING AND MEDIATION SERVICES, <br><br> *Plaintiff(s)* <br><br> v. <br><br> OXFORD REALTY & HOLDINGS LLC, WEST 27TH ST. REALTY, INC., MARC PATURET, JOSEPH GRILL, MAXIME TOUTON, F. MICHAEL CONTE, NIGEL SHAMASH, ET AL. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 1:20-CV-03429 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Maxime Touton
c/o Monsieur Touton Selection, Ltd.
129 West 27th St.
New York, NY 10001

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Tristan C. Loanzon
Loanzon LLP
1345 Avenue of the Americas, Fl. 2
NY, NY 10105

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____05/05/2020_____  /s/ P. Canales
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:20-CV-03429

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*

was received by me on *(date)*                                    .

☐ I personally served the summons on the individual at *(place)*

    on *(date)*                                    ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

    , a person of suitable age and discretion who resides there,

on *(date)*                    , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*                                    , who is

designated by law to accept service of process on behalf of *(name of organization)*

    on *(date)*                                    ; or

☐ I returned the summons unexecuted because                                    ; or

☐ Other *(specify):*

My fees are $                    for travel and $                    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:

                                      *Server's signature*

                                      *Printed name and title*

                                      *Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
C.C.M.S. d/b/a COMMUNITY COUNSELING AND :
MEDIATION SERVICES,                       :
                                          :
                Plaintiff,                :
                                          :
            -against-                     :
                                          :            **COMPLAINT**
OXFORD REALTY & HOLDINGS LLC, WEST        :
27TH STREET REALTY, INC., MARC PATURET,   :
JOSEPH GRILL, MAXIME TOUTON, F.           :
MICHAEL CONTE, NIGEL SHAMASH, and other   :
similarly situated BOARD MEMBERS OF WEST  :
27TH STREET REALTY, INC.,                 :
                                          :
                Defendants.               :
------------------------------------------x

Plaintiff C.C.M.S. d/b/a Community Counseling and Mediation Services ("CCMS"), states as

follows for its Complaint against Defendants Oxford Realty & Holdings, LLC, and West 27th Street

Realty Inc. and its board members Marc Paturet, Joseph Grill, Maxime Touton, F. Michael Conte, Nigel

Shamash, and other similarly situated board members (collectively "Defendants"):

## INTRODUCTION

1.      CCMS brings this action against Defendants seeking relief for injuries CCMS suffered as

a result of Defendant' illegal discrimination against C.C.M.S. and its clients. CCMS provides

assistance to individuals and families seeking mental health counseling; CCMS serves primarily African

American clients. In August 2019, CCMS began looking for a new office space in Manhattan after its 30-

year lease at a nearby location was due to expire at the end of December 2019. Through its broker, on

August 30, 2019, CCMS made an offer to Defendant Oxford Realty to lease an office located at 129

West 27th Street, NY, NY ("Premises"). CCMS began lease negotiations with Oxford Realty in

November 2019 for a 10-year sublease of the Premises. Oxford Realty was aware that CCMS's present

1

lease expired in December 2019. CCMS hired lawyers to negotiate the lease with Oxford Realty's lawyers. When the sublease was finalized in form, CCMS signed and sent it to Oxford Realty along with a security deposit of $100,000.00 and first month's rent of $25,000.00. Both checks were cashed by Oxford Realty on December 30, 2019. The sublease had a start date of December 15, 2019. CCMS hired an architect to create a design for the Premises and CCMS installed phone lines and network connections in the Premises. But the sublease did not start on December 15, 2019 because Defendants delayed scheduling the board interview for the approval of the sublease.

2.     On January 14, 2020, CCMS's President Emory Brooks was finally interviewed by the Board of the cooperative, Defendant West 27th Street Realty, Inc., which owned the building where the Premises is located. The Board consisted of Nigel Shamash of Oxford Realty and four or five other shareholders of the cooperative. During the interview, one of the board members, without prompt and off-topic, told everyone about the black man who attacked and killed Jewish people celebrating the Hanukkah in Monsey, New York. The news reported the black man was mentally ill. He was suggesting that such thing could happen in the building because of CCMS. Another board member raised the risk of lawsuits from building tenants who may be injured by a mentally ill client of CCMS. After the interview, the Board rejected the sublease to CCMS because CCMS's President allegedly said that CCMS will use the Premises for substance abuse counseling. This rationale made no sense because at the time of the interview, CCMS had already signed the sublease in which it agreed that it will not use the Premises for substance abuse counseling.

3.     *The Board's rationale was a pretext because the real reason for the rejection was the race of CCMS's President Mr. Brooks (African American) and the clientele that CCMS serves (African Americans). Mr. Brooks did not state or suggest during the Board interview that the Premises was going to be used for substance counseling because Mr. Brooks had already explicitly agreed on the*

2

permissible use in the already-finalized sublease. Defendants rejected the sublease with CCMS because Defendants believed that CCMS's traffic of African Americans in the building could give rise to the Hanukkah attack in Monsey, New York, and could expose the building to lawsuits from tenants for injuries inflicted by mentally ill black men, and was incompatible with the image of the building. CCMS seeks to recover damages for the injuries it suffered as a result of Defendants' illegal racial discrimination, and other relief as this Court deems appropriate.

## PARTIES

4.     CCMS is a not-for-profit New York corporation with a principal place of business at 25 Elm Street, 2nd Floor, Brooklyn, New York 11201. CCMS is a leading Brooklyn-based behavioral health organization committed to addressing the root causes and problems associated with mental illness and substance and alcohol abuse. As a highly professional, innovative, community based social service organization, CCMS provides a network of six (6) outpatient mental health clinics in the community and in schools; youth development and after school programs; and four (4) supportive housing facilities for formerly homeless mentally ill adults, low income veterans, and seniors, in the most impoverished minority populated areas in Brooklyn. In the Fall of 2020, CCMS is expected to unveil a new housing facility, with an urban farm, for seniors in East New York.

5.     At the Premises, CCMS planned to operate an outpatient Article 31 licensed mental health (but not substance abuse) clinic to be staffed by licensed child and adult psychiatrists, psychologists, and clinical social workers.

6.     Defendant West 27th Street Realty, Inc. is a NY corporation that owns a real property and improvements located at 129 West 27th Street, NY, NY, which is operated as a commercial cooperative building. It maintains a principal place of business at 129 West 27th St., Unit 1, NY, NY 10001.

3

7.     Defendant Oxford Realty & Holdings LLC is a NY limited liability company with a place of business in New York, NY. Oxford Realty is a shareholder of West 27th Street Realty, Inc., the owner of the building. Oxford Realty owns the shares allocated to Unit #8 of the said building (hereinafter "Premises"). Oxford Realty maintains a principal place of business at 29 West 36th Street, NY, NY 10018.

8.     Upon information and belief, Defendant Marc Paturet is a board member of West 27th Street Realty, Inc. and is the President of Hand Held Films, a company that occupies the ground floor and three floors of 129 West 27th St.

9.     Upon information and belief, Defendant Joseph Grill is a board member of West 27th Street Realty, Inc.  and is the President of Click Model Management, Inc., a company that occupies the 12th floor of 129 West 27th Street.

10.     Upon information and belief, Defendant Maxime Touton is a board member of West 27th Street Realty, Inc. and is President of Monsieur Touton Selection, Ltd., a company that occupies the 9th floor of 129 West 27th Street.

11.     Upon information and belief, Defendant F. Michael Conte is a board member of West 27th Street Realty, Inc. and is the owner of Honig Conte Porrino Insurance, a company that occupies the 6th floor of 129 West 27th Street.

12.     Upon information and belief, Nigel Shamash is a board member of West 27th Street Realty, Inc. and is a broker with 5CRE, a company based at 28 West 27th Street, NY, NY 10001. Upon information and belief, he is the owner of Defendant Oxford Realty & Holdings LLC, a company based at 57 West 38th St., NY, NY 10018.

## JURISDICTION AND VENUE

13.     This Complaint seeks relief for violations of 42 U.S.C. §§ 1981 and 1982. Jurisdiction is

4

proper in this Court under 28 U.S.C. §§ 1331.

14.     Defendant Oxford Realty conducts business in this district, and owns real property in this district, out of which the causes of action in this case arise. Oxford Realty therefore is subject to personal jurisdiction in this district, and venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2).

15.     Defendant West 27th Street Realty conducts business in this district, and owns real property in this district, out of which the causes of action in this case arise. West 27th Street Realty therefore is subject to personal jurisdiction in this district, and venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2).

16.     Defendants who are individually named are board members of Defendant West 27th Street Realty and are subject to personal jurisdiction in this district, and venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2).

## FACTS

### CCMS's Mission and Clients

17.     CCMS is a leading minority-led non-profit organization that provides wide range of social support, counseling, health, mental health, education and supportive housing services in poor minority areas in Brooklyn.

18.     CCMS will soon open a clinic in Manhattan in collaboration with the Harlem Family Institute and will provide mental health services to children (ages 2 and above), adults, couples, and families. The Manhattan clinic will not provide substance abuse or drug treatment.

19.     For over 38 years, CCMS has been led by President and CEO Emory X. Brooks. He is a licensed clinical social worker and a graduate of Columbia University School of Social Work, and received a certificate from the Harvard Business School's executive management and leadership course

5

in nonprofit management. He recently received a certificate in treating young adults with mental health issues from Harvard Medical School and Cambridge Health Alliance. He sits on the advisory council of the Harlem Family Institute, one of the top post-graduate psychoanalytic training and treatment center in the U.S.

## CCMS's Attempt to Sublease at 129 West 27th Street

20. Up until April 30, 2020, CCMS's Manhattan office was located at 115 West 31st Street, NY, NY. CCMS had leased space at that address for thirty years, and prior to that from 1988 to 1992, CCMS had an office in Soho. However, in early Fall 2019, CCMS received notice that it needed to vacate its 115 West 31st office because the building was being converted to other use. Accordingly, in August 2019, CCMS's President Mr. Brooks and his staff began to search for a new space for CCMS's Manhattan office.

21. In August 2019, CCMS staff viewed a space available for sublease on the whole eighth floor of an office building at 129 West 27th Street ("Premises"). The sublease was available from December 15, 2019 through December 31, 2029. The space measured 7,500 rentable square feet.

22. CCMS's real estate broker, Bob King, told Oxford Realty's Nigel Shamash and Saul Tawil, that CCMS was interested in negotiating a sublease of the Premises, and made a written offer for the same. Upon information and belief, Shamash told King that he has the votes in the board to approve the sublease because he controls five floors of the 12-story building and the president of the board votes with him.

23. On or about November 12, 2019, Oxford Realty's lawyer, Etan Harris, presented CCMS with a written proposal to sublease the Premises. On or about the same day, either Shamash or Tawil asked King whether CCMS has a succession plan given that its president and CEO (Brooks) was 85 years

old. CCMS thought that it was an odd question to say the least.

24.     CCMS's lawyer Diana Lee began negotiation of the sublease with Etan Harris, particularly the issue of CCMS's planned use of the Premises. Specifically, CCMS proposed the following use: "Tenant shall use and occupy the demised premises for general offices, executive and administrative offices and for Tenant's counseling programs, including but not limited to mental health and substance abuse counseling, all of the foregoing in connection with and in furtherance of Tenant's purposes and activities."

25.     On November 15, Harris replied that the planned use must be changed to delete the phrase "substance abuse counseling" but the rest of the planned use was acceptable.

26.     On November 19, Oxford Realty's Saul Tawil urged that the sublease only contain "mental health" use and not "alcoholism and substance abuse," and stated that CCMS can use the freight elevator. King replied on the same day: "I doubt [CCMS] are going to agree to be second class citizens ... using the freight elevator only."

27.     In response, on November 26, Lee emailed Harris that deleting the phrase "substance abuse counseling" was acceptable because CCMS "has agreed not to run any substance abuse counseling service at the site."[1] Of course, CCMS did not agree to just using the freight elevator to access the Premises. On that same email on November 26, Lee inquired about the redraft of the sublease.

28.     Harris emailed Lee a redraft of the lease on December 4, 2019.

29.     On December 9, Lee responded with additional changes in an email, and added "[c]an we assume the co-op has approved going forward with this lease and the minor work needed for tenant

---

[1] CCMS originally proposed to have substance abuse counseling in the lease even though it did not have current plans or funding to operate a substance abuse counseling clinic. Instead, CCMS wanted to have the flexibility to add substance abuse counseling if future funding comes. If CCMS obtains funding, NY State requires the lease to specifically include substance abuse counseling. In the end, CCMS agreed to remove such use for the Premises.

to occupy so the Lease can commence on December 15?"

30.     Harris replied on December 10 by sending Lee a copy of a redlined sublease and a "final executable copy" and wrote that "[i]f the attached is acceptable, please advise, and I will forward instructions for execution promptly."

31.     On December 16, CCMS's broker Bob King emailed Oxford Realty's Nigel Shamash inviting Shamash to visit an existing CCMS office in Brooklyn. It was understood then that Shamash wanted to conduct due diligence on CCMS's existing offices or operations. King added in the email: "Nigel, I gave Emory [CCMS's President] assurances that the board had approved already. I hope this works out."

32.     That same day, Lee emailed Harris: "our client will be installing telephone, data, and IT service in the space starting today and would like to move its furniture ... in by 12/23/2019" and CCMS "is ready to sign and deliver security deposit and 1st month's rent."

33.     Also, on the same day, King emailed Shamash to say that "Emory has his cable people in the space today. He wants to move all the furniture and files on December 23rd. Time is of the essence. Please make this a priority."

34.     Responding to Bob King's email about the furniture move-in, Oxford Realty's Nigel Shamash emailed back on December 16 stating "I need to get board approval for that. I will see if I can arrange."

35.     On December 16, Harris emailed Lee a copy of the sublease, writing "[u]pon full execution, please have tenant deliver the originals to landlord in duplicate, with first month's rent and security deposit, payable to landlord in good funds."

36.     On December 17, Harris and Lee exchanged minor revisions to the sublease.

37.     On December 18, 2019, CCMS signed and hand-delivered the sublease to Oxford Realty,

along with two checks to Oxford Realty in the amounts of $100,000.00 for security deposit and $25,000.00 for the first month's rent. Those checks were cashed by Oxford Realty on December 30, 2019 – twelve days after CCMS delivered it.

38.     In the meantime, CCMS was allowed into the Premises by Oxford Realty on December 16, 17, and 18 for the purposes of installing and wiring for telephone lines, data, and IT services. CCMS also purchased furniture specifically for the Premises and planned to deliver them around December 23, 2019. King, emailed Oxford Realty several times from December 19 asking when CCMS can move in.

39.     After CCMS sent the signed sublease and checks, on December 19, King asked Nigel Shamash by email "where are we with the board? CCMS has deliveries coming and asking me for the keys." On December 22, King emailed Shamash and asked "do we have board approval? Let's finish this!" Saul Tawil from Oxford Realty emailed King "patience, we are at the finish line."

40.     CCMS attempted to deliver furniture to the Premises on December 23 but was turned away by the building supervisor.

41.     After CCMS was turned away by the building, King emailed Shamash that same day: "They [CCMS] had planned to begin move in today. They have been turned away by building personal … because they have not been informed that a lease has been signed. That may be legally correct, but it stinks. Is this going to happen? They now have furniture being delivered. Absolutely bad business. Can you get this done now?"

42.     Shamash responded by email on December 23: "They [CCMS] have no certificate of insurance. How do they move in? Checks haven't cleared yet. Board vote is set imminently. It's no different to any other building. Apparently, they [CCMS] have already moved in. So I need their insurance ASAP." CCMS obtained the required insurance that same day.

43.     Shamash emailed King the same day asking that CCMS fill out a "sublet" application.

CCMS's attorney responded that a sublet application did not apply to the sublease. Obviously agreeing that the form was not the correct form, Shamash responded: "goal is to get the package out ASAP so I can get it approved ASAP…. Peter said he sees no issue with this tenant… so please fill in the document and any non-conforming questions simply leave blank or write not applicable." Oxford Realty's new requirement of a sublet application (while inapplicable as acknowledged by all) further set back the move-in date for CCMS and the Board interview of Brooks.

44.     The "Peter" referred to in the email from Shamash above is, upon information and belief, Peter Lehr, who was the property manager for defendant West 27th Street Realty, Inc.

45.     On December 24, King emailed Shamash asking "what needs to be done? Board approval? They [CCMS] need to move." Upon information and belief, Shamash knew all along that CCMS's current lease was expiring on December 31, 2019, so this was the understanding of all parties since CCMS made a written offer on August 30, 2019 to Oxford Realty to sublease the Premises.

46.     A member of the Board of Defendant West 27th Street Realty copied King on an email on December 26 that included Shamash. That board member, F. Michael Conte, emailed Shamash that "according to our bylaws all sublets must be approved. I'm not sure why anyone would assume otherwise."

47.     The Board interview was scheduled for January 14, 2020.

48.     Even though the Board interview was set for January 14, 2020, Oxford Realty knew well back in September 2019 that CCMS's lease expired on December 31, 2019. Oxford Realty already received the executed sublease and the $125,000.00 of security and first months' rent from CCMS. The checks were cashed on December 30, 2019.

49.     The day before the Board interview, King emailed Shamash to ask if he had any advice for Brooks to prepare for the interview.

50.     Shamash emailed back to say Brooks should mention "low traffic use" and the use would be the "same as the location on Clinton Avenue." The reference to Clinton Avenue was to CCMS's existing location where CCMS runs a program to treat children, adults, couples, groups, and families, where there is a mental health diagnosis. The site does not treat patients with a substance abuse diagnosis. It also has no license or operating certificate to provide those services at that location.

51.     On January 14, 2020, CCMS's President and CEO Emory Brooks interviewed with individuals that included Nigel Shamash, Marc Paturet, F. Michael Conte, Maxime Touton, Joey Grill, and others. The individuals who interviewed Brooks are members of Defendant West 27th Street Realty, Inc. and all are Caucasian or Jewish.

52.     At that point, CCMS has already signed and delivered to Oxford Realty on December 18, 2019 a sublease in which the parties already agreed to the permitted use of the Premises: "Tenant shall use and occupy the demised premises for general offices, executive and administrative offices and for Tenant's counseling programs, including but not limited to mental health, all of the foregoing in connection with and in furtherance of Tenant's purposes and activities, **but excluding substance abuse counseling**." Oxford Realty cashed on December 30, 2019 the two checks from CCMS in the total amount of $125,000.00.

53.     There was no question before the Board interview that the agreed upon use excluded substance abuse counseling. There was no reason for Brooks to suddenly change what he agreed to do in the sublease, especially since CCMS had submitted to the NY OMH on December 18 a proposed use for the Premises that only involved treatment of emotionally disturbed children ages 2-7 and adults with a mental illness diagnosis but not substance abuse diagnosis.

54.     At the board meeting, Brooks discussed his early year's work as psychotherapist in Westchester and his work with predominantly Jewish Orthodox adolescent boys, which led him to

establish CCMS. He discussed CCMS's new plan for the Premises, which include psychoanalytic treatment of children ages two to seven years old.

55.     Brooks did not suggest or imply that CCMS was planning to administer substance abuse counseling at the Premises given that CCMS had already agreed in and signed the sublease **excluding substance abuse counseling** from the permitted use.

56.     During the interview, board member F. Michael Conte raised with Brooks, without any prompt or any context, the December 28, 2019 attack by an African American man on a group a people celebrating Hanukkah in Monsey, New York. The alleged attacker in Monsey was reported in the news as an African American man who was mentally ill and under medication. He allegedly attacked Orthodox Jewish man with a machete. Another board member raised the concern about CCMS's clientele may subject the building owner to lawsuits from other tenants and clients if anyone gets injured by a mentally ill client of CCMS, like what happened in Monsey. Board member Grill added that his clients (young models who come to his office) would be at risk from clients of CCMS.

57.     Brooks was caught off-guard by the board members' offensive comments, and thought that perhaps the reason they raised the issue was because CCMS is a predominantly African American organization, run by an African American President and CEO, and treats African American clients who have mental illness.

58.     The board members' comments about the Monsey attack and mental illness were out of context given that the sublease expressly prohibited CCMS from providing substance abuse counseling. Nobody discussed or raised the issue of drug treatment of adults or substance abuse during the meeting.

59.     Despite the board members' comments, Brooks expected that the Board would approve CCMS's tenancy.

60.     The day after the meeting, January 15, 2020, Oxford Realty's principal Saul Tawil (who

was not at the Board meeting) emailed King the following: "your tenants rep was an idiot." Tawil was referring to CCMS's Brooks, whom Tawil never met.

61.     On or about January 15, 2020, CCMS was told by King that the Board rejected CCMS as a tenant, and upon information and belief, the reason stated by the Board was Brooks's alleged statement at the meeting that CCMS would treat patients with substance abuse diagnosis or disorder. Of course, that was not true because CCMS had already signed a sublease in which it agreed not to provide substance abuse counseling at the Premises.

62.     On January 24, 2020, Lee emailed Harris to seek the return of the security deposit and first month's rent. Lee followed up with another email on January 28.

63.     Finally, Harris emailed back the following on January 28:

Per our conversation earlier today, I circled back to my client [Oxford Realty], and was advised that your client was interviewed for nearly an hour by the Coop Board. He responded, unequivocally, that the use for the premises would include substance abuse counseling. Allegedly Board members even followed up that it was not in the sublease use, but your client insisted it was part of the business, and the patients were good people.

Needless to say, my client was utterly humiliated at this meeting, and looked like an absolute liar to the Board. Considering we were not even willing to move forward with any sublease review, and only did so with the express, written, confirmation from you that the premises would not be used for substance abuse counseling by your client, which was obviously not the case, my client has been damaged.

As such, we would like to withhold $4,000.00 of the monies deposited with us, to compensate my client for damages, most notably, attorneys fees expended, in working on this sublease based upon your client's fraudulent representation. Let me now if you consent and I shall draw up a release for same. Thanks.

64.     Harris's email was the first time that CCMS learned of the basis for the Board's rejection of the sublease. The proffered reason – that Brooks insisted on providing substance abuse counseling in the Premises – was a pretext for the actual reason, which was the race of Brooks, his staff, and his clientele. Defendants did not want in the building an African American organization with African American clients.

65. On January 30, 2020, CCMS's counsel emailed a letter to Harris seeking, among other things, the reconsideration by the Board of CCMS's application to sublease the Premises. In response, Harris responded: "CCMS's representative expressly stated during a nearly hour-long meeting that it would be conducting substance abuse counseling at the premises."

66. Brooks deny that he insisted, suggested, or implied that CCMS will provide substance abuse counseling in the Premises. As President and CEO of CCMS, he agreed in the sublease (by signing the sublease himself) to exclude substance abuse counseling as a permitted use.

67. At no time before or during the Board meeting that Brooks insisted, suggested, or implied that CCMS will provide substance abuse counseling in the Premises.

68. As President and CEO of CCMS and prior to the Board meeting, he had already agreed in the sublease to exclude substance abuse counseling as a permitted use.

69. In addition, on December 18, CCMS had already informed the NY Office of Mental Health ("OMH") that CCMS may be relocating to 129 West 27th Street and would be administering a program for emotionally disturbed children ages 2-7 and adults with mental illness diagnosis but not substance abuse diagnosis. Based on his over 30 years of experience overseeing programs under OMH and OASAS[2] regulations, Brooks knew that a clinic may not administer programs for people with substance abuse diagnosis when that clinic caters to children ages 2-7. Keeping in mind his deep and broad knowledge of OMH and OASAS practice, Brooks could not have proposed or suggested to the Board to use the Premises for substance abuse treatment.

70. Defendants, including Oxford Realty, West 27th St. Realty LLC, and individual board members created the pretext of substance abuse counseling in order to discriminate against CCMS and its clientele on the basis of race.

---

[2] New York Office of Alcoholism and Substance Abuse

71.     The real reason for Defendants' rejection of CCMS's sublease is that they do not want African American minorities in the building. Board member F. Michael Conte said as much when he brought up to Brooks during the interview the Monsey machete hacker, who was African American and reportedly, was taking medication for mental illness. Equally, Grill commented on how his models visiting his offices could get injured by CCMS's clients with substance abuse disorder. Behind this pretext, Defendants were worried about African Americans coming in and out of the building.

72.     Upon information and belief, the Board had at the meeting a copy of the subleased signed by CCMS which specifically excluded substance abuse counseling. Thus, if the Board had any concern about Brooks mentioning or suggesting that the Premises would be used for substance abuse counseling, any member of the Board could have inquired about any inconsistency or raised any concerns at the meeting. But no concern was ever raised at the board meeting.

73.     While Shamash and Oxford Realty were interested in consummating the sublease with C.C.M.S., they went along with the Board's decision to unlawfully deny the sublease based on race.

CCMS's Injuries

74.     As a result of Defendants' actions described above, CCMS has been directly and substantially injured. After Defendants refused to rent and refused to lease the Premises to CCMS, CCMS had to remain in its present office past the termination date of December 31, 2019 and pay the holdover rate of 1.5 times the monthly rent of $17,500.00 for January 2020 and two times the monthly rent from February 2020 going forward. Specifically, CCMS paid $26,250.00 for January 2020, $35,000.00 for February; $35,000.00 for March; and $35,000.00 for April. But for the rejection of the sublease based on race, CCMS would have had to only pay $25,000.00 per month to Oxford Realty.

75.     As a result of Defendants' actions described above, CCMS incurred unnecessary

expenses for attorney's fees in negotiating the rejected sublease in the amount of at least $15,368.00 and attorney's fees related to the preparation of this action.

76.     As a result of Defendants' actions described above, CCMS incurred unnecessary expenses in installing phone and data services at the Premises in the amount of at least $8,124.00.

77.     As a result of Defendants' actions described above, CCMS incurred unnecessary expenses in hiring an architect to prepare a design for the Premises in the amount of at least $4,919.75.

78.     As a result of Defendants' actions described above, CCMS incurred unnecessary expenses in storing furniture specifically ordered for the Premises in the amount of at least $1,153.70.

79.     In doing the acts or omitting to act as alleged in this Complaint, each board member of Defendant West 27th Street Realty Inc. was acting in the course and scope of his actual or apparent authority pursuant to such agencies.

80.      Accordingly, CCMS has suffered injury; the amount of damages to compensate CCMS should be determined at trial.

## COUNT I
### Violation of 42 U.S.C. § 1981

81.     CCMS realleges and incorporates by reference each of the preceding paragraphs.

82.     The individuals CCMS serves – primarily African Americans – are members of a protected class pursuant to 42 U.S.C. § 1981.

83.     By their refusal to rent and refusal to sublease the premises at 129 West 27th Street to CCMS, Defendants intentionally discriminated against CCMS based on the fact that CCMS is run by an African American and the individuals that CCMS serves are primarily African American.

84.     By their refusal to rent and refusal to sublease the Premises to CCMS, Defendants have intentionally deprived CCMS of its right to make and enforce contracts because of race in violation of 42 U.S.C. § 1981.

85. As a result of Defendants' illegal refusal to rent and refusal to sublease the Premises to CCMS, CCMS suffered injuries.

86. Defendants' conduct was willful, wanton, malicious, and in reckless disregard for CCMS's rights.

**WHEREFORE, CCMS respectfully prays for judgment and relief including:**

(1) An injunction barring Defendants from denying any group or individual its right to make and enforce contracts on account of the group's or individual's race;

(2) An injunction directing Defendants to pay for an ongoing training program regarding discrimination in commercial real estate, with such program to be provided by an independent expert to Defendants' employees and agents for no less than three years;

(3) An injunction requiring that Defendants pay for monitoring for three years of their compliance with statutory prohibitions against racial discrimination;

(4) Actual damages from each Defendant in an amount to be determined at trial;

(5) Punitive damages from each Defendant in an amount to be determined at trial;

(6) CCMS's costs, expenses and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(7) Such other relief as this Court deems fair and equitable.

## COUNT II
### Violation of 42 U.S.C. § 1982

87. CCMS realleges and incorporates by reference each of the preceding paragraphs.

88. The individuals CCMS serves – primarily African Americans – are members of a protected class pursuant to 42 U.S.C. § 1982.

89. By their refusal to rent and refusal to sublease the Premises to CCMS, Defendant

intentionally discriminated against CCMS based on the fact that the individuals CCMS serves are primarily African Americans.

90.     By their refusal to rent and refusal to sublease the Premises to CCMS, Defendant have intentionally deprived CCMS and its clients of their right to lease real property in violation of 42 U.S.C. § 1982.

91.     As a result of Defendant' illegal refusal to rent and refusal to sublease the Premises to CCMS, CCMS and its clients suffered injuries.

92.     Defendant' conduct was willful, wanton, malicious, and in reckless disregard for CCMS's rights.

**WHEREFORE, CCMS respectfully prays for judgment and relief including:**

(1)     An injunction barring Defendant from denying any group or individual its right to lease real property on account of the group's or individual's race;

(2)     An injunction directing Defendant to pay for an ongoing training program regarding discrimination in commercial real estate, with such program to be provided by an independent expert to Defendant' employees and agents for no less than three years;

(3)     An injunction requiring that Defendant pay for monitoring for three years of their compliance with statutory prohibitions against racial discrimination;

(4)     Actual damages from each Defendant in an amount to be determined at trial;

(5)     Punitive damages from each Defendant in an amount to be determined at trial;

(6)     CCMS's costs, expenses and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(7)     Such other relief as this Court deems fair and equitable.

# DEMAND FOR JURY TRIAL

CCMS demands a trial by jury on all issues set forth in the above Complaint.

DATED:     New York, New York
           May 1, 2020

                            Loanzon LLP


                            /s/Tristan C. Loanzon
                            _____
                            Tristan C. Loanzon
                            1345 Avenue of the Americas, 2nd Fl.
                            New York, New York 10105
                            (212) 760-1515
                            tristan@loanzon.com
                            *Attorney for Plaintiff C.C.M.S.*