# EXHIBIT C

## Page 1

```
 2            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------------------x
     C.C.M.S. d/b/a COMMUNITY COUNSELING AND
 4   MEDIATION SERVICES,
 5                                   Plaintiff,
 6
          -against-
 7
 8            Case No: 1:20-cv-03429 (NRB)
 9
10   OXFORD REALTY & HOLDINGS LLC, WEST 27TH STREET
     REALTY, INC., MARC PATURET, JOSEPH GRILL, MAXIME
11   TOUTON, F. MICHAEL CONTE, NIGEL SHAMASH, and
     other similarly situated BOARD MEMBERS OF WEST
12   27TH STREET REALTY, INC.
13                                   Defendants.
     ----------------------------------------------x
14         EXAMINATION BEFORE TRIAL of the
15   Plaintiff, C.C.M.S. d/b/a COMMUNITY COUNSELING AND
     MEDIATION SERVICES, by EMORY BROOKS, taken by the
16
17   Defendants, pursuant to Notice, held at the offices
     of Abrams Garfinkel Margolis Bergson, LLP, 1430
18
19   Broadway, 17th Floor, New York, New York 10018, on
20   December 8, 2022, at 10:20 a.m., before a Notary
21   Public of the State of New York.
22
     ***************************************************
23
              ESQUIRE DEPOSITION SOLUTIONS, LLC.
24
25
```

## Page 2

```
 2   A P P E A R A N C E S:
 3     BAKER & HOSTETLER, LLP
              Attorneys for Plaintiff
 4            45 Rockefeller Plaza
              New York, New York 10111
 5            (212)589-4200
 6     BY:    TARA E. TURNER, ESQ.
              Tturner@bakerlaw.com
 7
 8
 9     ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
              Attorneys for Defendants
10            1430 Broadway, 17th Floor
              New York, New York 10018
11            (212)201-1174
12     BY:    BARRY G. MARGOLIS, ESQ.
              Bmargolis@agmblaw.com
13
14
15     BARCLAY DAMON, LLP
              Attorneys for Defendant
16            MARC PATURET
              1270 Avenue of the Americas, Suite 501
17            New York, New York 10020
              (212)784-5811
18
19     BY:    MICHAEL J. CASE, ESQ.
              Mcase@barclaydamon.com
20
21
22
23
24
25
```

## Page 3

```
 2            S T I P U L A T I O N S:
     IT IS STIPULATED AND AGREED by and between the
 3   attorneys for the respective parties herein, and in
     compliance with Rule 221 of the Uniform Rules for
 4   the Trial Courts:
     THAT the parties recognize the provision of Rule
 5   3115 subdivisions (b), (c) and/or (d).  All
 6   objections made at a deposition shall be noted by
     the officer before whom the deposition is taken,
 7   and the answer shall be given and the deposition
     shall proceed subject to the objections and to the
 8   right of a person to apply for appropriate relief
     pursuant to Article 31 of the C.P.L.R.;
 9
     THAT every objection raised during a deposition
10   shall be stated succinctly and framed so as not to
     suggest an answer to the deponent and, at the
11   request of the questioning attorney, shall include
     a clear statement as to any defect in form or other
12   basis of error or irregularity. Except to the
     extent permitted by CPLR Rule 3115 or by this rule,
13   during the course of the examination persons in
     attendance shall not make statements or comments
14   that interfere with the questioning.
15   THAT a deponent shall answer all questions at a
     deposition, except (i) to preserve a privilege or
16   right of confidentiality, (ii) to enforce a
     limitation set forth in an order of a court, or
17   (iii) when the question is plainly improper and
     would, if answered, cause significant prejudice to
18   any person. An attorney shall not direct a deponent
     not to answer except as provided in CPLR Rule 3115
19   or this subdivision. Any refusal to answer or
     direction not to answer shall be accompanied by a
20   succinct and clear statement on the basis
     therefore. If the deponent does not answer a
21   question, the examining party shall have the right
     to complete the remainder of the deposition.
22
     THAT an attorney shall not interrupt the deposition
23   for the purpose of communicating with the deponent
     unless all parties consent or the communication is
24   made for the purpose of determining whether the
     question should not be answered on the grounds set
25   forth in Section 221.2 of these rules, and, in such
      event, the reason for the communication shall be
```

## Page 4

```
 2   stated for the record succinctly and clearly.
 3   THAT the failure to object to any question or to
     move to strike any testimony at this examination
 4   shall not be a bar or waiver to make such objection
     or motion at the time of the trial of this action,
 5   and is hereby reserved; and
 6   THAT this examination may be signed and sworn to by
     the witness examined herein before any Notary
 7   Public, but the failure to do so or to return the
     original of the examination to the attorney on
 8   whose behalf the examination is taken, shall not be
     deemed a waiver of the rights provided by Rule 3116
 9   and 3117 of the C.P.L.R, and shall be controlled
     thereby; and
10
     THAT the certification and filing of the original
11   of this examination are hereby waived.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1
2    E M O R Y   B R O O K S,  the witness herein,
3    having been first duly sworn by a Notary Public of
4    the State of New York, was examined and testified
5    as follows:
6    EXAMINATION BY
7    MR. MARGOLIS:
8    Q.    State your name for the record, please.
9    A.    Emory Brooks.
10   Q.    State your address for the record, please.
11   A.    4 West 16th Street, Apartment 7B, New York,
12   New York 10011.
13   Q.    Good morning, Mr. Brooks.  My name is Barry
14   Margolis.  I'm with the law firm of Abrams
15   Garfinkel Margolis Bergson.  This is where you are
16   today, and we are the attorneys for West 27th
17   Street Realty, Inc., Joseph Grill, Maxime Touton,
18   F. Michael Conte in this proceeding.  Okay?
19   Sitting next to me is Michael Case; he's the
20   attorney for Mr. Marc Paturet.  Okay?
21   A.    Okay.
22   Q.    Have you ever been deposed before?
23   A.    Yes.
24   Q.    Okay.  And so in connection with the
25   deposition, you understand that you are testifying

Page 6

1              E. Brooks
2    under oath, correct?
3    A.    Yes, I do.
4    Q.    Okay.  And you understand that you need to
5    tell the truth in these proceedings, correct?
6    A.    Yes.
7    Q.    And with respect to this other deposition
8    that you identified as having participated
9    previously in, were you a party to that litigation?
10   A.    Yes.
11   Q.    Okay.  Were you the plaintiff or the
12   defendant?
13   A.    Defendant.
14   Q.    Okay.  And what was the nature of that
15   lawsuit?
16   A.    It was the accounting firm that was suing
17   us for nonpayment and he hadn't produced the body
18   of work that we had agreed to.
19   Q.    And when you said he was suing us, who is
20   the us that you are --
21   A.    C.C.M., the agency that I represent now.
22   Q.    Okay.  And when you say the agency C.C.M.,
23   is that the plaintiff in this lawsuit --
24   A.    Yes.
25   Q.    -- C.C.M.S.?

Page 7

1              E. Brooks
2    A.    Yes.
3    Q.    Okay.  Just some housekeeping between us as
4    far as the deposition is concerned.  It's very
5    important that you let me finish the question
6    before you answer because if we're talking at the
7    same time, the reporter cannot record both of us.
8    A.    Right.
9    Q.    So I would appreciate it if you just wait
10   until I finish, and then you can give your answer
11   and then we can keep moving.  And we'll try to
12   develop a little bit of rhythm so we can figure it
13   out.  But again, it's very important to keep the
14   record clear, that we not talk at the same time.
15   Okay?
16   A.    I understand.  Yes.
17   Q.    Thank you.  And that lawsuit, approximately
18   when was that lawsuit with your company?
19   A.    Okay.  It was in '06.
20   Q.    And did it resolve?
21   A.    Yes.
22   Q.    Was it resolved through a trial or through
23   a settlement?
24   A.    It was a trial.
25   Q.    Was the outcome in favor of the plaintiff

Page 8

1              E. Brooks
2    or the defendant?
3    A.    Both.  The out -- the outcome -- the
4    judge -- they ruled that we didn't have to pay the
5    accounting firm until they had completed the work.
6    They then completed the work, and we paid them and
7    that was the agreement.
8    Q.    Understood.  And where was, if you recall,
9    that litigation pending?
10   A.    Where.
11   Q.    Where?
12   A.    It's in Manhattan.
13   Q.    Do you know if it was in state court or a
14   federal court?
15   A.    I don't remember.
16   Q.    Do you remember the name of the judge?
17   A.    No.
18   Q.    Did you testify at the trial of that
19   lawsuit?
20   A.    Yes.
21   Q.    Okay.  Were you represented by counsel in
22   connection with that lawsuit?
23   A.    Yes.
24   Q.    Who was the lawyers that represented you?
25   A.    Tristan Loanzon.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
9–12

Page 9

E. Brooks

1
2 Q.    And he was the attorney that previously
3 represented you in this lawsuit, correct?
4 A.    Yes.
5 Q.    In connection with today's deposition, I'm
6 going to be asking you a series of questions.  If
7 you don't understand something that I'm asking you,
8 I'm going to ask for you to tell me that so I can
9 better rephrase the question for you.  Do you
10 understand?
11 A.    Yes.
12 Q.    Do you understand that if you answer the
13 question, it will be presumed that you understood
14 what I was asking you unless you tell me otherwise?
15 A.    Yes.
16 Q.    If you need to take a break, please let me
17 know that you need to take a break.  Of course,
18 everybody gets breaks for whatever reason they
19 might need.  The only caveat to that is that if
20 there's a question pending at the time that you
21 need the break, you need to provide your answer,
22 and then we can take the break.  Do you understand?
23 A.    I understand.
24 Q.    Thank you.  Please try to keep in mind that
25 in addition to us not talking over each other, that

Page 10

E. Brooks

1
2 you need to answer all of the questions verbally.
3 So if you -- shaking your head or saying things
4 like mm-hmm, those can't be recorded by the
5 reporter on the record.  So do you understand that
6 instruction?
7 A.    Yes.
8 Q.    What is your date of birth?
9 A.    9/26/1932.
10 Q.    Have you ever been convicted of a crime?
11 A.    No.
12 Q.    Do you have any problems reading, writing,
13 speaking, or understanding English?
14 A.    No.
15 Q.    Have you ever been, or you are now taking
16 any kind of medication that might impact your
17 ability to remember any type of events?
18 A.    No.
19 Q.    Have you ever or are you now taking any
20 type of medication that would affect your ability
21 to understand and answer any questions?
22 A.    No.
23 Q.    Are you taking any medication now or at any
24 time that might affect your ability to tell the
25 truth?

Page 11

E. Brooks

1
2 A.    No.
3 Q.    Have you ingested any drugs or alcohol in
4 the last 24 hours that would affect your ability to
5 testify here in any way today?
6 A.    No.
7 Q.    Did you prepare for today's deposition?
8 A.    No.
9 Q.    Did you speak to anybody in advance of
10 today's deposition?
11 A.    Other than -- my attorney.
12 Q.    So you spoke to your attorney?
13 A.    The attorney.
14 Q.    Okay.  For how long did you meet with your
15 attorney?
16 A.    For about five minutes.
17 Q.    Okay.  Did you review any documents in
18 preparation for today?
19 A.    Did I review any documents in preparation
20 for today, no.
21 Q.    Other than your discussion with your
22 attorney, did you discuss your attending today's
23 deposition with anybody else?
24 A.    No.
25 Q.    Other than the law --

Page 12

E. Brooks

1
2 A.    Can I correct something?
3 Q.    Of course.
4 A.    I informed my office that I was coming for
5 a deposition on this case.
6 Q.    Okay.  In terms of just where you would be?
7 A.    Yes.
8 Q.    Okay.  But in terms of discussing with your
9 office anything about today's deposition, did you
10 discuss that with anybody else?
11 A.    No.
12 Q.    Okay.  When was the last time you spoke
13 with Robert King?
14 A.    Yesterday.
15 Q.    Okay.  And what did you speak to Mr. King
16 about?
17 A.    Let me see if I can remember.
18       I had called him and asked him if he had
19 had any communication with Marc Paturet, president
20 of the board, and he said no.  Eighty percent of
21 his communications -- I'm sorry.  I'm answering
22 more than what you asked me.
23 Q.    But that's okay.  You can answer.
24 A.    Eighty percent of his communications were
25 with Nigel Shamash and Saul.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
13–16

Page 13

E. Brooks

1
2   Q.    Just so we can make sure we have the
3   correct names on the record --
4   A.    Yes.
5   Q.    -- when you said you called or you spoke
6   with Robert King about Marc, was that Marc Paturet?
7   A.    Paturet.
8   Q.    Okay.  And that's Mr. Case's client,
9   correct?
10  A.    Yes.
11  Q.    Okay.  And then when you mentioned that
12  Robert said he spoke mostly with Nigel and with
13  Saul, are you referring to Nigel Shamash?
14  A.    Yes.
15  Q.    Okay.  And Saul Tawil, T-A-W-I-L?
16  A.    Yes.
17  Q.    Okay.  Why did you call Robert King to ask
18  him about Marc Paturet?
19  A.    I wanted to know the answer to that.
20  Q.    But why was that important to you yesterday
21  to call him to ask him that?
22  A.    Well, I hadn't spoken to him in a few
23  weeks, and I wanted to see if he was available to
24  answer that.  And I had been -- I was aware that
25  the attorney would be here and would be asking me

Page 14

E. Brooks

1
2   questions.  And I was preparing.
3   Q.    What else did you discuss with Robert King?
4   A.    Nothing about this case.
5   Q.    Okay.  Do you have other dealings with
6   Mr. King?
7   A.    Yes.
8   Q.    Okay.  And what other dealings do you have
9   with Mr. King?
10  A.    Well, he's a broker in Manhattan, been
11  there 30 years.  And he has located other spaces
12  for us, looked for other spaces for us, and looked
13  for spaces for other agencies that are connected
14  with us.
15  Q.    And again, when you say us, do you mean --
16  A.    I'm sorry.  C.C.M.S.
17  Q.    C.C.M.S., the plaintiff in this lawsuit?
18  A.    Plaintiff.
19  Q.    Okay.  Again, let's try not to talk over
20  each other because we're talking at the same time.
21  Okay?  So just try to be mindful of that.
22  A.    Sorry.
23  Q.    I know it's not easy.
24        When was the last time you spoke to Nigel
25  Shamash?

Page 15

E. Brooks

1
2   A.    I've never spoken to him other than at the
3   meeting.
4   Q.    When you say at the meeting --
5   A.    At the board meeting on January 14th.
6   Q.    Okay.  So other than that, you had -- since
7   have not spoke with him?
8   A.    Right.
9   Q.    Okay.  Had you spoken with him before?
10  A.    No.
11  Q.    Had you emailed with him before?
12  A.    I think so.
13  Q.    Okay.  What about Saul Tawil, have you
14  communicated with him since -- at any point in
15  time?
16  A.    Only emails.
17  Q.    How about any members of the board of
18  directors of the West 27th Street entity, have you
19  spoken with any of them since the meeting?
20  A.    No.
21  Q.    And when I say the meeting, we're talking
22  about the January 14, 2020, meeting, correct?
23  A.    Right.  The answer is no.
24  Q.    Thank you.
25  A.    Mm-hmm.

Page 16

E. Brooks

1
2   Q.    Other than Ms. Turner, who's sitting next
3   to you, are there any other attorneys that you are
4   consulting with in connection with this manner?
5   A.    John Siegal at the same firm.
6   Q.    Okay.  He works with Ms. Turner?
7   A.    He's a supervisor.
8   Q.    He's a supervisor.
9         Other than Mr. Siegal, are you working with
10  any other attorneys in connection with this matter?
11  A.    No.
12  Q.    When was the last time that you spoke to
13  Mr. Siegal about this matter?
14  A.    Yesterday.
15  Q.    Okay.  And did you meet with Mr. Siegal?
16  A.    It was a telephone -- it was a Zoom
17  meeting.
18  Q.    Zoom meeting.  And how long did you spend
19  on the Zoom meeting with Mr. Siegal?
20  A.    About a half hour.
21  Q.    Did you review any documents in connection
22  with that meeting?
23  A.    Yes.
24  Q.    Okay.  What documents did you review?
25  A.    The minutes of the board meeting of January



COMMUNITY COUNSELING AND MEDIATION 30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022

17–20

E. Brooks

1
2  14th. The -- that was the document, one other
3  document. I had asked him --
4  Q.    I'm not going to ask you not to tell me --
5        MR. MARGOLIS: Thank you Tara.
6  Q.    Your attorney was just about to object. So
7  anything that you discussed with Mr. Siegal or that
8  he said to you or you said to him, that's
9  privileged. So that's a confidential communication
10 between you and your attorney. So I'm not asking
11 you to disclose anything like that --
12 A.    Okay.
13 Q.    Okay?
14 A.    All right.
15 Q.    So my question to you before was about just
16 the documents that you might have reviewed in
17 connection with that call. That's it.
18      So you started to tell me you reviewed the
19 minutes. And is there anything document-wise that
20 you can identify?
21 A.    Yes, the email -- an email from the
22 attorney for Nigel Shamash. That's Eton Harris.
23 The email that was sent indicating the basis for
24 the decision to reject us. I -- that was the
25 document. I'll wait for you to ask me anything

E. Brooks

1
2  else.
3  Q.    Thank you. Any other documents?
4  A.    No.
5  Q.    Have you ever met Mr. Siegal before to
6  discuss this case?
7  A.    No.
8  Q.    Had you ever met with Ms. Turner before the
9  five-minute call that you had with her yesterday?
10 A.    Yes.
11 Q.    How many times have you met with Ms. Turner
12 to discuss this case?
13 A.    Two times.
14 Q.    Prior to yesterday's call, when was the
15 last time you met with Ms. Turner?
16 A.    Prior to yesterday, I met with her on
17 Monday, this past Monday.
18 Q.    Okay. And how long did you meet with her
19 this past Monday?
20 A.    About four hours.
21 Q.    And where did you meet with her?
22 A.    In her office.
23 Q.    Okay. And in connection with that meeting,
24 did you review any documents?
25 A.    Yes.

E. Brooks

1
2  Q.    Okay. What documents did you review?
3  A.    The minutes of the meeting of January 14th,
4  the communication between another law firm,
5  Manatt -- okay, and it's Shamat [sic] or Harris,
6  around his email. We reviewed that document.
7  Q.    Okay. Before we continue about more
8  documents from your meeting with Ms. Turner, you
9  mentioned the Manatt law firm?
10 A.    Yes.
11 Q.    Okay. That's Manatt Phelps?
12 A.    Yes.
13 Q.    And what is the relationship between you
14 and that law firm?
15 A.    We've been clients of the law firm for
16 about 20 years.
17 Q.    Okay. And how are they in any way, if at
18 all, related to this dispute?
19 A.    They were consulted at following our --
20 being notified that C.C.M.S. was rejected by the
21 board because the board thought that we were
22 providing drug treatment and we consulted Manatt.
23 And they represented us in communicating to the
24 board, okay, evidence that we were not providing
25 drug treatment. And we had evidence, we could

E. Brooks

1
2  bring the state in to confirm that. So that being
3  the fact, and since that was the basis that you
4  rejected us, their letter asked to reconsider and
5  to please lease the space to us.
6  Q.    Okay. You said that that was the basis
7  that you rejected us. Okay?
8        MS. TURNER: Objection.
9  Q.    You can answer the question. I didn't ask
10 the question yet.
11      In your testimony just now you used the
12 word "you" rejected us. Who were you referring to?
13 A.    The board.
14 Q.    Okay. And when you say that was the basis
15 that the board rejected "us" meaning, I guess,
16 C.C.M.S.?
17 A.    Yes.
18 Q.    Who communicated that to you?
19 A.    The broker. The broker communicated that
20 to us, and the email that was sent to yet another
21 attorney, Diana Lee, okay, informing her -- she's
22 the attorney that handled the lease negotiation for
23 C.C.M.S. and the entity we're talking about. So
24 that was -- that was it.
25 Q.    Did you ever receive any direct



Page 21

E. Brooks

1          E. Brooks
2  communication from the board articulating the
3  reason why C.C.M.S. was rejected?
4  A.   No.
5  Q.   Did you ever speak to anybody from the
6  board to inquire as to whether and why it was that
7  C.C.M.S.'s lease or sublease was rejected?
8  A.   No.
9  Q.   Did you partic -- were you present when any
10  of the board members were discussing whether to
11  approve or reject the C.C.M.S. sublease?
12  A.   Towards the end of the meeting with our
13  participant, they started discussing the lease to
14  us and their concern whether or not the -- this was
15  the owner -- the shareholder that owned the co-op
16  for a model agency that was concerned with whether
17  or not their staff might be safe with our being in
18  the building.
19  Q.   So just to unpack that, you recall at the
20  end of the meeting the shareholder that owned the
21  space that was a modeling agency communicating some
22  concern about the safety of their employees?
23  A.   Yes.
24  Q.   Okay.  Other than that, were you present at
25  all while the board members were discussing amongst

Page 22

E. Brooks

1          E. Brooks
2  themselves whether to approve or reject the
3  sublease?
4  A.   No.
5          Can I --
6  Q.   Sure.  Go ahead.
7  A.   (Unintelligible.)
8          In addition to Touton, the owner of the
9  modeling agency, Mr. Conte, okay, had also in
10  relating the incident in Upstate New York where a
11  black man had attacked a synagogue, okay.  So he
12  presented that as a concern, and I was there.  So
13  those two are the two things.
14  Q.   Those are two examples of things that you
15  heard expressed by people at the meeting?
16  A.   Yes.
17  Q.   Okay.  When you say Touton or Touton, who
18  do you mean by that?
19  A.   Can I -- I'm told not to have any records
20  here.  The listing of the board members.
21  Q.   Okay.
22  A.   Or --
23  Q.   Okay.  I'll show you something at some
24  point.  But what I'm asking you is why did you
25  mention that person's name?

Page 23

E. Brooks

1          E. Brooks
2  A.   Because that person spoke out at the
3  meeting, and that person described his
4  organization, okay, and who -- that he had young,
5  attractive models working there and he was
6  concerned.  So that's why I mentioned it --
7  Q.   Okay.  So just to be clear, so your
8  testimony is that Mr. Touton is the person -- the
9  shareholder that owns the modeling agency who
10  expressed the things you testified to before?
11  A.   Yes.
12  Q.   Okay.  Could you describe Mr. Touton?
13  A.   No.
14  Q.   In any way?  Do you recall him -- as you
15  sit here today, do you recall him in any way?
16  A.   I recall -- couple of -- he was sitting a
17  couple of seats from me.  I recall just meeting
18  with him then, but I couldn't -- I probably
19  couldn't identify him if I was to walk out in the
20  hallway and he was out there.
21  Q.   Okay.  What about Mr. Conte?
22  A.   The same.
23  Q.   Do you know what Mr. Conte's business is
24  that he runs from the West 27th Street location?
25  A.   I thought it was insurance or something

Page 24

E. Brooks

1          E. Brooks
2  like that.  He's on the sixth floor.  But I'm not
3  for sure.
4  Q.   Okay.
5  A.   He chaired the meeting.
6  Q.   He chaired the meeting.  Okay.  Do you know
7  what his position is on the board?
8  A.   No.
9  Q.   Okay.  I'm going to come back to the board
10  meeting in a little bit.  We'll talk about that in
11  some greater detail.  But I want to go back to
12  the -- your testimony earlier about the lawsuit
13  with the accounting firm.  Is that the only lawsuit
14  that you have otherwise been involved in?
15  A.   Where I testified and had a deposition.
16  There were others.
17  Q.   Okay.  Other than where you testified and
18  there being a deposition, have you ever been a
19  party to any lawsuit?
20  A.   Yes.
21  Q.   Okay.  How many?
22  A.   About 12.
23  Q.   Twelve?
24  A.   About 12.
25  Q.   Okay.  So do you recall all 12?



Page 25

1              E. Brooks
2  A.    No.
3  Q.    Okay.  In connection with the 12 lawsuits,
4  were you the plaintiff or the defendant, if you
5  know?
6  A.    Defendant.
7  Q.    In all 12?
8  A.    I don't remember.
9  Q.    Okay.  Do you remember any of the lawsuits
10  in which you were a plaintiff?
11  A.    I don't remember the details.
12  Q.    Do you recall if there were any lawsuits in
13  which you were a plaintiff as a person?
14  A.    As a person?  Not the agency?
15  Q.    Not the agency.
16  A.    Oh, no.  There were no lawsuits where I was
17  a plaintiff.
18  Q.    Okay.  What about as a defendant?
19  A.    No.
20  Q.    Okay.  With respect to C.C.M.S. --
21  A.    Wait.  Can I correct that now?
22  Q.    Sure.
23  A.    In the lawsuits for another entity as a
24  plaintiff, they listed the agency C.C.M.S. but also
25  they list me as a president, so -- maybe you're

Page 26

1              E. Brooks
2  not -- I don't want to be inaccurate in terms of
3  saying no because we're listed as well.
4  Q.    Okay.  Just to make sure I'm understanding
5  what you're saying, in a lawsuit where C.C.M.S. was
6  listed as a defendant, you were also listed, your
7  name individually, as the president --
8  A.    Yes.
9  Q.    -- as a defendant?
10  A.    Yes.
11  Q.    Okay.  What is your highest level of
12  education, Mr. Brooks?
13  A.    I have a master's degree and 30 hours
14  towards a doctorate.
15  Q.    And what was your master's degree in?
16  A.    In social work.  I'm a licensed clinical
17  social worker.
18  Q.    Where did you obtain that master's degree?
19  A.    From Columbia University.
20  Q.    And in what year did you obtain that?
21  A.    1961.
22  Q.    And when did you obtain your license as a
23  clinical social worker?
24  A.    I think that was in 2004, I believe.  I'm
25  not sure of that.  I have to look at the license.

Page 27

1              E. Brooks
2  Q.    Okay.  So after you graduated from Columbia
3  with a master's degree, you were not a licensed
4  clinical social worker, correct?
5  A.    Correct.
6  Q.    What vocation or career did you pursue at
7  that point?
8  A.    I pursued social work.
9  Q.    And did you work as a social worker?
10  A.    Yes.
11  Q.    But you worked as a social worker as a
12  nonclinical licensed social worker, correct?
13  A.    I was not a therapist when I graduated.
14  Q.    Okay.  Is a licensed clinical social worker
15  also known as a therapist?
16  A.    Yes.
17  Q.    Okay.  And when you're a social worker and
18  not a therapist, what is the job that a social
19  worker does if they're not a therapist?
20  A.    Well, take my job.  When I graduated from
21  Columbia, I worked at Manhattan General Hospital
22  drug treatment program.  I was the administrator
23  and director of social services.  So the role that
24  a non-therapist provides can be providing social
25  services to individuals and to families and

Page 28

1              E. Brooks
2  children.  This was a detoxification unit, and I
3  was immediately placed in charge of it.
4  Q.    And what was the name of the hospital?
5  A.    Manhattan General Hospital.
6  Q.    Manhattan General Hospital.
7  A.    General.  It was a private proprietary
8  hospital, and it was later bought by Beth Israel.
9  So it's a part of the Beth Israel now.
10  Q.    Understood.  Okay.  And when did you become
11  affiliated with C.C.M.S.?
12  A.    Well, okay.  To answer what you asked, I
13  was the founder, me and my wife -- me and my late
14  wife were the founders of C.C.M.S. in 1982.  We
15  created it.
16  Q.    Okay.  And what was -- prior to your
17  creation of C.C.M.S., what were you doing?
18  A.    Okay.  I was at Manhattan General Hospital
19  for four years, and then I transferred to Hawthorne
20  Cedar Knolls School which was the residential
21  treatment facility for young people under the
22  Jewish Board of Guardian.  That was the agency
23  where I worked for 12 years as a therapist, a
24  clinical supervisor, and as an administrator of a
25  boys unit.



Page 29

E. Brooks

1
2  Q.    Of a what kind of unit?
3  A.    For young boys.
4  Q.    Oh, a boys unit.
5  A.    Boys unit.  A mixture between Orthodox
6  Jewish youngsters and other youngsters from New
7  York City.  After that I then -- that's when I
8  learned all of the things that's involved in
9  running an agency since it was -- so I left there,
10  and then I went to Queens as a deputy director of
11  an agency, Queensboro --
12          (Reporter clarification.)
13  Q.    You have to slow down for the reporter, and
14  it's difficult to understand you.  So you said you
15  went to Queens?
16  A.    Yes.
17  Q.    To an agency.
18  A.    To another agency.
19  Q.    And you gave its name, which I couldn't
20  understand either.
21  A.    Queensboro Society --
22  Q.    Queensboro Society.
23  A.    -- for the Prevention of Cruelty to
24  Children, QSPCC.
25  Q.    Got you.  Okay.  And what did you do there?

Page 30

E. Brooks

1
2  A.    I was a deputy director, the director of
3  residential programs.
4  Q.    And how long were you there?
5  A.    I was there from '65 -- two years.
6          (Reporter clarification.)
7  Q.    Okay.  And where did you go after the
8  Queensboro agency?
9  A.    From there I started C.C.M.S.
10  Q.    Okay.  And what does C.C.M.S. stand for?
11  A.    Community Counseling and Mediation
12  Services.
13  Q.    And what is the business -- well, what was
14  the business of C.C.M.S. when you created it?
15  A.    It was -- it was mental health, social
16  services, after-school programs for children.  That
17  was -- that was the programs that we were involved
18  in administering.  Well, let me say, the mental
19  health clinics came a couple of years later.  But
20  the startup -- the startup was social services.
21      The first contract -- I'm sorry.  I'm
22  talking too fast.  The first contract was a
23  prevention program to prevent abuse to children.
24  That was the first program that was funded by the
25  government that in a sense allowed the agency to

Page 31

E. Brooks

1
2  have funds to start.
3      The -- my experience had been in terms of
4  diversity.  So we immediately applied for a
5  license, an Article 31 license to operate a
6  clinic -- outpatient clinics, okay.  In about 18
7  months we got that.  And so the clinics were added,
8  okay.  So as 10 years later we added housing,
9  supportive housing.
10  Q.    When you say you added supportive housing,
11  what is supportive housing?
12  A.    Supportive housing is housing programs for
13  homeless, mentality ill people.  And we've
14  developed four of them now.  We have four now, and
15  two are in the process of -- three -- two are in
16  the process of being developed here; one for
17  seniors with an urban farm and one in China, a
18  housing program that's on hold right now based on
19  the pandemic.
20          (Reporter clarification.)
21  Q.    When you said the clinics were added
22  subsequent to the formation of C.C.M.S., were
23  those -- what was the type of therapy that the
24  clinics were offering?
25  A.    Therapist, the treatment that was offered

Page 32

E. Brooks

1
2  was for any individual with a psychiatric
3  diagnosis.  You had to have -- this is an Article
4  31 clinic, the same clinic that we operated in
5  Manhattan for 27 years, and the -- this is the
6  entity that we needed space for.
7  Q.    When you say the entity that you needed
8  space for, what are you referring to?
9  A.    Clinic.
10  Q.    The clinic.
11  A.    A Manhattan clinic.
12  Q.    A Manhattan clinic?
13  A.    Yes.
14  Q.    Okay.  And when you said it involves -- the
15  treatment was for anyone with a psychiatric
16  diagnosis?
17  A.    Yes.
18  Q.    And did that include any type of drug
19  treatment therapy?
20  A.    No.
21  Q.    Okay.  Has C.C.M.S. been involved in any
22  drug treatment therapy?
23  A.    Yes.
24  Q.    Okay.  When did that happen?
25  A.    I don't have the license in front of me,



E. Brooks

but we got a license -- this license comes from OASAS and not the Office of Mental Health. So we have a license to provide drug treatment, and we have also a satellite license. So in -- in our five clinics, two of them are also licensed to provide drug treatment.

Q. So in 2019, when you were looking to sublet space --

A. Yes.

Q. -- in the West 27th Street co-op at that time, did C.C.M.S. have all its -- the current licenses that it currently has?

A. Did we have -- say it again?

Q. In 2019 --

A. Yes.

Q. -- when you were pursuing a sublease at the West 27th Street property, did you then have the clinic licenses or the therapy licenses that you currently have?

A. Yes.

Q. Okay. And those licenses included both mental health treatment and drug treatment, correct?

A. Yes. Can I add?



E. Brooks

Q. Sure.

A. Drug treatment, mental health treatment in several locations, both -- both provided in the same setting.

Q. Okay. Is it typical that people that -- that there's crossover between the patients needing both mental health and drug treatment?

A. Yes.

Q. Other than your -- and again, I apologize if I'm inverting the words, whether it's licensed clinical social worker, which I think that's what it is -- withdrawn.

Other than the license that you hold as a clinical social worker, do you hold any other licenses?

A. No.

Q. How many people are employed by C.C.M.S. currently?

A. About 300.

Q. And back in 2019 when you were pursuing the sublease at West 27th Street, how many people were employed by C.C.M.S.?

A. Around the same. Same number. Around 290 to 300, somewhere in that range.



E. Brooks

Q. And with respect to the sublease for the West 27th Street property, how many people were expected to be working for C.C.M.S. at that location?

A. The same as -- that works at the prior location there which was about 15 (unintelligible). We had 14 -- 12 to 14 offices in the prior place four blocks away. And this site, 27th Street, had the 12 individual interviewing rooms, which that's what made it attractive. So to answer your question, 15 -- maybe about 18 therapists because more than 15 can occupy the 12 offices since some are part-time. Most are full-time. So the clinic director -- so about 18 -- 18 people would be working in the clinic.

Q. Okay. Are they all therapists?

A. No. Of the 18, 15 would be licensed -- no, not as many as that. Let's say 12 -- 12 would be licensed, then some administrative people, and there's some interns. We take interns from 20 universities across the country including the ones right here in New York City, Hunter, Columbia, NYU. So they have placement with us for their internships. So they're then supervised and



E. Brooks

trained by a licensed person -- licensed clinician.

Q. Okay. So inclusive of the therapists, the administrative people, and the interns that might have been doing work at C.C.M.S., what was the anticipated head count for people to be working at the West 27th Street location?

A. Well, the clinic that this was replaced -- that was moving, okay, keep in mind we essentially were moving an adult clinic from 31st Street four blocks away, and it served 330 different clients, patients. So the roster was 330 patients. So we'd be moving those 330 as it was to a new location.

Q. Okay. So about 330 patients --

A. Yes.

Q. -- that were treated at the prior location were anticipated to be treated at the West 27th Street location?

A. Yes.

Q. Other than patients, how many C.C.M.S. personnel, whether they be therapists, administrative, or interns, were expected to be on site except -- not including the patients, at the West 27th Street property?

A. Am I allowed -- can I write down just some



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                          37–40

Page 37

E. Brooks

1  numbers?
2  A.    Yes.
3  Q.    If that would help you calculate it, then
4  feel free to use your notepad to help you calculate
5  it.
6  A.    Okay.
7  Q.    And while you are doing that, we'll go off
8  the record and I'm going to ask my colleagues to
9  try to be a little more quiet outside, okay?
10        (Whereupon, a discussion was held
11        off the record.)
12  A.    There's 14 therapists, one --
13  Q.    Slow down.  The reporter is taking down
14  what you're saying.
15  A.    Okay.  About 14 therapists, one director,
16  also therapist, the director's a -- treats as well,
17  two receptionists, two interns, one psychiatrist,
18  and nurse practitioner, over course of a week -- so
19  this is -- it's one FTE.  So that's twenty people.
20  Q.    Okay.  And what does FTE mean?
21  A.    Full-time equivalent.
22  Q.    Full-time equivalent.  Okay.  So 20 people
23  altogether?
24  A.    Yes.
25  Q.    Thank you.  Are you employed by C.C.M.S.?

Page 38

E. Brooks

2  A.    Yes.
3  Q.    And what kind of entity is C.C.M.S.?
4  A.    It's nonprofit.
5  Q.    Is it a nonprofit organized under New York
6  State law?
7  A.    Yes, 501(3)(c).
8        (Reporter clarification.)
9        THE WITNESS:  A 501(3)(c).
10       MR. MARGOLIS:  A 501(c) company.
11  Q.    Who are the shareholders of the 501(c)?
12  A.    There's no shareholders.  The board of
13  directors.
14  Q.    Who are the members of the board of the
15  501(c)?
16  A.    Want me to give you the names?
17  Q.    Yeah.
18  A.    Okay.  Russell Shuler, S-H-U-L-E-R, LaWanda
19  Jackson, L-A, capital W, A-N-D-A Jackson, Annette
20  Smith, Cassandra Underdue.
21        (Reporter clarification.)
22        THE WITNESS:  U-N-D-E-R-D-U-E.
23  Q.    And in 2019 when you were negotiating a
24  sublease, was it the same members of the board of
25  directors?

Page 39

E. Brooks

2  A.    Yes.
3  Q.    Who other than --
4  A.    Wait.  I'm sorry.  And there was one I left
5  off.  That's Jean Goossen.  In 2019 she died.  Jean
6  Goossen, G-O-O-S-S-E-N.  She was on the board then.
7  Q.    And when did she pass away?
8  A.    In '20, in 2020.
9  Q.    After the interview or before the
10  interview?
11  A.    I don't remember.  I'll have to check.
12  Q.    Okay.  We'll just leave a blank in the
13  transcript and when you get your opportunity to
14  review the transcript, you'll check and then you
15  can insert the date.  Okay?
16  A.    Thank you.
17  (INSERT)                                    .
18  A.    Thank you.
19        You had indicated that you were moving your
20  operations that were four blocks away into the West
21  27th Street premises.
22  A.    Yes.
23  Q.    What was the address where before -- that
24  you were occupying and then intending to leave to
25  move to West 27th Street?

Page 40

E. Brooks

2  A.    115 West 31st Street.
3  Q.    Okay.  And do you know if C.C.M.S. was a
4  tenant or a subtenant in that premise?
5  A.    Both.
6  Q.    So explain that to me, how you were both a
7  tenant and a subtenant.
8  A.    Keep in mind that we were there for 27
9  years, since 1995.  We had sublet from -- Women in
10  Need owned the building.  That's another social
11  service organization.  They owned the building and
12  they leased the fifth floor to us.  Then at some
13  point, they then sold the building.  And the new
14  owners -- we had a regular lease with the new
15  owners.
16  Q.    When you say you had a regular lease with
17  the new owners, did you not have --
18  A.    We were the tenants.  We were the tenants.
19  Q.    Right.  But were you not tenants of the
20  entity that first owned the building?
21  A.    We were -- we leased subtenants.  I'm not
22  for sure of that.  I'll get you the lease.  It just
23  felt a little bit different.  They -- maybe.  I
24  know what.  I'm sorry.  Let me correct this.  They
25  were leasing the building -- leasing the building.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
41—44

Page 41

E. Brooks

1
2 So then they then leased a floor of the building to
3 us.
4 Q.    Okay.  So I understand correctly, the
5 entity that you were leasing from was themselves a
6 tenant that was leasing the building from somebody
7 else?
8 A.    Yes.
9 Q.    Okay.
10 A.    I'm sorry.  I was confused.
11 Q.    And were they leasing the whole building?
12 A.    Yes.
13 Q.    Okay.  And do you know who that owner was
14 that they were leasing the building from?
15 A.    No, without going and checking the lease.
16 Q.    But you have a copy of that lease?
17 A.    Yes.
18 Q.    Okay.  And do you have a copy of your
19 sublease?
20 A.    Yes.
21       MR. MARGOLIS:  I'm going to call
22       for the production of those leases.
23 Q.    The building -- remind me again, it was
24 31st Street?
25 A.    115 West 31st Street.

Page 42

E. Brooks

1
2 Q.    Thank you.  The West 31st Street premises,
3 was that a co-op or was it just a building that was
4 owned by an entity or somebody and then there were
5 various tenants leasing premises there?
6 A.    I don't know.  It's easy to check.
7 Q.    When you say it's easy to check, how is
8 that?
9 A.    I'll go back to the leases and look into
10 the formulation of the lease and the description of
11 it.
12 Q.    Okay.  As you sit here today, because your
13 attorney is going to provide me with a copy of
14 those leases, and I'll review them as well and have
15 a better understanding.  But I'm asking you as you
16 sit here today, do you know if the premises at 31st
17 Street were a co-op -- was a co-op?
18 A.    I don't know.  I don't know.
19 Q.    Do you recall in connection with the West
20 31st Street premises whether or not there was a
21 document known as a proprietary lease involving any
22 of the parties?
23 A.    Let me -- I think that there was just one
24 owner of the building.
25 Q.    And then the agency that you leased from

Page 43

E. Brooks

1
2 was one tenant?
3 A.    Yes.
4 Q.    And then there were -- were there other
5 subtenants other than C.C.M.S. in the building?
6 A.    I don't think so.  I think Women in Need
7 occupied about three or four floors for that
8 agency, okay, and then they leased the one floor to
9 us.  And I'm not for sure.  It's a small building.
10 I'm not for sure if there was any other tenant in
11 the building.
12 Q.    Are they still in business, Women in Need?
13 A.    Yes.
14 Q.    Do you know if they still occupy that
15 space?
16 A.    Oh, no.  They moved out of the space there.
17 Q.    Where are they now located?
18 A.    I don't know offhand where they are.  They
19 run shelters, and they have some offices out in
20 East New York.  Where the headquarters is, I don't
21 know.
22 Q.    How many other locations does C.C.M.S. rent
23 other than --
24       Withdrawn.
25       At the time in 2019 when you were

Page 44

E. Brooks

1
2 negotiating a sublease of West 27th Street
3 property, how many other premises did C.C.M.S.
4 occupy?
5 A.    Am I able to get a document that lists --
6 can I get my little brochure that lists all of the
7 sites?
8 Q.    Wait.  Let me ask you this.  Is there some
9 document that you have that will refresh your
10 recollection as to the location?
11 A.    Yeah.  That's what I want to just get right
12 here in my own bag.
13 Q.    Okay.  So you can --
14 A.    Can I get that?
15 Q.    Yes, you can retrieve that.
16       THE WITNESS:  Say yes, please,
17       Tara.
18       MS. TURNER:  If you don't know the
19       answer, you need to say you don't know.
20       THE WITNESS:  (Retrieving
21       document.)
22 Q.    So just for the record, you are referring
23 to a brochure --
24 A.    Yes.
25 Q.    -- that you retrieved from your briefcase?



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                              45–48

Page 45

1              E. Brooks
2   A.   Yes.
3   Q.   And what is that a brochure for?
4   A.   This is the main office brochure that lists
5   all of our locations and they have -- and the name
6   of the -- what it is, and that would help me to be
7   able to answer your question.
8   Q.   Okay.  So first and foremost, let's have
9   this marked by -- can we mark this by the reporter?
10  A.   Yes.
11       MR. MARGOLIS:  Okay.  So why don't
12  we have this marked as Defense Exhibit A.
13       (Defendants' Exhibit A, brochure, was
14  marked for identification.)
15  Q.   Mr. Brooks, I'm showing you what we've
16  marked as Exhibit A, and on the back there are a
17  bunch of addresses.
18  A.   Yes.
19  Q.   Okay.  And is it fair to say those are all
20  locations where C.C.M.S. renders services?
21  A.   Yes.
22  Q.   Okay.  Can you give that back to me for a
23  moment?
24  A.   Sure.
25  Q.   Thank you.  Now, in 2019, were these all

Page 46

1              E. Brooks
2   the locations that C.C.M.S. had offices or provided
3   services from?
4   A.   Okay.  Let me just see if these have been
5   updated or reflects those.
6        The answer is no.  Two of the locations
7   that are listed here are locations that are about
8   to occur.  Okay.  Let me just look at which are the
9   ones that we had in 2019.  Okay.
10       The 13 locations that we had in 2019, and
11  this should be 13.
12  Q.   Okay.  And what are the two locations that
13  are reflected on the brochure that are future
14  locations?
15  A.   Two new housing program.
16  Q.   Okay.  And what are they?
17  A.   Jean's Place and Jackson's Place.
18  Q.   Okay.  Can I have that back, please?
19  A.   Sure.
20  Q.   Thank you.
21       Now, on this brochure I see a Manhattan
22  clinic at 15 West 39th Street?
23  A.   Yes.
24  Q.   Did that replace the 31st Street premise?
25  A.   Yes.

Page 47

1              E. Brooks
2   Q.   So this is updated since 2020?
3   A.   Yeah.  I shouldn't have said that one, but
4   that happened -- okay.
5   Q.   Okay.  When did 15 West 39th Street second
6   floor start operations?
7   A.   In 2020 around -- around July -- around
8   September of 2020, it needed some renovations.  But
9   we found that space right after the rejection.
10  Q.   Okay.  And how long did you stay in the
11  West 31st Street premises after you obtained the
12  rejection from West 27th Street?
13  A.   From January, because the lease had expired
14  in December.  So from January 2020 to whatever the
15  date is, I can get the date, in late 2020 when we
16  moved.  So that's eight or nine months.  If you
17  want an exact one, I can check to get that -- look
18  at the lease from when we started.
19  Q.   Okay.  So you have a lease at 15 West 39th
20  Street?
21  A.   Yes.
22  Q.   And that's the lease that you entered into
23  to replace the West 31st Street premises, correct?
24  A.   Yes.
25       MR. MARGOLIS:  I'm going to call

Page 48

1              E. Brooks
2   for production of the West 39th Street
3   lease as well.
4   Q.   Okay.  This is now part of the record so
5   we're going to leave this here.  Is that okay?
6   A.   I got 50 of them, yes.
7   Q.   Okay.  So with respect to the locations
8   that are referenced --
9        Withdrawn.
10       The 15 West 39th Street building that you
11  moved to, is that a co-op?
12  A.   Yes.
13  Q.   Okay.  And --
14  A.   Wait now.  Wait now.  Let me -- I answered
15  too fast.  I don't think so.
16  Q.   Okay.  But the lease might -- will the
17  lease describe what the arrangement is with that --
18  A.   Yes.
19  Q.   -- premise?
20  A.   Yes.
21  Q.   Okay.  With respect to any of the other
22  locations that are referenced on the back of
23  Exhibit A, are any of those premises co-ops?
24  A.   Let me look and see.
25       No.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
49–52

Page 49

E. Brooks

1
2  Q.   Prior to your negotiations to sublease the
3  premises at West 27th Street, had C.C.M.S. had any
4  locations at any buildings which were co-ops?
5  A.    I don't think so.
6  Q.    Mr. Brooks, do you live in a private home,
7  rental apartment, co-op apartment, or something
8  else?
9  A.    Co-op.
10  Q.    And where -- so the building for the
11  address that you identified for the record at the
12  beginning of the transcript is a co-op?
13  A.    Yes.
14  Q.    And how long have you lived in that co-op?
15  A.    Twenty-five years.
16  Q.    And have you ever served on the board of
17  directors of that co-op?
18  A.    No.
19  Q.    Have you ever served --
20       Withdrawn.
21       Do you own any other co-ops?
22  A.    No.
23  Q.    Other than the co-op that you've lived in
24  for, I think you said 25 years --
25  A.    Twenty-five years.

Page 50

E. Brooks

1
2  Q.    -- have you ever lived in any other co-op?
3  A.    No.
4  Q.    How about condominium, have you ever lived
5  in a condominium?
6  A.    No.
7  Q.    Have you ever served on the board of a
8  condominium?
9  A.    No.
10  Q.    In connection with any businesses that
11  you've been affiliated with, have you ever leased
12  any premises from a co-op?
13  A.    I don't remember.  I don't know.
14  Q.    What about from a condo?
15  A.    I don't remember.
16  Q.    What is your understanding of -- well, are
17  you familiar with the name Oxford Realty &
18  Holdings, LLC?
19  A.    Yes.
20  Q.    Okay.  What do you understand that entity
21  to be?
22  A.    It's the brokerage firm that Nigel Shamash
23  and Saul Tawil are involved in.  They have some
24  connection with that, and I think that's the entity
25  that might own the two floors in this building, 7th

Page 51

E. Brooks

1
2  and 8th floor.
3  Q.    And just so we're clear, when you say "in
4  this building," you mean West 27th Street?
5  A.    West 27th Street.
6  Q.    Okay.  No.  That's okay.
7       I understand -- I understand what you're
8  saying.
9       So I just want to make it clear --
10  A.    On the record.
11  Q.    -- for the record.
12       So it's your understanding that the Oxford
13  entity that I just mentioned is the owner of the
14  floors in West 27th Street, correct?
15  A.    Yes.
16  Q.    When you say they're owners of the floors,
17  what do you mean by owners?
18  A.    The minutes list this, but it was my
19  understanding -- recent understanding -- it
20  wasn't my -- initially I understood Nigel owned --
21  was a co-op owner himself of the -- himself, was
22  the co-op owner of the 7th floor.  And Saul was the
23  owner of the 8th floor.  That was my understanding.
24  Q.    Okay.  But there came a time that you
25  understood it differently?

Page 52

E. Brooks

1
2  A.    Yes.
3  Q.    Okay.  And how did you come about
4  understanding it differently?
5  A.    When I -- even a little bit prior to the
6  minutes, because the minutes -- well, I think I
7  just went on Google and looked at it.  And it
8  revealed that the owner of the 7th floor was the
9  Oxford Realty.
10  Q.    And the 8th floor as well?
11  A.    Yes.
12  Q.    Okay.
13  A.    I'm not for sure on the 8th floor.  I don't
14  know if I checked that.
15  Q.    And when you say the minutes, are you
16  referring to some sort of documents that were
17  produced in this litigation?
18  A.    Yes.
19  Q.    Okay.  So the minutes that you're referring
20  to having reviewed, those were something that you
21  obtained in connection with this litigation,
22  correct?
23  A.    Yes.
24  Q.    Okay.  And when you say that you looked on
25  Google and determined that Oxford was the owner of



Page 53

E. Brooks

1  the 7th floor, what do you understand them to own?
2  A.    Oxford?  To own the 7th and the 8th floor.
3  I'm not for sure if Nigel or Saul owned the real
4  estate agency.  But they -- as owner, they were the
5  ones that we dealt with in terms of owning the
6  co-op and the shareholders -- as shareholders.
7  Q.    Okay.  So just to clarify, did you
8  understand them to be owners or shareholders?
9  A.    Two shareholders.  Shareholders.
10  Q.    And what did you understand they were
11  shareholders of?
12  A.    The 7th and the 8th floor.
13  Q.    Okay.  But do you understand -- what are
14  shareholders, if you know, in the context of a
15  corporation?
16  A.    But in terms of what I was interested in,
17  the shareholders has a vote, has a vote on what
18  happens to the co-op that they have -- shareholder
19  of.
20  Q.    And when you -- so in connection with this
21  particular --
22          Withdrawn.
23          What did you understand Oxford to be a
24  shareholder of?

Page 54

E. Brooks

1  A.    From day one when we -- when our broker met
2  with Nigel in terms of presenting a potential
3  client, okay, he presented us in terms of needing
4  space for a clinic, and Nigel said to him,
5  according to Bob, okay, that he has five votes.  He
6  has two, he and Saul, and the president or Marc
7  Paturet, whatever his name is, has three floors.
8  And so they support one another.  So from day one
9  they said we have five votes, and we need six to
10  approve the lease.
11  Q.    Okay.  Now, this was communicated to you by
12  Robert?
13  A.    Yes.
14  Q.    Okay.  So just so we're clear, so I
15  understand what you're saying, when you were
16  discussing matters with Oxford, Nigel.  Your broker
17  had communicated to you that Oxford had two votes
18  and that the president, Marc Paturet, had three
19  votes, and that you needed a total of six votes,
20  correct?
21  A.    That was -- yes.
22  Q.    Now, when you -- when Robert communicated
23  this to you that there were six votes, what was the
24  total amount of votes that were out there, meaning

Page 55

E. Brooks

1  six out of what, if you knew?
2  A.    I think he said there were 12 co-ops.  He
3  said there were 12 co-ops and six votes were
4  needed.
5  Q.    So Robert told you you needed six votes?
6  A.    Yes.
7  Q.    Okay.  When Robert communicated this to
8  you --
9  A.    This was an email, and verbally.
10  Q.    Okay.  When he communicated this to you in
11  an email and verbally, did you ask to see any of
12  the corporate documents to verify what he was
13  communicating to you about these votes?
14  A.    No.
15  Q.    Did you ever review any documents,
16  corporate documents to verify what votes were
17  needed to approve a sublease?
18  A.    No.
19  Q.    If I told you that under the corporate
20  documents of West 27th Street, shareholders have no
21  right to vote on the approval of a sublease, would
22  you be surprised to hear that?
23  A.    I would be very surprised.
24  Q.    Are you familiar with the sublease approval

Page 56

E. Brooks

1  provisions in the corporate documents of the West
2  27th Street entity?
3  A.    Say it again.
4          MR. MARGOLIS:  Can you read that
5          back.
6          (Whereupon, the record was read by
7          the reporter.)
8  A.    I would hate to say -- I've seen it but do
9  I clearly understand it?  No.
10  Q.    When you say you've seen it, where did you
11  see it?
12  A.    I've seen a copy of the proprietary lease,
13  okay, for 27th Street, and my understanding is that
14  it stated that the shareholders have a vote.
15  Q.    Did you ever review the bylaws of the West
16  27th Street entity?
17  A.    Yes.
18  Q.    Does it provide anything in there about
19  voting?
20  A.    I was confused about understanding the
21  bylaws.
22  Q.    Okay.  How about the certificate of
23  incorporation, have you reviewed that for the West
24  27th Street entity?



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                          57—60

Page 57

E. Brooks

1
2   A.    No.
3   Q.    When you say you reviewed the proprietary
4   lease, when did you review the proprietary lease?
5   A.    I don't remember when, but I've reviewed it
6   even prior to it being available on discovery,
7   okay.  I had already seen that --
8   Q.    Did you see it before you had your
9   interview?
10  A.    I don't think so.
11  Q.    Had you reviewed the bylaws of the West
12  27th Street entity before the interview?
13  A.    They weren't available, no.
14  Q.    When you say they were not available, why
15  were they not available?
16  A.    We'd been begging for them.  They didn't
17  release them.
18  Q.    Okay.  Who begged for them?
19  A.    The -- Tristan Loanzon, the attorney we
20  used in the to initiate the litigation and Tara had
21  asked for them.
22  Q.    I'm asking you before the interview, okay,
23  going back to 20 -- not the lawsuit --
24  A.    Mm-hmm.
25  Q.    -- I'm asking you before the interview, had

Page 58

E. Brooks

1
2   you reviewed the bylaws?
3   A.    No.
4   Q.    Had you asked for them before the
5   interview?
6   A.    I don't remember.
7   Q.    Did you -- had you reviewed the proprietary
8   lease for -- between the co-op and any of its
9   shareholders prior to the interview?
10  A.    No.
11  Q.    Had you reviewed the certificate of
12  incorporation of the co-op prior to the interview?
13  A.    No.  Can I elaborate?
14  Q.    No.
15  A.    Okay.
16  Q.    How were you introduced to the Oxford
17  Holdings entity?
18  A.    How was I introduced?
19  Q.    Yes.
20  A.    Through email, Bob King -- Bob King told
21  me, you know, in email.  But I have to say, it
22  really had no relevancy.  We had no idea that -- we
23  had no reason to think that there was any problem,
24  that this was routine.
25  Q.    Okay.  But that's not --

Page 59

E. Brooks

1
2   A.    There was not no basis for checking on this
3   or that.
4   Q.    Okay.  I understand.
5   A.    Okay?
6   Q.    But my question is a little bit more simple
7   than what you just communicated.  I just wanted to
8   know how you found out about the space at Oxford
9   Holdings.
10  A.    From the broker.
11  Q.    Okay.
12  A.    From the broker.
13  Q.    Okay.  And so the broker is Robert King,
14  right?
15  A.    Yes.
16  Q.    And he told you that there was a location
17  available on West 27th Street, and therefore -- and
18  introduced you to the people that controlled those
19  premises, correct; is that fair to say?
20        MS. TURNER:  Objection.
21  Q.    You could answer.
22  A.    He was introducing me to the landlord of
23  the space that we were interested in.
24  Q.    And who was that landlord?
25  A.    Nigel.

Page 60

E. Brooks

1
2   Q.    Okay.  Again, Nigel Shamash?
3   A.    Nigel Shamash.
4   Q.    So if we talk about Nigel, let's keep it
5   simple so you don't have to use last names.
6   Anytime we talk about Nigel, it's Nigel Shamash.
7   A.    Okay.
8   Q.    Anytime we talk about Saul, it's Saul
9   Tawil.  And you understand then in some way to be
10  affiliated with the landlord, correct?
11  A.    Yes.
12  Q.    And you understood at some point that the
13  landlord was Oxford, the entity that we put on the
14  record as Oxford Realty & Holdings LLC, correct?
15  A.    Yes.
16  Q.    Okay.  When you were introduced to the
17  landlord, did you visit the premises?
18  A.    Yes.
19  Q.    Okay.  Was that before there were any
20  negotiations relating to a sublease?
21  A.    Yes.
22  Q.    Okay.  And approximately when was it that
23  you visited the premises?
24  A.    The initial contact was late August, so
25  either late August or the first few days in



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS
December 08, 2022
61–64

Page 61

E. Brooks

September. The broker had three or four different locations that he wanted to show us. This was one of them, this was one of them. There were several others. So and the appeal to this one is because it was large and had enough clinic space for us to move in without a lot of renovations.

Q.   Okay. What did you understand was operating in that space at the time that you toured it?

A.   Nothing. There was nothing in the space.

Q.   Okay. Was there a prior tenant that had, you know, therapy rooms?

A.   I don't know.

Q.   Okay. Well, when you arrived to the building, did you go up to the 7th and 8th floor?

A.   We went to the 7th floor, yes.

Q.   Okay. And was it occupied at that time?

A.   No.

Q.   Was it built out at that time?

A.   Yes.

Q.   Okay.

A.   Mm-hmm.

Q.   And it had the offices that you said you could use for therapy rooms, correct?

Page 62

E. Brooks

A.   Yes.

Q.   Did you go to the 8th floor?

A.   I don't think so. I don't remember my going there.

Q.   Who else from C.C.M.S. was with you when you went to look at the premises?

A.   Just me and the broker.

Q.   Robert King?

A.   Yes. And the architect, Andre Soluri, okay, came after us immediately.

Q.   Who from the landlord met you there, if anybody?

MS. TURNER:  Objection. Can I just --

Q.   Did anybody --

One second?

Did anybody -- was the landlord present when you toured the 7th floor?

A.   I don't remember.

MR. MARGOLIS:  Go ahead.

MS. TURNER:  I was just going to ask can we use the proper names Oxford and Nigel? Because I'm not sure, Mr. Brooks, when you say landlord, I'm not sure he has

Page 63

E. Brooks

the same meaning.

MR. MARGOLIS:  Okay. Sure.

MS. TURNER:  It's sort of a legal term, and he may not have the same understanding.

MR. MARGOLIS:  That's fine. No problem.

Q.   Do you recall when you went to tour the 7th floor, whether you met with Nigel or Saul?

A.   I didn't meet with Saul, and I don't think I even met with Nigel.

Q.   Did you know at that time that the building was a co-op?

A.   No. It wasn't relevant.

Q.   When you say it wasn't relevant, meaning it wasn't important to you? What do you mean by that?

A.   We were dealing with -- there was a landlord. And normally -- in fact, most of our other clinics also leased commercial buildings, okay? But we are just only concerned with who's in charge, who's the landlord for this space, and that's the person that we're interested in dealing with. And we would have trusted our broker --

Q.   Okay.

Page 64

E. Brooks

A.   -- in terms of introduce, arranging for us to see the space that's been presented as being available. Okay. That's what I meant in terms of not -- relevant in terms of any other details around it other than the landlord would be interested in us as tenants because they're showing the space --

Q.   Right.

A.   -- and --

(Simultaneous speakers.)

Q.   Your broker was showing you space and your interest was who it was that you would be paying the rent to?

A.   That's right.

Q.   And was that the only time you visited the premises other than for the interview?

A.   Yes, I believe. Yes.

Q.   How long were you there for?

A.   Maybe half hour.

Q.   What time of day were you there?

A.   It was in the morning, around 10 -- 10, 11:00.

Q.   Did you take an elevator or stairs to get to the 7th floor?

COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
65–68

Page 65

E. Brooks

1   A.    We took the elevator.
3   Q.    Do you recall how many elevators were in
4   the building?
5   A.    No.
6   Q.    Do you recall anything about the elevator
7   that you took to the 7th floor?
8   A.    No.  I don't want to guess at that.  No.
9   Q.    Do you recall the size of the elevator you
10  took to the 7th floor?
11  A.    No.
12  Q.    Do you recall when you came to the West
13  27th Street premise, whether or not there was any
14  lobby personnel?
15  A.    I don't remember.
16  Q.    Do you recall if there was a security desk
17  in the lobby?
18  A.    I don't remember.
19  Q.    The West 31st Street premise that you were
20  moving from, did C.C.M.S. do drug counseling in
21  that location?
22  A.    No.
23  Q.    Did there come a time that you had
24  discussions with Robert King about the type of
25  therapy that would be offered at the West 27th

Page 66

E. Brooks

2   Street premise?
3   A.    Say it again.
4         MR. MARGOLIS:  Can you read that
5         back?
6         (Whereupon, the record was read by
7         the reporter.)
8   A.    No.
9   Q.    What was your understanding when you toured
10  the 7th floor, as to what type of services you had
11  intended to offer at that location?
12  A.    Well, we -- the -- let me explain this a
13  little bit now.  Of our clinics, okay, the
14  Manhattan clinic was the only clinic that we
15  operated that served adults only, okay.  It was in
16  the license, okay.  And our plan was to add
17  children, okay, to add children to the population.
18  So that was a part of our formal request to OMH,
19  okay.  Just that, to add children to what we were
20  currently doing.
21        The reason -- and I shouldn't be saying
22  this -- but the reason that even the question came
23  up around it for the lease was I was looking ahead
24  in case in the future we might be interested in
25  doing some drug treatment, it would be in the

Page 67

E. Brooks

2   lease.  Several of our other clinics that we wanted
3   to do drug treatment as well, it wasn't in the
4   lease, and it took a lot of time to get it in the
5   lease for them -- for OMH to approve it and OASAS
6   to approve it.
7         So we were just looking ahead in terms of
8   whether or not we want to have the lease as
9   comprehensive as it could be in case in the future
10  we wanted to add the program.  But they said they
11  didn't want that and it was absolutely fine.
12  Q.    When you say they said they didn't want
13  that, who are you referring to?
14  A.    I'm sorry.  Nigel and Saul.  Saul was more
15  involved in this particular question.
16  Q.    How did you find out that Nigel and Saul
17  didn't want the drug treatment?
18  A.    They communicated to the broker, Bob King,
19  and then Bob King presented it to me.
20  Q.    Okay.  How did it come up in the first
21  place, if you know?
22  A.    Well, because we -- I think we had asked to
23  include it, the right to provide it in a lease.
24  Q.    Okay.  So what -- as you sit here today,
25  what do you recall that you were asking to be

Page 68

E. Brooks

2   included in the lease as far as the use or the
3   therapies to be provided at the West 27th Street
4   location?
5   A.    Well, just our therapy to children and
6   adults, okay, and we asked to have drug treatment
7   put in the lease.
8   Q.    Okay.
9   A.    Those three things.
10  Q.    Okay.  Do you recall asking for mental
11  health to be included in the lease?
12  A.    Mental health counseling?
13  Q.    Yes?
14  A.    Well, mental health counseling and therapy,
15  those are all synonymous, you know, the same thing.
16  Q.    Okay.  And that's what you were doing at
17  West 31st Street?
18  A.    That's correct.
19  Q.    Okay.  So if you could just tell me, what
20  does mental health counseling involve?
21  A.    Mental health counseling is the same as
22  providing therapy.  Okay.  Everything is diagnosis
23  driven, okay.  If a person is diagnosed as having
24  schizophrenia, okay, then that is the treatment
25  that you provide for someone.  You do an intake,



COMMUNITY COUNSELING AND MEDIATION  30b6                December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                              69–72

Page 69

E. Brooks

1
2  you evaluate the symptom picture, you make a formal
3  diagnosis.
4        This is all has to be recorded in our
5  notes.  And then the prescribed treatment kind of
6  based on the particular person as well.  You know,
7  in terms of do they need psychiatric medication or
8  psychiatric -- and therapy, or just therapy.  Okay.
9  That's -- that's assessed and that's decided
10  following an interview -- an intake interview with
11  the patient.
12  Q.    Okay.  And those intake interviews were
13  expected to be -- take place at West 27th Street
14  for example?
15  A.    Yes.
16  Q.    So there would be intake as part of the
17  process.  And then if the person continued with
18  C.C.M.S., there would be therapy available on site
19  in connection with whatever it was --
20  A.    The diagnosis.
21  Q.    -- that was concluded as the diagnosis?
22  A.    Yes.
23  Q.    Okay.  And was there any limitations in the
24  mental health arena on the types of mental health
25  therapy that was being offered?

Page 70

E. Brooks

1
2  A.    Were there any limitations?
3  Q.    Yeah.  I mean, you gave an example before
4  of like --
5  A.    Schizophrenia?
6  Q.    -- schizophrenia.
7  A.    Right.
8  Q.    So that's just one of many diagnoses,
9  mental health diagnoses, correct?
10  A.    Yes.
11  Q.    And I'm assuming all the mental health
12  diagnoses are referenced in the DSM book, right?
13  A.    That's correct.
14  Q.    So the DSM book has lots of different types
15  of diagnoses, correct?
16  A.    Yes.
17  Q.    And did C.C.M.S. diagnose -- do intakes for
18  people that had diagnoses other than schizophrenia?
19  A.    Yes.
20  Q.    Okay.  So other than schizophrenia, what
21  other diagnoses were involved with people that were
22  being treated at the West 31st Street premises?
23  A.    Let me clarify one piece now.  We do
24  central intake from our main clinic in Brooklyn.
25  Okay.  We have three intake coordinators, and we

Page 71

E. Brooks

1
2  get referrals from 108 different entities in the
3  city.  All of the clinic -- all of the hospitals
4  that have psychiatric programs refer to us, and we
5  then look at where the person's located, where
6  their home might be, or which clinic might be more
7  convenient for them.
8        They could live in Queens, but they work in
9  Manhattan, okay.  So going to the Manhattan clinic
10  would be more convenient for the client.  So the
11  initial assessment occurs at the central office
12  with two intake people and the tenant -- director
13  for the agency, okay, is asked to review the
14  referral.  Okay.
15        The common issue that's been dealt with now
16  since the pandemic is the increase in the amount of
17  the suicides, okay, and patients who have attempted
18  suicide, been hospitalized, and have been
19  discharged to a clinic.  Okay.  So severe
20  depression, okay, would be another diagnosis, okay,
21  that would be common.  Then we would work with
22  depression, schizophrenia, psychotic conditions,
23  okay, serious character disorder -- all --
24        (Reporter clarification.)
25  Q.    What kind of disorder?

Page 72

E. Brooks

1
2  A.    Character --
3  Q.    Character disorder.
4  A.    -- disorder.  All of the diagnoses in the
5  DSM-III that you referenced, okay, would be
6  potentially eligible.  We still look at the case,
7  okay.  We -- many of the clients that we're getting
8  now are also Asian because we have 60 Chinese and
9  Indian therapists, okay.  But again, they still
10  have to have a psychiatric diagnosis, and that
11  comes more in terms of who's paying for it.  Okay,
12  be eligible for Medicaid payment or the private
13  insurance companies, okay, require a diagnosis,
14  because the treatment's expensive, $180 a session.
15  Okay.  So that's it.
16  Q.    Okay.  And so as I understand from what you
17  just said, the intake for the patient would be
18  handled in the -- in a Brooklyn facility?
19  A.    Yes.
20  Q.    But for example, the Manhattan facility,
21  whether it be the West 31st Street or any other
22  location that it moved to, would be more of the
23  treatment center?
24  A.    Yes.  Yeah --
25  Q.    Not a center where they would do the



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
73–76

Page 73

E. Brooks

1
2    initial intake?
3    A.    That's correct.
4    Q.    Okay.
5    A.    That's correct.
6    Q.    And the people that are going to the intake
7    center who then are deployed to the various clinics
8    throughout the city or wherever they're located,
9    right, based on a psychological or psychiatric
10   diagnosis, some are medicated, some are not
11   medicated?
12   A.    Yes.
13   Q.    Okay.  And with respect to the therapists
14   that work -- that were working in the West 31st
15   Street premise, that would then be moving over to
16   West 27th Street --
17   A.    Right.
18   Q.    -- assuming the sublease had gone through,
19   did that involve people that were prescribing
20   medication as well?
21   A.    Ask that again?
22   Q.    Withdrawn.  Withdrawn.
23         Personnel for C.C.M.S. that were working at
24   West 21st Street, that if the sublease would have
25   gone through, would have moved to West 27th

Page 74

E. Brooks

1
2    Street --
3    A.    Yes.
4    Q.    -- were those people licensed or qualified
5    to prescribe medication?
6    A.    Yeah.  The psychiatrist can prescribe
7    medication.  The psychiatric nurse practitioner can
8    prescribe medication.  These are the two
9    disciplines that's involved in prescribing
10   medication.
11   Q.    Okay.  And these were people that were part
12   of the 20 that were anticipated to take -- be on
13   site at the West 27th Street location?
14   A.    Yes.
15   Q.    Okay.  Now, when you met with the board of
16   directors, and we'll get into more detail in a
17   little bit about the interview itself, I would
18   imagine that you -- just like you did very
19   carefully, explained to the board all of these
20   things relating to C.C.M.S., correct?
21   A.    Yes.
22         MS. TURNER:  Objection.
23   Q.    You can answer.
24   A.    Ask it again.
25         (Whereupon, the record was read by

Page 75

E. Brooks

1
2         the reporter.)
3    A.    I did not describe what I just described to
4    you a few minutes ago.
5    Q.    Okay.  Any of what you described to me,
6    or...
7    A.    Would it be easier for me to tell you what
8    I said?
9    Q.    Well, let me ask you this.
10   A.    Okay.
11   Q.    Did you tell them about the 300 or so
12   patients that were being transferred from 31st
13   Street to 27th Street?
14   A.    Yes.
15   Q.    Did you tell them that you were offering
16   mental health services to those people?
17   A.    Yes.
18   Q.    Okay.  Did you have any discussions about
19   the types of diagnoses that some of these people
20   had?
21   A.    No.
22   Q.    Did you discuss medication in any way with
23   the board?
24   A.    I don't remember.
25   Q.    Okay.  Did you discuss that it would be

Page 76

E. Brooks

1
2    adults and adolescents?
3    A.    Yes.
4    Q.    Did you discuss that at some future point
5    in time, not now, you might consider doing any type
6    of drug treatment?
7    A.    No.
8    Q.    Why not?
9    A.    Thank you.  I'm glad you asked that.
10   Because it was all so very clear that the board did
11   not want drug treatment in the building.  We had
12   agreed absolutely not only would we not provide
13   drug treatment, but let's put it in the lease that
14   we want --
15   Q.    Okay.  When you said it was very clear that
16   the board did not want drug treatment, how did you
17   know the board didn't want drug treatment?
18   A.    Well, through the landlord.
19   Q.    Okay.  So is it that the landlord told you
20   they didn't want drug treatment, or the landlord
21   told you that the board didn't want drug treatment?
22   A.    The landlord told me because the
23   landlord -- I have 50 emails, okay, was -- said
24   they was communicating with the president of the
25   board, okay?  And that they were trying to, you



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
77—80

Page 77

E. Brooks

1  know, move this along and get it approved.  And
2  then the feedback that was coming was that drug
3  treatment was not -- they weren't interested in our
4  providing -- they didn't want our providing drug
5  treatment in the building.  So I thought about it
6  for a couple of days, and I said that's fine.  So
7  we won't do it and put it in the lease.  So there
8  would be no reason for me to have -- it was not an
9  issue.
10  Q.    Okay.  So it's your position, it's your
11  testimony today that the notion or the concept of
12  drug treatment was not discussed at all?
13        MS. TURNER:  Objection.
14  Q.    You could answer.
15  A.    That's correct.  It was not discussed.
16  Q.    Okay.  So were the other use discussed?
17  A.    No.
18  Q.    So did -- the board didn't ask you any
19  questions about what you intended to use the space
20  for?
21  A.    Well, I told them what we intended to use
22  the space for.
23  Q.    Right.  Okay.  So you told them that you
24  intended to use it for mental health therapy and so

Page 78

E. Brooks

1  forth, correct?
2  A.    Yes.  But I told them that we would -- I
3  talked more about the children that we would be
4  serving which was new.  We would be adding children
5  to it.
6  Q.    Okay.  So of the 300 that were transferring
7  over, those were adolescents?
8  A.    No.  Those were adults.
9  Q.    Those were adults.  And then what was the
10  plan for how many children you were anticipating
11  adding?
12  A.    We would be adding children from -- because
13  we have a waiting list for children, okay.  This
14  was an underserved population, okay, but the same
15  central intake would then have another clinic to be
16  referring children to.  Now, children being
17  referred to us are assigned to one of the other
18  three clinics in Brooklyn, okay.  But we're going
19  to add -- if we would add Manhattan, now as the
20  children are referred, we'd refer them to the
21  Manhattan clinic.  We have --
22  Q.    How many --
23  A.    -- affiliation with the Landmarks High
24  School, which is -- everything is four, six blocks

Page 79

E. Brooks

1  away in Manhattan.  And the children that are
2  attending that school with mental health problems
3  would be referred to this clinic for eval- -- for
4  assessment, diagnosis, and potential services.
5  Q.    And those children that you were -- you
6  said you were focusing on that during the
7  interview, what ages are we talking about?
8  A.    Well, we're talking about from two years
9  old up.  Okay?  But with the initial group being
10  from two to six, this is from two to six, but
11  this -- these are limited -- this is called a
12  Reflective Network Therapy.  Okay.  They're a
13  famous, older than I am, child psychoanalyst.
14  Dr. Gilbert Kliman, okay, is the founder of this
15  concept which is very, very famous, okay.  We would
16  be implementing a little sample of that in terms of
17  having six to eight little children in a room
18  receiving this very special type of therapy.  Okay.
19  Q.    Okay.  So just so I'm clear, because I
20  think you mentioned that you spent time during the
21  interview speaking about the children, that you
22  communicated that that was something that was now
23  going to be a new enhancement to C.C.M.S., that you
24  were looking to bring on that type of special

Page 80

E. Brooks

1  treatment of these younger children as you just
2  described, correct?
3        MS. TURNER:  Objection.
4  Q.    You can answer the question.
5  A.    That's correct.
6  Q.    Okay.  Thank you.
7        (Whereupon, a recess was taken at
8        this time.)
9  Q.    Okay.  We're back on the record.
10        This is a reminder, Mr. Brooks, you're
11  still under oath.  Every time we go off and we go
12  back on, you're still under oath every time we go
13  back on the record.  Until we say that this is
14  finished, you remain under oath, okay?
15  A.    I understand.
16  Q.    Okay.  Good.  So when we last were here, we
17  were talking about your discussions with the
18  broker, about what they understood the landlord and
19  the broker -- and the board wanting or not wanting
20  as it related to the use of the premises.
21  Specifically we were talking about the drug
22  treatment.
23        What was your understanding about the
24  approval process that you, C.C.M.S., would have to



COMMUNITY COUNSELING AND MEDIATION  30b6
December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS
81–84

Page 81

E. Brooks

1  go through in order for the sublease to be
2  approved?
3  A.    Well, my understanding was that we needed
4  six votes of the board of directors to approve of
5  the -- the application.
6  Q.    And that -- I think you testified earlier
7  that had been communicated to you by the broker,
8  correct?
9  A.    Yes.
10  Q.    And he had communicated that the landlord,
11  Nigel, Saul, were two votes, the president was
12  three, Marc Paturet, and then there was one needed?
13  A.    Yes.
14  Q.    Did you understand at any point in your
15  negotiations with the landlord, Oxford, that you
16  would have to be interviewed by the board?
17  A.    No.
18  Q.    Did you have any understanding that you
19  would have to make any type of submission of
20  materials about C.C.M.S. or otherwise in order to
21  obtain the board's approval?
22  A.    No.
23  Q.    And with respect to my prior question with
24  respect to the interview, did there, at some point,
25

Page 82

E. Brooks

1  come a time that you did learn that it was a
2  requirement of the board of directors in order to
3  evaluate approval of the sublease, that there had
4  to be an interview?
5  A.    You said did I at some point learn that?
6  Q.    Yes.
7  A.    Yes.
8  Q.    Okay.  When did you learn that?
9  A.    In late December.
10  Q.    Okay.  And that's 2019, correct?
11  A.    Yes.
12  Q.    Okay.  Who told you that?
13  A.    The broker.
14  Q.    So at no point prior to late December 2019
15  did your broker ever tell you that you would need
16  to have an interview in order to obtain the board's
17  approval for the sublease, correct?
18  A.    That's correct.
19  Q.    And at no point prior to the end of
20  December were you ever told by the landlord about
21  the interview, correct?
22  A.    Right.
23  Q.    What about the submission, any type of
24  submission?  Were you ever told -- did there come a

Page 83

E. Brooks

1  time that you learned that you would have to submit
2  some application?
3  A.    Around the same time.
4  Q.    Okay.
5  A.    (Unintelligible) December.
6  Q.    Okay.  And was that the first time that you
7  learned that?
8  A.    Yes.
9  Q.    Okay.  So at no time prior to that date in
10  late December did the broker, Mr. King, ever tell
11  you that you needed to make a submission, correct?
12  A.    That's right.
13  Q.    And at no time prior to that did your
14  landlord -- the landlord rather, Oxford -- and when
15  I said Oxford, I also mean Nigel and Saul.  Any of
16  those, the corporation, the Oxford entity, or Nigel
17  or Saul tell you you have to submit an application,
18  correct?
19  A.    That's correct.
20  Q.    You mentioned that you did believe that you
21  needed six votes.
22  A.    Yes.
23  Q.    And that the broker had communicated that
24  you had five?

Page 84

E. Brooks

1  A.    Yes.
2  Q.    Did there come a time that you learned that
3  you had the sixth vote?
4  A.    Yes.
5  Q.    Okay.  Who communicated that to you?
6  A.    The broker.
7  Q.    Robert King?
8  A.    Robert King.
9  Q.    And what did he tell you in terms of having
10  obtained the sixth vote?
11  A.    Well, let me just -- can I correct myself
12  on this?
13  Q.    Sure.
14  A.    He told me that that was -- that he was
15  told by the landlord, okay, that we -- that he had
16  approval.  That we had approval.  And that is what
17  triggered our then coming into the space with that
18  approval and setting up the data -- the data
19  system, okay, and telephone system and getting
20  ready to move in and order furniture.  Because --
21  So we felt that we were close to getting
22  the final -- and we got the emails from the broker
23  and from conversation with the broker saying he was
24  very happy.  He just spoke to Nigel, okay, and we



Page 85

E. Brooks

1
2   should be able to get you in it in the next couple
3   of days. So this was what was communicated to me
4   by Robert King. And he -- there was no concern.
5   Q.    Okay. Did Robert King ever show you at or
6   around this time, when he told you you could get
7   ready to do the IT and the cabling and the
8   furniture installation, any form of documentation
9   from the board that they had approved?
10  A.    No.
11  Q.    Did the landlord -- did you see anything --
12  did the landlord send you -- and when I say the
13  landlord, again, we're talking Oxford and we're
14  also talking Nigel and Saul or either one. Did
15  they send you anything from the board of directors
16  that said that the sublease was approved?
17  A.    No.
18  Q.    Did you ask either Robert or the landlord
19  for something in writing from the board of
20  directors of the co-op indicating that the sublease
21  had been approved?
22  A.    No. I saw no reason to do that.
23  Q.    And why did you see no reason to do that?
24  A.    Because if the -- if the organization was
25  allowing me to set up our offices, prepare a lease,

Page 86

E. Brooks

1
2   that they were hiring an attorney to prepare a
3   lease, and they had seemed interested in us as
4   tenants over the four months, I would have had no
5   reason to have been questioning. Because they
6   could simply, if they didn't want us in the
7   building, they could simply have said at any time
8   up to that, we -- in thinking about it, we don't
9   want you.
10         Maybe you've got too much -- whatever it
11  is, they could have said what 90 percent of the
12  landlords say when they don't want you in the
13  building, is that we don't want the kind of traffic
14  that a nonprofit would be in terms of its clients
15  coming in for service would represent. So --
16  Q.    Okay. Let me stop you there. And they
17  never told you that, the landlord, correct? They
18  showed you that they were very much interested in
19  you coming aboard, correct?
20  A.    Yes. Yes.
21  Q.    Okay. But they never provided you with
22  anything from the board of directors, correct?
23  A.    No.
24  Q.    Neither did Robert King, correct?
25  A.    Correct.

Page 87

E. Brooks

1
2   Q.    And Robert King was your broker, correct?
3   A.    Yes.
4   Q.    And you knew that it was a co-op building,
5   did you not?
6   A.    Yes.
7         MS. TURNER: Objection.
8         MR. MARGOLIS: Okay.
9         THE WITNESS: I'm sorry.
10  Q.    Prior to the -- finding out that you needed
11  to submit an application and have an interview in
12  late December, okay, had you communicated at any
13  time in the process up to that point in time with
14  any members of the board of directors?
15  A.    No.
16  Q.    You indicated that you were told that you
17  had the three votes of Mr. Paturet, the president
18  of the board. Did you, at any point in time, see
19  anything in writing confirming that prior to the
20  interview?
21  A.    No.
22  Q.    Okay. Did you ever ask Mr. King to provide
23  anything in writing relating to those five votes?
24  A.    No.
25  Q.    Did at any point in time anybody

Page 88

E. Brooks

1
2   communicate to you, whether it be Robert King the
3   broker or the landlord, Saul, or Nigel, who the
4   sixth vote was?
5   A.    No.
6   Q.    At any point in time, did you ask to see --
7   ask, meaning of Robert King or the landlord, Nigel
8   or Saul, any documentation that would have
9   supported the conclusion that you needed six votes?
10        MS. TURNER: Objection.
11  Q.    You could answer.
12        MS. TURNER: You could answer.
13  A.    No.
14  Q.    Do you recall as you sit here today when
15  you signed the sublease?
16  A.    Yes.
17  Q.    When did you sign the sublease?
18  A.    December 18, 2019.
19  Q.    And do you know when Oxford signed the
20  sublease?
21  A.    I don't think they did. I don't know.
22  Q.    Have you ever seen a copy of the sublease
23  signed by them?
24  A.    No.
25  Q.    Did you ever ask them for a copy of the



Page 89

1           E. Brooks
2  signed lease?
3  A.    We begged for it.  Yes.
4  Q.    And when you say we --
5  A.    Me and the broker.
6  Q.    Okay.  And --
7  A.    I asked the broker and the broker asked
8  them for it.
9  Q.    Okay.  So when you --
10  A.    And the broker was asking them for the keys
11  to let us in to bring our furniture.
12  Q.    Okay.  Prior to the broker asking for the
13  keys so that you can bring in furniture, what did
14  you say to Robert King about getting a signed copy
15  of the lease?
16  A.    I don't think I said anything to him about
17  that.
18  Q.    Okay.  Well, at the time, at or about the
19  time that you signed the sublease, right?
20  A.    Mm-hmm.
21  Q.    Had you started to make arrangements to --
22  for the cabling and the furniture?
23  A.    We had already done the cabling.  That was
24  done four, five weeks earlier than that.
25  Q.    When you said you had already done it,

Page 90

1           E. Brooks
2  meaning it had come on premise?
3           (Simultaneous speakers.)
4  A.    Yes, come on the premises and completed
5  the --
6  Q.    Okay.
7  A.    -- data information.
8  Q.    Okay.  Who provided you with access to do
9  that?
10  A.    The super, the super of the building.
11  Q.    Do you know if the super ever discussed
12  that with the board of directors?
13  A.    He discussed with the landlord.  I don't
14  know if he discussed with the board of directors.
15  Q.    How do you know he discussed it with the
16  landlord?
17  A.    Because he said so, that we were authorized
18  to come in.  Okay.  We were stopped from coming in
19  with the furniture because we didn't have
20  authoriza- -- they said they didn't authorize that.
21  The landlord had asked for a certificate of
22  insurance saying, according to the broker now, that
23  something could get damaged.  We want to make sure
24  you have coverage.  And we immediately called our
25  brokers and got an insurance statement covering

Page 91

1           E. Brooks
2  them, okay, in case anything happened in the moving
3  in.
4  Q.    Do you know if that certificate of
5  insurance also covered the board of directors or
6  the corporation?
7  A.    I think so.
8  Q.    Do you know if the landlord ever
9  communicated to the board of directors that they
10  were providing C.C.M.S. with authority to install
11  the cabling?
12  A.    I don't know.
13  Q.    Did you ever see anything in writing?
14  A.    No.  I didn't need to.
15  Q.    I didn't ask you if you needed to.  I'm
16  just asking you if you did.
17  A.    No.
18  Q.    And you said you didn't -- why do you say
19  you didn't need to?
20  A.    I had no reason to have been trust -- not
21  trusting them.
22  Q.    When you say them, who are you referring
23  to?
24  A.    The landlord -- the landlord and whoever
25  controlled the 7th floor that we were interested in

Page 92

1           E. Brooks
2  leasing or subleasing.  I thought that they were
3  interested in us and...
4  Q.    Well, even if they were interested in you,
5  they were interested in you --
6           Withdrawn.
7           Are you saying it wasn't in your mind to
8  think that there was some oversight over the
9  landlord that was part of the process of having you
10  move into the building?
11           MS. TURNER:  Objection.  Leading.
12  Q.    You can answer.
13  A.    I'm thinking that he has control with
14  having the three votes from the president and the
15  two votes that they have, and that that -- I
16  thought he would be able to accomplish getting
17  approval for us.
18  Q.    Right.  But what was the basis for your
19  thinking?  You didn't see anything in writing, did
20  you?
21  A.    No.
22  Q.    Okay.
23  A.    Can I answer you though?
24  Q.    No.
25  A.    You asked a question.



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                93–96

Page 93

E. Brooks

1
2  Q.    I have my answer.
3  A.    You got your answer.
4  Q.    Thank you.  I have my answer.
5        As of the time that you signed the
6  sublease, had you seen any communication from the
7  board approving that sublease?
8  A.    No.
9  Q.    Did you read the sublease?
10  A.   Oh, the sublease, the sublease application.
11  Q.   No.  The sublease.
12  A.   Oh, the lease itself, okay.  Did I read it?
13  Yes.
14  Q.   Were you aware that it contained provisions
15  that said that the board needed to approve the
16  sublease?
17  A.   I remember seeing that.
18  Q.   When you signed the sublease, did you ask
19  anybody if you had -- do we have anything in
20  writing from the board approving the sublease?
21  A.   No.
22  Q.   You mentioned a woman by the name of Diana
23  Lee?
24  A.   Yes.
25  Q.   Who was she?

Page 94

E. Brooks

1
2  A.    She was the attorney that negotiated the
3  lease.
4  Q.    So she was representing C.C.M.S. in
5  connection with the lease transaction?
6  A.    Yes.
7  Q.    Did you ever provide her with any type of
8  documentation from the board of directors saying
9  that they were approving the lease?
10  A.   No.
11  Q.   Did you discuss --
12       Withdrawn.
13       Did you discuss with Diana Lee the need for
14  board approval?
15       MS. TURNER:  Objection.
16       Mr. Brooks, I'm going to instruct
17       you any conversations with your formal
18       counsel is privileged.
19       MR. MARGOLIS:  You waived all that.
20       You've produced all those communications.
21       MS. TURNER:  Then you can show him.
22       MR. MARGOLIS:  Okay.  But that's
23       still -- you waived the privilege.  It
24       doesn't prevent him from testifying.
25       MS. TURNER:  I'm instructing him

Page 95

E. Brooks

1
2  not to answer.
3        MR. MARGOLIS:  Okay.  Noted.  We'll
4  mark it for a ruling.
5  Q.    What do you recall being the start date for
6  the lease?
7  A.    What do I recall as the start date?
8  Q.    Mm-hmm.
9  A.    I don't know.  It was -- it was -- I think
10  the end of December because we had to move by then.
11  So everyone was, I thought, aiming for that.
12  Q.    When you asked Robert King, begging --
13  begging him for a copy of the countersigned
14  sublease, did you ask him why are we not getting
15  the lease?
16  A.    Yes.
17  Q.    And what did he tell you?
18  A.    He didn't know.  I mean, he was upset with
19  it.  He was upset and just saying that people had
20  been lying to him.
21  Q.    Okay.  And when you say he said people were
22  lying to him --
23        (Simultaneous speakers.)
24  A.    He told me --
25  Q.    -- who did he think was lying to him?

Page 96

E. Brooks

1
2  A.    The broker -- I mean, the landlord, Nigel
3  and Saul.
4  Q.    Nigel.
5  A.    Nigel and Saul.
6  Q.    And did you ask him why do you think
7  they're lying?
8  A.    Because they told him that they had board
9  approval -- board approval to get this done.  He
10  also, excuse me, lied in terms of that we had to
11  have a meeting, that they hadn't mentioned that in
12  four months, in the four months of -- and that
13  common sense would have said that rather than
14  having them spend all this money on the developing
15  of the lease, having us come in and put all of this
16  equipment in there, that why not have me go see the
17  board then and see if the board was acceptable of
18  us.
19  Q.    So King was expressing to you that he was
20  upset that they had put C.C.M.S. through this, if
21  they knew that you had to apply or that you need to
22  have an interview, that they should have told you
23  this sooner?
24  A.    Yes.
25        MS. TURNER:  Objection.



Page 97

E. Brooks

1
2      THE WITNESS:  I'm sorry.
3  A.    They should have just arranged it sooner,
4  just...
5  Q.    How did you meet Robert King?
6  A.    We were looking for space a couple of years
7  earlier and he was one of the brokers in Manhattan.
8  We had several, and he was one of them.  And it was
9  routine.  It was a routine.  Keep in mind that we
10  lease space in addition to the clinic space.  So
11  it's routine that we -- that's a part of what we
12  do, you know, we get a new program, and, you know,
13  sometimes you have to lease new space for the staff
14  to operate the program.
15  Q.    So how many years before this deal that you
16  were working on for the West 27th Street premises
17  had you been working with Robert King?
18  A.    With Robert King?  I would say maybe two or
19  three years.
20  Q.    And at the time that you first were
21  introduced to Robert King, what was your
22  understanding of his experience?
23  A.    Oh, I was very impressed because he had had
24  30 years, that was what I was told, 30 years of
25  experience in leasing space in Manhattan.  This was

Page 98

E. Brooks

1
2  the reason we used him rather than one of the other
3  brokers that we had worked with that leases -- that
4  works with clients all over the city.  But he would
5  focalize -- he specialized in the area that we were
6  looking.  He even knew the owner of the building at
7  115 West 31st Street.  Okay.
8  Q.    So when Mr. King introduced you to Oxford
9  and the West 27th Street building, did you ask him
10  what experience he had with leasing within a co-op?
11  A.    No.
12  Q.    Are you aware that leasing within a co-op
13  building requires different know-how than leasing
14  from a landlord?
15  A.    Yes.
16  Q.    Did you know that then?
17  A.    I think I knew that then.  But also it
18  would have made no sense for me to have insulted
19  Bob King in asking him something like that.
20  Q.    I'm not suggesting you should have insulted
21  him.  I'm just asking whether you ever asked him
22  whether or not he had experience in a lease
23  transaction in a co-op building.
24  A.    I didn't have enough experience myself with
25  doing that to have known to have even been

Page 99

E. Brooks

1
2  concerned with that.
3  Q.    So you've testified you've lived in a co-op
4  for 25 years.  Where is that co-op located?
5  A.    16th Street in Manhattan.
6  Q.    And when -- does that co-op have a managing
7  agent?
8  A.    Yes.
9  Q.    Who's the managing agent?
10  A.    MD -- MD --
11  Q.    Square.
12  A.    Yeah, MD Square.
13  Q.    Okay.  I know them.
14        So it's MD with a superscript 2?
15  A.    Yeah.
16  Q.    Were they the managing agent 25 years ago?
17  A.    No.
18  A.    I didn't think so.
19  A.    No, no, no.
20  Q.    Who was the managing agent then?
21  A.    I can't remember.  There have been several.
22  There have been several managing agents since I
23  think everyone was disappointed with them.
24  Q.    Okay.  When you sought to buy your co-op 25
25  years ago, did you have to submit an application to

Page 100

E. Brooks

1
2  the board?
3  A.    We had to submit an application and we had
4  to have an interview, my wife and I.
5  Q.    And in connection with that application,
6  did you have to submit, like, financials?
7  A.    I would think so.  I think so.
8  Q.    Information about your employment?
9  A.    (No verbal response.)
10  Q.    Yes?
11  A.    Yes.
12  Q.    Did you have to supply bank statements?
13  A.    I think so.
14  Q.    And do you recall doing something like that
15  25 years ago when you bought the co-op?
16  A.    Yes.
17  Q.    And did you have an interview?
18  A.    Yes.
19  Q.    And prior to the interview when you bought
20  your apartment, did you know whether you had been
21  approved or not approved by the co-op?
22  A.    You said prior to my interview, no.
23  Q.    And then at some point you had your
24  interview, correct?
25  A.    Yes.



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                    101–104

Page 101

          E. Brooks
1
2  Q.    And then at some point somebody
3  communicated to you that the board had approved
4  your purchase of the co-op, correct?
5  A.    Yes.
6  Q.    And then you bought the co-op?
7  A.    Yes.
8  Q.    So having gone through that experience in
9  the past, why did you not ask anybody about that in
10 connection with your sublease at a co-op building
11 on West 27th Street?
12 A.    Because I thought that in four months
13 someone would have said something that you needed
14 to have an interview.
15 Q.    Okay.
16 A.    And that it was perfectly logical to me
17 that the -- the landlord was saying I need six
18 votes; I have five, and we'll get the other vote.
19 And then that's it.  No one mentioned anything
20 about a meeting, and that seemed perfectly
21 understandable to me and logical, you know --
22 Q.    And when you said someone should have said
23 something, just so we're clear about this, who are
24 you referring to when you say somebody should have
25 said something?

Page 102

          E. Brooks
1
2  A.    The broker, Nigel, or Saul.
3  Q.    So none of them said anything?
4  A.    None of them said anything.
5  Q.    And Robert King is somebody that you worked
6  with before?
7  A.    Yes.
8  Q.    And Robert King is somebody that you're
9  still working with, correct?
10 A.    Yes.
11 Q.    But you never asked.  You just assumed they
12 would have told you if you needed something more,
13 correct?
14 A.    Yes.
15       MS. TURNER:  Objection.
16 Q.    The answer was yes, correct?
17 A.    Yes.
18       MR. MARGOLIS:  Okay.  So let's have
19    this marked as Defendants' Exhibit B.
20       (Defendants' Exhibit B, multi-page
21 document, was marked for identification.)
22 Q.    Okay.  Mr. Brooks, I'm showing you what's
23 been marked as Exhibit B -- Defendants' Exhibit B.
24 Just -- you can flip through it.  It's a multipage
25 document.  The cover sheet says, "Summons in a

Page 103

          E. Brooks
1
2  Civil Action."  And then three pages in it says,
3  "complaint."
4  A.    Okay.
5  Q.    Okay.  And then the complaint is a 19-page
6  complaint.
7        I'll represent that this is a copy of the
8  lawsuit complaint filed by C.C.M.S., which is
9  currently pending in the southern district of New
10 York, okay?
11 A.    Yes.
12 Q.    Have you seen this before?
13 A.    Yes.
14 Q.    Now, if you take a look at the last page on
15 Page 19, the document is signed by Tristan Loanzon.
16       Do you see that?
17 A.    Yes.
18 Q.    And that was your attorney prior to
19 Ms. Turner's firm, correct?
20 A.    Yes.
21 Q.    When was the first time that you reviewed
22 this document?
23 A.    What date was that submitted?  Oh, May 1st
24 it was submitted.  May 1st of 2020.  I would have
25 reviewed it three or four days before it was

Page 104

          E. Brooks
1
2  submitted.
3  Q.    So you recall reviewing it before May 1,
4  2020?
5  A.    Oh, yes.  Yes.
6  Q.    And you approved Mr. Loanzon's filing of
7  this document?
8  A.    Yes.
9  Q.    And to your understanding, everything
10 contained herein is true to the best of your
11 knowledge?
12 A.    You mean now or then?
13 Q.    Then.
14 A.    I thought it was true then.
15 Q.    Have you come to learn that things are not
16 true in there today?
17 A.    Yes.
18 Q.    What are you referring to?
19 A.    Well, the reference to Nigel as being on
20 the board.  I thought that he was on the board and
21 it was shown that way.  And that's not -- doesn't
22 seem to be true.
23 Q.    Okay.  So you came to learn that Nigel was
24 never on the board, correct?
25 A.    Yes.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
105–108

E. Brooks

1  
2  Q.    And how did you come to learn that?
3  A.    The response to the suit against Nigel and
4  his firm, their response to that, and then we did
5  check.  And no, he was just a shareholder.  We
6  didn't -- but not on the board.
7  Q.    Okay.  He was present though during your
8  interview, right?
9  A.    Yes, sitting right next to me.
10  Q.    Did he ever introduce himself as a member
11  of the board?
12  A.    Only time I was in his presence was at that
13  meeting.
14  Q.    Okay.  But when I say introduced himself as
15  a member of the board, by in person or by email.
16  Did he ever represent to you that he was a member
17  of the board?
18  A.    No.
19  Q.    Did he ever represent to you that Saul was
20  a member of the board?
21  A.    No.
22  Q.    Did you ever see any documentation that
23  either Nigel or Saul were members of the board?
24  A.    No.
25  Q.    Anything other than the allegations

E. Brooks

1  
2  relating to Nigel being on the board, anything else
3  that you recall as you sit here today is incorrect
4  as stated in this document?
5  A.    Can I take a quick minute to look through
6  it?
7  Q.    You can take as long as you need.
8  A.    Just a couple of minutes.
9      Am I being asked to confirm that this is --
10  that this is true?  Can you ask your question again
11  to me?
12  Q.    I asked you before if you believe that
13  everything that was pled or articulated in this
14  document, Exhibit B, was true.  And you said, Yes
15  except.
16  A.    Okay.  Okay.  At the time.  Okay.  But
17  you're saying even now in looking at it, is that
18  the -- that's what you're asking me now?
19  Q.    Yes.  And you said no.
20      Now, you came to learn that some things are
21  not true that are alleged in here.  And you gave an
22  example before of Mr. Nigel -- or not Mr. Nigel,
23  Nigel not being a member of the board.  I'm asking
24  you if there's anything else that you can identify
25  today as being not true?

E. Brooks

1  
2  A.    I really need to study this very carefully,
3  you know.  I don't want to give you an answer so
4  that -- and then I've overlooked five things in
5  here that I disagreed with.
6  Q.    Okay.  That's fair.
7  A.    Is that fair?
8  Q.    That's fair.  So let me ask you to turn to
9  paragraph 1 which is on page -- at the bottom.
10  It's Page 2.  It's Page 1 into Page 2.
11  A.    Okay.
12  Q.    And I'm going to direct your attention to
13  Page 2, at the top which is the second half of
14  paragraph 1.  It says, "The sublease had a start
15  date of December 15, 2019."  It's midway down.
16      Do you see that?
17  A.    Yes.
18  Q.    Okay.  And then about two lines down it
19  says, "But the sublease did not start on December
20  15, 2019, because Defendants delayed scheduling the
21  board interview for the approval of the sublease."
22      Do you see that?
23  A.    Yes.
24  Q.    Okay.  Do you know what the term
25  "defendants" mean?

E. Brooks

1  
2  A.    Yes.
3  Q.    Okay.  So take a look at the first page of
4  this document.  And you'll see at the top it says,
5  "C.C.M.S. d/b/a Community Counseling, Plaintiff
6  versus," and then there's a bunch of names.
7      Do you see that?
8  A.    Yes.
9  Q.    Then it says, "defendants."
10  A.    Yes.
11  Q.    So when it says, "Defendants delayed
12  scheduling the board interview for the approval of
13  the sublease," who did you mean by defendants in
14  this document?
15  A.    At the time we meant the people that are on
16  here, the board members, the -- the names that are
17  on here.
18  Q.    Okay.  So what is the basis for the board
19  members being accused or alleged to have delayed
20  the closing -- delayed the interview, I'm sorry,
21  the scheduling of the interview?
22  A.    Oh, I think --
23  Q.    What is that referring to?
24  A.    Okay.  The -- Nigel, Saul, our broker, and
25  C.C.M.S., me, we seem to all have been trying to



Page 109

E. Brooks

1 get -- and Harris, the attorney, to get this done
2 for us to be able to move in by the end of December
3 to avoid holdover and a very expensive situation
4 for us.  In addition, the elevator -- there was
5 only one elevator at 115 West 31st Street, and they
6 were about to close it down.  So it would have
7 created big problems for us in remaining there.
8 Okay.
9     So we were desperate to get out.  Everybody
10 was clear about that.  Okay.  So in late December,
11 okay, to then be -- there was no issue in terms of
12 we had to meet with the board, but to speak with
13 the board and we're meeting with the board in two
14 weeks -- in fact, in two and a half weeks, we
15 thought that was -- that was --
16 Q.    Okay.  So we're clear, on December 15th or
17 thereabouts when you signed the lease --
18 A.    Right.
19 Q.    -- you didn't even know about an interview,
20 correct?
21         MS. TURNER:  Objection.
22 Q.    That's what you testified to earlier.
23 A.    When we signed -- when I signed the --
24 Q.    When you signed the lease, you didn't know

Page 110

E. Brooks

1 that there was a need for any kind of interview?
2 A.    Yes.
3 Q.    You testified earlier that late in December
4 at some point after you signed the lease, you found
5 out that you needed an interview, correct?
6 A.    Yes.
7 Q.    Okay.  So you're saying --
8         (Simultaneous speakers.)
9 A.    -- after we made out the sublease
10 application.
11 Q.    Right.
12 A.    Okay.
13 Q.    That you had to fill out a sublease
14 application and that you had to have an interview.
15 You found that out very late in December.
16 A.    Yes.
17 Q.    So in this complaint when you say, "The
18 defendants delayed scheduling the board interview
19 for the approval of the sublease," your testimony
20 is that what you're referring to is the two-week
21 period between when you found out you needed an
22 interview and the date of the interview, which was
23 January 14th, correct?
24 A.    No.

Page 111

E. Brooks

1         MS. TURNER:  Objection.  Leading.
2         You can answer.
3 A.    No.  Okay.  Yes and no.  The complaint here
4 is that the landlord -- the landlord Nigel and
5 Saul, okay, if they knew that we required a meeting
6 with the board, should have arranged -- should have
7 made that clear and arranged it during the prior
8 three and a half months.
9 Q.    Okay.  So you're not talking about the
10 two-week period but from Christmas to the second
11 week of January, correct?
12 A.    Well, that also -- almost to compound it,
13 not only do you have to have a board meeting, okay,
14 but it's -- and our lease is going to expire in the
15 other place in two days now, okay, but two and a
16 half weeks from now -- two and a half weeks from
17 now which was further rubbing it in in terms of --
18 so it was a double piece.
19 Q.    Okay.  When you say rubbing in it, okay,
20 when -- what documentation have you seen --
21         Withdrawn.
22     Have you seen any documentation showing
23 when the board was apprised that it needed to
24 schedule an interview with you?

Page 112

E. Brooks

1 A.    Well, see, I consider Patuset [sic], the
2 board -- the board president was involved right
3 along, according to Nigel and according to the
4 broker, Bob King, that they were relating two or
5 three times a week to the president of the board.
6 Okay.
7     So I'm thinking that the board is being
8 informed, and even when he had to do some work in
9 there, Nigel said to Bob in email, Let me get board
10 clearance for that.  He came back and said, It's
11 okay for you to do this.  Okay.  We wanted to move
12 in.  Said, Let me get board approval.  That didn't
13 come, okay.  The evidence, it was showing that he
14 was consulting with the board around things that
15 were going on.
16 Q.    In this negotiation period in the four
17 month or so before the year-end --
18 A.    Right.
19 Q.    -- did you ever see any communication in
20 writing between Nigel, Saul, Robert King with Marc
21 Paturet?
22 A.    No.
23 Q.    Did you ever ask to see such a
24 communication?



COMMUNITY COUNSELING AND MEDIATION  30b6        December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS               113–116

Page 113

1                  E. Brooks
2   A.    No.
3   Q.    Do you know when the first date Marc
4   Paturet learned that an interview needed to be
5   scheduled with C.C.M.S. and you?
6   A.    No.
7   Q.    Do you know the first date that Joseph
8   Grill found out that an interview needed to be
9   scheduled with you or C.C.M.S.?
10  A.    No.
11  Q.    Do you know when the first date that Maxime
12  Touton was advised that an interview needed to be
13  scheduled with you or C.C.M.S.?
14  A.    No.
15  Q.    Do you know the first date that F. Michael
16  Conte found out that an interview needed to be
17  scheduled with you and/or C.C.M.S.?
18  A.    No.
19        MR. MARGOLIS:  Okay.  Why don't we
20     take our break.
21        (Whereupon, a recess was taken at
22     this time.)
23  Q.    Okay.  Mr. Brooks, I hope you had a nice
24  lunch break.
25  A.    Very nice.

Page 114

1                  E. Brooks
2   Q.    Thank you for returning.  Just a reminder
3   that you're still under oath.  Okay?
4   A.    Okay.
5   Q.    So you testified earlier that there came a
6   time that you learned that an application needed to
7   be filled out.
8   A.    Yes.
9   Q.    Who communicated that to you?
10  A.    The broker.  That's Robert King.
11  Q.    Okay.  And how did he communicate that to
12  you?
13  A.    By email.
14  Q.    And do you recall what he told you in terms
15  of the application package that needed to be
16  submitted?
17  A.    That I have to submit an application -- an
18  application for a sublease, okay.  And, you know
19  what?  I think I'm wrong.  I think it might have
20  been the attorney.  It might have been the
21  (unintelligible) attorney would have informed me
22  that --
23  Q.    Wait.  Say that again.
24  A.    Might have been Bob and the attorney that
25  informed me that we had to fill out an application,

Page 115

1                  E. Brooks
2   and then I received the application then from
3   Kaled, Susan Rubin, okay, to fill out.  And I did.
4   Q.    Okay.  So you mentioned Susan Rubin at
5   Kaled, K-A-L-E-D, correct?
6   A.    Yes.
7   Q.    Had you ever heard of Kaled before that
8   date?
9   A.    No.
10  Q.    Okay.  When you received it from Susan
11  Rubin at Kaled, did you ask Robert King who is
12  Susan Rubin?
13  A.    No.
14  Q.    Okay.  When you received the application
15  from Susan --
16        Withdrawn.
17        When you received -- when Robert King told
18  you you needed to fill out the application, what
19  was your response to him?
20        MS. TURNER:  Objection.
21  Q.    Did you respond to him --
22        Withdrawn.  Withdrawn.
23        Did you respond to him?
24  A.    That we would do it.  That we would fill
25  out the application.

Page 116

1                  E. Brooks
2   Q.    Okay.  Did you communicate anything else to
3   him?
4   A.    No.
5   Q.    Did you ask why am I filling out the
6   application?
7   A.    No.  No.
8   Q.    At the time that you received the
9   application, had you already installed the cabling
10  and the wiring on the premise?
11  A.    Yes, yes.
12  Q.    Had you already tried to move in the
13  furniture?
14  A.    Yes.
15  Q.    Okay.  Explain to me what happened with the
16  furniture.
17  A.    Well, we had ordered the furniture once we
18  had felt clear that we were accepted and they were
19  trying to get us in by December 30th.  And so we
20  had ordered -- we were going to move the furniture
21  clearly that we already had and there was some
22  additional furniture.
23        So we were all set to move in, okay.  And
24  since we had just finished installing the IT
25  equipment and the telephones, getting that is all



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                      117–120

Page 117

E. Brooks

1  set up, we assumed that we were okay to also get
2  ready to move in.  It was just a question of the
3  formality, okay, of his getting the final board
4  approval.
5
6  Q.    Okay.  So let me ask you about that.
7        You said that you felt okay that -- and
8  that you were awaiting final -- that it was just a
9  formality.
10  A.    Yes.
11  Q.    Okay.  Did somebody communicate to you that
12  it was merely a formality?
13  A.    Common sense did.
14  Q.    Well, I asked you if anybody had
15  communicated that to you.
16  A.    No.
17  Q.    Okay.  The common sense that you're
18  referring to was your own common sense, right?
19  A.    Yes.
20  Q.    Okay.  So did there come a time that you
21  had arranged to have furniture moved into the
22  premise?
23  A.    Yes.
24  Q.    Okay.
25  A.    Yes.

Page 118

E. Brooks

1
2  Q.    And do you know if the delivery people
3  brought the furniture to the building?
4  A.    Yes.
5  Q.    Yes, you know, yes, they did?
6  A.    Yes, they did.
7  Q.    And were -- did there come a time that you
8  were advised about anything in relationship to that
9  delivery?
10  A.    Yes.
11  Q.    What were you advised?
12  A.    We were advised that we needed to have --
13  that there hadn't been found approval for us to do
14  that, one.  And two, we needed the insurance.  We
15  needed insurance in case there was damage to the
16  building as the furniture was brought in.
17  Q.    Who communicated to you that you had not
18  obtained final approval at that point?
19  A.    I don't remember.
20  Q.    But you were aware at that point that there
21  was an issue with approval of the sublease,
22  correct?
23  A.    Yes.
24  Q.    Would you say that was the first time that
25  you knew that there was an issue with approval?

Page 119

E. Brooks

1
2  A.    I would say yes.
3  Q.    So what did you do when you were notified
4  that the building would not allow access for the
5  delivery of the furniture?
6  A.    Well, I tried to keep focused and I
7  addressed what Nigel to Bob King had requested --
8  in fact, I think no.  There was an email from
9  Nigel, there was an email from him requesting the
10  insurance.  And so I focused on calling the broker
11  and getting the insurance that day, getting a copy
12  of it and copying -- and they would also indicate
13  that we were covering the building -- I don't know
14  if it stated the board, but the building itself,
15  okay, that would be insured in case anything
16  happened.
17  Q.    As of that time when you were notified that
18  the delivery was not being permitted and that the
19  insurance was required, had you heard from Kaled?
20  A.    I'm not for sure of the dates around this.
21  We might have already had the application and now
22  had filled out the application and sent it right
23  back.  And then we were contacted to -- that was a
24  fee connected with that, and of course we paid
25  that.  It was around the same time.  This was all

Page 120

E. Brooks

1
2  happening around the same time.
3  Q.    Prior to your receiving the application
4  from Kaled, Susan Rubin, did you ever make any
5  inquiry of anybody as to whether there was a
6  managing agent that was responsible for managing
7  the building?
8  A.    No, no.
9  Q.    Did you ever look around the lobby or the
10  exterior of the building --
11        Withdrawn.
12        In being in the lobby or at the exterior of
13  the building, did you ever notice any signage that
14  reflected that the building had a managing agent?
15  A.    No.  Can I add something to that?
16  Q.    No.
17  A.    Please.
18  Q.    No.
19  A.    Okay.
20  Q.    Sorry.  This is just the way it goes.  I'm
21  not being rude, Mr. Brooks.  It's just a process.
22  Okay?
23  A.    Okay.
24  Q.    Thank you.  I ask the questions.  You
25  answer.



COMMUNITY COUNSELING AND MEDIATION 30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
121–124

Page 121

E. Brooks

1
2  A.    Just an explanation, but go ahead.
3  Q.    If I need an explanation of something that
4  I don't understand, I will ask you to explain.
5  A.    Okay.
6  Q.    In your communications with the landlord
7  regarding the installation of the IT equipment --
8  A.    Mm-hmm.
9  Q.    -- did they ever mention to you that you
10 had to coordinate in any way with the managing
11 agent of the building?
12 A.    No.
13 Q.    How were you connected to the super?  I
14 think that's who you indicated assisted you in
15 access to the building.
16 A.    We have an office manager, Courtney Watley
17 is his name, and he was my staff that is involved
18 in arranging for the IT people to come in,
19 arranging for the telephone system to be set up,
20 you know, the server, and also he would be in
21 charge of the furniture.  So he immediately became
22 acquainted with the super of the building.  So this
23 was the person that he communicated with around
24 when we were bringing the furniture -- wanted to
25 bring the furniture in.

Page 122

E. Brooks

1
2  Q.    How did he obtain the contact information
3  for the super?
4  A.    Well, he had visited the building, maybe a
5  half a dozen times.  So he knew the building and
6  this was -- so when we had requested permission to
7  set up the IT equipment, he was directed to the
8  super by -- I guess the broker would have spoken to
9  the landlord.  And that's when the introduction
10 occurred.  So when Courtney went to the building,
11 he would go right to the super, and the super
12 allowed him to, you know, bring the crew up that
13 was doing this IT service.
14 Q.    Did C.C.M.S. ever seek approval in writing
15 from the board to bring in the IT crew?
16 A.    From the board -- we weren't dealing with
17 the board.  We were dealing only with -- the answer
18 is no.
19 Q.    You were dealing with the shareholder?
20 A.    Yes.
21 Q.    Oxford?
22 A.    Yes.
23 Q.    The landlord?
24 A.    Yes.
25 Q.    Nigel, Saul?

Page 123

E. Brooks

1
2  A.    Saul, yes.
3  Q.    Got it.  So you testified that you got a
4  package from Susan Rubin and you sent it back.
5  A.    Yes.
6  Q.    After you sent the package back, did you
7  receive any further communications from Susan Rubin
8  regarding the package?
9  A.    Yeah.  She wrote back that I need to
10 include a payment for the application --
11 application payment fee, which we did.
12 Q.    Okay.  And then after that, were there any
13 further communications with Susan Rubin about the
14 package?
15 A.    No.  There was an email -- I don't know if
16 the email was from Susan or Peter or from Nigel,
17 just indicating that they were okay with this --
18 with this client, with this tenant.  They had no
19 issues with this tenant.  That was in an email.
20 Q.    So you recall seeing an email from somebody
21 that said there was no issue with the tenant?
22 A.    Yes.
23 Q.    Okay.  But as you sit here today, you don't
24 remember who sent that email?
25 A.    No.

Page 124

E. Brooks

1
2  Q.    Okay.  You mentioned Peter.
3  A.    Yes.
4  Q.    So who is Peter?
5  A.    Peter is in charge of the Kaled, Peter
6  Lehr, L-E-H-R.  He was Susan's boss.
7  Q.    Okay.  And did you have any communications
8  with him?
9  A.    No.
10 Q.    Have you ever spoken with him?
11 A.    No.
12 Q.    Have you ever spoken within Susan, or has
13 it all been through email?
14 A.    All through email.
15 Q.    How did you learn that an interview was
16 required?
17 A.    This was all occurring around the 23rd of
18 December, around that time frame, okay, where we
19 were trying to get in and so forth.  And then I
20 think that Bob -- I don't know -- I don't remember
21 for sure, but I think that Bob King would have
22 informed me that he just learned that you have to
23 have a meeting, an actual meeting with the board,
24 okay, and we said like set it up.  And thinking
25 that it would be in the next two or three days.



Page 125

E. Brooks

1
2 Q.    Why do you think it would be in the next
3 two or three days?
4 A.    Because we thought -- I thought that all of
5 the parties were trying to assist us to getting
6 into the building before the end of the year,
7 before December 30th.
8 Q.    When you say all of the parties, who are
9 you referring to?
10 A.    The landlord, the landlord, the broker, and
11 we assumed the board.
12 Q.    Okay.  But on what basis did you assume the
13 board?
14 A.    Based on what Nigel had communicated to us
15 from the very beginning, that he had five votes.
16 So we're thinking these are the five votes that are
17 saying it's okay.
18 Q.    When you heard about five votes, right, did
19 you ever think about how that -- you said the five
20 votes had something to do with the floors, right?
21      MS. TURNER:  Objection.
22 Q.    In the building?
23 A.    Each vote -- each shareholder has a vote in
24 the meeting.
25 Q.    Right.  But are you familiar with the

Page 126

E. Brooks

1
2 difference between shareholder voting and board
3 voting?
4 A.    No.  Except if it's in terms of leasing a
5 co-op, they're the same.  That's my understanding.
6 Q.    Okay.  When you bought your co-op 25 years
7 ago, are you aware that the shareholders voted to
8 approve you, or the board voted to approve you?
9 A.    The board voted to approve me.
10 Q.    Okay.  So in this case, why did you think
11 that shareholder votes were relevant as opposed to
12 board votes?
13 A.    Based on the language in the lease -- in
14 the -- what's the word for it, the proprietary
15 lease document that -- the document that describes
16 this, that describes this, that the owner of the
17 co-op has a vote and then in the process, I'd seen
18 it in writing is the answer to your question.
19 Q.    Okay.  And you say you saw it in writing in
20 the proprietary lease?
21 A.    Yes.
22      MR. MARGOLIS:  Okay.  Okay.  Let's
23      take a break.  I'm going to go get the
24      proprietary lease.
25      (Whereupon, a recess was taken at

Page 127

E. Brooks

1
2 this time.)
3      (Defendants' Exhibit C, proprietary
4      lease, was marked for identification.)
5 Q.    So I'm going to show you what we've marked
6 as Exhibit C, which is a copy of the proprietary
7 lease.  This is a copy that your attorney provided
8 us.  It's the proprietary lease between West 27th
9 Street Realty, Inc., which is the co-op, one of the
10 defendants in the case, to Oxford Realty Holdings
11 LLC.
12      Do you see that?
13 A.    Yes.
14 Q.    And the document's Bate stamped C.C.M.S.
15 107 through 142.
16      Before you review it or become familiar
17 with it, let me just ask you, have you seen the
18 proprietary lease before?
19 A.    Yes.
20 Q.    Okay.  And when did you first see it?
21 A.    When the -- Tristan Loanzon, the attorney
22 that was preparing the complaint, showed me that
23 the shareholders, according to the lease, has a
24 vote on their co-op.
25 Q.    Okay.  My question to you earlier was a

Page 128

E. Brooks

1
2 little different, which was not after the lawsuit
3 was commenced but before the lawsuit was commenced,
4 while you were negotiating the sublease with Nigel
5 and Oxford --
6 A.    Right.
7 Q.    -- how -- what was your reference for the
8 fact that the shareholder votes that you said you
9 had five of was the votes that you needed for
10 approval of the sublease?
11 A.    This was based on Bob King's sharing with
12 me information from Nigel indicating that he needed
13 five -- that he had five votes.
14 Q.    What was your understanding of --
15 A.    I thought it meant board.
16 Q.    Okay.  You thought he had five board votes
17 and needed six?
18 A.    Yes.
19 Q.    At the time that Robert King had
20 communicated to you this information about having
21 five, needing six votes, did you know how many
22 members of the board there were?
23 A.    There's 12 floors so I thought that there
24 might have been 12.
25 Q.    Okay.  What was the basis for you to think



COMMUNITY COUNSELING AND MEDIATION  30b6                   December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                                129–132

Page 129
1                E. Brooks
2  that there were 12 board members?
3  A.   Because there were 12 floors.
4  Q.   Okay.  But did you ever see any
5  documentation reflecting that there were an equal
6  number of board members based on the number of
7  floors in the building?
8  A.   No.
9  Q.   Did you ever look into that in any way?
10  A.   No.
11  Q.   So when it came to the proprietary lease,
12  you didn't see this document until after the
13  lawsuit was commenced, correct?
14  A.   I don't remember.
15  Q.   Before you testified very emphatically that
16  you read a provision in the proprietary lease that
17  says that there was a shareholder vote associated
18  with the sublet approval.
19        MS. TURNER:  Objection.
20  Q.   The process.
21  A.   That was a vote that was connected to the
22  co-op.  In other words, the shareholders -- the
23  language should be in here.
24        The language was that the shareholder has a
25  vote for that co-op.  That's what I read.

Page 130
1                E. Brooks
2  Q.   Right.  But you read that after you met
3  with Mr. Loanzon in connection with this
4  litigation, correct?
5  A.   Yes.
6  Q.   You didn't read that --
7  A.   Yes.
8  Q.   -- as you were doing your negotiations with
9  Nigel or having your conversations with Robert King
10  as it related to trying to get the sublease
11  executed, correct?
12  A.   That's correct.
13  Q.   All right.  You can put that away.
14        So you said you found out from Robert King
15  that you needed to have an interview, correct?
16  A.   Yes.
17  Q.   And you said you had anticipated that the
18  interview would be in the next few days.
19        How did the date for the interview come up?
20  A.   I was told the date.  I was told the date.
21  Q.   Okay.  Who told you about the date?
22  A.   Bob King.
23        (Reporter clarification.)
24        (Whereupon, a discussion was held
25  off the record.)

Page 131
1                E. Brooks
2  Q.   When you heard from him that the date had
3  been selected --
4        Withdrawn.
5        What did he communicate to you about the
6  date?
7  A.   That it was -- it wouldn't be until two and
8  a half weeks.
9  Q.   Okay.  Did he say the date or did he just
10  say it wouldn't be for two and a half weeks?
11  A.   No.  He gave me the date.
12  Q.   So you calculated that that was a couple
13  and a half weeks later?
14  A.   Correct.
15  Q.   Okay.  And what was the date?
16  A.   January 14, 2019.
17  Q.   Okay.  Would I be inaccurate to say you
18  meant to say 2020?
19  A.   2020, I'm sorry.  2020.
20  Q.   I just want to make sure we're talking
21  about the same January 14th.
22  A.   2020.
23  Q.   Okay.  Do you know where that -- who
24  dictated that date?
25  A.   No.

Page 132
1                E. Brooks
2  Q.   Did you ever ask Robert King, Bob King
3  where the date came from?
4  A.   No.
5  Q.   Did you ever -- was it ever explained to
6  you why that date was selected?
7  A.   No.
8  Q.   What was your understanding about what
9  would happen on January 14, 2020?
10  A.   I was very -- we were very worried and
11  upset that this was super bad news.  We knew
12  that -- we knew that that was trouble.
13  Q.   Okay.  Why did you know or believe that was
14  bad news or trouble?
15  A.   Thank you for asking that.
16        We were desperate to move out in two or
17  three days, and to hear you have to have a meeting
18  with the board and it's two and a half weeks from
19  now seemed incredibly inconsiderate or something --
20  something -- it fed into the notion that something
21  was going on bad around our application for
22  approval.
23  Q.   So did you communicate that to Bob King?
24  A.   Yes.
25  Q.   Okay.  And what did Bob King tell you?



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
133—136

Page 133

E. Brooks

1
2  A.    He was even more upset than I was in terms
3  of this being bad news, and he immediately start
4  looking for other places.
5  Q.    You had already incurred expenses for the
6  IT, correct?
7  A.    Yes.
8  Q.    You had already incurred expenses for the
9  furniture?
10  A.    Very little on that, but yes.
11  Q.    You had to move out of West 31st Street?
12  A.    Okay.  Yes.
13  Q.    There were going to be elevator problems at
14  31st Street any day?
15  A.    Yes.
16  Q.    You had a sublease that was supposed to
17  start December 15th, correct, and you hadn't
18  received a copy back of the sublease from the
19  landlord, correct?
20  A.    Right.
21  Q.    Did you communicate with Nigel or Saul or
22  Oxford in any way to find out why this was
23  happening, that now there was an interview that was
24  scheduled that you had never known about for
25  months, now January 14th, two and a half weeks

Page 134

E. Brooks

1
2  later?
3  A.    Mm-hmm.  I wasn't in communication with
4  Nigel and Saul, but Bob King said he was.  And he
5  had expressed the concern about that, the upsetness
6  [sic] about that.  And the -- frankly accused them
7  of lying to him in not telling him that this was a
8  part of the process.
9  Q.    Other than that Bob King had told you
10  during that four-month period that Marc Paturet had
11  known about this transaction, what other
12  communications, if any, did you see to the board
13  notifying them that over the last four months you
14  had been negotiating a sublease for C.C.M.S. for
15  that space?
16        MS. TURNER:  Objection.  Compound
17  question.
18  Q.    You can answer.
19  A.    Please ask the question again.
20        (Whereupon, the record was read by
21        the reporter.)
22  A.    None.
23  Q.    Do you know if Joseph Grill knew anything
24  about your sublease transaction?
25  A.    I don't know.

Page 135

E. Brooks

1
2  Q.    Do you know if Maxime Touton knew anything
3  over that four-month period of your transaction?
4  A.    No.
5  Q.    Do you know if F. Michael Conte knew
6  anything about your sublease transaction during
7  that four-month period?
8  A.    No.  Right on the end -- on Conte, two and
9  a half weeks before the meeting, okay, on January
10  14, there was a communication from him, okay, to
11  Nigel, and I think Bob might have been copied.
12  Because we knew he would be involved in the meeting
13  and he had commented -- and he wrote an email
14  saying there that that there has to be -- there's a
15  board meeting, and this is routine and why wouldn't
16  anyone expect that there would be a board meeting
17  to approve this.  So that was that communication
18  with him prior to --
19  Q.    Okay.  When did you see that communication?
20  A.    It was forwarded to me.  I don't remember
21  the date on it.  But this is all around the same
22  time.
23  Q.    So it was forwarded to you before the
24  interview?
25  A.    Yes, before the interview.

Page 136

E. Brooks

1
2  Q.    So that email suggested to you, you know,
3  why would anybody think that there wasn't going to
4  be an interview?
5  A.    Yes.
6  Q.    And that was from Michael Conte?
7  A.    Yes.
8  Q.    Did that give you pause that the board was
9  sort of surprised that they too were sort of not
10  apprised of what was going on?
11  A.    Well, I wouldn't want to characterize it
12  that way, but I would certainly say that in getting
13  the letter from him, to me it felt like trouble.
14  It felt like trouble.
15  Q.    Okay.  Well, certainly it was trouble for
16  you who was looking to move spaces and was in a
17  rush and needed to switch and had invested money.
18  So I understand that's certainly trouble.  Is that
19  trouble?
20  A.    Yes.
21  Q.    Okay.  Is that the trouble you're referring
22  to?
23  A.    That -- trouble in the deal going through.
24  Q.    Right.  You were being squeezed at this
25  point in time, right?



COMMUNITY COUNSELING AND MEDIATION  30b6                    December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                        137—140

Page 137

E. Brooks
1
2  A.    Yes.  But that was in the way secondary
3  because the worst thing that can happen there --
4  All right, so we're there for an extra month and
5  the rent is -- the holdover rent is double.  But
6  that was it.  Okay.  I was worried that there was
7  more involved in that.  Not just a delay.
8  Q.    But what specifically did you -- did
9  anybody say do you that there was trouble beyond
10  the delay?
11  A.    Just the facts of scheduling a in-person
12  meeting two and a half weeks, that itself just told
13  me that that was trouble and not good for us.  That
14  that was people that were opposed to our lease.
15  Q.    Okay.  When you say there were people
16  opposed to your lease, what were you relying on at
17  that time to say that anybody opposed your lease?
18  A.    Based on the fact that I'm thinking from
19  the very beginning that we got five votes, three
20  from the president and two from Nigel, and two from
21  Nigel.
22  Q.    But that was something that was
23  communicated to you, correct?
24  A.    Yes.
25  Q.    But you didn't know if that was true or

Page 138

E. Brooks
1
2  not, did you?
3  A.    No.
4  Q.    You know now that wasn't true, correct?
5          MS. TURNER:  Objection.
6  A.    I don't know.  I don't know what happened,
7  whose mind was changed and who was -- what the --
8  was there someone there that said we don't want
9  this black client and agency in here and that
10  person end up prevailing around the decision.
11  Q.    How do you know there was -- what evidence
12  or what documents have you relied on to say there
13  was a change if there's nothing that you have to
14  rely on that the board even knew about this
15  situation?
16  A.    Well, see, I don't believe that.  I don't
17  believe that Nigel, a very experienced co-op owner,
18  okay, and in business a long time, would have gone
19  that far, would have been allowing his tenant
20  applicant to be coming in the building, setting up
21  all of this without getting some board signed off.
22  He's an experienced person and I can't imagine that
23  he would have done that.
24  Q.    But you don't know what the circumstances
25  were, do you?

Page 139

E. Brooks
1
2  A.    That's right.  Yes.
3  Q.    So you're speculating that it didn't add up
4  to you because somebody with his level of
5  experience should not have belatedly informed you
6  of an interview or belatedly informed you of a
7  application package and things like that?
8          MS. TURNER:  Objection.
9  Q.    Correct?
10  A.    I --
11          MS. TURNER:  Do you need the
12      question reread?
13          THE WITNESS:  No, please.
14          MR. MARGOLIS:  He's answering the
15      question.  I mean, I'm happy for it to be
16      read back.
17          THE WITNESS:  Please read it back.
18          MR. MARGOLIS:  Tara, please keep
19      your objections to -- there should be
20      nonspeaking objections.  You're okay to
21      object but not to tell the witness whether
22      he needs to have a question read back for
23      him or not.  It's not an appropriate
24      statement on the road.  That's something
25      the witness has to identify, not you.

Page 140

E. Brooks
1
2          MS. TURNER:  Okay.
3          MR. MARGOLIS:  Thank you.
4          (Whereupon, the record was read by
5      the reporter.)
6  A.    I would add to that not only with his
7  experience, but as the person who owned the co-op
8  and it's been vacant for a long time, so he's
9  losing money, okay, so he was committed to making
10  the deal.  Okay.  So I wouldn't believe that he
11  would have -- he wanted to make the deal, okay.
12  And I think that -- I don't know if he -- if or why
13  he would have withheld information from us, that it
14  was not only just -- I don't think he knew that a
15  meeting, an actual meeting was going to be required
16  in this situation.
17  Q.    When you say you don't think he knew,
18  what's the basis for that?
19  A.    I'm thinking that he -- that if he had six
20  votes, the board wouldn't have had to physically
21  meet face-to-face with me for an interview to make
22  the decision.
23  Q.    Right.  But you don't know -- you never saw
24  any documentation that said he had six votes?
25  A.    No.



COMMUNITY COUNSELING AND MEDIATION  30b6                December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                    141–144

Page 141

E. Brooks

1
2  Q.    You were just told that by him and Robert
3  King, correct?
4  A.    Yes.  Yes.
5  Q.    Okay.  Prior to the interview, did you have
6  any communications with Nigel or Saul about the
7  interview?
8  A.    I don't remember if the commun -- if the
9  email came directly from Nigel or directly from Bob
10 in terms of reminding me that I was having a
11 meeting with the board, okay, and to be careful
12 around what you communicate.  And because I had
13 asked what to expect.  I wanted to be prepared for
14 it.  And that's what I heard.
15 Q.    And why do you say that, or why do you
16 characterize the communication as being careful?
17 What was the concern as far as you knew?
18 A.    It wasn't spelled out.
19 Q.    So who was it that was telling you to be
20 careful?
21 A.    I believe it had been Bob King.  It could
22 have been -- the email will tell us this.  It could
23 have been Nigel or Saul.
24 Q.    Okay.  Regardless of who it came from, what
25 was -- when you saw that, what was your

Page 142

E. Brooks

1
2  understanding of why you needed to be careful?
3  A.    Well, it was consistent with my being
4  concerned that we were in trouble around the
5  application.
6  Q.    Did you communicate to anybody in writing
7  about, what do you mean be careful?
8  A.    No.
9  Q.    Did you have discussions with Nigel or Saul
10 about being careful?
11 A.    No.
12 Q.    Did you have any discussions with Bob King
13 about being careful?
14 A.    No.
15 Q.    Did you ask to speak to any -- to Marc
16 Paturet, the board president, about the upcoming
17 interview so that you could get a sense of what was
18 going to happen at the interview?
19 A.    No.
20 Q.    Did you reach out to Susan Rubin to ask?
21 A.    No.
22 Q.    Did you ask to speak to her boss?
23 A.    No.
24 Q.    Okay.  Did you prepare with anybody for the
25 interview?

Page 143

E. Brooks

1
2  A.    Did I what?
3  Q.    Prepare for the interview with anybody.
4  A.    Not with anybody.  I just prepared myself.
5  Q.    Okay.  How did you prepare yourself?
6  A.    I just reviewed -- reviewed the
7  application, I reviewed the facts in terms of what
8  our clinic -- our current clinic was and that we
9  were just moving four blocks.  And I wanted to be
10 able to describe that and that's what happened.
11 Q.    Who coordinated your appearance at the
12 interview?
13 A.    It was -- I did.  It was directed to me.
14 This is easy.  They made the date.  This is the
15 date and I needed to communicate -- I don't know
16 if -- I guess it was to Bob.  I wasn't
17 communicating with anyone else, I don't believe, in
18 terms of confirming yes.  I think I would be there
19 for 4:00, whatever the date was -- the time was on
20 the 14th to meet with them.
21 Q.    And where did you understand the meeting
22 was going to take place?
23 A.    It would take place at the building, 129
24 West 27th Street, 6th floor.
25 Q.    Okay.  Whose premises is the 6th floor, if

Page 144

E. Brooks

1
2  you recall?
3  A.    Conte.
4  Q.    Conte?
5  A.    Conte.
6  Q.    And how long did it last?
7  A.    About an hour.
8  Q.    And do you recall the time?
9  A.    I'm not for sure if it was 4:15 to 5:15 or
10 5:15 to 6:15.
11 Q.    Were you alone?
12 A.    Yes.
13 Q.    And who was there?
14 A.    The -- can I look at this?
15      MR. MARGOLIS:  Okay.  The witness
16 is looking at the caption.
17 A.    Conte, Touton, Grill, Nigel.  Is that five?
18 And I'm missing someone.  I think there was someone
19 else.  Another.
20 Q.    Okay.  Were people wearing stickers with
21 their names on them?  How do you know who was
22 there?
23 A.    They -- other than Conte and Touton and
24 Nigel -- Nigel was sitting next me -- I wasn't for
25 sure of the other two people that were there.  But



COMMUNITY COUNSELING AND MEDIATION 30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                         145–148

Page 145
E. Brooks

1
2  Conte spoke, Touton spoke and gave examples. So --
3  and then Nigel was right next to me and we talked a
4  little bit. So those are the three that I could
5  swear was there.
6  Q.    Okay. So how did other names -- how did
7  the other names show up in the caption as the
8  defendants?
9  A.    I don't know. I don't know how the lawyer
10  framed it that way.
11  Q.    Okay. So were you ever given a list of the
12  names of the people that were in attendance at the
13  meeting?
14  A.    No.
15  Q.    Was there a sign-in sheet for you to fill
16  out when you arrived?
17  A.    I don't remember. I don't remember. But
18  if there was, I didn't get a copy of it. I don't
19  remember that we signed in.
20  Q.    Okay. Did you receive business cards from
21  any of the members of the board?
22  A.    No.
23  Q.    Was Marc Paturet there?
24  A.    I knew after they said he wasn't there. I
25  didn't know then. I didn't know then that he

Page 146
E. Brooks

1
2  wasn't there. I hadn't met with him before.
3  Q.    So do you know how his name shows up in the
4  caption?
5  A.    I think because he -- the -- I don't know
6  why the attorney put his name there. If the
7  question that was asked to me as a client in terms
8  of who were the board people that you've been
9  involved with, he'd have been the first name. He
10  would have been the first person that would have
11  been named.
12  Q.    Okay. But as far as the meeting is
13  concerned, you don't know if -- as you sit here
14  today, you don't know whether he was there or not?
15  A.    Well, it -- in thinking back on it, I'm now
16  clear that he wasn't there.
17  Q.    And why are you now clear that he wasn't
18  there?
19  A.    Well -- I blame myself for this now. In
20  revisiting the meeting itself, if he had been
21  there, he would have been chairing the meeting,
22  okay, as a president, and he would have been also
23  saying something. And this is my -- based on worry
24  and under stress around the whole thing, that I
25  didn't put that together right away, you know, that

Page 147
E. Brooks

1
2  he wasn't there until the -- this discovery
3  revealed that he was out of the country. But
4  that's me. That's on me in terms of -- but in
5  thinking back on it now and then, I'm clear he
6  wasn't there.
7  Q.    So in paragraph 51 if you take a look at
8  the complaint where it says on January 14, 2020,
9  you interviewed with individuals that included
10  Nigel, Marc Paturet, F. Michael Conte, Maxime
11  Touton, Joey Grill and others. That's not an
12  accurate statement, correct?
13  A.    Right.
14  Q.    And how do you know Joey Grill was there?
15  A.    I remember the name and I remember... I
16  remember his name and he said something. He said
17  some stuff and --
18  Q.    What did he say?
19  A.    I don't remember.
20  Q.    What does he look like?
21  A.    I don't remember.
22  Q.    What does Maxime Touton look like?
23  A.    I don't remember.
24  Q.    So you said Nigel was there, right?
25  A.    Yes.

Page 148
E. Brooks

1
2  Q.    You've already said Marc wasn't there.
3  Michael Conte you said was there, Maxime you said
4  was there. Joey Grill you said you think he was
5  there, he said something, and others. Who were the
6  others?
7  A.    I don't know.
8  Q.    Were there other people there?
9  A.    No.
10  Q.    And then so why is it said in paragraph 51,
11  it says, "and others"?
12  A.    That's what the attorney wrote. I don't
13  know.
14  Q.    Well, you reviewed this you said three days
15  before it was finalized, right?
16  A.    Absolutely.
17  Q.    And you told your attorney it was correct,
18  right?
19  A.    I missed it.
20  Q.    Now, it says that Nigel was part of the
21  group that interviewed you. Is that a correct
22  statement too? Did you think at that point in time
23  that Nigel was a member of the board?
24  A.    Oh, absolutely.
25  Q.    Okay. So you thought that he was



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
149–152

Page 149

E. Brooks
1
2 interviewing you as well?
3 A.   Absolutely.
4 Q.   Even though he was the party you were
5 negotiating the sublease with?
6 A.   Yes.
7 Q.   He had already spoken to you many times
8 before that, correct?
9 A.   No.  To Bob.
10 Q.   Through Bob but in writing?
11 A.   Yes.
12 Q.   In writing through you?
13 A.   Yes.
14 Q.   Okay.  Did you record the interview in any
15 way?
16 A.   I have some notes on it.
17 Q.   Okay.
18 A.   I didn't bring them.  I have some notes.
19          MR. MARGOLIS:  Those were not
20      produced.  I'm going to ask that they be
21      produced.
22 Q.   When did you take those notes?
23 A.   At the meeting.  A couple of notes more
24 describing our programs, notes like that, okay.
25 And I certainly made a note of the question, the

Page 150

E. Brooks
1
2 comment that Conte had made in terms of the black
3 person hurting people.  And I made a note of that
4 and --
5 Q.   When did you make that note?
6 A.   I think I made it on the spot.
7 Q.   So while you were talking to these people,
8 you were writing that down?
9 A.   During the meeting.  During the meeting or
10 either -- I don't know if it was afterwards that I
11 made that note.  I just had the meeting with them
12 and I knew that we were -- that we were in trouble.
13 Q.   Okay.
14 A.   We were in trouble.
15 Q.   I'm just asking you specifically, you made
16 a reference to having made a notation about a
17 comment that somebody made, and I'm just trying to
18 understand when you recorded that statement.
19 A.   I recorded it probably at the meeting.
20 Q.   Okay.  When you say "probably," as you sit
21 here today, do you recall doing that or you're
22 guessing that you would have done that then?
23 A.   Well, I wanted to be accurate and tell the
24 truth.  I'm not for sure if I recorded it then or
25 15 minutes later after the meeting ended and I was

Page 151

E. Brooks
1
2 going over what happened.
3 Q.   Okay.  And other than taking the notes
4 during the meeting, the interview, did you record
5 it in any way?
6 A.   No.
7 Q.   So no audio recording?
8 A.   No.
9 Q.   No phone recording?
10 A.   No.
11 Q.   No video recording?
12 A.   No.
13 Q.   Have you met any of the people that were at
14 the meeting with you physically before?
15 A.   No.
16 Q.   Have you seen any of those people since?
17 A.   No.
18          MR. MARGOLIS:  Let me have this
19      marked as Exhibit D.
20          (Defendants' Exhibit D, an email,
21      was marked for identification.)
22 Q.   I'm showing you what we've marked as
23 Exhibit D, which is an email that your attorney
24 produced in discovery.
25      It's an -- oh, an email from Robert King,

Page 152

E. Brooks
1
2 November 20, 2019, to you.
3      Do you see that?
4 A.   Yes.
5 Q.   Do you recognize this email?
6 A.   Yes.
7 Q.   Do you recall receiving this email from
8 Mr. King?
9 A.   Yes.
10 Q.   Now, it says, "Hi, Emory."  That's you?
11 A.   Yes.
12 Q.   Okay.  And if you look in the middle, it
13 says, "Please be mindful that the language you used
14 to describe the services you'll be providing at the
15 129 West 27th Street clinic is to be shown to the
16 board."
17      Do you see that?
18 A.   Yes.
19 Q.   Okay.  And it says, "This is the final step
20 as board approval is necessary."
21 A.   Yes.
22 Q.   Have you ever seen any communications
23 whereby the use or the description of the services
24 that C.C.M.S. would be providing was shown to the
25 board?



COMMUNITY COUNSELING AND MEDIATION 30b6                    December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                                153–156

Page 153

E. Brooks

1
2 A.    Ask that again.
3       MR. MARGOLIS:  I'm going to ask the
4    reporter to read it.
5       (Whereupon, the record was read by
6    the reporter.)
7 A.    Let me think.  Yes.
8 Q.    Okay.  What was it that you recall that you
9    saw that showed that the use or the services that
10   C.C.M.S. was providing was shown to the board?
11 A.    Can I borrow this for a second and look at
12   it?
13 Q.    Sure.  You're pointing to the brochure?
14 A.    The brochure.  I'm just trying to look.
15   Because there are six clinics, so I'm trying to
16   think back in terms of the history of the
17   negotiation around the space.  The...
18       And you're saying to the board, not to the
19   landlord.
20 Q.    Correct.  Not to the landlord.
21 A.    Right.  Okay.
22       (Perusing.)
23   No.  No.
24 Q.    And it says at the end before it says,
25   "very best, Bob," it says, "This is the final step

Page 154

E. Brooks

1
2 as board approval is necessary."
3    Do you see that?
4 A.    Yes.
5 Q.    So it's fair to say that as of November 20,
6 2019, you were aware that there was no board
7 approval, correct?
8 A.    Yes.
9 Q.    Take a look at Exhibit A -- B rather, the
10 complaint again.  Please turn to Page 7.  That's
11 the numbered Page 7 at the bottom.
12    In paragraph 29 at the bottom it says,
13 quote, "On December 9, Lee responded with
14 additional changes in an e-mail and added, quote,
15 'Can we assume the co-op has approved going forward
16 with this lease and the minor work needed for
17 tenant to occupy so the lease can commence on
18 December 15th?'"
19    Do you see that?
20 A.    Yes.
21 Q.    Now, take a look at number 30 which is the
22 next paragraph.  It says, "Harris replied on
23 December 10th by sending Lee a copy of a redlined
24 sublease and a, quote, 'final executable copy' and
25 wrote that, quote, 'If the attached is acceptable,

Page 155

E. Brooks

1
2 please advise and I will forward instructions for
3 execution promptly.'"
4    Do you see that?
5 A.    Yes.
6 Q.    Okay.  Do you know whether anybody
7 responded to Diana Lee's inquiry about whether the
8 co-op has approved?
9 A.    I don't know.  I don't know.
10 Q.    Do you know if Diana Lee ever made any
11 inquiry on your behalf or on C.C.M.S.'s behalf
12 prior to your execution of the sublease whether or
13 not the board had approved the transaction?
14 A.    I don't remember.
15       MR. MARGOLIS:  Let me have this
16    marked as Exhibit E.
17       (Defendants' Exhibit E, an email,
18       was marked for identification.)
19 Q.    I'm showing you an email that was produced
20 by your attorneys.  It's a communication between
21 Diana Lee, which is your transactional attorney,
22 correct?
23 A.    Yes.
24 Q.    And yourself, Ebrooks@ccmnyc.org.  Have you
25 seen this email before?

Page 156

E. Brooks

1
2 A.    Let me look at it.
3    (Perusing.)
4    Yes.
5 Q.    So you recall seeing this email?
6 A.    Yes.
7 Q.    You received it from Diana Lee?
8 A.    Yes.
9 Q.    If you see item number 5, it says, "re: 40
10 E.  Has the co-op consented to the sublease and the
11 work to be performed by tenant to prepare the space
12 for its use?  Emory, are there any permits needed?"
13    Do you see that?
14 A.    Yes.
15 Q.    Did you respond to Diana Lee?
16 A.    I did, but I don't remember what I said
17 without checking.
18 Q.    When you say without checking?
19 A.    Without going and finding my response to
20 this.
21 Q.    Okay.  So you believe you would have
22 communicated to her back?
23 A.    Yes.  Mm-hmm.
24 Q.    As you sit here today, do you know with
25 respect to specifically number 5, whether you



Page 157

E. Brooks

1
2 advised her about the co-op's consent?
3 A.    No.
4            MR. MARGOLIS:  I'm going to call
5        for the production of any communications
6        from Mr. Brooks to Ms. Lee responding to
7        this email specifically.
8 Q.    Is it fair to state at this time, December
9 11, 2019, that your attorney Diana Lee didn't know
10 whether the co-op at that point had consented to
11 the sublease?
12 A.    That's correct.
13 Q.    Take a look at paragraph 31 of the
14 complaint.
15        We should just keep that in front --
16            (Simultaneous speakers.)
17 Q.    And just keep that to your side because I'm
18 going to keep coming back to that.
19 A.    All right.  30?
20 Q.    No.  31 which is on Page 8.
21        In paragraph 31 it says, "On December 16th,
22 C.C.M.S.'s broker Bob King emailed Oxford Realty's
23 Nigel Shamash inviting Shamash to visit an existing
24 C.C.M.S. office in Brooklyn.  It was understood
25 then that Shamash wanted to conduct due diligence

Page 158

E. Brooks

1
2 on C.C.M.S.'s existing offices or operations.  King
3 added in the email, quote, 'Nigel, I gave Emory,
4 C.C.M.S.'s president, assurances that the board had
5 approved already.  I hope this works out.'"
6        Do you see that?
7 A.    Yes.
8 Q.    So as of this point, is it your
9 recollection that Bob King had assured you that the
10 board had approved it by that point?
11            MS. TURNER:  Objection.
12 Q.    You could answer.
13 A.    Yes.
14 Q.    Okay.  And how did Bob give you that
15 assurance?
16 A.    I don't know if -- I don't remember if it
17 was by email or by phone call.
18 Q.    Well, what did he tell you about a board
19 approval?
20 A.    I'd have to review my documents.  I'd have
21 to review my documents and an email that -- I mean,
22 a telephone call that I did record that he called
23 me -- I have to check the date now, in terms of
24 being very excited and happy and so forth and said
25 we got it.  Nigel just called me and we have the

Page 159

E. Brooks

1
2 approval and we'll try to get you in there in two
3 or three days.  That's on voice message.
4 Q.    Okay.  And that's something that you have
5 preserved?
6 A.    Yes.
7            MR. MARGOLIS:  Okay.  I'm going to
8        call for the production of this, which has
9        also not been produced.
10 Q.    It's your recollection that in that
11 recording he told you that you received board
12 approval?
13 A.    I think so.  I'm not a hundred percent
14 sure.  There was a whole lot of we're about to have
15 it, you know, I think we got it.  We should be able
16 to get in in two or three days.  I don't know if it
17 was any more than that.
18 Q.    So you don't know with certainty that it
19 was actually a statement of approval, but it may be
20 something positive-sounding?
21 A.    Yes.
22 Q.    Okay.  It says, "I hope this works out."
23        Any idea -- do you have any idea why Bob
24 King would be saying to Nigel, I hope this works
25 out?

Page 160

E. Brooks

1
2            MS. TURNER:  Objection.  Calls for
3        speculation.
4 Q.    If you know.  I'm not asking you to
5 speculate.
6 A.    Yes.  Everyone -- everyone -- I was
7 concerned.  Bob King, everyone was worried at this
8 point that the deal was being sabotaged, okay.  So
9 any little signs in terms of delay in what was
10 going on and we think that people changed -- some
11 people that were in support of the project changed
12 their mind about supporting it.  That's what it
13 felt like.  I'll just say to you.
14 Q.    Okay.  But this was December 16th though.
15 So what happened at around December 16th that made
16 you think that the deal was maybe being sabotaged?
17 You testified earlier you had not yet gotten the
18 application; you hadn't been told about the
19 interview.  Nothing.  So tell me what was happening
20 at this date that supports your statement now that
21 the deal was somehow maybe being sabotaged by
22 people changing their minds.
23 A.    I'd have to check my emails and notes
24 around that time.  Is this from the 15th --
25 Q.    The 16th.



COMMUNITY COUNSELING AND MEDIATION  30b6         December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                      161–164

Page 161

E. Brooks

2  A.    The 16th. I think that one of the things
3  that had just happened was the -- in the
4  negotiation of the lease, the attorney all of a
5  sudden became unavailable -- became unavailable to
6  finish the lease with Diana.
7  Q.    What attorney?
8  A.    Eton Harris. Okay. Eton Harris, and it
9  was a matter of, you know, four or five days or so.
10 And it felt like something had happened. And we
11 contacted Nigel. And that was the email from Nigel
12 saying look, no, no. Don't worry about this.
13 We're a man of our word. We haven't changed our
14 mind. And he sent an email and copied us where he
15 was yelling at the attorney, Get back to Diane,
16 finish this up, and so forth.
17      So this was the climate, okay, that this
18 was occurring in. And of course it put us in a
19 complete paranoid state at that point in terms
20 of -- so that's -- to answer your question, that
21 was a little sign that something was going wrong
22 around the deal.
23 Q.    Okay.
24 A.    Our interpretation of it now -- my
25 interpretation of it.

Page 162

E. Brooks

2  Q.    Okay. What knowledge do you have today
3  that Marc Paturet knew about what was going on at
4  around this time?
5  A.    There was no reason to think anything
6  otherwise.
7  Q.    Well, I'm asking -- I hear you. I
8  appreciate that. But I'm asking specifically,
9  tangibly, what did you know that Marc Paturet was
10 thinking or doing at this time relating to this
11 deal?
12 A.    Well, we think that he was the reason why
13 we were getting close and that they were
14 negotiating and trying to find that sixth vote or
15 if someone else -- it's the sixth vote. It was
16 like someone grabbed the sixth vote and said no,
17 no, no, no. Let's not approve this and --
18 Q.    Okay. Who is the someone that grabbed the
19 sixth vote? Do you know specifically who that is?
20 A.    I don't know specifically.
21 Q.    Okay. Well, do you know not specifically?
22 Do you know at all?
23 A.    I could guess.
24 Q.    No.
25 A.    You don't want a guess.

Page 163

E. Brooks

2  Q.    I don't want you to guess. I want real
3  facts. I want what you know. I don't want you to
4  guess. I'm asking you --
5  A.    I don't know.
6  Q.    Do you know who that sixth vote even was?
7  A.    No.
8  Q.    Do you even know other than them telling
9  you that there was a need for a sixth vote, that
10 there actually was a sixth vote that was relevant
11 here?
12 A.    Just common sense. Just common sense that
13 if Nigel didn't have a lot of votes committed to
14 him, okay, for his own sake and his own finances,
15 wouldn't have allowed it to have gone this far. He
16 would not -- why would he be spending 10, $15,000
17 to create a lease if he's thinking that, Wait now.
18 I'm not for sure I can get this approved.
19      Why couldn't he just simply waited --
20 waited and got the approval from the board before
21 his spending his own money. He didn't do that. So
22 he acted as if he had control of the deal, which
23 was consistent with what he said all along. And so
24 we accepted that.
25      (Simultaneous speakers.)

Page 164

E. Brooks

2  Q.    But do you know as a fact that he had
3  control over the deal?
4  A.    Just common sense.
5  Q.    But I'm asking if you knew as a fact that
6  he had control over the deal?
7  A.    No.
8      MS. TURNER: Objection.
9  Q.    You also testified that you believed there
10 were 12 members of the board. Explain to me how
11 six votes would have given you approval.
12 A.    I don't know. I don't know what the
13 bylaws -- I couldn't understand it. I don't know
14 what the bylaws and the proprietary lease states
15 about that. There is some language in there that
16 describes it. But I don't have the ability to
17 really understand as someone that's an expert in
18 terms of, you know, leases and so forth. I didn't
19 understand. I just knew that there were 12 floors.
20 But the 12th floor could have been for something
21 else, and this is all based on what Nigel had
22 communicated to Bob from the very beginning.
23 Q.    Which you acknowledged you didn't verify by
24 reviewing any of the documents -- the corporate
25 documents yourself, correct?



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
165–168

Page 165

E. Brooks

1
2   A.   Right.
3   Q.   Okay.  Take a look at paragraph 39 on Page
4   9.
5        It says there, "After C.C.M.S. sent the
6   signed sublease and checks on December 19th, King
7   asked Nigel Shamash by email, 'Where are we with
8   the board?  C.C.M.S. has deliveries coming and
9   asking me for the keys.'  On December 22, King
10  emailed Shamash and asked, 'Do we have board
11  approval?  Let's finish this.'  Saul Tawil from
12  Oxford emailed King, 'Patience.  We are at the
13  finish line.'"
14       Do you see that?
15  A.   Yes.
16  Q.   Okay.  Were you privy to those
17  communications?
18  A.   Yes.
19  Q.   Okay.  So it's fair to say that on December
20  22, King was inquiring of Shamash do we have board
21  approval.
22       Do you see that?
23  A.   Yes.
24  Q.   And so you knew at that point in time that
25  there was no board approval?

Page 166

E. Brooks

1
2   A.   Yes.  Yes.
3   Q.   In 41 it says, "After C.C.M.S. was turned
4   away by the building, King emailed Shamash that
5   same day, quote, 'They, C.C.M.S., had planned to
6   begin moving today.  They have been turned away by
7   building personnel because they have not been
8   informed that a lease has been signed.  That may be
9   legally correct, but it stinks.  Is this going to
10  happen?'"
11       Do you see that?
12  A.   Yes.
13  Q.   Were you aware of this email communication
14  from King to Shamash?
15  A.   Yes.
16  Q.   Okay.  And do you know what King is
17  referring to when he says that may be legally
18  correct?
19  A.   Well, yes.  In terms of the requirement for
20  the board to meet, all of this is correct.  But
21  it's inconsistent with what Shamash has represented
22  to the broker in terms of --
23  Q.   That's who?
24  A.   Shamash -- Nigel.
25  Q.   Nigel.

Page 167

E. Brooks

1
2   A.   Nigel.
3   Q.   Okay.
4   A.   Had represented to the broker in terms of
5   the process and this is all inconsistent with his
6   having five votes in his pocket and needing six.
7   Q.   But at this time in or about December 23,
8   Bob and Shamash are emailing with each other, and
9   it's clear, at least from these emails as
10  communicated to you, that things are not yet in
11  place with the building, correct?
12  A.   Yes.
13       MS. TURNER:  Objection.
14       THE WITNESS:  Oh, I'm sorry.
15  Q.   You can answer.
16  A.   Yes.
17  Q.   Yes.
18       MR. MARGOLIS:  Let's have this
19  marked as Exhibit F.
20       (Defendant's Exhibit F, email
21       thread, were marked for identification.)
22  Q.   I'm showing you what's been marked as
23  Exhibit F which is a couple of emails.  Your
24  attorney produced these as C.C.M.S. 28 to 29.
25       If you take a look at the last page, and

Page 168

E. Brooks

1
2   then look forward to the front page, at least the
3   email at the bottom, that's consistent with the Q
4   and A we just had a moment ago, right?  Is this the
5   communication between Robert King and Shamash about
6   the move-in?
7   A.   Let me look.
8   Q.   Sure.
9   A.   (Perusing.)
10       Yes.
11  Q.   And this is -- is there any reference to
12  the board here?
13  A.   Nigel is communicating that the board vote
14  is set imminently.
15  Q.   That's the email above.  I was asking you
16  in the email in the bottom.
17  A.   Okay.  Let's see.
18       (Perusing.)
19       (Unintelligible) and what's your question?
20  Q.   Is there any reference to the board in that
21  email?
22  A.   No.
23  Q.   In the email above on the first page, as
24  you pointed out a minute ago, there is a reference
25  from Nigel Shamash in his email to Bob about, "The



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
169–172

Page 169

1             E. Brooks
2   board vote is set immediately.  It's no different
3   to any other building."
4       Do you see that?
5   A.   Yes.
6           MS. TURNER:  Objection.
7   Q.   Do you see that?  You can answer the
8   question.
9   A.   Yes.
10  Q.   This email was shared with you by Bob?
11  A.   Yes.
12  Q.   There's no reference to the sixth vote.
13      Do you see that?
14  A.   Right.
15  Q.   When you got this email from Bob and it
16  said board vote is at immediately, did you
17  communicate to him in any way in writing, what
18  board vote?  You already have five votes, we just
19  needed the sixth vote.  What is the board vote that
20  is referred to here?  Did you communicate in any
21  way that way?
22          MS. TURNER:  Objection.
23  Q.   You can answer.
24  A.   No.
25          MS. TURNER:  Can I just clarify?

Page 170

1             E. Brooks
2       The email says the board vote is set
3       imminently.  I think you said immediately a
4       few times.  I just wanted to correct --
5           MR. MARGOLIS:  If I said
6       immediately, I meant to say imminently.
7       You can correct the record.  Thank you.
8       Thanks.
9   Q.   You can put that down.
10  A.   Okay.
11  Q.   Do you know as of this date whether you had
12  submitted the application?
13          MR. CASE:  You mean December 23rd,
14      right?
15          MR. MARGOLIS:  December 23.
16  A.   Do I know as of December 23rd if I had
17  submitted?  I think it was submitted on that date,
18  around that date.
19  Q.   Well, let me show you and we'll mark as
20  Exhibit G.
21          (Defendants' Exhibit G, sublet
22      application, was marked for
23      identification.)
24  Q.   I'm showing you what's been marked as
25  Exhibit G.  Take a look at this.

Page 171

1             E. Brooks
2   A.   Right.
3   Q.   Have you seen this before?
4   A.   Yes.
5   Q.   If you take a look at the second and third
6   pages, it's a form with handwriting.  Is that your
7   handwriting?
8   A.   Yes, it is.
9   Q.   And take a look at the last page.
10      And there's a signature on that page.  Do
11  you recognize that signature?
12  A.   Yes.  It's mine.
13  Q.   And there's a date.  Do you see the date?
14  A.   Yes.
15  Q.   What is the date?
16  A.   December 24th.
17  Q.   What year?
18  A.   2019.
19  Q.   Okay.
20      Can we just go off the record for one
21  moment?
22          (Whereupon, a discussion was held
23      off the record.)
24          (Whereupon, a recess was taken at
25      this time.)

Page 172

1             E. Brooks
2           MR. MARGOLIS:  Let's have this
3       marked as H.
4           (Defendants' Exhibit H, email
5       thread, were marked for identification.)
6   Q.   Okay.  Mr. Brooks, I'm showing you a series
7   of emails.  It's a two-page document produced by
8   your attorneys, C.C.M.S. 16 to 17.
9       It starts with an email at the bottom where
10  Nigel is writing to Robert, "Robert, please have
11  this filled in ASAP.  Thanks.  Nothing here we
12  don't already have.  Need to get this email to the
13  board this minute."
14      Do you see that?
15  A.   Yes.
16  Q.   And then right above it there's an email
17  from Robert to you.  This is December 23rd at 12:46
18  p.m.  "Please fill out ASAP."
19      Do you see that?
20  A.   Yes.
21  Q.   Do you recall receiving this email?
22  A.   Yes.
23  Q.   Now, take a look at the above.  There's an
24  email from Nigel to Diana Lee, cc Robert King and
25  you.  I think also your admin is there.



COMMUNITY COUNSELING AND MEDIATION  30b6      December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                        173–176

Page 173

E. Brooks

1
2      Do you see that?
3  A.    Yes, I do.
4  Q.    Okay.  It says, "Monday, December 23rd at
5  12:51 p.m., reapplication.  Peter says he sees no
6  issue with this tenant, so please fill in the
7  document and any nonconforming questions simply
8  leave blank or write not applicable."
9      Do you see that?
10  A.    Yes.
11  Q.    You testified earlier about some sort of
12  email where Peter had said something about the
13  tenant.  Do you recall that?
14  A.    Yes.
15  Q.    Is this the email that you were referring
16  to?
17  A.    I think so.
18  Q.    Okay.  Thank you.  And who do you
19  understand Peter to be?
20  A.    In charge of the Kaled leasing company.
21  Q.    Okay.
22  A.    He's the boss.
23  Q.    When you say the Kaled leasing company, do
24  you mean the managing agent of the building?
25  A.    Yes.

Page 174

E. Brooks

1
2  Q.    Are you aware or have seen any
3  communications between Peter at Kaled and the board
4  regarding C.C.M.S.?
5  A.    No.
6  Q.    Do you have any reason to doubt that on
7  this day Peter believed that your application was
8  fine?
9  A.    I have no reason to doubt it.
10      I'm not allowed to ask you a question ever?
11  Q.    No, no, no.
12  A.    Next time.
13  Q.    I know.  If we were having coffee, you
14  would.  But not in this context, sir.  I'm sorry.
15  A.    Okay.
16  Q.    Okay.  You can put that down, please.
17  A.    All right.
18      MR. MARGOLIS:  Let's have this
19  marked as I.
20      (Defendants' Exhibit I, email
21      thread, was marked for identification.)
22  Q.    Mr. Brooks, I'm showing you a two-page
23  document produced by your attorneys, C.C.M.S. 18 to
24  19.  I want to start on the second page which seems
25  to be the earliest of the emails.  There's an email

Page 175

E. Brooks

1
2  at the bottom from Emory Brooks, Tuesday, December
3  24th, 6:05 p.m. to a number of email addresses.
4      Do you see that?
5  A.    Yes, I do.
6  Q.    Okay.  And that's an email -- have you seen
7  this email before?
8  A.    Yes.
9  Q.    And is that the email that transmitted the
10  application?
11  A.    Yes.
12  Q.    You had not submitted an application at any
13  point in time before this, correct?
14  A.    That's correct.
15  Q.    Okay.  So there are a couple of email
16  addresses I just want to go over with you.
17      Do you recognize the email address
18  Ns@5cre.com?
19      Let me find that actually.  That's Nigel's.
20  That's Nigel's company.
21  Q.    And then it says, "Susan Rubin,
22  Susan@kaled.com"?
23  A.    Yes.
24  Q.    Okay.  That's the managing agent, correct?
25  A.    Yes.

Page 176

E. Brooks

1
2  Q.    Then there's one Kbknyc@gmail.com.  Who is
3  that?
4  A.    That's Bob.  Bob King.
5  Q.    Bob King.  Okay.  And then Dlee@manatt,
6  that's your lawyer, correct?
7  A.    Yes.
8  Q.    Okay.
9      (Reporter clarification.)
10      MR. MARGOLIS:  M-A-N-A-T-T.
11  Q.    Right above that is an email December 26th.
12  I guess everybody took off for Christmas.  You sent
13  it in on Christmas Eve at 6:05 p.m.  Do you
14  remember doing that on Christmas Eve?
15  A.    Let's see.  This came from me?
16  Q.    On the bottom.
17  A.    On the 24th.
18  Q.    Yes.
19  A.    Yes.
20  Q.    That's Christmas Eve, right?
21  A.    Yes.
22  Q.    6:05 p.m.
23  A.    Yes.
24  Q.    And then you get a response the day after
25  Christmas, December 26th, from Susan.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
177–180

Page 177

E. Brooks

1
2        Do you see that above?
3   A.     Yes.
4   Q.     "I am in receipt of your application which
5   I will start to process"?
6   A.     Yes.
7   Q.     And then she asks you about the checks.
8        Do you see that?
9   A.     Yes.
10  Q.     Okay.  Then above that there's an email
11  from Nigel to Susan, cc you.
12       Do you see that?
13  A.     I see that.
14  Q.     Where he tells her that, "However, we are
15  in a rush.  We will handle any payment next real
16  working day.  Is that okay?  Thanks."
17       Do you see that?
18  A.     Yes.
19  Q.     Did they advance the fee?
20  A.     No.  We paid the fee.
21  Q.     Okay.  Do you know what he meant by "we
22  will handle any payment next real working day"?
23  A.     My understanding is that he was saying
24  don't hold up anything based on that, that we'll be
25  responsible for --

Page 178

E. Brooks

1
2   Q.     So the "we" meaning somehow either you guys
3   or him, somebody would handle it?
4   A.     Well, clearly we were supposed to handle
5   it, but he was saying that he would be responsible
6   for it.  And he didn't want Susan to hold us up
7   five minutes, the processing of it based on the
8   fee.
9   Q.     Understood.  Got you.  Okay.  And Susan
10  writes back moments later, "I will start the
11  process and then submit to the board."
12       Do you see that?
13  A.     Yes.
14  Q.     Do you remember seeing that at this time?
15  A.     Yes.
16  Q.     So as of this time, it was communicated to
17  you that the board was going to be seeing your
18  package, right?
19  A.     Yes.
20  Q.     And the board hadn't seen that package at
21  any prior time because you never submitted anything
22  directly to the board, correct?
23  A.     That's correct.
24  Q.     The next thing is Bob writes around
25  lunchtime to Susan, but then he cc's you and Nigel

Page 179

E. Brooks

1
2   and addresses the email to Nigel himself.
3        Do you see that?
4   A.     Yes.
5   Q.     Do you recall seeing this email?
6   A.     Yes, I do.
7   Q.     Okay.  You can put that down.
8   A.     Mm-hmm.
9            MR. MARGOLIS:  Let's have this
10  marked as J.
11           (Defendants' Exhibit J, sublease
12  summary, was marked for identification.)
13  Q.     Okay.  Mr. Brooks, I'm showing you
14  something, a document, two pages, C.C.M.S. 68 to 69
15  produced by your client.  Do you see that -- by
16  your attorney.
17       Do you see that?
18  A.     I see this.
19  Q.     Have you seen this before?
20  A.     Let me look and see.  I think so.
21  Q.     Okay.  Do you know who drafted this
22  document?
23  A.     Let me look at it carefully now.
24  Q.     Please.
25  A.     I don't know who prepared this.

Page 180

E. Brooks

1
2   Q.     Have you ever seen it before?
3   A.     I think I have.  I'm not for sure.
4   Q.     You're not sure.  Okay.  Take a look at the
5   front page in the top in the first paragraph.
6        It says, "The building is owned by a
7   cooperative cooperation in which landlord leases
8   the premises."  And then it defines the situation,
9   that situation as described, the over-lease.
10       So it says, "in which the landlord leases
11  the premises from West 27th Street Realty, Inc.,
12  the over-landlord.  Therefore, this is a sublease."
13       Do you see that?
14  A.     Yes.
15  Q.     Is that consistent with your understanding
16  about what the arrangement was intended to be
17  between C.C.M.S., Oxford Realty, and West 27th
18  Street Realty, Inc.?
19  A.     Well, the problem I'm seeing right now in
20  terms of listing the premises as the entire 8th
21  floor, that's not correct.
22  Q.     Well, I'm asking you about -- I see what it
23  says about the premises.  I'm not asking you about
24  that.  I'm asking you about the top.  The
25  narrative.  This describes that there's a landlord



Page 181

E. Brooks
1
2 and that there's an over-lease, an over-landlord.
3    Do you see that?
4 A.   Yes, I do.
5 Q.   Okay.  So is that consistent with your
6 understanding that the over-landlord was West 27th
7 Street Realty, Inc.?
8 A.   Well, I didn't -- I didn't see or
9 understand this in the past.  This is the first
10 time that I'm looking at this.
11 Q.   Okay.  So you don't -- this doesn't mean
12 much to you because you never saw it before?
13 A.   That's right.
14 Q.   Okay.  So let's move on.
15    Let's have this marked as K.
16       (Defendants' Exhibit K, sublease,
17    was marked for identification.)
18       (Whereupon, a discussion was held
19    off the record.)
20 Q.   I'm showing you what we've marked as K.
21 Have you seen this document before?
22 A.   Yes, I have.
23 Q.   What is this document?
24 A.   This is the lease for the premises.
25 Q.   Is this the sublease or the lease?

Page 182

E. Brooks
1
2 A.   Well, I was going to say lease, but
3 sublease.  It's the sublease.
4 Q.   Okay.  It says at the top "standard form of
5 sublease Oxford Realty."
6    Do you see that?
7 A.   I see that.
8 Q.   Okay.  Then if you go to the first
9 paragraph under where it says, "agreement of
10 sublease," it says -- well, it says before that,
11 "Agreement of sublease made as of this 12th day of
12 December 2019."
13    Do you see that?
14 A.   Let me find that.  Where is that?
15 Q.   It's the very small print over here
16 (indicating).
17    Agreement of sublease, and there's a date.
18    Do you see that?
19 A.   Yes.
20 Q.   Okay.  And then it says, "Oxford Realty &
21 Holdings LLC," with an address, "party of the first
22 part, herein after owner, and C.C.M.S.," with an
23 address, "party of the second part."
24    Do you see that?
25 A.   I see that.

Page 183

E. Brooks
1
2 Q.   Now, do you see the next section, it says,
3 "witnesseth," W-I-T-N-E-S-S-E-T-H, "witnesseth"?
4 A.   Yeah.
5 Q.   Okay.  And then it says, "Whereas by
6 agreement dating June 15, 2004, herein after the
7 over-lease West 27th Street Realty, Inc., herein
8 after the over-landlord has leased to owner unit
9 number 8, which owner hereby represents to tenant
10 is the entire 8th floor in the building known by
11 street number as 129 West 27th Street, New York,
12 New York."
13    Do you see that?
14 A.   Yes.
15 Q.   Okay.  Now, this document is Bates stamped
16 with a o-op 0289 on the bottom through co-op 0321.
17 I'll represent that this is a document that we
18 produced to your attorneys.  What I'd like you to
19 do is I'd like you to turn to Page Co-op 0293.  And
20 let me know when you get there.
21 A.   Okay.
22 Q.   Okay.  So there's a signature at the bottom
23 under the printed letters C.C.M.S.
24    Do you see that?
25 A.   Yes, I do.

Page 184

E. Brooks
1
2 Q.   Do you recognize that signature?
3 A.   That's my signature.
4 Q.   Okay.  And there's also a witness's
5 signature.
6    Do you see that?
7 A.   Yes, I do.
8 Q.   Do you recognize that signature?
9 A.   No.
10 Q.   Okay.  Do you remember signing the
11 sublease?
12 A.   No.
13 Q.   Did you sign the sublease?
14 A.   I think I did.  I don't remember though.
15 Q.   Okay.
16 A.   I don't remember this.
17 Q.   Okay.  Well, at some point earlier today
18 you testified that you signed the sublease, but you
19 don't remember ever getting a copy of the
20 sublease -- signed lease returned from Oxford.  Do
21 you remember that testimony?
22 A.   Yes.
23 Q.   Okay.  Do you have any reason to believe
24 that this is not the sublease that you signed?
25 A.   Well, this makes no sense in terms of this



COMMUNITY COUNSELING AND MEDIATION 30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
185–188

Page 185

E. Brooks

1
2  shows the premises at the 8th floor and we're the
3  7th floor.
4  Q.   Okay.  I'm not asking you whether it makes
5  sense or not.  I'm just asking you -- I'm asking
6  you if you signed -- you recognized your signature,
7  and you said yes.  And so you're not -- you're not
8  sure if you signed the sublease?
9       MS. TURNER:  Objection.
10 A.   I'm not -- I'm not saying that.  I'm just
11 saying your question is this is my signature?
12 Q.   Correct.
13 A.   Okay.  That's what you're asking, did I
14 sign this?
15 Q.   Correct.
16 A.   Yes.  The answer is yes.
17 Q.   Okay.  My other question to you was there's
18 a recital on the first page where it speaks about
19 West 27th Realty, Inc. being the over-landlord.
20     Do you see that?
21 A.   Yes.
22 Q.   Did you understand in signing the sublease
23 that you signed that there was an over-landlord to
24 Oxford being the landlord that was subleasing to
25 you?

Page 186

E. Brooks

1
2  A.   Did I understand that?
3  Q.   Yeah.
4  A.   I paid no attention to that, no.
5  Q.   When you say you paid no attention to it,
6  did you not read what you were signing before you
7  signed it?
8  A.   Beat me up on this, but let's assume this
9  was a regular sublease application and I didn't
10 read it carefully.  I did not read it carefully.
11 Q.   Okay.  Take a look at Page Co-op 0295.
12 There's a box at the bottom with initials.
13 A.   Yes.
14 Q.   Are those your initials?
15 A.   Yes.
16 Q.   Did you initial that?
17 A.   Yes.
18 Q.   Take a look at the next page.
19     Did you initial that?
20 A.   Yes.
21 Q.   Take a look at the next page.
22     Did you initial that?
23 A.   Yes.
24 Q.   Take look at the next page.
25     Did you initial that?

Page 187

E. Brooks

1
2  A.   Yes.
3  Q.   Take a look at the next page.
4      Did you initial that?
5  A.   Yes.
6  Q.   Take a look at the next page.
7      Did you initial that?
8  A.   Yes.
9  Q.   I'll represent that through the end of the
10 document, which is co-op 0321, they're all
11 initialled similarly.  Any reason to believe those
12 are not your signatures -- your initials rather?
13 A.   No.
14 Q.   Did you read any of those pages before
15 initialing them, Mr. Brooks?
16 A.   I don't think so.  No.
17 Q.   Where were you when you initialed this
18 document?
19 A.   I don't remember.  I don't remember if this
20 was e-mailed to me and I signed and initialed them
21 and emailed them back to someone -- to the
22 attorney.
23 Q.   Do you recall being in the same room with
24 your attorney when you initialed this?
25 A.   That I know I was not.  I would have been

Page 188

E. Brooks

1
2  in my office.
3  Q.   Okay.  So at any point in time, did you go
4  through page by page this document with your
5  attorney?
6  A.   No.
7  Q.   Take a look at 0298 of this document.
8      (Whereupon, a discussion was held
9      off the record.)
10 Q.   Okay.  So I'm asking you to look at co-op
11 0298.
12 A.   Okay.
13 Q.   And at the top in 41 dash A, little, A, do
14 you see that?  And then it says capital A.
15     "This sublease and all the rights of
16 parties hereunder are subject and subordinate to
17 the over lease."
18     Do see that?
19 A.   Yes.
20 Q.   Do you know what that means?
21 A.   No.
22 Q.   Did you ever ask anybody about what that
23 means?
24 A.   No.
25 Q.   Prior to your initialing it, did you ever



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
189–192

Page 189

1                 E. Brooks
2   ask anybody?
3   A.   No.
4   Q.   Take a look at the next page, c-op 0299.
5   A.   Okay.
6   Q.   And it says E.  Do you see that?  There's a
7   B, C, a D, and an E?
8   A.   Mm-hmm.
9   Q.   And in E it says, "In accordance with the
10  terms and conditions of the over-lease, this
11  sublease is contingent upon the consent of the
12  over-landlord herein after referred to as the
13  over-landlord consent."
14       Do you see that?
15  A.   Yes.  Yes.
16  Q.   Do you recall seeing this provision when
17  you were executing this document?
18  A.   No.
19  Q.   Were you aware that the written sublease
20  that you were signing provided for -- had a
21  provision rather in it that said that the sublease
22  is contingent rather upon the consent of the
23  over-landlord?
24  A.   Yes.
25  Q.   So you knew that your sublease needed the

Page 190

1                 E. Brooks
2   approval of the co-op corporation, correct?
3   A.   Not from this.  Not from this document.
4   Q.   From the negotiations you knew it?
5   A.   Yes.
6   Q.   Okay.
7        But when you were initialing this page, you
8   were not aware that that was expressly stated here?
9   A.   That's correct.
10  Q.   Okay.  You can put that down.
11       (Whereupon, a discussion was held
12       off the record.)
13  A.   You know, if you -- you said that you
14  created this.  Was it sent to our attorney?
15  Q.   You can discuss these issues with your
16  attorney.
17  A.   Okay.  Okay.  All right.
18  Q.   I didn't say I created anything.
19  A.   I thought you said we created this.
20  Q.   No, I didn't say that.
21  A.   You didn't?
22  Q.   No.
23       MR. CASE:  I think he said he
24       produced it.
25       THE WITNESS:  Pardon?

Page 191

1                 E. Brooks
2        (Simultaneous speakers.)
3   Q.   I provided a copy of it to your attorneys.
4   A.   Okay.  Thank you.
5   Q.   Take a look at paragraph 49 of exhibit --
6   A.   Of the --
7   Q.   The complaint, yup.
8   A.   Okay.
9   Q.   49 provides, "The date before the board
10  interview, King emailed Shamash to ask if he had
11  any advice for Brooks to prepare for the
12  interview."
13       Do you see that?
14  A.   Yes.
15  Q.   When I asked you earlier today about a
16  communication about preparing for the interview, is
17  this consistent with what you were referring to
18  then?
19  A.   Yes.
20  Q.   Let me show you what we -- we're going to
21  mark this as L.
22       (Defendants' Exhibit L, email
23       thread, was marked for identification.)
24  Q.   I'm showing you what we've marked as L.
25       Below in the bottom there's an email

Page 192

1                 E. Brooks
2   January 13th, 4:58 from Robert King.
3        It says, "Hello, gentleman.  Is there any
4   advice you can offer to Emory before this board
5   interview tomorrow?  I hope all goes well."
6        You see that?
7   A.   Yes.
8   Q.   Have you ever seen that before?
9   A.   Yes.
10  Q.   Okay.  Now, take a look at the top.  All
11  the way up at the top.  It shows that Robert King
12  sent an email to Emory Brooks.
13       Do you see that?
14  A.   Yes.
15  Q.   Is that your email address?
16  A.   Yes, it is.
17  Q.   And it appears to be a forward of this
18  communication with Nigel Shamash.  You would agree
19  with that?
20  A.   Yes.
21  Q.   The top email from Nigel to Robert responds
22  to the earlier email and says, "I will be there
23  with you.  The attorney who represented you
24  represented a very similar use.  Just say you are
25  the same thing, low-traffic office use, and you



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
193-196

Page 193

E. Brooks

1   will be fine.  Just say you're the same as the
2   location on Clinton Avenue.  You will be completely
3   fine.  The same stuff that may be comfortable with
4   you will make them comfortable with you."
5       Do you see that?
6   A.   Yes.
7   Q.   Do you recall seeing that?
8   A.   Yes.
9   Q.   Do you know what Nigel was responding to
10  when he said low traffic office use?
11  A.   No.
12  Q.   Isn't it a fact that what you were
13  intending to use the premises for was not
14  low-traffic office use; isn't that true?
15  A.   No, it is not true.
16  Q.   Do you know why Nigel would write that if
17  that wasn't true?
18  A.   No.
19  Q.   "Just say that you're the same as the
20  location on Clinton Avenue."
21      Do you see that?
22  A.   Yes.
23  Q.   You know what Nigel meant about that?
24  A.   Yes.

Page 194

E. Brooks

1   Q.   What did he mean about that?
2   A.   Clinton is an outpatient clinic just like
3   the Manhattan clinic, okay.  And it has about 12,
4   13 offices, okay.  And it sees clients in all of
5   those offices.  So actually, I was doing that
6   because that's also true.  Okay.  So in describing
7   the clinic, I didn't need to describe the Clinton
8   clinic.  I can describe the Manhattan clinic.
9   Q.   Okay.  When --
10  A.   So the issue of low traffic --
11  Q.   I was just going to ask you.  Let me get to
12  that.
13      So Robert writes -- sends this exchange to
14  you about 5:55 p.m. on the 13th, the night before
15  the interview.
16      Did you have a conversation with Robert
17  about why it was that Nigel was communicating to
18  him that you should say low-traffic office use?
19  A.   No.
20  Q.   Okay.  But you knew when you saw that that
21  that was not consistent with the use that was
22  intended for the West 27th Street premises,
23  correct?
24  A.   That's both correct.  And I'm not clear,

Page 195

E. Brooks

1   okay, in terms of what low traffic means here.  If
2   we are leasing 14 treatment offices and we're using
3   14 treatment offices, and that was clear from day
4   one, I don't know how it gets defined in terms of
5   low traffic.  This is -- this is routine traffic
6   for treatment occurring in 14 offices.
7   Q.   So 14 offices, 20 personnel, over 300
8   patients, low-traffic office use is inconsistent
9   with that, correct?
10  A.   That's consistent.  That's consistent
11  with -- somebody said when did you stop beating
12  someone.  Well, wait now.  I never beat them in the
13  first place.  This is the description of the
14  clinic.  I described the clinic.
15  Q.   Right.  What I'm asking you though, this is
16  not a communication from you to anybody.  This is
17  Nigel communicating to Robert King, which Robert
18  King ultimately forwarded to you that evening.
19      Nigel is saying to Robert that Emory --
20  this is how I'm reading it -- that Emory should
21  tell the board at tomorrow's meeting that it's a
22  low-traffic office use.
23      Is that what it says?
24  A.   Yes.

Page 196

E. Brooks

1   Q.   Okay.  You agree with me that that was what
2   Nigel was telling Robert?
3   A.   Yes.
4   Q.   Okay.  And when you got that from Robert,
5   right, you understood that to be not consistent
6   with your understanding of how C.C.M.S. was going
7   to be operating at West 27th Street?
8       MS. TURNER:  Objection.
9   A.   No.  No -- I -- I -- I understood --
10  Q.   What did you understand that to mean when
11  you got the email?
12  A.   Okay.  See, I consider the clinic that we
13  operate, okay, 31st Street and the clinic that
14  we'll be operating there, it's the same place,
15  okay, and it is normal traffic.  This is normal
16  traffic, not -- I understood this to mean don't
17  maybe emphasize extra stuff beyond what you're
18  doing here.
19      In other words, like if we had 25
20  therapists and we had therapists working 8:00,
21  9:00, 10:00 at night and then seeing even more
22  patients, we weren't doing that.  Okay?  So I
23  wouldn't -- I would define it as I was operating a
24  normal clinic.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
197–200

Page 197

E. Brooks

1
2  Q.    Right.  But what I'm asking you is what did
3  you understand -- I hear you.  I understand exactly
4  what you're describing to me.  What I'm asking you
5  is a slightly different question, which is when
6  Robert King sent you this email and it says not
7  normal-traffic office use, not normal traffic for
8  your clinic, it says low-traffic office use.
9        My question is, did you comment in any way
10  to Robert King about why it was that Nigel was
11  recommending that you use the term "low traffic"?
12  A.    No.
13  Q.    Okay.  That's all I want to know.  Thank
14  you.  You can put that down.
15  A.    Okay.  Mm-hmm.
16          MR. MARGOLIS:  Let's have this
17      marked as M.
18          (Defendants' Exhibit M, email
19      thread, was marked for identification.)
20  Q.    I'm showing you Exhibit M, which is
21  something your attorneys provided to us, C.C.M.S.
22  0267 to 0268.
23        And at the bottom there's an email from
24  Michael Conte to Susan Rubin about -- it says, "The
25  board will meet on January 14th to consider this

Page 198

E. Brooks

1
2  application.  It is customary that the applicant
3  appear for an interview at that time.  According to
4  our bylaws, all sublets must be approved.  I am not
5  sure why anyone would assume otherwise."
6        Do you see that?
7  A.    Yes.
8  Q.    Okay.  Earlier today I asked you about
9  communications, and you mentioned to me that you
10  remember an email from Michael Conte.  Is this the
11  email that you were referring to?
12  A.    Yes, it is.
13  Q.    Okay.  And this, if you take a look at the
14  first page on the top, appears to have been sent to
15  you 10 days after the interview from Robert King.
16        Do you see that?
17  A.    Yes.
18  Q.    Do you know if you saw this email
19  contemporaneous with Mr. Conte communicating with
20  Susan Rubin and Nigel and the others that are
21  referenced below?
22  A.    Yes.
23  Q.    You did?
24  A.    Yes.
25  Q.    Do you know why Robert King was sending it

Page 199

E. Brooks

1
2  to you again on January 24th?
3  A.    No.
4  Q.    Take a look at below the email from Robert
5  King to you.  There's an email from Robert King to
6  Aweil@herbertmines.com.
7        Do you see that?
8  A.    Yes.
9  Q.    Do you know who Aweil@herbertmines.com is?
10  A.    No.
11          (Reporter clarification.)
12          MR. MARGOLIS:  A. Weil, W-E-I-L, at
13      Herbert, H-E-R-B-E-R-T, Mines, M-I-N-E-S
14      dot com.
15  Q.    Okay.  You can put that down.
16  A.    Mm-hmm.
17          MR. MARGOLIS:  Let's mark this as N
18      as in Nancy.
19          (Defendants' Exhibit N, an email,
20      was marked for identification.)
21  Q.    Okay.  I'm showing you what's been marked
22  as Exhibit N.  This is a document produced by your
23  attorneys, C.C.M.S. 269.
24        It's an email from Robert King to Saul and
25  Nigel.

Page 200

E. Brooks

1
2        Do you see that?
3  A.    Yes.
4  Q.    And the subject matter is in uppercase
5  letters, What, exclamation point.
6        Do you see that?
7  A.    Yes.
8  Q.    If you take a look at the "from" and "to"
9  that's above that, it says that Robert King sent it
10  to you on January 24, 2020.
11        Do you see that?
12  A.    Yes.
13  Q.    But did you see this earlier?
14  A.    Yes.
15  Q.    Who had sent it to you earlier?
16  A.    Bob King.  Bob King sent it to me.
17  Q.    It says in the first sentence of the email,
18  "You need to speed this up.  Can't wait until
19  January 14 and then the board might deny them."
20        Do you see that?
21  A.    Yes.
22  Q.    Did you have a discussion with Robert King
23  prior to him sending this email to Saul or Nigel?
24  A.    No.
25  Q.    Did you tell him to send this email?



COMMUNITY COUNSELING AND MEDIATION  30b6     December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS             201–204

Page 201

1            E. Brooks
2   A.    No.
3   Q.    He says, "I have not told Emory yet as I
4   have set up two new spaces to show him today after
5   he calms down."
6        Do you see that?
7   A.    Yes.
8   Q.    Why was he saying "after he calms down"?
9   A.    Well, he knew I would be upset with the
10  news here.
11  Q.    The news that there was an interview now
12  being scheduled now like two and a half weeks out,
13  correct?
14  A.    That's right.
15  Q.    Okay.  "He's going to go through the roof,
16  and Diana Lee had already told me that if this
17  blows up, there's going to be hell to pay.
18  Lawsuits."
19        Do you see that?
20  A.    Yes.
21  Q.    Okay.  Had you at this point discussed
22  lawsuits?
23  A.    No.
24  Q.    Do you know what that reference is to Diana
25  Lee telling him that if this blows up, there's

Page 202

1            E. Brooks
2   going to be hell to pay?
3   A.    Yes.  What is the -- it's a deferential
4   reliance.
5   Q.    Detrimental reliance?
6   A.    Detrimental reliance.  That four months of
7   negotiating with an agency, letting them do all of
8   this, and then at the last minute set up a, you
9   know, false stuff in order to reject them.  That
10  was what she said, Diana Lee.
11  Q.    When did you have that conversation with
12  her?
13  A.    I don't know if it was a conversation or an
14  email.  It probably was a conversation.  Maybe
15  around this time, around this -- but even before
16  that, because she was having questions in terms of
17  whether or not -- the first question was as an
18  attorney who had also worked with Kaled around
19  other leases, okay, she was familiar with the
20  process and she had questioned -- questioned the
21  need for this application.  Okay.
22        So that and some other things had her to
23  believe that this was part of the setup.  That we
24  were setting up -- setting up an explanation for
25  why we were going to be rejected.  But the plan was

Page 203

1            E. Brooks
2   to reject us.
3   Q.    Okay.  So on what basis that you know, if
4   she communicated it to you, that there was any
5   information that you were being rejected?
6   A.    Because it was the only thing that made
7   sense, okay, in terms of if they were cooperating
8   with us, okay --
9   Q.    Who's they?
10  A.    The board.
11  Q.    Well, where --
12  A.    The board --
13  Q.    -- again, I'm asking -- you've already
14  testified all day that you, at this point, had not
15  even spoken with the board.  So, I mean, where was
16  the board not cooperating --
17  A.    The information that the board would give a
18  meeting two and a half weeks after our lease has
19  expired was interpreted and felt to all of us,
20  okay, as if this was a delaying tactic, okay,
21  delaying tactic.  And it made no sense if you want
22  to accept a tenant, okay, to schedule a meeting
23  that far ahead knowing that they're going to start
24  being financially punished by the place that
25  they're financially in, because the lease would

Page 204

1            E. Brooks
2   have expired.
3   Q.    Okay.  I appreciate that.  Tell me what --
4   did you ever send your lease for the West 31st
5   Street premises to the board?
6   A.    Well, you see, you keep making reference to
7   the board, but you won't find any address and to
8   who, if one is sending something to the board, who
9   are you sending it to --
10  Q.    Well, I'm just asking you what -- did you
11  ever send your West 31st Street lease to Kaled?
12  A.    That wasn't indicated.
13  Q.    Okay.  So on what basis do you claim that
14  the board knew when your lease was expiring?
15  A.    Well, see, that's -- that's easy because
16  your -- the process of this board, okay, and of
17  this organization was to use the owner of the co-op
18  as the front person dealing with any application
19  for -- to occupy one of the co-ops.  So that's
20  Nigel is the person that correctly should have been
21  dealing with.
22  Q.    Okay.  So Nigel knew when your lease was
23  expiring, correct?
24  A.    Yes.
25  Q.    Okay.  Maybe Saul knew when your lease was



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
205–208

Page 205

E. Brooks
1
2  expiring.  Robert knew when your lease was
3  expiring.
4  A.    And Patuset [sic], the board president,
5  assuming that Michael wasn't lying about his
6  communications with the president.
7  Q.    Michael?  Michael who?
8  A.    I'm sorry.  Nigel, Nigel Shamash.
9  Q.    Nigel.  Okay.  But you have not seen any
10  such communications with Paturet, correct?
11  A.    Right.
12  Q.    As we sit here today, you don't know that
13  Nigel wasn't lying, correct?
14  A.    Right.
15  Q.    So if Nigel was lying, right, and he never
16  told the board about your lease coming to an end,
17  the board would not be able to know that you were
18  in financial straits by having this delay, correct?
19        MS. TURNER:  Objection.
20  Q.    Correct?
21  A.    Yes.  But the board would be responsible
22  for it.  If one of your employees were to hurt an
23  applicant coming in here, yes, that person's
24  responsible for it, but so is the law firm in terms
25  of having someone here, okay, that could hurt a

Page 206

E. Brooks
1
2  tenant or an applicant.
3  Q.    Okay.  What employee are you referring to?
4  A.    I'm talking about Nigel -- the system was
5  using the owner of the co-op to deal with all
6  applicants.  So if that person lies and screws up
7  and so forth, that person has some responsibility.
8  So does the institution; so does the organization.
9  Q.    Okay.  Pursuant to what are you relying
10  that if Nigel is lying to you and Nigel messes up
11  and Nigel doesn't communicate with the board about
12  your sublease --
13  A.    Mm-hmm.
14  Q.    -- and doesn't arrange for your application
15  and doesn't arrange for your interview until the
16  11th hour, what is the basis for the board's
17  responsibility, if you know?
18        MS. TURNER:  Objection.
19  A.    The board is responsible for whoever is
20  designated as the one to negotiate with an outside
21  tenant.
22  Q.    Okay.  My question to you is, where is
23  that?  What document are you referring to that that
24  is in, if you're relying on some sort of document?
25  Or are you just making that up?

Page 207

E. Brooks
1
2  A.    I'm just saying common sense.
3  Q.    Okay.  But other than -- whose common
4  sense?  You're --
5        (Simultaneous speakers.)
6  A.    Mine.  My common sense.
7  Q.    Okay.  But is there some --
8  A.    And I think the jurors' common sense.
9  Q.    -- is there some law that you're relying
10  on?  Is there some fact that you're relying on?  I
11  just want to know.  I'm just inquiring, Mr. Brooks.
12  You're saying that if Nigel's a liar and he doesn't
13  arrange the interview, he doesn't arrange the
14  application, he doesn't tell anybody about the --
15  your lease expiring at West 31st Street, somehow
16  that's on the board.  That's what you're saying.  I
17  appreciate it.  I'm asking you other than your
18  common sense, where are -- what are you relying on
19  to say that, if you know?
20        MS. TURNER:  Objection.
21  Q.    Do you know something specific that you can
22  point to?
23  A.    I don't know.  I don't know.
24  Q.    Okay.  Thank you.
25        MS. TURNER:  Barry, is it possible

Page 208

E. Brooks
1
2  we can take a break soon?
3        MR. MARGOLIS:  Soon.  Yes.  I'll
4  let you know.  I'll keep an eye on it.
5  Okay.  Let's take that break.
6        (Whereupon, a recess was taken at
7  this time.)
8  Q.    Let's take a look at 51.
9  A.    51?  Okay.
10  Q.    Yeah, please, of the complaint.
11  I went through this -- I showed this
12  provision to you earlier in the deposition where I
13  asked you about the people attending?
14  A.    Yes.
15  Q.    And then on the last sentence it says, "The
16  individuals who interviewed Brooks are members of
17  the defendant West 27th Realty, Inc. and all are
18  Caucasian or Jewish."
19  Do you see that?
20  A.    Yes.
21  Q.    Jewish.
22  I guess we'll start with the Caucasian.  Is
23  it your recollection that everybody in attendance
24  at the meeting representing the co-op in any way
25  were Caucasian?



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
209–212

Page 209

E. Brooks

1
2  A.    There were none black.
3  Q.    Okay.  None of them were black?
4  A.    Right.
5  Q.    Okay.  But what about Caucasian?
6  A.    I think that they were Caucasian.
7  Q.    Okay.  When you say you think they were --
8  I asked you earlier if you could describe any of
9  them and you said no.  So I'm asking you --
10  A.    That's what you were asking?  Okay.  I
11  thought you were asking specific description.
12         (Simultaneous speakers.)
13  Q.    I was asking you whatever way you wanted to
14  interpret it.  So my question to you is whose
15  selection for this term in 51 was Caucasian, was
16  that you or your attorney?
17  A.    Well, I would have been the one who would
18  have given them the information since I was there.
19  Q.    Okay.  So do you recall communicating that
20  everybody who was there was Caucasian?
21  A.    I don't remember saying that --
22  Caucasian -- or I think I also said or Jewish.
23  Q.    Okay.  Or Jewish?
24  A.    Yes.
25  Q.    Okay.  And what is the basis for your

Page 210

E. Brooks

1
2  statement that people were Jewish?
3  A.    That was just my impression.
4  Q.    Your impression based upon what, sir?
5  A.    Experience.
6  Q.    What's your experience to identify people
7  as Jewish by attending a meeting with them?
8         MS. TURNER:  Objection.
9  A.    I don't know.
10  Q.    Well, these are your words, sir.  So I'd
11  like to know why it is in paragraph 51 of this
12  complaint, people that you say who were attending
13  the meeting, you believe some were Jewish.
14  A.    Yes.
15  Q.    Did you discuss with them their religion?
16  A.    No.
17  Q.    Did you ask them what their religion was?
18  A.    No.
19  Q.    Did they identify for you what their
20  religion was?
21  A.    No.
22  Q.    So why is it that it says they were Jewish
23  there?  Do you know?
24  A.    No.  I have described -- can I answer?
25  Q.    No.  You're finished.

Page 211

E. Brooks

1
2  A.    Well, I'm not finished.  Let me -- let
3  me --
4  Q.    Do you need to clarify something?
5  A.    Can I clarify something?
6  Q.    Sure.
7  A.    I had presented my background, okay, my
8  background in terms of working, okay, at Hawthorne
9  Cedar Knolls School in Westchester.  It was a
10  Jewish organization, okay, and I had a Jewish
11  caseload of children, okay.  And I described that,
12  and I described that also hoping, okay, knowing
13  that my perspective that we were in trouble with
14  this board, hoping that in describing a part of my
15  background, which was the truth, okay, would have
16  me sympathetic in terms of both the children piece;
17  but also working with Jewish children for 12 years
18  okay, that if there was a member of the board that
19  was Jewish, okay, would feel positive about me and
20  my agency.
21  Q.    Okay.  Do you know if Michael Conte is
22  Jewish?
23  A.    No.
24  Q.    Do you think Michael Conte cared whether or
25  not you had worked with Jewish children or not?

Page 212

E. Brooks

1
2         MS. TURNER:  Objection.
3  A.    He would not have cared.  He was the one
4  that described the person in the synagogue -- black
5  person hurting people.
6  Q.    So let's talk about the black person
7  hurting people because that's in your complaint as
8  well.
9         Let's take a look at 56.  Okay?
10         By the way, before we get to 56, we'll talk
11  about that in a moment.  Marc Paturet, do you know
12  if he's Jewish?
13  A.    No.
14  Q.    How about Maxime Touton --
15         MR. CASE:  Just for clarity, does
16         that mean no, you don't know; or you know
17         that he's not?
18         THE WITNESS:  I don't know.
19  Q.    You don't know one way or the other?
20  A.    Right.
21  Q.    How about Maxime Touton?
22  A.    I don't know.
23  Q.    How about Joey Grill?
24  A.    I don't know.
25  Q.    How about Nigel Shamash?



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
213–216

Page 213

E. Brooks

1
2  A.    I had thought at the time that he might
3  have been.
4  Q.    Okay.  What made you think that?
5          MS. TURNER:  Objection.
6  Q.    You can answer.
7  A.    His -- I thought his eastern background and
8  I had worked with a considerable number of people
9  from Israel, okay, business people, okay, and I
10  just thought that he might have been.
11  Q.    Because of the way he looked?
12  A.    His name.  You know, his name, and I just
13  thought that, that either one could have been.  He
14  and Saul.
15  Q.    So because somebody might have been Jewish
16  on this board, you thought it was important to
17  share with them your experience with the Jewish
18  orthodox school or children that you had treated in
19  the past, correct?
20  A.    Yes.
21  Q.    Okay.
22          MS. TURNER:  Objection.
23  Q.    All right.  Now, let's go to 56.
24      There's a reference in 56 where you say,
25  "Board member F. Michael Conte raised with Brooks

Page 214

E. Brooks

1
2  without any prompt or any context the December 28,
3  2019, attack by an African-American man on a
4  group" -- I think it should have said of people,
5  but I think it says "a people"?
6  A.    Of people.
7  Q.    "On a group a people celebrating Hanukkah
8  in Monsey, New York."
9      Do you see that?
10  A.    Yes.
11  Q.    "The alleged attack in Monsey was reported
12  in the news as an African-American man who was
13  mentally ill and under medication.  He allegedly
14  attacked Orthodox Jewish man with a machete."
15      Do you see that?
16  A.    Yes.
17  Q.    Okay.  Were you familiar with this event
18  that took place?
19  A.    Yes.
20  Q.    Okay.  Was the man who attacked the
21  Orthodox Jewish man with a machete an
22  African-American man?
23  A.    Yes.
24  Q.    Was it a mentally ill man --
25          MS. TURNER:  Objection.

Page 215

E. Brooks

1
2  Q.    -- as far as you knew?
3  A.    My interpretation is yes.
4  Q.    Well, this allegation which is in your
5  complaint says the man was mentally ill and under
6  medication.  So where did you get that information
7  about this attacker?
8          MS. TURNER:  Objection.
9  A.    From the newspapers, reading about the
10  person and reading what happened and what was said,
11  okay.  As a licensed clinician, I made the
12  interpretation that this was behavior of a
13  disturbed person.
14  Q.    Okay.  A disturbed person who was mentally
15  ill, correct?
16  A.    Yes.  That's the same word, the same thing.
17  Q.    Disturbed, mentally ill?
18  A.    A mentally ill person.
19  Q.    A mentally ill person is somebody who's
20  diagnosed with some sort of mental illness,
21  correct?
22  A.    Or functioning in a mental illness way.
23  Q.    Okay.  And would they typically, as a
24  licensed clinical social worker, if you evaluated
25  them, likely to be diagnosed with some sort of

Page 216

E. Brooks

1
2  mental illness?
3  A.    Yes.
4  Q.    What about the medication, where did that
5  come from in the allegation?  Is that something
6  from the newspaper?
7          MS. TURNER:  Objection.
8  A.    I don't remember.
9  Q.    Okay.
10  A.    I don't remember.
11  Q.    When you -- sitting here recalling the
12  newspaper article or whatever references that you
13  knew about this incident from, was the attack on a
14  group of people celebrating Hanukkah in Monsey, New
15  York?  I don't know the facts.  So was that what
16  the article was reporting?
17  A.    Yes.
18  Q.    Okay.
19  A.    Yes, that's correct.
20  Q.    Now, there's another reference here in this
21  sentence to another board member raised the concern
22  about C.C.M.S.'s clientele, maybe the subject --
23  "may subject the building owner to lawsuits from
24  other tenants and clients if anyone gets injured by
25  a mentally ill client of C.C.M.S."



COMMUNITY COUNSELING AND MEDIATION  30b6                 December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                          217–220

Page 217

E. Brooks

1
2     Do you see that?
3  A.   Yes.
4  Q.   "Like what happened in Monsey," it says.
5     Do you know who -- what board member
6  specifically said that?
7  A.   The -- I thought it was -- I don't want to
8  guess on this.  Where is -- do you have the list --
9  the list that lists the board members and what
10 floors they're on?
11 Q.   No.
12 A.   Well, when I see that, I'll be able to look
13 at the name because it also described what floors
14 they were connected with and what agency they ran.
15 Whichever -- ever those five board members there,
16 whichever one was in charge of the one with the
17 models, okay, is the one that I'm talking about.
18 Q.   Okay.  So the next sentence says, "Board
19 member Grill added that his clients, young models
20 who come to his office, would be at risk from
21 clients."
22 A.   Then it would have been Grill.
23 Q.   Okay.  Well, here in the last sentence you
24 do talk about Grill.
25 A.   Okay.

Page 218

E. Brooks

1
2  Q.   But in the sentence before, you don't
3  reference Grill.  You just say another board member
4  raised the concern.
5  A.   Same one.
6  Q.   The same one?
7  A.   Yes.
8  Q.   Okay.  Earlier today you testified that the
9  board member that had the modeling agent was Maxime
10 Touton.
11 A.   That's what I --
12 Q.   So is it Grill or Maxime Touton?
13 A.   It's Grill.
14 Q.   What makes you say it's Grill?
15 A.   Because I -- this is what I put at the
16 time, okay, and this was right in front of me.  I
17 had documents, okay.  I'm told don't be bringing
18 any documents.  I want to be accurate but I'm -- to
19 try to trust your memory in terms of exactly which
20 one of them said this, it's hard to do.  Okay.
21 Q.   Okay.  So as you sit here today, this
22 refreshes your recollection that the board member
23 that made the statements about the young models and
24 the board member that made the statements about
25 somebody getting injured by a mentally ill client,

Page 219

E. Brooks

1
2  that was Grill?
3        MS. TURNER:  Objection.
4  A.   I'm not for sure now.  I'm not for sure.
5  I'd have to go and check, check some more.
6  Q.   What would you be checking?
7  A.   Be checking my notes.  I'd be checking
8  other documents.
9  Q.   What other documents?
10 A.   I don't want you to say, oh, I caught it.
11 Q.   I'm not looking --
12 A.   You said it was Grill and it was really
13 Touton.  Or it was he said Touton and it was really
14 Grill.
15 Q.   Mr. Brooks, this is not a trick.
16 A.   It's really irrelevant.  There were two
17 people that brought up comments like that.  Conte
18 was one and there was another board member and I
19 can check.  I don't want to get on the record now
20 and saying definitely it was this one.  Let me
21 check and see.
22 Q.   And these board members that raised these
23 comments raised comments about violence, correct?
24 A.   Yes.
25 Q.   Violence that people at C.C.M.S. might be

Page 220

E. Brooks

1
2  treating on the premises, correct?
3  A.   Yes.  Yes.
4  Q.   You can put that -- you can keep that out.
5  Okay.
6        If -- at any point in time, did Robert King
7  or Nigel Shamash or Saul in any conversations with
8  you tell you that they advised the board that your
9  premises would be solely used for administrative
10 purposes?
11 A.   Did Saul or anyone tell me --
12 Q.   Did Saul, Nigel, or Robert, those were the
13 three people that you seem to have been exclusively
14 dealing with until the end of December --
15 A.   Right.
16 Q.   -- tell you at any point in time that they
17 had advised the board that the sublease -- the
18 subtenant, C.C.M.S., was going to solely use the
19 premises for administrative offices?
20 A.   No.  No one.
21 Q.   Were you aware that -- rather --
22 Withdrawn.
23    Did at any point in time Nigel, Saul, or
24 Robert tell you that they had advised the board or
25 that they had not advised the board rather that you



COMMUNITY COUNSELING AND MEDIATION 30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
221–224

Page 221

E. Brooks

1
2  would be conducting therapy as a clinic at the
3  subject premises?
4        MS. TURNER:  Objection.
5  Q.    You can answer.
6  A.    They told the board -- they told the board
7  and the board was Patuset [sic], okay?  They told
8  the board that we were operating -- we'd be
9  operating a clinic.
10 Q.    Okay.  How do you know that, that they told
11 the board that you were operating as a clinic?
12 A.    Nigel.  Nigel --
13 Q.    Nigel.  Again, Nigel?
14 A.    Yes.
15 Q.    Okay.  Nigel told you he told the board?
16 A.    He told the broker and which then told me.
17 Q.    But if he was lying and he didn't tell the
18 board, the board wouldn't know, correct?
19       MS. TURNER:  Objection.
20 A.    That's correct.
21 Q.    At any point in time, did you ever describe
22 in any way during the meeting that the counseling
23 that C.C.M.S. provides to -- I don't know if
24 they're called clients or patients --
25 A.    Patients.

Page 222

E. Brooks

1
2  Q.    -- Patients are to assist people to rejoin
3  society?  Does that sound like something you would
4  say?
5  A.    No.
6  Q.    To assist people to normalize their life or
7  anything like that, is that something that you
8  would say?
9        MS. TURNER:  Objection.
10 A.    Probably not.  Can I further elaborate on
11 it?
12 Q.    Please.
13 A.    Okay.  The diagnosis ranged from a mild
14 diagnosis.  The people that the clinic currently
15 served as adults are also people who work in
16 offices, law firms, work in other offices around
17 the facility.  These are -- it ranges from that,
18 okay.  You can have a mental illness and be
19 functioning normally.
20       Let's say that you are dealing with a
21 depression, okay?  Everything else is normal about
22 the way you're functioning except you're very down
23 and very upset and worried and so forth.  Okay?
24 But you're not a danger to anyone.  Okay.  So it
25 ranges from that to people who have just been

Page 223

E. Brooks

1
2  discharged from a hospital, okay --
3  Q.    From a psychiatric hospital?
4  A.    From a psychiatric hospital.  They may have
5  attempted suicide.  We have an increase in the
6  number of suicide patients now.  Okay?  And
7  that's -- the suicide is an aggression towards the
8  self.  But it's the same continuum of aggression
9  towards others as well.
10 Q.    What does that mean?  What does that mean?
11 A.    The person who would kill themselves,
12 okay -- in fact, it's healthier for the person
13 physically to externalize the rage, okay, and hurt
14 someone else, but it's the same illness to some --
15 it's the same illness, okay?
16 Q.    So if I understand what you're saying,
17 people that are diagnosed with the tendency to do
18 suicide are part -- it's similar to people who
19 would maybe be violent to other people?
20       MS. TURNER:  Objection.
21 A.    Yes.
22 Q.    Okay.  Understood.  Thank you.
23       Now, when you were at the interview, was
24 there a discussion about your hours of operation?
25 A.    Yes.

Page 224

E. Brooks

1
2  Q.    And what do you remember from the interview
3  about what the hours of operation would be?
4  A.    Well, I remember presenting in terms of
5  presenting the clinic, okay, and I said that the
6  clinic is open Monday through Friday, okay, 9:00 to
7  8:00 and Saturdays from 9:00 to 5:00.
8  Q.    Okay.  Was it 9:00 to 8:00 weekdays and
9  9:00 to 5:00 weekends?
10 A.    Yes.
11 Q.    Do you know the businesses that operate in
12 that building as of the time of your interview?  Do
13 you know what days they operate?
14 A.    No.
15 Q.    Do you know if any of them operate on the
16 weekend?
17 A.    No, I don't know.
18 Q.    Do you know how access -- how access is
19 obtained to the front door of the office building
20 on a given day?
21 A.    No.
22 Q.    Do you know if it's an -- open during
23 business hours or locked or a key card system?  Do
24 you know anything about that?
25 A.    No.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
225–228

Page 225

E. Brooks

1
2  Q.    Did you investigate any of that before you
3  signed the sublease?
4  A.    No.  Can I explain?
5  Q.    No.
6  A.    No, don't explain.  Okay.
7  Q.    Do you know if the building has any type of
8  personnel in the lobby on the weekends?
9  A.    I don't know.
10  Q.    Did the discussion -- was there a
11  discussion during the interview that C.C.M.S. would
12  provide security in the building?
13  A.    No.
14  Q.    So the topic of security did not come up at
15  all?
16  A.    No.
17  Q.    Do you have any type of security at any of
18  the other locations that are reflected on the back
19  of Exhibit A, the brochure?
20  A.    Only in the housing division.  Only --
21  because we have -- we house 72 people and children
22  and families.  But none of the other programs, none
23  of the other clinics.
24  Q.    None of the other clinics have security?
25  A.    Security.

Page 226

E. Brooks

1
2  Q.    Okay.  And when you say the housing, you
3  mean it's like a residential facility?
4  A.    Yes.
5  Q.    Understood.  At any point in time during
6  the interview, did you have any discussion with any
7  of the board members regarding a not-for-profit
8  organization called Common Ground?
9  A.    No.  I don't remember that.
10  Q.    Do you know the not-for-profit Common
11  Ground?
12  A.    I think so.  I've heard of them before.
13  Q.    And what is your memory of what that
14  organization does?
15  A.    I don't like to say.  I'm going to have to
16  check it.
17  Q.    When you were speaking to the members of
18  the board about C.C.M.S., did you speak at all
19  about the race of the people that work at C.C.M.S.?
20  Did that come up?
21  A.    I don't think so.  I --
22  Q.    Did you give this --
23  A.    -- I might have mentioned that we serve all
24  ethnicities, okay, and we -- a large Chinese
25  population, a large number of Chinese therapists,

Page 227

E. Brooks

1
2  okay.  But that was -- there wasn't much of a focus
3  on that.
4  Q.    Is there anything in your brochure about
5  who C.C.M.S. services in terms of race or ethnicity
6  or anything like that?
7  A.    Well, we're a diverse agency that serves
8  all of the people who -- and we get people referred
9  to us of all backgrounds.  Okay?
10  Q.    How about the people that work there, same,
11  it's diverse depending upon -- and I think you
12  mentioned earlier you had a number of Asian
13  therapists --
14  A.    Chinese therapists.
15  Q.    -- Chinese therapists?
16  A.    Yes.
17  Q.    So across the organization, that's how you
18  would describe it, very diverse?
19  A.    Yes.
20  Q.    And do you recall that coming up in the
21  context of your meeting with the board?
22  A.    No.
23        MR. MARGOLIS:  Let's have this
24    marked as O.
25        (Defendants' Exhibit O, an email,

Page 228

E. Brooks

1
2    was marked for identification.)
3  Q.    I'm showing you what's been marked as O.
4  It's an email that your lawyers produced to us,
5  C.C.M.S. 275.
6        Have you seen this email before?
7  A.    Let me see here.
8    (Perusing.)
9    Yes, I've seen this.
10  Q.    Okay.  At the top of the page it says
11  Robert King sent that to you on January 24, 2020.
12        Do you see that?
13  A.    Yes.
14  Q.    Did you see it before January 24, 2020?
15  A.    No.  When that was written --
16  Q.    It was written --
17  A.    -- on the 15th -- written on the 15th by
18  Saul --
19  Q.    Correct.
20  A.    -- and sent to Bob, and then Bob sent it to
21  me.  I don't remember the sequence of things in
22  terms of exactly when I saw this.
23        (Simultaneous speakers.)
24  Q.    Okay.  But at some point you saw it, right?
25  A.    Yes.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
229–232

Page 229

E. Brooks

1
2  Q.   And there's an email here.  It says from
3  Bob to Saul, "Nigel informed me of the board's
4  decision.  Just awful."  And then Saul writes back
5  to Bob, "Your tenants' rep was an idiot."
6      Do you see that?
7  A.   Yes.
8  Q.   That's referring to you, correct?
9  A.   Yes.
10  Q.   And are you aware that after the interview,
11  that Nigel contacted Bob?
12  A.   I know that now.
13  Q.   Okay.  You listened to the -- you listened
14  to the recording?
15  A.   Yes.
16  Q.   Okay.  And Bob didn't tell you about that?
17  A.   He told me that he had received a call from
18  Nigel, okay, and he had heard from Saul, telling
19  them that I was an idiot in the interview and I had
20  insisted on drug treatment, okay.  And they tried
21  to remind me that it was in the lease not to do
22  that, but that I still insisted.  You know, that
23  the tenants were good people and I shouldn't do
24  that, and that was the basis that we were rejected.
25      This was what was also shared -- told to

Page 230

E. Brooks

1
2  Bob and Bob passed that on to me.  And also -- and
3  then the law firm, okay, Harris -- Eton Harris, the
4  firm for the project and for Nigel emailed the same
5  information to Diana Lee, the other lawyer -- the
6  leasing lawyer that we were using.
7  Q.   To tell her the reason --
8  A.   Tell her the reason, that's right.
9  Q.   Right.  But until -- and so other than Bob
10  telling it to you orally, you were not aware until
11  recently of the telephone conversation between
12  Nigel and Bob, or at least you had not heard a tape
13  of it until recently, correct?
14  A.   The details of it.
15  Q.   The details of it.
16  A.   It was more -- more was recorded around
17  what happened than I had been informed of.
18  Q.   By Bob?
19  A.   By Bob.
20  Q.   Got it.  Okay.
21      Now, when -- you said that Bob communicated
22  to you the rejection and that the attorney for
23  Nigel, Harris, had also communicated the rejection
24  to your lawyer, Diana Lee, correct?
25  A.   Right.  To my lawyer as well as to the --

Page 231

E. Brooks

1
2  another firm, Manatt, also communicated the same
3  thing, okay.
4  Q.   But Manatt is Diana's firm?
5  A.   No.  But she had been there.  I don't know
6  if she was there at the -- no.  She had left there
7  and she was working at another firm, and this went
8  to another lawyer at the firm.
9  Q.   Okay.  Who was representing you at the
10  time?  Was it the Manatt or was it Diana at the
11  other firm?
12  A.   Well, they both were -- they both were
13  representing me around different things.
14  Q.   Okay.  So my question to you is after you
15  heard about this through Robert King --
16  A.   Right.
17  Q.   -- and your attorneys heard about it
18  through Eton Harris --
19  A.   Yes.
20  Q.   -- did you make any effort to contact any
21  of the members of the board to discuss it?
22  A.   No.
23  Q.   Did you contact Susan Rubin at Kaled?
24  A.   No.
25  Q.   Did you contact Peter Lehr, her boss at

Page 232

E. Brooks

1
2  Kaled?
3  A.   No.  We contacted the landlord to begin
4  with.
5  Q.   Okay.  But the landlord wasn't the one that
6  rejected your lease.  It was the board and you were
7  aware of it.  You had the interview with the board.
8  So I'm just asking you if you followed up at all
9  with the board?
10  A.   No.
11  Q.   Now, I think you testified earlier today
12  that you had to pay holdover rent.
13  A.   Yes.
14  Q.   How long did you stay at the West 31st
15  Street address after your lease had expired?
16  A.   I think about seven months.
17  Q.   Okay.  And during that seven-month period,
18  what did you do to find another location?
19  A.   Bob King found another location for us,
20  found it quickly.  And the reason for the seven
21  months was the renovation of the space.
22  Q.   So to build out the new space?
23  A.   Yes.  And we remained where we were until
24  we moved.
25  Q.   Okay.  And did you do that with the consent



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                      233–236

Page 233

1                    E. Brooks
2  of the landlord?
3  A.    Yes.  We were paying -- you mean the 115
4  West 31st Street landlord?
5  Q.    Correct.
6  A.    Yes.  We were paying more money.
7  Q.    Okay.  And you were paying more money
8  because your lease had a provision in it that said
9  you had to pay more money if you were a holdover
10  tenant?
11  A.    Yes.
12  Q.    Okay.  Do you recall total how much rent
13  you paid to your West 31st Street landlord during
14  that seven-month period?
15  A.    I don't recall offhand.  I'd have to check
16  that.
17          MR. MARGOLIS:  I'm going to leave a
18      blank in the transcript for you to insert
19      that.
20          THE WITNESS:  Sure.
21  (INSERT)                     .
22  Q.    And then there came a time that you
23  relocated to another premise, correct?
24  A.    Yes.
25  Q.    And where was that?

Page 234

1                    E. Brooks
2  A.    15 West 39th Street.
3  Q.    And what floor?
4  A.    Second floor.
5  Q.    Okay.  And who was your landlord?
6  A.    Mrs. Cheng, C-H-E-N-G.
7  Q.    Mrs. Cheng?
8  A.    Cheng.
9  Q.    Okay.  And is that the name of the landlord
10  on the lease?
11  A.    Yes.
12  Q.    And what is the term of the lease that you
13  have with Mrs. Cheng at that location?
14  A.    It's 10 years.
15  Q.    And what is the monthly rent?
16  A.    23,000.
17  Q.    And does it escalate at all, or does it
18  stay at 23,000?
19  A.    I think it escalates.
20  Q.    Within the 10 years?
21  A.    Yes.
22          MR. MARGOLIS:  I'm going to call
23      for production of that lease, please.
24  Q.    How much in legal fees did you pay Tristan
25  Loanzon to represent you in connection with this

Page 235

1                    E. Brooks
2  lawsuit?
3          MS. TURNER:  Objection.
4  A.    I'd have to check it.  I don't know --
5  remember offhand.
6  Q.    Well, do you know -- can you estimate?
7          MS. TURNER:  Objection.
8  A.    I don't want to estimate.
9  Q.    Do you have documents that show how much
10  you paid?
11  A.    Yes, oh, absolutely.
12          MR. MARGOLIS:  I'm going to call
13      for the production of those documents to
14      the extent they haven't been produced
15      already.
16  Q.    What about Tara's firm, how much have you
17  spent in attorneys' fees for Tara's firm?
18          MS. TURNER:  Objection.
19  A.    A fortune.  I have to get -- we have the
20  information.  We have the invoice and what we paid.
21  I'll get it for you.
22  Q.    Do you have an engagement letter with her
23  firm?
24  A.    Yes.
25  Q.    And is there a fee arrangement that you

Page 236

1                    E. Brooks
2  have with her firm?
3          MS. TURNER:  Objection.
4  A.    Yes.
5          MR. MARGOLIS:  What's the basis for
6      your objection?  You have a claim for
7      attorneys' fees.
8          MS. TURNER:  Just the way you're
9      asking the question.  You're not giving him
10      enough time to answer.
11          MR. MARGOLIS:  I'm not giving him
12      enough time to answer?
13          MS. TURNER:  Yes.
14          MR. MARGOLIS:  Okay.
15      I'll give you more time to answer.
16      That's not a viable objection.
17  Q.    Do you know what the total attorneys' fees
18  between Tara's firm and Tristan's firm that you
19  incurred so far in connection with this case?
20  A.    I can get that for you.
21          MR. MARGOLIS:  Okay.  We'll leave a
22      line in the transcript so that you can
23      supply that.
24  (INSERT)                     .
25  Q.    Have you employed any other attorneys to



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
237–240

Page 237

E. Brooks
1
2 work with you or C.C.M.S. in connection with this
3 lawsuit in any way?
4  A.   We haven't engaged no one else.
5  Q.   You have not engaged anybody else?
6  A.   Right.
7        MR. MARGOLIS:  I'm just going to
8    take a five-minute break and see if there's
9    anything else that I want to ask the
10   witness.
11       (Whereupon, a recess was taken at
12   this time.)
13       MR. MARGOLIS:  I have nothing
14   further for the witness.
15       (Whereupon, a discussion was held
16   off the record.)
17       THE WITNESS:  Thank you.
18       MR. MARGOLIS:  Thank you.
19 EXAMINATION BY
20 MR. CASE:
21  Q.   Mr. Brooks, my name is Michael Case.  I am
22 with the Barclay Damon law firm.  I'm representing
23 Marc Paturet in this case.  I'm just going to ask
24 you --
25  A.   What's your law firm?

Page 238

E. Brooks
1
2  Q.   It's called Barclay Damon.
3        (Whereupon, a discussion was held
4    off the record.)
5  Q.   Mr. Brooks, I want to make sure I
6 understand.
7        MR. MARGOLIS:  Can you read back
8    the last question and answer?
9        (Whereupon, the record was read by
10   the reporter.)
11  Q.   Okay.  Let me put it this way:  So my law
12 firm is called Barclay Damon.  Have you heard of
13 that law firm before?
14  A.   They represent us.
15  Q.   They represent you?
16  A.   We've gotten waiver for this.
17  Q.   Okay.  We have a waiver today.  Okay.
18  A.   So be nice to me.
19       (Whereupon, a discussion was held
20   off the record.)
21  Q.   Okay.  So you've testified earlier today
22 about a number of things.  Things that you
23 personally observed, things that you heard from
24 others, and things that seemed like common sense to
25 you.

Page 239

E. Brooks
1
2  A.   Mm-hmm.
3  Q.   And I'm just going to ask you a few
4 questions just to make sure that -- because there's
5 a lot of discussion, make sure that I -- make sure
6 that I have a clear understanding about where your
7 testimony falls as it relates to Mr. Paturet.
8 Okay?
9  A.   Yes, sir.
10  Q.   Did you ever speak with Mr. Paturet
11 concerning any topic -- any topic prior to your
12 learning that the sublease had been declined?
13  A.   No.
14  Q.   Okay.  Did you ever -- aside from --
15       Strike that.
16       Did you ever communicate with Mr. Paturet
17 in writing regarding any topic prior to the denial
18 of the sublease?
19  A.   No.
20  Q.   Okay.  And by in writing, I mean email,
21 texts, court, you know, snail mail.  You understand
22 that to be -- that's what we're talking about,
23 right?
24  A.   Yes.
25  Q.   Okay.  Was Mr. Paturet present at any time

Page 240

E. Brooks
1
2 when you visited the leased premises or the
3 premises you contemplated subleasing?
4  A.   No.
5  Q.   Okay.  Was Mr. Paturet present at the
6 interview in January of 2020?
7  A.   Are you asking me that in terms of what I
8 know now or what I knew then?
9  Q.   Either actually.
10  A.   He was not there.
11  Q.   Okay.  Did you ever see any communications
12 between Mr. Paturet and Bob King?
13  A.   No.
14  Q.   Okay.  Were you ever a party to any
15 communications between Mr. Paturet and Nigel
16 Shamash?
17  A.   No.
18  Q.   Okay.  Did you ever overhear or were you a
19 party to any conversation between Mr. Paturet and
20 Mr. Shamash?
21  A.   No.
22  Q.   Okay.  And to the extent that you testified
23 the communications between Mr. Shamash and
24 Mr. Paturet took place, what is the basis of that
25 testimony?  Is that something that you heard from



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
241–244

Page 241

1            E. Brooks
2  Mr. King?
3  A.    From Mr. King as well as emails from Nigel
4  Shamash.  Yeah, emails where he had said -- spoke
5  to the president and blah, blah, blah.
6  Q.    Okay.  Okay.  And in those emails, did
7  Mr. Shamash specifically reference Mr. Paturet?
8  A.    Not the name, but the position, president.
9  Q.    And emails referring to, have you produced
10  those -- has your counsel produced those in this
11  litigation?
12  A.    You said will we produce them?
13  Q.    Have they been produced in this litigation?
14  A.    I don't know.
15  Q.    Okay.  Have you provided them to your
16  counsel for production in this litigation, any
17  emails between Shamash -- yeah, between you and
18  Shamash in which he's referencing a communication
19  with Paturet?
20  A.    Yeah.  We've produced those.
21  Q.    Okay.
22  A.    Mm-hmm.  The attorney has those.
23  Q.    Okay.  And other than the documents that
24  have been produced in this litigation, are you
25  aware of any other documents reflecting

Page 242

1            E. Brooks
2  communications -- communications to you from
3  Shamash in which Shamash discusses communications
4  he had with Paturet?
5  A.    I have to check.  I have to check because
6  about 20, 30 emails back and forth, and my attorney
7  might not have all of them.  Okay?  And also some
8  of them were presented here today.  So I need to go
9  back now and check and see if there are additional
10  emails that makes reference to that.
11  Q.    Okay.
12  A.    I will give it to my attorney.
13         MR. CASE:  Okay.  Yes.  We'll leave
14  a space in the record for that, request
15  that you do so.
16         And to the extent that there are
17  any such communications that you come up
18  with, we request that they be produced.
19  And with that I think I have no further
20  questions.
21         (Reporter clarification.)
22         MR. CASE:  We need a copy of the
23  transcript.
24         MR. MARGOLIS:  So if you provide
25  Mr. Case and I with a copy, you provide

Page 243

1            E. Brooks
2  another copy?
3         MS. TURNER:  I was anticipating
4  ordering my own copy.
5         (Whereupon, a discussion was held
6  off the record.)
7         (Whereupon, a recess was taken at
8  this time.)
9  EXAMINATION BY
10  MS. TURNER:
11  Q.    Mr. Brooks, I only have a couple of
12  questions.  This might be an obvious question, but
13  what's your race, Mr. Brooks?
14  A.    African American.
15  Q.    And how old are you?
16  A.    Ninety.
17  Q.    Thank you.
18         You were born in 1932, correct?
19  A.    Yes.
20  Q.    So in the 90 years you've been alive, have
21  you ever experienced racism as a black man in
22  America?
23  A.    Yes.
24  Q.    And do you have any examples of racism
25  you've experienced?

Page 244

1            E. Brooks
2  A.    Well, you know, I was born in Texas -- born
3  in Texas and reared there for a while.  And as a
4  black there, you experience it all the time.  Okay?
5  Since then, you experience it in all kinds, direct
6  and subtle ways; where if I was wearing a pair of
7  jeans and a shirt and went into a Bergdorf Goodman,
8  okay, they would kind of like watch me a bit in
9  terms of whether or not I'm there to -- what am I
10  there to do.  Am I there to make a purchase.
11         Where as if I went dressed the way I am
12  now, no one would ask me any kind of questions.
13  They would assume that I was a lawyer or a
14  professor or a professional person and I'm safe.
15  And in fact, my wife -- my late wife, who was
16  white, okay, we used to talk about it and make fun
17  about it.  We were going down to Bergdorf, and no,
18  no, no.  Let me go and get dressed.  I have to go
19  and get dressed because I want to be -- and this
20  was just an automatic beat.  I just took it for
21  granted, and I didn't -- so there are samples.
22  There's 50 samples of stuff like that, okay, where
23  you're treated differently in terms of stereotype.
24  And so that.  Mm-hmm.
25  Q.    And you've also experienced overt racism



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
245–248

1                    E. Brooks
2   where someone has called you a derogatory name?
3            MR. MARGOLIS:  Did you say over
4       racism?
5        MS. TURNER:  Overt.
6        THE WITNESS:  Overt.
7        MS. TURNER:  Sorry.
8   A.   Not often.  A couple of times, okay,
9   because I was always viewed kind of like a benign
10  person.  Situations never called for someone, like,
11  cursing me out.  So I've seen it.  Okay.  But have
12  I personally experienced it a lot?  No.
13  Q.   Okay.  But you understand as a black man
14  who's lived in this country for 90 years, that
15  there are all different types of racism, and that's
16  something you live with every day?
17  A.   Right.  I experienced a little bit of it
18  yesterday in court.  We have -- can I talk about
19  that?  Can I just say it?  You asked me about it,
20  okay?
21       Forgive me.  Go ahead.
22  Q.   I think we should just focus on this
23  deposition in this case though.
24  A.   Okay.  It was an example of racism though.
25  Okay.  Go ahead.

1                    E. Brooks
2   Q.   Can you just quickly -- I know we heard the
3   lengthy explanation that you gave defense counsel,
4   but again, what does C.C.M.S. do?
5   A.   C.C.M.S. provides mental health services to
6   children and families.  We provide after-school
7   services, we provide housing programs for homeless,
8   mentally ill.  That's here.  And also we're
9   developing a senior housing program in China.
10  We've done international adoptions.  Okay.  We have
11  an office in India.  Okay.  So we are an
12  international company.
13       I'm a part of the global CEOs in terms of I
14  was invited to China and been to China four times
15  in terms of our doing business there, our
16  counterparts doing business here.  Okay?  So that's
17  C.C.M.  We're a highly diverse agency with about
18  300 staff.  We have 60 Chinese therapists and
19  physical people; and we have, you know, black
20  staff, white staff, staff from Russia, Asian and so
21  forth.
22       And we kind of pride ourselves on being a
23  diverse agency.  We (unintelligible) a black-led
24  agency.  At the same time, we were -- my wife was
25  white and we cofounded C.C.M. 40 years ago.  So

1                    E. Brooks
2   that's C.C.M.
3   Q.   Thank you.  How did you come to learn
4   about -- I'm going to refer to it as the premises,
5   but the space you were looking to sublease at 129
6   West 27th Street?
7   A.   We had just learned in July of 2019 that we
8   had to move because the building where we had been
9   in for 27 years was changing its purpose.  And so
10  we start looking for space, and Bob King is one of
11  the brokers that we also worked with.  He has been
12  a broker in Manhattan for 30 years.  Okay.  Looking
13  at the same kinds of buildings we'd been looking
14  at.  Okay?  This was -- we were at 115 West 31st
15  Street.
16       So we contacted Bob and said that we're
17  looking for some space, and we looked at some --
18  we'd already started with another firm that had
19  another location that we looked at on 38th Street.
20  And the owner of the building -- the owner of the
21  building had visited our clinic, okay, reviewed our
22  application, and told us in about 10 days that he
23  didn't want to go forward with it.  He was -- that
24  our population and the nature of what we did as a
25  social service agency wouldn't fit into his

1                    E. Brooks
2   building.  And so we were turned down.  Okay.
3   That's happened before.  Okay.
4        So Bob, also in learning that, said no, no,
5   no.  I wouldn't have taken you to show you that
6   because I already knew that.  So Bob looked and
7   found about four or five different places for us to
8   look at.  And we looked at the one on 27th Street,
9   and it was the most impressive mainly because it
10  had the offices already built out.  And in the --
11  several of the other buildings that also really
12  wanted us to come in, it was four or five months of
13  renovations to build -- and the cost, but to build
14  the 14 offices that we needed.
15       27th Street was, like, perfect because it
16  already had all that we required with some minor
17  adjustments around the waiting area that we could
18  literally move in a couple of days and get set up
19  there.  So that was the reason that we were very
20  impressed with this space, and Bob King had located
21  it for us.
22  Q.   Thank you.  And before your interview with
23  the board to sublease the premises, were there any
24  issues or hiccups in the lease negotiation process?
25  A.   One.  We had -- I'll give you a little



COMMUNITY COUNSELING AND MEDIATION  30b6                    December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                        249–252

Page 249

E. Brooks

1  background on that.  We had wanted to have in the
2  lease the right to treat drug-addicted persons --
3  look at in the future.  We had a case before where
4  we wanted to add that to our license, and the
5  requirement to add that is that it's in the lease,
6  okay.  It's in the lease, so we thought we would
7  get it in here.  They said that they didn't want
8  that and we agreed with that.  We agreed with that.
9  And so it was specifically written in the lease
10  that we wouldn't provide drug treatment.
11       And also, it -- we wouldn't do it because
12  it's -- it's contraindicated.  You don't need to be
13  a clinician to make this judgment.  You would make
14  it, okay, in terms of not having a program that
15  serves little children, okay, and someone sitting
16  next to them that is dealing with an addiction
17  problem.  Okay.
18       It would make no sense for either
19  population, you know, for the person who is
20  struggling with trying to deal with addiction.
21  Okay.  You want a very calm facility for them to be
22  receiving services.  And it would clearly be not
23  the right place for children.
24       So one, even if we wanted to do that and
25

Page 250

E. Brooks

1  even if we would insist, we couldn't get approval
2  for it.  The Office of Mental Health would not
3  approve of use in terms of serving children and
4  serving an addicted population in the same setting.
5  Okay?  I -- in March of 2019 I got a certificate
6  from the Harvard Medical School, went for training,
7  and one of the items that we were trained on was
8  treating the addiction.  But it came up in a way in
9  terms of talking about the type of setting that you
10  would be involved.  They didn't deal with it.
11       No one would have raised it because it
12  would have been a pretty dumb question.  No one
13  would be treating children in the same setting that
14  you're dealing with an addicted population.
15  Q.   Thank you.
16       When did you meet with the board again?
17  A.   January 14, 2019.
18  Q.   Do you mean 2020?
19  A.   2020.
20  Q.   I know.  No one remembers that time period.
21  That was right before COVID.
22  A.   2020.
23  Q.   Thank you.  And again, how long was the
24  meeting roughly?
25

Page 251

E. Brooks

1  A.   About an hour.
2  Q.   Okay.  And how many people attended the
3  meeting?
4  A.   Six with me.  The five people and myself.
5  Q.   And what stood out to you from the meeting
6  with the board?
7       MR. MARGOLIS:  Objection.
8  A.   Okay.  I can still answer that?
9       Okay.  Well, I was already quite worried
10  based, okay, on what was happening around the
11  conversation about the black man -- this is -- the
12  disturbed black man, okay?  I thought it was
13  describing an ill patient.  An ill patient.
14  There's a difference between an ill patient and a
15  violent patient.  Okay.
16       That is not -- we would try our best to
17  avoid treating a patient with a history of
18  violence, okay, to protect ourselves, our staff,
19  our other clients, and it's not the best kind of
20  environment to be working with mentally ill people.
21  Okay.  So what protects us also would be protecting
22  the other tenants in the building.  So that's it.
23  Q.   Okay.  Can you just remind me again -- you
24  mentioned the black man in Monsey.  What was
25

Page 252

E. Brooks

1  discussed in regards to that at the board
2  interview?
3  A.   Well, Mr. Conte, out of clear blue sky,
4  brought that up.  You know, at the time that he
5  said that, I had just described the program for the
6  children that we would be bringing in, okay.  And I
7  gave my background in terms of working with
8  children.  And this was a very new program and a
9  very exciting program.
10       And once I had finished that, he asked me
11  if I was aware of the incident that just happened
12  with a mentally ill patient up in Monsey, New York,
13  and this is what he had done.  And I was a little
14  bit floored by it because it came from -- everyone
15  reading the papers at that time was aware of that.
16  But it further made me anxious and depressed
17  because it didn't feel like this was good news, his
18  raising that; because we were operating a clinic,
19  and we were serving people that are most -- that
20  are ill -- mentally ill.
21       And this was super criticism of them and
22  frightening, I think, perhaps the other board
23  members in terms of who might not have known that
24  we were operating a clinic -- that a clinic was



COMMUNITY COUNSELING AND MEDIATION  30b6                December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                           253–256

Page 253

E. Brooks

1
2  coming in here, to make them more anxious than they
3  should have been in terms of the reality.
4  Q.    And did he specifically mention that the
5  gentleman was black?
6  A.    Yes.
7  Q.    The person who attacked?
8  A.    Yes.  With a machete, yes.  He mentioned
9  that.
10  Q.    And what did you think when he referred to
11  the man's race?
12  A.    Well, this already -- to tell you the
13  truth, it reminded me, even with the spot of Saul
14  having told -- asked Bob King, the broker, to check
15  with me and see if we would be agreeable to taking
16  the freight elevator to our -- to the 7th floor,
17  taking the freight elevator for our staff and for
18  the clients coming into our program.
19        And Bob, as he related to me later, he
20  didn't tell me about this for quite a while because
21  he knew it would be very depressing and upsetting.
22  And he said no, I'm not even going to tell
23  Mr. Brooks.  I know he would reject that, that his
24  tenants and his agency would be treated as
25  second-class citizens.  That would be unacceptable.

Page 254

E. Brooks

1
2  Q.    And what did Bob --
3  A.    It made me think of that in terms of the
4  racial piece.
5  Q.    And when did Bob tell you that, about using
6  the freight elevator -- your patients using the
7  freight elevator?
8  A.    Sometime early in November.  I'd have to
9  check the email on it.
10  Q.    But it was before the board interview?
11  A.    It was before the board interview.
12  Q.    And why do you think C.C.M.S.'s patients
13  would be asked to use the freight elevator?
14  A.    Because this is what Saul, according to
15  Bob, asked him to check with me as if he was trying
16  to find a way to get us into the building -- it was
17  also a little bit of a signal that there was some
18  trouble, that he was -- that they were finding --
19  trying to find a way to make us acceptable to
20  whoever might be opposed to having this black
21  clinic in the building.
22  Q.    So do you think that C.C.M.S.'s patients
23  were being asked to use the freight elevator
24  because they were black?
25        MR. MARGOLIS:  Objection.

Page 255

E. Brooks

1
2  A.    Yes, because they were black and mentally
3  ill.
4  Q.    And was there anything else discussed at
5  your interview with the board that concerned you?
6  A.    Well, one -- also the owner of the modeling
7  agency, in terms of whether or not his staff, you
8  know, and clients, you know, would be comfortable.
9  At the meeting, I was really thinking, you know,
10  that they would and that many of the clients that
11  are being served by this clinic are people who work
12  in the law firms, work at other corporations in the
13  community.  In the community, okay, in addition to
14  patients with serious -- with a serious diagnosis
15  that live in the community or live in the
16  surrounding areas that might work in Manhattan.
17        So our clinic is more convenient for them.
18  That's -- if you went to look at the demographics,
19  a breakdown of ethnicity and patients that are
20  being serviced by the clinic, that's what you would
21  find.
22  Q.    Okay.  How did you think the interview went
23  with the board?
24  A.    Well, I didn't think it went well.  I
25  didn't think it went well.  (Unintelligible).  And

Page 256

E. Brooks

1
2  towards the end, Nigel was also -- seemed concerned
3  in terms of the fact that he was seeing that the
4  board was really not going to accept us, and he had
5  proposed -- and he mentioned the broker that might
6  have been concerned.
7        But since the broker had brought him an
8  appropriate tenant four months ago, okay, and Nigel
9  had communicated that clearly -- that being a
10  clinic and needing 14 offices was not a problem
11  because we have 14 offices.  And so Bob had brought
12  him an appropriate client, okay, that they then had
13  negotiated the lease with, allowed the client to
14  come into the building and set up for -- set up
15  those 14 offices for therapists and for clients to
16  then reject them would mean that they would be at a
17  risk for the broker's fee or be liable for a
18  lawsuit from the broker.
19        So he was concerned -- so he proposed could
20  we consider maybe a one-year lease to kind of see
21  how things went.  He raised that.  He raised that
22  at the board meeting.  And there was no reaction to
23  it.  But I would -- this was towards the tail end
24  of the meeting before the meeting ended with me,
25  for me to leave.  So -- then that was it.



COMMUNITY COUNSELING AND MEDIATION  30b6
C.C.M.S. V. OXFORD REALTY & HOLDINGS

December 08, 2022
257–260

Page 257

E. Brooks

1
2  Q.    But the board rejected the sublease?
3  A.    Not at that moment.  But later they did,
4  yes.
5  Q.    And they didn't respond to Nigel's offer
6  for a one-year trial period?
7  A.    That's correct.
8  Q.    And what's your belief as to why they
9  rejected the sublease, the board?
10         MR. MARGOLIS:  Objection.
11 A.    Well, I think that the reason -- my
12 opinion, okay, is that there was some objection
13 from some important board member.  They denied that
14 sixth vote because we were a black agency and with
15 black clients; and maybe with a client that's a
16 cousin of the guy who harmed people up in Monsey,
17 New York, and we weren't considered safe -- that
18 they weren't safe in having us in the building.
19 Q.    And after the sublease was rejected, what
20 did C.C.M.S. do?
21 A.    Well, we consulted a law firm when we got
22 the email from the attorney, okay, Eton Harris,
23 indicating that we were rejected because Emory
24 Brooks was insisting on doing drug treatment.
25 Okay.  And even though they pleaded with me that it

Page 258

E. Brooks

1
2  was in the lease that you wouldn't do it, I still
3  insisted on doing it.  Okay?
4         I spoke to the law firm and convinced --
5  showed the law firm that in our application to OMH,
6  okay, that the license, we did not request to
7  provide drug treatment.  And you can't mess around
8  and lie to the place that you're applying to the
9  license.  Okay.  And we had evidence of that.
10 Okay.  So we had convincing evidence.
11        So the law firm then contacted Nigel, okay,
12 contacted them with -- under the expectation that
13 we could satisfy their express concern with the
14 reasons they were rejecting us, that they might
15 reconsider.  They might reconsider and then accept
16 us.  They didn't.  They didn't -- they didn't
17 accept us.
18 Q.    Why do you think Nigel said that the
19 sublease was rejected for your insistence on drug
20 treatment?  Why do you think he said that?
21 A.    I think that he would have looked pretty
22 silly in the court system if he said it was
23 around -- to say that we were a clinic, but he had
24 accepted negotiating with us as a clinic from day
25 one, and four months later -- so it wouldn't have

Page 259

E. Brooks

1
2  been believable.  So he needed something original
3  as a basis for us being rejected.
4  Q.    So you think he just made up --
5  A.    Yes.
6  Q.    -- the reference to drug treatment?
7  A.    Yes.
8  Q.    Because he couldn't say that the reason was
9  your race --
10         MR. MARGOLIS:  Objection.
11 Q.    -- and the race of clients?
12         MR. MARGOLIS:  Objection.  You're
13         leading the witness.
14 A.    Right.  He couldn't say he was rejecting us
15 because of the volume and because we were operating
16 a clinic.  I mean, he would look silly in terms of
17 leasing 14 offices for us and our using the 14
18 offices is too busy.  It wouldn't be believable.
19 Q.    So once the sublease was rejected, what
20 office space did C.C.M.S. use?
21 A.    We remained where we were, paying the extra
22 money until we found space.  Rehabil- --
23 established the space, constructed the space, and
24 moved in.
25 Q.    Do you recall how much the holdover rent

Page 260

E. Brooks

1
2  was per month?
3  A.    I don't remember that.  I have to look in
4  my files and I can find it.  I'll get it to you
5  and...
6  Q.    Did you have any other damages from the
7  sublease rejection?
8  A.    Just the cost of the IT people for three
9  days installing equipment, the server, and setting
10 rooms up.  And there was some furniture that we
11 bought.  Most of the furniture we already had.  And
12 some expenses like that that we incurred.
13 Q.    And what about -- did you consult an
14 architect?
15         (Simultaneous speakers.)
16 A.    Yes.  There's some architectural fees --
17 architectural fees in having to prepare
18 architectural plans for 27th Street.  And if you
19 look at the plans, the plans very clearly label the
20 rooms as treatment rooms.  So there's no confusion
21 around that.
22        So there were architectural fees and there
23 was some legal fees, you know.  Because if you're
24 paying to negotiate a lease, you know, gotten a
25 lease -- fees to negotiate one lease at 27th Street



COMMUNITY COUNSELING AND MEDIATION  30b6                    December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                                   261–264

Page 261

E. Brooks
1 and then that fell through.  And then to go and
2 have to negotiate a lease for 15 West 39th Street.
3 So there's some legal fees that we incurred as
4 well.
5          MS. TURNER:  Okay.  I think that's
6      all I have.
7          THE WITNESS:  Okay.
8 FURTHER EXAMINATION BY
9 MR. MARGOLIS:
10 Q.     Just a quick redirect.  You said you were
11 in court yesterday.  Is that another lawsuit that
12 you're involved in right now?
13 A.     Yes.
14 Q.     Okay.  Are you the plaintiff or the
15 defendant?
16 A.     We're the defendant.
17 Q.     Okay.  And what does that lawsuit involve?
18 A.     Staff member that we had to terminate that
19 was leading a very large program that we operate
20 under a contract with the city Department of Mental
21 Health had got into a squabble with one of the
22 subcontractors.  And they had asked -- the
23 subcontractor had asked her -- they were in a
24 fight -- had asked her about a deduction in the --

Page 262

E. Brooks
1 that contract, which our staff interpreted as
2 racist, okay.  As racist.  This might be funny.
3      So I terminated her because I had hired
4 her, and she worked with the agency three times and
5 was a worker.  But I made a mistake.  It was the
6 wrong role.  This particular role requires some --
7 a lot of maturity, you know, and dealing and not
8 wanting to fight back even if she thought that the
9 other person was being racist.  You don't kind of
10 go and shoot them or go and withhold information
11 from them.  It's inappropriate.  Okay.
12      So I terminated her, and she's suing the
13 agency -- and suing me for terminating her because
14 she had made a complaint about racism from another
15 entity.  The judge, they're trying to work out a
16 settlement, okay, and we don't want to settle this
17 because --
18          MS. TURNER:  Mr. Brooks, I'm just
19      going to caution you talking about your
20      case strategy on another case.  It's
21      unrelated to this.
22 Q.     You can finish your statement.
23 A.     I was trying to get to the judge asking,
24 you know, if we had -- trying to make the case for

Page 263

E. Brooks
1 settling.  Okay.  If we had consulted our insurance
2 company, what would be the lawyer's fee and so
3 forth in terms of -- and I felt it was -- that was
4 kind of insulting, and the questioning how the
5 person was terminated.  Okay.
6      I'm thinking at the time, maybe because of
7 this case, that if I was a white director leading
8 an agency, okay, when we started -- when I started
9 C.C.M.S., it was 1983.  There were 45 agencies --
10 start-up agencies like ours.  There are two of them
11 left now, and we're one of the two.  Okay.  We've
12 been a successful agency.  Okay.
13      And I thought that if I had been a white
14 director, okay, with a background of running a very
15 successful nonprofit agency, she would have not
16 made the assumption -- she would have made the
17 assumption that I was doing the right thing, that I
18 had the qualifications to make a decision on the
19 staff that I had hired.  And I would have had the
20 ability to evaluate the -- whether or not this
21 makes sense from a business perspective for us to
22 settle this.  Okay?  But she didn't.  Okay.  So I
23 felt it was -- it was somewhat subtle.
24 Q.     Who is she, the judge?

Page 264

E. Brooks
1 A.     Yes.
2 Q.     And who was the judge?
3 A.     Judge Mann.  She's a chief magistrate judge
4 in the --
5 Q.     Southern district.
6 A.     -- court.  Right.  She's retiring.
7          MR. MARGOLIS:  Okay.  Thank you.  I
8      think we're done.
9          (Whereupon, a discussion was held
10      off the record.)
11 FURTHER EXAMINATION BY
12 MR. CASE:
13 Q.     You testified about architectural plans
14 that were prepared.  Were those ever communicated
15 to the board at 27th Street?
16 A.     You see, I want to say yes to that because
17 I considered any information that we were giving to
18 the landlord is given to the board, that he's
19 consulting the board.  When we wanted to do
20 installation, okay, that he said let me check with
21 the board.  He then came back and said it's okay.
22      We wanted to move in.  He said no, no, let
23 me check with the board.  And they didn't give
24 approval for that.  Let's wait until we sign, we



Page 265

1              E. Brooks
2  get approval.  So I'm thinking that any
3  communications I'm having with Nigel is
4  communicated with the board.  We had separate --
5  Q.     Let me ask you this way:  Did you
6  communicate -- did you provide those plans to
7  Nigel?
8  A.     Yes.
9  Q.     Do you recall approximately when?  Was that
10 before or after the interview, let's say?
11 A.     Oh, way before the interview.
12 Q.     Okay.
13 A.     It was -- it was --
14 Q.     Was it before or after you put in the
15 application?
16 A.     It was before that.
17 Q.     Okay.
18 A.     It was way before that.
19 Q.     Okay.
20 A.     Can I further answer that?  When we first
21 looked at the space -- we first looked at the
22 space, we brought the architect over with us
23 because the architect immediately does what's
24 called a test fit design.  He'll take the floor
25 plans and then look at inserting our clinic in

Page 266

1              E. Brooks
2  terms of offices for (unintelligible) --
3        (Reporter clarification.)
4  A.     So in the first two or three weeks, we'll
5  get drawings of the space in terms of our clinic
6  fitting in there.  So -- and these were shared with
7  the broker who then shared them with Nigel.  I
8  think I gave them to the broker.
9  Q.     You gave them to the broker?
10 A.     Yes.
11 Q.     So all you know is you gave them to the
12 broker.  You don't know whether the broker gave
13 them to Nigel?
14 A.     That is correct.
15
16        (Continued on next page to
17   accommodate jurat.)
18
19
20
21
22
23
24
25

Page 267

2  Q.     And you don't know whether or not Nigel
3  gave them to the board?
4  A.     That's correct.
5              MR. CASE:  Okay.  I have no further
6        questions.
7           (Time Noted:  5:44 p.m.)
8
9  _____
10                   EMORY BROOKS
11
12 Subscribed and sworn to before me
13 this _____ day of _____ 20__.
14
15 _____
16      Notary Public
17
18
19
20
21
22
23
24
25

Page 268

2              I N D E X
3
4  WITNESS             EXAMINATION BY      PAGE
5  Emory Brooks        Mr. Margolis        5, 261
6                      Mr. Case            237, 264
7                      Ms. Turner          243
8        EXHIBITS
9  DEFENDANTS'          DESCRIPTION         PAGE
10 A                    Brochure            45
11 B                    Multi-page document 102
12 C                    Proprietary lease   127
13 D                    An email            151
14 E                    An email            155
15 F                    Email thread        167
16 G                    Sublet application  170
17 H                    Email thread        172
18 I                    An email            174
19 J                    Sublease summary    179
20 K                    Sublease            181
21 L                    Email thread        191
22 M                    Email thread        197
23 N                    An email            199
24 O                    An email            228
25      (Exhibits retained by Mr. Margolis.)



COMMUNITY COUNSELING AND MEDIATION  30b6          December 08, 2022
C.C.M.S. V. OXFORD REALTY & HOLDINGS                          269–271

Page 269

```
1
2               REQUESTS FOR PRODUCTION
3   DESCRIPTION                              PAGE
4   Lease agreements for 115 West 31st Street  41
5   West 39th Street lease               47-48
6   Notes taken during interview           149
7   Response from Mr. Brooks to Ms. Lee to
8   particular email                       157
9   Recorded voice message                 159
10  Lease for 15 West 39th Street with
11  Mrs. Cheng                             234
12  Amount in legal fees paid to
13  Tristan Loanzon's firm                 235
14  Documents reflecting communications to
15  Plaintiff from Shamash discussing
16  Communications had with Paturet        241
17               INSERTS
18  DESCRIPTION                            PAGE
19  Date of Jean Goossen's death            39
20  Rent paid to West 31st Street landlord  233
21  during 7-month period
22  Attorney's fees incurred in this case   236
23               RULINGS
24  PAGE  LINE   QUESTIONING ATTORNEY
25  94    13-14       Mr. Margolis
```

Page 271

```
1
2               ERRATA SHEET
3       ESQUIRE DEPOSITION SOLUTIONS, LLC.
4   CASE NAME:            C.C.M.S. v. OXFORD REALTY
5   DATE OF DEPOSITION: December 8, 2022
6   WITNESS'S NAME:      Emory Brooks
7   PAGE  LINE (S)    CHANGE           REASON
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19
20             _____
21                      EMORY BROOKS
22  SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20__.
24  _____    _____
25  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

Page 270

```
1
2          C E R T I F I C A T E
3
4       I, TENEJA THWEATT, hereby certify that the
5   Examination Before Trial of EMORY BROOKS was held
6   before me on the 8th day of December, 2022; that
7   said witness was duly sworn before the commencement
8   of his testimony; that the testimony was taken
9   stenographically by myself and then transcribed by
10  myself; that the party was represented by counsel
11  as appears herein; that the within transcript is a
12  true record of the Examination Before Trial of said
13  witness;
14       That I am not connected by blood or
15  marriage with any of the parties; that I am not
16  interested directly or indirectly in the outcome of
17  this matter; that I am not in the employ of any of
18  the counsel.
19       IN WITNESS WHEREOF, I have hereunto set my
20  hand this 15th day of December, 2022.
21
22  _____
23          TENEJA THWEATT
24
25
```

