# EXHIBIT D



# Transcript of Nigel Shamash

**Date:** December 20, 2022
**Case:** Community Counseling & Mediation Services -v- Oxford Realty & Holdings LLC

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2
3  ----------------------------x
4  C.C.M.S. d/b/a COMMUNITY
   COUNSELING AND MEDIATION
5  SERVICES,                    Civil Action No.
                                20-cv-03429(NRB)
6
7           Plaintiff,
8        v.
9  OXFORD REALTY & HOLDINGS LLC,
   WEST 27TH STREET REALTY, INC.,
   MARC PATURET, JOSEPH GRILL,
10 MAXIME TOUTON, F. MICHAEL
   CONTE, NIGEL SHAMASH, and
11 other similarly situated
   BOARD MEMBERS OF WEST 27TH
12 STREET REALTY, INC.,
13           Defendants.
14 ----------------------------x
15
16      Videotaped Deposition of NIGEL SHAMASH
17           Conducted Virtually
18        Tuesday, December 20, 2022
19             10:45 a.m. EST
20
21
22
23 Job No. 475425
24 Pages 1 - 245
25 Reported by:  Nancy C. Bendish, CCR, RMR, CRR

**2**

1  A P P E A R A N C E S :
2  (All participated remotely via
    Zoom Videoconference)
3
4  ON BEHALF OF PLAINTIFF CCMS d/b/a COMMUNITY
5  COUNSELING AND MEDIATION SERVICES:
6
7      BAKER HOSTETLER
       BY:  TARA E. TURNER, ESQ.
8      45 Rockefeller Plaza
       New York, New York 10111
       212.589.4200
9
10 ON BEHALF OF DEFENDANTS 27TH STREET REALTY,
11 INC., JOSEPH GRILL, MAXIME TOUTON,
   F. MICHAEL CONTE:
12
13     ABRAMS GARFINKEL MARGOLIS BERGSON LLP
       BY:  BARRY G. MARGOLIS, ESQ.
14     1430 Broadway, 17th Floor
       New York, New York 10018
15      212-201-1170
16
17 ON BEHALF OF DEFENDANT MARK PATURET:
18
19     BARCLAY DAMON LLP
       BY:  MICHAEL CASE, ESQ.
20     1270 Avenue of the Americas
       Suite 501
       New York, New York  10020
21     212.784.5800
22
23
24
25

**3**

1  A P P E A R A N C E S :
2  (All participated remotely via
    Zoom Videoconference)
3
4  ON BEHALF OF THE WITNESS
5  NIGEL SHAMASH:
6
7      LAW OFFICES OF MARC E. BENGUALID PLLC
       BY:  ETAN C. HARRIS, ESQ.
8      330 West 38th Street, Suite 305
       New York, NY 10018
9      212.360.5516
10
11 ALSO PRESENT:
12     JOHN GUGARTY, Planet Depos Technician
13     BRENDON SKIPPER, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1             I N D E X
2
   WITNESS                    EXAMINATION
3
4  NIGEL SHAMASH
5    By Ms. Turner...........................7
6    By Mr. Case...........................241
7
8
9
10           E X H I B I T S
11 IDENT.      DESCRIPTION            PAGE
12
13 Exhibit P   Subpoena to Testify...............11
14 Exhibit Q   Summons re Oxford Realty v.
               Two Franks Holdings LLC...........36
15 Exhibit R   Floor Plan of 8th Floor.......... 46
16 Exhibit S   Touton About Our Company
               Screengrab......................69
17 Exhibit T   Click Models About Us Screengrab..75
18 Exhibit U   Email Nov 8, 2019................93
19 Exhibit V   Email Nov 10, 2019...............98
20 Exhibit W   Email Nov 18, 2019..............100
21 Exhibit X   Email Jan 18, 2020,
               CCMS0000427-429.................103
22 Exhibit Y   Email Nov 19, 2019,
               CCMS0000497-500.................125
23 Exhibit Z   Email Nov 25, 2019..............131
24
25

**Page 5**

```
          E X H I B I T S  (Cont'd)

IDENT.          DESCRIPTION                 PAGE

Exhibit AA   Email Dec 10, 2019,
             CCMS0000201-212..................133

Exhibit BB   Email Nov 26, 2019..............138

Exhibit CC   Email Dec 4, 2019...............143

Exhibit DD   Email Dec 11, 2019..............146

Exhibit EE   Email Dec 13, 2019..............151

Exhibit FF   Email Jan 24, 2020,
             CCMS0000066-67..................158

Exhibit GG   Email Dec 19, 2010,
             COOP0324-325....................162

Exhibit HH   Email Jan 3, 2020...............184

Exhibit II   Email Jan 7, 2020...............190

Exhibit JJ   Email Jan 8, 2020...............193

Exhibit KK   Meeting Summary, COOP0322-323...200

Exhibit LL   Email Jan 24, 2020,
             CCMS0000275-281.................220

Exhibit MM   Lee/Harris Letters,
             CCMS0000020-023.................226

Exhibit NN   Email Jan 30, 2020..............227

Exhibit OO   Email Feb 12, 2020..............236

Exhibit PP   Email Mar 4, 2020 to J. Mengel...238

Exhibit QQ   Email Dec 23, 2019..............241
```

**Page 6**

1  THE VIDEOGRAPHER:  Here begins
2  media number 1 in the videotaped deposition of
3  Nigel Shamash in the matter of Community
4  Counseling and Mediation Services v. Oxford
5  Realty & Holdings LLC in the United States
6  District Court, Southern District of New York,
7  Case No. 20-cv-03429.
8  Today's date is December 20th,
9  2022.  The time on the video monitor is 10:45
10 a.m. Eastern Standard Time.  The remote
11 videographer today is Brendon Skipper
12 representing Planet Depos.  All parties of this
13 video deposition are attending remotely.
14 Would counsel please voice
15 identified themselves and state whom they
16 represent.
17 MR. HARRIS:  Etan Harris of the
18 Law Offices of Marc Bengualid for the witness
19 Nigel Shamash.
20 MS. TURNER:  Tara Turner of
21 BakerHostetler for the plaintiff Community
22 Counseling and Mediation Services.
23 MR. MARGOLIS:  Barry Margolis,
24 Abrams Garfinkel Margolis Bergson for West 27th
25 Street Realty, Inc., Joseph Grill, Maxime

**Page 7**

1  Touton, F. Michael Conte.
2  MR. CASE:  And Michael Case with
3  Barclay Damon LLC representing defendant Mark
4  Paturet.
5  THE VIDEOGRAPHER:  The court
6  reporter today is Nancy Bendish representing
7  Planet Depos.  Would the reporter please swear
8  in the witness.
9
10 N I G E L   S H A M A S H, having been duly
11 sworn, testified as follows:
12 EXAMINATION BY MS. TURNER:
13 Q.   Good morning, Mr. Shamash.  My
14 name is Tara Turner and I'll be taking your
15 deposition today.  As I stated earlier, I
16 represent Community Counseling and Mediation
17 Services, the plaintiff in this action.
18 Today we're going to have a
19 conversation, but in question and answer form.
20 I'm going to ask you a number of questions and I
21 ask that you answer each of my questions
22 truthfully and to the best of your knowledge.
23 Before answering, however, please
24 wait until I finish asking each question
25 completely.  It's difficult for the reporter to

**Page 8**

1  capture simultaneous conversation, so only one
2  person should be speaking at a time.
3  If you do not understand the
4  question, please ask me or the reporter to
5  repeat the question or rephrase and I will be
6  happy to do that.
7  The court reporter will be taking
8  down my questions and your answers, so your
9  answers must be audible.  Please say yes or no
10 rather than nodding your head.  It's very
11 important that we keep all of your responses
12 verbal.  Do you understand?
13 **A.   Yes.**
14 Q.   I mentioned that I represent
15 Community Counseling and Mediation Services.  I
16 might refer to them throughout the deposition as
17 CCMS.  Do you understand what that means?
18 **A.   Yes.**
19 Q.   I may also refer to the defendants
20 in this matter, West 27th Street Realty, Inc.,
21 Marc Paturet, Joseph Grill, Maxime Touton and
22 F. Michael Conte.  If I refer to all defendants,
23 I will use defendants or the co-op, but I may
24 also refer more specifically to board members of
25 the co-op, in which case I will identify it as

9

1 the Co-op Board. Do you understand?
2 **A. Sure.**
3 Q. And you understand if I refer to
4 Oxford, I'm referring to Oxford Realty &
5 Holdings LLC?
6 **A. Yes.**
7 Q. Thank you.
8 If you need a break for any reason
9 besides the pre-scheduled break that we have at
10 12:15, please let me know and I'll be happy to
11 take a break. I just ask that you don't take a
12 break while a question is pending.
13 **A. Sure.**
14 Q. Thank you.
15 Mr. Shamash, this is sort of out
16 of the norm of typical deposition instructions,
17 but today we might be talking about some things
18 related to the race or ethnicity of certain
19 individuals. I don't mean these questions to be
20 insensitive, but the claims in this case are for
21 racial discrimination. So if you don't know the
22 race or ethnicity of someone, please feel free
23 to respond that you don't know. But I just
24 wanted to discuss that up front as we go through
25 the questions. Do you understand?

10

1 **A. Yes.**
2 Q. Thank you. And you also
3 understand that you are now under oath?
4 **A. Yes.**
5 Q. And you understand that the
6 testimony you're about to give has the same
7 force and effect as if you were testifying in a
8 courtroom?
9 **A. Yes.**
10 Q. And are you suffering from any
11 medical conditions, medical or physical -- I'm
12 sorry, medical conditions, mental or physical,
13 that would prevent you from testifying fully and
14 truthfully today?
15 **A. No.**
16 Q. And are you taking any medications
17 or substances that would prevent you from
18 testifying fully and truthfully today, or would
19 otherwise affect your recollection?
20 **A. No.**
21 Q. Thank you.
22 Is there anything else I should be
23 aware of that would prevent you from testifying
24 fully and truthfully today?
25 **A. No.**

11

1 Q. Mr. Shamash, are you represented
2 by counsel today?
3 **A. Yes.**
4 Q. And just for the record, could
5 your counsel please identify himself again.
6 MR. HARRIS: Etan Harris, Law
7 Office of Marc Bengualid for Nigel Shamash.
8 MS. TURNER: Thank you.
9 I believe John introduced himself
10 earlier. He is with Planet Depos and he will be
11 controlling any of the digital documents.
12 John, could you please pull up
13 document 1.
14 THE TECHNICIAN: Stand by,
15 counsel. One moment.
16 (Exhibit P marked for
17 identification.)
18 THE TECHNICIAN: Document 1 is on
19 screen. It is marked as Exhibit P.
20 MR. MARGOLIS: Tara, what's the
21 plan for you providing us with these exhibits?
22 MS. TURNER: Sure. I will
23 share the -- there is a link where as we mark
24 these exhibits you will be able to download them
25 immediately, and then I can also send you copies

12

1 once the deposition is complete.
2 MR. CASE: Tara, for the sake of
3 clarity, where do we find that link?
4 MS. TURNER: It should have been
5 in the deposition invite, but I will resend
6 right now. We just want to go off the record
7 for two minutes and I can send.
8 MR. CASE: Okay.
9 THE VIDEOGRAPHER: We're going off
10 the record. The time is 10:52.
11 (Discussion off the record.)
12 THE VIDEOGRAPHER: We're back on
13 the record. The time is 10:54.
14 BY MS. TURNER:
15 Q. Mr. Shamash, John has pulled up
16 document 1, which we have marked as Exhibit P.
17 Do you recognize this document?
18 **A. Yes.**
19 Q. What is it?
20 **A. A subpoena.**
21 Q. Is this the subpoena you received
22 in connection with this case?
23 **A. It's a subpoena. I don't have**
24 **this in mind specifically, but it has my name on**
25 **it so I have to imagine so.**

13

1    Q.    And you see at the top of the
2  subpoena it says CCMS doing business as
3  Community Counseling and Mediation Services --
4    A.    Yes.
5    Q.    -- v. West 27th Street Realty,
6  Inc.?
7    A.    Um-hum.
8    Q.    So you understand this is a
9  subpoena in connection with this action?
10    A.    Yes.
11    Q.    Thank you.
12         And you understand that the
13  parties and your counsel have agreed to conduct
14  this deposition by remote means?
15    A.    Um-hum.
16    Q.    And you understand that the
17  deposition will be videorecorded, and you
18  consent to that?
19    A.    Um-hum, yup.
20    Q.    Thank you.  If you could just say
21  yes or no so that it's clear for the court
22  reporter.
23    A.    Yes.
24    Q.    Thank you.
25         MS. TURNER:  John, you can take

14

1  down document 1.
2    Q.    Mr. Shamash, what's your
3  understanding of the nature of this lawsuit?
4    A.    There was a board meeting
5  where these people got refused.
6         (Reporter clarification.)
7    A.    -- where CCMS was refused.
8    Q.    And do you understand that my
9  client sued the defendants, as well as you and
10  Oxford, for racial discrimination?
11    A.    I do, yes.
12    Q.    And you and Oxford were previously
13  defendants in the action but you've now been
14  dismissed?
15    A.    Yes.
16    Q.    Correct?  Thank you.
17         Mr. Shamash, what did you do, if
18  anything, to prepare for this deposition?
19    A.    Can you repeat the question.
20  Prepare?
21    Q.    Prepare.
22    A.    I sent over documents that were
23  requested of me.  And I listened to the phone
24  call recording.
25    Q.    Did you speak with anyone to

15

1  prepare?
2    A.    Not really.  I had a conversation
3  with my attorney.
4    Q.    Okay.  I'm not going to ask you
5  about the substance of that conversation.
6         Did you meet with your attorney to
7  prepare for the deposition?
8    A.    I had a conversation with him.
9    Q.    How long was that conversation?
10         MR. HARRIS:  Counsel, this is not
11  relevant, the duration of the conversation with
12  the attorney.  I don't think that's an
13  appropriate question.  You're kind of jumping
14  into attorney-client privilege, don't you think,
15  Tara?
16         MS. TURNER:  I think it's a pretty
17  standard question to ask how long someone met
18  with their attorney to prepare for a deposition.
19    Q.    Did you have a half-hour
20  conversation, did you have an eight-hour
21  conversation?
22         MR. HARRIS:  Objection.  I'm not
23  going to let him answer that.  I think it's
24  inappropriate.
25    Q.    When did you meet with your

16

1  attorney to prepare for the deposition,
2  Mr. Shamash?  Or when did you have a
3  conversation with your attorney to prepare for
4  the deposition?
5         THE WITNESS:  I have to answer
6  that?
7         MR. HARRIS:  It's privileged.
8         THE WITNESS:  Okay.
9    A.    We met last week, sometime last
10  week.
11    Q.    Was there a day of week that you
12  met?
13    A.    Sometime last week.
14    Q.    Are you refusing to answer what
15  day you met with your attorney?
16    A.    No, I just don't remember.  It was
17  sometime last week.  This got delayed from
18  Friday, so it was sometime last week between
19  Tuesday and Thursday, but I can't remember
20  exactly which day it was.
21    Q.    Okay, thank you.
22         And I'm sorry, did you meet with
23  your attorney or just spoke with your attorney,
24  just so the record is clear?
25    A.    We had a conversation.

---

**17**

1    Q.    You had a conversation on the
2 phone?
3          MR. HARRIS:  Objection.  This is
4 attorney-client privilege.  You can't go into
5 details when he spoke to his attorney.  I'm not
6 letting him answer this question.  Move on.
7    Q.    Was anyone else on the call with
8 you besides you and your attorney?
9    A.    No.
10    Q.    Thank you.
11          Other than your attorney, did you
12 meet or speak with anyone else in preparation
13 for this deposition?
14    A.    No.
15    Q.    You didn't speak to a spouse, a
16 partner, a family member?
17    A.    I had a very tertiary conversation
18 with Mr. Saul Tawil about this.
19    Q.    And who is Mr. Tawil?
20    A.    Mr. Tawil is one of the partners
21 of a company which owns Oxford.
22    Q.    And what was the substance of your
23 conversation?
24    A.    To tell him that we're being
25 deposed.

---

**18**

1    Q.    And how do you know Mr. Tawil?
2    A.    He is a shareholder of the company
3 which owns a share of Oxford.
4    Q.    Do you have a personal
5 relationship with him?
6    A.    Not particularly personally, no.
7    Q.    Are you related to him?
8    A.    Through marriage.
9    Q.    How are you related to him through
10 marriage?
11    A.    His brother is married to my
12 sister.
13    Q.    Thank you.
14          Did you review any materials in
15 preparation for this deposition?
16    A.    No.  With the exception of the
17 phone call.
18    Q.    And you produced documents in
19 response to the subpoena for this deposition,
20 correct?
21    A.    Yes, ma'am.
22    Q.    Do you have any other materials
23 produced in response to the subpoena?
24    A.    The only thing I have is the phone
25 call.

---

**19**

1    Q.    Mr. Shamash, you understand your
2 attorney produced roughly 70 documents in
3 response to this subpoena?
4    A.    Um-hum, yes.
5    Q.    Mr. Shamash, do you have any
6 materials in front of you right now?
7    A.    No, ma'am.
8    Q.    And is there anyone else in the
9 room with you besides your attorney?
10    A.    No.
11    Q.    Thank you.
12          Mr. Shamash, have you met or
13 spoken with counsel for the defendants before,
14 Mr. Margolis and Mr. Case who are on the line?
15    A.    I don't believe so.  I don't know
16 if we've ever spoken.  Mr. Margolis, have we
17 ever spoken?  I don't know if I've ever spoken
18 to Mr. Margolis before.  I've never spoken to
19 Mr. Case before.
20          MR. MARGOLIS:  Just for the
21 record, Tara, I've never spoken to Mr. Shamash.
22          MS. TURNER:  Thank you.
23    Q.    And you've never met Mr. Case or
24 Mr. Margolis?
25    A.    No.

---

**20**

1    Q.    Thank you.
2          Mr. Shamash, have you spoken with
3 any of the individual defendants in this action?
4 And I can repeat the names if you need me to.
5    A.    Please do.
6    Q.    Please do?
7    A.    Yes.
8    Q.    Sorry, you cut out a little bit.
9          Have you ever spoken with Mr. F.
10 Michael Conte.
11    A.    After, or when?  Before?
12    Q.    Ever.
13    A.    Ever, yeah.
14    Q.    And have you ever spoken to him
15 concerning this action or the events that led to
16 this action?
17    A.    No.
18    Q.    You've never spoken with him?
19    A.    Correct.
20    Q.    Have you ever spoken with --
21          MR. HARRIS:  Object to the form on
22 the last question.
23    Q.    Have you ever spoken with
24 Mr. Joseph Grill about this action or the events
25 that led to this action?

21

1    A.    No.
2    Q.    Have you ever spoken with Mr., I
3 believe it's Paturet regarding this action or
4 the events that led to this action?
5    A.    No.
6         MR. HARRIS:  Objection to form.
7    Q.    Have you ever spoken with
8 Mr. Touton regarding this action or the events
9 that led to this action?
10        MR. HARRIS:  Objection to form.
11 You can answer.
12    A.    No.
13        MR. CASE:  Can we specify the
14 first name of Mr. Touton?
15        MS. TURNER:  Sure.  It's -- and
16 I'm sorry if I'm mispronouncing -- it's
17 Mr. Maxime Touton.
18        MR. MARGOLIS:  M-a-x-i-m-e.
19        MS. TURNER:  Thank you.
20    Q.    Mr. Shamash, have you ever spoken
21 with a Mr. Eric Doctormann in connection with
22 this action or the events that led to this
23 action?
24    A.    No.
25        MR. HARRIS:  Objection to form.

22

1    Q.    But you have spoken with all of
2 those individuals before?
3        MR. MARGOLIS:  Objection.
4 Generally, from the beginning of time?  Tara,
5 you've got to narrow the question.
6    Q.    You have spoken with those
7 individuals since Oxford took over the property
8 at 129 West 27th Street at the eighth floor?
9        MR. CASE:  Object to the form.
10    A.    Some of them.
11        MR. MARGOLIS:  What was the
12 answer, Nancy?
13        THE WITNESS:  Some of them.
14        (Reporter clarification.)
15    Q.    Of those individuals, which ones
16 have you spoken with?
17    A.    You want them one by one?
18    Q.    Sure.
19    A.    Um-hum.
20    Q.    Have you ever spoken with
21 Mr. Joseph Grill or Joey Grill?
22    A.    Yes.
23    Q.    Have you ever spoken with Mr. Eric
24 Doctormann?
25    A.    I don't believe so.

23

1    Q.    Have you ever spoken with --
2    A.    If I have, it hasn't been for more
3 than a minute.
4    Q.    Have you ever spoken with
5 Mr. Maxime Touton?
6    A.    I don't believe so.
7    Q.    Have you ever spoken with Mr. F.
8 Michael Conte?
9    A.    Yes.
10    Q.    And then, have you ever spoken
11 with Mr. Marc Paturet?
12    A.    I don't believe so.  If I have,
13 not more than a couple of minutes.
14    Q.    Mr. Shamash, have you spoken with
15 Peter Lehr or anyone from Kaled Management
16 concerning this action or the events that led to
17 this action?
18        MR. HARRIS:  Object to the form.
19 You can answer.
20    A.    No.
21    Q.    Have you ever spoken with Peter
22 Lehr since Oxford took over the eighth floor?
23    A.    If I did, not for more than a
24 couple of minutes.
25    Q.    Mr. Shamash, have you ever been

24

1 deposed before?
2    A.    Yes.
3    Q.    If so, in what action?
4    A.    There was a real estate action 25
5 years ago.  It went for -- or so.  Maybe 20
6 years ago.  And it went for -- I don't remember
7 it being very long.
8    Q.    Do you remember what court that
9 action was in?
10    A.    It wasn't a court.
11    Q.    Was it -- I'm sorry.  Do you know
12 what court the action was situated in?
13    A.    No.
14    Q.    What were the circumstances of the
15 dispute?
16    A.    Two tenants -- a tenant had an
17 option to buy a building with a lease, or so
18 they thought, a lease with an option, and they
19 asked me at the -- as someone who knew both
20 parties, but wasn't part of the parties, if I
21 knew anything to do with the lease with the
22 option to buy, and I didn't.
23    Q.    And what subjects generally did
24 you testify about?
25    A.    It's been a long time; I can't

25

1 remember.
2     Q.    And have you ever given testimony
3 in court?
4     A.    No. Ah -- no.
5     Q.    Have you ever given testimony in
6 an arbitration or mediation?
7     A.    I did have an arbitration in
8 landlord/tenant court with a squatter a few
9 years ago.
10     Q.    How many is a few years ago?
11     A.    Three or four.
12     Q.    Do you remember what action that
13 was?
14     A.    Not well.
15     Q.    And can you just describe the
16 circumstances of that dispute?
17     A.    Tenant moved in -- someone moved
18 into a space, which we didn't know about, and
19 they went out in court where they said it was an
20 office space and that was the end of the
21 conversation. It ended.
22     Q.    And what subjects did you testify
23 about in the arbitration?
24     A.    It was literally three seconds
25 where the court basically got the gist of the

26

1 whole thing. But there was an arbitrator, so I
2 guess that counts as arbitration.
3     Q.    And what property was this dispute
4 about?
5     A.    Building on 29th Street.
6     Q.    The same building at issue?
7     A.    Building from 27th Street.
8     Q.    Okay, thank you. I'm actually
9 diagnosed dyslexic, so if I get some numbers
10 wrong today, forgive me.
11        Now I'm just going to ask you a
12 little bit -- a few personal questions,
13 Mr. Shamash. Can you just please describe your
14 race and ethnicity for the record.
15     A.    I'm Jewish. My parents are Middle
16 Eastern. They're both from Baghdad.
17     Q.    Thank you. Can you please
18 describe your educational history.
19     A.    Some college.
20     Q.    What does some college mean?
21     A.    I went to college from the age of
22 17 until 20-ish. I believe I dropped out after
23 three years of college.
24     Q.    What college was that?
25     A.    Florida College.

27

1     Q.    And what degree were you speaking?
2     A.    Business related.
3     Q.    Why did you drop out?
4     A.    Because I was too busy in my
5 personal business.
6     Q.    What's your current occupation?
7     A.    I'm a real estate developer.
8     Q.    And where do you work?
9     A.    I have an office in Chelsea.
10     Q.    What company do you work for?
11     A.    I work for myself.
12     Q.    And how long have you worked for
13 yourself?
14     A.    Since I dropped out of college.
15     Q.    Just working backwards to when you
16 dropped out, could you just generally describe
17 your work history?
18     A.    Sure. I initially was in
19 commercial real estate, initially as a broker
20 for small spaces. Over the years it's morphed,
21 but it's very much a development and asset
22 management business at this point.
23     Q.    Thank you.
24     A.    Consultancy, too.
25        (Reporter clarification.)

28

1        THE WITNESS: Consultancy too.
2        MR. MARGOLIS: Insolvency too?
3        THE WITNESS: Consultancy.
4        MR. MARGOLIS: Insolvency.
5        MR. HARRIS: No, consultancy.
6        MR. MARGOLIS: Oh, consultancy,
7 I'm sorry. Mr. Shamash, you have your hand over
8 your mouth. It's difficult to read your lips.
9     Q.    Mr. Shamash, just for my benefit,
10 could you please describe the differences
11 between being a broker and a commercial real
12 estate developer?
13     A.    Sure. A developer buys real
14 estate, takes a loan, builds things and hopes he
15 leases or sells things. A real estate broker
16 works on behalf of the real estate owners or on
17 behalf of the tenants and tries to get them
18 inside of buildings, be it commercial or
19 residential.
20     Q.    Thank you. And do you still
21 broker any spaces for clients?
22     A.    I still carry a broker's license,
23 although it's -- I very much -- it's very much
24 something that I do on the side at this point.
25     Q.    How many commercial properties

29

1  would you say you've been involved in as a
2  broker, over your career?
3      **A.    Tens, if not hundreds.**
4      Q.    And how many residential
5  properties have you been involved in as a broker
6  over your career?
7      **A.    Not many.**
8      Q.    Of those commercial properties
9  where you were a broker, how many of those were
10  co-ops?
11     **A.    There are approximately,**
12  **approximately ten or so commercial co-ops in the**
13  **area of Chelsea in the Garment District.  Over**
14  **the past 20 years I've had an interaction one**
15  **way or another with, I'd say, 60 percent of**
16  **them.**
17     Q.    So of the total number of
18  properties, commercial properties that you've
19  been involved in as a broker, how many would you
20  say, if you can give a percentage, involved
21  dealing with a co-op?
22     **A.    Involved dealing with a co-op?**
23  **When I said I've interacted, it's very rarely a**
24  **case of me dealing with a co-op.  As a broker**
25  **you've got a customer and you deal with a**

30

1  **manager.**
2      **So, in that case, very few.  In**
3  **the case of how many of my commercial deals have**
4  **involved me dealing with a co-op, a highly**
5  **fractional number.**
6      Q.    Could you give an estimate?
7      **A.    Between .25 percent and .5 percent**
8  **would be my guess.**
9      Q.    Understood.
10     And to circle back to what you
11  said earlier about 60 percent -- strike that.
12     How many commercial properties
13  have you been involved as a broker --
14     **A.    Representing the tenant or**
15  **representing the landlord?**
16     Q.    Either.
17     **A.    How many properties -- so, can I**
18  **clarify the question?**
19     Q.    Sorry, I didn't actually get a
20  chance to finish the question.
21     **A.    Sorry.**
22     Q.    How many commercial properties
23  have you been involved in as a broker for a
24  landlord or a tenant that involved a co-op?
25     **A.    My apologies, it's a long**

31

1  **question.  Can you repeat it again.**
2      MS. TURNER:  Nancy, could you
3  repeat the question.
4      (Last question read.)
5      **A.    Does that include me getting a**
6  **phone call for a space, to look at a space, and**
7  **me showing ten office spaces and one of them**
8  **happens to be a co-op?  Does that count?**
9      Q.    Yes.
10     **A.    So the question is how many times**
11  **have I been inside of a co-op with a tenant.**
12     Q.    I didn't ask where you physically
13  were located.
14     **A.    Every time it would have been**
15  **physically.  Meaning, you want to know how many**
16  **times I've interacted with a co-op.  Most of the**
17  **time we'll get in a cost light (phonetic) when**
18  **we were running a brokerage.  A tenant would**
19  **call us looking for space.  We would go on a**
20  **multiple listing search.  We would find**
21  **listings.  If one of them happens to be listed**
22  **inside of a co-op, it really doesn't make a**
23  **difference to the action of me showing space.**
24  **So you call the landlord representative, be it a**
25  **co-op or an owner or whatever; you say is the**

32

1  space available still.  They could say yes; you
2  then show the space.  That's it.  If they like
3  it, they make an offer.
4      How many times have I done that
5  and it being a commercial co-op, it's happened a
6  lot.  I don't have a number for it.  Easily more
7  than ten times.  At one point I was a very busy
8  broker, so it would be more than ten times.
9  Less than a hundred, I'm sure.  Somewhere in
10  that range.
11     Q.    Thank you for that explanation.
12     I'm going to shift gears to some
13  questions about Oxford.  Mr. Shamash, what's
14  your connection to Oxford?
15     **A.    I own a minority share in a**
16  **company which owns a share of Oxford.**
17     Q.    And what's the company that you
18  own a minority share of?
19     **A.    I don't know it's exact name but**
20  **it has "Oxford" in its name.**
21     Q.    And do you know when Oxford was
22  formed?
23     **A.    If memory serves me correctly,**
24  **within a couple of years of 2005.  So in between**
25  **2003 and 2007.**

---

**33**

1    Q.    Thank you.  And when did you
2    become involved with Oxford?
3    **A.    Gradually as I got older and my**
4    **father did as well, and Saul did as well.**
5    Q.    And how is your father connected
6    to Oxford?
7    **A.    He was the initial person who**
8    **identified the property and he has been pretty**
9    **much a silent partner for most of the time.**
10   Q.    Understood.  So who manages
11   Oxford?
12   **A.    Saul Tawil along with me.**
13   Q.    Now, I want to just sort of define
14   this term to shorten it, but when I'm referring
15   to the premises, I'm referring to -- sorry, I
16   have to find the address now because of my
17   dyslexia.
18        If I'm referring to the premises,
19   I'm referring to 129 West 27th Street,
20   specifically the eighth floor in New York, New
21   York, 10001.  Do you understand what that means?
22   **A.    Yes.**
23   Q.    Thank you.  Besides the premises,
24   does Oxford rent or own any other commercial
25   properties?

---

**34**

1    **A.    Yes.**
2    Q.    Where?
3    **A.    Seventh floor.**
4    Q.    And besides the seventh floor of
5    that address, does Oxford rent or own any other
6    properties?
7    **A.    No.**
8    Q.    Do you or Mr. Tawil rent or own
9    other commercial properties?
10       MR. HARRIS:  Objection to form.
11   Mr. Who?
12       MS. TURNER:  I'm sorry if I'm
13   mispronouncing it.  Tawil.
14   **A.    Yes.**
15   Q.    And where are those properties
16   located?
17   **A.    I don't know exactly what Saul**
18   **owns, but I can speak for myself.**
19   Q.    Sure.  We'll start with you.
20   **A.    I own real estate throughout**
21   **Manhattan, central Jersey.  I have my houses in**
22   **New York and central Jersey and upstate New**
23   **York.**
24   Q.    How many commercial properties do
25   you own?

---

**35**

1    **A.    Good question.**
2         **A running tally of approximately**
3    **six or seven.**
4    Q.    How many residential properties do
5    you own?
6    **A.    Single-family residential**
7    **properties?**
8    Q.    Any type of residential property.
9    **A.    Three, four.**
10   Q.    And do you own any properties,
11   commercial or residential, that Mr. Tawil owns?
12   **A.    He owns this with us. He's**
13   **affiliated with other buildings.  I don't know**
14   **the addresses of them.**
15   Q.    How many of the commercial
16   properties that you own have co-ops?
17   **A.    Three.**
18   Q.    Where are Oxford's offices
19   located?
20   **A.    I don't know where they're**
21   **currently operated -- located.  I have no idea.**
22   Q.    Where do you work out of?
23   **A.    I work out of 27 West 28th --**
24   **sorry, 28 West 27th -- that's my dyslexia.  28**
25   **West 27th Street, one block away.**

---

**36**

1    Q.    Thank you.
2         Since its formation, has Oxford
3    been involved in any lawsuits?
4    **A.    No.  Apart from this.**
5         MS. TURNER:  John, if you could
6    please pull up document 2.
7    **A.    Can I just correct that.  Not that**
8    **I know of, not that I recall.**
9         THE TECHNICIAN:  Stand by,
10   counsel.
11       (Exhibit Q marked for
12   identification.)
13       THE TECHNICIAN:  Document 2 is on
14   screen marked as Exhibit Q.
15   Q.    Mr. Shamash, I'm going to give you
16   a second to review this.
17   **A.    Sure.**
18       (Witness reviewing document.)
19   Q.    Do you recognize this document?
20   **A.    I do indeed.**
21   Q.    What is it?
22   **A.    This is a previous tenant, and**
23   **that's what my questions involved before; I**
24   **didn't know whether there was a lawsuit filed or**
25   **not.  This is a previous tenant of the space.**

---

**37**

1    Q.    So this is a summons and complaint
2  in connection with a lawsuit Oxford Realty &
3  Holdings, LLC v. Two Franks Holdings LLC; is
4  that correct?
5    **A.    That's right.**
6    Q.    What was the nature of that
7  lawsuit?
8    **A.    They were a tenant and they wanted**
9  **to leave the space early.**
10    Q.    And when you say "they," are you
11  referring to Two Franks Holdings LLC?
12    **A.    Yes.**
13    Q.    And where were they a tenant?
14    **A.    They were a tenant on one of the**
15  **floors. I don't know which one.**
16    MS. TURNER:  John, could you
17  please -- I'm not sure if we are able to scroll
18  down the document.  Maybe just scroll to the
19  next page.
20    THE TECHNICIAN:  Is there a
21  particular section you're looking for, Ms.
22  Turner?
23    MS. TURNER:  Sorry, it's very
24  small on my screen.  It's making it very hard
25  for me to see.

**38**

1    MR. HARRIS:  Thank you.  Can you
2  scroll through the whole document so I can
3  review it?  Thank you.
4    MR. MARGOLIS:  John, are you able
5  to elongate that vertically?
6    THE TECHNICIAN:  Say again, sir.
7    MR. MARGOLIS:  Like are you able
8  to make the frame longer, top to bottom?  No,
9  not scrolling.  Just like, are you able to like
10  increase the border to stretch it higher so that
11  it's bigger?
12    THE TECHNICIAN:  I don't believe
13  so, sir.  The only thing I can do is zoom out to
14  show more of it, but obviously that will make
15  the text smaller.
16    MR. MARGOLIS:  Okay.
17    MS. TURNER:  John, could you go to
18  page 2, and pull up number 4 of the document.
19  BY MS. TURNER:
20    Q.    Mr. Shamash, could you please read
21  number 4 of the document.
22    **A.    "That at all relevant times,**
23  **plaintiff was and still is a cooperative**
24  **tenant-lessee, and a shareholder of West 27th**
25  **Street Realty, Inc., the owner of the**

**39**

1  **aforementioned premises, with a portion of said**
2  **shares allocated to Unit 8 at the building known**
3  **as 129 West 27th Street."**
4    Q.    Does this refresh your
5  recollection that this lawsuit involved the same
6  premises that's at issue here?
7    **A.    It says Unit 8; I imagine that's**
8  **the eighth floor.**
9    Q.    Thank you.
10    Why did Two Franks want to get out
11  of their lease?
12    **A.    I actually have very little memory**
13  **of this, but it's a very common thing that a**
14  **tenant wants to get out of the space, is going**
15  **to make an argument economically to get out**
16  **because the lease is for, typically, five or ten**
17  **years.  So, they would make a claim saying that**
18  **they're having economic hardship or something**
19  **like that, and they try to get out of the lease.**
20    Q.    Do you recall how long Two Franks'
21  lease was for the premises?
22    **A.    I don't.  We typically sign leases**
23  **between three and ten years.**
24    MS. TURNER:  John, if you could go
25  to the third page.

**40**

1    Q.    Mr. Shamash, if you could just
2  read -- and you can read it to yourself --
3  number 5 of the document.
4    **A.    Can I read it out loud?**
5    Q.    Sure.
6    **A.    (As read):  "On or about November**
7  **23, 2016, defendant, as subtenant, entered into**
8  **a sublease with the plaintiff, as cooperative-**
9  **tenant, for five years commencing in December**
10  **1st, 2016 and ending in 2021, beginning at a**
11  **basic annual rent of $285,000 with an annual**
12  **increase of three percent for each year of that**
13  **sublease thereafter."**
14    Q.    Thank you.
15    Does this refresh your
16  recollection that the sublease with Two Franks
17  began December 1st, 2016 and was set to end
18  November 30th, 2021?
19    **A.    It says that on the document.  I**
20  **don't have a recollection of it specifically,**
21  **but it says that on the document.  I'll take it**
22  **as being correct.**
23    Q.    And why did Two Franks vacate the
24  premises early before their lease was up?
25    MR. HARRIS:  Objection, asked and

**41**

1 answered. You can answer it.
2     **A.   I'll answer it. If I remember**
3 **right, they didn't have the money.**
4     Q.   Do you know what kind of business
5 Two Franks was?
6     **A.   Media company.**
7     Q.   What kind of media?
8     **A.   That I don't know. Media.**
9     Q.   Thank you.
10     What happened to this -- what
11 happened in this lawsuit?
12     MR. HARRIS: Objection to form.
13 What do you mean what happened?
14     Q.   What was the outcome of this
15 lawsuit?
16     **A.   They left the space.**
17     Q.   So this action is still pending?
18     **A.   Is it? I don't know. I don't**
19 **think so.**
20     MS. TURNER: John, if you could go
21 down to page, the bottom of this page and the
22 top of page 4.
23     Q.   Mr. Shamash, could you just read
24 number 11, please.
25     **A.   (As read): "Pursuant to the**

**42**

1 **sublease agreement, defendant is obligated to**
2 **plaintiff for rent and additional rent from 2019**
3 **and the conclusion of the lease term on 2021,**
4 **minus the security deposit, for a total of**
5 **713,000."**
6     Q.   What was that amount?
7     **A.   $713,571.87.**
8     Q.   Thank you.
9     Did Oxford ever receive that
10 money?
11     **A.   I have no idea.**
12     Q.   Did you receive any money from Two
13 Franks in connection with this lawsuit?
14     **A.   If I received any money? No, I**
15 **didn't.**
16     Q.   Did Oxford receive any money?
17     **A.   I have no idea.**
18     Q.   Are there any other lawsuits that
19 Oxford has been a party to?
20     **A.   Not that I know of.**
21     MS. TURNER: Thank you, John, you
22 can take the document down.
23     Q.   So, I already defined what the
24 premises are, but can you just describe what the
25 physical space is?

**43**

1     **A.   The space, the building is a**
2 **75-foot by 100 12-story commercial building, and**
3 **the space is one floor of that --**
4     (Reporter clarification.)
5     **A.   One floor of that, or two floors,**
6 **depending on what we're talking about. As far**
7 **as I know we're talking about the eighth floor,**
8 **so one floor of that.**
9     Q.   Yes, I defined premises as just
10 the eighth floor. If I ask about another floor,
11 I'll make sure to clarify.
12     How many square feet was the
13 eighth floor?
14     **A.   Rentable square footage is**
15 **somewhere in the range of 8500 square feet.**
16 **That's how commercial real estate is measured on**
17 **a brokerage basis. Usable space is**
18 **approximately 5500 square feet.**
19     Q.   What's the difference between
20 rentable and usable space?
21     **A.   It's something called the loss**
22 **factor, and it's a way in which real estate**
23 **companies account for spaces. When you rent a**
24 **space in Manhattan, you have to cover the common**
25 **areas. You have a larger building, that**

**44**

1 **includes corridors, hallways, bathrooms,**
2 **elevators, elevator shafts, areas -- the fire**
3 **escapes, areas that are not specifically past**
4 **your space.**
5     **Real estate companies over the**
6 **years have agreed to make that a -- make it a**
7 **generally fixed amount of 35 percent over the**
8 **usable space, depending on the kind of building**
9 **that you're in. As you go to a higher rent**
10 **building, that loss factor becomes higher. When**
11 **you go to a lower rent building, typically that**
12 **loss factor becomes lower. As opposed to in**
13 **residential real estate when you rent a 1,000**
14 **square foot apartment, it's 1,000 square feet.**
15     Q.   Understood. Thank you for that
16 explanation.
17     Did the eighth floor have any
18 windows?
19     **A.   Yes.**
20     Q.   Do you know how many?
21     **A.   No.**
22     Q.   Did it have a bathroom?
23     **A.   Yes.**
24     Q.   Did it have elevator access?
25     **A.   Yes.**

45

1    Q.    Was the eighth floor -- was the
2  space finished or was it still under
3  construction?
4          MR. MARGOLIS:  Objection.
5          MR. HARRIS:  Objection.
6          MR. MARGOLIS:  When are we talking
7  about, Tara?
8          MS. TURNER:  We're talking about
9  right now.
10         MR. HARRIS:  Today?
11         MS. TURNER:  Yes.
12   A.    It's a second generation buildout
13 that hasn't changed very much in the past 20
14 years.
15   Q.    What about at the time that my
16 client applied to sublease the eighth floor?
17   A.    As I said, it's a second
18 generation buildout that hasn't changed very
19 much in the past 20 years.
20   Q.    Thank you.  Is there a reception
21 area in the space?
22   A.    The space can be used however a
23 tenant would take over it.  If they want to put
24 a reception area somewhere, they put a reception
25 area somewhere.

46

1    Q.    Is the space divided in any way?
2    A.    Yes, it's got perimeter offices.
3    Q.    How many offices?
4    A.    I don't know.  Approximately 20.
5  Approximately.  Could be 10, actually.  Between
6  10 and 20.
7    Q.    Thank you.
8          MS. TURNER:  John, if you could
9  pull up the document by Bates number, it begins
10 with CCMS and ends in 173.
11         THE TECHNICIAN:  Stand by,
12 counsel.
13         (Exhibit R marked for
14 identification.)
15         THE TECHNICIAN:  That document is
16 on screen now, marked as Exhibit R.
17         MS. TURNER:  Thank you.
18 BY MS. TURNER:
19   Q.    Mr. Shamash, I'm going to
20 represent to you that the plaintiff produced
21 this document in this litigation, but do you
22 recognize this first page?
23   A.    Yeah.  It's an older floor plan of
24 the space.
25   Q.    Is this floor plan still accurate

47

1  for the eighth floor?
2    A.    It certainly -- the majority of it
3  is accurate.  I don't know, there may have been
4  some movement in walls.  This is a very old
5  floor plan.
6    Q.    Thank you.  And based on this
7  floor plan, how many offices are on the eighth
8  floor?
9    A.    Let's count together.  One, two,
10 three, four, five, six, seven along the right
11 side.  One, two, three, four, five, six, seven,
12 seven along the left side; and I believe that
13 bottom left is a kitchen, but I may be wrong.
14 The kitchen might be in the center; I'm not 100%
15 sure.
16         So, approximately 14, between 14
17 and 20.  At the bottom there was a bathroom and
18 the top I'm pretty sure that's a closet.  That
19 central common corridor area I'm pretty sure is
20 a conference room.  It may be offices.  It's in
21 that range.
22   Q.    Okay.  So it has approximately 14
23 offices?
24   A.    Approximately.
25   Q.    Thank you.

48

1          When did Oxford take over the
2  eighth floor?
3    A.    When they bought it?
4    Q.    Yes.
5    A.    You've asked me that question
6  already.  Within two years or so, between like
7  2003 and 2006, in that range.
8          MS. TURNER:  John, you can
9  actually take down Exhibit R.
10   Q.    How long is Oxford's lease for,
11 for the space?
12   A.    Oh, I'm sorry.  Typically a lease
13 is 99 years, but this specific one I don't know.
14   Q.    Working backwards, could you
15 identify the subtenants for the premises,
16 working back to when Oxford bought the eighth
17 floor?
18   A.    I can remember Two Franks; you
19 showed me an exhibit.  Had a couple of media
20 companies inside there over the years.  I don't
21 remember them by name, to be honest.
22   Q.    Is there a subtenant in the space
23 currently, in the premises?
24   A.    No.
25   Q.    No.  After CCMS's sublease was

**49**

1　rejected, was there a subtenant in that space
2　between that time period, roughly January 2020
3　and today?
4　　　A.　No.
5　　　Q.　And before CCMS's sublease was
6　rejected, the prior tenant was Two Franks,
7　correct?
8　　　A.　Was there someone in between? I
9　don't know. I think there was another gap.
10　　　Q.　And before Two Franks, who was the
11　subtenant in the premises?
12　　　A.　There were a series of media
13　companies. One of them was a video game
14　developer. That one I remember well. I like
15　video games.
16　　　Q.　How long were they in the space,
17　the video game developer?
18　　　A.　That's a really good question.
19　Maybe five years, maybe. I think they actually
20　had an IPO at one point during it. In the range
21　of five years.
22　　　Q.　Since Oxford purchased the
23　premises, how many total tenants, subtenants,
24　have used the space?
25　　　A.　No clue.

**50**

1　　　Q.　Less than ten?
2　　　A.　Less than ten I would imagine.
3　　　Q.　Do you recall any other subtenants
4　besides the video game developer?
5　　　A.　Specifically, no.
6　　　Q.　On average, how long were the
7　leases for these subtenants?
8　　　A.　Between three and ten years the
9　length of the leases that we typically sign,
10　with a focus on volume, preferably.
11　　　Q.　Do you recall with the video game
12　developer?
13　　　A.　I don't know what they signed the
14　lease under, but it eventually merged to become
15　THQ, which I think was then later bought by a
16　company called Activision, which may have become
17　Activision Blizzard, but I don't know if that
18　was all during our tenure or not.
19　　　Q.　I definitely know Blizzard, that's
20　one I know.
21　　　Q.　Speaking of Two Franks, how often
22　did -- do you recall how many employees Two
23　Franks had that used the space?
24　　　A.　(Witness shakes head.)
25　　　Q.　Do you know if they had visitors

**51**

1　to the space?
2　　　A.　No.
3　　　Q.　Generally when tenants have
4　visitors to the building, what elevator do they
5　use?
6　　　A.　Passenger elevator, unless the
7　visitor is delivering something.
8　　　Q.　And then what elevator would they
9　use if they were delivering something?
10　　　A.　The freight elevator; unless, of
11　course, they're picking something up.
12　　　Q.　What elevator would they use if
13　they were picking something up?
14　　　A.　The freight elevator, I'd hope, if
15　they were.
16　　　Q.　Understood.
17　　　　Is the premises currently for
18　rent?
19　　　A.　Yes.
20　　　Q.　Is it currently for sale?
21　　　A.　It goes on and off for sale. We
22　don't know. I think everything is for sale if
23　you get the right price.
24　　　Q.　When was the last time it was
25　formally up for sale, the premises?

**52**

1　　　A.　That I don't know. You have to
2　define the word "formally" really.
3　　　Q.　When was the last time marketing
4　materials were prepared to advertise the sale of
5　the premises?
6　　　A.　I would say we certainly
7　contemplated a sale after it's been vacant for
8　so long. In the past two years I haven't been
9　party to any marketing materials or an exclusive
10　that's being signed with a broker.
11　　　Q.　Talking about the building where
12　the premises is located, you said there are 12
13　floors in the building, correct?
14　　　A.　Um-hum.
15　　　Q.　Does the size of each floor vary?
16　　　A.　I don't believe so, no. I believe
17　the building is a right angle.
18　　　Q.　And Oxford also leases the seventh
19　floor of 129 West 27th Street, correct?
20　　　A.　That is right.
21　　　Q.　And who occupies the seventh
22　floor?
23　　　A.　It's currently vacant.
24　　　Q.　How long has it been vacant?
25　　　A.　I don't recall.

**53**

1   Q.   Do you recall the last tenant in
2   the seventh floor?
3       A.   The last tenant I can't tell you
4   by name, but they were an engineering company.
5       Q.   And when did their lease end?
6       A.   It's foggy, but within the past
7   three years since the pandemic.
8       Q.   Do you recall any other subtenants
9   that used the seventh floor?
10      A.   Oh, no, actually THQ, actively. I
11  believe they had both floors.
12      Q.   They had both floors.
13      A.   That's right.
14      Q.   And they could use both floors
15  because there's a stairwell that connects the
16  floors, seventh and eighth?
17      A.   Yes. Although it's closed at this
18  point. The frame of it is there and maybe in
19  the floor plan, probably is in the floor plan
20  that shows it.
21      Q.   So it's possible for subtenants to
22  rent both the seventh and eighth floor?
23      A.   That is correct.
24      Q.   Do you recall how many people
25  worked at the engineering firm that used the

**54**

1   seventh floor?
2       A.   No. I don't really interact with
3   the tenants.
4       Q.   Do you -- go ahead.
5       A.   That's it.
6       Q.   Do you know if the engineering
7   firm had any visitors to their building?
8       A.   No idea.
9       Q.   Why is the seventh floor still
10  empty?
11      A.   Because we've been unable to find
12  a tenant to replace them.
13      Q.   And why is the eighth floor still
14  empty?
15      A.   Because we've been unable to find
16  a tenant to replace them.
17      Q.   Is the seventh floor still
18  currently for rent?
19      A.   Yes.
20      Q.   Is it also for sale?
21      A.   It's exactly the same answers as
22  the eighth floor.
23      Q.   Do you recall how long the
24  engineering firm occupied the seventh floor?
25      A.   They would have signed a lease for

**55**

1   between three and seven years. I think they
2   were probably there for five years, in that
3   range.
4       Q.   I know you can't remember anyone
5   but the engineering firm, but can you estimate
6   how many total subtenants you had in the seventh
7   floor?
8       A.   It's exactly the same answer as
9   what I gave for the eighth.
10      Q.   So less than ten?
11      A.   Whatever I answered for the
12  eighth.
13      Q.   Mr. Shamash, we've discussed the
14  seventh and eighth floor of the building. How
15  many of the total floors were occupied at the
16  time CCMS applied to sublease the premises?
17      A.   Ask the question again. Sorry.
18      Q.   How many floors of the building
19  were occupied at the time CCMS applied to
20  sublease the premises?
21      A.   All of them, I think.
22      Q.   So excluding the seventh and
23  eighth floor, all other floors were occupied at
24  the time CCMS applied to sublease?
25      A.   I think I'm the only person who

**56**

1   leases floors, or Oxford is the only entity that
2   leases floors in that building, I believe. I
3   could be wrong, but I believe. That's my
4   understanding.
5       Q.   Thank you. Thinking back to
6   December 2019 through January 2020, if you
7   recall, who occupied each floor of the building
8   besides the seventh and eighth?
9       A.   I don't remember who occupied the
10  floors during that time on the seventh floor. I
11  don't have a good recollection of dates
12  specifically, but I can tell you at the time
13  when CCMS was looking at the space, it was
14  vacant.
15      Q.   The seventh and eighth floor were
16  vacant?
17      A.   The eighth floor.
18      Q.   There was a tenant in the seventh
19  floor during that time?
20      A.   I'm not sure. I think so. It
21  could have been the engineering company then,
22  but I'm not sure. I wouldn't doubt it.
23      Q.   Thinking back to the time that
24  CCMS applied to sublease the premises, was
25  Joseph or Joey Grill occupying the 12th floor

Page 57

1  under Click Models?
2      A.   Joey's been in that building for
3  as long as I can remember, but I don't know what
4  company he owns.
5      Q.   Understood.  And was he occupying
6  the 12th floor?
7      A.   Him physically as an entity or as
8  a person?
9      Q.   Either.
10     A.   As a person, I have no idea.  He's
11 a jet setter; he goes all over the world.  He
12 has a great lifestyle.  No idea where he is.  As
13 a company, yes, there's a company up there.
14     Q.   Understood.  That's that same time
15 period when CCMS applied to sublease the
16 premises.  Was Eric Doctormann occupying the
17 11th floor?
18     A.   With due respect to him, I'm sure
19 he's a very nice guy, I know nothing about him.
20 I know his name when you say it, but I didn't
21 know his last name prior to this.
22     Q.   Do you know if he still occupies
23 any floors in the building?
24     A.   I have no idea.
25     Q.   Okay.  Again, thinking back to the

Page 58

1  time that CCMS applied to sublease the premises,
2  was Maxime Touton through -- and I'm going to
3  butcher this -- Monsieur Touton Selection
4  Limited, occupying the ninth and tenth floors?
5      A.   There are two Toutons.  I don't
6  know the first name of either.  One is the
7  father or the uncle, and one is the son or the
8  nephew; and they are in the ninth floor, I
9  think.  I think the ninth and the tenth, I
10 think.
11     Q.   And similar to the seventh and
12 eighth floor, are the ninth and tenth floors
13 connected by a staircase?
14     A.   I have no idea.
15     Q.   Have you ever been up to the ninth
16 or tenth floor?
17     A.   Yeah, once or twice.
18     Q.   But you don't recall if there's a
19 staircase connecting the floors?
20     A.   (Witness shakes head.)
21     Q.   But generally the Touton entity
22 occupies both of those floors?
23     A.   As far as I recall.
24     Q.   Thank you.
25          And at the time CCMS applied to

Page 59

1  sublease the premises, was Mr. Conte -- and
2  forgive me if I'm mispronouncing that -- was his
3  business occupying the sixth floor?
4      A.   I believe so.
5      Q.   And was that Honig Conte Porrino
6  Insurance Agency, Inc.?
7      A.   I guess so.
8      Q.   Thank you.
9          Have you ever heard the name
10 Barbara Torgerson?
11     A.   Who?
12     Q.   Torgerson, T-o-r-g-e-r-s-o-n.
13     A.   Barbara Torgerson, no.
14     Q.   Have you ever heard the name
15 Donald Baechler, B-a-e-c-h-l-e-r?
16     A.   No.
17     Q.   At the time CCMS applied to
18 sublease the premises, what floors was Marc
19 Paturet occupying?
20     A.   Do you remember you said there was
21 someone who I'm not sure what his name was,
22 never heard it; is that him or is that Marc?  I
23 confuse those two people.
24     Q.   Oh, I'm not sure what --
25     A.   So you named someone in the last

Page 60

1  question.  Who was it you named last?
2      Q.   Donald Baechler.
3      A.   Before that.  You were talking
4  about the tenants on the floors.  You said
5  Mr. Touton, you said Joey Grill, and who was the
6  other guy?
7      Q.   Eric Doctormann?
8      A.   Okay.  And who did you just
9  reference right now?
10     Q.   Marc Paturet. It's P-a-t-u-r-e-t.
11     A.   I confuse the two people.  I don't
12 know.  I haven't really interacted with either.
13     Q.   Okay.  So you don't know which
14 floors Marc Paturet occupied at the premises?
15     A.   If you told me Marc and -- I'm
16 really bad with names, Marc and who are you
17 asking this time?  If you told me one was on 11
18 and one was on five, three, what are they on?
19 If you told me which one is which, I could tell
20 you.
21     Q.   So you recognize both names but
22 you don't have any personal knowledge as to
23 which floors they occupy?
24     A.   I don't really interact with them.
25 I recognize both names.

61

1    Q.    Understood.  If I reminded you
2  Marc Paturet's company is Hand Held Films, would
3  that refresh your recollection as to when --
4    **A.    Yeah, Hand Held Films has a sign**
5  **on the lower end of the building, on the bottom**
6  **of the building, so I know very well where they**
7  **are because I pass it all the time.**
8    Q.    Could you just describe what that
9  lower level of the building looks like?
10   **A.    Yeah.  They're retail space, has a**
11 **bunch of film equipment, they have something to**
12 **do with film equipment there.**
13   Q.    As of now, today, how many floors
14 in the building are currently occupied?
15   **A.    I haven't been there in many**
16 **years.  Probably the last time I was at that**
17 **building was at the meeting.  Maybe I've been**
18 **there once or twice since, so I could not tell**
19 **you what's occupied and what's not.**
20   Q.    Do you know if anyone -- any of
21 the individuals I just spoke about, which were
22 Joey Grill, Eric Doctormann, Maxime Touton, F.
23 Michael Conte and Marc Paturet, do you know if
24 any of them have left the building, the
25 premises?

62

1    **A.    I have no interaction with any of**
2  **them.**
3    Q.    And do you know if there are any
4  new occupants in the building besides the ones
5  we discussed?
6    **A.    Not that I know of.**
7    Q.    Do you recognize anyone with the
8  last name Guercio, G-u-e-r-c-i-o?
9    **A.    Do you have a first name?**
10   Q.    No.
11   **A.    No.**
12   Q.    Okay.  Now I'm going to go through
13 sort of these individuals we just discussed,
14 which all of them besides Eric Doctormann are
15 defendants in this action, and I have a series
16 of questions for each defendant.
17   **A.    Can you give me a minute while I**
18 **take a quick bathroom break?**
19   Q.    We're going to take a break, I
20 think Barry needs to hop off at 12:15 and we had
21 a pre-scheduled lunch.  Could you possibly hold
22 it, or would you like to go now?
23       THE WITNESS:  I'd rather go now.
24       MS. TURNER:  Okay, sure.
25       THE VIDEOGRAPHER:  We're going off

63

1  the record at 11:55.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  We're back on
4  the record.  The time is 12:06.
5  BY MS. TURNER:
6    Q.    Mr. Shamash, am I pronouncing that
7  correctly?
8    **A.    Shamash.**
9    Q.    Okay.  Before we took a break, I
10 told you that I was going to ask you some
11 questions about the individual defendants.  Are
12 you ready to proceed?
13   **A.    Sure.**
14   Q.    Okay.  With regards to defendant
15 Mr. F. Michael Conte, can you just remind me
16 what floor he or his business occupied in the
17 building?
18   **A.    He's on a floor below me.  I think**
19 **he's on sixth.  He may be on five.**
20   Q.    And Mr. Conte's business is, as we
21 stated previously, Honig Conte Porrino Insurance
22 Agency, correct?
23   **A.    Um-hum.**
24   Q.    Have you ever visited the floor
25 that Mr. Conte occupies?

64

1    **A.    I have no memory of going to his**
2  **floor.  Oh, during the time we were meeting on**
3  **the floor, actually, you're correct.  So I have**
4  **been on his floor, yeah.**
5    Q.    So you visited his floor on
6  January 14th, 2020 when CCMS was interviewed for
7  the sublease?
8    **A.    Yes.**
9    Q.    Do you recall visiting that floor
10 at any other time?
11   **A.    Not that I know of.**
12   Q.    Do you know how long Mr. Conte and
13 his business have occupied that space?
14   **A.    No.**
15   Q.    Do you know how many people work
16 in that space?
17   **A.    No clue.**
18   Q.    Do you know how many visitors the
19 insurance agency gets?
20   **A.    No.**
21   Q.    Do you know if the employees and
22 visitors to the insurance agency use the
23 elevators?
24   **A.    I have no idea.**
25   Q.    Is Mr. Conte currently a board

---

65

1 member of the co-op?
2     **A.  I don't know.**
3     Q.  Was Mr. Conte a board member of
4 the co-op when CCMS applied to sublease the
5 premises?
6     **A.  I believe so, yes.**
7     Q.  Do you know how long he was a
8 board member?
9     **A.  No idea.**
10     Q.  Do you know if he holds a specific
11 position on the board?
12     **A.  I have no idea.**
13     Q.  Do you know Mr. Conte's race or
14 ethnicity?
15     **A.  I have no idea what his ethnicity**
16 **is.**
17     Q.  But he is not Black?
18     **A.  He's not Black.**
19       MR. HARRIS:  Objection to form.
20     Q.  How often have you spoken with
21 Mr. Conte?
22     **A.  How often?**
23     Q.  Um-hum.
24     **A.  Once a decade.**
25     Q.  And just to confirm from earlier,

---

66

1 have you ever discussed this case or the facts
2 of this case with him?
3     **A.  No.**
4     Q.  What's the substance of the
5 conversations you've had with him?
6     **A.  I've discussed nothing of**
7 **substance with Mr. Conte.**
8     Q.  Nothing related to the building?
9       MR. HARRIS:  Objection.  Is this
10 regarding in the meeting as well or just in
11 general? I mean, is this forevermore?
12       THE WITNESS:  I think she means
13 outside of the meeting.
14     Q.  Separate from the January 14th,
15 2020 interview. We're just talking generally
16 your interactions with all of these individuals.
17 We'll get into the specifics --
18     **A.  Technically I've had no**
19 **interactions with anyone.**
20     Q.  Mr. Maxime Touton, what floors
21 does the Touton business occupy?
22     **A.  I said previously nine and ten, as**
23 **far as I can recall.**
24     Q.  Thank you. And you visited the
25 ninth and tenth floor before?

---

67

1     **A.  I don't know if I've ever been on**
2 **ten. I've been on ninth once.**
3     Q.  Could you describe the physical
4 space, the ninth and tenth floor?
5     **A.  I can't describe the tenth. The**
6 **ninth is a wood paneled office space with wine**
7 **everywhere. They sell wine.**
8     Q.  Is that similar to the eighth
9 floor?
10     **A.  No, we don't have any wine on the**
11 **eighth floor.**
12     Q.  Do you know how long the Touton
13 company has occupied that space?
14     **A.  I don't know.**
15     Q.  Do you know how many people work
16 there?
17     **A.  No.**
18     Q.  Do you know how many -- do you
19 know if they get visitors to that space?
20     **A.  No.**
21     Q.  Do they share their wine?
22     **A.  They've never offered me any.**
23     Q.  Do you know if the Touton
24 employees and visitors use the elevator?
25     **A.  I would imagine.**

---

68

1     Q.  Is Mr. Touton currently a board
2 member of the co-op?
3     **A.  I don't know.**
4     Q.  Was Mr. Touton a board member of
5 the co-op when CCMS applied to sublease the
6 premises?
7     **A.  I -- when you say Mr. Touton,**
8 **there are two Mr. Toutons.**
9     Q.  I'm referring to Maxime Touton.
10     **A.  I don't know their first names.**
11     Q.  But there was a gentleman with the
12 last name Touton who was a board member?
13     **A.  Yes.**
14     Q.  Thank you.
15     Do you know if Mr. Touton had a
16 specific position on the board?
17     **A.  No.**
18     Q.  Do you know how long he was a
19 board member?
20     **A.  No.**
21     Q.  Do you know Mr. Touton's race or
22 ethnicity?
23     **A.  I have no idea of his ethnicity.**
24 **He's French.**
25     Q.  And he is not Black, correct?

---

69

1    A.   No.  He's French.
2         MR. HARRIS:  When you say Black,
3    you're talking about skin color, correct?
4         MS. TURNER:  Yes.
5    Q.   How often have you spoken with
6    Mr. Touton?
7    A.   If ever.
8    Q.   When you did visit the ninth
9    floor, what was the context for your visit?
10   A.   Many, many years ago there was a
11   shareholders' meeting on his floor.  I've been
12   there once.  I wasn't there for long, though.
13   Q.   What was the subject of the
14   shareholders' meeting?
15   A.   It's a shareholders' meeting, so
16   general maintenance and things like that.  As I
17   said, it's been a long time, but it was nothing
18   of substance and nothing particularly
19   interesting.
20        MS. TURNER:  John, if you could
21   pull up document 3.
22        THE TECHNICIAN:  Stand by,
23   counsel.
24        (Exhibit S marked for
25   identification.)

---

70

1         THE TECHNICIAN:  Document 3 is on
2    screen marked as Exhibit S.
3         MS. TURNER:  I'm going to
4    represent that this is a copy of the "About Our
5    Company" page from Mr. Touton's company that I
6    pulled off the internet this morning, so we know
7    it's current.  And you've marked this as Exhibit
8    S.
9    Q.   Mr. Shamash, looking at the top
10   images, do you recognize this space as
11   Mr. Touton's?
12   A.   I recognize it as a wood panelled
13   office with a lot of wine.
14   Q.   Is it fair to say this is likely
15   Mr. Touton's space?
16   A.   Likely Mr. Touton's office, yes.
17   Q.   Does this look like the type of
18   space that you would have administrative
19   offices?
20   A.   Yes, it does.  Looking at the
21   picture behind that glass door, it's
22   administrative.  If you look at the picture on
23   the right behind those glass walls, it's
24   administrative.
25   Q.   And what would the purpose be for

---

71

1    the lounge furniture and couches in this space?
2    A.   I don't know the layout of the
3    space, so I have no idea.
4         MR. HARRIS:  Objection to form.
5    Q.   Does this look like the type of
6    space where a company might invite clients or
7    visitors?
8         MR. HARRIS:  Object to form.
9    A.   Once again, I don't know the
10   layout of that space, but it certainly looks
11   nice.
12   Q.   It does.
13        If you could look below the images
14   to bullet 4, could you just read the fourth
15   bullet for me?
16   A.   "Our 12,000 square foot Manhattan
17   headquarters serves as the base for our
18   operations departments and our national sales
19   force team," and then it's covered up from the
20   Zoom meeting.  I can't read anymore what's to
21   the right of it.  "We offer state of the art
22   graphics and marketing" --
23   Q.   Can you finish that.
24   A.   "Our sales force team of nearly
25   200 people."

---

72

1    Q.   Thank you, Mr. Shamash.
2         Do you know if salespeople use
3    this space?
4    A.   Possibly.
5    Q.   Do you know if Mr. Touton hosts
6    clients and salespeople in the office?
7    A.   I have no idea.
8         MS. TURNER:  John, you can take
9    down Exhibit S.
10   Q.   Now I'm going to ask you some
11   questions about Joey Grill.  Can you just remind
12   me what floor his company operates or occupies,
13   I'm sorry?
14   A.   Joey is on the 12th floor.
15   Q.   And what's his business generally?
16   A.   Models.
17   Q.   And have you ever visited the 12th
18   floor?
19   A.   Once or twice.
20   Q.   Could you describe it?
21   A.   Concrete floors, concrete
22   ceilings, exposed open plan, as far as I can
23   remember.
24   Q.   Would it be considered the
25   penthouse of the building?

73

1    A.    Well, it's on the top floor; that
2  would be defined as the penthouse, the top
3  floor.
4    Q.    Thank you.
5        Is the space similar to the space
6  on the eighth floor?
7    A.    No.  One's filled and one's open,
8  from my memory.
9    Q.    Do you know how long Joey Grill's
10 company has occupied that space?
11   A.    No.
12   Q.    Do you know how many people work
13 in that space?
14   A.    No idea.
15   Q.    When you went up to visit, did you
16 see any employees in the space?
17   A.    Not that I recall.
18   Q.    Do you know if anyone visits the
19 space?
20   A.    No idea.
21   Q.    No models visit the space?
22   A.    One would imagine.
23   Q.    Would those models or visitors use
24 the elevator?
25   A.    I don't even know if they visit

74

1  the space.  They might be on Zoom calls all day.
2  No idea.
3    Q.    Is Mr. Grill currently a board
4  member of the Co-op?
5    A.    I believe so.  At the time.  Now,
6  I don't know.
7    Q.    Now you don't know.  But he was a
8  board member of the co-op when CCMS applied to
9  sublease the premises?
10   A.    To the best of my knowledge, yes.
11   Q.    Do you know how long he was a
12 board member?
13   A.    No idea.
14   Q.    Do you know if he had a specific
15 position on the board?
16   A.    No, ma'am.
17   Q.    I'm sorry, I didn't hear that.
18   A.    No.
19   Q.    Do you know Mr. Grill's race or
20 ethnicity?
21   A.    I do not.
22   Q.    Would it be fair to say he's not
23 Black?
24   A.    It would be fair that he's not
25 Black.

75

1    Q.    How often do you speak with
2  Mr. Grill?
3    A.    I haven't spoken to him since.
4    Q.    Since what?
5    A.    Since the first meeting.
6    Q.    January 14th, 2020?
7    A.    Yes.
8    Q.    Thank you.
9        Before that meeting, when was the
10 last time -- the prior time you spoke to him?
11   A.    Sometime in the three to five
12 years preceding that.
13   Q.    But you didn't speak to him
14 regularly?
15   A.    No.
16       MS. TURNER:  John, if you could
17 pull up document 4.
18       THE TECHNICIAN:  Stand by,
19 counsel.
20       (Exhibit T marked for
21 identification.)
22       THE TECHNICIAN:  Document 4 is on
23 screen now marked as Exhibit T.
24   Q.    Mr. Shamash, I'm going to
25 represent to you that this is a copy of the

76

1  About page of Mr. Grill's company Click Models,
2  which occupies the 12th floor; and I pulled this
3  off the internet this morning, so it is current.
4  And we're marking this as Exhibit T.
5        Could you, Mr. Shamash, please
6  read the first sentence of the second paragraph.
7    A.    "Over the past 30 years Click has
8  added offices throughout the United States and
9  presently represents over 1,000 models with
10 divisions focusing on women, men, plus size,
11 runway, showroom" -- I believe that says FIT, I
12 don't know what that means, "and television
13 commercials.  The talent division manages" --
14   Q.    Just the first sentence.
15   A.    I'm sorry?
16   Q.    You were good with just the first
17 sentence.
18   A.    Okay, great.
19   Q.    Thank you.  Do you know if Click
20 Models ever hosts photo shoots?
21   A.    I have no idea.  No clue.
22       MS. TURNER:  John, you can take
23 down Exhibit T.
24   Q.    The last questions I have are in
25 relation -- for this section, are related to

**77**

1  Mr. Paturet, which we discussed earlier.  Do you
2  now understand he operates Hand Held Films?
3      **A.  Okay.**
4      MR. HARRIS:  Objection to form.
5      MR. CASE:  Object to form.
6      Q.  Do you recall what floors Hand
7  Held Films occupies?
8      **A.  Ground floor.  104.  And I think**
9  **the basement, too.**
10      Q.  Do you know how long Hand Held
11  Films has occupied those spaces?
12      **A.  Exactly, no, but it has to be from**
13  **when 27th Street had Hand Held Films in the**
14  **ground floor.  I don't remember who the previous**
15  **retail tenant was, but it's been at least five**
16  **years.**
17      Q.  Do you know how many people work
18  in that space?
19      **A.  I don't.**
20      Q.  Have you ever seen people coming
21  and going from that space?
22      **A.  No.**
23      Q.  Is Mr. Paturet currently a board
24  member of the co-op?
25      **A.  Apparently so.**

**78**

1      Q.  It was a question.
2      **A.  I guess so.  Same question, by the**
3  **way, you just asked me the same question again.**
4  **Was he at the time; yes, I believe so.  Is he**
5  **currently; I have no idea.**
6      Q.  Oh, sorry, I was getting to the
7  question.  I'm sorry if that was confusing.
8      So I asked is he currently a board
9  member of the co-op?
10      **A.  No idea.**
11      Q.  No idea.  Was he a board member of
12  the co-op when CCMS applied to sublease the
13  premises?
14      **A.  To my understanding, yes.**
15      Q.  Did he hold a specific position on
16  the board?
17      **A.  Not that I know of, but maybe.  I**
18  **don't know.**
19      Q.  How long was he a board member?
20      **A.  No idea.**
21      Q.  Do you know Mr. Paturet's race or
22  ethnicity?
23      **A.  I have no idea.**
24      Q.  It's not a fair question because I
25  know you previously stated you didn't exactly

**79**

1  remember who he was.
2      **A.  Um-hum.  I also don't know if he's**
3  **Black.  I don't know.**
4      Q.  Understood.  Thank you.
5      Have you ever noticed visitors to
6  the retail space on the first floor?
7      **A.  Yeah.**
8      Q.  How many people would you say
9  visit daily?
10      **A.  I can't say visit daily, but we**
11  **work down the street.  So I see trucks outside**
12  **and customers walking in and out all the time.**
13  **It's a retail space.**
14      Q.  So people visit daily.  You just
15  can't give a specific number?
16      **A.  They visit daily.  Customers,**
17  **daily.**
18      Q.  And what are customers doing when
19  they visit?
20      **A.  I don't know, but they congregate**
21  **around the freight elevator.**
22      Q.  Are they moving equipment,
23  perhaps?
24      **A.  I couldn't tell you.**
25      Q.  The next main thing I want to

**80**

1  focus on, and we're talking generally, not
2  specific to the dispute with CCMS, but in the
3  past when Oxford has subleased the seventh or
4  the eighth floor, can you just walk me through
5  that process.
6      **A.  Sure.  A listing gets put onto a**
7  **multiple listing site.  Typically for commercial**
8  **real estate it is a company called CoStar or a**
9  **company called LoopNet, happen to be owned by**
10  **the same company.  Put up a listing of a space**
11  **for rent, either through a broker or as an owner**
12  **or an owner's representative.  Brokers typically**
13  **rally tenants, call up, see if the space is**
14  **available.**
15      **In our case, the response is**
16  **formulated, it's always a yes if it's available.**
17  **If it's with a lease out, we tell them it's**
18  **going to lease out.  But anything outside of**
19  **that, the answer is always yes.**
20      **Any questions superfluous to that**
21  **can be used as a whatever typically are**
22  **responded to with the words "have a look at it**
23  **first," and we'll talk about it afterwards,**
24  **after you make an offer.**
25      **You then show the space or,**

**Page 81**

1 rather, they go over there through the -- they
2 take their customer in through the freight
3 elevator with the super. He takes them up, he
4 shows them the space, and 90 percent of the time
5 you don't hear anything back from them
6 afterwards. But when we do get something from
7 them, they might have some follow-up questions,
8 you answer them to the best of your ability.
9 They make a term sheet. The term sheet is then
10 sent over to the attorneys. The attorneys
11 respond accordingly, and hopefully there is a
12 lease that's generated accordingly.
13     That's the general gist of how
14 real estate in Manhattan works.
15     Q.   Thank you.
16         And once you've agreed upon terms
17 with a potential subtenant, at what point does
18 the property manager get involved?
19     A.   The property manager is usually
20 there to respond to business terms; legal is
21 there for legal terms.
22     Q.   So at what stage does the property
23 manager get involved?
24     MR. HARRIS:  Objection to form.
25 Property manager for the co-op?

**Page 82**

1     MS. TURNER:  The property manager
2 for the building.
3     A.   Property manager for the building.
4     MR. HARRIS:  Which in this case
5 would be a co-op, the building is owned by a
6 co-op. Clarification would be helpful.
7     MS. TURNER:  Thank you.
8     Q.   For example, I understand Kaled
9 Management is the property manager for the
10 building. So at what point, if you were
11 subletting the seventh and eighth floor,
12 considering subletting, would you involve Kaled
13 Management?
14     A.   When they have a signed lease.
15     Q.   Understood.
16         In the past when Oxford has
17 subleased the seventh or eighth floor, does the
18 subtenant submit an application?
19     A.   Yes.
20     Q.   And when do they submit an
21 application?
22     A.   When they have a signed lease.
23     Q.   And when you say a signed lease,
24 do you mean when both parties sign a lease?
25     A.   I don't really ask. The co-op

**Page 83**

1 owner or lessor doesn't have to countersign the
2 lease. If you have a signed lease and deposits,
3 that lease has the proprietary lease as an
4 exhibit, and it's understood that it's pending
5 board approval to get it.
6     MR. MARGOLIS:  I need to hear that
7 last answer. Nancy, can you read that back.
8         (Last answer read.)
9     Q.   Does the property manager make a
10 recommendation about whether to approve or deny
11 the sublease?
12     A.   I don't think so.
13     Q.   Does the property manager run
14 background checks on the sublessee?
15     A.   I don't know.
16     Q.   At what point does the Co-op Board
17 get involved in the sublease process?
18     A.   So, generally they would probably
19 check over an application or something to see if
20 the use is consistent; i.e. not trying to put
21 in, you know, a restaurant on the floor or
22 something like that. The initial, initial one-
23 eye-closed checks would probably be done, and if
24 you pass that initial thing they would set up a
25 board meeting.

**Page 84**

1     Q.   Would the board get involved in
2 the sublease before a sublease application was
3 submitted?
4     A.   No.
5     Q.   And in the past when you've
6 subleased the seventh or eighth floor, how have
7 you obtained board approval?
8     A.   Go to a meeting and they explain
9 that they're an office use, and then they
10 check -- they ask you initial questions, traffic
11 counts and like that, you get approved.
12     Q.   And is a formal meeting required?
13     A.   Always.
14     Q.   Are there any requirements for how
15 many board members or shareholders attend that
16 meeting?
17     A.   I do not know.
18     Q.   Can board approval be given in
19 writing?
20     A.   In writing?
21     Q.   Um-hum.
22     A.   I have no idea.
23     Q.   Can board approval be given
24 without the in-person meeting?
25     A.   I have no idea.

**85**

1    Q.    Has it -- in the nearly 20 years
2    you've been subleasing the seventh or eighth
3    floor, has board approval ever been given in
4    writing without a meeting?
5         THE WITNESS:  Do I have to qualify
6    that she just said nearly 20 years that I --
7         MR. HARRIS:  Oh, just clarify; you
8    mean Oxford, correct?
9         MS. TURNER:  Yes, I mean Oxford,
10   I'm sorry.
11   **A.    Okay.  Can you ask the question**
12   **again?**
13   Q.    In the approximately 20 years
14   Oxford has been subleasing the seventh and
15   eighth floor, has board approval ever been given
16   in writing without a meeting?
17   **A.    I don't believe so.**
18   Q.    Do you know how many board votes
19   are required to approve a sublease?
20   **A.    I do not.**
21   Q.    Is there a difference between
22   board member votes and shareholder votes to
23   approve the sublease?
24   **A.    Yes.  Shareholder votes don't**
25   **count.**

**86**

1    Q.    What do you mean by they don't
2    count?
3    **A.    You have a list of shareholders,**
4    **everyone who owns a share.  Then you have a**
5    **board, which is a Board of Directors.  It's the**
6    **Board of Directors who vote on an approval.**
7    **Shareholder votes are absolutely irrelevant.**
8    Q.    So what would be the purpose then
9    of the shareholder voting?
10   **A.    There is no purpose.  There is no**
11   **shareholder vote.**
12   Q.    Are the shareholders required to
13   place a vote?
14   **A.    Shareholders are not required, nor**
15   **are they voting members.**
16        MR. HARRIS:  Objection to form.
17   Just to clarify, you mean for approval of a
18   subtenant?
19        MS. TURNER:  Yes.
20   **A.    Just for clarification, I'm also**
21   **saying in the act of approving a subtenant.**
22   Q.    Once the Co-op Board approves a
23   subtenant, what happens next?
24   **A.    Once they approve the subtenant,**
25   **the tenant provides proof of insurance, and we**

**87**

1    **typically take the money in the form of a check.**
2    **We sometimes ask for a cashier's check.  It's at**
3    **that point that I -- not me, but Oxford will**
4    **deposit the check, and hopefully we don't hear**
5    **from anyone after that.**
6    Q.    And when does the subtenant take
7    possession?
8    **A.    When the approval is given.**
9    Q.    And the checks are cashed?
10   **A.    I don't know if the checks being**
11   **cashed is necessary for them to take possession.**
12   Q.    Understood.
13        Other than CCMS, has the co-op
14   ever denied other sublease applicants for
15   the premises --
16   **A.    Not in my experience.**
17   Q.    I didn't get to finish my
18   question.
19        When you're saying not in your
20   experience, related to the eighth floor or in
21   all of your experience related to any floor in
22   the building?
23   **A.    The only floor that goes up for**
24   **lease is the seventh and eighth floors, as far**
25   **as I know.**

**88**

1    Q.    So other than CCMS, you're not
2    aware of the co-op ever denying a sublease
3    applicant for the eighth or seventh floor?
4    **A.    As far as I know, as far as I**
5    **recall.  It could have happened, but it would**
6    **have been a time before my tenure at the**
7    **premises.**
8    Q.    Understood.
9        How many times have you submitted
10   a subtenant to the board for approval?
11   **A.    Less than five, probably more like**
12   **three.  If you're asking me personally, I don't**
13   **submit; submit on behalf of Oxford.  Oxford in**
14   **the past 20 years, I don't have a count.  In my**
15   **memory, like three, four times, tops.  I'd be**
16   **surprised if it's more, but in that range.**
17   Q.    Thank you.
18        I want to shift gears now to talk
19   more specifically about the sublease with CCMS.
20   When did you first learn about CCMS?
21   **A.    Would have been after they toured**
22   **the space.**
23   Q.    Do you recall when that was?
24   **A.    No.**
25   Q.    Was it generally in the fall of

**89**

1  2019?

2      A.    Yeah, in that range.

3      Q.    Had you ever met CCMS's president,

4  Emory Brooks, before?

5      A.    No.

6            MR. HARRIS:  Can you clarify,

7  objection.  Before what?

8            MS. TURNER:  Before CCMS sought to

9  sublease the premises.

10      A.    No.

11      Q.    Before CCMS sought to sublease the

12  premises, had you ever met Bob King?

13      A.    No.

14      Q.    Could you just describe for me

15  generally what transpired when CCMS sought to

16  sublease the eighth floor.

17      **A.    That's a very general question.**

18  **Could you be a bit more specific, please?**

19      Q.    Can you walk me through the steps

20  that you and Oxford and CCMS did in order to

21  sublease the premises.

22      **A.    Okay.  Initially the premises is**

23  **toured.  Broker reaches out, asks us, through**

24  **the multiple listing, if the space is available.**

25  **If it's not the lease out, the answer is always**

**90**

1  **yes.  So I imagine that happened here.**

2            **He would have said, how do I get**

3  **inside of the space, the broker of course.  I**

4  **would have answered, or Saul would have**

5  **answered, go straight to the building, speak to**

6  **the super in the freight elevator, take the**

7  **freight elevator up.**

8            **At which point he would have shown**

9  **it to the customer.  Whether he toured it with**

10  **him, without him, I have no idea.  I'm not party**

11  **to any of that.  And we have no records of who**

12  **goes in and out of the building.  They just go**

13  **up to the super and say, hey, we spoke to the**

14  **owner, can I see the floor.  The super then**

15  **escorts them up there and shows them the space.**

16            **Once they see the space, they look**

17  **around.  We are not party to any of it, we're**

18  **not party to any of the conversations they have**

19  **on the floor because we're not there.  Get a**

20  **term sheet.  We then respond accordingly to the**

21  **term sheet, be it on the phone, in an email.**

22  **Doesn't always have to be in writing.**

23            **Once there's a set of terms agreed**

24  **upon, they may not be disclosed in writing on**

25  **the term sheets.  There might be changes in the**

**91**

1  **term sheet, in which case you tell the lawyers,**

2  **there's a change here or there.**

3            **They then go through legal and the**

4  **lawyers draw a lease around their understanding**

5  **of the business terms, and then they sign a**

6  **lease.  Then they give a deposit; and then we**

7  **send it over to the Board for their approval.**

8      Q.    And you don't --

9      **A.    And to my understanding that's how**

10  **this went and how every other lease in Manhattan**

11  **goes, with the exception of the board approval,**

12  **it could be replaced with landlord approval, I**

13  **guess.**

14      Q.    Understood.  And why was CCMS's

15  sublease rejected?

16      **A.    In my opinion it was rejected**

17  **because they presented themselves as an office**

18  **space with ancillary counseling.  The moment**

19  **that meeting started, it was very clear it was a**

20  **counseling space with ancillary office space.**

21      Q.    You didn't know that it was a

22  counseling space?

23      **A.    Absolutely not.  It was a --**

24  **predominantly, primarily, no, absolutely not.**

25  **Ancillary, possibly.  But definitely not**

**92**

1  **primarily.  It was very uncomfortable.**

2      Q.    What was uncomfortable about

3  the --

4      **A.    The meeting.  Because everyone was**

5  **being nice, but it was a very uncomfortable**

6  **meeting.**

7      Q.    Why was it uncomfortable?

8      **A.    Because at the very introduction**

9  **of the thing, one of the first questions was is**

10  **there narcotics counseling.  And the immediate**

11  **answer was, yes.**

12            **At that point -- and I don't have**

13  **the best memory, but there was a phone call**

14  **which I'm sure we'll get into, which jogged a**

15  **lot of my memory.  At that point this was just**

16  **the most uncomfortable conversation because it**

17  **was clearly not as was presented to me, nor as**

18  **was presented to the Board.**

19      Q.    How long did the interview with

20  Mr. Brooks last?

21      **A.    So, I don't remember exactly.  It**

22  **felt like a very long time.  It felt like years,**

23  **but I think I dealt with that humiliation for**

24  **approximately 30 to 45 minutes.**

25      Q.    And who informed Mr. Brooks that

93

1  the sublease was rejected?
2  **A.   It would have been their broker.**
3  Q.   And did you inform his broker?
4  **A.   Yes, I did.**
5  Q.   So, I'm now going to go through
6  documents leading up to the interview. This
7  might be a little tedious, so bear with me.
8  MS. TURNER: John, if you could
9  pull up document 5.
10  THE TECHNICIAN: Stand by,
11  counsel.
12  (Exhibit U marked for
13  identification.)
14  THE TECHNICIAN: Document 5 is on
15  screen now, marked as Exhibit U.
16  Q.   Mr. Shamash, do you recognize this
17  document?
18  **A.   I don't recognize it, no.**
19  MR. MARGOLIS: Could you blow it
20  up a little bit more.
21  Q.   I'm sorry, could you repeat your
22  answer, Mr. Shamash.
23  **A.   I don't recognize it, no.**
24  Q.   You don't.
25  Did you produce this document in

94

1  connection with your subpoena?
2  **A.   Yes, I believe so.**
3  MR. HARRIS: Counsel, I was given
4  a bunch of documents, I sifted through them and
5  I produced documents that were responsive to the
6  subpoena, with the objections in my letter
7  incorporating same.
8  MS. TURNER: Understood.
9  Q.   Can you just describe what's going
10  on in this email correspondence?
11  **A.   Sure. Saul is asking me, "Please**
12  **confirm no free time," which I've got to**
13  **imagine, is there any free rent inside of the**
14  **lease. Previously there's a message from the**
15  **broker, Bob King, to Saul saying, "Saul," to**
16  **which I'm cc'd, and DLee is cc'd. I don't know**
17  **who DLee is. "Please prepare leases as per your**
18  term sheet and forward to Diana Lee (cc'd here).
19  Please cc me as well. Many thanks, Bob."
20  And then Saul emails me saying,
21  "Please confirm no free time." That's what
22  we're looking at.
23  Q.   Thank you.
24  Would it be fair to say this is
25  describing that back and forth agreeing to a

95

1  term sheet for that lease?
2  MR. HARRIS: Objection to form.
3  You can answer.
4  **A.   Yeah, you can see underneath it**
5  **says, "Enclosed is final offer. Please have him**
6  **sign it and send it."**
7  Q.   And when was this final offer
8  sent?
9  **A.   I have no idea. I haven't seen**
10  **it. Do we have one with his signature?**
11  MR. HARRIS: You answer the
12  question. She'll ask the questions.
13  **A.   I don't know. It says over here**
14  **November 7th, 2019.**
15  Q.   Do you see the date at the bottom
16  of the email?
17  **A.   I see November 7, 2019. I see**
18  **November 8, 2019. I see November 8th, Friday,**
19  **the 8th of November, 2019, so I would have to**
20  **imagine it's around there.**
21  Q.   So did Mr. Tawil send the final
22  offer on November 7th, 2019?
23  **A.   I guess. I don't know.**
24  MR. CASE: Counsel, are you asking
25  the witness if he has personal knowledge as to

96

1  whether or not the offer was sent on that date?
2  I mean the signed document was sent on that
3  date?
4  MS. TURNER: Sorry, who is
5  speaking?
6  MR. CASE: It's Michael case.
7  MS. TURNER: And what was your
8  question? I'm sorry.
9  MR. CASE: Are you asking him if
10  he had personal knowledge of the offer sheet
11  being sent that day?
12  MS. TURNER: I'm just asking him
13  if this is what the email says, that he
14  produced.
15  THE WITNESS: That's what the
16  email says.
17  MR. HARRIS: Let the attorneys
18  speak.
19  MS. TURNER: I don't know if
20  there's a standing objection.
21  MR. CASE: No, I'm just asking for
22  clarification. I think he's answered the
23  question.
24  MS. TURNER: Okay.
25  Q.   Mr. Shamash, does this refresh

97

1 your recollection that a final term sheet was
2 sent on November 7th, 2019 to CCMS's broker?
3    **A.   No.**
4         MR. HARRIS:  Objection.
5    **A.   No.**
6    Q.   Do you have any reason to believe
7 this email isn't accurate?
8    **A.   No.**
9         MR. MARGOLIS:  What exhibit was
10 this?  I know it's document 5, but what exhibit
11 is it?
12        THE TECHNICIAN:  Counsel, this is
13 Exhibit U.
14        MR. MARGOLIS:  E as in Edward?
15        THE TECHNICIAN:  U as in umbrella.
16        MR. MARGOLIS:  U as in umbrella.
17 Thank you.
18        MS. TURNER:  John, you can take
19 this document down.
20 BY MS. TURNER:
21    Q.   Mr. Shamash, would it be fair to
22 say sometime in early November Oxford exchanged
23 term sheets with CCMS for the sublease of the
24 premises?
25    **A.   Sure, yeah.**

98

1         MR. HARRIS:  Objection.  Is
2 this --
3    **A.   Am I sure of it?  No.**
4         MR. HARRIS:  Answer to the best of
5 your memory.
6    **A.   To my memory, I don't know if we**
7 **exchanged term sheets.**
8    Q.   Did you eventually agree to a
9 sublease, though?
10    **A.   Oxford agreed to a sublease at one**
11 **point.**
12    Q.   And why didn't you, your attorney,
13 produce the attached term sheet?
14    **A.   I sent --**
15        MR. HARRIS:  Counsel, I have to
16 review that.  As to why -- my client can't
17 answer as to why his attorney did or did not do
18 one thing.
19        MS. TURNER:  Okay.  John, can you
20 pull up document 14.
21        THE TECHNICIAN:  Stand by,
22 counsel.
23        (Exhibit V marked for
24 identification.)
25        THE TECHNICIAN:  Document 14 is on

99

1 screen.  It is marked as Exhibit V, and I will
2 blow it up for you.
3    Q.   Mr. Shamash, do you recognize this
4 document?
5    **A.   No.**
6    Q.   Did your attorney produce it in
7 response to this subpoena?
8    **A.   I don't know.**
9         MR. HARRIS:  Counsel, I did
10 produce it in response to the subpoena.
11    Q.   Did you review -- Mr. Shamash, did
12 you review any documents before your attorney
13 produced them in response to the subpoena?
14    **A.   No.**
15    Q.   Can you please read for me the
16 bottom of this email dated November 8th, 2019
17 from Bob to Saul Tawil and yourself.
18    **A.   From Bob King to Saul Tawil and**
19 **myself:  "Just a reminder that both you and CCM**
20 **want to move quickly, so please expedite this**
21 **lease.  Have a good weekend.  Sent from my**
22 **iPhone."**
23    Q.   Do you recall that CCMS was in a
24 hurry to finalize the sublease for the premises?
25    **A.   Not particularly, no.**

100

1         MS. TURNER:  John, if you could
2 pull up document 9.
3         THE TECHNICIAN:  Stand by,
4 counsel.
5         (Exhibit W marked for
6 identification.)
7         THE TECHNICIAN:  Document 9 is on
8 screen now.  It is marked as Exhibit W.
9    Q.   Mr. Shamash, do you recognize this
10 email?
11    **A.   No.**
12    Q.   What's the date on this email?
13    **A.   Monday the 18th of November, 2019.**
14    Q.   And who is this email from?
15    **A.   It's from Robert King.**
16    Q.   And who is it addressed to?
17    **A.   It's addressed to me and Saul.**
18    Q.   And can you please read the body
19 of the email.
20    **A.   "Nigel, did you make it over to**
21 **the 31st Street clinic?  What are the next**
22 **steps?  Please advise, Bob."**
23    Q.   What was Mr. King referring to
24 with respect to the 31st Street clinic?
25    **A.   They had a location on 31st**

---

**101**

1 Street. They told me to go and have a look at
2 it.
3     Q.    When you say "they," are you
4 referring to CCMS?
5     A.    When I say "they," I mean Robert
6 King speaking on behalf of CCMS.
7     Q.    And did you ever visit the 31st
8 Street clinic?
9     A.    I went up in the elevator, opened
10 the door, and went back down.
11     Q.    What did you observe at the 31st
12 Street clinic?
13     A.    I saw a waiting area.
14     Q.    A waiting area for what?
15     A.    A waiting area for, I would guess,
16 a clinic or a medical location. I don't know
17 what was behind the door.
18     Q.    And did you visit the 31st Street
19 clinic before or after this email?
20     A.    No idea.
21     Q.    Did you visit the 31st Street
22 clinic sometime in November 2019?
23     A.    I visited it. I don't know when
24 it was.
25     Q.    And what do you understand the

---

**102**

1 word "clinic" to mean?
2     A.    The word "clinic" is what they
3 have on 31st Street. Their use of the word
4 "clinic," although to be fair, it was in an
5 email, probably just glanced upon by me, the use
6 of the word "clinic" is that it would be
7 something that people would go in -- what would
8 be the definition of the word "clinic"?
9 Definition of the word "clinic," somewhere you
10 go in and you are studied by a clinician.
11     Q.    And I believe you said earlier
12 that you thought CCMS intended to use the
13 premises for ancillary counseling?
14     A.    Yes. 100 percent.
15     Q.    This email suggests that CCMS was
16 already operating a clinic at 31st Street,
17 correct?
18     A.    This email suggests that they had
19 a location at 31st Street. What this email
20 doesn't talk about is that they had a location
21 in Clinton Hill, which we were told by the
22 broker was going to be akin to what they were
23 doing here.
24     Q.    Then why would Mr. King ask you to
25 visit the 31st Street clinic?

---

**103**

1     A.    I don't recall.
2     MS. TURNER: John, if you could
3 pull up the document, it's a CCMS document
4 ending in 427.
5     THE TECHNICIAN: Stand by,
6 counsel.
7     (Exhibit X marked for
8 identification.)
9     THE TECHNICIAN: That document is
10 on screen now. It is marked as Exhibit X.
11     MS. TURNER: John, if you could
12 maybe slowly scroll through the document so
13 Mr. Shamash can review. And I'll represent that
14 this document was produced by CCMS in connection
15 with the lawsuit.
16     (Witness reviewing document.)
17     THE WITNESS: Do you mind
18 scrolling up, please. Up some more, up more.
19 Stop. Okay, carry on.
20     (Witness reviewing document.)
21     Q.    Mr. Shamash, do you recognize this
22 document?
23     A.    No.
24     Q.    You don't recall any of the events
25 described in this email?

---

**104**

1     A.    No.
2     MS. TURNER: John, can you please
3 go to the end of the document.
4     Q.    Mr. Shamash, when was this
5 email --
6     MR. HARRIS: Hold on, hold on.
7 Let him read it, please. Sorry I cut you off.
8     (Witness reviewing document.)
9     A.    Okay.
10     Q.    When was this email sent,
11 Mr. Shamash?
12     A.    Tuesday, November 19th, 2019 at
13 12:14 p.m.
14     Q.    And who sent it?
15     A.    It was sent from Robert King.
16     Q.    And who was it sent to?
17     A.    It was sent to Saul Tawil and
18 Nigel Shamash.
19     Q.    And does reading this email
20 refresh your recollection about any
21 conversations or events that took place?
22     A.    No.
23     Q.    Mr. Shamash, can you please read
24 the first four sentences.
25     A.    (As read): "After my conversation

105

1  on Sunday and yesterday with Saul, it appears
2  that your position is that you never agreed to
3  this use. Come on now, you are big boys and
4  knew exactly what CCM does. The first thing any
5  landlord does is research the tenant. And
6  Nigel, I told you two months ago what they did.
7  For my part, within an hour of receiving the
8  assignment I went to the 31st Street and saw
9  what I was dealing with."
10      MR. HARRIS: That's all.
11      Q.  Is this 31st Street clinic the
12  same clinic that the previous document was
13  referring to?
14      A.  I imagine.
15      Q.  Do you know what Mr. King is
16  referring to when he says "it appears that your
17  position is that you never agreed to this use"?
18      A.  Yes.
19      Q.  What's he referring to?
20      A.  He's referring to my statement
21  that I never agreed to this use, which is
22  consistent with the conversation that I had with
23  him immediately after the meeting.
24      Q.  I'm just going to break that down
25  a little bit.

106

1          The conversation you had with who?
2      A.  With Mr. King.
3      Q.  After what meeting?
4      A.  The board meeting.
5      Q.  On January 14th, 2020?
6          THE WITNESS: It was on January
7  14th?
8          MR. HARRIS: You don't know, you
9  don't know.
10      A.  I don't know.
11      Q.  So this document does refresh your
12  recollection as to the events --
13      A.  No.
14      Q.  But now recall what Mr. King
15  was referring to when he said, "it appears that
16  your position is that you never agreed to this
17  use"?
18      A.  This doesn't refresh my memory of
19  that.
20      Q.  So you have an independent
21  recollection of there being an issue with the
22  use for the premises?
23      A.  Yes.
24      Q.  What's your recollection of the
25  dispute over the use?

107

1      A.  My recollection was the use was
2  office space with ancillary counseling services
3  akin to their location in Clinton Hill.
4      Q.  Why is Mr. King referring to the
5  31st Street clinic in his email then?
6          MR. CASE: Object to form.
7      A.  I can't speak for him.
8      Q.  When Mr. King says, "Come on now,
9  you are big boys and knew exactly what CCM
10  does," what do you think he's referring to?
11          MR. HARRIS: Objection to form.
12      A.  I think it sounds to me like he's
13  trying to CYA with his customer.
14          MS. TURNER: John, if you could
15  just move up to the next portion of the email
16  chain. Thank you.
17      Q.  Mr. Shamash, do you recognize this
18  email?
19      A.  I do not.
20      Q.  Could you read the second
21  sentence -- actually, let me back up.
22          When was this email sent?
23          MR. CASE: Are you asking him if
24  he knows when it was sent or what does it say on
25  the document?

108

1      Q.  What does this document say the
2  date it was sent was?
3      A.  The document says that it was sent
4  on November 19th, 2019 at 1:14 p.m.
5      Q.  And based on this document, who
6  sent this email?
7      A.  It was sent by Saul Tawil.
8      Q.  Do you have any reason to believe
9  that this email isn't accurate?
10      A.  It exists, yeah; I'm looking at
11  it.
12          MR. HARRIS: Objection to form.
13      Q.  And is there a reason that you
14  didn't produce this email chain in response to
15  the subpoena?
16      A.  No, there's no reason.
17      Q.  Why didn't you produce this email
18  chain in response to the subpoena?
19      A.  I did a search on my computer; it
20  didn't come up.
21      Q.  Is it possible that there are
22  additional emails that did not come up when you
23  searched for documents responsive to this?
24      A.  Well, we're looking at an email
25  that didn't come up.

109

1    Q.    So you missed documents when you
2  searched for correspondence responsive to this
3  subpoena?
4         MR. HARRIS: Objection, he's not
5  saying he missed documents. Objection to form.
6    Q.    Did you miss this document?
7    A.    I'm not saying --
8         MR. CASE: Object to form.
9    Q.    Mr. Shamash, can you read this
10 email for me, please?
11   A.    Sure. From Saul: "Original offer
12 sheet, has no use with below, including
13 alcoholism and substance abuse. The space they
14 are renting has a separate elevator. We can
15 offer them the freight elevator axis," which I
16 guess he means access, "only. And use is mental
17 health. And maybe it can pass, and maybe put in
18 lease under one of the clauses, including
19 alcoholism and substance abuse, but not under
20 the main heading of use mental health. I will
21 review with my attorney."
22   Q.    Do you know what Mr. Tawil is
23 referring to here?
24   A.    No, not really. His English is
25 not the best.

110

1    Q.    The phrase in parentheses
2  "including alcoholism and substance abuse," is
3  that referring to the type of counseling that
4  CCMS could provide at the premises?
5    A.    I have no idea. You're referring
6  to Saul's email and his later conversation with
7  the attorney. I wasn't party to it.
8    Q.    Understood.
9         Do you know why Mr. Tawil would
10 offer that CCMS could use the freight elevator
11 only?
12   A.    I do not. And did he just use the
13 word "only"? "We can offer them freight
14 elevator -- has a separate elevator. We can
15 offer them freight axis only." That's what he
16 wrote. Maybe it's him trying to make the deal
17 happen so he can collect some rent. That would
18 be my guess.
19   Q.    Do any of the current occupants of
20 the building use the freight elevator only?
21   A.    I actually think Hand Held Films.
22   Q.    And is that because they have
23 large equipment?
24   A.    I don't know why, to be honest.
25   Q.    Understood. But none of the other

111

1  11 floors ever --
2    A.    I have no idea. I don't work in
3  the building.
4    Q.    At the bottom of this page ending
5  in 428, the statement "and use is mental
6  health," what did you understand that to mean?
7    A.    I don't understand it to mean
8  anything. His English is not the best.
9    Q.    And the top sentence on the next
10 page ending in 429, "and maybe it can pass,"
11 what do you think Mr. Tawil is referring to
12 there?
13   A.    I believe he's trying to get this
14 approved by the board so he can collect rent.
15   Q.    And why do you believe that?
16   A.    Because he's here to collect rent.
17   Q.    So he has an interest in
18 subleasing the premises to anyone?
19   A.    Absolutely.
20   Q.    And what was your interest as far
21 as being the broker?
22   A.    Well, no, I'm not the broker.
23   Q.    You weren't the broker in the
24 sublease negotiation with CCMS?
25   A.    No, I was not.

112

1    Q.    Did Oxford use a broker?
2    A.    Not that I know of.
3         MS. TURNER: John, can you move up
4  to the next section on this email.
5    Q.    Do you recognize this email?
6    A.    No.
7    Q.    And again, you didn't produce this
8  email?
9    A.    I don't know.
10        MR. HARRIS: Counsel, I don't
11 recognize this email as being produced.
12        MS. TURNER: Thank you.
13   Q.    Mr. Shamash, based on this
14 document, what was the date of this email?
15   A.    November 19th, 2019.
16   Q.    Do you have any reason to believe
17 this email isn't accurate?
18   A.    No.
19   Q.    Could you please read the third
20 and fourth sentence of the email.
21   A.    (As read): "I hope Nigel actually
22 does go to see the 31st Street facility. It's
23 100 percent agreeable. No one would object.
24 But I can guarantee you they are pursuing
25 another space and I doubt they are going to

113

1  agree to be second" -- I can't read on, can't
2  see it -- no, I can't see it. There's a camera
3  on top of it.
4      MR. HARRIS: The Zoom caption of
5  the other people. There we go.
6      A.  "I can guarantee you they are
7  pursuing another space and I doubt they are
8  going to agree to be second class citizens...
9  using the freight elevator only."
10     Q.  Thank you.
11         Do you recall what Mr. King is
12 referring to here?
13     A.  No.
14     Q.  About visiting the 31st Street
15 facility?
16     A.  No.
17     Q.  Do you recall if you had already
18 visited the facility at this time?
19     A.  No.
20         MS. TURNER: John, can you move up
21 to the next part of the email.
22     Q.  Do you recognize this email?
23     A.  No.
24     Q.  Based on the document, when was
25 this sent?

114

1      A.  November 19th at 2:53.
2      Q.  Who was it sent by?
3      A.  It was sent by Saul.
4      Q.  Can you read the last two
5  sentences of the email, please.
6      A.  "Just finished new freight
7  elevator entrance for their clients for eighth
8  floor."
9      Q.  Do you know what Mr. Tawil was
10 referring to?
11     A.  I have no idea.
12     Q.  Had the freight elevator recently
13 been renovated at the building?
14     A.  It's an automated freight.
15     Q.  I'm sorry, you didn't answer my
16 question. Had the freight elevator recently
17 been renovated?
18     A.  It was upgraded to automated, but
19 I don't know when.
20     Q.  You don't know if it was upgraded
21 around this time?
22     A.  No. I don't think around this
23 time, but it's been updated to automated. You
24 don't need a superintendent to move it with a
25 manual, push the buttons. It's just like a

115

1  regular elevator at this point.
2      Q.  Would it be strange for Mr. Tawil
3  to suggest that CCMS clients use the freight
4  elevator for the eighth floor?
5          MR. HARRIS: Objection to form.
6      A.  I don't think it's particularly
7  strange, no.
8      Q.  Why do you think he would suggest
9  they use the freight elevator?
10     A.  Because he wants to get a tenant
11 inside of the space. So if he was seeing an
12 overflow of users or something like that, then
13 he would say use the freight elevator. It's
14 overflow, just like Hand Held Films does.
15     Q.  What do you mean by overflow of
16 users?
17     A.  Meaning if there was people coming
18 inside over there and there's going to be
19 traffic, the freight elevator is another
20 entrance with another elevator.
21     Q.  Has Mr. Tawil ever suggested
22 before that other subtenants use the freight
23 elevator?
24     A.  I have no idea.
25         MS. TURNER: Just one second on my

116

1  end.
2          THE WITNESS: While we wait, can I
3  get another bathroom break?
4          MR. HARRIS: Is that okay?
5          MS. TURNER: I was just going to
6  say, this would actually be a good stopping
7  point for me for lunch, if everyone is in
8  agreement.
9          MR. HARRIS: That's fine.
10         THE TECHNICIAN: How long do we
11 want to break for?
12         (Comments off the record.)
13         THE VIDEOGRAPHER: We're going off
14 the record, the time is 13:14.
15         (Luncheon recess taken.)
16         THE VIDEOGRAPHER: We're back on
17 the record; the time is 13:47.
18 BY MS. TURNER:
19     Q.  Mr. Shamash, I want to turn back
20 to the document we were looking at before we
21 took a lunch break.
22         MS. TURNER: John, if you could
23 pull up --
24         THE TECHNICIAN: Counsel, Exhibit
25 X is back on screen.

117

1          MS. TURNER:  Thank you.  Could you
2   just scroll down to the Bates number so I can
3   confirm it's the right -- yes.  Awesome.
4          If you can go to the top page
5   please, John.  Perfect, right there.
6   BY MS. TURNER:
7       Q.    Mr. Shamash, do you want to take a
8   second to review this?
9       **A.    Um-hum.**
10         (Witness reviewing document.)
11      Q.    Mr. Shamash, do you recognize this
12  email?
13      **A.    No.**
14      Q.    Based on the document, what's the
15  date of the email?
16      **A.    November 19th, 2019.**
17      Q.    And who's the email from?
18      **A.    It's from Robert King to Saul with**
19  **me cc'd.  Just for a note, on the previous email**
20  **I wasn't cc'd.**
21      Q.    Understood.
22         Mr. Shamash, could you read the
23  fourth sentence down.
24      **A.    Fourth down, starting on what**
25  **word?**

118

1       Q.    "In fact, back in."
2       **A.    (As read):  "In fact, back in**
3   **September when we first submitted our offer, I**
4   **was concerned about board approval and Nigel and**
5   **I had a conversation... he assured me you had**
6   five votes locked up... (your two plus another
7   three) and that you only needed one more... the
8   president of the board."
9       Q.    Thank you.  Do you know what
10  Mr. King is referring to there?
11      **A.    No.**
12      Q.    Did you have a conversation with
13  Mr. King about board approval?
14      **A.    Not that I recall.  But if I did,**
15  **there weren't five votes, so it doesn't really**
16  **match the makeup of the board, so...**
17      Q.    What do you mean it doesn't really
18  matter?
19      **A.    Well, you explained --**
20         MR. HARRIS:  Objection, he said
21  say matter.  He said match the makeup of the
22  board.
23         MS. TURNER:  I'm sorry, I misheard
24  him.
25         Nancy, could you read back what

119

1   the witness' answer was.
2          COURT REPORTER:  I'm sorry, I
3   think I heard what you heard as well.
4          (Record read.)
5          MR. HARRIS:  You want to restate
6   it.
7       **A.    There weren't five votes, that**
8   **doesn't really match.**
9       Q.    What do you mean it doesn't match?
10      **A.    Well, if I remember correctly from**
11  **the previous conversation, there are five people**
12  **at the board meeting.  To say that I had five**
13  **votes locked up, two plus three, I'm not on the**
14  **board.  So, I don't know what it's referring to,**
15  **but he needed approval from the board.**
16      Q.    Is it possible the two votes he's
17  referring to would be votes for the seventh and
18  eighth floor?
19      **A.    We're not on the board.**
20      Q.    And you have no idea what he's
21  referring to --
22      **A.    I don't.**
23      Q.    The plus another three; you have
24  no idea what that's referring to?
25      **A.    I have no idea.  He's talking**

120

1   about the board.
2       Q.    And who was the president of the
3   board during this time, at the time of this
4   email?
5       **A.    I don't know.**
6       Q.    I'm sorry?
7       **A.    I don't know.**
8       Q.    You don't know who the president
9   of the board is?
10      **A.    I can't tell you who it is now or**
11  **who it was then.**
12      Q.    So Mr. King is emailing you about
13  a conversation that you don't recollect,
14  referencing votes on a board that you say don't
15  match?
16      **A.    No.  Certainly wouldn't imply that**
17  **the board was locked up; otherwise they wouldn't**
18  **have had the meeting.**
19         (Reporter clarification.)
20      **A.    -- was locked up.  Otherwise there**
21  **wouldn't have been the need for a meeting.  Or I**
22  **guess there would have, but no, if that's what**
23  **you're talking about.**
24      Q.    You've never had conversations
25  with board members about sublease approvals?

121

1      A.   No.
2           MR. HARRIS:  Just one second.
3   Just wait until she finishes her question, okay.
4           THE WITNESS:  Carry on.
5      Q.   Where would Mr. King get the idea
6   that you had a certain number of votes locked
7   up?
8           MR. CASE:  Object to form.
9      A.   I can't speak for him.
10     Q.   Just give me one second,
11  Mr. Shamash.
12          Why would Mr. King be concerned
13  about board approval?
14     A.   Because you need board approval to
15  get them inside of the building.  He knew that.
16     Q.   I asked you to read the fourth
17  sentence.  Can you read the sentence immediately
18  following it, starting with "He would want."
19     A.   (As read):  "He would want to
20  visit their location to see fie himself what CCM
21  did and unless he saw something terrible, we
22  would not get the votes.  Now this?"
23     Q.   What do you think Mr. King is
24  referring to there?
25          MR. CASE:  Object to form.

122

1      A.   It's been a few years.  I don't
2   know, but it sounds to me like he's trying to
3   cover himself again.
4      Q.   How would he be trying to cover
5   himself?
6           MR. CASE:  Object to form.
7      A.   He wants to imply that we knew his
8   use, even though it was contrary to
9   conversations previous.
10     Q.   So you remember conversations
11  about the use of the premises, but you don't
12  remember any of these emails or the fact that
13  you told Mr. King you had five votes locked up?
14          MR. HARRIS:  Objection to form.
15          MR. CASE:  Object to form.
16     A.   I remember the conversations of
17  the use because I have a recording of one of the
18  conversations.
19     Q.   And was that conversation on
20  November 19th, 2019?
21     A.   I don't remember the date of it.
22  It was immediately after the board meeting.
23     Q.   So nearly two months after this
24  email?
25     A.   I guess so.  Two months after or

123

1   before?
2           MS. TURNER:  Sorry, I think there
3   was some background noise there.
4           THE WITNESS:  She said two months
5   after.
6           MR. HARRIS:  I think she's wrong.
7           MS. TURNER:  Thank you, John.  You
8   can take that down.
9           John, can you pull up the document
10  starting with CCMS and ending in 497.
11          THE TECHNICIAN:  Stand by,
12  counsel.  Counsel, you said 497?
13          MS. TURNER:  Yes, please.
14          THE TECHNICIAN:  I do not believe
15  I have that.  Let me double-check the
16  repository.
17          MS. TURNER:  I believe I added it
18  on the break, so you might have to refresh.
19          THE TECHNICIAN:  Gotcha.  One
20  moment, please.
21          MR. MARGOLIS:  Tara, did you add
22  anything else, because I downloaded the share
23  file?
24          MS. TURNER:  Yes, I may have added
25  one or two more documents.

124

1   I'm sorry, about that, Barry.  My
2   understanding was it would update automatically.
3           MR. MARGOLIS:  Yeah, it doesn't
4   update when you download from it, so I'm trying
5   to just stay current with you, which is fine.  I
6   know you said you'll give us the documents after
7   the fact, but I just want to be able to -- I'm
8   just making sure I have them, that's all.
9           MS. TURNER:  Got it.
10          MR. MARGOLIS:  Looks like COOP 324
11  and CCMS 497 is what you added.
12          MS. TURNER:  That sounds right.
13          MR. CASE:  Barry, did you say COOP
14  324 and CCMS 497?
15          MR. MARGOLIS:  That's what it
16  looks like to me.
17          MR. HARRIS:  We see all the pages,
18  or we're not doing that document?
19          MS. TURNER:  Yes, we are.  I just
20  wanted Michael and Barry to be able to locate
21  the document.
22  BY MS. TURNER:
23     Q.   Mr. Shamash, can you please take a
24  minute and review this document.
25          MR. HARRIS:  Could we see the

125

1  other three pages, please. This is 1 of 4.
2        Slow down a little, I'm sorry.
3  Thank you.
4        Next page.
5        MS. TURNER: When you finish
6  Mr. Shamash, John, can you please move to page
7  2.
8        MR. HARRIS: There's another page.
9        MS. TURNER: It's just the tail
10 end of that.
11       MR. HARRIS: Okay.
12       MR. MARGOLIS: Are we marking this
13 as an exhibit?
14       MS. TURNER: Yes, please.
15       THE TECHNICIAN: This will be
16 marked as Exhibit Y.
17       (Exhibit Y marked for
18 identification.)
19 BY MS. TURNER:
20    Q.    Mr. Shamash, I'll represent to you
21 this is an email produced by CCMS in this
22 action.
23       Before we get into the substance
24 of the document, Mr. Shamash, is there a reason
25 you didn't produce this document?

126

1    A.    You can see from the page, I'm not
2  a party to a lot of these. I don't think I'm a
3  party to all of it.
4    Q.    Understood, but is there a reason
5  you didn't produce the duplicates of the
6  documents where you did respond?
7    A.    I gave you what I had.
8        MR. HARRIS: Counsel, he gave me
9  what he has, and I gave you what's responsive to
10 the subpoena.
11       MS. TURNER: Thank you.
12    Q.    Mr. Shamash, do you recognize this
13 portion of the email in the middle of the page
14 starting with November 19th at 3:44 p.m.?
15    A.    Do I recognize the part where he
16 says it's going to be a satellite program
17 similar to the one in Brooklyn, no, I don't
18 recognize it.
19    Q.    So, do you recognize this email?
20    A.    No.
21    Q.    Who is this email from?
22    A.    This email is from Robert King to
23 me and Saul.
24    Q.    And can you please read the email.
25    A.    Yes. (As read): "You win. The

127

1  email directs CCMNYC, it is okay with removing
2  the substance abuse language from" -- and then
3  it gets cut off from the camera, "use. It turns
4  out this is a satellite program currently only
5  available in Brooklyn. They will not provide
6  this treatment at the Manhattan location. I
7  hope this resolves the matter."
8    Q.    What did you understand that email
9  to mean?
10       MR. HARRIS: Objection to form.
11 You can answer.
12    A.    I understood it to mean that the
13 location on 31st Street was not a continuation
14 of their space on 27th Street.
15    Q.    Does this email reference the 31st
16 Street location?
17    A.    It doesn't. It references -- it's
18 a satellite program of their location in
19 Brooklyn, and it will not provide this treatment
20 at their Manhattan location.
21    Q.    Mr. Shamash, the first email
22 states, "CMNYC is okay with removing the
23 substance abuse language from the use."
24       Do you understand that to be the
25 satellite program that provides substance abuse

128

1  counseling?
2        MR. HARRIS: Objection to form.
3  You can answer.
4    A.    I don't actually remember what it
5  references exactly because it's been a while,
6  but if I was to read this now, I'd understand it
7  to say that there wasn't substance abuse
8  counseling in the space and the use of the space
9  is akin to that location in Brooklyn.
10    Q.    Where in this email does it say
11 that the use of the space was akin to the space
12 in Brooklyn?
13    A.    "It turns out thus is a satellite
14 program currently only available in Brooklyn.
15 They will not provide this treatment at their
16 Manhattan location." That's where it says it.
17    Q.    Mr. Shamash, is it possible that
18 Mr. King is referring to the substance abuse
19 counseling as being the satellite program only
20 available in Brooklyn?
21    A.    Possible.
22    Q.    Earlier you stated that Mr. Brooks
23 at the January 14th, 2020 interview insisted
24 that he would be conducting substance abuse
25 counseling at the premises, correct?

---

129

1    A.    At the meeting, Mr. Brooks?
2    Q.    Yes.
3    A.    Yes, it was immediate.
4    Q.    However, do you see in this email
5  that Mr. King is representing CCMS has agreed to
6  remove any substance abuse language from the use
7  of the premises?
8    A.    Yes.
9    Q.    So why would Mr. Brooks then
10 represent at the board meeting that he was
11 conducting substance abuse counseling?
12   A.    I don't know why.  Maybe because
13 he was and we were told otherwise.
14         MS. TURNER:  John, could you move
15 up to the next email?
16   Q.    Do you recognize this email,
17 Mr. Shamash?
18   A.    No.
19   Q.    What's the date of this email
20 based on the document?
21   A.    November 19th, 2019.
22   Q.    And who is it from?
23   A.    It's from me to Bob King, the
24 broker, cc'ing Saul Tawil.
25   Q.    And can you read the body of this

---

130

1  email?
2    A.    "Please detail precisely what they
3  are doing in the space for the board.  Thanks."
4    Q.    Why did you ask Mr. King --
5  actually, strike that.
6          The "they" in this sentence, who
7  are you referring to?
8          MR. HARRIS:  Objection to form.
9    A.    CCMS.
10   Q.    Why did you ask Mr. King to detail
11 precisely what they're doing in the space?
12   A.    Because if it wasn't an
13 ancillary -- if it was not to dummy up space,
14 you wouldn't get approved by the building.
15         In addition, narcotics and
16 substance abuse, you've to know what you're
17 setting up a meeting for.
18         MS. TURNER:  John, can you move up
19 to the next part of the email.  And you can
20 actually do the next two together.
21         If you want to take a second to
22 review, Mr. Shamash.
23   A.    I reviewed it.
24   Q.    Did anyone ever respond to you
25 with the description of what the use would be

---

131

1  for the premises?
2    A.    I don't remember.
3    Q.    Did Mr. Brooks ever email you
4  personally describing what the use would be?
5    A.    I never once spoke or communicated
6  with Mr. Brooks, to the best of my recollection.
7    Q.    Did Mr. King, as his email stated,
8  pass along that it would be an out-patient
9  clinic?
10   A.    I don't believe so, no.
11   Q.    Were you aware that CCMS would
12 provide services for children at the premises?
13         MR. HARRIS:  Objection to form.
14 You can answer.
15   A.    I don't think it really mattered
16 because we were looking at predominantly office
17 space.  Children don't need narcotics
18 counseling, as far as I can tell.
19         MS. TURNER:  Thank you, John, I
20 think we're finished with this document.
21         John, can you pull up document 8.
22         THE TECHNICIAN:  Stand by,
23 counsel.
24         (Exhibit Z marked for
25 identification.)

---

132

1          THE TECHNICIAN:  Document 8 is on
2  screen, marked as Exhibit Z.
3  BY MS. TURNER:
4    Q.    Mr. Shamash, do you recognize this
5  document?
6    A.    I do not.
7    Q.    Do you know if you produced it?
8    A.    I do not.
9    Q.    I'll represent to you that your
10 attorney produced this to us as responsive to
11 the subpoena.
12         Do you know who the email is from?
13   A.    It's from Robert King.
14   Q.    On what date?
15   A.    Monday the 25th of November, 2019.
16   Q.    And who's it addressed to?
17   A.    Saul and myself.
18   Q.    And can you just read the body of
19 of the email.
20   A.    "Good morning.  Emory Brooks has
21 instructed his attorney Diana Lee to contact
22 your attorney, Etan Harris, with her remaining
23 lease comments.  We hope Etan will help expedite
24 this.  Very best, Bob."
25   Q.    Do you know what Mr. King was

133

1  referring to about expediting the lease?
2      **A.    No.**
3      Q.    You didn't understand that CCMS
4  was in a hurry to finalize the lease?
5          MR. HARRIS:  Objection to form.
6      **A.    No.  There's a lot of emails with**
7  **hurry up; he wants to collect his commission.**
8      Q.    And do you know if Mr. Brooks'
9  attorney, Diana Lee, contacted your attorney?
10     **A.    I don't even remember who Diana**
11 **is.**
12     Q.    Understood.
13         MS. TURNER:  John, you can take
14 that document down.
15         John, could you pull up the
16 document beginning in CCMS, ending in 201.
17         THE TECHNICIAN:  Stand by counsel.
18         (Exhibit AA marked for
19 identification.)
20         THE TECHNICIAN:  That document is
21 on screen now marked as Exhibit AA.
22         MS. TURNER:  Thank you.
23         MR. MARGOLIS:  What was the
24 document number on this again?  Oh, this is CCMS
25 201.  Okay, thank you.

134

1          MS. TURNER:  Yes.
2          MR. HARRIS:  Give us a minute so
3  he can review it.  Thank you.
4          (Witness reviewing document.)
5          MS. TURNER:  We're only going to
6  be looking at a limited portion of this
7  document.
8          MR. HARRIS:  I just want to review
9  the whole document, if that's okay.
10         (Witness reviewing document.)
11         MS. TURNER:  This is actually the
12 page I wanted to discuss.  I don't have anything
13 for the remainder of the document.
14         MR. HARRIS:  Okay.
15         MS. TURNER:  If you'd like to
16 start here.
17         MR. HARRIS:  You can go ahead.
18         MS. TURNER:  John, can you move
19 slightly up so we can see the date.
20 BY MS. TURNER:
21     Q.    Mr. Shamash, do you recognize this
22 document?
23     **A.    No.**
24         MR. MARGOLIS:  Can you identify
25 the page by Bates stamp for the record, please.

135

1          MS. TURNER:  Sure.  It's
2  CCMS00002 -- hold on.
3          THE TECHNICIAN:  Counsel, the page
4  presently being displayed is ending in 208.
5          MS. TURNER:  Thank you.
6          MR. MARGOLIS:  Thank you.
7          MS. TURNER:  Poor eyesight and the
8  dyslexia is not doing me any favors.
9      Q.    Mr. Shamash, did your attorney
10 ever forward you this email?
11     **A.    I don't know.**
12     Q.    What's the date of this email?
13     **A.    November 15, 2019, 11:24 a.m.**
14     Q.    And is this email from your
15 attorney?
16     **A.    It's from my attorney.**
17     Q.    Etan Harris.  And can you read the
18 body of the email starting with "Can we."
19     **A.    "Can we limit the use language to:**
20 **Tenant shall use and occupy demised premises for**
21 **general offices, executive and administrative**
22 **offices and for tenant's counseling programs,**
23 **including but not limited to mental health**
24 **counseling, all of the foregoing in connection**
25 **with and in furtherance of tenant's purposes and**

136

1  **activities."**
2      Q.    What do you understand mental
3  health counseling to be?
4          MR. HARRIS:  Objection to form.
5  You can answer, if you know.
6      **A.    I hesitate to even venture a**
7  **guess.  I guess I haven't been through any**
8  **personally.**
9      Q.    But you understand it to be
10 clinic, a clinic providing services to
11 patients --
12     **A.    No.**
13         MR. HARRIS:  Objection to form.
14 And you're asking him to opine as to what his
15 counsel was saying?  He's not an author or
16 contributor to the document.
17         MS. TURNER:  I'm asking him what
18 he understands mental health counseling to be.
19         MR. HARRIS:  Do you want to
20 rephrase your question?
21     Q.    Do you think mental health
22 counseling would include providing services,
23 mental health services, to patients?
24     **A.    Yeah, sure, okay.  I'll accept**
25 **that.**

137

1    Q.    Does this sentence anywhere
2 describe ancillary clinic or ancillary
3 counseling?
4         MR. HARRIS:  Objection to form.
5 You can answer.
6    **A.    No.**
7         MS. TURNER:  John, can you move to
8 the next, one page up, ending in 207.
9    Q.    Mr. Shamash, do you recognize this
10 document?
11   **A.    No.**
12   Q.    Did your attorney ever forward it
13 to you?
14   **A.    I have no idea.**
15   Q.    Can you just please read the first
16 sentence of the email.
17   **A.    "The below use clause is**
18 **acceptable as our client has agreed not to run**
19 **any substance abuse counseling service at the**
20 **site.  When can we expect a redraft of the lease**
21 **in response to our comments sent to you on**
22 **November 15th, which I am reattaching?  Our**
23 **client would like to take occupancy as soon as**
24 **possible."**
25   Q.    So, Mr. Shamash, yet again CCMS is

138

1 representing that they're not going to run any
2 substance abuse counseling --
3    **A.    Yes.**
4    Q.    -- at the premises?
5         MR. HARRIS:  Objection to form.
6 Let her finish her question.
7         Sorry, can you repeat your
8 question again.
9    Q.    Based on this document, CCMS is
10 yet again representing that they're not going to
11 run any substance abuse counseling at the
12 premises; is that correct?
13        MR. HARRIS:  Objection to form.
14 You can answer.
15   **A.    That's correct.**
16   Q.    Thank you.
17        MS. TURNER:  Can we pull up
18 document 22, John.
19        THE TECHNICIAN:  Stand by.
20        (Exhibit BB marked for
21 identification.)
22        THE TECHNICIAN:  Document 22 is on
23 screen, marked as Exhibit BB.
24        MR. MARGOLIS:  Just for
25 clarification, was CCMS 201 to 212 marked as AA?

139

1         MS. TURNER:  Yes.
2         MR. MARGOLIS:  Okay, thank you.
3    Q.    Mr. Shamash, have you had a chance
4 to review this document?
5    **A.    No.  Review, yeah.**
6         MR. HARRIS:  Can you zoom in a
7 little bit?  It's pretty small.
8    Q.    Mr. Shamash, do you recognize this
9 document?
10   **A.    No.**
11   Q.    Do you know if you produced it?
12   **A.    No.**
13   Q.    I'm going to represent to you that
14 your attorney did produce this document in
15 response to your subpoena.
16        Looking in the middle of the page,
17 what's the date of this email?
18   **A.    November 26th, 2019.**
19   Q.    And who's the email from?
20   **A.    It's from Robert King.**
21   Q.    Can you just quickly read the
22 email body for me?
23   **A.    "Gentleman, I do hope the**
24 **attorneys are talking.  CCM needs to move this**
25 **along."**

140

1    Q.    So yet again Mr. King is asking to
2 move along the sublease process, correct?
3         MR. HARRIS:  Objection to form.
4    **A.    Yes.**
5         MR. MARGOLIS:  You broke up, Etan.
6 Did you say something?
7         MR. HARRIS:  Yes, I object to
8 form.  But he can still answer.
9    **A.    Yes.**
10        MS. TURNER:  John, can you move up
11 to the next portion of the email.
12   Q.    Do you recognize this part of the
13 email, Mr. Shamash?
14   **A.    I don't.**
15   Q.    What's the date of the email?
16   **A.    November 26th, 2019.**
17   Q.    Who's it from?
18   **A.    It's from me.**
19   Q.    And you produced this document?
20   **A.    I believe so.**
21        MR. HARRIS:  By counsel.  I
22 produced this document.
23   Q.    And can you please just read the
24 body of the email for me?
25   **A.    (As read):  "Yes, the attorneys**

141

1 should be talking. I spoke to the president of
2 the board. They're working on it. It's all
3 good."
4    Q.    What did you mean by this email?
5    A.    It's been a couple years. I don't
6 remember.
7    Q.    Who did you speak with?
8    A.    I don't remember. Accordingly,
9 the president of the board. I don't know who
10 the president is, though.
11    Q.    How could you have a conversation
12 with someone if you don't know who they are?
13    A.    It's been a long time and I have a
14 lot of conversations.
15       MR. HARRIS: Objection the form.
16 He never said that he had the conversation.
17    Q.    Do you have any reason to doubt
18 your own words?
19       MR. CASE: I'll object to form.
20    A.    No.
21    Q.    Is there a reason you would say
22 you spoke to someone if you didn't speak with
23 them?
24    A.    No.
25    Q.    Do you know why you would tell

142

1 Mr. King that you spoke to the president of the
2 board?
3    A.    I don't remember this
4 conversation.
5    Q.    Do you have any idea what you
6 could be referring to?
7    A.    No.
8    Q.    What do you think Mr. King
9 understood your statement to mean?
10       MR. HARRIS: Objection to form.
11 He doesn't remember this conversation.
12    A.    I don't remember the conversation.
13    Q.    Is it possible that Mr. King
14 understood you were speaking to the president of
15 the board about board approval for the sublease?
16    A.    That could be possible.
17    Q.    But you now don't recall who the
18 president of the board was?
19    A.    I don't remember.
20    Q.    Is it possible that the president
21 of the board at the time of this email was Marc
22 Paturet?
23       MR. CASE: Objection. Object to
24 form.
25       MR. HARRIS: Same, object to form.

143

1       MR. CASE: You're asking him about
2 a conversation that he doesn't recall.
3       MS. TURNER: I mean, he has his
4 email in front of him.
5    A.    I do not recall ever --
6       MR. HARRIS: You're not to answer.
7       MS. TURNER: John, you can take
8 that document down. Pull up document 12,
9 please.
10       THE TECHNICIAN: Stand by.
11       (Exhibit CC marked for
12 identification.)
13       THE TECHNICIAN: Document 12 is on
14 screen now. It is marked as Exhibit CC.
15    Q.    Do you just want to take a second
16 to review this, Mr. Shamash?
17       MR. HARRIS: Can you zoom in,
18 please. Thank you.
19       (Witness reviewing document.)
20       MR. HARRIS: Scroll down, please.
21 Mind scrolling up a little bit? Thank you.
22    Q.    Do you recognize this email,
23 Mr. Shamash?
24    A.    I don't know.
25    Q.    You don't know if you recognize

144

1 it?
2    A.    I do not recognize it.
3       MS. TURNER: John, if you could
4 just scroll up a little bit so we can see the
5 date. Perfect, thank you.
6    Q.    Do you know who produced this
7 document?
8    A.    I do not.
9    Q.    I'll represent to you that your
10 attorney produced it in response to your
11 subpoena.
12       What's the date of this email,
13 Mr. Shamash?
14    A.    December 4th, 2019.
15    Q.    And who's it addressed to?
16    A.    It's addressed from me to Robert
17 King, Etan Harris, Saul. That's all. Me, Etan,
18 and Saul and Robert King.
19    Q.    Can you read the body of the
20 email. I know it's in all caps but you don't
21 have to scream it.
22    A.    (As read): "Etan!! What's taking
23 so long? Emory, we're not" -- I don't know
24 whether that's a quotation of what Emory is
25 speaking. "Emory, we're not shooting for a

145

1 better deal. We're waiting on our attorney.
2 Have your attorney call our attorney. We are
3 men of our word. Thanks."
4      Q.   What did you mean by "We are men
5 of our word"?
6      A.   I don't know. I think I was
7 referencing -- I don't know whether I'm -- I
8 don't know. I don't know whether I'm
9 referencing Emory is quoting Emory or whether
10 I'm writing something. I don't know.
11      Q.   Why did you ask your attorney what
12 is taking so long?
13      MR. HARRIS:  Objection to form.
14 He said he didn't recognize the email.
15      You can answer.
16      A.   I don't remember.
17      Q.   Is it possible that you understood
18 that CCMS had a deadline --
19      A.   I don't remember.
20      (Indiscernible crosstalk.)
21      Q.   -- to the sublease?
22      MR. HARRIS:  Answer the question.
23      A.   I don't remember.
24      MS. TURNER:  John, you can take
25 that document down. That was Exhibit CC, for

146

1 everyone.
2      John, if you could please pull up
3 document 23.
4      THE TECHNICIAN:  Stand by,
5 counsel.
6      (Exhibit DD marked for
7 identification.)
8      THE TECHNICIAN:  Document 23 is on
9 screen now. It is marked as Exhibit DD.
10 BY MS. TURNER:
11      Q.   Mr. Shamash, do you want to take a
12 second to review the email?
13      A.   Um-hum. (Indiscernible)
14      Q.   I'm sorry?
15      A.   Um-hum.
16      (Witness reviewing document.)
17      MS. TURNER:  John, can you scroll
18 up a little bit so we can see the -- thank you.
19      Q.   Mr. Shamash, do you recognize this
20 email?
21      A.   No.
22      Q.   Do you know who produced it?
23      A.   No.
24      Q.   I'll represent to you that your
25 attorney produced it in response to your

147

1 subpoena.
2      What's the date of this email?
3      A.   December 10th, 2019, 9:38 a.m.
4      Q.   Who is the email from and who is
5 it addressed to?
6      A.   It's from Robert King to Saul and
7 myself.
8      Q.   Could you please read the body of
9 the email starting with "I sent Etan"?
10      A.   (As read):  "I sent Etan the below
11 email this morning. Hi Etan, Nigel has informed
12 us that all language issues in the lease have
13 been agreed upon. If so, please forward the
14 execution copy of the lease agreement to Diana
15 Lee for her review. CCMNYC is negotiating
16 another lease and time is of the essence."
17      Q.   What did you understand this email
18 to mean?
19      MR. HARRIS:  Objection to form.
20      A.   I don't remember the email.
21      Q.   Mr. Shamash, is this yet another
22 instance where CCMS or its representative has
23 asked to expedite the sublease process?
24      MR. CASE:  Object to form.
25      A.   Brokers always try to expedite the

148

1 lease. They want to get their commissions.
2      Q.   Is there any reason why you
3 wouldn't take Mr. King seriously in asking to
4 expedite the lease?
5      A.   We all work in good faith to
6 expedite a lease to collect rent. He wants to
7 get his commission. Nothing we can do about it,
8 it doesn't affect the deal.
9      Q.   Mr. Shamash, did you know that
10 CCMS's lease for its prior location was ending?
11      A.   No. Don't remember. But you have
12 to imagine it was ending but, then again, I
13 don't remember. I don't know if this was a
14 satellite -- looking back, I don't know if it
15 was a satellite space or another space. I don't
16 remember.
17      Q.   Thank you.
18      MS. TURNER:  John, could you move
19 up to the next email. You might be able to get
20 actually --
21      I don't know, can you see that,
22 Mr. Shamash, both of those emails?
23      A.   Yes, um-hum.
24      Q.   Do you recognize these emails?
25      A.   No.

149

1  Q.   On the bottom half, what's the
2  date of that email?
3  **A.   The one from Saul?**
4  Q.   Yes.
5  **A.   Tuesday, December 10th, 2019 at**
6  **12:47.**
7  Q.   What did Saul ask you?
8  **A.   "Vote status?  Saul".**
9  Q.   Why was Mr. Tawil asking you about
10 the vote status?
11        MR. CASE:  Object to form.
12 **A.   Because he wanted to see where the**
13 **status of the vote was.**
14 Q.   Do you recall what the status of
15 the vote was on December 10th, 2019?
16 **A.   I do not.**
17 Q.   Mr. Shamash, what did you respond
18 to him the following day?
19 **A.   At 3:21 I answer it, "Still**
20 **waiting."**
21 Q.   Oh, I'm sorry, it was the same
22 day.  Do you recall what you were still waiting
23 on?
24 **A.   I do not.**
25 Q.   Were you waiting to have a

150

1  conversation with board members of the co-op?
2  **A.   I can't recall.**
3  Q.   Were you waiting to have a
4  conversation with any specific board members of
5  the co-op?
6        MR. HARRIS:  Objection to form.
7  **A.   I don't recall.  Still waiting, I**
8  **don't know.**
9        MS. TURNER:  John, if you can move
10 up to the next set of two emails I think we can
11 get both in, as long as Mr. Shamash can see
12 them.
13 Q.   Do you recognize this email
14 exchange, Mr. Shamash?
15 **A.   I do not.**
16 Q.   The following date, December 11th,
17 2019 Mr. Tawil asking you "any sense of when?"
18 Do you know what he's referring to?
19 **A.   I do not.**
20 Q.   Is he referring to the vote
21 status?
22 **A.   I don't know.**
23 Q.   And the following -- or same day,
24 two minutes later, you respond that you will
25 work on it this afternoon.  Is that correct?

151

1  **A.   That is correct.**
2  Q.   What were you going to work on?
3  **A.   I don't know.**
4  Q.   Is it possible that you were going
5  to work on getting board approval?
6        MR. HARRIS:  Objection to form.
7  **A.   Possible.**
8  Q.   Is it possible you were going to
9  speak to someone on the board?
10 **A.   I don't recall.**
11 Q.   But is it possible?
12 **A.   I don't recall.**
13        MS. TURNER:  Okay, John, you can
14 take that down.  John, if you could pull up
15 document 25.
16        THE TECHNICIAN:  Stand by,
17 counsel.
18        (Exhibit EE marked for
19 identification.)
20        THE TECHNICIAN:  Document 25 is on
21 screen now.  It is marked as Exhibit EE.
22 Q.   Mr. Shamash, do you want to take a
23 second to review the email exchange?
24 **A.   Would you mind zooming out,**
25 **please.  I can't read it.  Thank you.**

152

1        (Witness reviewing document.)
2  Q.   Were you able to review the
3  document, Mr. Shamash?
4  **A.   Yes.**
5  Q.   Do you recognize this email
6  exchange?
7  **A.   No.**
8  Q.   Looking at the email before us,
9  what's the date of this email?
10 **A.   December 12th, 2019, 3:52.**
11 Q.   Do you know who produced this
12 document?
13 **A.   No.**
14 Q.   I'll represent to you that your
15 attorney produced it as responsive to your
16 subpoena.
17        Who's this email from and who is
18 it addressed to?
19 **A.   It's from Robert King to Saul and**
20 **myself.**
21 Q.   And can you just read the body of
22 the email starting with "Saul" and ending with
23 "off on it."
24 **A.   "Okay guys.  Saul, I misread**
25 **Diana's email.  CCM wants to move in on Monday.**

153

1  I believe that everything has been agreed upon
2  so please push Etan to make the final changes to
3  the lease so Emory Brooks can sign off on it."
4      Q.   Did you understand that CCMS
5  wanted to move in in mid-December to the
6  premises?
7          MR. HARRIS:  Objection to form.
8      A.   They would like to.  They need a
9  board meeting to get in there.
10     Q.   But did you understand that?
11     A.   Understand what?
12     Q.   That they wanted to move in in
13 mid-December.
14     A.   According to this email, sure.
15     Q.   You have no recollection --
16     A.   No, I don't remember this deal
17 very well.
18     Q.   Why is that?
19     A.   Because I have a lot of
20 transactions which I have to deal with.  I'm a
21 very busy person and the thing that stays in my
22 mind is the uncomfortable meeting which
23 proceeded.
24     Q.   So you've selectively forgotten
25 the months of communications leading up to the

154

1  board meeting?
2          MR. HARRIS:  Objection to form.
3  You can answer.
4      A.   I think the phrase "selectively
5  forgotten" implies that I --
6          (Reporter clarification.)
7      A.   I think the phrase "selectively
8  forgotten" means that you're implying I have any
9  choice of cognitive dissonance.  No, I just
10 don't remember every email that I've written.
11     Q.   Do you remember conversations
12 you've had?
13     A.   Of course I do.
14     Q.   But not conversations with board
15 members about board approval for this sublease?
16     A.   I remember what I remember.  We
17 are going through this deposition to see what I
18 remember.
19         MS. TURNER:  John, if you could
20 move up to the next exchange.  I think you might
21 have missed.  Perfect.
22     Q.   Mr. Shamash, do you recognize this
23 exchange?
24     A.   No.
25     Q.   On December 12th, 2019 Saul asked

155

1  you the status on the vote; is that correct?
2          MR. HARRIS:  Objection to form.
3      A.   According to this email.
4      Q.   Why was Saul asking about the
5  status on the vote?
6          MR. HARRIS:  Objection to form.
7      A.   Because he wanted to lease the
8  space.
9      Q.   And had the status changed?
10     A.   I don't recall.
11     Q.   In response, Mr. Shamash, on
12 December 12th you responded to Saul, "I'm
13 sending signed lease to Kaled.  Joey completely
14 MIA."
15     A.   Um-hum.
16     Q.   What did you mean by "Joey
17 completely MIA"?
18     A.   MIA, missing in action.
19     Q.   And the Joey you're referring to
20 in this email, is that Joseph or Joey Grill?
21     A.   I would imagine so.
22         MR. HARRIS:  Objection to form.
23     A.   I'd imagine so.
24     Q.   What did you mean by "Joey
25 completely MIA"; how did that relate to

156

1  Mr. Tawil's --
2      A.   I don't remember.
3      Q.   -- question?
4      A.   Don't remember.
5      Q.   Had you had conversations with
6  Joey about board approval for this sublease?
7      A.   I doubt it, seeing that I'm saying
8  he was MIA.
9      Q.   Why would Joey being MIA matter
10 for purposes of approving the sublease?
11         MR. HARRIS:  Objection.
12     A.   Because he's a busy individual.
13         MS. TURNER:  John, if you could
14 just scroll to the next email exchange.
15     Q.   I'm looking at the December 13,
16 2019 email from Saul, Mr. Tawil.
17     A.   Um-hum.
18     Q.   Do you recognize this response
19 from Mr. Tawil?
20     A.   I don't.
21     Q.   Could you read it for me, please.
22     A.   "MIA - missing in action, or
23 mine?"
24     Q.   What did you understand this email
25 to mean?

---

157

1 　　　　MR. HARRIS:  Objection.
2 　　**A.　Saul writes very different emails.**
3 　　Q.　I'm sorry?
4 　　**A.　I said, Saul writes very different**
5 **emails.**
6 　　Q.　Is Mr. Tawil asking you whether
7 Joey is missing in action?
8 　　**A.　Your interpretation is as good as**
9 **mine.**
10 　　Q.　Is it possible Mr. Tawil is asking
11 you whether Mr. Grill is his, in the sense that
12 he will agree to the sublease?
13 　　**A.　No, I doubt it was that.  Wouldn't**
14 **make sense.**
15 　　Q.　What do you think Mr. Tawil meant
16 by "or mine?"
17 　　**A.　I don't know, but...**
18 　　Q.　So looking at the email below it
19 where you said "Joey completely MIA," is it
20 possible Mr. Tawil was not sure whether you
21 meant missing in action or Joey completely mine?
22 　　　　MR. HARRIS:  Objection to form.
23 You can answer if you know.
24 　　**A.　I don't know.  My guess would be,**
25 **do you mean missing in action?**

---

158

1 　　Q.　Thank you.
2 　　　　MS. TURNER:  John, you can take
3 this document down, which was marked EE.
4 　　　　MR. HARRIS:  Can we take a five-
5 minute break to go to the restroom?  Is that
6 okay?
7 　　　　MS. TURNER:  That's fine with me.
8 　　　　MR. HARRIS:  2:50, 2:51.
9 　　　　THE VIDEOGRAPHER:  We're going off
10 the record; the time is 14:46.
11 　　　　(Recess taken.)
12 　　　　THE VIDEOGRAPHER:  We're back on
13 the record; the time is 14:52.
14 BY MS. TURNER:
15 　　Q.　Welcome back, Mr. Shamash.
16 　　　　MS. TURNER:  John, can you pull up
17 the document beginning with CCMS and ending in
18 66.
19 　　　　THE TECHNICIAN:  Stand by,
20 counsel.
21 　　　　(Exhibit FF marked for
22 identification.)
23 　　　　THE TECHNICIAN:  That document is
24 on screen now.  It is marked as Exhibit FF.
25 　　　　MS. TURNER:  Thank you.

---

159

1 BY MS. TURNER:
2 　　Q.　Mr. Shamash, do you recognize this
3 email, once you've had a chance to review?
4 　　　　(Witness reviewing document.)
5 　　**A.　Um-hum.**
6 　　Q.　Do you recognize this email?
7 　　**A.　Yes.**
8 　　Q.　On December 13th, 2019 Mr. King
9 has sent you an email and also forwarded the
10 below section beginning with "Emory," asking you
11 to provide the information in bold.  Is that
12 correct?
13 　　**A.　That's what the email says.**
14 　　　　MS. TURNER:  Actually, can we pull
15 up Exhibit J.
16 　　　　THE TECHNICIAN:  Stand by,
17 counsel, one moment.
18 　　　　Exhibit J on screen now.
19 　　Q.　Mr. Shamash, do you recognize this
20 document?
21 　　**A.　Can you zoom in please.**
22 　　　　(Witness reviewing document.)
23 　　**A.　No.**
24 　　　　MR. HARRIS:  Can you continue to
25 the bottom.

---

160

1 　　**A.　No.**
2 　　Q.　You don't recognize this document,
3 Mr. Shamash?
4 　　**A.　I do not.**
5 　　　　MS. TURNER:  John, can you go back
6 up to the first page, please.
7 　　Q.　Mr. Shamash, can you read next to
8 "use" what the description is.
9 　　**A.　"Offices and for tenant's**
10 **counseling programs, including mental health but**
11 **no substance abuse counseling."**
12 　　Q.　Was this consistent with all your
13 discussions with CCMS regarding the use of this
14 space, prior to this document?
15 　　**A.　Offices and for tenant's**
16 **counseling programs, mental health but no**
17 **substance -- yeah, I'd say that's consistent.**
18 　　Q.　And I believe earlier you stated
19 that Oxford typically entered into subleases
20 ranging from three to seven years.
21 　　**A.　Three to ten.**
22 　　Q.　Three to ten.  Why were you
23 seeking a ten-year lease with CCMS?
24 　　**A.　Because they seemed like a good**
25 **tenant and the rent was there.**

161

1    Q.    What made them seem like a good
2 tenant?
3    A.    Well, they were an office use,
4 which is consistent with the historical use.
5 They had other locations, and that space
6 specifically was very high end.
7    Q.    But you also visited the space at
8 31st Street, correct?
9    A.    As mentioned in previous emails
10 that we went over from then, they were saying
11 that the space in Brooklyn was akin to what they
12 were doing in this space.
13    Q.    My question was you also visited
14 the space at 31st Street --
15    A.    I saw --
16        MR. HARRIS:  Let her finish her
17 question.
18    Q.    My question was you also visited
19 the space at the 31st Street clinic, correct?
20    A.    As mentioned previously, I went up
21 in the elevator, I looked around and went back
22 down inside of the elevator.
23        MS. TURNER:  John, you can take
24 that down.  Can we pull up COOP 324.
25        THE TECHNICIAN:  Stand by.

162

1        (Exhibit GG marked for
2 identification.)
3        THE TECHNICIAN:  COOP 324 is on
4 screen now.  It is marked as Exhibit GG.
5    Q.    Mr. Shamash, can you take a second
6 to review this document.
7        (Witness reviewing document.)
8    Q.    Mr. Shamash, do you recognize this
9 document?
10    A.    No.
11    Q.    Again, why don't you recognize it?
12        MR. HARRIS:  Objection to form.
13 Why don't you recognize a document, that doesn't
14 make any sense.
15        MS. TURNER:  Well, you're not
16 asking the questions.
17        MR. HARRIS:  Objection to form.  I
18 don't understand how someone can know how they
19 don't remember something.  You want to rephrase
20 it, go for it.  If not, not.
21    Q.    Mr. Shamash, you don't recall
22 anything about this email or the content
23 therein?
24    A.    You asked me if I recognized the
25 document.  You didn't ask me if I remember any

163

1 parts of that document.  I remember parts of
2 that email, in particular the bit that I'm
3 looking at right now.
4        MS. TURNER:  Okay, John, can you
5 just zoom out a little bit.
6    Q.    Can you identify for me what parts
7 you remember?
8    A.    The parts where it references
9 there is no substance abuse treatment.  The part
10 where we mention it's a quiet tenancy with a
11 full floor with no division plan and minimal
12 construction.  I remember, vague memory of
13 writing that email.  I don't remember the
14 specifics of the email.
15    Q.    Sorry, I'm just trying to find the
16 document on my end.
17        MS. TURNER:  John, can you
18 possibly zoom out to see the full document.  I'm
19 not able to find it on my end.  Thank you.
20    Q.    Mr. Shamash, did you send this
21 email on December 19th to Peter Lehr?
22    A.    Yes, ma'am.
23    Q.    Could you read the first full
24 sentence, second paragraph for me, please.
25    A.    "I believe they are a good use for

164

1 the building as they are low traffic" --
2        MR. HARRIS:  Could you back out a
3 little bit.  It's being blocked by the zoom
4 screen area.
5    A.    "I believe they are a good use for
6 the building as they are low in traffic, and
7 conformant with the traffic nature of the
8 building, a place of business and very 9 to 5.
9 Should they be operating after building hours
10 for any reason, as with our other tenants, they
11 have to pay for a doorman."
12    Q.    Why did you represent that CCMS
13 would be using the premises for low traffic?
14    A.    Because that is what was presented
15 to us.
16    Q.    So, in Exhibit J that you just
17 reviewed, which indicated CCMS would be
18 providing counseling services, you would qualify
19 counseling services as low traffic?
20        MR. HARRIS:  Objection to form.
21 You can answer.
22    A.    As mentioned in the next
23 paragraph, the use was going to be akin to
24 Clinton Street, which I was told was low
25 traffic.  Clinton Hill, not Clinton Street,

165

1 which I was told was low traffic.
2     Q.    But the express terms of the
3 sublease included counseling services, correct?
4     A.    Yes.
5     Q.    And you still define that as low
6 traffic.
7     A.    Yes.  It was defined to us as low
8 traffic.
9     Q.    Do you understand what counseling
10 services are?
11    A.    Not my -- no.  No, I don't.
12    Q.    If I say I'm providing medical
13 services, would you understand that to mean a
14 patient is coming in and receiving a service?
15    A.    It was not presented to us as
16 medical services.
17    Q.    How would counseling services be
18 any different than medical services?  You're
19 still providing a service to a patient.
20    A.    It was ancillary.
21    Q.    Where in the sublease does it say
22 ancillary?
23    A.    I didn't write the sublease.
24    Q.    But you agreed on the terms of the
25 sublease?

166

1     A.    I did not.
2     Q.    Oxford agreed on the terms of the
3 sublease?
4     A.    Yes.
5     Q.    And you presented that to the
6 board?
7     A.    Presented to the best of my
8 knowledge as was sent to me through the broker.
9     Q.    Did you read the sublease?
10    A.    No.
11    Q.    Did you know about the use clause?
12    A.    No.
13    Q.    Can you just explain the capacity
14 in which you presented --
15    A.    Of course.
16    Q.    -- CCMS to the board?
17    A.    Of course.  So the broker is
18 presenting a term sheet that are negotiated by
19 the lawyers.  My capacity is to get this through
20 the board and approved.  And my capacity is to
21 use my best judgment as to what the use is
22 conformant to going up to the board.
23        Pursuant to this, as it's stated
24 over here, if there was narcotic counseling, it
25 would be an immediate no from this board,

167

1 because it's an office building, not a narcotics
2 building.
3        Immediately after this there was a
4 meeting where the first thing that he said was
5 there's going to be narcotics.  One would
6 imagine the initial question was pursuant to
7 this email which was the one email from me to
8 the board saying, by the way, there's no
9 narcotics.
10    Q.    Mr. Shamash, did we review
11 multiple documents today where CCMS, or its
12 representative, represented that they wouldn't
13 provide substance abuse counseling?
14    A.    Yes.
15    Q.    And it's your position that
16 Mr. Brooks entered the meeting and said the
17 exact opposite?
18    A.    Correct.
19    Q.    Are you aware that CCMS would have
20 been required to have a special state license to
21 have substance abuse counseling at the premises?
22    A.    No.
23    Q.    You weren't informed of this after
24 the meeting?
25    A.    No.  Not that I know of.

168

1     Q.    Why would Mr. Brooks represent
2 that he was going to perform substance abuse
3 counseling if he didn't possess a license to do
4 so?
5     A.    I can't speak for him.
6     Q.    Mr. Shamash, in this email to
7 Peter Lehr, which was forwarded to defendants,
8 you also stated "a place for business and very 9
9 to 5."  Did you understand CCMS would also --
10 would be operating as late as 8 p.m. and also on
11 Saturday?
12    A.    This is my expression of what I
13 understood the deal to be from the broker.
14    Q.    Who was the broker?
15    A.    Robert King.
16    Q.    But did you review the sublease
17 terms or the sublease itself?
18    A.    No.
19        MS. TURNER:  John, if you could
20 just scroll down to the second part of the
21 email.
22    Q.    Can you read, Mr. Shamash, can you
23 read the sentence starting with, and I won't
24 scream it, "There is no substance because
25 treatment."

169

1    A.    (As read):  "There is no
2 substance" -- well, let's start, "CCM is a
3 30-year-old organization which has around ten
4 satellite locations around the city.  This
5 location is their new HQ and we have been very
6 clear in the lease.  There is no substance abuse
7 treatment, no questionable traffic to the
8 building.  It is exactly the use as the use
9 clause states in the lease agreement:  The
10 administrative offices for their programs
11 including but not limited to..."
12    Q.    Mr. Shamash, is there a reason you
13 left out counseling programs in the use clause?
14    A.    Yes.
15    Q.    Why?
16    A.    Because it was ancillary.
17    Q.    Is the word "ancillary" in the use
18 clause?
19    A.    I don't know.
20    Q.    Well, we can pull up the sublease.
21    A.    You can.
22        MS. TURNER:  Actually, let's pull
23 up Exhibit G.
24        THE TECHNICIAN:  Stand by,
25 counsel.  One moment.

170

1        Exhibit G on screen.
2    Q.    Mr. Shamash, are you familiar with
3 this document or do you need a second to review?
4        MR. HARRIS:  Review it.
5    A.    I'd like to review it.
6        (Witness reviewing document.)
7    Q.    Mr. Shamash, do you recognize this
8 document?
9    A.    I don't.
10    Q.    You've never seen this sublease
11 application?
12    A.    I have no memory of it.
13    Q.    Did you ask my client CCMS to fill
14 this out?
15    A.    I don't know whether I was in
16 receipt of it or sent it straight to Kaled or
17 straight to Saul, or it may have been sent to
18 me.  I haven't seen it.  I don't remember it.
19    Q.    If it was sent to you, would you
20 have reviewed it?
21    A.    Probably not.
22    Q.    Why not?
23    A.    Because it's not really my job
24 description with Saul.  I'm here to just bring
25 things forward.  I don't really open very many

171

1 documents.
2    Q.    Did you know the board would be
3 reviewing the sublease application?
4    A.    Sure.
5    Q.    And you didn't think to review the
6 sublease application to make sure that it was
7 consistent with your representation to the
8 board?
9    A.    That is correct.
10        MS. TURNER:  John, can we go to
11 the first page of the document.  I'm sorry, the
12 second substantive page.
13        THE TECHNICIAN:  So the page after
14 this one, counsel?
15        MS. TURNER:  Yes, please.
16    Q.    Mr. Shamash, can you please read
17 the written response to "Please give description
18 of daily operation."
19    A.    (As read):  "At the 129th Street
20 office we will provide a licensed out-patient
21 clinic, providing psycho" -- can you zoom out?
22 "Providing psycho -- psycho therapist services."
23    Q.    Thank you.  What do you think when
24 reviewing that language, Mr. Shamash?
25        MR. HARRIS:  Objection to form.

172

1    A.    I don't have a memory for this.
2    Q.    In your opinion is this consistent
3 with the use in the sublease?
4    A.    In my opinion that's not really
5 consistent in what was presented to me as their
6 use.  That's the question you're meaning to ask?
7    Q.    Would this be consistent with
8 counseling services?  Counseling programs?
9        MR. HARRIS:  Objection to form.
10 You can answer.
11    A.    The use is written inside the
12 sublease.
13    Q.    I'm sorry?
14    A.    The use is written inside of the
15 sublease, under the use clause.  That's probably
16 the extent of what I would -- that's the extent
17 of what would be presented to me.
18    Q.    Understood.  Below number 6 we
19 have A, B, C, D.  How many employees daily,
20 what's the written response to how many
21 employees daily will be at the premises?
22    A.    12.
23    Q.    And how many customers daily?
24    A.    50.
25    Q.    And how many weekly?

173

1    A.    200.
2    Q.    And then what's the response for
3  hours of operation and days of week?
4    A.    **Monday through Thursday, 9 a.m. to**
5  **8 p.m.; Friday and Saturday, 9 to 5.  Days of**
6  **week, Monday through Saturday.**
7    Q.    So this sublease application that
8  my client filled out, would you say it's
9  consistent with low traffic, normal office
10  hours?
11    A.    **On a 7500 square foot space, 50**
12  **people throughout the day would be relatively**
13  **low traffic, yes.  At the meeting -- should I**
14  **carry on?  At the meeting he said he was going**
15  **to have rooms with like tons of people, hundreds**
16  **of people.  This is not consistent with that.**
17  **They're saying 200 people per week.  Yes, that's**
18  **consistent to low traffic for a 7500 square foot**
19  **space.  It's a full floor of an office building.**
20    Q.    Mr. Shamash, we went over the
21  floor plan earlier and I think you agreed there
22  were about 14 offices on the eighth floor,
23  correct?
24    A.    **Correct.**
25    Q.    How do you believe my client could

174

1  have had hundreds of people in the office?
2    A.    **Well, since he said that in the**
3  **meeting.**
4    Q.    Did you record that meeting too?
5    A.    **I recorded my conversation with**
6  **Mr. Brooks, luckily.  Mr. Brooks -- no.**
7  **Mr. King, luckily, immediately after.**
8    Q.    So the only evidence you have that
9  my client, Mr. Brooks, said that he was going to
10  provide substance abuse counseling and hundreds
11  of people would enter the premises daily is your
12  word versus his?
13         MR. HARRIS:  Objection to form.
14  That's not what he said.  You can answer.
15    A.    **That's not what I said.**
16    Q.    What did you say then?
17    A.    **I said that when I finished the**
18  **meeting I immediately called the broker and**
19  **stated how the meeting went.  It was an**
20  **incredibly uncomfortable meeting.  I recorded**
21  **it, mentioning exactly what happened, as I**
22  **remembered five minutes previously.  And using**
23  **that, that has jogged my memory as to what**
24  **happened in the meeting.  It's the best form**
25  **of -- I could find.**

175

1    Q.    But otherwise, you don't have any
2  proof of what my client said in the meeting?
3    A.    **Sure.**
4    Q.    Do you recall when --
5         MR. HARRIS:  One second, it looks
6  like Barry stepped away.
7         MR. MARGOLIS:  I'm still here.
8         MR. HARRIS:  Okay.
9         MR. MARGOLIS:  Thank you.
10         MR. HARRIS:  Continue, Barry?
11         MR. MARGOLIS:  Please continue.
12  Sorry.
13    Q.    Mr. Shamash, do you recall when my
14  client submitted this sublease application?
15    A.    **No.**
16    Q.    Does December 24th, 2019 sound
17  correct?
18    A.    **If that's what's written on the**
19  **email.**
20    Q.    Just give me one second.
21         MS. TURNER:  John, can we pull up
22  Exhibit K.
23         THE TECHNICIAN:  Stand by,
24  counsel.
25         Exhibit K is on screen.  Is there

176

1  a particular section you're looking for?
2         MS. TURNER:  I'm concerned with
3  this first page, if you could zoom in on the --
4  if you can see right where your cursor is, I
5  want to make sure I get that line and above it
6  in.
7         MR. HARRIS:  Just zoom out a
8  little bit because the screens on the right are
9  blocking -- there we go.
10    Q.    Mr. Shamash, you didn't have a
11  chance to review this entire document, but I'll
12  represent to you that this is the sublease
13  agreement that my client signed.  Do you
14  recognize this document?
15    A.    **I recognize it as the front page**
16  **of a standard form of sublease, yes.**
17    Q.    In the center of the page where it
18  says "Occupancy," and I know it's very blurry.
19  To the extent you can, can you read what it says
20  next to "Occupancy."
21    A.    **Would you mind pointing it out for**
22  **me, please.**
23         (As read):  "Tenant shall use and
24  occupy demised premises for general, executive
25  and administrative offices and for tenant's

177

1 counseling programs, including but not limited
2 to mental health, all of the foregoing
3 connections will be" -- "and in furtherance of
4 tenant's purposes and activities, but excluding
5 substance abuse counseling."
6     Q.    Mr. Shamash, is this consistent
7 with the sublease application that my client
8 filled out?
9     **A.    I didn't write the sublease and I**
10 **didn't write the application. I think that's a**
11 **question for counsel.**
12    Q.    Mr. Shamash, do you think that
13 this description of the use is consistent with
14 your email to the board about low traffic?
15    **A.    Sure, yeah.**
16    Q.    Mr. Shamash, why didn't you ask
17 CCMS to complete a sublease application earlier?
18    **A.    We don't know the specifics of how**
19 **this would go on. You don't submit an**
20 **application until you are filing with the board.**
21 **You don't file with the board until you've got a**
22 **signed lease.**
23    **The other question, you just asked**
24 **me why did I ask. It may have gone through**
25 **counsel. I don't know who asked for what.**

178

1     MR. MARGOLIS:  Nancy, can I ask
2 that that be read back, or that the witness
3 repeat, the question and answer be repeated
4 because I didn't get it.
5     (Record read.)
6     MS. TURNER:  John, could you pull
7 up Exhibit I.
8     THE TECHNICIAN:  Stand by,
9 counsel. Exhibit I is on screen now.
10     MR. HARRIS:  Can you zoom in; it's
11 really small.
12    Q.    Mr. Shamash, if you could just
13 take a second to review this, if you need to.
14    **A.    Yes, please.**
15     (Witness reviewing document.)
16    Q.    Are you finished reviewing,
17 Mr. Shamash?
18     MR. HARRIS:  Counsel, is there --
19 it says 2 of 4 pages. Is there two more pages
20 on this?
21     THE TECHNICIAN:  This document
22 only has two pages. I don't know what that 2/4
23 indicates.
24     MR. HARRIS:  No problem.
25     MS. TURNER:  This exhibit was used

179

1 in the deposition of my client and that's the
2 way it was used in the deposition, so we're just
3 using it.
4     MR. HARRIS:  No problem.
5 BY MS. TURNER:
6     Q.    Mr. Shamash, do you recognize this
7 email exchange?
8     **A.    No.**
9     Q.    Do you recall anything related to
10 the events described in the email exchange?
11    **A.    No. It's an email from Emory**
12 **Brooks to Susan Rubin and me, but it's from**
13 **Emory to Susan.**
14    Q.    Understood. And Mr. Brooks is
15 attaching the sublease application that we
16 reviewed a few documents ago?
17    **A.    Um-hum.**
18     MS. TURNER:  John, if you could
19 just scroll up.
20    Q.    Do you recall what your email on
21 December 26th, 2019 was referring to?
22    **A.    I don't, but if I'm going to say**
23 **process checks, I would like to note that it's**
24 **probably not his checks for security deposit and**
25 **first month's rent; rather, the checks for the**

180

1 Co-op Board's approval to set up a meeting.
2     Q.    Understood. After that first
3 sentence, though, can you read only the second
4 sentence.
5     **A.    "Is that okay? Thanks."**
6     Q.    No.
7     **A.    "However, we are in a rush."**
8     Q.    Thank you.
9     Why did you tell Ms. Rubin that
10 you were in a rush?
11    **A.    Same reason that Mr. King asks**
12 **that we're in a rush. I want to get my tenant**
13 **inside there and I want to collect rent. I**
14 **don't want to take time.**
15    Q.    So you weren't willing to expedite
16 a rush for the sublease for the past two months
17 until December 26th, 2019?
18     MR. HARRIS:  Objection to form.
19 He never said that.
20     MR. CASE:  Object to form.
21    **A.    Why would I be delaying? I want**
22 **to get my customer in the building so I can**
23 **collect rent.**
24    Q.    Could you have been referring to
25 rushing a meeting with the board to approve the

181

1  sublease?
2      A.  When you say collect, you're
3  referring -- what are you talking about?  In
4  this email or previous?  What are you
5  referencing?
6      Q.  In this email when you said
7  "However, we are in a rush," could you be
8  referring to expediting or hurrying up a board
9  meeting to approve the sublease?
10     A.  Sure.
11     Q.  So you understood that CCMS needed
12 the sublease approval as soon as possible?
13     MR. HARRIS:  Objection to form.
14     A.  It doesn't mean that.  We were in
15 a rush, I was in a rush.  I don't want to go
16 back and forth.  I want to get this board
17 meeting and get a tenant in my building.
18     Q.  Understood, thank you.
19     MS. TURNER:  John, can you pull up
20 Exhibit M, please.
21     THE TECHNICIAN:  Counsel, is that
22 M as in mountain or N as in November?
23     MS. TURNER:  M as in mountain.
24     THE TECHNICIAN:  Thank you.  One
25 moment.

182

1      MS. TURNER:  I haven't heard that
2  one.  I always heard M as in Mary.
3      THE TECHNICIAN:  Exhibit M is on
4  screen.
5      MS. TURNER:  Thank you, John.
6      Q.  Mr. Shamash, you want to take a
7  second to review this, see if you recognize it.
8      (Witness reviewing document.)
9      Q.  Do you recognize it, Mr. Shamash?
10     A.  I do not.
11     Q.  Do you recall any of the events
12 referenced in this email?
13     A.  No.  I also don't know who some of
14 the parties are.
15     Q.  Who do you not recognize?
16     A.  At the top.
17     Q.  At the top of the document?
18     A.  Yeah.  I don't know who aweil is.
19     MS. TURNER:  We can just go back
20 to that clip you had before, John.
21     Q.  Mr. Shamash, did you receive this
22 email?
23     A.  I see an email with my name on it,
24 so I have to imagine so.
25     Q.  Is there a reason you didn't

183

1  produce it in response to your subpoena?
2      A.  There's no reason.
3      Q.  You didn't locate it in your
4  files?
5      A.  I sent all the files that came up
6  in the search.
7      MR. HARRIS:  Counsel, I did not
8  see this email when I reviewed it.
9      Q.  Understood.
10         What did you understand
11 Mr. Conte's email to mean on December 26th,
12 2019?
13     A.  The board will meet on January
14 14th to consider the application and that it's
15 customary that the applicant appear for an
16 interview, meaning applicants always have to go
17 for an interview to get into the building.
18 According to our bylaws, all sublets must be
19 approved, and that he's not sure why anyone
20 would assume otherwise.
21     Q.  Thank you.
22         Did it seem strange at all that
23 the Co-op Board couldn't schedule a meeting
24 until January 14th?
25     A.  No; people are very busy.  And

184

1  you're also talking about the holidays right
2  now, it's December 26th.  You have Christmas,
3  Hanukkah.
4      Q.  But Mr. Conte's responding to an
5  email the day after Christmas.
6      A.  Sure, but he's not the only person
7  there.  He's got to meet the whole board.
8      Q.  Do you have any idea why January
9  14th, 2020 was chosen for the board interview?
10     A.  I have no idea.
11     Q.  Were you asked if you were
12 available on that date?
13     A.  No, I'm here to get a tenant in.
14 I'll make myself available.
15     Q.  And when Mr. Conte says, "It is
16 customary that the applicant appear for an
17 interview at that time," is it required?
18     A.  I'm not familiar with the
19 proprietary lease.
20     MS. TURNER:  Thanks, John.  Can
21 you pull up document 28.
22     THE TECHNICIAN:  Stand by,
23 counsel.
24     (Exhibit HH marked for
25 identification.)

185

1    THE TECHNICIAN:  Document 28 is on
2  screen.  It is marked as Exhibit HH.
3    Q.    Mr. Shamash, do you want to take a
4  second to review this?
5    A.    Um-hum.  Can we see the rest of
6  it.
7        (Witness reviewing document.)
8    Q.    Mr. Shamash, do you recognize this
9  document?
10   A.    I don't.
11   Q.    Do you know who produced it?
12   A.    I don't.
13       MR. HARRIS:  I produced it.
14       MS. TURNER:  Thank you,
15  Mr. Harris.
16       MR. MARGOLIS:  I didn't hear what
17  Etan said.
18       MR. HARRIS:  Counsel, I produced
19  the document.
20       MR. MARGOLIS:  Thank you.
21       MS. TURNER:  John, could you
22  scroll up to the substance of that document.
23  Can we go to the bottom email.  Sorry.  I don't
24  know if it's getting cut off for people.
25       Thank you.

186

1    Q.    Mr. Shamash, do you recognize this
2  email from Mr. King?
3    A.    I don't recognize it.
4    Q.    Do you recall any of the events
5  referenced in the email?
6    A.    Yes, the part above where someone
7  had multiple hospital visits.  I remember that
8  weekend well.
9    Q.    I'm sorry to hear that.
10   A.    Oh, everyone was fine.
11   Q.    Do you recall Mr. King asking for
12  advice for the board meeting on January 14th?
13   A.    I don't.
14   Q.    Mr. King, in this email Mr. King
15  asks you to jump on a phone call to formulate a
16  plan.  Did you speak with him?
17   A.    I don't remember.
18       MS. TURNER:  John, if you could
19  move up to the next email.
20   Q.    Mr. Shamash, do you recall your
21  response on January 3rd, 2020?
22   A.    No, nor do I know who that call-in
23  was with.
24   Q.    And, Mr. Shamash, you're referring
25  to the statement, "Yes, we have a plan and a

187

1  call in to speed up, and will be working on it
2  Monday and Tuesday"?  Is that what you're
3  referring to?
4    A.    Yeah, I don't know whether that's
5  about a call-in to Robert or a call-in with my
6  partner.  I have no idea what I was talking
7  about.
8    Q.    What would you have been working
9  on Monday and Tuesday?
10   A.    I don't know; I was on very little
11  sleep.
12   Q.    You were what, I'm sorry?
13   A.    I was on very little sleep.  It
14  was a bad weekend; it was a very long weekend.
15   Q.    What were you referring to as far
16  as a call-in to speed up?
17   A.    I have no idea.  Maybe a call in
18  to my partner, Saul, to see like -- I don't
19  know.  I have no idea.
20   Q.    Could you have been referring to
21  speeding up a meeting with the board to approve
22  the sublease?
23   A.    Maybe.
24   Q.    At this stage that was the last
25  step and you took action --

188

1    A.    Yes.
2    Q.    -- in getting the sublease
3  approved.
4    A.    Yeah.
5    Q.    Who would you have called to speed
6  up that process?
7    A.    Probably called Kaled, but I don't
8  imagine they would have sped it up for me.
9    Q.    If you needed something from the
10  board, did you typically communicate with Kaled?
11   A.    You would reach out to Kaled.  I
12  don't imagine they would speed it up for me.
13  It's very possible that I just was telling him,
14  yeah, I'd make a call speed it up, knowing that
15  it's set for January 14th.  I don't remember.
16   Q.    You could have just been placating
17  him?
18   A.    Could have been.  I don't
19  remember.
20   Q.    Was there someone at Kaled that
21  you typically spoke with if you needed
22  information or to talk to someone on the board?
23   A.    I know of Peter's email; I reach
24  out to Peter Lehr on everything.
25   Q.    And how long has Peter been with

189

1  Kaled, if you know?
2      A.   I don't know how long he's been
3  with that company for.
4      Q.   How long has he been managing the
5  building?
6      A.   Best part of the last decade.
7      Q.   Thank you.
8           MS. TURNER:  John, I have three
9  more documents that are very similar, so I don't
10 want to spend a ton of time on them, and
11 hopefully we can quickly run through them, but
12 they are documents 16, 17 and then Exhibit L,
13 but we can start with document 16.
14          THE TECHNICIAN:  Stand by.
15          THE WITNESS:  Could I take time
16 for a bathroom break; can I get five minutes?
17          MS. TURNER:  Nancy, could you
18 remind us when the last break was.  I want to
19 give you a break, Mr. Shamash, but I'm also
20 cognizant of Mr. Case and Mr. Margolis' time to
21 question you.
22          COURT REPORTER:  Just give me a
23 second.
24          MR. HARRIS:  If he needs to go to
25 the restroom, he needs to go to the restroom.

190

1  COURT REPORTER:  The last break
2  was at 2:46.  It's now 3:39.
3           MS. TURNER:  Do you want to take
4  five minutes.
5           THE VIDEOGRAPHER:  Going off the
6  record; the time is 15:39.
7           (Recess taken.)
8           THE VIDEOGRAPHER:  We're back on
9  the record.  The time is 15:44.
10 BY MS. TURNER:
11     Q.   Welcome back, Mr. Shamash.  Before
12 you left we were about to look at document 16.
13          (Exhibit II marked for
14 identification.)
15          THE TECHNICIAN:  Document 16 is on
16 screen now.  It is marked as Exhibit II.
17     Q.   Mr. Shamash, do you recognize this
18 document?
19     A.   No.
20     Q.   Do you recall any of the events
21 referenced in the document?
22     A.   Let me read it.
23          (Witness reviewing document.)
24     A.   Done.
25     Q.   Mr. Shamash, the last email we

191

1  looked at was January 3rd.  Do you know if you
2  spoke with Mr. King between January 3rd and this
3  email, January 7th?
4      A.   No.
5      Q.   Mr. Shamash, do you understand
6  that, from this email, that CCMS, their current
7  landlord turned off their elevator at their 31st
8  Street clinic?
9      A.   I see it in the email.
10     Q.   Do you recall anything about CCMS
11 and their situation with their lease at 31st
12 Street?
13     A.   I don't.
14     Q.   You didn't know that the landlord
15 was converting the use of the building and they
16 were forced to find a new sublease and had to
17 find one by December 31st?
18     A.   I don't -- the use hasn't changed
19 still, for the record.
20     Q.   I'm sorry?
21          MR. HARRIS:  Answer the question.
22     A.   I don't.
23     Q.   Did you ever respond to this
24 email, Mr. Shamash?
25     A.   I don't recall.

192

1      Q.   Did you ever advise Mr. King or
2  Mr. Brooks to bring anything with them to the
3  January 14th, 2020 interview?
4      A.   I don't recall.  Generally you
5  don't need to bring anything with you unless
6  it's specifically requested.
7      Q.   Did you give Mr. King or
8  Mr. Brooks any advice for the January 14th, 2020
9  interview?
10     A.   Sure.
11     Q.   What was your advice?
12     A.   Be honest.
13          MR. MARGOLIS:  What did you say,
14 Nigel?  I'm sorry, I didn't hear you.
15          THE WITNESS:  Be honest.
16          MR. MARGOLIS:  Be honest, okay.
17     A.   Was there more advice?  I don't
18 recall.
19     Q.   Did you understand Mr. Brooks was
20 anxious about the January 14th interview?
21     A.   No.  In fact, I have never spoken
22 to Mr. Brooks prior to him at that meeting.
23     Q.   Did you know Mr. Brooks was Black?
24     A.   No.
25          MS. TURNER:  Thank you, John.  Can

193

1  we pull out document 17 real quick.
2        (Exhibit JJ marked for
3  identification.)
4        THE TECHNICIAN:  Document 17 is on
5  screen.  It is marked as Exhibit JJ.
6        MS. TURNER:  Thank you, John.
7     Q.  Mr. Shamash, if you'd like a
8  second to review, let me know when you're ready.
9        (Witness reviewing document.)
10    A.  Okay.
11    Q.  Mr. Shamash, do you recognize this
12 email from Mr. King --
13    A.  No.
14    Q.  -- addressed to you on January
15 8th, 2020?
16    A.  No.
17    Q.  Do you recall any of the events
18 referenced in the email?
19    A.  Do I recall the meeting?  Yes, I
20 recall the meeting.
21    Q.  Understood.
22        Do you recall Mr. King's attempts
23 to get advice from you for the January 14th,
24 2020 interview?
25    A.  No.

194

1     Q.  Do you know who produced this
2  document?
3     A.  No.
4     Q.  I'll represent to you that your
5  attorney produced this in response to your
6  subpoena.
7        Did you respond to Mr. King's
8  January 8th email?
9     A.  I don't know.
10    Q.  If this sublease for CCMS had been
11 approved, would the board have informed
12 Mr. Brooks at the meeting?
13        MR. MARGOLIS:  Objection.
14    A.  I can't speak for the board.
15    Q.  In your experience with past
16 subtenants that have been approved, does the
17 board typically inform the subtenant of the
18 approval at the board meeting?
19    A.  I don't know.
20    Q.  If subtenants aren't informed of
21 their approval at the board meeting, typically
22 how long does it take before they find out if
23 they're approved?
24        MR. CASE:  Objection.
25        MR. HARRIS:  Objection to form.

195

1     You're saying if they are informed of the
2  approval at the board meeting; is that what I
3  heard?
4        MS. TURNER:  I'm sorry.  I said if
5  they are not informed of the decision at the
6  board meeting, how quickly are they informed
7  after the meeting takes place?
8     A.  After a vote.  How long after the
9  vote, I don't know.
10    Q.  Would a vote normally take place
11 at the interview?
12    A.  I don't know.
13    Q.  Have you ever been present for a
14 board vote on a sublease?
15    A.  Not that I recall.
16    Q.  How were your -- Oxford's former
17 subtenants approved?
18    A.  They would go to board meetings
19 and present themselves, much like this one, and
20 then the Board of Directors would decide.  Do
21 they vote in front of them?  No, not typically,
22 but I don't recall.
23    Q.  And would you attend, did you
24 attend those meetings with Oxford's subtenants?
25    A.  I have no memory of doing so, but

196

1     I'm sure I have.
2        MS. TURNER:  I think we're
3  finished with that, John.  Next one is Exhibit
4  L.
5     Q.  Mr. Shamash, please take a moment
6  to review.
7        (Witness reviewing document.)
8     Q.  Mr. Shamash, do you recall this
9  email exchange with Mr. King?
10    A.  I don't.
11    Q.  Do you recall the events
12 referenced in the email exchange?
13    A.  Yes.
14        MS. TURNER:  John, if you could
15 just scroll to the bottom of the email.  Thank
16 you.
17    Q.  Mr. Shamash, Mr. King has now
18 asked you for advice for the January 14th, 2020
19 interview on three separate occasions.  Did you
20 ever respond to him with advice before his
21 email?
22    A.  I don't recall.
23        MS. TURNER:  John, if you can
24 scroll up to the top.
25    Q.  Mr. Shamash, what do you recall

197

1 about your response to Mr. King regarding the
2 January 14th, 2020 interview?
3     **A.    Can you repeat the question?**
4     Q.    I believe I asked you a few
5 questions ago if you recalled anything regarding
6 the events referenced in this email. So now I'm
7 asking what specifically in relation to your
8 response do you recall?
9     **A.    If I recall correctly, I told you**
10 **that I answered that he should be truthful. And**
11 **here, to the best of my knowledge, I thought he**
12 **was being truthful.** As I write, (as read):
13 "I'll be there with you. The attorney who
14 represented you represented a similar use. Just
15 say you're the same thing, low traffic office
16 use and you'll be fine. Just say you're the
17 same as the location on Clinton Avenue and
18 you'll be completely fine."
19         As far as I know, that was him
20 being truthful.
21     Q.    When you say the attorney who
22 represented you represented a very similar use,
23 who are you referring to?
24     **A.    There was a previous tenant who**
25 **was a community outreach person that used to own**

198

1 **one of the lower stores.**
2     Q.    Do you remember what floor that
3 was?
4     **A.    I don't. I believe it was the**
5 **lower floor, like 2, 3 or 4. It was one of the**
6 **lower floors.**
7     Q.    Do you recall when they owned
8 those floors?
9     **A.    Long time ago, like 20 years ago.**
10     Q.    And in this email you're stating
11 that community outreach company is the same as a
12 nonprofit that provides counseling services?
13     **A.    No, they didn't provide counseling**
14 **services. They were an office use. What they**
15 **did was they were a not-for-profit who provided**
16 **community outreach, which is what we figured**
17 **these guys were.**
18     Q.    But you understood that CCMS
19 provided counseling services because it was in
20 the sublease?
21     **A.    As I said, it's in the sublease**
22 **but it was an ancillary use and they were just**
23 **like their location in Clinton Avenue.**
24     Q.    Did CCMS ever explicitly state
25 that counseling was an ancillary use?

199

1     **A.    The broker certainly did, yes.**
2     Q.    Do you have a document that shows
3 Mr. King representing that counseling services
4 were ancillary to office services?
5     **A.    I don't know.**
6     Q.    Again, in this email you've
7 described the use as low traffic office use.
8 Knowing what you know now about CCMS's services,
9 do you think that's consistent with low traffic
10 office use?
11         MR. HARRIS: Objection to form.
12 We don't know what he knows now about CCMS's
13 services. That's an assumption from counsel.
14         MS. TURNER: Based on what -- go
15 ahead.
16         MR. HARRIS: I'm saying, do you
17 want to rephrase it or (indiscernible).
18         MS. TURNER: I'll rephrase.
19     Q.    Based on what you learned at the
20 January 14th, 2020 interview, do you think that
21 CCMS's services are consistent with low traffic
22 office use?
23     **A.    Based on what he said at the**
24 **interview, nothing was low traffic whatsoever.**
25     Q.    Is 50 patients a day low traffic?

200

1     **A.    I believe so, yes. Remember, this**
2 **is 7500 square feet. We counted 14 rooms. 14**
3 **rooms would equate to three people in a room**
4 **over eight hours, approximately every day.**
5 **That's low traffic.**
6         MS. TURNER: John, if we could now
7 pull up the document that begins with COOP and
8 ends with 322.
9         THE TECHNICIAN: Stand by,
10 counsel.
11         (Exhibit KK marked for
12 identification.)
13         THE TECHNICIAN: COOP 322 is on
14 the screen now. It is Exhibit KK.
15     Q.    Mr. Shamash, if you can just
16 please take a second to review and let me know
17 when you're ready.
18         (Witness reviewing document.)
19     Q.    Are you ready?
20     **A.    Yeah.**
21     Q.    Mr. Shamash, do you recognize this
22 document?
23     **A.    I do not.**
24     Q.    Have you ever seen it before?
25     **A.    I have not.**

201

1    Q.    You know for sure that you've
2  never seen it before?
3    A.    I've never seen that before.  As
4  far as I know, I haven't seen it before.
5    Q.    I'll represent to you that this
6  document was produced by the defendants, the
7  co-op.
8         Having reviewed the document,
9  Mr. Shamash, what do you understand it to be?
10   A.    Some kind of paraphrase of the
11 meeting.
12   Q.    Would these possibly be the
13 meeting minutes?
14   A.    I don't know what meeting minutes
15 look like.  I don't see anything that says the
16 word "minutes" on there.
17   Q.    Do you know whether co-op boards
18 record minutes or descriptions of meetings they
19 hold?
20   A.    I'm not familiar with what minutes
21 look like.
22   Q.    Do you know if co-op boards record
23 descriptions of meetings they hold?
24   A.    I would say this is a paraphrase
25 of the meeting.  So if that refers to what

202

1  minutes are, then these are minutes.
2    Q.    Mr. Shamash, if you can read
3  the -- first, let me back up.
4         Do you recognize any of the
5  individuals that this email is addressed to or
6  prepared by?
7    A.    Can you zoom in please.
8         F. Michael Conte, it's from him.
9    Q.    And you recognize that name?
10   A.    I do know who Michael is, yes.
11         Susan Rubin I don't know.  Marc is
12 at Hand Held Films, as we've gone over before.
13 He's a lower floor tenant.  And Peter Lehr is
14 Peter Lehr.
15   Q.    Is it possible Susan Rubin works
16 for Kaled as well?
17   A.    Yes.
18   Q.    And just for the record, Mr. Conte
19 is a board member, or at the time was a board
20 member for the co-op?
21   A.    I don't know who was on the board
22 but he was at the meeting so I imagine he was a
23 board member, yes.  Or had a position on the
24 board.
25   Q.    Do you know why Mr. Paturet, Marc,

203

1  was cc'd on this email?
2    A.    No.
3    Q.    Was Marc present at the board
4  interview?
5    A.    I don't recall.
6         MR. CASE:  Excuse me, can you
7  repeat that, the answer, please.
8         THE WITNESS:  I don't recall.
9    Q.    You don't recall exactly who was
10 at the January 14th, 2020 interview?
11   A.    I don't recall.
12   Q.    Okay.  Well let's read the second
13 full sentence, starting with "In attendance
14 were."
15   A.    (As read):  "In attendance were
16 Emory Brooks (prospective tenant), me, Nigel
17 Shamash (owner of floors 7 and 8, realtor and
18 landlord for prospective tenant), Joey Grill
19 (owner of the 12 floor), Eric Doctormann (owner
20 of the 12th floor), Maxime Touton and F. Michael
21 Conte."
22   Q.    And just to clarify, Eric
23 Doctormann is the owner of the 11th floor, based
24 on this.
25   A.    Sure.

204

1    Q.    Thank you.
2         So Marc is not referenced as being
3  in attendance?
4    A.    Looks like that.
5    Q.    Do you have any reason to believe
6  that Marc was in attendance at the January 14th,
7  2020 board interview?
8    A.    No, I don't remember him being
9  there.
10   Q.    Moving on to the third paragraph,
11 if you could start with the second sentence,
12 "Mr. Brooks."
13   A.    "The meeting convened" -- "Mr.
14 Brooks."
15   Q.    Yes.
16   A.    "Mr. Brooks confirmed that there
17 would be 12 therapists on staff that would see
18 about 50 patients a day, mostly children who
19 would be accompanied by their caregiver.  He
20 also mentioned that this would only be one
21 aspect of the patients viewed."
22   Q.    Mr. Shamash, is 50 patients a day
23 consistent with the sublease application that
24 CCMS completed?
25   A.    50 multiplied by 12 is 600.

205

1    Q.    I'm sorry, where is your math
2  coming from?
3    A.    There would be 12 therapists on
4  staff and they'd see about 50 patients a day.
5  12 multiplied by 50 is 600.
6    Q.    Mr. Shamash, is it possible that
7  consistent with the sublease application there
8  would be 50 patients total per day, not
9  multiplied by 12 therapists?
10    A.    That's an ambiguous sentence.  I
11  read that as 12 multiplied by 50.
12    Q.    Mr. Shamash, is it physically
13  possible for 12 therapists to each see 50
14  patients per day?
15    A.    I don't know; I've never been to a
16  therapy office.
17    Q.    Do you think that doctors see 50
18  patients per day?
19         MR. HARRIS:  Objection to form.
20  Are these doctors, are these psychologists?
21    A.    Are these group meetings?
22    Q.    Excuse me?
23         MR. HARRIS:  You want to rephrase
24  or have him answer?
25         MS. TURNER:  I'm sorry, I didn't

206

1  hear Mr. Shamash's response.
2         MR. HARRIS:  You can answer.
3    A.    Are these group meetings?
4    Q.    Mr. Shamash, is it possible that
5  Mr. Brooks meant 12 therapists would see a total
6  of 50 patients per day, consistent with his
7  sublease application?
8    A.    It's possible.
9    Q.    Did Mr. Brooks ever state that
10  more than 50 patients per day --
11    A.    Yes.
12    Q.    -- would go to the premise?
13    A.    My memory is that the traffic was
14  extended in that meeting.
15    Q.    Mr. Shamash, how is it possible
16  that your memory is different than the meeting
17  minutes?
18         MR. CASE:  Object to form.
19    Q.    Mr. Shamash, if you could read the
20  next paragraph starting with "Various
21  questions."
22    A.    (As read):  "Various questions
23  were presented to those in attendance.
24  Mr. Brooks went on to explain that the building
25  would be used to see patients on Saturday as

207

1  well as Monday through Friday.  Mr. Brooks
2  confirmed that he does not employ security" --
3  I'm sorry, "he does employ security guards.
4  Mr. Brooks went on to explain that some of his
5  clients are sent for anger management by the
6  criminal court, as well as an assortment of
7  other behavioral issues."
8    Q.    Mr. Shamash, is that consistent
9  with your recollection of what was discussed at
10  the January 14th, 2020 interview?
11    A.    Yes.
12    Q.    So, Mr. Shamash, Mr. Brooks
13  represented that CCMS would see patients on
14  Monday through Friday, as well as Saturdays,
15  correct?
16    A.    To the best of my knowledge, yes.
17    Q.    And this was consistent with what
18  CCMS represented in its sublease application?
19    A.    I guess.  I guess.  I'd have to
20  see the sublease application again, but I guess.
21    Q.    We can pull it up.
22    A.    Sure.
23         THE TECHNICIAN:  Which exhibit was
24  that, counsel?
25         MS. TURNER:  I'm looking.  Hold

208

1  on.
2         Exhibit G.  I believe it's the
3  third page.
4    Q.    Mr. Shamash, do you see next to
5  6D, days of week, CCMS represented they would be
6  providing services Monday through Saturday?
7    A.    Yes.
8    Q.    And while we're on this page,
9  Mr. Shamash, do you see that in response to 6A,
10  how many employees daily, CCMS represented 12
11  employees?
12    A.    Yes.
13    Q.    And next to 6B, how many customers
14  daily, CCMS represented 50 customers daily,
15  correct?
16    A.    Correct.
17    Q.    And this is consistent with the,
18  we'll call it meeting description prepared by
19  Mr. Conte that we were just looking at, correct?
20    A.    Apart from the amount of
21  customers, as I said, the way that --
22    Q.    I asked if this sublease
23  application was consistent with the meeting
24  description that Mr. Conte prepared that --
25    A.    To which I responded that A, C and

**209**

1 D were consistent.
2      Q.   And you disagree that the 12
3 therapists refers to the 12 employees in this
4 sublease application and that the 50 customers
5 daily refers to the 50 customers in the
6 sublease?
7           MR. HARRIS:  Objection to form.
8 You can answer.
9      **A.   My opinion was at the meeting**
10 **there was mentions of group therapy, to the best**
11 **of my recollection.**
12      Q.   Your opinion was that there were
13 mentions of group therapy, or you actually heard
14 that there was group therapy?
15      **A.   Yes.  I seem to remember there was**
16 **a mention of group therapy.**
17           MS. TURNER:  If we could go back
18 to Exhibit KK.  Thank you, John.
19      Q.   Mr. Shamash, if you could read the
20 last two paragraphs beginning with "Those in
21 attendance."
22      **A.   "Those in attendance voted**
23 **unanimously" --**
24      Q.   I'm sorry, I meant the paragraph
25 above.

**210**

1      **A.   (As read):  "Those in attendance**
2 **deliberated and reviewed and reiterated that the**
3 **firm was not simply operating as an**
4 **administrative office as we were told, but as an**
5 **out-patient clinic as described in their**
6 application for tenancy (attached).  Those in
7 attendance voted unanimously not to approve the
8 application.  (Nigel Shamash voted not to
9 approve the application as well)."
10      Q.   Mr. Shamash, what did Mr. Conte
11 mean that you voted not to approve the
12 application?
13      **A.   I don't know.  I'm not a board**
14 **member.**
15      Q.   Did, Mr. Shamash, at the January
16 14th, 2020 interview, did you express any
17 concern over approving the sublease?
18      **A.   I'm not a board member.**
19      Q.   Did you express any concern over
20 approving the sublease?
21      **A.   No.  In fact, I tried to get it**
22 **through.  I offered, I said to Mr. Conte and**
23 **company, let's try it for a year, for a year**
24 **and, if I remember right, Mr. Brooks said no to**
25 **that.**

**211**

1      Q.   Why would Mr. Conte represent that
2 you voted not to approve the application as
3 well?
4      **A.   I don't know.**
5      Q.   So you didn't put forth any vote
6 on the application or express --
7      **A.   I'm not a board member.**
8      Q.   -- any concerns.  I didn't ask you
9 if you were a board member.
10      **A.   Therefore I can't vote.**
11      Q.   In the bylaws for the building are
12 there some actions that shareholders can vote
13 on?
14      **A.   I don't know.**
15      Q.   Mr. Shamash, why did you attend
16 the interview instead of Mr. Tawil?
17      **A.   Mr. Tawil is not of the greatest**
18 **physical health, so I have to cover anything**
19 **like that.**
20      Q.   Would Mr. Tawil have a vote?
21      **A.   No.  He's not on the board.**
22      Q.   Going back to the paragraph,
23 "Those in attendance deliberated and reviewed
24 and reiterated that this firm was not simply
25 operating as an administrative office as we were

**212**

1 told."  Who told the board that CCMS was
2 operating as an administrative office?
3      **A.   I don't know.  We've both seen the**
4 **email that was written where we introduced them**
5 **as an administrative office with ancillary**
6 **counseling uses.  You've seen that email.  You**
7 **showed it as an exhibit and that certainly said**
8 **it as an introduction.  So, I would say it was**
9 **there.  Who told me that?  The broker.**
10      Q.   Where in writing did the broker
11 represent there was ancillary counseling
12 services?
13      **A.   Don't know.**
14      Q.   And do you now understand that
15 consistent with the sublease use, CCMS was
16 operating a clinic, intending to operate a
17 clinic at the premises?
18           MR. HARRIS:  Objection to form.
19 You can answer.
20      **A.   I understand now that what they**
21 **were looking to do was inconsistent with what**
22 **was presented to us prior to the meeting, yes.**
23      Q.   But what was presented in the
24 sublease application and sublease was consistent
25 with providing counseling services, or a clinic?

213

1  A.  No, I wasn't present for that.
2  You're asking me personally.  What I knew was
3  that it was ancillary office space akin to --
4  ancillary counseling space akin to their space
5  in Brooklyn.
6  Q.  Was anything else -- and I think,
7  John, you can put this document down, but we're
8  going to still talk about the board interview.
9  Was there anything else memorable
10 that was discussed at the January 14th, 2020
11 interview?
12  MR. MARGOLIS:  Objection.
13  A.  The entire thing was repeated by
14 me to the broker on a phone call.  That is the
15 best record I have as to how that went down.
16  Q.  Well, we're making a record here
17 today, while you're under oath.  So while you're
18 under oath, was there anything else important
19 discussed at the January 14th, 2020 interview?
20  A.  No, that was the nature of the
21 meeting.
22  MR. HARRIS:  Objection to form.
23 When you say important, do you say anything that
24 was talked about or anything important or
25 anything that he remembers?

214

1  Q.  Is there anything that you recall
2  that was discussed at the January 14th, 2020
3  interview that you recall, sitting here today
4  under oath?
5  A.  Can we like be a little bit more
6  exact?  The nature of the meeting was, hey, how
7  are you; it's going to be narcotics meetings.
8  Fast forward to really uncomfortable meeting.
9  That was the nature of the meeting that I
10 remember.
11  Q.  In the meeting description
12 prepared by Mr. Conte, was there any reference
13 to narcotics or substance abuse counseling?
14  A.  In the meeting?
15  Q.  In the description we were just
16 looking at.  We can pull it back up.
17  A.  Go ahead, pull it up.
18  MS. TURNER:  John, can you pull up
19 Exhibit KK.
20  THE TECHNICIAN:  Stand by,
21 counsel.  Exhibit KK on screen.
22  A.  Near the top.
23  Q.  Mr. Shamash, can you point me to
24 where Mr. Conte's meeting description references
25 narcotics or substance abuse?

215

1  Q.  Can you go down a little bit.
2  As far as I can tell there was no
3  mention of narcotics in there, but there was in
4  the meeting.
5  Q.  Do you have any explanation for
6  why Mr. Conte's meeting description varies so
7  differently from your recollection of the
8  January 14th, 2020 interview?
9  A.  No, I don't.
10  MR. HARRIS:  Objection to form.
11  MR. CASE:  Object to form.
12  Q.  Was there anything else you recall
13 that was discussed at the January 14th, 2020
14 interview?
15  A.  No.
16  Q.  Mr. Shamash, do you recall a
17 discussion at the January 14, 2020 interview of
18 an incident that occurred in Monsey, New York?
19  A.  No.
20  Q.  There wasn't discussion at the
21 January 14th, 2020 interview of an attack by a
22 Black man on people of Jewish faith that
23 occurred in Monsey, New York?
24  A.  I have no memory of anything like
25 that.

216

1  Q.  None of the board members or other
2  attendees to the January 14th, 2020 interview
3  discussed this attack at the interview?
4  A.  I have no memory of this.
5  Q.  Did any of the board members
6  express any concerns about the type of clients
7  that would be coming to the premises to see
8  CCMS?
9  A.  Yes, the second narcotics was
10 mentioned.  In fact, Mr. Brooks spoke quite a
11 while.  I remember him referencing that his
12 customers were mostly children and mostly Asian.
13 We didn't ask anything about that.  That was all
14 Mr. Brooks talking.  It was a very uncomfortable
15 meeting.
16  Q.  Uncomfortable because you lied to
17 the board about the use?
18  MR. HARRIS:  Objection to form.
19 Don't, don't.  Objection to form.  You can
20 answer.
21  A.  I didn't lie.
22  Q.  Mr. Shamash, did Mr. Grill or any
23 of the other board members express concern about
24 clients of CCMS using the elevators with
25 Mr. Grill's models?

217

1   A.   I don't recall.
2   Q.   Just for the record, was
3  Mr. Brooks the only Black person in the January
4  14th, 2020 interview?
5   A.   I don't recall.
6   Q.   You don't remember what people
7  looked like?
8   A.   No, I don't remember the makeup of
9  everyone who was there.  As far as I know, he
10  may have been the only person of African
11  American descent, but I'm not sure.  But you're
12  saying Black; I don't know.  I don't think so.
13  I think he was the only one.
14   Q.   Did the subject of Mr. Brooks or
15  anyone else's race come up at the interview?
16  Race or ethnicity?
17   A.   No.  The only mention of race or
18  ethnicity was Mr. Brooks mentioning the majority
19  of his customers were Asian.  It was not asked
20  of him; he just stated it.
21   Q.   But you understood that CCMS's
22  patients come from diverse backgrounds?
23   A.   I had no understanding at all,
24  but -- no.
25   Q.   Did you walk Mr. Brooks out once

218

1  the interview was finished?
2   A.   No.
3   Q.   Why not?
4   A.   Because it was the most
5  humiliating, uncomfortable meeting of my career
6  and I just wanted it to end.
7   Q.   Why was it humiliating?
8   A.   Because at the very introduction
9  he said he was a narcotics use, and then I just
10  had to sit there and everyone had to go through
11  a meeting with this individual.  It was very
12  uncomfortable.
13   Q.   Did you try to clarify with
14  Mr. Brooks that substance abuse counseling would
15  not take place at the premises per the sublease?
16   A.   It's pretty hard to bring that
17  back, especially as he was very verbal, and it's
18  not my place.
19   Q.   But I thought you wanted to get
20  the sublease approved?
21   A.   Absolutely.  Hence why I said
22  let's try to get this for a year on a trial
23  basis, for which he objected to.  But it's not
24  my place to correct him on his views or his
25  running of his business.  That's who he is.

219

1  I've never spoken to him before the meeting,
2  never met him before the meeting, and I didn't
3  train him per se on this meeting.
4          I understood him to be an office
5  use with an ancillary counseling space, and the
6  meeting became a office use -- a narcotics
7  counseling space with ancillary office.  If I
8  remember right from the conversation, we went
9  from the majority of the space being offices to
10  only two offices and the rest of the space being
11  counseling.  That's in the recording.  It was
12  very uncomfortable.
13   Q.   After Mr. Brooks left the
14  interview, did you stay back and discuss the
15  sublease with the board members?
16   A.   I have no memory of that
17  whatsoever.  I remember it ending, him leaving,
18  me waiting for him to be out of my sight, and
19  then me leaving immediately after.
20          (Reporter clarification.)
21   Q.   But you don't have any memory of
22  having conversations with the board about
23  approving the sublease or rejecting the
24  sublease?
25   A.   No.

220

1   Q.   But you previously stated this was
2  the most humiliating meeting of your entire life
3  that you remember so vividly, but you don't
4  remember those conversations?
5   A.   Well, it's a pretty foregone
6  conclusion at --
7          MR. HARRIS:  Objection to form.
8  You can answer.
9   A.   It's a foregone conclusion at that
10  point.  It was a horrible meeting; it went
11  terribly.
12          MS. TURNER:  John, if you can pull
13  up the document beginning with CCMS, ending in
14  275.
15          THE TECHNICIAN:  Stand by,
16  counsel.
17          (Exhibit LL marked for
18  identification.)
19          THE TECHNICIAN:  That document is
20  on screen now.  It is marked as Exhibit LL.
21          MS. TURNER:  Thank you.
22   Q.   Mr. Shamash, please take a moment
23  to review this and then let me know when you're
24  ready to discuss.
25          (Witness reviewing document.)

221

1      THE WITNESS:  Can I ask a
2  question?
3      MR. HARRIS:  You can't ask
4  questions.  She asks the questions.
5      **A.   Okay.**
6      Q.   Mr. Shamash, do you recognize this
7  email exchange?
8      **A.   I do not.  I'm not on it.**
9      Q.   Do you recall any of the events
10 referenced in this email exchange?
11     **A.   I do not.**
12     Q.   Is this the first time you're
13 seeing this email exchange?
14     **A.   It is.**
15     Q.   Do you know why Mr. Tawil would
16 have told Mr. King "Your tenant's rep was an
17 idiot"?
18     **A.   I don't.**
19     Q.   Does he often use that type of
20 language, Mr. Tawil?
21     **A.   Yes.  He's a colorful individual.**
22     Q.   Is it professional to refer to
23 potential tenants as idiots?
24     MR. MARGOLIS:  Objection.
25     MR. HARRIS:  Objection.  You can

222

1  answer.
2      **A.   I think we've qualified that**
3  **Saul's emails are always very colorful.**
4      Q.   Would you have referred to
5  Mr. Brooks as an idiot?
6      MR. HARRIS:  Objection to form.
7  You can answer.
8      **A.   I don't think he was an idiot.**
9      Q.   Well, what do you think of
10 Mr. Brooks?
11     **A.   I think that he presented himself**
12 **in an honest manner to the board, but that was**
13 **not what was presented to us as what the use**
14 **was.**
15     Q.   And who's the "us" you're
16 referring to?
17     **A.   You know what, the "us" is me,**
18 **okay.  What he presented to the Board was not**
19 **presented to me as to what the use was.**
20     Q.   But it was consistent with what he
21 presented to Oxford, Kaled and the Board?
22     MR. HARRIS:  Objection to form.
23 That's not --
24     MR. MARGOLIS:  Objection.
25     MR. HARRIS:  That's not accurate

223

1  at all.
2      **A.   That's inaccurate, correct.  It's**
3  **inaccurate.**
4      MR. MARGOLIS:  Tara, you might
5  want to rephrase that.
6      MS. TURNER:  Thanks, Barry.
7      Q.   Was what CCMS represented to
8  Oxford in the sublease, that Oxford agreed to,
9  in the sublease application that was submitted
10 to Kaled, consistent with what was represented
11 to the Board on January 14th, 2020?
12     MR. HARRIS:  Objection to form.
13 What's in the sublease application and what's in
14 the use for the lease are different.  They're
15 different uses in there, they conflict with each
16 other.  So which one are you referring to?  Just
17 referring to that, because you're putting it all
18 into one...
19     MS. TURNER:  You're testifying for
20 the client.
21     Q.   Mr. Shamash, can you just answer
22 the question?  Nancy can read it back if you
23 need her to.
24     MR. HARRIS:  Read it back.  I'm
25 objecting to form.

224

1      (The following question was read:
2  "Was what CCMS represented to Oxford in the
3  sublease, that Oxford agreed to, in the sublease
4  application that was submitted to Kaled,
5  consistent with what was represented to the
6  Board on January 14th, 2020?")
7      **A.   Are you referencing board, the --**
8      Q.   We'll take them one at a time.
9  We'll take them one at a time.
10     **A.   Okay.**
11     Q.   Was what CCMS agreed to, CCMS and
12 Oxford agreed to in the sublease, the use for
13 the premises, consistent with what was
14 represented to the board on January 14th, 2020?
15     **A.   No.**
16     Q.   And what's your basis for that
17 response?
18     **A.   Well, he immediately went into**
19 **narcotics counseling.**
20     Q.   And is that reflected in the
21 meeting description that Mr. Conte prepared?
22     **A.   I guess not.**
23     Q.   Did Mr. Conte have any reason to
24 leave that out of the meeting description?
25     MR. HARRIS:  Objection to form.

225

1     MR. CASE:  Objection.
2     **A.   I can't speak for him.**
3     Q.    Was what CCMS represented in its
4  sublease application consistent with what
5  Mr. Brooks represented at the January 14, 2020
6  interview?
7     **A.   No.**
8     Q.    How was it inconsistent?
9     **A.   He mentioned narcotics counseling**
10  **the moment that meeting started.**
11    Q.    Was it consistent based on the
12  number of employees, the number of daily
13  patients and the type of counseling that was
14  going to be conducted?
15    **A.   I don't believe so, no.**
16    Q.    And the only thing you believe
17  that was inconsistent was you claim he
18  referenced narcotics or substance abuse
19  counseling?
20    MR. CASE:  Object to form.
21  Misstates his testimony.
22    **A.   No, it's not the only --**
23    MR. HARRIS:  Did you want to
24  rephrase or do you want him to answer the
25  question?

226

1     Q.    How was Mr. Brooks' representation
2  of the January 14th, 2020 interview different
3  from what he represented in the sublease
4  application?
5     **A.   Narcotics use, traffic,**
6  **ancillary --**
7     Q.    How is the traffic different?
8     **A.   In my opinion he was saying a lot**
9  **more than 50 people.  And finally, ancillary**
10  **versus office, very much different.**
11    Q.    Understood.
12    MS. TURNER:  John, could we pull
13  up a document beginning in CCMS, ending in 020.
14    THE TECHNICIAN:  Stand by,
15  counsel.
16    (Exhibit MM marked for
17  identification.)
18    THE TECHNICIAN:  That document is
19  on screen now.  It is marked as Exhibit MM.
20    Q.    Mr. Shamash, do you want to take a
21  second to review it and let me know when you're
22  ready.
23    (Witness reviewing document.)
24    **A.   Yes.**
25    Q.    Do you recognize this email?

227

1     **A.   No.**
2     Q.    I'll represent to you that your
3  attorney -- actually, hold on.  Sorry, I'm
4  looking at the wrong document.  One moment.
5     MS. TURNER:  Could we pull up
6  document 10, please.
7     THE TECHNICIAN:  Stand by,
8  counsel.
9     MS. TURNER:  Sorry about that
10  everyone.
11    (Exhibit NN marked for
12  identification.)
13    THE TECHNICIAN:  Document 10 is on
14  screen now, marked as Exhibit NN.
15    Q.    Mr. Shamash, could you take a
16  second to review.  Let me know when you're ready
17  to discuss.
18    MR. HARRIS:  You'll have to zoom
19  in a little more, I'm sorry.
20    (Witness reviewing document.)
21    **A.   You're going to have to zoom out a**
22  **little bit, I can't read.**
23    MR. HARRIS:  Can you move to the
24  right, actually?  Is that possible?
25    (Witness reviewing document.)

228

1     Q.    Mr. Shamash, do you recognize
2  these documents?
3     **A.   No.  Nor do I know who Kenneth**
4  **Friedman is.  I see at the bottom it says**
5  **attorneys for CCMS.  I have no memory of that.**
6     Q.    I'll represent to you that your
7  attorney produced them in response to your
8  subpoena.
9     If we can go to page, the first
10  page, the bottom half of the first page.
11  Actually, I'm sorry, John, can we go to the
12  fourth page in the middle.
13    THE TECHNICIAN:  One moment,
14  counsel.
15    MS. TURNER:  Thank you.
16    Q.    I'm sorry, Mr. Shamash, did you
17  say that you don't recognize these documents at
18  all?
19    **A.   No.**
20    Q.    Having read them, do you have any
21  recollection of the events they're referring to?
22    **A.   No.  That's legalese stuff between**
23  **lawyers.  I just leave it to them.**
24    Q.    Okay.  Following the January 14,
25  2020 interview, did you have any contact with

---

229

1  Mr. Brooks or anyone else at CCMS?
2      A.    No.
3      Q.    Did you have any, after the
4  January 14th, 2020 interview in your
5  subsequently recorded call that you've referred
6  to many times, did you have any additional
7  contact with Mr. Bob King?
8      A.    Not that I remember.
9      Q.    If you could read -- actually, in
10 this letter which you produced back to us, was
11 received by your attorney, and it states, "The
12 documentary record here makes clear, however,
13 that CCMS did not intend to and would not
14 provide substance abuse counseling at the
15 premises.  The occupancy provision of the
16 sublease (copy attached, in pertinent part)
17 expressly excluded substance abuse counseling.
18 Likewise, in CCMS's administrative application
19 to the New York State Office of Mental Health to
20 license new space at the premises (copy
21 attached, in pertinent part), the description of
22 the program CCMS would operate at the premises
23 does not include substance abuse treatment."
24         Do you understand what that means,
25 Mr. Shamash?

230

1      A.    No.
2      Q.    Did your attorney inform you that
3  CCMS had sent a letter explaining that substance
4  abuse counseling was not being provided at the
5  premises?
6          MR. HARRIS:  Objection.  Don't
7  answer.  It's attorney-client privilege.
8      Q.    Did you know that CCMS had
9  represented, after the January 14th, 2020
10 interview, that it would not conduct substance
11 abuse counseling at the premises?
12     A.    I don't recall.
13     Q.    Can we go back up to page 1 that
14 we were looking at before, the bottom of page 1.
15         Mr. Shamash, can you let me know
16 which email addresses you recognize in the
17 address portion of this email.
18     A.    I recognize my email, ns@5cre.  I
19 recognize Robert King and Saul.  The cameras --
20 I can't see what's to the right of Saul because
21 of the system.  You have to zoom out.  There you
22 go.
23         So, nothing to the right of Saul.
24 I recognize Emory Brooks's email.  I don't know
25 who DLee is.  I imagine she's one of the

231

1      attorneys.  As mentioned, I don't know who
2      Kenneth Friedman is.  I think he's one of the
3      attorneys.  And Stacy Simmons also I imagine is
4      one of the attorneys.  And of course I recognize
5      Etan's email.  He's my attorney.
6          Q.    And you were cc'd on Etan's
7      response to this letter?
8          A.    Sure, yeah.
9          Q.    And in the body of the email can
10     you please read for me what Etan wrote starting
11     with "The issue we have."
12         A.    "The issue we have is that CCMS's
13     representative expressly stated that during a
14     nearly hour-long board meeting that it would be
15     conducting substance abuse counseling on the
16     premises.  Your letter, although identifying the
17     issue, does not deny this fact."
18         Q.    And is it -- I'm sorry?
19         A.    Okay.
20         Q.    So, is it your position that the
21     sublease was rejected because Mr. Brooks
22     insisted on substance abuse counseling?
23         A.    I'm not on the board.
24             MR. HARRIS:  Objection to form.
25     You can answer.

232

1      A.    I'm not on the board.  I don't
2  know why it was refused.
3      Q.    But in your opinion, one of the
4  issues was that --
5      A.    As --
6          MR. HARRIS:  Let her finish the
7  question, Nigel.
8          Reask the question, please.
9      Q.    In your opinion one of the issues
10 and one of the reasons CCMS's sublease may have
11 been rejected was because Mr. Brooks insisted on
12 substance abuse counseling?
13     A.    Yes.
14     Q.    And do you now know that
15 Mr. Brooks legally could not have performed
16 substance abuse counseling at the premises?
17         MR. CASE:  Object to form.
18     A.    Yes.  I know because of you
19 telling me that.
20         MR. HARRIS:  Objection to form.
21     Q.    At the time your attorney received
22 this letter and you were cc'd on this email, did
23 you attempt to reach out to Mr. King or
24 Mr. Brooks?
25     A.    No.

233

1    Q.    Why not?
2    A.    It was the most uncomfortable,
3  humiliating meeting of my life and I wanted to
4  put it behind me.
5    Q.    You just wanted to wipe your hands
6  of it?
7         MR. HARRIS:  Objection to form.
8         MR. CASE:  Object to form.
9    A.    As opposed to what?
10   Q.    Well, Mr. Shamash, you spent a lot
11 of time talking about Mr. Tawil's desire to get
12 the sublease approved, Mr. King's desire to get
13 the sublease approved, your desire to get the
14 sublease approved; and then all of a sudden we
15 have the board meeting and the sublease is
16 rejected and you have no desire to...
17   A.    I always have the desire to have
18 tenants in my building, but you're not going to
19 get someone approved if they're a narcotics use
20 inside of my office building.
21   Q.    But in this letter from Mr. Brooks
22 and CCMS's attorney, they're representing that
23 there was no possible way they could perform
24 substance abuse counseling at the premises and
25 that this had been agreed upon and was in the

234

1  sublease.
2    A.    Once again, I'm in the board --
3  I'm not the board, rather, so I can't speak as
4  to the reason why the board, exclusive reason as
5  to why the board has rejected.  This is one of
6  the reasons why, but I do not believe we were in
7  a position to request another meeting.
8    Q.    Did the board give you any reasons
9  for why it rejected the sublease?
10   A.    I don't recall.
11   Q.    Mr. Shamash, I'm really circling
12 up here.
13         After CCMS's sublease was denied,
14 did you try to re-rent the premises?
15   A.    Of course.
16   Q.    Since January 2020, how many
17 prospective tenants have viewed the space, the
18 premises?
19   A.    I have no idea.
20   Q.    Can you put an estimate?
21   A.    No.  As mentioned to you
22 previously, you get emails from a broker to ask
23 if it's still available, and you tell them to go
24 straight to the building.  I have no
25 interactions as to how many times it's been

235

1  viewed.  No idea.
2    Q.    Have you, in connection with the
3  premises, since January 2020, have you taken any
4  next steps with a prospective tenant, exchanged
5  a term sheet, prepared a sublease or anything?
6    A.    I've not received a term sheet on
7  the premises.
8    Q.    Understood.
9         While Oxford was negotiating the
10 sublease with CCMS, did Oxford have any other
11 prospective tenants interested in the premises?
12   A.    Not that I know of.
13   Q.    In your opinion as a former broker
14 and someone who has their broker license, why
15 are the premises still empty?
16   A.    I think office space has a long
17 way to go.  50,000 square feet of offices is
18 very hard to rent.  The pandemic took a lot of
19 that out, a lot of that product out.  There's
20 just not many offices of that size.
21   Q.    I've got a few quick documents.
22         MS. TURNER:  John, if you can pull
23 up document 18.
24         THE TECHNICIAN:  Stand by,
25 counsel.

236

1         (Exhibit OO marked for
2  identification.)
3         THE TECHNICIAN:  Document 18 is on
4  screen now.  It is marked as Exhibit OO.
5    Q.    Mr. Shamash, please take a second
6  to review and let me know when you're ready.
7         (Witness reviewing document.)
8    Q.    Mr. Shamash, do you recognize this
9  email?
10   A.    No.
11   Q.    Are you cc'd on it or is it
12 addressed to you?
13   A.    It's addressed to Peter, but I'm
14 in the "to" line along with Saul.
15   Q.    And who drafted the email?
16   A.    Etan Harris.
17   Q.    What's the date of the email?
18   A.    Wednesday, the 12th of February
19 2020.
20   Q.    Do you recall your attorney
21 requesting a copy of the board minutes --
22   A.    No.
23   Q.    -- for the January 14, 2020
24 interview?
25   A.    No.

237

1  Q.  Why would your attorney have
2  requested a copy of the board minutes on
3  February 12th, 2020?
4       MR. HARRIS:  Objection to form.
5  **A.  You have to speak to him about**
6  **that.**
7  Q.  Did you direct him to request a
8  copy of the board minutes?
9       MR. HARRIS:  Objection.
10      MR. CASE:  Object to form.
11      MR. HARRIS:  Privileged.  Don't
12  answer.
13      MS. TURNER:  I'm sorry, I didn't
14  hear what you said, Etan.
15      MR. HARRIS:  I'm directing him not
16  to answer.  That's attorney-client privilege.
17      MS. TURNER:  Etan, you produced
18  this document.
19      MR. HARRIS:  I understand I
20  produced the document.  You're asking if he
21  directed me to do this, and I'm saying that's
22  attorney-client privilege.  You're asking for
23  our conversations outside of this document.
24  He's not going to answer it.
25      MS. TURNER:  Okay.

238

1  Q.  Mr. Shamash, do you know if your
2  attorney received a copy of the board minutes?
3  **A.  I don't know.**
4  Q.  And is it still your testimony
5  that you've never seen a copy of the board
6  minutes until today?
7  **A.  Yes.**
8  Q.  Do you know if Peter Lehr
9  responded to your attorney's email?
10 **A.  I do not.**
11      MS. TURNER:  John, can we move on
12  to document 27.
13      THE TECHNICIAN:  Stand by,
14  counsel.
15      (Exhibit PP marked for
16  identification.)
17      THE TECHNICIAN:  Document 27 is on
18  screen now.  It is marked as Exhibit PP.
19  Q.  Mr. Shamash, can you take a second
20  to review this?
21 **A.  Um-hum.**
22 Q.  Let me know when you're ready.
23      MR. HARRIS:  You can scroll down.
24      (Witness reviewing document.)
25 Q.  Do you recognize this email?

239

1  **A.  No.**
2  Q.  Do you recall any of the events
3  referenced in the email?
4  **A.  No.**
5  Q.  Do you see that -- do you know who
6  Jacqueline Mengel is?
7  **A.  No.**
8  Q.  Based on her email address, is it
9  likely that she works for Kaled?
10 **A.  Yeah, but I don't know her.**
11 Q.  Understood.
12      MS. TURNER:  John, if you could
13  scroll up to the top of the email.
14 Q.  Mr. Shamash, do you know why Marc
15  Paturet is approving flu protocols for the
16  building?
17 **A.  I don't, and I don't know why I'm**
18 **on that emailed cc'd just with Peter.  I've got**
19 **to imagine everyone is bcc'd and I was a cc.  I**
20 **have no idea.**
21 Q.  And this doesn't relate at all to
22  the dispute that's at issue there?
23 **A.  No.**
24 Q.  And was it normal for Marc to cc
25  you on administrative emails for the building?

240

1       MR. CASE:  Object to form.
2  **A.  Those are just emails that I mark**
3  **as read.  I don't even open them.  I can't tell**
4  **you.**
5  Q.  But you produced this document?
6       THE WITNESS:  Did I?
7       MR. HARRIS:  I, counsel, produced
8  the document as responsive to the subpoena, with
9  the production of my letter, or objection.
10      MS. TURNER:  That is all I have
11  for now.  Thank you, Mr. Shamash.
12      THE WITNESS:  Thank you.
13      MR. HARRIS:  Barry, Michael, you
14  guys have anything?
15      MR. MARGOLIS:  Can we take five?
16      MR. HARRIS:  Yes.  Thank you.
17      THE VIDEOGRAPHER:  We're going off
18  the record.  The time is 16:52.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We're back on
21  the record.  The time is 16:57.
22      MR. MARGOLIS:  I have no questions
23  for Mr. Shamash.
24      MR. HARRIS:  Michael?
25      MR. CASE:  Yes.

241

1  EXAMINATION BY MR. CASE:
2      Q.   Mr. Shamash, my name is Michael
3  Case.  I'm representing defendant Marc Paturet
4  here.  I just have a couple of quick questions.
5          I'd like to ask whoever is
6  handling the documents, I guess it's going to be
7  John, right?  Can you pull up document 21.
8          THE TECHNICIAN:  Stand by,
9  counsel.
10         MR. HARRIS:  You should know,
11 Michael, that in your Zoom here your
12 (indiscernible).  I don't know why.  We see you
13 but you're like a still for some reason.
14         MR. CASE:  Okay.  Sorry about
15 that, I'm not quite sure what the problem is.
16 It's something about -- I have to talk to my
17 service provider.  Anyway, you can hear me,
18 though, right?
19         MR. HARRIS:  Oh, yeah.
20         (Exhibit QQ marked for
21 identification.)
22         THE TECHNICIAN:  Document 21 is on
23 screen, marked as Exhibit QQ.
24         MR. CASE:  QQ, okay, thank you.
25 ///

242

1  BY MR. CASE:
2      Q.   Mr. Shamash, take a look at what's
3  been marked as Exhibit QQ, and I'll just ask you
4  whether or not that's an email that you authored
5  on or about December 23 of 2019?  At least the
6  first one on the page.
7          MR. HARRIS:  Can we see the next
8  email down.  Can you go back to the top?  I
9  don't know if he finished reading the first one.
10         THE WITNESS:  "Sheltering arms."
11         MR. HARRIS:  Don't answer
12 questions.  Read it and then answer the
13 questions of the attorneys.
14         (Witness reviewing document.)
15     A.   Okay.
16     Q.   First of all, can you tell me what
17 application is being discussed in that document?
18     A.   I believe this is about the
19 application from the co-op.  I don't know,
20 honestly.
21     Q.   Okay.  In December of 2019 did you
22 know who was the president of the co-op --
23     A.   At the time I likely knew.  Right
24 now I do not.
25     Q.   I'm sorry.  Can you repeat that

243

1  answer.
2      A.   At the time I likely knew who the
3  president is.  Now I do not know who the
4  president was or is.
5      Q.   Can you tell me the name of the
6  individual that you're referring to there when
7  you used the term "president"?
8      A.   I don't.  I don't know who I was
9  referring to.
10     Q.   Did you speak with my client, Marc
11 Paturet, at any time in December of 2019?
12     A.   I don't believe so.
13     Q.   If I asked you the same question
14 about November of 2019, would your answer be the
15 same?
16     A.   I don't believe so.  I do not
17 believe that I've spoken to him more than once
18 in my life.
19     Q.   Okay.  Can you recall generally
20 about when that was that you --
21     A.   I remember at one point he
22 presented an offer to buy my building, but we
23 were not close on terms whatsoever.  That's my
24 interaction with him that I remember.  When was
25 it, I don't know.  I don't know whether it was

244

1  pre-COVID or post-COVID, pre this meeting or
2  after this meeting.  I don't know.  I think it
3  was all before.
4      Q.   You don't recall whether or not
5  that was before or after the events that gave
6  rise to this lawsuit?
7      A.   I think it was before.  I don't
8  think I've had any interaction with any board
9  members since this meeting.
10     Q.   Okay.  And if I asked you about
11 the communications with Mr. Paturet in January
12 of 2019, would your answer be the same?
13     A.   Yes.
14         MR. CASE:  I think I have no
15 further questions for you.
16         MR. MARGOLIS:  I think we're done.
17         MR. HARRIS:  No questions?  All
18 right, thanks a lot, everyone.
19         THE VIDEOGRAPHER:  This marks the
20 end of the deposition of Nigel Shamash.  We're
21 going off the video record at 17:02.
22 (Deposition concluded 5:02 p.m.)
23         -o0o-
24
25

245

1       REPORTER'S CERTIFICATION
2
3          I, NANCY C. BENDISH, Certified
4   Court Reporter and Notary Public of the States
5   of New York and New Jersey, do hereby certify
6   that, prior to the commencement of the
7   aforementioned examination, NIGEL SHAMASH was
8   sworn by me to testify the truth, the whole
9   truth and nothing but the truth.
10         I DO FURTHER CERTIFY that the
11  foregoing is a true and accurate transcript of
12  the testimony as taken stenographically by me at
13  the time, place, and on the date hereinbefore
14  set forth.
15         I DO FURTHER CERTIFY that I am
16  neither a relative nor employee nor attorney nor
17  counsel of any party in this action and that I
18  am neither a relative nor employee of such
19  attorney or counsel, and that I am not
20  financially interested in the event nor outcome
21  of this action.
22
                _____
23         NANCY C. BENDISH, CCR, RMR, CRR
                Realtime Systems Administrator
24              Certificate No. XI00836
25  Dated:  December 21, 2022

| A |
|---|

**aa**
5:4, 133:18,
133:21, 138:25
**ability**
81:8
**able**
11:24, 37:17,
38:4, 38:7,
38:9, 124:7,
124:20, 148:19,
152:2, 163:19
**about**
4:19, 4:22,
9:17, 10:6,
15:5, 17:18,
20:24, 24:24,
25:18, 25:23,
26:4, 30:11,
32:13, 40:6,
43:6, 43:7,
43:10, 45:7,
45:8, 45:15,
52:11, 57:19,
60:4, 61:21,
63:11, 69:3,
70:4, 72:11,
76:1, 80:23,
83:10, 88:19,
88:20, 92:2,
102:20, 104:20,
113:14, 118:4,
118:13, 120:1,
120:12, 120:23,
120:25, 121:13,
122:11, 124:1,
133:1, 142:15,
143:1, 148:7,
149:9, 154:15,
155:4, 156:6,
162:22, 166:11,
173:22, 177:14,
181:3, 184:1,
187:5, 187:7,
190:12, 191:10,
192:20, 197:1,
199:8, 199:12,

204:18, 205:4,
213:8, 213:24,
216:6, 216:13,
216:17, 216:23,
219:22, 227:9,
233:11, 237:5,
241:14, 241:16,
242:5, 242:18,
243:14, 243:20,
244:10
**above**
176:5, 186:6,
209:25
**abrams**
2:20, 6:24
**absolutely**
86:7, 91:23,
91:24, 111:19,
218:21
**abuse**
109:13, 109:19,
110:2, 127:2,
127:23, 127:25,
128:7, 128:18,
128:24, 129:6,
129:11, 130:16,
137:19, 138:2,
138:11, 160:11,
163:9, 167:13,
167:21, 168:2,
169:6, 174:10,
177:5, 214:13,
214:25, 218:14,
225:18, 229:14,
229:17, 229:23,
230:4, 230:11,
231:15, 231:22,
232:12, 232:16,
233:24
**accept**
136:24
**acceptable**
137:18
**access**
44:24, 109:16
**accompanied**
204:19
**according**
153:14, 155:3,

183:18
**accordingly**
81:11, 81:12,
90:20, 141:8
**account**
43:23
**accurate**
46:25, 47:3,
97:7, 108:9,
112:17, 222:25,
245:11
**act**
86:21
**action**
1:7, 7:17,
13:9, 14:13,
20:3, 20:15,
20:16, 20:24,
20:25, 21:3,
21:4, 21:8,
21:9, 21:22,
21:23, 23:16,
23:17, 24:3,
24:4, 24:9,
24:12, 25:12,
31:23, 41:17,
62:15, 125:22,
155:18, 156:22,
157:7, 157:21,
157:25, 187:25,
245:17, 245:21
**actions**
211:12
**actively**
53:10
**activision**
50:16, 50:17
**activities**
136:1, 177:4
**actually**
26:8, 30:19,
39:12, 46:5,
48:9, 49:19,
53:10, 64:3,
107:21, 110:21,
112:21, 116:6,
128:4, 130:5,
130:20, 134:11,

148:20, 159:14,
169:22, 209:13,
227:3, 227:24,
228:11, 229:9
**add**
123:21
**added**
76:8, 123:17,
123:24, 124:11
**addition**
130:15
**additional**
42:2, 108:22,
229:6
**address**
33:16, 34:5,
230:17, 239:8
**addressed**
100:16, 100:17,
132:16, 144:15,
144:16, 147:5,
152:18, 193:14,
202:5, 236:12,
236:13
**addresses**
35:14, 230:16
**administrative**
70:18, 70:22,
70:24, 135:21,
169:10, 176:25,
210:4, 211:25,
212:2, 212:5,
229:18, 239:25
**administrator**
245:25
**advertise**
52:4
**advice**
186:12, 192:8,
192:11, 192:17,
193:23, 196:18,
196:20
**advise**
100:22, 192:1
**affect**
10:19, 148:8
**affiliated**
35:13

**aforementioned**
39:1, 245:7
**african**
217:10
**after**
20:11, 26:22,
48:25, 52:7,
80:24, 87:5,
88:21, 101:19,
104:25, 105:23,
106:3, 122:22,
122:23, 122:25,
123:5, 124:6,
164:9, 167:3,
167:23, 171:13,
174:7, 180:2,
184:5, 195:7,
195:8, 219:13,
219:19, 229:3,
230:9, 234:13,
244:2, 244:5
**afternoon**
150:25
**afterwards**
80:23, 81:6
**again**
11:5, 31:1,
38:6, 55:17,
57:25, 71:9,
78:3, 85:12,
112:7, 122:3,
133:24, 137:25,
138:8, 138:10,
140:1, 148:12,
162:11, 199:6,
207:20, 234:2
**age**
26:21
**agency**
59:6, 63:22,
64:19, 64:22
**ago**
24:5, 24:6,
25:9, 25:10,
69:10, 105:6,
179:16, 197:5,
198:9
**agree**
98:8, 113:1,

113:8, 157:12
**agreeable**
112:23
**agreed**
13:13, 44:6,
81:16, 90:23,
98:10, 105:2,
105:17, 105:21,
106:16, 129:5,
137:18, 147:13,
153:1, 165:24,
166:2, 173:21,
223:8, 224:3,
224:11, 224:12,
233:25
**agreeing**
94:25
**agreement**
42:1, 116:8,
147:14, 169:9,
176:13
**ah**
25:4
**ahead**
54:4, 134:17,
199:15, 214:17
**akin**
102:22, 107:3,
128:9, 128:11,
161:11, 164:23,
213:3, 213:4
**alcoholism**
109:13, 109:19,
110:2
**all**
2:2, 3:2, 6:12,
8:11, 8:22,
22:1, 38:22,
50:18, 55:21,
55:23, 57:11,
61:7, 62:14,
66:16, 74:1,
79:12, 87:21,
105:10, 124:8,
124:17, 126:3,
135:24, 141:2,
144:17, 144:20,
147:12, 148:5,

160:12, 177:2,
183:5, 183:18,
183:22, 216:13,
217:23, 223:1,
223:17, 228:18,
233:14, 239:21,
240:10, 242:16,
244:3, 244:17
**allocated**
39:2
**along**
33:12, 47:10,
47:12, 131:8,
139:25, 140:2,
236:14
**already**
42:23, 48:6,
102:16, 113:17
**also**
3:16, 8:19,
8:24, 10:2,
11:25, 52:18,
54:20, 79:2,
86:20, 159:9,
161:7, 161:13,
161:18, 168:8,
168:9, 168:10,
182:13, 184:1,
189:19, 204:20,
231:3
**although**
28:23, 53:17,
102:4, 231:16
**always**
80:16, 80:19,
84:13, 89:25,
90:22, 147:25,
182:2, 183:16,
222:3, 233:17
**ambiguous**
205:10
**american**
217:11
**americas**
2:30
**amount**
42:6, 44:7,
208:20

**ancillary**
91:18, 91:20,
91:25, 102:13,
107:2, 130:13,
137:2, 165:20,
165:22, 169:16,
169:17, 198:22,
198:25, 199:4,
212:5, 212:11,
213:3, 213:4,
219:5, 219:7,
226:6, 226:9
**anger**
207:5
**angle**
52:17
**annual**
40:11
**another**
29:15, 43:10,
49:9, 112:25,
113:7, 115:19,
115:20, 116:3,
118:6, 119:23,
125:8, 147:16,
147:21, 148:15,
234:7
**answer**
7:19, 7:21,
15:23, 16:5,
16:14, 17:6,
21:11, 22:12,
23:19, 41:1,
41:2, 55:8,
80:19, 81:8,
83:7, 83:8,
89:25, 92:11,
93:22, 95:3,
95:11, 98:4,
98:17, 114:15,
119:1, 127:11,
128:3, 131:14,
136:5, 137:5,
138:14, 140:8,
143:6, 145:15,
145:22, 149:19,
154:3, 157:23,
164:21, 172:10,

174:14, 178:3,
191:21, 203:7,
205:24, 206:2,
209:8, 212:19,
216:20, 220:8,
222:1, 222:7,
223:21, 225:24,
230:7, 231:25,
237:12, 237:16,
237:24, 242:11,
242:12, 243:1,
243:14, 244:12

**answered**
41:1, 55:11,
90:4, 90:5,
96:22, 197:10

**answering**
7:23

**answers**
8:8, 8:9, 54:21

**anxious**
192:20

**any**
9:8, 10:10,
10:16, 11:11,
18:14, 18:22,
19:5, 20:3,
28:21, 33:24,
34:5, 35:8,
35:10, 36:3,
42:12, 42:14,
42:16, 42:18,
44:17, 46:1,
50:3, 52:9,
53:8, 54:7,
57:23, 60:22,
61:20, 61:24,
62:1, 62:3,
64:10, 67:10,
67:22, 73:16,
80:20, 84:14,
87:21, 90:11,
90:17, 90:18,
94:13, 97:6,
99:12, 103:24,
104:20, 105:4,
108:8, 110:19,
112:16, 122:12,

129:6, 135:8,
136:7, 137:19,
138:1, 138:11,
141:17, 142:5,
148:2, 150:4,
150:17, 154:8,
162:14, 162:25,
164:10, 165:18,
175:1, 182:11,
184:8, 186:4,
190:20, 192:8,
193:17, 202:4,
204:5, 210:16,
210:19, 211:5,
211:8, 214:12,
215:5, 216:5,
216:6, 216:22,
219:21, 221:9,
224:23, 228:20,
228:25, 229:3,
229:6, 234:8,
235:3, 235:10,
239:2, 243:11,
244:8, 245:17

**anymore**
71:20

**anyone**
14:25, 17:7,
17:12, 19:8,
23:15, 55:4,
61:20, 62:7,
66:19, 73:18,
87:5, 111:18,
130:24, 183:19,
217:15, 229:1

**anything**
10:22, 14:18,
24:21, 80:18,
81:5, 111:8,
123:22, 134:12,
162:22, 179:9,
191:10, 192:2,
192:5, 197:5,
201:15, 211:18,
213:6, 213:9,
213:18, 213:23,
213:24, 213:25,
214:1, 215:12,

215:24, 216:13,
235:5, 240:14

**anyway**
241:17

**anywhere**
137:1

**apart**
36:4, 208:20

**apartment**
44:14

**apologies**
30:25

**apparently**
77:25

**appear**
183:15, 184:16

**appears**
105:1, 105:16,
106:15

**applicant**
88:3, 183:15,
184:16

**applicants**
87:14, 183:16

**application**
82:18, 82:21,
83:19, 84:2,
170:11, 171:3,
171:6, 173:7,
175:14, 177:7,
177:10, 177:17,
177:20, 179:15,
183:14, 204:23,
205:7, 206:7,
207:18, 207:20,
208:23, 209:4,
210:6, 210:8,
210:9, 210:12,
211:2, 211:6,
212:24, 223:9,
223:13, 224:4,
225:4, 226:4,
229:18, 242:17,
242:19

**applied**
45:16, 55:16,
55:19, 55:24,
56:24, 57:15,

58:1, 58:25,
59:17, 65:4,
68:5, 74:8,
78:12

**appropriate**
15:13

**approval**
83:5, 84:7,
84:18, 84:23,
85:3, 85:15,
86:6, 86:17,
87:8, 88:10,
91:7, 91:11,
91:12, 118:4,
118:13, 119:15,
121:13, 121:14,
142:15, 151:5,
154:15, 156:6,
180:1, 181:12,
194:18, 194:21,
195:2

**approvals**
120:25

**approve**
83:10, 85:19,
85:23, 86:24,
180:25, 181:9,
187:21, 210:7,
210:9, 210:11,
211:2

**approved**
84:11, 111:14,
130:14, 166:20,
183:19, 188:3,
194:11, 194:16,
194:23, 195:17,
218:20, 233:12,
233:13, 233:14,
233:19

**approves**
86:22

**approving**
86:21, 156:10,
210:17, 210:20,
219:23, 239:15

**approximately**
29:11, 29:12,
35:2, 43:18,

46:4, 46:5,
47:16, 47:22,
47:24, 85:13,
92:24, 200:4
**arbitration**
25:6, 25:7,
25:23, 26:2
**arbitrator**
26:1
**area**
29:13, 45:21,
45:24, 45:25,
47:19, 101:13,
101:14, 101:15,
164:4
**areas**
43:25, 44:2,
44:3
**aren't**
194:20
**argument**
39:15
**arms**
242:10
**around**
79:21, 90:17,
91:4, 95:20,
114:21, 114:22,
161:21, 169:3,
169:4
**art**
71:21
**asian**
216:12, 217:19
**asked**
24:19, 40:25,
48:5, 78:3,
78:8, 121:16,
147:23, 154:25,
162:24, 177:23,
177:25, 184:11,
196:18, 197:4,
208:22, 217:19,
243:13, 244:10
**asking**
7:24, 60:17,
88:12, 94:11,
95:24, 96:9,

96:12, 96:21,
107:23, 136:14,
136:17, 140:1,
143:1, 148:3,
149:9, 150:17,
155:4, 157:6,
157:10, 159:10,
162:16, 186:11,
197:7, 213:2,
237:20, 237:22
**asks**
89:23, 180:11,
186:15, 221:4
**aspect**
204:21
**asset**
27:21
**assignment**
105:8
**assortment**
207:6
**assume**
183:20
**assumption**
199:13
**assured**
118:5
**attached**
98:13, 210:6,
229:16, 229:21
**attaching**
179:15
**attack**
215:21, 216:3
**attempt**
232:23
**attempts**
193:22
**attend**
84:15, 195:23,
195:24, 211:15
**attendance**
203:13, 203:15,
204:3, 204:6,
206:23, 209:21,
209:22, 210:1,
210:7, 211:23
**attendees**
216:2

**attending**
6:13
**attorney**
15:3, 15:6,
15:12, 15:18,
16:1, 16:3,
16:16, 16:23,
17:5, 17:8,
17:11, 19:2,
19:9, 98:12,
98:17, 99:6,
99:12, 109:21,
110:7, 132:10,
132:21, 132:22,
133:9, 135:9,
135:15, 135:16,
137:12, 139:14,
144:10, 145:1,
145:2, 145:11,
146:25, 152:15,
194:5, 197:13,
197:21, 227:3,
228:7, 229:11,
230:2, 231:5,
232:21, 233:22,
236:20, 237:1,
238:2, 245:16,
245:19
**attorney's**
238:9
**attorney-client**
15:14, 17:4,
230:7, 237:16,
237:22
**attorneys**
81:10, 96:17,
139:24, 140:25,
228:5, 231:1,
231:3, 231:4,
242:13
**audible**
8:9
**author**
136:15
**authored**
242:4
**automated**
114:14, 114:18,

114:23
**automatically**
124:2
**available**
32:1, 80:14,
80:16, 89:24,
127:5, 128:14,
128:20, 184:12,
184:14, 234:23
**avenue**
2:30, 197:17,
198:23
**average**
50:6
**aware**
10:23, 88:2,
131:11, 167:19
**away**
35:25, 175:6
**aweil**
182:18
**awesome**
117:3
**axis**
109:15, 110:15

---
**B**
---

**b-a-e-c-h-l-e-r**
59:15
**back**
12:12, 30:10,
48:16, 56:5,
56:23, 57:25,
63:3, 81:5,
83:7, 94:25,
101:10, 107:21,
116:16, 116:19,
116:25, 118:1,
118:2, 118:25,
148:14, 158:12,
158:15, 160:5,
161:21, 164:2,
178:2, 181:16,
182:19, 190:8,
190:11, 202:3,
209:17, 211:22,
214:16, 218:17,
219:14, 223:22,

223:24, 229:10,
230:13, 240:20,
242:8
**background**
83:14, 123:3
**backgrounds**
217:22
**backwards**
27:15, 48:14
**bad**
60:16, 187:14
**baechler**
59:15, 60:2
**baghdad**
26:16
**baker**
2:9
**bakerhostetler**
6:21
**barbara**
59:10, 59:13
**barclay**
2:28, 7:3
**barry**
2:21, 6:23,
62:20, 124:1,
124:13, 124:20,
175:6, 175:10,
223:6, 240:13
**base**
71:17
**based**
47:6, 108:5,
112:13, 113:24,
117:14, 129:20,
138:9, 199:14,
199:19, 199:23,
203:23, 225:11,
239:8
**basement**
77:9
**basic**
40:11
**basically**
25:25
**basis**
43:17, 218:23,
224:16

**bates**
46:9, 117:2,
134:25
**bathroom**
44:22, 47:17,
62:18, 116:3,
189:16
**bathrooms**
44:1
**bb**
5:6, 138:20,
138:23
**bcc'd**
239:19
**bear**
93:7
**became**
219:6
**because**
27:4, 33:16,
39:16, 53:15,
54:11, 54:15,
61:7, 78:24,
90:19, 91:17,
92:4, 92:8,
92:16, 110:22,
111:16, 115:10,
121:14, 122:17,
123:22, 128:5,
129:12, 130:12,
131:16, 149:12,
153:19, 155:7,
156:12, 160:24,
164:14, 167:1,
168:24, 169:16,
170:23, 176:8,
178:4, 198:19,
216:16, 218:4,
218:8, 223:17,
230:20, 231:21,
232:11, 232:18
**become**
33:2, 50:14,
50:16
**becomes**
44:10, 44:12
**been**
7:10, 12:4,

14:13, 23:2,
23:25, 24:25,
29:1, 29:5,
29:19, 30:13,
30:23, 31:11,
31:14, 33:8,
36:3, 42:19,
47:3, 52:7,
52:8, 52:24,
54:11, 54:15,
56:21, 57:2,
58:15, 61:15,
61:17, 64:4,
67:1, 67:2,
69:11, 69:17,
77:15, 85:2,
85:3, 85:14,
85:15, 88:6,
88:21, 93:2,
114:13, 114:17,
114:23, 120:21,
122:1, 128:5,
136:7, 141:5,
141:13, 147:13,
153:1, 167:20,
169:5, 170:17,
180:24, 187:8,
187:20, 188:16,
188:18, 188:25,
189:2, 189:4,
194:10, 194:16,
195:13, 205:15,
217:10, 232:11,
233:25, 234:25,
242:3
**before**
7:23, 19:13,
19:18, 19:19,
20:11, 22:2,
24:1, 36:23,
40:24, 49:5,
49:10, 60:3,
63:9, 66:25,
75:9, 84:2,
88:6, 89:4,
89:7, 89:8,
89:11, 99:12,
101:19, 115:22,

116:20, 123:1,
125:23, 152:8,
182:20, 190:11,
194:22, 196:20,
200:24, 201:2,
201:3, 201:4,
202:12, 219:1,
219:2, 230:14,
244:3, 244:5,
244:7
**began**
40:17
**beginning**
22:4, 40:10,
133:16, 158:17,
159:10, 209:20,
220:13, 226:13
**begins**
6:1, 46:9,
200:7
**behalf**
2:6, 2:16,
2:26, 3:6,
28:16, 28:17,
88:13, 101:6
**behavioral**
207:7
**behind**
70:21, 70:23,
101:17, 233:4
**being**
17:24, 24:7,
28:11, 32:5,
40:22, 52:10,
87:10, 92:5,
96:11, 106:21,
111:21, 112:11,
128:19, 135:4,
156:9, 164:3,
197:12, 197:20,
204:2, 204:8,
219:9, 219:10,
230:4, 242:17
**believe**
11:9, 19:15,
21:3, 22:25,
23:6, 23:12,
26:22, 38:12,

47:12, 52:16,
53:11, 56:2,
56:3, 59:4,
65:6, 74:5,
76:11, 78:4,
85:17, 94:2,
97:6, 102:11,
108:8, 111:13,
111:15, 112:16,
123:14, 123:17,
131:10, 140:20,
153:1, 160:18,
163:25, 164:5,
173:25, 197:4,
198:4, 200:1,
204:5, 208:2,
225:15, 225:16,
234:6, 242:18,
243:12, 243:16,
243:17

**below**
63:18, 71:13,
109:12, 137:17,
147:10, 157:18,
159:10, 172:18

**bendish**
1:34, 7:6,
245:3, 245:24

**benefit**
28:9

**bengualid**
3:9, 6:18, 11:7

**bergson**
2:20, 6:24

**besides**
9:9, 17:8,
19:9, 33:23,
34:4, 50:4,
56:8, 62:4,
62:14

**best**
7:22, 74:10,
81:8, 92:13,
98:4, 109:25,
111:8, 131:6,
132:24, 166:7,
166:21, 174:24,
189:6, 197:11,

207:16, 209:10,
213:15

**better**
145:1

**between**
16:18, 28:11,
30:7, 32:24,
39:23, 43:19,
46:5, 47:16,
48:6, 49:2,
49:8, 50:8,
55:1, 85:21,
191:2, 228:22

**big**
105:3, 107:9

**bigger**
38:11

**bit**
20:8, 26:12,
89:18, 93:20,
105:25, 139:7,
143:21, 144:4,
146:18, 163:2,
163:5, 164:3,
176:8, 214:5,
215:1, 227:22

**black**
65:17, 65:18,
68:25, 69:2,
74:23, 74:25,
79:3, 192:23,
215:22, 217:3,
217:12

**blizzard**
50:17, 50:19

**block**
35:25

**blocked**
164:3

**blocking**
176:9

**blow**
93:19, 99:2

**blurry**
176:18

**board's**
180:1

**boards**
201:17, 201:22

**bob**
89:12, 94:15,
94:19, 99:17,
99:18, 100:22,
129:23, 132:24,
229:7

**body**
100:18, 129:25,
132:18, 135:18,
139:22, 140:24,
144:19, 147:8,
152:21, 231:9

**bold**
159:11

**border**
38:10

**both**
24:19, 26:16,
53:11, 53:12,
53:14, 53:22,
58:22, 60:21,
60:25, 82:24,
99:19, 148:22,
150:11, 212:3

**bottom**
38:8, 41:21,
47:13, 47:17,
61:5, 95:15,
99:16, 111:4,
149:1, 159:25,
185:23, 196:15,
228:4, 228:10,
230:14

**bought**
48:3, 48:16,
50:15

**boys**
105:3, 107:9

**break**
9:8, 9:9, 9:11,
9:12, 62:18,
62:19, 63:9,
105:24, 116:3,
116:11, 116:21,
123:18, 158:5,
189:16, 189:18,
189:19, 190:1

**brendon**
3:18, 6:11

**bring**
170:24, 192:2,
192:5, 218:16

**broadway**
2:22

**broke**
140:5

**broker**
27:19, 28:11,
28:15, 28:21,
29:2, 29:5,
29:9, 29:19,
29:24, 30:13,
30:23, 32:8,
52:10, 80:11,
89:23, 90:3,
93:2, 93:3,
94:15, 97:2,
102:22, 111:21,
111:22, 111:23,
112:1, 129:24,
166:8, 166:17,
168:13, 168:14,
174:18, 199:1,
212:9, 212:10,
213:14, 234:22,
235:13, 235:14

**broker's**
28:22

**brokerage**
31:18, 43:17

**brokers**
80:12, 147:25

**brooklyn**
126:17, 127:5,
127:19, 128:9,
128:12, 128:14,
128:20, 161:11,
213:5

**brooks**
89:4, 92:20,
92:25, 128:22,
129:1, 129:9,
131:3, 131:6,
132:20, 133:8,
153:3, 167:16,
168:1, 174:6,
174:9, 179:12,

179:14, 192:2,
192:8, 192:19,
192:22, 192:23,
194:12, 203:16,
204:12, 204:14,
204:16, 206:5,
206:9, 206:24,
207:1, 207:4,
207:12, 210:24,
216:10, 216:14,
217:3, 217:14,
217:18, 217:25,
218:14, 219:13,
222:5, 222:10,
225:5, 226:1,
229:1, 231:21,
232:11, 232:15,
232:24, 233:21
**brooks's**
230:24
**brother**
18:11
**building**
24:17, 26:5,
26:6, 26:7,
39:2, 43:1,
43:2, 43:25,
44:8, 44:10,
44:11, 51:4,
52:11, 52:13,
52:17, 54:7,
55:14, 55:18,
56:2, 56:7,
57:2, 57:23,
61:5, 61:6,
61:9, 61:14,
61:17, 61:24,
62:4, 63:17,
66:8, 72:25,
82:2, 82:3,
82:5, 82:10,
87:22, 90:5,
90:12, 110:20,
111:3, 114:13,
121:15, 130:14,
164:1, 164:6,
164:8, 164:9,
167:1, 167:2,

169:8, 173:19,
180:22, 181:17,
183:17, 189:5,
191:15, 206:24,
211:11, 233:18,
233:20, 234:24,
239:16, 239:25,
243:22
**buildings**
28:18, 35:13
**buildout**
45:12, 45:18
**builds**
28:14
**bullet**
71:14, 71:15
**bunch**
61:11, 94:4
**business**
13:2, 27:2,
27:5, 27:22,
41:4, 59:3,
63:16, 63:20,
64:13, 66:21,
72:15, 81:20,
91:5, 164:8,
168:8, 218:25
**busy**
27:4, 32:7,
153:21, 156:12,
183:25
**butcher**
58:3
**buttons**
114:25
**buy**
24:17, 24:22,
243:22
**buys**
28:13
**bylaws**
183:18, 211:11

---
### C
---

**call**
14:24, 17:7,
18:17, 18:25,
31:6, 31:19,

31:24, 80:13,
92:13, 145:2,
186:15, 187:1,
187:17, 188:14,
208:18, 213:14,
229:5
**call-in**
186:22, 187:5,
187:16
**called**
43:21, 50:16,
80:8, 80:9,
174:18, 188:5,
188:7
**calls**
74:1
**came**
183:5
**camera**
113:2, 127:3
**cameras**
230:19
**can't**
16:19, 17:4,
24:25, 53:3,
55:4, 67:5,
71:20, 79:10,
79:15, 98:16,
107:7, 113:1,
113:2, 120:10,
121:9, 150:2,
151:25, 168:5,
194:14, 211:10,
221:3, 225:2,
227:22, 230:20,
234:3, 240:3
**capacity**
166:13, 166:19,
166:20
**caps**
144:20
**caption**
113:4
**capture**
8:1
**career**
29:2, 29:6,
218:5

**caregiver**
204:19
**carry**
28:22, 103:19,
121:4, 173:14
**case**
2:29, 4:7, 6:7,
7:2, 8:25, 9:20,
12:2, 12:8,
12:22, 19:14,
19:19, 19:23,
21:13, 22:9,
29:24, 30:2,
30:3, 66:1,
66:2, 77:5,
80:15, 82:4,
91:1, 95:24,
96:6, 96:9,
96:21, 107:6,
107:23, 109:8,
121:8, 121:25,
122:6, 122:15,
124:13, 141:19,
142:23, 143:1,
147:24, 149:11,
180:20, 189:20,
194:24, 203:6,
206:18, 215:11,
225:1, 225:20,
232:17, 233:8,
237:10, 240:1,
240:25, 241:1,
241:3, 241:14,
241:24, 242:1,
244:14
**cashed**
87:9, 87:11
**cashier's**
87:2
**cc**
5:7, 94:19,
143:11, 143:14,
145:25, 239:19,
239:24
**cc'd**
94:16, 94:18,
117:19, 117:20,
203:1, 231:6,

232:22, 236:11, 239:18

**cc'ing**
129:24

**ccm**
99:19, 105:4, 107:9, 121:20, 139:24, 152:25, 169:2

**ccmnyc**
127:1, 147:15

**ccms's**
48:25, 49:5, 89:3, 91:14, 97:2, 148:10, 199:8, 199:12, 199:21, 217:21, 229:18, 231:12, 232:10, 233:22, 234:13

**ccr**
1:34, 245:24

**ceilings**
72:22

**center**
47:14, 176:17

**central**
34:21, 34:22, 47:19

**certain**
9:18, 121:6

**certainly**
47:2, 52:6, 71:10, 120:16, 199:1, 212:7

**certificate**
245:26

**certification**
245:1

**certified**
245:3

**certify**
245:5, 245:10, 245:15

**chain**
107:16, 108:14, 108:18

**chance**
30:20, 139:3,

159:3, 176:11

**change**
91:2

**changed**
45:13, 45:18, 155:9, 191:18

**changes**
90:25, 153:2

**check**
83:19, 84:10, 87:1, 87:2, 87:4

**checks**
83:14, 83:23, 87:9, 87:10, 179:23, 179:24, 179:25

**chelsea**
27:9, 29:13

**children**
131:12, 131:17, 204:18, 216:12

**choice**
154:9

**chosen**
184:9

**christmas**
184:2, 184:5

**circle**
30:10

**circling**
234:11

**circumstances**
24:14, 25:16

**citizens**
113:8

**city**
169:4

**civil**
1:7

**claim**
39:17, 225:17

**claims**
9:20

**clarification**
14:6, 22:14, 27:25, 43:4, 82:6, 86:20, 96:22, 120:19,

138:25, 154:6, 219:20

**clarify**
30:18, 43:11, 85:7, 86:17, 89:6, 203:22, 218:13

**clarity**
12:3

**class**
113:8

**clause**
137:17, 166:11, 169:9, 169:13, 169:18, 172:15

**clauses**
109:18

**clear**
13:21, 16:24, 91:19, 169:6, 229:12

**clearly**
92:17

**click**
4:22, 57:1, 76:1, 76:7, 76:19

**client**
14:9, 45:16, 98:16, 137:18, 137:23, 170:13, 173:8, 173:25, 174:9, 175:2, 175:14, 176:13, 177:7, 179:1, 223:20, 243:10

**clients**
28:21, 71:6, 72:6, 114:7, 115:3, 207:5, 216:6, 216:24

**clinic**
100:21, 100:24, 101:8, 101:12, 101:16, 101:19, 101:22, 102:1, 102:2, 102:4, 102:6, 102:8,

102:9, 102:16, 102:25, 105:11, 105:12, 107:5, 131:9, 136:10, 137:2, 161:19, 171:21, 191:8, 210:5, 212:16, 212:17, 212:25

**clinician**
102:10

**clinton**
102:21, 107:3, 164:24, 164:25, 197:17, 198:23

**clip**
182:20

**close**
243:23

**closed**
53:17

**closet**
47:18

**clue**
49:25, 64:17, 76:21

**cmnyc**
127:22

**co-op**
8:23, 8:25, 9:1, 29:21, 29:22, 29:24, 30:4, 30:24, 31:8, 31:11, 31:16, 31:22, 31:25, 32:5, 65:1, 65:4, 68:2, 68:5, 74:4, 74:8, 77:24, 78:9, 78:12, 81:25, 82:5, 82:6, 82:25, 83:16, 86:22, 87:13, 88:2, 150:1, 150:5, 180:1, 183:23, 201:7, 201:17, 201:22, 202:20, 242:19,

242:22
**co-ops**
29:10, 29:12,
35:16
**cognitive**
154:9
**cognizant**
189:20
**collect**
110:17, 111:14,
111:16, 133:7,
148:6, 180:13,
180:23, 181:2
**college**
26:19, 26:20,
26:21, 26:23,
26:24, 26:25,
27:14
**color**
69:3
**colorful**
221:21, 222:3
**come**
105:3, 107:8,
108:20, 108:22,
108:25, 217:15,
217:22
**coming**
77:20, 115:17,
165:14, 205:2,
216:7
**commencement**
245:6
**commencing**
40:9
**comments**
116:12, 132:23,
137:21
**commercial**
27:19, 28:11,
28:18, 28:25,
29:8, 29:12,
29:18, 30:3,
30:12, 30:22,
32:5, 33:24,
34:9, 34:24,
35:11, 35:15,
43:2, 43:16,

80:7
**commercials**
76:13
**commission**
133:7, 148:7
**commissions**
148:1
**common**
39:13, 43:24,
47:19
**communicate**
188:10
**communicated**
131:5
**communications**
153:25, 244:11
**community**
1:5, 2:6, 6:3,
6:21, 7:16,
8:15, 13:3,
197:25, 198:11,
198:16
**companies**
43:23, 44:5,
48:20, 49:13
**company**
4:19, 17:21,
18:2, 27:10,
32:16, 32:17,
41:6, 50:16,
53:4, 56:21,
57:4, 57:13,
61:2, 67:13,
70:5, 71:6,
72:12, 73:10,
76:1, 80:8,
80:9, 80:10,
189:3, 198:11,
210:23
**complaint**
37:1
**complete**
12:1, 177:17
**completed**
204:24
**completely**
7:25, 155:13,
155:17, 155:25,

157:19, 157:21,
197:18
**computer**
108:19
**concern**
210:17, 210:19,
216:23
**concerned**
118:4, 121:12,
176:2
**concerning**
20:15, 23:16
**concerns**
211:8, 216:6
**concluded**
244:22
**conclusion**
42:3, 220:6,
220:9
**concrete**
72:21
**conditions**
10:11, 10:12
**conduct**
13:13, 230:10
**conducted**
1:26, 225:14
**conducting**
128:24, 129:11,
231:15
**conference**
47:20
**confirm**
65:25, 94:12,
94:21, 117:3
**confirmed**
204:16, 207:2
**conflict**
223:15
**conformant**
164:7, 166:22
**confuse**
59:23, 60:11
**confusing**
78:7
**congregate**
79:20
**connected**
33:5, 58:13

**connecting**
58:19
**connection**
12:22, 13:9,
21:21, 32:14,
37:2, 42:13,
94:1, 103:14,
135:24, 235:2
**connections**
177:3
**connects**
53:15
**consent**
13:18
**consider**
183:14
**considered**
72:24
**considering**
82:12
**consistent**
83:20, 105:22,
160:12, 160:17,
161:4, 171:7,
172:2, 172:5,
172:7, 173:9,
173:16, 173:18,
177:6, 177:13,
199:9, 199:21,
204:23, 205:7,
206:6, 207:8,
207:17, 208:17,
208:23, 209:1,
212:15, 212:24,
222:20, 223:10,
224:5, 224:13,
225:4, 225:11
**construction**
45:3, 163:12
**consultancy**
27:24, 28:1,
28:3, 28:5, 28:6
**cont'd**
5:1
**contact**
132:21, 228:25,
229:7
**contacted**
133:9

**conte**
1:18, 2:18,
7:1, 8:22,
20:10, 23:8,
59:1, 59:5,
61:23, 63:15,
63:21, 63:25,
64:12, 64:25,
65:3, 65:21,
66:7, 184:15,
202:8, 202:18,
203:21, 208:19,
208:24, 210:10,
210:22, 211:1,
214:12, 224:21,
224:23

**conte's**
63:20, 65:13,
183:11, 184:4,
214:24, 215:6

**contemplated**
52:7

**content**
162:22

**context**
69:9

**continuation**
127:13

**continue**
159:24, 175:10,
175:11

**contrary**
122:8

**contributor**
136:16

**controlling**
11:11

**convened**
204:13

**conversation**
7:19, 8:1,
15:2, 15:5,
15:8, 15:9,
15:11, 15:20,
15:21, 16:3,
16:25, 17:1,
17:17, 17:23,
25:21, 92:16,

104:25, 105:22,
106:1, 110:6,
118:5, 118:12,
119:11, 120:13,
122:19, 141:11,
141:16, 142:4,
142:11, 142:12,
143:2, 150:1,
150:4, 174:5,
219:8

**conversations**
66:5, 90:18,
104:21, 120:24,
122:9, 122:10,
122:16, 122:18,
141:14, 154:11,
154:14, 156:5,
219:22, 220:4,
237:23

**converting**
191:15

**coop**
5:14, 5:18,
124:10, 124:13,
161:24, 162:3,
200:7, 200:13

**cooperative**
38:23, 40:8

**copies**
11:25

**copy**
70:4, 75:25,
147:14, 229:16,
229:20, 236:21,
237:2, 237:8,
238:2, 238:5

**correct**
14:16, 18:20,
20:19, 36:7,
37:4, 40:22,
49:7, 52:13,
52:19, 53:23,
63:22, 64:3,
68:25, 69:3,
85:8, 102:17,
128:25, 138:12,
138:15, 140:2,
150:25, 151:1,

155:1, 159:12,
161:8, 161:19,
165:3, 167:18,
171:9, 173:23,
173:24, 175:17,
207:15, 208:15,
208:16, 208:19,
218:24, 223:2

**correctly**
32:23, 63:7,
119:10, 197:9

**correspondence**
94:10, 109:2

**corridor**
47:19

**corridors**
44:1

**cost**
31:17

**costar**
80:8

**couches**
71:1

**could**
11:4, 11:12,
13:20, 27:16,
28:10, 30:6,
31:2, 32:1,
36:5, 37:16,
38:17, 38:20,
39:24, 40:1,
41:20, 41:23,
46:5, 46:8,
48:14, 53:14,
56:3, 56:21,
60:19, 61:8,
61:18, 62:21,
67:3, 69:20,
71:13, 71:14,
72:20, 75:16,
76:5, 88:5,
89:14, 89:18,
91:12, 93:8,
93:19, 93:21,
100:1, 103:2,
103:11, 107:14,
107:20, 110:4,
110:10, 112:19,

116:22, 117:1,
117:22, 118:25,
124:25, 129:14,
133:15, 141:11,
142:6, 142:16,
144:3, 146:2,
147:8, 148:18,
151:14, 154:19,
156:13, 156:21,
163:23, 164:2,
168:19, 173:25,
174:25, 176:3,
178:6, 178:12,
179:18, 180:24,
181:7, 185:21,
186:18, 187:20,
188:16, 188:18,
189:15, 189:17,
196:14, 200:6,
204:11, 206:19,
209:17, 209:19,
226:12, 227:5,
227:15, 229:9,
232:15, 233:23,
239:12

**couldn't**
79:24, 183:23

**counsel**
6:14, 11:2,
11:5, 11:15,
13:13, 15:10,
19:13, 36:10,
46:12, 69:23,
75:19, 93:11,
94:3, 95:24,
97:12, 98:15,
98:22, 99:9,
100:4, 103:6,
112:10, 116:24,
123:12, 126:8,
131:23, 133:17,
135:3, 136:15,
140:21, 146:5,
151:17, 158:20,
159:17, 169:25,
171:14, 175:24,
177:11, 177:25,
178:9, 178:18,

181:21, 183:7,
184:23, 185:18,
199:13, 200:10,
207:24, 214:21,
220:16, 226:15,
227:8, 228:14,
235:25, 238:14,
240:7, 241:9,
245:17, 245:19
**counseling**
1:6, 2:7, 6:4,
6:22, 7:16,
8:15, 13:3,
91:18, 91:20,
91:22, 92:10,
102:13, 107:2,
110:3, 128:1,
128:8, 128:19,
128:25, 129:11,
131:18, 135:22,
135:24, 136:3,
136:18, 136:22,
137:3, 137:19,
138:2, 138:11,
160:10, 160:11,
160:16, 164:18,
164:19, 165:3,
165:9, 165:17,
166:24, 167:13,
167:21, 168:3,
169:13, 172:8,
174:10, 177:1,
177:5, 198:12,
198:13, 198:19,
198:25, 199:3,
212:6, 212:11,
212:25, 213:4,
214:13, 218:14,
219:5, 219:7,
219:11, 224:19,
225:9, 225:13,
225:19, 229:14,
229:17, 230:4,
230:11, 231:15,
231:22, 232:12,
232:16, 233:24
**count**
31:8, 47:9,

85:25, 86:2,
88:14
**counted**
200:2
**countersign**
83:1
**counts**
26:2, 84:11
**couple**
23:13, 23:24,
32:24, 48:19,
141:5, 241:4
**course**
51:11, 90:3,
154:13, 166:15,
166:17, 231:4,
234:15
**court**
1:1, 6:6, 7:5,
8:7, 13:21,
24:8, 24:10,
24:12, 25:3,
25:8, 25:19,
25:25, 119:2,
189:22, 190:1,
207:6, 245:4
**courtroom**
10:8
**cover**
43:24, 122:3,
122:4, 211:18
**covered**
71:19
**criminal**
207:6
**crosstalk**
145:20
**crr**
1:34, 245:24
**current**
27:6, 70:7,
76:3, 110:19,
124:5, 191:6
**currently**
35:21, 48:23,
51:17, 51:20,
52:23, 54:18,
61:14, 64:25,

68:1, 74:3,
77:23, 78:5,
78:8, 127:4,
128:14
**cursor**
176:4
**customary**
183:15, 184:16
**customer**
29:25, 81:2,
90:9, 107:13,
180:22
**customers**
79:12, 79:16,
79:18, 172:23,
208:13, 208:14,
208:21, 209:4,
209:5, 216:12,
217:19
**cut**
20:8, 104:7,
127:3, 185:24
**cv**
6:7
**cv-(nrb**
1:8
**cya**
107:13

---

**D**

**daily**
79:9, 79:10,
79:14, 79:16,
79:17, 171:18,
172:19, 172:21,
172:23, 174:11,
208:10, 208:14,
209:5, 225:12
**damon**
2:28, 7:3
**date**
6:8, 95:15,
96:1, 96:3,
100:12, 108:2,
112:14, 117:15,
122:21, 129:19,
132:14, 134:19,
135:12, 139:17,

140:15, 144:5,
144:12, 147:2,
149:2, 150:16,
152:9, 184:12,
236:17, 245:13
**dated**
99:16, 245:27
**dates**
56:11
**day**
16:11, 16:15,
16:20, 74:1,
96:11, 149:18,
149:22, 150:23,
173:12, 184:5,
199:25, 200:4,
204:18, 204:22,
205:4, 205:8,
205:14, 205:18,
206:6, 206:10
**days**
173:3, 173:5,
208:5
**dd**
5:8, 146:6,
146:9
**deadline**
145:18
**deal**
29:25, 110:16,
145:1, 148:8,
153:16, 153:20,
168:13
**dealing**
29:21, 29:22,
29:24, 30:4,
105:9
**deals**
30:3
**dealt**
92:23
**dec**
5:4, 5:7, 5:8,
5:9, 5:13, 5:27
**decade**
65:24, 189:6
**december**
1:27, 6:8,

40:9, 40:17,
56:6, 144:14,
147:3, 149:5,
149:15, 150:16,
152:10, 154:25,
155:12, 156:15,
159:8, 163:21,
175:16, 179:21,
180:17, 183:11,
184:2, 191:17,
242:5, 242:21,
243:11, 245:27
**decide**
195:20
**decision**
195:5
**defendant**
2:26, 7:3,
40:7, 42:1,
62:16, 63:14,
241:3
**defendants**
1:22, 2:16,
8:19, 8:22,
8:23, 14:9,
14:13, 19:13,
20:3, 62:15,
63:11, 168:7,
201:6
**define**
33:13, 52:2,
165:5
**defined**
42:23, 43:9,
73:2, 165:7
**definitely**
50:19, 91:25
**definition**
102:8, 102:9
**degree**
27:1
**delayed**
16:17
**delaying**
180:21
**deliberated**
210:2, 211:23
**delivering**
51:7, 51:9

**demised**
135:20, 176:24
**denied**
87:14, 234:13
**deny**
83:10, 231:17
**denying**
88:2
**departments**
71:18
**depending**
43:6, 44:8
**depos**
3:17, 6:12,
7:7, 11:10
**deposed**
17:25, 24:1
**deposit**
42:4, 87:4,
91:6, 179:24
**deposition**
1:25, 6:2,
6:13, 7:15,
8:16, 9:16,
12:1, 12:5,
13:14, 13:17,
14:18, 15:7,
15:18, 16:1,
16:4, 17:13,
18:15, 18:19,
154:17, 179:1,
179:2, 244:20,
244:22
**deposits**
83:2
**descent**
217:11
**describe**
25:15, 26:13,
26:18, 27:16,
28:10, 42:24,
61:8, 67:3,
67:5, 72:20,
89:14, 94:9,
137:2
**described**
103:25, 179:10,
199:7, 210:5

**describing**
94:25, 131:4
**description**
4:12, 5:2,
130:25, 160:8,
170:24, 171:17,
177:13, 208:18,
208:24, 214:11,
214:15, 214:24,
215:6, 224:21,
224:24, 229:21
**descriptions**
201:18, 201:23
**desire**
233:11, 233:12,
233:13, 233:16,
233:17
**detail**
130:2, 130:10
**details**
17:5
**developer**
27:7, 28:12,
28:13, 49:14,
49:17, 50:4,
50:12
**development**
27:21
**diagnosed**
26:9
**diana**
94:18, 132:21,
133:9, 133:10,
147:14
**diana's**
152:25
**difference**
31:23, 43:19,
85:21
**differences**
28:10
**different**
157:2, 157:4,
165:18, 206:16,
223:14, 223:15,
226:2, 226:7,
226:10
**differently**
215:7

**difficult**
7:25, 28:8
**digital**
11:11
**direct**
237:7
**directed**
237:21
**directing**
237:15
**directors**
86:5, 86:6,
195:20
**directs**
127:1
**disagree**
209:2
**disclosed**
90:24
**discrimination**
9:21, 14:10
**discuss**
9:24, 134:12,
219:14, 220:24,
227:17
**discussed**
55:13, 62:5,
62:13, 66:1,
66:6, 77:1,
207:9, 213:10,
213:19, 214:2,
215:13, 216:3,
242:17
**discussion**
12:11, 215:17,
215:20
**discussions**
160:13
**dismissed**
14:14
**displayed**
135:4
**dispute**
24:15, 25:16,
26:3, 80:2,
106:25, 239:22
**dissonance**
154:9

**district**
1:1, 1:2, 6:6,
29:13
**diverse**
217:22
**divided**
46:1
**division**
76:13, 163:11
**divisions**
76:10
**dlee**
94:16, 94:17,
230:25
**doctormann**
21:21, 22:24,
57:16, 60:7,
61:22, 62:14,
203:19, 203:23
**doctors**
205:17, 205:20
**documentary**
229:12
**documents**
11:11, 14:22,
18:18, 19:2,
93:6, 94:4,
94:5, 99:12,
108:23, 109:1,
109:5, 123:25,
124:6, 126:6,
167:11, 171:1,
179:16, 189:9,
189:12, 228:2,
228:17, 235:21,
241:6
**doing**
13:2, 79:18,
102:23, 124:18,
130:3, 130:11,
135:8, 161:12,
195:25
**donald**
59:15, 60:2
**done**
32:4, 83:23,
190:24, 244:16
**door**
70:21, 101:10,

101:17
**doorman**
164:11
**double-check**
123:15
**doubt**
56:22, 112:25,
113:7, 141:17,
156:7, 157:13
**down**
8:8, 14:1,
37:18, 41:21,
42:22, 48:9,
72:9, 76:23,
79:11, 97:19,
101:10, 105:24,
117:2, 117:23,
117:24, 123:8,
125:2, 133:14,
143:8, 143:20,
145:25, 151:14,
158:3, 161:22,
161:24, 168:20,
213:7, 213:15,
215:1, 238:23,
242:8
**download**
11:24, 124:4
**downloaded**
123:22
**drafted**
236:15
**draw**
91:4
**drop**
27:3
**dropped**
26:22, 27:14,
27:16
**due**
57:18
**duly**
7:10
**dummy**
130:13
**duplicates**
126:5
**duration**
15:11

**during**
49:20, 50:18,
56:10, 56:19,
64:2, 120:3,
231:13
**dyslexia**
33:17, 35:24,
135:8
**dyslexic**
26:9

**E**

**each**
7:21, 7:24,
40:12, 52:15,
56:7, 62:16,
205:13, 223:15
**earlier**
7:15, 11:10,
30:11, 65:25,
77:1, 102:11,
128:22, 160:18,
173:21, 177:17
**early**
37:9, 40:24,
97:22
**easily**
32:6
**eastern**
6:10, 26:16
**economic**
39:18
**economically**
39:15
**educational**
26:18
**edward**
97:14
**ee**
5:9, 151:18,
151:21, 158:3
**effect**
10:7
**eight**
200:4
**eight-hour**
15:20
**eighth**
22:8, 23:22,

33:20, 39:8,
43:7, 43:10,
43:13, 44:17,
45:1, 45:16,
47:1, 47:7,
48:2, 48:16,
53:16, 53:22,
54:13, 54:22,
55:9, 55:12,
55:14, 55:23,
56:8, 56:15,
56:17, 58:12,
67:8, 67:11,
73:6, 80:4,
82:11, 82:17,
84:6, 85:2,
85:15, 87:20,
87:24, 88:3,
89:16, 114:7,
115:4, 119:18,
173:22
**either**
30:16, 57:9,
58:6, 60:12,
80:11
**elevator**
44:2, 44:24,
51:4, 51:6,
51:8, 51:10,
51:12, 51:14,
67:24, 73:24,
79:21, 81:3,
90:6, 90:7,
101:9, 109:14,
109:15, 110:10,
110:14, 110:20,
113:9, 114:7,
114:12, 114:16,
115:1, 115:4,
115:9, 115:13,
115:19, 115:20,
115:23, 161:21,
161:22, 191:7
**elevators**
44:2, 64:23,
216:24
**elongate**
38:5

else
10:22, 17:7,
17:12, 19:8,
123:22, 213:6,
213:9, 213:18,
215:12, 229:1
else's
217:15
emailed
239:18
emailing
120:12
emails
94:20, 108:22,
122:12, 133:6,
148:22, 148:24,
150:10, 157:2,
157:5, 161:9,
222:3, 234:22,
239:25, 240:2
emory
89:4, 132:20,
144:23, 144:24,
144:25, 145:9,
153:3, 159:10,
179:11, 179:13,
203:16, 230:24
employ
207:2, 207:3
employee
245:16, 245:18
employees
50:22, 64:21,
67:24, 73:16,
172:19, 172:21,
208:10, 208:11,
209:3, 225:12
empty
54:10, 54:14,
235:15
enclosed
95:5
end
25:20, 40:17,
53:5, 61:5,
104:3, 116:1,
125:10, 161:6,
163:16, 163:19,

218:6, 244:20
ended
25:21
ending
40:10, 103:4,
111:4, 111:10,
123:10, 133:16,
135:4, 137:8,
148:10, 148:12,
152:22, 158:17,
219:17, 220:13,
226:13
ends
46:10, 200:8
engineering
53:4, 53:25,
54:6, 54:24,
55:5, 56:21
english
109:24, 111:8
enter
174:11
entered
40:7, 160:19,
167:16
entire
176:11, 213:13,
220:2
entity
56:1, 57:7,
58:21
entrance
114:7, 115:20
equate
200:3
equipment
61:11, 61:12,
79:22, 110:23
eric
21:21, 22:23,
57:16, 60:7,
61:22, 62:14,
203:19, 203:22
escapes
44:3
escorts
90:15
especially
218:17

esq
2:10, 2:21,
2:29, 3:10
essence
147:16
est
1:28
estate
24:4, 27:7,
27:19, 28:12,
28:14, 28:15,
28:16, 34:20,
43:16, 43:22,
44:5, 44:13,
80:8, 81:14
estimate
30:6, 55:5,
234:20
etan
3:10, 6:17,
11:6, 132:22,
132:23, 135:17,
140:5, 144:17,
144:22, 147:9,
147:10, 147:11,
153:2, 185:17,
231:10, 236:16,
237:14, 237:17
etan's
231:5, 231:6
ethnicity
9:18, 9:22,
26:14, 65:14,
65:15, 68:22,
68:23, 74:20,
78:22, 217:16,
217:18
even
73:25, 122:8,
133:10, 136:6,
240:3
event
245:20
events
20:15, 20:24,
21:4, 21:8,
21:22, 23:16,
103:24, 104:21,

106:12, 179:10,
182:11, 186:4,
190:20, 193:17,
196:11, 197:6,
221:9, 228:21,
239:2, 244:5
eventually
50:14, 98:8
ever
19:16, 19:17,
20:9, 20:12,
20:13, 20:14,
20:20, 20:23,
21:2, 21:7,
21:20, 22:20,
22:23, 23:1,
23:4, 23:7,
23:10, 23:21,
23:25, 25:2,
25:5, 42:9,
58:15, 59:9,
59:14, 63:24,
66:1, 67:1,
69:7, 72:17,
76:20, 77:20,
79:5, 85:3,
85:15, 87:14,
88:2, 89:3,
89:12, 101:7,
111:1, 115:21,
130:24, 131:3,
135:10, 137:12,
143:5, 191:23,
192:1, 195:13,
196:20, 198:24,
200:24, 206:9
every
31:14, 91:10,
154:10, 200:4
everyone
86:4, 92:4,
116:7, 146:1,
186:10, 217:9,
218:10, 227:10,
239:19, 244:18
everything
51:22, 153:1,
188:24

everywhere
67:7
evidence
174:8
exact
32:19, 167:17,
214:6
exactly
16:20, 34:17,
54:21, 55:8,
77:12, 78:25,
92:21, 105:4,
107:9, 128:5,
169:8, 174:21,
203:9
examination
4:3, 7:12,
241:1, 245:7
example
82:8
exception
18:16, 91:11
exchange
150:14, 151:23,
152:6, 154:20,
154:23, 156:14,
179:7, 179:10,
196:9, 196:12,
221:7, 221:10,
221:13
exchanged
97:22, 98:7,
235:4
excluded
229:17
excluding
55:22, 177:4
exclusive
52:9, 234:4
excuse
203:6, 205:22
execution
147:14
executive
135:21, 176:24
exhibits
11:21, 11:24
exists
108:10

expect
137:20
expedite
99:20, 132:23,
147:23, 147:25,
148:4, 148:6,
180:15
expediting
133:1, 181:8
experience
87:16, 87:20,
87:21, 194:15
explain
84:8, 166:13,
206:24, 207:4
explained
118:19
explaining
230:3
explanation
32:11, 44:16,
215:5
explicitly
198:24
exposed
72:22
express
165:2, 210:16,
210:19, 211:6,
216:6, 216:23
expression
168:12
expressly
229:17, 231:13
extended
206:14
extent
172:16, 176:19
eye-closed
83:23
eyesight
135:7

─────── F ───────

facility
112:22, 113:15,
113:18
fact
118:1, 118:2,

122:12, 124:7,
192:21, 210:21,
216:10, 231:17
factor
43:22, 44:10,
44:12
facts
66:1
fair
70:14, 74:22,
74:24, 78:24,
94:24, 97:21,
102:4
faith
148:5, 215:22
fall
88:25
familiar
170:2, 184:18,
201:20
family
17:16
far
43:6, 58:23,
66:23, 72:22,
87:24, 88:4,
111:20, 131:18,
187:15, 197:19,
201:4, 215:2,
217:9
fast
214:8
father
33:4, 33:5,
58:7
favors
135:8
feb
5:25
february
236:18, 237:3
feel
9:22
feet
43:12, 43:15,
43:18, 44:14,
200:2, 235:17
felt
92:22

few
25:8, 25:10,
26:12, 30:2,
122:1, 179:16,
197:4, 235:21
ff
5:10, 158:21,
158:24
fie
121:20
figured
198:16
file
123:23, 177:21
filed
36:24
files
183:4, 183:5
filing
177:20
fill
170:13
filled
73:7, 173:8,
177:8
film
61:11, 61:12
films
61:2, 61:4,
77:2, 77:7,
77:11, 77:13,
110:21, 115:14,
202:12
final
95:5, 95:7,
95:21, 97:1,
153:2
finalize
99:24, 133:4
finally
226:9
financially
245:20
find
12:3, 31:20,
33:16, 54:11,
54:15, 163:15,
163:19, 174:25,

191:16, 191:17, 194:22

**fine**
116:9, 124:5, 158:7, 186:10, 197:16, 197:18

**finish**
7:24, 30:20, 71:23, 87:17, 125:5, 138:6, 161:16, 232:6

**finished**
45:2, 114:6, 131:20, 174:17, 178:16, 196:3, 218:1, 242:9

**finishes**
121:3

**fire**
44:2

**firm**
53:25, 54:7, 54:24, 55:5, 210:3, 211:24

**first**
21:14, 46:22, 58:6, 62:9, 68:10, 75:5, 76:6, 76:14, 76:16, 79:6, 80:23, 88:20, 92:9, 104:24, 105:4, 118:3, 127:21, 137:15, 160:6, 163:23, 167:4, 171:11, 176:3, 179:25, 180:2, 202:3, 221:12, 228:9, 228:10, 242:6, 242:9, 242:16

**fit**
76:11

**five**
39:16, 40:9, 47:10, 47:11, 49:19, 49:21, 55:2, 60:18,

63:19, 75:11, 77:15, 88:11, 118:6, 118:15, 119:7, 119:11, 119:12, 122:13, 158:4, 174:22, 189:16, 190:4, 240:15

**fixed**
44:7

**floors**
37:15, 43:5, 52:13, 53:11, 53:12, 53:14, 53:16, 55:15, 55:18, 55:23, 56:1, 56:2, 56:10, 57:23, 58:4, 58:12, 58:19, 58:22, 59:18, 60:4, 60:14, 60:23, 61:13, 66:20, 72:21, 77:6, 87:24, 111:1, 198:6, 198:8, 203:17

**florida**
26:25

**flu**
239:15

**focus**
50:10, 80:1

**focusing**
76:10

**foggy**
53:6

**follow-up**
81:7

**following**
121:18, 149:18, 150:16, 150:23, 224:1, 228:24

**follows**
7:11

**foot**
43:2, 44:14, 71:16, 173:11,

173:18

**footage**
43:14

**force**
10:7, 71:19, 71:24

**forced**
191:16

**foregoing**
135:24, 177:2, 245:11

**foregone**
220:5, 220:9

**forevermore**
66:11

**forgive**
26:10, 59:2

**forgotten**
153:24, 154:5, 154:8

**form**
7:19, 20:21, 21:6, 21:10, 21:25, 22:9, 23:18, 34:10, 41:12, 65:19, 71:4, 71:8, 77:4, 77:5, 81:24, 86:16, 87:1, 95:2, 107:6, 107:11, 108:12, 109:5, 109:8, 115:5, 121:8, 121:25, 122:6, 122:14, 122:15, 127:10, 128:2, 130:8, 131:13, 133:5, 136:4, 136:13, 137:4, 138:5, 138:13, 140:3, 140:8, 141:15, 141:19, 142:10, 142:24, 142:25, 145:13, 147:19, 147:24, 149:11, 150:6, 151:6, 153:7, 154:2,

155:2, 155:6, 155:22, 157:22, 162:12, 162:17, 164:20, 171:25, 172:9, 174:13, 174:24, 176:16, 180:18, 180:20, 181:13, 194:25, 199:11, 205:19, 206:18, 209:7, 212:18, 213:22, 215:10, 215:11, 216:18, 216:19, 220:7, 222:6, 222:22, 223:12, 223:25, 224:25, 225:20, 231:24, 232:17, 232:20, 233:7, 233:8, 237:4, 237:10, 240:1

**formal**
84:12

**formally**
51:25, 52:2

**formation**
36:2

**formed**
32:22

**former**
195:16, 235:13

**formulate**
186:15

**formulated**
80:16

**forth**
94:25, 181:16, 211:5, 245:14

**forward**
94:18, 135:10, 137:12, 147:13, 170:25, 214:8

**forwarded**
159:9, 168:7

**four**
25:11, 35:9, 47:10, 47:11, 88:15, 104:24

**fourth**
71:14, 112:20,
117:23, 117:24,
121:16, 228:12
**fractional**
30:5
**frame**
38:8, 53:18
**franks**
4:17, 37:3,
37:11, 39:10,
39:20, 40:16,
40:23, 41:5,
42:13, 48:18,
49:6, 49:10,
50:21, 50:23
**free**
9:22, 94:12,
94:13, 94:21
**freight**
51:10, 51:14,
79:21, 81:2,
90:6, 90:7,
109:15, 110:10,
110:13, 110:15,
110:20, 113:9,
114:6, 114:12,
114:14, 114:16,
115:3, 115:9,
115:13, 115:19,
115:22
**french**
68:24, 69:1
**friday**
16:18, 95:18,
173:5, 207:1,
207:14
**friedman**
228:4, 231:2
**front**
9:24, 19:6,
143:4, 176:15,
195:21
**full**
163:11, 163:18,
163:23, 173:19,
203:13
**fully**
10:13, 10:18,

10:24
**furniture**
71:1
**further**
244:15, 245:10,
245:15
**furtherance**
135:25, 177:3

**G**

**g-u-e-r-c-i-o**
62:8
**game**
49:13, 49:17,
50:4, 50:11
**games**
49:15
**gap**
49:9
**garfinkel**
2:20, 6:24
**garment**
29:13
**gave**
55:9, 126:7,
126:8, 126:9,
244:5
**gears**
32:12, 88:18
**general**
66:11, 69:16,
81:13, 89:17,
135:21, 176:24
**generally**
22:4, 24:23,
27:16, 44:7,
51:3, 58:21,
66:15, 72:15,
80:1, 83:18,
88:25, 89:15,
192:4, 243:19
**generated**
81:12
**generation**
45:12, 45:18
**gentleman**
68:11, 139:23
**getting**
31:5, 78:6,

151:5, 185:24,
188:2
**gg**
5:13, 162:1,
162:4
**gist**
25:25, 81:13
**give**
10:6, 29:20,
30:6, 36:15,
62:17, 79:15,
91:6, 121:10,
124:6, 134:2,
171:17, 175:20,
189:19, 189:22,
192:7, 234:8
**given**
25:2, 25:5,
84:18, 84:23,
85:3, 85:15,
87:8, 94:3
**glanced**
102:5
**glass**
70:21, 70:23
**go**
9:24, 12:6,
17:4, 31:19,
38:17, 39:24,
41:20, 44:9,
44:11, 54:4,
62:12, 62:22,
62:23, 81:1,
84:8, 90:5,
90:12, 91:3,
93:5, 101:1,
102:7, 102:10,
104:3, 112:22,
113:5, 117:4,
134:17, 158:5,
160:5, 162:20,
171:10, 176:9,
177:19, 181:15,
182:19, 183:16,
185:23, 189:24,
189:25, 195:18,
199:14, 206:12,
209:17, 214:17,

215:1, 218:10,
228:9, 228:11,
230:13, 230:22,
234:23, 235:17,
242:8
**goes**
51:21, 57:11,
87:23, 90:12,
91:11
**going**
7:18, 7:20,
12:9, 15:4,
15:23, 26:11,
32:12, 36:15,
39:14, 46:19,
58:2, 62:12,
62:19, 62:25,
63:10, 64:1,
70:3, 72:10,
75:24, 77:21,
80:18, 93:5,
94:9, 102:22,
105:24, 112:25,
113:8, 115:18,
116:5, 116:13,
126:16, 134:5,
138:1, 138:10,
139:13, 151:2,
151:4, 151:8,
154:17, 158:9,
164:23, 166:22,
167:5, 168:2,
173:14, 174:9,
179:22, 190:5,
211:22, 213:8,
214:7, 225:14,
227:21, 233:18,
237:24, 240:17,
241:6, 244:21
**gone**
177:24, 202:12
**good**
7:13, 35:1,
49:18, 56:11,
76:16, 99:21,
116:6, 132:20,
141:3, 148:5,
157:8, 160:24,

161:1, 163:25, 164:5
**gotcha**
123:19
**gradually**
33:3
**graphics**
71:22
**great**
57:12, 76:18
**greatest**
211:17
**grill**
1:16, 2:17, 6:25, 8:21, 20:24, 22:21, 56:25, 60:5, 61:22, 72:11, 74:3, 75:2, 155:20, 157:11, 203:18, 216:22
**grill's**
73:9, 74:19, 76:1, 216:25
**ground**
77:8, 77:14
**group**
205:21, 206:3, 209:10, 209:13, 209:14, 209:16
**guarantee**
112:24, 113:6
**guards**
207:3
**guercio**
62:8
**guess**
26:2, 30:8, 59:7, 78:2, 91:13, 95:23, 101:15, 109:16, 110:18, 120:22, 122:25, 136:7, 157:24, 207:19, 207:20, 224:22, 241:6
**gugarty**
3:17

**guy**
57:19, 60:6
**guys**
152:24, 198:17, 240:14

## H

**half**
149:1, 228:10
**half-hour**
15:19
**hallways**
44:1
**hand**
28:7, 61:2, 61:4, 77:2, 77:6, 77:10, 77:13, 110:21, 115:14, 202:12
**handling**
241:6
**hands**
233:5
**hanukkah**
184:3
**happen**
80:9, 110:17
**happened**
32:5, 41:10, 41:11, 41:13, 88:5, 90:1, 174:21, 174:24
**happens**
31:8, 31:21, 86:23
**happy**
8:6, 9:10
**hard**
37:24, 218:16, 235:18
**hardship**
39:18
**head**
8:10, 50:24, 58:20
**heading**
109:20
**headquarters**
71:17

**health**
109:17, 109:20, 111:6, 135:23, 136:3, 136:18, 136:21, 136:23, 160:10, 160:16, 177:2, 211:18, 229:19
**hear**
74:17, 81:5, 83:6, 87:4, 185:16, 186:9, 192:14, 206:1, 237:14, 241:17
**heard**
59:9, 59:14, 59:22, 119:3, 182:1, 182:2, 195:3, 209:13
**held**
61:2, 61:4, 77:2, 77:7, 77:10, 77:13, 110:21, 115:14, 202:12
**help**
132:23
**helpful**
82:6
**hence**
218:21
**here**
6:1, 39:6, 90:1, 91:2, 94:18, 95:13, 102:23, 109:23, 111:16, 113:12, 134:16, 166:24, 170:24, 175:7, 184:13, 197:11, 213:16, 214:3, 229:12, 234:12, 241:4, 241:11
**hereby**
245:5
**hereinbefore**
245:13
**hesitate**
136:6

**hey**
90:13, 214:6
**hh**
5:15, 184:24, 185:2
**hi**
147:11
**high**
161:6
**higher**
38:10, 44:9, 44:10
**highly**
30:4
**hill**
102:21, 107:3, 164:25
**himself**
11:5, 11:9, 121:20, 122:3, 122:5, 222:11
**historical**
161:4
**history**
26:18, 27:17
**hold**
62:21, 78:15, 104:6, 135:2, 201:19, 201:23, 207:25, 227:3
**holdings**
1:14, 4:17, 6:5, 9:5, 37:3, 37:11
**holds**
65:10
**holidays**
184:1
**honest**
48:21, 110:24, 192:12, 192:15, 192:16, 222:12
**honestly**
242:20
**honig**
59:5, 63:21
**hop**
62:20

hope
51:14, 112:21,
127:7, 132:23,
139:23
hopefully
81:11, 87:4,
189:11
hopes
28:14
horrible
220:10
hospital
186:7
hostetler
2:9
hosts
72:5, 76:20
hour
105:7
hour-long
231:14
hours
164:9, 173:3,
173:10, 200:4
houses
34:21
however
7:23, 45:22,
129:4, 180:7,
181:7, 229:12
hq
169:5
humiliating
218:5, 218:7,
220:2, 233:3
humiliation
92:23
hundred
32:9
hundreds
29:3, 173:15,
174:1, 174:10
hurry
99:24, 133:4,
133:7
hurrying
181:8

I

idea
35:21, 42:11,

42:17, 54:8,
57:10, 57:12,
57:24, 58:14,
64:24, 65:9,
65:12, 65:15,
68:23, 71:3,
72:7, 73:14,
73:20, 74:2,
74:13, 76:21,
78:5, 78:10,
78:11, 78:20,
78:23, 84:22,
84:25, 90:10,
95:9, 101:20,
110:5, 111:2,
114:11, 115:24,
119:20, 119:24,
119:25, 121:5,
137:14, 142:5,
184:8, 184:10,
187:6, 187:17,
187:19, 234:19,
235:1, 239:20
ident
4:12, 5:2
identification
11:17, 36:12,
46:14, 69:25,
75:21, 93:13,
98:24, 100:6,
103:8, 125:18,
131:25, 133:19,
138:21, 143:12,
146:7, 151:19,
158:22, 162:2,
184:25, 190:14,
193:3, 200:12,
220:18, 226:17,
227:12, 236:2,
238:16, 241:21
identified
6:15, 33:8
identify
8:25, 11:5,
48:15, 134:24,
163:6
identifying
231:16

idiot
221:17, 222:5,
222:8
idiots
221:23
ii
5:16, 190:13,
190:16
images
70:10, 71:13
imagine
12:25, 39:7,
50:2, 67:25,
73:22, 90:1,
94:13, 95:20,
105:14, 148:12,
155:21, 155:23,
167:6, 182:24,
188:8, 188:12,
202:22, 230:25,
231:3, 239:19
immediate
92:10, 129:3,
166:25
immediately
11:25, 105:23,
121:17, 122:22,
167:3, 174:7,
174:18, 219:19,
224:18
implies
154:5
imply
120:16, 122:7
implying
154:8
important
8:11, 213:18,
213:23, 213:24
in-person
84:24
inaccurate
223:2, 223:3
inappropriate
15:24
inc
1:15, 1:21,
2:17, 6:25,

8:20, 13:6,
38:25, 59:6
incident
215:18
include
31:5, 136:22,
229:23
included
165:3
includes
44:1
including
109:12, 109:18,
110:2, 135:23,
160:10, 169:11,
177:1
inconsistent
212:21, 225:8,
225:17
incorporating
94:7
increase
38:10, 40:12
incredibly
174:20
indeed
36:20
independent
106:20
indicated
164:17
indicates
178:23
individual
20:3, 63:11,
156:12, 218:11,
221:21, 243:6
individuals
9:19, 22:2,
22:7, 22:15,
61:21, 62:13,
66:16, 202:5
inform
93:3, 194:17,
230:2
information
159:11, 188:22
informed
92:25, 147:11,

167:23, 194:11,
194:20, 195:1,
195:5, 195:6

**initial**
33:7, 83:22,
83:24, 84:10,
167:6

**initially**
27:18, 27:19,
89:22

**insensitive**
9:20

**inside**
28:18, 31:11,
31:22, 48:20,
90:3, 94:13,
115:11, 115:18,
121:15, 161:22,
172:11, 172:14,
180:13, 233:20

**insisted**
128:23, 231:22,
232:11

**insolvency**
28:2, 28:4

**instance**
147:22

**instead**
211:16

**instructed**
132:21

**instructions**
9:16

**insurance**
59:6, 63:21,
64:19, 64:22,
86:25

**intend**
229:13

**intended**
102:12

**intending**
212:16

**interact**
54:2, 60:24

**interacted**
29:23, 31:16,
60:12

**interaction**
29:14, 62:1,
243:24, 244:8

**interactions**
66:16, 66:19,
234:25

**interest**
111:17, 111:20

**interested**
235:11, 245:20

**interesting**
69:19

**internet**
70:6, 76:3

**interpretation**
157:8

**interview**
66:15, 92:19,
93:6, 128:23,
183:16, 183:17,
184:9, 184:17,
192:3, 192:9,
192:20, 193:24,
195:11, 196:19,
197:2, 199:20,
199:24, 203:4,
203:10, 204:7,
207:10, 210:16,
211:16, 213:8,
213:11, 213:19,
214:3, 215:8,
215:14, 215:17,
215:21, 216:2,
216:3, 217:4,
217:15, 218:1,
219:14, 225:6,
226:2, 228:25,
229:4, 230:10,
236:24

**interviewed**
64:6

**introduced**
11:9, 212:4

**introduction**
92:8, 212:8,
218:8

**invite**
12:5, 71:6

**involve**
82:12

**involved**
29:1, 29:5,
29:19, 29:20,
29:22, 30:4,
30:13, 30:23,
30:24, 33:2,
36:3, 36:23,
39:5, 81:18,
81:23, 83:17,
84:1

**iphone**
99:22

**ipo**
49:20

**irrelevant**
86:7

**ish**
26:22

**issue**
26:6, 39:6,
106:21, 231:11,
231:12, 231:17,
239:22

**issues**
147:12, 207:7,
232:4, 232:9

**itself**
168:17

---

### J

**jacqueline**
239:6

**jan**
4:30, 5:10,
5:15, 5:16,
5:17, 5:19, 5:24

**january**
49:2, 56:6,
64:6, 66:14,
75:6, 106:5,
106:6, 128:23,
183:13, 183:24,
184:8, 186:12,
186:21, 188:15,
191:1, 191:2,
191:3, 192:3,

192:8, 192:20,
193:14, 193:23,
194:8, 196:18,
197:2, 199:20,
203:10, 204:6,
207:10, 210:15,
213:10, 213:19,
214:2, 215:8,
215:13, 215:17,
215:21, 216:2,
217:3, 223:11,
224:6, 224:14,
225:5, 226:2,
228:24, 229:4,
230:9, 234:16,
235:3, 236:23,
244:11

**jersey**
34:21, 34:22,
245:5

**jet**
57:11

**jewish**
26:15, 215:22

**jj**
5:17, 193:2,
193:5

**job**
1:32, 170:23

**joey**
22:21, 56:25,
60:5, 61:22,
72:11, 72:14,
73:9, 155:13,
155:16, 155:19,
155:20, 155:24,
156:6, 156:9,
157:7, 157:19,
157:21, 203:18

**joey's**
57:2

**jogged**
92:14, 174:23

**john**
3:17, 11:9,
11:12, 12:15,
13:25, 36:5,
37:16, 38:4,

38:17, 39:24,
41:20, 42:21,
46:8, 48:8,
69:20, 72:8,
75:16, 76:22,
93:8, 97:18,
98:19, 100:1,
103:2, 103:11,
104:2, 107:14,
112:3, 113:20,
116:22, 117:5,
123:7, 123:9,
125:6, 129:14,
130:18, 131:19,
131:21, 133:13,
133:15, 134:18,
137:7, 138:18,
140:10, 143:7,
144:3, 145:24,
146:2, 146:17,
148:18, 150:9,
151:13, 151:14,
154:19, 156:13,
158:2, 158:16,
160:5, 161:23,
163:4, 163:17,
168:19, 171:10,
175:21, 178:6,
179:18, 181:19,
182:5, 182:20,
184:20, 185:21,
186:18, 189:8,
192:25, 193:6,
196:3, 196:14,
196:23, 200:6,
209:18, 213:7,
214:18, 220:12,
226:12, 228:11,
235:22, 238:11,
239:12, 241:7

**joseph**
1:16, 2:17,
6:25, 8:21,
20:24, 22:21,
56:25, 155:20

**judgment**
166:21

**jump**
186:15

**jumping**
15:13

### K

**kaled**
23:15, 82:8,
82:12, 155:13,
170:16, 188:7,
188:10, 188:11,
188:20, 189:1,
202:16, 222:21,
223:10, 224:4,
239:9

**keep**
8:11

**kenneth**
228:3, 231:2

**kind**
15:13, 41:4,
41:7, 44:8,
201:10

**king**
89:12, 94:15,
99:18, 100:15,
100:23, 101:6,
102:24, 104:15,
105:15, 106:2,
106:14, 107:4,
107:8, 113:11,
117:18, 118:10,
118:13, 120:12,
121:5, 121:12,
121:23, 122:13,
126:22, 128:18,
129:5, 129:23,
130:4, 130:10,
131:7, 132:13,
132:25, 139:20,
140:1, 142:1,
142:8, 142:13,
144:17, 144:18,
147:6, 148:3,
152:19, 159:8,
168:15, 174:7,
180:11, 186:2,
186:11, 186:14,
191:2, 192:1,
192:7, 193:12,

196:9, 196:17,
197:1, 199:3,
221:16, 229:7,
230:19, 232:23

**king's**
193:22, 194:7,
233:12

**kitchen**
47:13, 47:14

**kk**
5:18, 200:11,
200:14, 209:18,
214:19, 214:21

**knew**
24:19, 24:21,
105:4, 107:9,
121:15, 122:7,
213:2, 242:23,
243:2

**knowing**
188:14, 199:8

**knowledge**
7:22, 60:22,
74:10, 95:25,
96:10, 166:8,
197:11, 207:16

**known**
39:2

**knows**
107:24, 199:12

### L

**landlord**
25:8, 30:15,
30:24, 31:24,
91:12, 105:5,
191:7, 191:14,
203:18

**language**
127:2, 127:23,
129:6, 135:19,
147:12, 171:24,
221:20

**large**
110:23

**larger**
43:25

**last**
16:9, 16:13,

16:17, 16:18,
20:22, 31:4,
51:24, 52:3,
53:1, 53:3,
57:21, 59:25,
60:1, 61:16,
62:8, 68:12,
75:10, 76:24,
83:7, 83:8,
92:20, 114:4,
187:24, 189:6,
189:18, 190:1,
190:25, 209:20

**late**
168:10

**later**
50:15, 110:6,
150:24

**law**
3:9, 6:18, 11:6

**lawsuit**
14:3, 36:24,
37:2, 37:7,
39:5, 41:11,
41:15, 42:13,
103:15, 244:6

**lawsuits**
36:3, 42:18

**lawyers**
91:1, 91:4,
166:19, 228:23

**layout**
71:2, 71:10

**leading**
93:6, 153:25

**learn**
88:20

**learned**
199:19

**lease**
24:17, 24:18,
24:21, 39:11,
39:16, 39:19,
39:21, 40:24,
42:3, 48:10,
48:12, 50:14,
53:5, 54:25,
80:17, 80:18,

81:12, 82:14,
82:22, 82:23,
82:24, 83:2,
83:3, 87:24,
89:25, 91:4,
91:6, 91:10,
94:14, 95:1,
99:21, 109:18,
132:23, 133:1,
133:4, 137:20,
147:12, 147:14,
147:16, 148:1,
148:4, 148:6,
148:10, 153:3,
155:7, 155:13,
160:23, 169:6,
169:9, 177:22,
184:19, 191:11,
223:14

**leases**
28:15, 39:22,
50:7, 50:9,
52:18, 56:1,
56:2, 94:17

**least**
77:15, 242:5

**leave**
37:9, 224:24,
228:23

**leaving**
219:17, 219:19

**led**
20:15, 20:25,
21:4, 21:9,
21:22, 23:16

**lee**
5:22, 94:18,
132:21, 133:9,
147:15

**left**
41:16, 47:12,
47:13, 61:24,
169:13, 190:12,
219:13

**legal**
81:20, 81:21,
91:3

**legalese**
228:22

**legally**
232:15

**lehr**
23:15, 23:22,
163:21, 168:7,
188:24, 202:13,
202:14, 238:8

**length**
50:9

**less**
32:9, 50:1,
50:2, 55:10,
88:11

**lessor**
83:1

**let's**
47:9, 169:2,
169:22, 203:12,
210:23, 218:22

**letter**
94:6, 229:10,
230:3, 231:7,
231:16, 232:22,
233:21, 240:9

**letters**
5:22

**letting**
17:6

**level**
61:9

**license**
28:22, 167:20,
168:3, 229:20,
235:14

**licensed**
171:20

**lie**
216:21

**lied**
216:16

**life**
220:2, 233:3,
243:18

**lifestyle**
57:12

**light**
31:17

**likely**
70:14, 70:16,

239:9, 242:23,
243:2

**likewise**
229:18

**limit**
135:19

**limited**
58:4, 134:6,
135:23, 169:11,
177:1

**line**
19:14, 176:5,
236:14

**link**
11:23, 12:3

**lips**
28:8

**list**
86:3

**listed**
31:21

**listened**
14:23

**listing**
31:20, 80:6,
80:7, 80:10,
89:24

**listings**
31:21

**literally**
25:24

**litigation**
46:21

**little**
20:8, 26:12,
39:12, 93:7,
93:20, 105:25,
125:2, 139:7,
143:21, 144:4,
146:18, 163:5,
164:3, 176:8,
187:10, 187:13,
214:5, 215:1,
227:19, 227:22

**llc**
1:14, 4:17,
6:5, 7:3, 9:5,
37:3, 37:11

**llp**
2:20, 2:28

**loan**
28:14

**locate**
124:20, 183:3

**located**
31:13, 34:16,
35:19, 35:21,
52:12

**location**
100:25, 101:16,
102:19, 102:20,
107:3, 121:20,
127:6, 127:13,
127:16, 127:18,
127:20, 128:9,
128:16, 148:10,
169:5, 197:17,
198:23

**locations**
161:5, 169:4

**locked**
118:6, 119:13,
120:17, 120:20,
121:6, 122:13

**long**
15:9, 15:17,
24:7, 24:25,
27:12, 30:25,
39:20, 48:10,
49:16, 50:6,
52:8, 52:24,
54:23, 57:3,
64:12, 65:7,
67:12, 68:18,
69:12, 69:17,
73:9, 74:11,
77:10, 78:19,
92:19, 92:22,
116:10, 141:13,
144:23, 145:12,
150:11, 187:14,
188:25, 189:2,
189:4, 194:22,
195:8, 198:9,
235:16

**longer**
38:8

**look**
31:6, 70:17,
70:22, 71:5,
71:13, 80:22,
90:16, 101:1,
190:12, 201:15,
201:21, 242:2
**looked**
161:21, 191:1,
217:7
**looking**
31:19, 37:21,
56:13, 70:9,
70:20, 94:22,
108:10, 108:24,
116:20, 131:16,
134:6, 139:16,
148:14, 152:8,
156:15, 157:18,
163:3, 176:1,
207:25, 208:19,
212:21, 214:16,
227:4, 230:14
**looks**
61:9, 71:10,
124:10, 124:16,
175:5, 204:4
**loopnet**
80:9
**loss**
43:21, 44:10,
44:12
**lot**
32:6, 70:13,
92:15, 126:2,
133:6, 141:14,
153:19, 226:8,
233:10, 235:18,
235:19, 244:18
**loud**
40:4
**lounge**
71:1
**low**
164:1, 164:6,
164:13, 164:19,
164:24, 165:1,
165:5, 165:7,

173:9, 173:13,
173:18, 177:14,
197:15, 199:7,
199:9, 199:21,
199:24, 199:25,
200:5
**lower**
44:11, 44:12,
61:5, 61:9,
198:1, 198:5,
198:6, 202:13
**luckily**
174:6, 174:7
**lunch**
62:21, 116:7,
116:21
**luncheon**
116:15

## M

**m-a-x-i-m-e**
21:18
**ma'am**
18:21, 19:7,
74:16, 163:22
**made**
161:1
**main**
79:25, 109:20
**maintenance**
69:16
**majority**
47:2, 217:18,
219:9
**make**
31:22, 32:3,
38:8, 38:14,
39:15, 39:17,
43:11, 44:6,
80:24, 81:9,
83:9, 100:20,
110:16, 153:2,
157:14, 162:14,
171:6, 176:5,
184:14, 188:14
**makes**
229:12
**makeup**
118:16, 118:21,

217:8
**making**
37:24, 124:8,
213:16
**man**
215:22
**management**
23:15, 27:22,
82:9, 82:13,
207:5
**manager**
30:1, 81:18,
81:19, 81:23,
81:25, 82:1,
82:3, 82:9,
83:9, 83:13
**manages**
33:10, 76:13
**managing**
189:4
**manhattan**
34:21, 43:24,
71:16, 81:14,
91:10, 127:6,
127:20, 128:16
**manner**
222:12
**manual**
114:25
**many**
25:10, 28:25,
29:4, 29:7,
29:9, 29:19,
30:3, 30:12,
30:17, 30:22,
31:10, 31:15,
32:4, 34:24,
35:4, 35:15,
43:12, 44:20,
46:3, 47:7,
49:23, 50:22,
53:24, 55:6,
55:15, 55:18,
61:13, 61:15,
64:15, 64:18,
67:15, 67:18,
69:10, 73:12,
77:17, 79:8,

84:15, 85:18,
88:9, 94:19,
170:25, 172:19,
172:20, 172:23,
172:25, 208:10,
208:13, 229:6,
234:16, 234:25,
235:20
**mar**
5:26
**marc**
1:16, 3:9,
6:18, 8:21,
11:7, 23:11,
59:18, 59:22,
60:10, 60:14,
60:15, 60:16,
61:2, 61:23,
142:21, 202:11,
202:25, 203:3,
204:2, 204:6,
239:14, 239:24,
241:3, 243:10
**margolis**
2:20, 2:21,
6:23, 6:24,
11:20, 19:14,
19:16, 19:18,
19:20, 19:24,
21:18, 22:3,
22:11, 28:2,
28:4, 28:6,
38:4, 38:7,
38:16, 45:4,
45:6, 83:6,
93:19, 97:9,
97:14, 97:16,
123:21, 124:3,
124:10, 124:15,
125:12, 133:23,
134:24, 135:6,
138:24, 139:2,
140:5, 175:7,
175:9, 175:11,
178:1, 185:16,
185:20, 189:20,
192:13, 192:16,
194:13, 213:12,

221:24, 222:24,
223:4, 240:15,
240:22, 244:16
**mark**
2:26, 7:3,
11:23, 240:2
**marked**
11:16, 11:19,
12:16, 36:11,
36:14, 46:13,
46:16, 69:24,
70:2, 70:7,
75:20, 75:23,
93:12, 93:15,
98:23, 99:1,
100:5, 100:8,
103:7, 103:10,
125:16, 125:17,
131:24, 132:2,
133:18, 133:21,
138:20, 138:23,
138:25, 143:11,
143:14, 146:6,
146:9, 151:18,
151:21, 158:3,
158:21, 158:24,
162:1, 162:4,
184:24, 185:2,
190:13, 190:16,
193:2, 193:5,
200:11, 220:17,
220:20, 226:16,
226:19, 227:11,
227:14, 236:1,
236:4, 238:15,
238:18, 241:20,
241:23, 242:3
**marketing**
52:3, 52:9,
71:22
**marking**
76:4, 125:12
**marks**
244:19
**marriage**
18:8, 18:10
**married**
18:11

**mary**
182:2
**match**
118:16, 118:21,
119:8, 119:9,
120:15
**materials**
18:14, 18:22,
19:6, 52:4, 52:9
**math**
205:1
**matter**
6:3, 8:20,
118:18, 118:21,
127:7, 156:9
**mattered**
131:15
**maxime**
1:17, 2:17,
6:25, 8:21,
21:17, 23:5,
58:2, 61:22,
66:20, 68:9,
203:20
**maybe**
24:5, 37:18,
49:19, 53:18,
61:17, 78:17,
103:12, 109:17,
110:16, 111:10,
129:12, 187:17,
187:23
**mean**
9:19, 26:20,
41:13, 66:11,
82:24, 85:8,
85:9, 86:1,
86:17, 96:2,
101:5, 102:1,
111:6, 111:7,
115:15, 118:17,
119:9, 127:9,
127:12, 141:4,
142:9, 143:3,
145:4, 147:18,
155:16, 155:24,
156:25, 157:25,
165:13, 181:14,

183:11, 210:11
**meaning**
31:15, 115:17,
172:6, 183:16
**means**
8:17, 13:14,
33:21, 66:12,
76:12, 109:16,
154:8, 229:24
**meant**
157:15, 157:21,
206:5, 209:24
**measured**
43:16
**media**
6:2, 41:6,
41:7, 41:8,
48:19, 49:12
**mediation**
1:6, 2:7, 6:4,
6:22, 7:16,
8:15, 13:3, 25:6
**medical**
10:11, 10:12,
101:16, 165:12,
165:16, 165:18
**medications**
10:16
**meet**
15:6, 15:25,
16:22, 17:12,
183:13, 184:7
**meetings**
195:18, 195:24,
201:18, 201:23,
205:21, 206:3,
214:7
**member**
17:16, 65:1,
65:3, 65:8,
68:2, 68:4,
68:12, 68:19,
74:4, 74:8,
74:12, 77:24,
78:9, 78:11,
78:19, 85:22,
202:19, 202:20,
202:23, 210:14,

210:18, 211:7,
211:9
**members**
1:20, 8:24,
84:15, 86:15,
120:25, 150:1,
150:4, 154:15,
216:1, 216:5,
216:23, 219:15,
244:9
**memorable**
213:9
**memory**
32:23, 39:12,
64:1, 73:8,
88:15, 92:13,
92:15, 98:5,
98:6, 106:18,
163:12, 170:12,
172:1, 174:23,
195:25, 206:13,
206:16, 215:24,
216:4, 219:16,
219:21, 228:5
**men**
76:10, 145:3,
145:4
**mengel**
5:26, 239:6
**mental**
10:12, 109:16,
109:20, 111:5,
135:23, 136:2,
136:18, 136:21,
136:23, 160:10,
160:16, 177:2,
229:19
**mention**
163:10, 209:16,
215:3, 217:17
**mentioned**
8:14, 161:9,
161:20, 164:22,
204:20, 216:10,
225:9, 231:1,
234:21
**mentioning**
174:21, 217:18

mentions
209:10, 209:13
merged
50:14
message
94:14
met
15:17, 16:9,
16:12, 16:15,
19:12, 19:23,
89:3, 89:12,
219:2
mia
155:14, 155:17,
155:18, 156:8,
156:9, 156:22,
157:19
mia"
155:25
michael
1:17, 2:18,
2:29, 7:1, 7:2,
8:22, 20:10,
23:8, 61:23,
63:15, 96:6,
124:20, 202:8,
202:10, 203:20,
240:13, 240:24,
241:2, 241:11
mid-december
153:5, 153:13
middle
26:15, 126:13,
139:16, 228:12
might
8:16, 9:17,
47:14, 71:6,
74:1, 81:7,
90:25, 93:7,
123:18, 148:19,
154:20, 223:4
mind
12:24, 103:17,
143:21, 151:24,
153:22, 176:21
mine
156:23, 157:9,
157:16, 157:21

minimal
163:11
minority
32:15, 32:18
minus
42:4
minute
23:3, 62:17,
124:24, 134:2,
158:5
minutes
12:7, 23:13,
23:24, 92:24,
150:24, 174:22,
189:16, 190:4,
201:13, 201:14,
201:16, 201:18,
201:20, 202:1,
206:17, 236:21,
237:2, 237:8,
238:2, 238:6
misheard
118:23
mispronouncing
21:16, 34:13,
59:2
misread
152:24
miss
109:6
missed
109:1, 109:5,
154:21
missing
155:18, 156:22,
157:7, 157:21,
157:25
misstates
225:21
mm
5:22, 226:16,
226:19
models
4:22, 57:1,
72:16, 73:21,
73:23, 76:1,
76:9, 76:20,
216:25

moment
11:15, 91:18,
123:20, 159:17,
169:25, 181:25,
196:5, 220:22,
225:10, 227:4,
228:13
monday
100:13, 132:15,
152:25, 173:4,
173:6, 187:2,
187:9, 207:1,
207:14, 208:6
money
41:3, 42:10,
42:12, 42:14,
42:16, 87:1
monitor
6:9
monsey
215:18, 215:23
monsieur
58:3
month's
179:25
months
105:6, 122:23,
122:25, 123:4,
153:25, 180:16
more
8:24, 23:2,
23:13, 23:23,
32:6, 32:8,
38:14, 88:11,
88:16, 88:19,
89:18, 93:20,
103:18, 118:7,
123:25, 178:19,
189:9, 192:17,
206:10, 214:5,
226:9, 227:19,
243:17
morning
7:13, 70:6,
76:3, 132:20,
147:11
morphed
27:20

most
31:16, 33:9,
92:16, 218:4,
220:2, 233:2
mostly
204:18, 216:12
mountain
181:22, 181:23
mouth
28:8
move
17:6, 99:20,
107:15, 112:3,
113:20, 114:24,
125:6, 129:14,
130:18, 134:18,
137:7, 139:24,
140:2, 140:10,
148:18, 150:9,
152:25, 153:5,
153:12, 154:20,
186:19, 227:23,
238:11
moved
25:17
movement
47:4
moving
79:22, 204:10
much
27:21, 28:23,
33:9, 45:13,
45:19, 195:19,
226:10
multiple
31:20, 80:7,
89:24, 167:11,
186:7
multiplied
204:25, 205:5,
205:9, 205:11
must
8:9, 183:18
myself
27:11, 34:18,
99:19, 132:17,
147:7, 152:20,
184:14

## N

**name**
7:14, 12:24,
21:14, 32:19,
32:20, 48:21,
53:4, 57:20,
57:21, 58:6,
59:9, 59:14,
59:21, 62:8,
62:9, 68:12,
182:23, 202:9,
241:2, 243:5
**named**
59:25, 60:1
**names**
20:4, 60:16,
60:21, 60:25,
68:10
**nancy**
1:34, 7:6,
22:12, 31:2,
83:7, 118:25,
178:1, 189:17,
223:22, 245:3,
245:24
**narcotic**
166:24
**narcotics**
92:10, 130:15,
131:17, 167:1,
167:5, 167:9,
214:7, 214:13,
214:25, 215:3,
216:9, 218:9,
219:6, 224:19,
225:9, 225:18,
226:5, 233:19
**narrow**
22:5
**national**
71:18
**nature**
14:3, 37:6,
164:7, 213:20,
214:6, 214:9
**near**
214:22

**nearly**
71:24, 85:1,
85:6, 122:23,
231:14
**necessary**
87:11
**need**
9:8, 20:4,
83:6, 114:24,
120:21, 121:14,
131:17, 153:8,
170:3, 178:13,
192:5, 223:23
**needed**
118:7, 119:15,
181:11, 188:9,
188:21
**needs**
62:20, 139:24,
189:24, 189:25
**negotiated**
166:18
**negotiating**
147:15, 235:9
**negotiation**
111:24
**neither**
245:16, 245:18
**nephew**
58:8
**never**
19:18, 19:21,
19:23, 20:18,
59:22, 67:22,
105:2, 105:17,
105:21, 106:16,
120:24, 131:5,
141:16, 170:10,
180:19, 192:21,
201:2, 201:3,
205:15, 219:1,
219:2, 238:5
**new**
1:2, 2:12,
2:23, 2:32,
3:12, 6:6,
33:20, 34:22,
62:4, 114:6,

169:5, 191:16,
215:18, 215:23,
229:19, 229:20,
245:5
**next**
37:19, 79:25,
86:23, 100:21,
107:15, 111:9,
112:4, 113:21,
125:4, 129:15,
130:19, 130:20,
137:8, 140:11,
148:19, 150:10,
154:20, 156:14,
160:7, 164:22,
176:20, 186:19,
196:3, 206:20,
208:4, 208:13,
235:4, 242:7
**nice**
57:19, 71:11,
92:5
**nigel**
1:18, 1:25,
3:7, 4:5, 6:3,
6:19, 11:7,
100:20, 104:18,
105:6, 112:21,
118:4, 147:11,
192:14, 203:16,
210:8, 232:7,
244:20, 245:7
**nine**
66:22
**ninth**
58:4, 58:8,
58:9, 58:12,
58:15, 66:25,
67:2, 67:4,
67:6, 69:8
**nn**
5:24, 227:11,
227:14
**nodding**
8:10
**noise**
123:3
**none**
110:25, 216:1

**nonprofit**
198:12
**norm**
9:16
**normal**
173:9, 239:24
**normally**
195:10
**not-for-profit**
198:15
**notary**
245:4
**note**
117:19, 179:23
**nothing**
57:19, 66:6,
66:8, 69:17,
69:18, 148:7,
199:24, 230:23,
245:9
**noticed**
79:5
**nov**
4:24, 4:26,
4:28, 4:32,
4:35, 5:6
**november**
40:6, 40:18,
95:14, 95:17,
95:18, 95:19,
95:22, 97:2,
97:22, 99:16,
100:13, 101:22,
104:12, 108:4,
112:15, 114:1,
117:16, 122:20,
126:14, 129:21,
132:15, 135:13,
137:22, 139:18,
140:16, 181:22,
243:14
**ns@5cre**
230:18
**number**
6:2, 7:20,
29:17, 30:5,
32:6, 38:18,
38:21, 40:3,

41:24, 46:9,
79:15, 117:2,
121:6, 133:24,
172:18, 225:12
**numbers**
26:9
**ny**
3:12

O

**o0o**
244:23
**oath**
10:3, 213:17,
213:18, 214:4
**object**
20:21, 22:9,
23:18, 71:8,
77:5, 107:6,
109:8, 112:23,
121:8, 121:25,
122:6, 122:15,
140:7, 141:19,
142:23, 142:25,
147:24, 149:11,
180:20, 206:18,
215:11, 225:20,
232:17, 233:8,
237:10, 240:1
**objected**
218:23
**objecting**
223:25
**objection**
15:22, 17:3,
21:6, 21:10,
21:25, 22:3,
34:10, 40:25,
41:12, 45:4,
45:5, 65:19,
66:9, 71:4,
77:4, 81:24,
86:16, 89:7,
95:2, 96:20,
97:4, 98:1,
107:11, 108:12,
109:4, 109:5,
115:5, 118:20,

122:14, 127:10,
128:2, 130:8,
131:13, 133:5,
136:4, 136:13,
137:4, 138:5,
138:13, 140:3,
141:15, 142:10,
142:23, 145:13,
147:19, 150:6,
151:6, 153:7,
154:2, 155:2,
155:6, 155:22,
156:11, 157:1,
157:22, 162:12,
162:17, 164:20,
171:25, 172:9,
174:13, 180:18,
181:13, 194:13,
194:24, 194:25,
199:11, 205:19,
209:7, 212:18,
213:12, 213:22,
215:10, 216:18,
216:19, 220:7,
221:24, 221:25,
222:6, 222:22,
222:24, 223:12,
224:25, 225:1,
230:6, 231:24,
232:20, 233:7,
237:4, 237:9,
240:9
**objections**
94:6
**obligated**
42:1
**observe**
101:11
**obtained**
84:7
**obviously**
38:14
**occasions**
196:19
**occupancy**
137:23, 176:18,
176:20, 229:15
**occupants**
62:4, 110:19

**occupation**
27:6
**occupied**
54:24, 55:15,
55:19, 55:23,
56:7, 56:9,
60:14, 61:14,
61:19, 63:16,
64:13, 67:13,
73:10, 77:11
**occupies**
52:21, 57:22,
58:22, 63:25,
72:12, 76:2,
77:7
**occupy**
60:23, 66:21,
135:20, 176:24
**occupying**
56:25, 57:5,
57:16, 58:4,
59:3, 59:19
**occurred**
215:18, 215:23
**offer**
32:3, 71:21,
80:24, 95:5,
95:7, 95:22,
96:1, 96:10,
109:11, 109:15,
110:10, 110:13,
110:15, 118:3,
243:22
**offered**
67:22, 210:22
**office**
11:7, 25:20,
27:9, 31:7,
67:6, 70:13,
70:16, 72:6,
84:9, 91:17,
91:20, 107:2,
131:16, 161:3,
167:1, 171:20,
173:9, 173:19,
174:1, 197:15,
198:14, 199:4,
199:7, 199:10,

199:22, 205:16,
210:4, 211:25,
212:2, 212:5,
213:3, 219:4,
219:6, 219:7,
226:10, 229:19,
233:20, 235:16
**offices**
3:9, 6:18,
35:18, 46:2,
46:3, 47:7,
47:20, 47:23,
70:19, 76:8,
135:21, 135:22,
160:9, 160:15,
169:10, 173:22,
176:25, 219:9,
219:10, 235:17,
235:20
**often**
50:21, 65:20,
65:22, 69:5,
75:1, 221:19
**oh**
28:6, 48:12,
53:10, 59:24,
64:2, 78:6,
85:7, 133:24,
149:21, 186:10,
241:19
**okay**
12:8, 15:4,
16:8, 16:21,
26:8, 38:16,
47:22, 57:25,
60:8, 60:13,
62:12, 62:24,
63:9, 63:14,
76:18, 77:3,
85:11, 89:22,
96:24, 98:19,
103:19, 104:9,
116:4, 121:3,
125:11, 127:1,
127:22, 133:25,
134:9, 134:14,
136:24, 139:2,
151:13, 152:24,

158:6, 163:4,
175:8, 180:5,
192:16, 193:10,
203:12, 221:5,
222:18, 224:10,
228:24, 231:19,
237:25, 241:14,
241:24, 242:15,
242:21, 243:19,
244:10

**old**
47:4

**older**
33:3, 46:23

**once**
12:1, 58:17,
61:18, 65:24,
67:2, 69:12,
71:9, 72:19,
81:16, 86:22,
86:24, 90:16,
90:23, 131:5,
159:3, 217:25,
234:2, 243:17

**one**
8:1, 11:15,
17:20, 22:17,
29:14, 31:7,
31:21, 32:7,
35:25, 37:14,
37:15, 43:3,
43:5, 43:8,
47:9, 47:11,
48:13, 49:13,
49:14, 49:20,
50:20, 58:6,
58:7, 60:17,
60:18, 60:19,
73:22, 83:22,
92:9, 95:10,
98:10, 98:18,
109:18, 112:23,
115:25, 118:7,
121:2, 121:10,
122:17, 123:19,
123:25, 126:17,
137:8, 149:3,
159:17, 167:5,

167:7, 169:25,
171:14, 175:5,
175:20, 181:24,
182:2, 191:17,
195:19, 196:3,
198:1, 198:5,
204:20, 217:13,
223:16, 223:18,
224:8, 224:9,
227:4, 228:13,
230:25, 231:2,
231:4, 232:3,
232:9, 232:10,
234:5, 242:6,
242:9, 243:21

**one's**
73:7

**ones**
22:15, 62:4

**only**
8:1, 18:24,
38:13, 55:25,
56:1, 87:23,
109:16, 110:11,
110:13, 110:15,
110:20, 113:9,
118:7, 127:4,
128:14, 128:19,
134:5, 174:8,
178:22, 180:3,
184:6, 204:20,
217:3, 217:10,
217:13, 217:17,
219:10, 225:16,
225:22

**oo**
5:25, 236:1,
236:4

**open**
72:22, 73:7,
170:25, 240:3

**opened**
101:9

**operate**
212:16, 229:22

**operated**
35:21

**operates**
72:12, 77:2

**operating**
102:16, 164:9,
168:10, 210:3,
211:25, 212:2,
212:16

**operation**
171:18, 173:3

**operations**
71:18

**opine**
136:14

**opinion**
91:16, 172:2,
172:4, 209:9,
209:12, 226:8,
232:3, 232:9,
235:13

**opposed**
44:12, 233:9

**opposite**
167:17

**option**
24:17, 24:18,
24:22

**order**
89:20

**organization**
169:3

**original**
109:11

**other**
1:19, 17:11,
18:22, 33:24,
34:5, 34:9,
35:13, 42:18,
50:3, 53:8,
55:23, 60:6,
64:10, 87:13,
87:14, 88:1,
91:10, 110:25,
113:5, 115:22,
125:1, 161:5,
164:10, 177:23,
207:7, 216:1,
216:23, 223:16,
235:10

**otherwise**
10:19, 120:17,

120:20, 129:13,
175:1, 183:20

**out**
9:15, 20:8,
25:19, 26:22,
27:3, 27:14,
27:16, 35:22,
35:23, 38:13,
39:10, 39:14,
39:15, 39:19,
40:4, 79:12,
80:17, 80:18,
89:23, 89:25,
90:12, 127:4,
128:13, 151:24,
163:5, 163:18,
164:2, 169:13,
170:14, 171:21,
173:8, 176:7,
176:21, 177:8,
188:11, 188:24,
193:1, 194:22,
217:25, 219:18,
224:24, 227:21,
230:21, 232:23,
235:19

**out-patient**
131:8, 171:20,
210:5

**outcome**
41:14, 245:20

**outreach**
197:25, 198:11,
198:16

**outside**
66:13, 79:11,
80:18, 237:23

**over**
14:22, 22:7,
23:22, 27:20,
28:7, 29:2,
29:6, 29:13,
44:5, 44:7,
45:23, 48:1,
48:20, 57:11,
76:7, 76:9,
81:1, 81:10,
83:19, 91:7,

95:13, 100:20, 106:25, 115:18, 161:10, 166:24, 173:20, 200:4, 202:12, 210:17, 210:19

**overflow**
115:12, 115:14, 115:15

**own**
32:15, 32:18, 33:24, 34:5, 34:8, 34:20, 34:25, 35:5, 35:10, 35:16, 141:18, 197:25

**owned**
80:9, 82:5, 198:7

**owner**
31:25, 38:25, 80:11, 83:1, 90:14, 203:17, 203:19, 203:23

**owner's**
80:12

**owners**
28:16

**owns**
17:21, 18:3, 32:16, 34:18, 35:11, 35:12, 57:4, 86:4

**oxford**
1:14, 4:16, 6:4, 9:4, 14:10, 14:12, 17:21, 18:3, 22:7, 23:22, 32:13, 32:14, 32:16, 32:20, 32:21, 33:2, 33:6, 33:11, 33:24, 34:5, 36:2, 37:2, 42:9, 42:16, 42:19, 48:1, 48:16, 49:22, 52:18,

56:1, 80:3, 82:16, 85:8, 85:9, 85:14, 87:3, 88:13, 89:20, 97:22, 98:10, 112:1, 160:19, 166:2, 222:21, 223:8, 224:2, 224:3, 224:12, 235:9, 235:10

**oxford's**
35:18, 48:10, 195:16, 195:24

## P

**p-a-t-u-r-e-t**
60:10

**page**
4:12, 5:2, 37:19, 38:18, 39:25, 41:21, 41:22, 46:22, 70:5, 76:1, 111:4, 111:10, 117:4, 125:4, 125:6, 125:8, 126:1, 126:13, 134:12, 134:25, 135:3, 137:8, 139:16, 160:6, 171:11, 171:12, 171:13, 176:3, 176:15, 176:17, 208:3, 208:8, 228:9, 228:10, 228:12, 230:13, 230:14, 242:6

**pages**
1:33, 124:17, 125:1, 178:19, 178:22

**pandemic**
53:7, 235:18

**paneled**
67:6

**panelled**
70:12

**paragraph**
76:6, 163:24, 164:23, 204:10, 206:20, 209:24, 211:22

**paragraphs**
209:20

**paraphrase**
201:10, 201:24

**parentheses**
110:1

**parents**
26:15

**part**
24:20, 105:7, 113:21, 126:15, 130:19, 140:12, 163:9, 168:20, 186:6, 189:6, 229:16, 229:21

**participated**
2:2, 3:2

**particular**
37:21, 163:2, 176:1

**particularly**
18:6, 69:18, 99:25, 115:6

**parties**
6:12, 13:13, 24:20, 82:24, 182:14

**partner**
17:16, 33:9, 187:6, 187:18

**partners**
17:20

**parts**
163:1, 163:6, 163:8

**party**
42:19, 52:9, 90:10, 90:17, 90:18, 110:7, 126:2, 126:3, 245:17

**pass**
61:7, 83:24,

109:17, 111:10, 131:8

**passenger**
51:6

**past**
29:14, 44:3, 45:13, 45:19, 52:8, 53:6, 76:7, 80:3, 82:16, 84:5, 88:14, 180:16, 194:15

**patient**
165:14, 165:19

**patients**
136:11, 136:23, 199:25, 204:18, 204:21, 204:22, 205:4, 205:8, 205:14, 205:18, 206:6, 206:10, 206:25, 207:13, 217:22, 225:13

**paturet**
1:16, 2:26, 7:4, 8:21, 21:3, 23:11, 59:19, 60:10, 60:14, 61:23, 77:1, 77:23, 142:22, 202:25, 239:15, 241:3, 243:11, 244:11

**paturet's**
61:2, 78:21

**pay**
164:11

**pending**
9:12, 41:17, 83:4

**penthouse**
72:25, 73:2

**people**
14:5, 53:24, 59:23, 60:11, 64:15, 67:15, 71:25, 73:12, 77:17, 77:20,

79:8, 79:14,
102:7, 113:5,
115:17, 119:11,
173:12, 173:15,
173:16, 173:17,
174:1, 174:11,
183:25, 185:24,
200:3, 215:22,
217:6, 226:9
**percent**
29:15, 30:7,
30:11, 40:12,
44:7, 81:4,
102:14, 112:23
**percentage**
29:20
**perfect**
117:5, 144:5,
154:21
**perform**
168:2, 233:23
**performed**
232:15
**perhaps**
79:23
**perimeter**
46:2
**period**
49:2, 57:15
**person**
8:2, 33:7,
55:25, 57:8,
57:10, 153:21,
184:6, 197:25,
217:3, 217:10
**personal**
18:4, 26:12,
27:5, 60:22,
95:25, 96:10
**personally**
18:6, 88:12,
131:4, 136:8,
213:2
**pertinent**
229:16, 229:21
**peter**
23:15, 23:21,
163:21, 168:7,

188:24, 188:25,
202:13, 202:14,
236:13, 238:8,
239:18
**peter's**
188:23
**phone**
14:23, 17:2,
18:17, 18:24,
31:6, 90:21,
92:13, 186:15,
213:14
**phonetic**
31:17
**photo**
76:20
**phrase**
110:1, 154:4,
154:7
**physical**
10:11, 10:12,
42:25, 67:3,
211:18
**physically**
31:12, 31:15,
57:7, 205:12
**picking**
51:11, 51:13
**picture**
70:21, 70:22
**placating**
188:16
**place**
86:13, 104:21,
164:8, 168:8,
195:7, 195:10,
218:15, 218:18,
218:24, 245:13
**plaintiff**
1:10, 2:6,
6:21, 7:17,
38:23, 40:8,
42:2, 46:20
**plan**
4:18, 11:21,
46:23, 46:25,
47:5, 47:7,
53:19, 72:22,

163:11, 173:21,
186:16, 186:25
**planet**
3:17, 6:12,
7:7, 11:10
**plaza**
2:11
**please**
6:14, 7:7,
7:23, 8:4, 8:9,
9:10, 9:22,
11:5, 11:12,
20:5, 20:6,
26:13, 26:17,
28:10, 36:6,
37:17, 38:20,
41:24, 76:5,
89:18, 94:11,
94:17, 94:19,
94:21, 95:5,
99:15, 99:20,
100:18, 100:22,
103:18, 104:2,
104:7, 104:23,
109:10, 112:19,
114:5, 117:5,
123:13, 123:20,
124:23, 125:1,
125:6, 125:14,
126:24, 130:2,
134:25, 137:15,
140:23, 143:9,
143:18, 143:20,
146:2, 147:8,
147:13, 151:25,
153:2, 156:21,
159:21, 160:6,
163:24, 171:15,
171:16, 171:17,
175:11, 176:22,
178:14, 181:20,
196:5, 200:16,
202:7, 203:7,
220:22, 227:6,
231:10, 232:8,
236:5
**pllc**
3:9

**plus**
76:10, 118:6,
119:13, 119:23
**point**
27:22, 28:24,
32:7, 49:20,
53:18, 81:17,
82:10, 83:16,
87:3, 90:8,
92:12, 92:15,
98:11, 115:1,
116:7, 214:23,
220:10, 243:21
**pointing**
176:21
**poor**
135:7
**porrino**
59:5, 63:21
**portion**
39:1, 107:15,
126:13, 134:6,
140:11, 230:17
**position**
65:11, 68:16,
74:15, 78:15,
105:2, 105:17,
106:16, 167:15,
202:23, 231:20,
234:7
**possess**
168:3
**possession**
87:7, 87:11
**possible**
53:21, 108:21,
119:16, 128:17,
128:21, 137:24,
142:13, 142:16,
142:20, 145:17,
151:4, 151:7,
151:8, 151:11,
157:10, 157:20,
181:12, 188:13,
202:15, 205:6,
205:13, 206:4,
206:8, 206:15,
227:24, 233:23

**possibly**
62:21, 72:4,
91:25, 163:18,
201:12
**post-covid**
244:1
**potential**
81:17, 221:23
**pp**
5:26, 238:15,
238:18
**pre**
244:1
**pre-covid**
244:1
**pre-scheduled**
9:9, 62:21
**preceding**
75:12
**precisely**
130:2, 130:11
**predominantly**
91:24, 131:16
**preferably**
50:10
**premise**
206:12
**premises**
33:15, 33:18,
33:23, 39:1,
39:6, 39:21,
40:24, 42:24,
43:9, 48:15,
48:23, 49:11,
49:23, 51:17,
51:25, 52:5,
52:12, 55:16,
55:20, 56:24,
57:16, 58:1,
59:1, 59:18,
60:14, 61:25,
65:5, 68:6,
74:9, 78:13,
87:15, 88:7,
89:9, 89:12,
89:21, 89:22,
97:24, 99:24,
102:13, 106:22,

110:4, 111:18,
122:11, 128:25,
129:7, 131:1,
131:12, 135:20,
138:4, 138:12,
153:6, 164:13,
167:21, 172:21,
174:11, 176:24,
212:17, 216:7,
218:15, 224:13,
229:15, 229:20,
229:22, 230:5,
230:11, 231:16,
232:16, 233:24,
234:14, 234:18,
235:3, 235:7,
235:11, 235:15
**preparation**
17:12, 18:15
**prepare**
14:18, 14:20,
14:21, 15:1,
15:7, 15:18,
16:1, 16:3,
94:17
**prepared**
52:4, 202:6,
208:18, 208:24,
214:12, 224:21,
235:5
**present**
3:16, 195:13,
195:19, 203:3,
213:1
**presented**
91:17, 92:17,
92:18, 164:14,
165:15, 166:5,
166:7, 166:14,
172:5, 172:17,
206:23, 212:22,
212:23, 222:11,
222:13, 222:18,
222:19, 222:21,
243:22
**presenting**
166:18
**presently**
76:9, 135:4

**president**
89:3, 118:8,
120:2, 120:8,
141:1, 141:9,
141:10, 142:1,
142:14, 142:18,
142:20, 242:22,
243:3, 243:4,
243:7
**pretty**
15:16, 33:8,
47:18, 47:19,
139:7, 218:16,
220:5
**prevent**
10:13, 10:17,
10:23
**previous**
36:22, 36:25,
77:14, 105:12,
117:19, 119:11,
122:9, 161:9,
181:4, 197:24
**previously**
14:12, 63:21,
66:22, 78:25,
94:14, 161:20,
174:22, 220:1,
234:22
**price**
51:23
**primarily**
91:24, 92:1
**prior**
49:6, 57:21,
75:10, 148:10,
160:14, 192:22,
212:22, 245:6
**privilege**
15:14, 17:4,
230:7, 237:16,
237:22
**privileged**
16:7, 237:11
**probably**
53:19, 55:2,
61:16, 83:18,
83:23, 88:11,

102:5, 170:21,
172:15, 179:24,
188:7
**problem**
178:24, 179:4,
241:15
**proceed**
63:12
**proceeded**
153:23
**process**
80:5, 83:17,
140:2, 147:23,
179:23, 188:6
**produce**
93:25, 98:13,
99:6, 99:10,
108:14, 108:17,
112:7, 125:25,
126:5, 139:14,
183:1
**produced**
18:18, 18:23,
19:2, 46:20,
94:5, 96:14,
99:13, 103:14,
112:11, 125:21,
132:7, 132:10,
139:11, 140:19,
140:22, 144:6,
144:10, 146:22,
146:25, 152:11,
152:15, 185:11,
185:13, 185:18,
194:1, 194:5,
201:6, 228:7,
229:10, 237:17,
237:20, 240:5,
240:7
**product**
235:19
**production**
240:9
**professional**
221:22
**program**
126:16, 127:4,
127:18, 127:25,

128:14, 128:19,
229:22
**programs**
135:22, 160:10,
160:16, 169:10,
169:13, 172:8,
177:1
**pronouncing**
63:6
**proof**
86:25, 175:2
**properties**
28:25, 29:5,
29:8, 29:18,
30:12, 30:17,
30:22, 33:25,
34:6, 34:9,
34:15, 34:24,
35:4, 35:7,
35:10, 35:16
**property**
22:7, 26:3,
33:8, 35:8,
81:18, 81:19,
81:22, 81:25,
82:1, 82:3,
82:9, 83:9,
83:13
**proprietary**
83:3, 184:19
**prospective**
203:16, 203:18,
234:17, 235:4,
235:11
**protocols**
239:15
**provide**
110:4, 127:5,
127:19, 128:15,
131:12, 159:11,
167:13, 171:20,
174:10, 198:13,
229:14
**provided**
198:15, 198:19,
230:4
**provider**
241:17

**provides**
86:25, 127:25,
198:12
**providing**
11:21, 136:10,
136:22, 164:18,
165:12, 165:19,
171:21, 171:22,
208:6, 212:25
**provision**
229:15
**psycho**
171:21, 171:22
**psychologists**
205:20
**public**
245:4
**pull**
11:12, 36:6,
38:18, 46:9,
69:21, 75:17,
93:9, 98:20,
100:2, 103:3,
116:23, 123:9,
131:21, 133:15,
138:17, 143:8,
146:2, 151:14,
158:16, 159:14,
161:24, 169:20,
169:22, 175:21,
178:6, 181:19,
184:21, 193:1,
200:7, 207:21,
214:16, 214:17,
214:18, 220:12,
226:12, 227:5,
235:22, 241:7
**pulled**
12:15, 70:6,
76:2
**purchased**
49:22
**purpose**
70:25, 86:8,
86:10
**purposes**
135:25, 156:10,
177:4

**pursuant**
41:25, 166:23,
167:6
**pursuing**
112:24, 113:7
**push**
114:25, 153:2
**put**
45:23, 45:24,
80:6, 80:10,
83:20, 109:17,
211:5, 213:7,
233:4, 234:20
**putting**
223:17

**Q**

**qq**
5:27, 241:20,
241:23, 241:24,
242:3
**qualified**
222:2
**qualify**
85:5, 164:18
**question**
7:19, 7:24,
8:4, 8:5, 9:12,
14:19, 15:13,
15:17, 17:6,
20:22, 22:5,
30:18, 30:20,
31:1, 31:3,
31:4, 31:10,
35:1, 48:5,
49:18, 55:17,
60:1, 78:1,
78:2, 78:3,
78:7, 78:24,
85:11, 87:18,
89:17, 95:12,
96:8, 96:23,
114:16, 121:3,
136:20, 138:6,
138:8, 145:22,
156:3, 161:13,
161:17, 161:18,
167:6, 172:6,

177:11, 177:23,
178:3, 189:21,
191:21, 197:3,
221:2, 223:22,
224:1, 225:25,
232:7, 232:8,
243:13
**questionable**
169:7
**questions**
7:20, 7:21,
8:8, 9:19, 9:25,
26:12, 32:13,
36:23, 62:16,
63:11, 72:11,
76:24, 80:20,
81:7, 84:10,
92:9, 95:12,
162:16, 197:5,
206:21, 206:22,
221:4, 240:22,
241:4, 242:12,
242:13, 244:15,
244:17
**quick**
62:18, 193:1,
235:21, 241:4
**quickly**
99:20, 139:21,
189:11, 195:6
**quiet**
163:10
**quite**
216:10, 241:15
**quotation**
144:24
**quoting**
145:9

**R**

**race**
9:18, 9:22,
26:14, 65:13,
68:21, 74:19,
78:21, 217:15,
217:16, 217:17
**racial**
9:21, 14:10

**rally**
80:13
**range**
32:10, 43:15,
47:21, 48:7,
49:20, 55:3,
88:16, 89:2
**ranging**
160:20
**rarely**
29:23
**rather**
8:10, 62:23,
81:1, 179:25,
234:3
**re-rent**
234:14
**reach**
188:11, 188:23,
232:23
**reaches**
89:23
**read**
28:8, 31:4,
38:20, 40:2,
40:4, 40:6,
41:23, 41:25,
71:14, 71:20,
76:6, 83:7,
83:8, 99:15,
100:18, 104:7,
104:23, 104:25,
107:20, 109:9,
112:19, 112:21,
113:1, 114:4,
117:22, 118:2,
118:25, 119:4,
121:16, 121:17,
121:19, 126:24,
126:25, 128:6,
129:25, 132:18,
135:17, 137:15,
139:21, 140:23,
140:25, 144:19,
144:22, 147:8,
147:10, 151:25,
152:21, 156:21,
160:7, 163:23,

166:9, 168:22,
168:23, 169:1,
171:16, 171:19,
176:19, 176:23,
178:2, 178:5,
180:3, 190:22,
197:12, 202:2,
203:12, 203:15,
205:11, 206:19,
206:22, 209:19,
210:1, 223:22,
223:24, 224:1,
227:22, 228:20,
229:9, 231:10,
240:3, 242:12
**reading**
104:19, 242:9
**ready**
63:12, 193:8,
200:17, 200:19,
220:24, 226:22,
227:16, 236:6,
238:22
**real**
24:4, 27:7,
27:19, 28:11,
28:13, 28:15,
28:16, 34:20,
43:16, 43:22,
44:5, 44:13,
80:8, 81:14,
193:1
**really**
15:2, 31:22,
49:18, 52:2,
54:2, 60:12,
60:16, 60:24,
82:25, 109:24,
118:15, 118:17,
119:8, 131:15,
170:23, 170:25,
172:4, 178:11,
214:8, 234:11
**realtime**
245:25
**realtor**
203:17
**realty**
1:14, 1:15,

1:21, 2:16,
4:16, 6:5, 6:25,
8:20, 9:4, 13:5,
37:2, 38:25
**reask**
232:8
**reason**
9:8, 97:6,
108:8, 108:13,
108:16, 112:16,
125:24, 126:4,
141:17, 141:21,
148:2, 164:10,
169:12, 180:11,
182:25, 183:2,
204:5, 224:23,
234:4, 241:13
**reasons**
232:10, 234:6,
234:8
**reattaching**
137:22
**recall**
36:8, 39:20,
50:3, 50:11,
50:22, 52:25,
53:1, 53:8,
53:24, 54:23,
56:7, 58:18,
58:23, 64:9,
66:23, 73:17,
77:6, 88:5,
88:23, 99:23,
103:1, 103:24,
106:14, 113:11,
113:17, 118:14,
142:17, 143:2,
143:5, 149:14,
149:22, 150:2,
150:7, 151:10,
151:12, 155:10,
162:21, 175:4,
175:13, 179:9,
179:20, 182:11,
186:4, 186:11,
186:20, 190:20,
191:10, 191:25,
192:4, 192:18,

193:17, 193:19,
193:20, 193:22,
195:15, 195:22,
196:8, 196:11,
196:22, 196:25,
197:8, 197:9,
198:7, 203:5,
203:8, 203:9,
203:11, 214:1,
214:3, 215:12,
215:16, 217:1,
217:5, 221:9,
230:12, 234:10,
236:20, 239:2,
243:19, 244:4
**recalled**
197:5
**receipt**
170:16
**receive**
42:9, 42:12,
42:16, 182:21
**received**
12:21, 42:14,
229:11, 232:21,
235:6, 238:2
**receiving**
105:7, 165:14
**recently**
114:12, 114:16
**reception**
45:20, 45:24
**recess**
63:2, 116:15,
158:11, 190:7,
240:19
**recognize**
12:17, 36:19,
46:22, 60:21,
60:25, 62:7,
70:10, 70:12,
93:16, 93:18,
93:23, 99:3,
100:9, 103:21,
107:17, 112:5,
112:11, 113:22,
117:11, 126:12,
126:15, 126:18,

126:19, 129:16,
132:4, 134:21,
137:9, 139:8,
140:12, 143:22,
143:25, 144:2,
145:14, 146:19,
148:24, 150:13,
152:5, 154:22,
156:18, 159:2,
159:6, 159:19,
160:2, 162:8,
162:11, 162:13,
170:7, 176:14,
176:15, 179:6,
182:7, 182:9,
182:15, 185:8,
186:1, 186:3,
190:17, 193:11,
200:21, 202:4,
202:9, 221:6,
226:25, 228:1,
228:17, 230:16,
230:18, 230:19,
230:24, 231:4,
236:8, 238:25
**recognized**
162:24
**recollect**
120:13
**recollection**
10:19, 39:5,
40:16, 40:20,
56:11, 61:3,
97:1, 104:20,
106:12, 106:21,
106:24, 107:1,
131:6, 153:15,
207:9, 209:11,
215:7, 228:21
**recommendation**
83:10
**record**
11:4, 12:6,
12:10, 12:11,
12:13, 16:24,
19:21, 26:14,
63:1, 63:4,
116:12, 116:14,

116:17, 119:4,
134:25, 158:10,
158:13, 174:4,
178:5, 190:6,
190:9, 191:19,
201:18, 201:22,
202:18, 213:15,
213:16, 217:2,
229:12, 240:18,
240:21, 244:21
**recorded**
174:5, 174:20,
229:5
**recording**
14:24, 122:17,
219:11
**records**
90:11
**redraft**
137:20
**refer**
8:16, 8:19,
8:22, 8:24, 9:3,
221:22
**reference**
60:9, 127:15,
214:12
**referenced**
182:12, 186:5,
190:21, 193:18,
196:12, 197:6,
204:2, 221:10,
225:18, 239:3
**references**
127:17, 128:5,
163:8, 214:24
**referencing**
120:14, 145:7,
145:9, 181:5,
216:11, 224:7
**referred**
222:4, 229:5
**referring**
9:4, 33:14,
33:15, 33:18,
33:19, 37:11,
68:9, 100:23,
101:4, 105:13,

105:16, 105:19,
105:20, 106:15,
107:4, 107:10,
109:23, 110:3,
110:5, 111:11,
113:12, 114:10,
118:10, 119:14,
119:17, 119:21,
119:24, 121:24,
128:18, 130:7,
133:1, 142:6,
150:18, 150:20,
155:19, 179:21,
180:24, 181:3,
181:8, 186:24,
187:3, 187:15,
187:20, 197:23,
222:16, 223:16,
223:17, 228:21,
243:6, 243:9
**refers**
201:25, 209:3,
209:5
**reflected**
224:20
**refresh**
39:4, 40:15,
61:3, 96:25,
104:20, 106:11,
106:18, 123:18
**refused**
14:5, 14:7,
232:2
**refusing**
16:14
**regarding**
21:3, 21:8,
66:10, 160:13,
197:1, 197:5
**regards**
63:14
**regular**
115:1
**regularly**
75:14
**reiterated**
210:2, 211:24
**rejected**
49:1, 49:6,

91:15, 91:16,
93:1, 231:21,
232:11, 233:16,
234:5, 234:9
**rejecting**
219:23
**relate**
155:25, 239:21
**related**
9:18, 18:7,
18:9, 27:2,
66:8, 76:25,
87:20, 87:21,
179:9
**relation**
76:25, 197:7
**relationship**
18:5
**relative**
245:16, 245:18
**relatively**
173:12
**relevant**
15:11, 38:22
**remainder**
134:13
**remaining**
132:22
**remember**
16:16, 16:19,
24:6, 24:8,
25:1, 25:12,
41:2, 48:18,
48:21, 49:14,
55:4, 56:9,
57:3, 59:20,
72:23, 77:14,
79:1, 92:21,
119:10, 122:10,
122:12, 122:16,
122:21, 128:4,
131:2, 133:10,
141:6, 141:8,
142:3, 142:11,
142:12, 142:19,
145:16, 145:19,
145:23, 147:20,
148:11, 148:13,

148:16, 153:16,
154:10, 154:11,
154:16, 154:18,
156:2, 156:4,
162:19, 162:25,
163:1, 163:7,
163:12, 163:13,
170:18, 186:7,
186:17, 188:15,
188:19, 198:2,
200:1, 204:8,
209:15, 210:24,
214:10, 216:11,
217:6, 217:8,
219:8, 219:17,
220:3, 220:4,
229:8, 243:21,
243:24
**remembered**
174:22
**remembers**
213:25
**remind**
63:15, 72:11,
189:18
**reminded**
61:1
**reminder**
99:19
**remote**
6:10, 13:14
**remotely**
2:2, 3:2, 6:13
**remove**
129:6
**removing**
127:1, 127:22
**renovated**
114:13, 114:17
**rent**
33:24, 34:5,
34:8, 40:11,
42:2, 43:23,
44:9, 44:11,
44:13, 51:18,
53:22, 54:18,
80:11, 94:13,
110:17, 111:14,

111:16, 148:6,
160:25, 179:25,
180:13, 180:23,
235:18
**rentable**
43:14, 43:20
**renting**
109:14
**rep**
221:16
**repeat**
8:5, 14:19,
20:4, 31:1,
31:3, 93:21,
138:7, 178:3,
197:3, 203:7,
242:25
**repeated**
178:3, 213:13
**rephrase**
8:5, 136:20,
162:19, 199:17,
199:18, 205:23,
223:5, 225:24
**replace**
54:12, 54:16
**replaced**
91:12
**reported**
1:34
**reporter**
7:6, 7:7, 7:25,
8:4, 8:7, 13:22,
14:6, 22:14,
27:25, 43:4,
119:2, 120:19,
154:6, 189:22,
190:1, 219:20,
245:4
**reporter's**
245:1
**repository**
123:16
**represent**
6:16, 7:16,
8:14, 46:20,
70:4, 75:25,
103:13, 125:20,

129:10, 132:9,
139:13, 144:9,
146:24, 152:14,
164:12, 168:1,
176:12, 194:4,
201:5, 211:1,
212:11, 227:2,
228:6
**representation**
171:7, 226:1
**representative**
31:24, 80:12,
147:22, 167:12,
231:13
**represented**
11:1, 167:12,
197:14, 197:22,
207:13, 207:18,
208:5, 208:10,
208:14, 223:7,
223:10, 224:2,
224:5, 224:14,
225:3, 225:5,
226:3, 230:9
**representing**
6:12, 7:3, 7:6,
30:14, 30:15,
129:5, 138:1,
138:10, 199:3,
233:22, 241:3
**represents**
76:9
**request**
234:7, 237:7
**requested**
14:23, 192:6,
237:2
**requesting**
236:21
**required**
84:12, 85:19,
86:12, 86:14,
167:20, 184:17
**requirements**
84:14
**research**
105:5
**resend**
12:5

**residential**
28:19, 29:4,
35:4, 35:6,
35:8, 35:11,
44:13
**resolves**
127:7
**respect**
57:18, 100:24
**respond**
9:23, 81:11,
81:20, 90:20,
126:6, 130:24,
149:17, 150:24,
191:23, 194:7,
196:20
**responded**
80:22, 155:12,
208:25, 238:9
**responding**
184:4
**response**
18:19, 18:23,
19:3, 80:15,
99:7, 99:10,
99:13, 108:14,
108:18, 137:21,
139:15, 144:10,
146:25, 155:11,
156:18, 171:17,
172:20, 173:2,
183:1, 186:21,
194:5, 197:1,
197:8, 206:1,
208:9, 224:17,
228:7, 231:7
**responses**
8:11
**responsive**
94:5, 108:23,
109:2, 126:9,
132:10, 152:15,
240:8
**rest**
185:5, 219:10
**restate**
119:5
**restaurant**
83:21

**restroom**
158:5, 189:25
**retail**
61:10, 77:15,
79:6, 79:13
**review**
18:14, 36:16,
38:3, 98:16,
99:11, 99:12,
103:13, 109:21,
117:8, 124:24,
130:22, 134:3,
134:8, 139:4,
139:5, 143:16,
146:12, 147:15,
151:23, 152:2,
159:3, 162:6,
167:10, 168:16,
170:3, 170:4,
170:5, 171:5,
176:11, 178:13,
182:7, 185:4,
193:8, 196:6,
200:16, 220:23,
226:21, 227:16,
236:6, 238:20
**reviewed**
130:23, 164:17,
170:20, 179:16,
183:8, 201:8,
210:2, 211:23
**reviewing**
36:18, 103:16,
103:20, 104:8,
117:10, 134:4,
134:10, 143:19,
146:16, 152:1,
159:4, 159:22,
162:7, 170:6,
171:3, 171:24,
178:15, 178:16,
182:8, 185:7,
190:23, 193:9,
196:7, 200:18,
220:25, 226:23,
227:20, 227:25,
236:7, 238:24,
242:14

**right**
12:6, 19:6,
37:5, 41:3,
45:9, 47:10,
51:23, 52:17,
52:20, 53:13,
60:9, 70:23,
71:21, 117:3,
117:5, 124:12,
163:3, 176:4,
176:8, 184:1,
210:24, 219:8,
227:24, 230:20,
230:23, 241:7,
241:18, 242:23,
244:18
**rise**
244:6
**rmr**
1:34, 245:24
**robert**
100:15, 101:5,
104:15, 117:18,
126:22, 132:13,
139:20, 144:16,
144:18, 147:6,
152:19, 168:15,
187:5, 230:19
**rockefeller**
2:11
**room**
19:9, 47:20,
200:3
**rooms**
173:15, 200:2,
200:3
**roughly**
19:2, 49:2
**rubin**
179:12, 180:9,
202:11, 202:15
**run**
83:13, 137:18,
138:1, 138:11,
189:11
**running**
31:18, 35:2,
218:25

**runway**
76:11
**rush**
180:7, 180:10,
180:12, 180:16,
181:7, 181:15
**rushing**
180:25

---

**S**

---

**s**
2:1, 3:1
**said**
25:19, 29:23,
30:11, 39:1,
45:17, 52:12,
59:20, 60:4,
60:5, 66:22,
69:17, 85:6,
90:2, 102:11,
106:15, 118:20,
118:21, 123:4,
123:12, 124:6,
141:16, 145:14,
157:4, 157:19,
167:4, 167:16,
173:14, 174:2,
174:9, 174:14,
174:15, 174:17,
175:2, 180:19,
181:6, 185:17,
195:4, 198:21,
199:23, 208:21,
210:22, 210:24,
212:7, 218:9,
218:21, 237:14
**sake**
12:2
**sale**
51:20, 51:21,
51:22, 51:25,
52:4, 52:7,
54:20
**sales**
71:18, 71:24
**salespeople**
72:2, 72:6
**same**
10:6, 26:6,

39:5, 54:21,
55:8, 57:14,
78:2, 78:3,
80:10, 94:7,
105:12, 142:25,
149:21, 150:23,
180:11, 197:15,
197:17, 198:11,
243:13, 243:15,
244:12
**satellite**
126:16, 127:4,
127:18, 127:25,
128:13, 128:19,
148:14, 148:15,
169:4
**saturday**
168:11, 173:5,
173:6, 206:25,
208:6
**saturdays**
207:14
**saul**
17:18, 33:4,
33:12, 34:17,
90:4, 94:11,
94:15, 94:20,
99:17, 99:18,
100:17, 104:17,
105:1, 108:7,
109:11, 114:3,
117:18, 126:23,
129:24, 132:17,
144:17, 144:18,
147:6, 149:3,
149:7, 149:8,
152:19, 152:22,
152:24, 154:25,
155:4, 155:12,
156:16, 157:2,
157:4, 170:24,
170:24, 187:18,
230:19, 230:20,
230:23, 236:14
**saul's**
110:6, 222:3
**saw**
101:13, 105:8,

121:21, 161:15
**say**
8:9, 13:20,
29:1, 29:15,
29:20, 31:25,
32:1, 37:10,
38:6, 52:6,
57:20, 68:7,
69:2, 70:14,
74:22, 79:8,
79:10, 82:23,
90:13, 94:24,
97:22, 101:3,
101:5, 107:24,
108:1, 115:13,
116:6, 118:21,
119:12, 120:14,
124:13, 128:7,
128:10, 140:6,
141:21, 160:17,
165:12, 165:21,
173:8, 174:16,
179:22, 181:2,
192:13, 197:15,
197:16, 197:21,
201:24, 212:8,
213:23, 228:17
**saying**
39:17, 86:21,
87:19, 94:15,
94:20, 109:5,
109:7, 136:15,
156:7, 161:10,
167:8, 173:17,
195:1, 199:16,
217:12, 226:8,
237:21
**says**
13:2, 39:7,
40:19, 40:21,
76:11, 95:5,
95:13, 96:13,
96:16, 105:16,
107:8, 108:3,
126:16, 128:16,
159:13, 176:18,
176:19, 178:19,
184:15, 201:15,

228:4
**schedule**
183:23
**scream**
144:21, 168:24
**screen**
11:19, 36:14,
37:24, 46:16,
70:2, 75:23,
93:15, 99:1,
100:8, 103:10,
116:25, 132:2,
133:21, 138:23,
143:14, 146:9,
151:21, 158:24,
159:18, 162:4,
164:4, 170:1,
175:25, 178:9,
182:4, 185:2,
190:16, 193:5,
200:14, 214:21,
220:20, 226:19,
227:14, 236:4,
238:18, 241:23
**screengrab**
4:20, 4:22
**screens**
176:8
**scroll**
37:17, 37:18,
38:2, 103:12,
117:2, 143:20,
144:4, 146:17,
156:14, 168:20,
179:19, 185:22,
196:15, 196:24,
238:23, 239:13
**scrolling**
38:9, 103:18,
143:21
**se**
219:3
**search**
31:20, 108:19,
183:6
**searched**
108:23, 109:2
**second**
36:16, 45:12,

45:17, 76:6,
107:20, 113:1,
113:8, 115:25,
117:8, 121:2,
121:10, 130:21,
143:15, 146:12,
151:23, 162:5,
163:24, 168:20,
170:3, 171:12,
175:5, 175:20,
178:13, 180:3,
182:7, 185:4,
189:23, 193:8,
200:16, 203:12,
204:11, 216:9,
226:21, 227:16,
236:5, 238:19
**seconds**
25:24
**section**
37:21, 76:25,
112:4, 159:10,
176:1
**security**
42:4, 179:24,
207:2, 207:3
**see**
13:1, 37:25,
73:16, 79:11,
80:13, 83:19,
90:14, 90:16,
95:4, 95:15,
95:17, 95:18,
112:22, 113:2,
121:20, 124:17,
124:25, 126:1,
129:4, 134:19,
144:4, 146:18,
148:21, 149:12,
150:11, 154:17,
163:18, 176:4,
182:7, 182:23,
183:8, 185:5,
187:18, 191:9,
201:15, 204:17,
205:4, 205:13,
205:17, 206:5,
206:25, 207:13,

207:20, 208:4,
208:9, 216:7,
228:4, 230:20,
239:5, 241:12,
242:7
**seeing**
115:11, 156:7,
221:13
**seeking**
160:23
**seem**
161:1, 183:22,
209:15
**seemed**
160:24
**seen**
77:20, 95:9,
170:10, 170:18,
200:24, 201:2,
201:3, 201:4,
212:3, 212:6,
238:5
**selection**
58:3
**selectively**
153:24, 154:4,
154:7
**sell**
67:7
**sells**
28:15
**send**
11:25, 12:7,
91:7, 95:6,
95:21, 163:20
**sending**
155:13
**sense**
150:17, 157:11,
157:14, 162:14
**sent**
14:22, 81:10,
95:8, 96:1,
96:2, 96:11,
97:2, 98:14,
99:21, 104:10,
104:14, 104:15,
104:16, 104:17,

107:22, 107:24,
108:2, 108:3,
108:6, 108:7,
113:25, 114:2,
114:3, 137:21,
147:9, 147:10,
159:9, 166:8,
170:16, 170:17,
170:19, 183:5,
207:5, 230:3
**sentence**
76:6, 76:14,
76:17, 107:21,
111:9, 112:20,
117:23, 121:17,
130:6, 137:1,
137:16, 163:24,
168:23, 180:3,
180:4, 203:13,
204:11, 205:10
**sentences**
104:24, 114:5
**separate**
66:14, 109:14,
110:14, 196:19
**september**
118:3
**series**
49:12, 62:15
**seriously**
148:3
**serves**
32:23, 71:17
**service**
137:19, 165:14,
165:19, 241:17
**services**
1:7, 2:7, 6:4,
6:22, 7:17,
8:15, 13:3,
107:2, 131:12,
136:10, 136:22,
136:23, 164:18,
164:19, 165:3,
165:10, 165:13,
165:16, 165:17,
165:18, 171:22,
172:8, 198:12,

198:14, 198:19,
199:3, 199:4,
199:8, 199:13,
199:21, 208:6,
212:12, 212:25
**set**
40:17, 83:24,
90:23, 150:10,
180:1, 188:15,
245:14
**setter**
57:11
**setting**
130:17
**seven**
35:3, 47:10,
47:11, 47:12,
55:1, 160:20
**seventh**
34:3, 34:4,
52:18, 52:21,
53:2, 53:9,
53:16, 53:22,
54:1, 54:9,
54:17, 54:24,
55:6, 55:14,
55:22, 56:8,
56:10, 56:15,
56:18, 58:11,
80:3, 82:11,
82:17, 84:6,
85:2, 85:14,
87:24, 88:3,
119:17
**shafts**
44:2
**shakes**
50:24, 58:20
**shall**
135:20, 176:23
**shamash's**
206:1
**share**
11:23, 18:3,
32:15, 32:16,
32:18, 67:21,
86:4, 123:22
**shareholder**
18:2, 38:24,

85:22, 85:24,
86:7, 86:9,
86:11
**shareholders**
69:11, 69:14,
69:15, 84:15,
86:3, 86:12,
86:14, 211:12
**shares**
39:2
**she'll**
95:12
**sheet**
81:9, 90:20,
90:21, 91:1,
94:18, 95:1,
96:10, 97:1,
98:13, 109:12,
166:18, 235:5,
235:6
**sheets**
90:25, 97:23,
98:7
**sheltering**
242:10
**shift**
32:12, 88:18
**shooting**
144:25
**shoots**
76:20
**shorten**
33:14
**should**
8:2, 10:22,
12:4, 141:1,
164:9, 173:13,
197:10, 241:10
**show**
32:2, 38:14,
80:25
**showed**
48:19, 212:7
**showing**
31:7, 31:23
**shown**
90:8
**showroom**
76:11

**shows**
53:20, 81:4,
90:15, 199:2
**side**
28:24, 47:11,
47:12
**sifted**
94:4
**sight**
219:18
**sign**
39:22, 50:9,
61:4, 82:24,
91:5, 95:6,
153:3
**signature**
95:10
**signature-mig2k**
245:22
**signed**
50:13, 52:10,
54:25, 82:14,
82:22, 82:23,
83:2, 96:2,
155:13, 176:13,
177:22
**silent**
33:9
**similar**
58:11, 67:8,
73:5, 126:17,
189:9, 197:14,
197:22
**similarly**
1:19
**simmons**
231:3
**simply**
210:3, 211:24
**simultaneous**
8:1
**since**
22:7, 23:22,
27:14, 36:2,
49:22, 53:7,
61:18, 75:3,
75:4, 75:5,
174:2, 234:16,

235:3, 244:9
**single-family**
35:6
**sir**
38:6, 38:13
**sister**
18:12
**sit**
218:10
**site**
80:7, 137:20
**sitting**
214:3
**situated**
1:19, 24:12
**situation**
191:11
**six**
35:3, 47:10,
47:11
**sixth**
59:3, 63:19
**size**
52:15, 76:10,
235:20
**skin**
69:3
**skipper**
3:18, 6:11
**sleep**
187:11, 187:13
**slightly**
134:19
**slow**
125:2
**slowly**
103:12
**small**
27:20, 37:24,
139:7, 178:11
**smaller**
38:15
**some**
9:17, 22:10,
22:13, 26:9,
26:19, 26:20,
32:12, 47:4,
63:10, 72:10,

81:7, 103:18,
110:17, 123:3,
182:13, 201:10,
207:4, 211:12,
241:13
**someone**
9:22, 15:17,
24:19, 25:17,
49:8, 59:21,
59:25, 141:12,
141:22, 151:9,
162:18, 186:6,
188:20, 188:22,
233:19, 235:14
**something**
28:24, 39:18,
43:21, 51:7,
51:9, 51:11,
51:13, 61:11,
81:6, 83:19,
83:22, 102:7,
115:12, 121:21,
140:6, 145:10,
162:19, 188:9,
241:16
**sometime**
16:9, 16:13,
16:17, 16:18,
75:11, 97:22,
101:22
**sometimes**
87:2
**somewhere**
32:9, 43:15,
45:24, 45:25,
102:9
**son**
58:7
**soon**
137:23, 181:12
**sorry**
10:12, 16:22,
20:8, 21:16,
24:11, 28:7,
30:19, 30:21,
33:15, 34:12,
35:24, 37:23,
48:12, 55:17,

72:13, 74:17,
76:15, 78:6,
78:7, 85:10,
93:21, 96:4,
96:8, 104:7,
114:15, 118:23,
119:2, 120:6,
123:2, 124:1,
125:2, 138:7,
146:14, 149:21,
157:3, 163:15,
171:11, 172:13,
175:12, 185:23,
186:9, 187:12,
191:20, 192:14,
195:4, 205:1,
205:25, 207:3,
209:24, 227:3,
227:9, 227:19,
228:11, 228:16,
231:18, 237:13,
241:14, 242:25
**sort**
9:15, 33:13,
62:13
**sought**
89:8, 89:11,
89:15
**sound**
175:16
**sounds**
107:12, 122:2,
124:12
**southern**
1:2, 6:6
**spaces**
27:20, 28:21,
31:7, 43:23,
77:11
**speak**
14:25, 17:12,
17:15, 34:18,
75:1, 75:13,
90:5, 96:18,
107:7, 121:9,
141:7, 141:22,
151:9, 168:5,
186:16, 194:14,

225:2, 234:3,
237:5, 243:10
**speaking**
8:2, 27:1,
50:21, 96:5,
101:6, 142:14,
144:25
**special**
167:20
**specific**
48:13, 65:10,
68:16, 74:14,
78:15, 79:15,
80:2, 89:18,
150:4
**specifically**
8:24, 12:24,
33:20, 40:20,
44:3, 50:5,
56:12, 88:19,
161:6, 192:6,
197:7
**specifics**
66:17, 163:14,
177:18
**specify**
21:13
**sped**
188:8
**speed**
187:1, 187:16,
188:5, 188:12,
188:14
**speeding**
187:21
**spend**
189:10
**spent**
233:10
**spoke**
16:23, 17:5,
61:21, 75:10,
90:13, 131:5,
141:1, 141:22,
142:1, 188:21,
191:2, 216:10
**spoken**
19:13, 19:16,

19:17, 19:18,
19:21, 20:2,
20:9, 20:14,
20:18, 20:20,
20:23, 21:2,
21:7, 21:20,
22:1, 22:6,
22:16, 22:20,
22:23, 23:1,
23:4, 23:7,
23:10, 23:14,
23:21, 65:20,
69:5, 75:3,
192:21, 219:1,
243:17
**spouse**
17:15
**square**
43:12, 43:14,
43:15, 43:18,
44:14, 71:16,
173:11, 173:18,
200:2, 235:17
**squatter**
25:8
**st**
100:21, 100:24,
100:25, 101:7,
101:11, 101:18,
101:21, 102:3,
102:16, 102:19,
102:25, 105:8,
105:11, 107:5,
112:22, 113:14,
127:13, 127:15,
161:8, 161:14,
161:19, 191:7,
191:11, 191:17
**stacy**
231:3
**staff**
204:17, 205:4
**stage**
81:22, 187:24
**staircase**
58:13, 58:19
**stairwell**
53:15

**stamp**
134:25
**stand**
11:14, 36:9,
46:11, 69:22,
75:18, 93:10,
98:21, 100:3,
103:5, 123:11,
131:22, 133:17,
138:19, 143:10,
146:4, 151:16,
158:19, 159:16,
161:25, 169:24,
175:23, 178:8,
184:22, 189:14,
200:9, 214:20,
220:15, 226:14,
227:7, 235:24,
238:13, 241:8
**standard**
6:10, 15:17,
176:16
**standing**
96:20
**start**
34:19, 134:16,
169:2, 189:13,
204:11
**started**
91:19, 225:10
**starting**
117:24, 121:18,
123:10, 126:14,
135:18, 147:9,
152:22, 168:23,
203:13, 206:20,
231:10
**state**
6:15, 71:21,
167:20, 198:24,
206:9, 229:19
**stated**
7:15, 63:21,
78:25, 128:22,
131:7, 160:18,
166:23, 168:8,
174:19, 217:20,
220:1, 231:13

**statement**
105:20, 111:5,
142:9, 186:25
**states**
1:1, 6:5, 76:8,
127:22, 169:9,
229:11, 245:4
**stating**
198:10
**status**
149:8, 149:10,
149:13, 149:14,
150:21, 155:1,
155:5, 155:9
**stay**
124:5, 219:14
**stays**
153:21
**stenographically**
245:12
**step**
187:25
**stepped**
175:6
**steps**
89:19, 100:22,
235:4
**still**
28:20, 28:22,
32:1, 38:23,
41:17, 45:2,
46:25, 54:9,
54:13, 54:17,
57:22, 140:8,
149:19, 149:22,
150:7, 165:5,
165:19, 175:7,
191:19, 213:8,
234:23, 235:15,
238:4, 241:13
**stop**
103:19
**stopping**
116:6
**stores**
198:1
**story**
43:2

**straight**
90:5, 170:16,
170:17, 234:24
**strange**
115:2, 115:7,
183:22
**street**
1:15, 1:21,
2:16, 3:11,
6:25, 8:20,
26:5, 26:7,
33:19, 35:25,
38:25, 39:3,
52:19, 77:13,
79:11, 100:21,
100:24, 101:1,
101:8, 101:12,
101:18, 101:21,
102:3, 102:16,
102:19, 102:25,
105:8, 105:11,
107:5, 112:22,
113:14, 127:13,
127:14, 127:16,
161:8, 161:14,
161:19, 164:24,
164:25, 171:19,
191:8, 191:12
**stretch**
38:10
**strike**
30:11, 130:5
**studied**
102:10
**stuff**
228:22
**subject**
69:13, 217:14
**subjects**
24:23, 25:22
**subleased**
80:3, 82:17,
84:6
**subleases**
160:19
**subleasing**
85:2, 85:14,

111:18

**sublessee**
83:14

**sublets**
183:18

**subletting**
82:11, 82:12

**submit**
82:18, 82:20,
88:13, 177:19

**submitted**
84:3, 88:9,
118:3, 175:14,
223:9, 224:4

**subpoena**
4:14, 12:20,
12:21, 12:23,
13:2, 13:9,
18:19, 18:23,
19:3, 94:1,
94:6, 99:7,
99:10, 99:13,
108:15, 108:18,
109:3, 126:10,
132:11, 139:15,
144:11, 147:1,
152:16, 183:1,
194:6, 228:8,
240:8

**subsequently**
229:5

**substance**
15:5, 17:22,
66:4, 66:7,
69:18, 109:13,
109:19, 110:2,
125:23, 127:2,
127:23, 127:25,
128:7, 128:18,
128:24, 129:6,
129:11, 130:16,
137:19, 138:2,
138:11, 160:11,
160:17, 163:9,
167:13, 167:21,
168:2, 168:24,
169:2, 169:6,
174:10, 177:5,

185:22, 214:13,
214:25, 218:14,
225:18, 229:14,
229:17, 229:23,
230:3, 230:10,
231:15, 231:22,
232:12, 232:16,
233:24

**substances**
10:17

**substantive**
171:12

**subtenant**
40:7, 48:22,
49:1, 49:11,
81:17, 82:18,
86:18, 86:21,
86:23, 86:24,
87:6, 88:10,
194:17

**subtenants**
48:15, 49:23,
50:3, 50:7,
53:8, 53:21,
55:6, 115:22,
194:16, 194:20,
195:17, 195:24

**sudden**
233:14

**sued**
14:9

**suffering**
10:10

**suggest**
115:3, 115:8

**suggested**
115:21

**suggests**
102:15, 102:18

**suite**
2:31, 3:11

**summary**
5:18

**summons**
4:16, 37:1

**sunday**
105:1

**super**
81:3, 90:6,

90:13, 90:14

**superfluous**
80:20

**superintendent**
114:24

**sure**
9:2, 9:13,
11:22, 21:15,
22:18, 27:18,
28:13, 32:9,
34:19, 36:17,
37:17, 40:5,
43:11, 47:15,
47:18, 47:19,
56:20, 56:22,
57:18, 59:21,
59:24, 62:24,
63:13, 80:6,
92:14, 94:11,
97:25, 98:3,
109:11, 124:8,
135:1, 136:24,
153:14, 157:20,
171:4, 171:6,
175:3, 176:5,
177:15, 181:10,
183:19, 184:6,
192:10, 196:1,
201:1, 203:25,
207:22, 217:11,
231:8, 241:15

**surprised**
88:16

**susan**
179:12, 179:13,
202:11, 202:15

**swear**
7:7

**sworn**
7:11, 245:8

**system**
230:21

**systems**
245:25

---

**T**

**t-o-r-g-e-r-s-o-n**
59:12

**tail**
125:9

**take**
9:11, 13:25,
40:21, 42:22,
45:23, 48:1,
48:9, 62:18,
62:19, 72:8,
76:22, 81:2,
87:1, 87:6,
87:11, 90:6,
97:18, 117:7,
123:8, 124:23,
130:21, 133:13,
137:23, 143:7,
143:15, 145:24,
146:11, 148:3,
151:14, 151:22,
158:2, 158:4,
161:23, 162:5,
178:13, 180:14,
182:6, 185:3,
189:15, 190:3,
194:22, 195:10,
196:5, 200:16,
218:15, 220:22,
224:8, 224:9,
226:20, 227:15,
236:5, 238:19,
240:15, 242:2

**taken**
63:2, 116:15,
158:11, 190:7,
235:3, 240:19,
245:12

**takes**
28:14, 81:3,
195:7

**taking**
7:14, 8:7,
10:16, 144:22,
145:12

**talent**
76:13

**talk**
80:23, 88:18,
102:20, 188:22,
213:8, 241:16

**talked**
213:24
**talking**
9:17, 43:6,
43:7, 45:6,
45:8, 52:11,
60:3, 66:15,
69:3, 80:1,
119:25, 120:23,
139:24, 141:1,
181:3, 184:1,
187:6, 216:14,
233:11
**tally**
35:2
**tara**
2:10, 6:20,
7:14, 11:20,
12:2, 15:15,
19:21, 22:4,
45:7, 123:21,
223:4
**tawil**
17:18, 17:19,
17:20, 18:1,
33:12, 34:8,
34:13, 35:11,
95:21, 99:17,
99:18, 104:17,
108:7, 109:22,
110:9, 111:11,
114:9, 115:2,
115:21, 129:24,
149:9, 150:17,
156:16, 156:19,
157:6, 157:10,
157:15, 157:20,
211:16, 211:17,
211:20, 221:15,
221:20
**tawil's**
156:1, 233:11
**team**
71:19, 71:24
**technically**
66:18
**technician**
3:17, 11:14,

11:18, 36:9,
36:13, 37:20,
38:6, 38:12,
46:11, 46:15,
69:22, 70:1,
75:18, 75:22,
93:10, 93:14,
97:12, 97:15,
98:21, 98:25,
100:3, 100:7,
103:5, 103:9,
116:10, 116:24,
123:11, 123:14,
123:19, 125:15,
131:22, 132:1,
133:17, 133:20,
135:3, 138:19,
138:22, 143:10,
143:13, 146:4,
146:8, 151:16,
151:20, 158:19,
158:23, 159:16,
161:25, 162:3,
169:24, 171:13,
175:23, 178:8,
178:21, 181:21,
181:24, 182:3,
184:22, 185:1,
189:14, 190:15,
193:4, 200:9,
200:13, 207:23,
214:20, 220:15,
220:19, 226:14,
226:18, 227:7,
227:13, 228:13,
235:24, 236:3,
238:13, 238:17,
241:8, 241:22
**tedious**
93:7
**television**
76:12
**tell**
17:24, 53:3,
56:12, 60:19,
61:18, 79:24,
80:17, 91:1,
120:10, 131:18,

141:25, 180:9,
215:2, 234:23,
240:3, 242:16,
243:5
**telling**
188:13, 232:19
**ten**
29:12, 31:7,
32:7, 32:8,
39:16, 39:23,
50:1, 50:2,
50:8, 55:10,
66:22, 67:2,
160:21, 160:22,
169:3
**ten-year**
160:23
**tenancy**
163:10, 210:6
**tenant**
24:16, 25:8,
25:17, 30:14,
30:24, 31:11,
31:18, 36:22,
36:25, 37:8,
37:13, 37:14,
39:14, 40:9,
45:23, 49:6,
53:1, 53:3,
54:12, 54:16,
56:18, 77:15,
86:25, 105:5,
115:10, 135:20,
160:25, 161:2,
176:23, 180:12,
181:17, 184:13,
197:24, 202:13,
203:16, 203:18,
235:4
**tenant's**
135:22, 135:25,
160:9, 160:15,
176:25, 177:4,
221:16
**tenant-lessee**
38:24
**tenants**
24:16, 28:17,

49:23, 51:3,
54:3, 60:4,
80:13, 164:10,
221:23, 233:18,
234:17, 235:11
**tens**
29:3
**tenth**
58:4, 58:9,
58:12, 58:16,
66:25, 67:4,
67:5
**tenure**
50:18, 88:6
**term**
33:14, 42:3,
81:9, 90:20,
90:21, 90:25,
91:1, 94:18,
95:1, 97:1,
97:23, 98:7,
98:13, 166:18,
235:5, 235:6,
243:7
**terms**
81:16, 81:20,
81:21, 90:23,
91:5, 165:2,
165:24, 166:2,
168:17, 243:23
**terrible**
121:21
**terribly**
220:11
**tertiary**
17:17
**testified**
7:11
**testify**
4:14, 24:24,
25:22, 245:8
**testifying**
10:7, 10:13,
10:18, 10:23,
223:19
**testimony**
10:6, 25:2,
25:5, 225:21,

238:4, 245:12
**text**
38:15
**th**
1:15, 1:20,
2:16, 2:22,
3:11, 6:8, 6:24,
8:20, 13:5,
22:8, 26:5,
26:7, 33:19,
35:23, 35:24,
35:25, 38:24,
39:3, 40:18,
52:19, 56:25,
57:6, 57:17,
64:6, 66:14,
72:14, 72:17,
75:6, 76:2,
77:13, 100:13,
104:12, 106:5,
106:7, 108:4,
112:15, 114:1,
117:16, 122:20,
126:14, 127:14,
128:23, 129:21,
132:15, 137:22,
139:18, 140:16,
147:3, 149:5,
149:15, 150:16,
152:10, 154:25,
155:12, 159:8,
163:21, 171:19,
175:16, 179:21,
180:17, 183:11,
183:14, 183:24,
184:2, 184:9,
186:12, 188:15,
192:3, 192:8,
192:20, 193:23,
196:18, 197:2,
199:20, 203:10,
203:20, 203:23,
204:6, 207:10,
210:16, 213:10,
213:19, 214:2,
215:8, 215:13,
215:21, 216:2,
217:4, 223:11,

224:6, 224:14,
226:2, 229:4,
230:9, 236:18,
237:3
**thank**
9:7, 9:14,
10:2, 10:21,
11:8, 13:11,
13:20, 13:24,
14:16, 16:21,
17:10, 18:13,
19:11, 19:22,
20:1, 21:19,
26:8, 26:17,
27:23, 28:20,
32:11, 33:1,
33:23, 36:1,
38:1, 38:3,
39:9, 40:14,
41:9, 42:8,
42:21, 44:15,
45:20, 46:7,
46:17, 47:6,
47:25, 56:5,
58:24, 59:8,
66:24, 68:14,
72:1, 73:4,
75:8, 76:19,
79:4, 81:15,
82:7, 88:17,
94:23, 97:17,
107:16, 112:12,
113:10, 117:1,
118:9, 123:7,
125:3, 126:11,
131:19, 133:22,
133:25, 134:3,
135:5, 135:6,
138:16, 139:2,
143:18, 143:21,
144:5, 146:18,
148:17, 151:25,
158:1, 158:25,
163:19, 171:23,
175:9, 180:8,
181:18, 181:24,
182:5, 183:21,
185:14, 185:20,

185:25, 189:7,
192:25, 193:6,
196:15, 204:1,
209:18, 220:21,
228:15, 240:11,
240:12, 240:16,
241:24
**thanks**
94:19, 130:3,
145:3, 180:5,
184:20, 223:6,
244:18
**themselves**
6:15, 91:17,
195:19
**therapist**
171:22
**therapists**
204:17, 205:3,
205:9, 205:13,
206:5, 209:3
**therapy**
205:16, 209:10,
209:13, 209:14,
209:16
**thereafter**
40:13
**therefore**
211:10
**therein**
162:23
**they'd**
205:4
**thing**
18:24, 26:1,
38:13, 39:13,
79:25, 83:24,
92:9, 98:18,
105:4, 153:21,
167:4, 197:15,
213:13, 225:16
**things**
9:17, 28:14,
28:15, 69:16,
170:25
**think**
15:12, 15:14,
15:16, 15:23,

41:19, 49:9,
49:19, 50:15,
51:22, 55:1,
55:21, 55:25,
56:20, 58:9,
58:10, 62:20,
63:18, 66:12,
77:8, 83:12,
92:23, 96:22,
107:10, 107:12,
110:21, 111:11,
114:22, 115:6,
115:8, 119:3,
121:23, 123:2,
123:6, 126:2,
131:15, 131:20,
136:21, 142:8,
145:6, 150:10,
154:4, 154:7,
154:20, 157:15,
171:5, 171:23,
173:21, 177:10,
177:12, 196:2,
199:9, 199:20,
205:17, 213:6,
217:12, 217:13,
222:2, 222:8,
222:9, 222:11,
231:2, 235:16,
244:2, 244:7,
244:8, 244:14,
244:16
**thinking**
56:5, 56:23,
57:25
**third**
39:25, 112:19,
204:10, 208:3
**thought**
24:18, 102:12,
197:11, 218:19
**thq**
50:15, 53:10
**three**
25:11, 25:24,
26:23, 35:9,
35:17, 39:23,
40:12, 47:10,

47:11, 50:8,
53:7, 55:1,
60:18, 75:11,
88:12, 88:15,
118:7, 119:13,
119:23, 125:1,
160:20, 160:21,
160:22, 189:8,
196:19, 200:3
**through**
9:24, 18:8,
18:9, 38:2,
56:6, 58:2,
62:12, 80:4,
80:11, 81:1,
81:2, 89:19,
89:23, 91:3,
93:5, 94:4,
103:12, 136:7,
154:17, 166:8,
166:19, 173:4,
173:6, 177:24,
189:11, 207:1,
207:14, 208:6,
210:22, 218:10
**throughout**
8:16, 34:20,
76:8, 173:12
**thursday**
16:19, 173:4
**time**
6:9, 6:10, 8:2,
12:10, 12:13,
22:4, 24:25,
31:14, 31:17,
33:9, 45:15,
49:2, 51:24,
52:3, 55:16,
55:19, 55:24,
56:10, 56:12,
56:19, 56:23,
57:14, 58:1,
58:25, 59:17,
60:17, 61:7,
61:16, 63:4,
64:2, 64:10,
69:17, 74:5,
75:10, 78:4,

79:12, 81:4,
88:6, 92:22,
94:12, 94:21,
113:18, 114:21,
114:23, 116:14,
116:17, 120:3,
141:13, 142:21,
147:16, 158:10,
158:13, 180:14,
184:17, 189:10,
189:15, 189:20,
190:6, 190:9,
198:9, 202:19,
221:12, 224:8,
224:9, 232:21,
233:11, 240:18,
240:21, 242:23,
243:2, 243:11,
245:13
**times**
31:10, 31:16,
32:4, 32:7,
32:8, 38:22,
88:9, 88:15,
229:6, 234:25
**today**
6:11, 7:6,
7:15, 7:18,
9:17, 10:14,
10:18, 10:24,
11:2, 26:10,
45:10, 49:3,
61:13, 167:11,
213:17, 214:3,
238:6
**today's**
6:8
**together**
47:9, 130:20
**told**
60:15, 60:17,
60:19, 63:10,
101:1, 102:21,
105:6, 122:13,
129:13, 164:24,
165:1, 197:9,
210:4, 212:1,
212:9, 221:16

**ton**
189:10
**tons**
173:15
**took**
22:7, 23:22,
63:9, 104:21,
116:21, 187:25,
235:18
**top**
13:1, 38:8,
41:22, 47:18,
70:9, 73:1,
73:2, 111:9,
113:3, 117:4,
182:16, 182:17,
196:24, 214:22,
239:13, 242:8
**tops**
88:15
**torgerson**
59:10, 59:12,
59:13
**total**
29:17, 42:4,
49:23, 55:6,
55:15, 205:8,
206:5
**toured**
88:21, 89:23,
90:9
**touton**
1:17, 2:17,
4:19, 7:1, 8:21,
21:8, 21:14,
21:17, 23:5,
58:2, 58:3,
58:21, 60:5,
61:22, 66:20,
66:21, 67:12,
67:23, 68:1,
68:4, 68:7,
68:9, 68:12,
68:15, 69:6,
72:5, 203:20
**touton's**
68:21, 70:5,
70:11, 70:15,

70:16
**toutons**
58:5, 68:8
**traffic**
84:10, 115:19,
164:1, 164:6,
164:7, 164:13,
164:19, 164:25,
165:1, 165:6,
165:8, 169:7,
173:9, 173:13,
173:18, 177:14,
197:15, 199:7,
199:9, 199:21,
199:24, 199:25,
200:5, 206:13,
226:5, 226:7
**train**
219:3
**transactions**
153:20
**transcript**
245:11
**transpired**
89:15
**treatment**
127:6, 127:19,
128:15, 163:9,
168:25, 169:7,
229:23
**trial**
218:22
**tried**
210:21
**tries**
28:17
**trucks**
79:11
**true**
245:11
**truth**
245:8, 245:9
**truthful**
197:10, 197:12,
197:20
**truthfully**
7:22, 10:14,
10:18, 10:24

**try**
39:19, 147:25,
210:23, 218:13,
218:22, 234:14
**trying**
83:20, 107:13,
110:16, 111:13,
122:2, 122:4,
124:4, 163:15
**tuesday**
1:27, 16:19,
104:12, 149:5,
187:2, 187:9
**turn**
116:19
**turned**
191:7
**turns**
127:3, 128:13
**twice**
58:17, 61:18,
72:19
**two**
4:17, 12:7,
24:16, 37:3,
37:11, 39:10,
39:20, 40:16,
40:23, 41:5,
42:12, 43:5,
47:9, 47:11,
48:6, 48:18,
49:6, 49:10,
50:21, 50:22,
52:8, 58:5,
59:23, 60:11,
68:8, 105:6,
114:4, 118:6,
119:13, 119:16,
122:23, 122:25,
123:4, 123:25,
130:20, 150:10,
150:24, 178:19,
178:22, 180:16,
209:20, 219:10
**type**
35:8, 70:17,
71:5, 110:3,
216:6, 221:19,

225:13
**typical**
9:16
**typically**
39:16, 39:22,
44:11, 48:12,
50:9, 80:7,
80:12, 80:21,
87:1, 160:19,
188:10, 188:21,
194:17, 194:21,
195:21

---

**U**

**um-hum**
13:7, 13:15,
13:19, 19:4,
22:19, 52:14,
63:23, 65:23,
79:2, 84:21,
117:9, 146:13,
146:15, 148:23,
155:15, 156:17,
159:5, 179:17,
185:5, 238:21
**umbrella**
97:15, 97:16
**unable**
54:11, 54:15
**unanimously**
209:23, 210:7
**uncle**
58:7
**uncomfortable**
92:1, 92:2,
92:5, 92:7,
92:16, 153:22,
174:20, 214:8,
216:14, 216:16,
218:5, 218:12,
219:12, 233:2
**under**
10:3, 45:2,
50:14, 57:1,
109:18, 109:19,
172:15, 213:17,
213:18, 214:4
**underneath**
95:4

**understand**
8:3, 8:12,
8:17, 9:1, 9:3,
9:25, 10:3,
10:5, 13:8,
13:12, 13:16,
14:8, 19:1,
33:21, 77:2,
82:8, 101:25,
111:6, 111:7,
127:8, 127:24,
128:6, 133:3,
136:2, 136:9,
147:17, 153:4,
153:10, 153:11,
156:24, 162:18,
165:9, 165:13,
168:9, 183:10,
191:5, 192:19,
201:9, 212:14,
212:20, 229:24,
237:19
**understanding**
14:3, 56:4,
78:14, 91:4,
91:9, 124:2,
217:23
**understands**
136:18
**understood**
30:9, 33:10,
44:15, 51:16,
57:5, 57:14,
61:1, 79:4,
82:15, 83:4,
87:12, 88:8,
91:14, 94:8,
110:8, 110:25,
117:21, 126:4,
127:12, 133:12,
142:9, 142:14,
145:17, 168:13,
172:18, 179:14,
180:2, 181:11,
181:18, 183:9,
193:21, 198:18,
217:21, 219:4,
226:11, 235:8,

239:11
**unit**
39:2, 39:7
**united**
1:1, 6:5, 76:8
**unless**
51:6, 51:10,
121:21, 192:5
**until**
7:24, 26:22,
121:3, 177:20,
177:21, 180:17,
183:24, 238:6
**update**
124:2, 124:4
**updated**
114:23
**upgraded**
114:18, 114:20
**upstate**
34:22
**usable**
43:17, 43:20,
44:8
**use**
8:23, 51:5,
51:9, 51:12,
53:14, 64:22,
67:24, 72:2,
73:23, 83:20,
84:9, 102:3,
102:5, 102:12,
105:3, 105:17,
105:21, 106:17,
106:22, 106:25,
107:1, 109:12,
109:16, 109:20,
110:10, 110:12,
110:20, 111:5,
112:1, 115:3,
115:9, 115:13,
115:22, 122:8,
122:11, 122:17,
127:3, 127:23,
128:8, 128:11,
129:6, 130:25,
131:4, 135:19,
135:20, 137:17,

160:8, 160:13,
161:3, 161:4,
163:25, 164:5,
164:23, 166:11,
166:21, 169:8,
169:13, 169:17,
172:3, 172:6,
172:11, 172:14,
172:15, 176:23,
177:13, 191:15,
191:18, 197:14,
197:16, 197:22,
198:14, 198:22,
198:25, 199:7,
199:10, 199:22,
212:15, 216:17,
218:9, 219:5,
219:6, 221:19,
222:13, 222:19,
223:14, 224:12,
226:5, 233:19
**users**
115:12, 115:16
**uses**
212:6, 223:15
**using**
113:9, 164:13,
174:22, 179:3,
216:24
**usually**
81:19

---

**V**

**vacant**
52:7, 52:23,
52:24, 56:14,
56:16
**vacate**
40:23
**vague**
163:12
**varies**
215:6
**various**
206:20, 206:22
**vary**
52:15
**venture**
136:6

**verbal**
8:12, 218:17
**versus**
174:12, 226:10
**vertically**
38:5
**via**
2:2, 3:2
**video**
6:9, 6:13,
49:13, 49:15,
49:17, 50:4,
50:11, 244:21
**videoconference**
2:3, 3:3
**videographer**
3:18, 6:1,
6:11, 7:5, 12:9,
12:12, 62:25,
63:3, 116:13,
116:16, 158:9,
158:12, 190:5,
190:8, 240:17,
240:20, 244:19
**videorecorded**
13:17
**videotaped**
1:25, 6:2
**viewed**
204:21, 234:17,
235:1
**views**
218:24
**virtually**
1:26
**visit**
69:8, 69:9,
73:15, 73:21,
73:25, 79:9,
79:10, 79:14,
79:16, 79:19,
101:7, 101:18,
101:21, 102:25,
121:20
**visited**
63:24, 64:5,
66:24, 72:17,
101:23, 113:18,

161:7, 161:13,
161:18
**visiting**
64:9, 113:14
**visitor**
51:7
**visitors**
50:25, 51:4,
54:7, 64:18,
64:22, 67:19,
67:24, 71:7,
73:23, 79:5
**visits**
73:18, 186:7
**vividly**
220:3
**voice**
6:14
**volume**
50:10
**vote**
86:6, 86:11,
86:13, 149:8,
149:10, 149:13,
149:15, 150:20,
155:1, 155:5,
195:8, 195:9,
195:10, 195:14,
195:21, 211:5,
211:10, 211:12,
211:20
**voted**
209:22, 210:7,
210:8, 210:11,
211:2
**votes**
85:18, 85:22,
85:24, 86:7,
118:6, 118:15,
119:7, 119:13,
119:16, 119:17,
120:14, 121:6,
121:22, 122:13
**voting**
86:9, 86:15

---

**W**

**wait**
7:24, 116:2,

121:3
**waiting**
101:13, 101:14,
101:15, 145:1,
149:20, 149:22,
149:25, 150:3,
150:7, 219:18
**walk**
80:4, 89:19,
217:25
**walking**
79:12
**walls**
47:4, 70:23
**want**
12:6, 22:17,
31:15, 33:13,
39:10, 45:23,
79:25, 88:18,
99:20, 116:11,
116:19, 117:7,
119:5, 121:18,
121:19, 124:7,
130:21, 134:8,
136:19, 143:15,
146:11, 148:1,
151:22, 162:19,
176:5, 180:12,
180:13, 180:14,
180:21, 181:15,
181:16, 182:6,
185:3, 189:10,
189:18, 190:3,
199:17, 205:23,
223:5, 225:23,
225:24, 226:20
**wanted**
9:24, 37:8,
124:20, 134:12,
149:12, 153:5,
153:12, 155:7,
218:6, 218:19,
233:3, 233:5
**wants**
39:14, 115:10,
122:7, 133:7,
148:6, 152:25
**way**
29:15, 43:22,

46:1, 78:3,
167:8, 179:2,
208:21, 233:23,
235:17

**we'll**
31:17, 34:19,
66:17, 80:23,
92:14, 208:18,
224:8, 224:9

**we're**
7:18, 12:9,
12:12, 17:24,
43:6, 43:7,
45:8, 62:19,
62:25, 63:3,
66:15, 76:4,
80:1, 90:17,
90:19, 94:22,
108:24, 116:13,
116:16, 119:19,
124:18, 131:20,
134:5, 144:23,
144:25, 145:1,
158:9, 158:12,
179:2, 180:12,
190:8, 196:2,
208:8, 213:7,
213:16, 240:17,
240:20, 244:16,
244:20

**we've**
19:16, 54:11,
54:15, 55:13,
202:12, 212:3,
222:2

**wednesday**
236:18

**week**
16:9, 16:10,
16:11, 16:13,
16:17, 16:18,
173:3, 173:6,
173:17, 208:5

**weekend**
99:21, 186:8,
187:14

**weekly**
172:25

**welcome**
158:15, 190:11

**went**
24:5, 24:6,
25:19, 26:21,
73:15, 91:10,
101:9, 101:10,
105:8, 161:10,
161:20, 161:21,
173:20, 174:19,
206:24, 207:4,
213:15, 219:8,
220:10, 224:18

**weren't**
111:23, 118:15,
119:7, 167:23,
180:15

**west**
1:15, 1:20,
3:11, 6:24,
8:20, 13:5,
22:8, 33:19,
35:23, 35:24,
35:25, 38:24,
39:3, 52:19

**whatever**
31:25, 55:11,
80:21

**whatsoever**
199:24, 219:17,
243:23

**whether**
36:24, 83:10,
90:9, 96:1,
144:24, 145:7,
145:8, 145:9,
157:6, 157:11,
157:20, 170:15,
187:4, 201:17,
242:4, 243:25,
244:4

**whoever**
241:5

**whole**
26:1, 38:2,
134:9, 184:7,
245:8

**willing**
180:15

**win**
126:25

**windows**
44:18

**wine**
67:6, 67:7,
67:10, 67:21,
70:13

**wipe**
233:5

**within**
32:24, 48:6,
53:6, 105:7

**without**
84:24, 85:4,
85:16, 90:10

**witness**
3:6, 4:3, 6:18,
7:8, 16:5, 16:8,
22:13, 28:1,
28:3, 36:18,
50:24, 58:20,
62:23, 66:12,
85:5, 95:25,
96:15, 103:16,
103:17, 103:20,
104:8, 106:6,
116:2, 117:10,
119:1, 121:4,
123:4, 134:4,
134:10, 143:19,
146:16, 152:1,
159:4, 159:22,
162:7, 170:6,
178:2, 178:15,
182:8, 185:7,
189:15, 190:23,
192:15, 193:9,
196:7, 200:18,
203:8, 220:25,
221:1, 226:23,
227:20, 227:25,
236:7, 238:24,
240:6, 240:12,
242:10, 242:14

**women**
76:10

**wood**
67:6, 70:12

**word**
52:2, 102:1,
102:2, 102:3,
102:6, 102:8,
102:9, 110:13,
117:25, 145:3,
145:5, 169:17,
174:12, 201:16

**words**
80:22, 141:18

**work**
27:8, 27:10,
27:11, 27:17,
35:22, 35:23,
64:15, 67:15,
73:12, 77:17,
79:11, 111:2,
148:5, 150:25,
151:2, 151:5

**worked**
27:12, 53:25

**working**
27:15, 48:14,
48:16, 141:2,
187:1, 187:8

**works**
28:16, 81:14,
202:15, 239:9

**world**
57:11

**wouldn't**
56:22, 120:16,
120:17, 120:21,
130:14, 148:3,
157:13, 167:12

**write**
165:23, 177:9,
177:10, 197:12

**writes**
157:2, 157:4

**writing**
84:19, 84:20,
85:4, 85:16,
90:22, 90:24,
145:10, 163:13,
212:10

**written**
154:10, 171:17,

172:11, 172:14, 172:20, 175:18, 212:4

**wrong**
26:10, 47:13, 56:3, 123:6, 227:4

**wrote**
110:16, 231:10

## X

**xi**
245:26

## Y

**yeah**
20:13, 46:23, 58:17, 61:4, 61:10, 64:4, 79:7, 89:2, 95:4, 97:25, 108:10, 124:3, 136:24, 139:5, 160:17, 177:15, 182:18, 187:4, 188:4, 188:14, 200:20, 231:8, 239:10, 241:19

**year**
40:12, 210:23, 218:22

**year-old**
169:3

**years**
24:5, 24:6, 25:9, 25:10, 26:23, 27:20, 29:14, 32:24, 39:17, 39:23, 40:9, 44:6, 45:14, 45:19, 48:6, 48:13, 48:20, 49:19, 49:21, 50:8, 52:8, 53:7, 55:1, 55:2, 61:16, 69:10, 75:12, 76:7,

77:16, 85:1, 85:6, 85:13, 88:14, 92:22, 122:1, 141:5, 160:20, 198:9

**yesterday**
105:1

**york**
1:2, 2:12, 2:23, 2:32, 3:12, 6:6, 33:20, 33:21, 34:22, 34:23, 215:18, 215:23, 229:19, 245:5

**yourself**
27:13, 40:2, 99:17

**yup**
13:19

## Z

**zoom**
2:3, 3:3, 38:13, 71:20, 74:1, 113:4, 139:6, 143:17, 159:21, 163:5, 163:18, 164:3, 171:21, 176:3, 176:7, 178:10, 202:7, 227:18, 227:21, 230:21, 241:11

**zooming**
151:24

## $

**$285,000**
40:11

**$713,571.87**
42:7

## .

**.100**
4:28

**.103**
4:31

**.11**
4:14

**.125**
4:33

**.131**
4:35

**.133**
5:5

**.138**
5:6

**.143**
5:7

**.146**
5:8

**.151**
5:9

**.158**
5:11

**.162**
5:14

**.184**
5:15

**.190**
5:16

**.193**
5:17

**.200**
5:18

**.220**
5:20

**.226**
5:23

**.227**
5:24

**.236**
5:25

**.238**
5:26

**.241**
4:7, 5:27

**.25**
30:7

**.36**
4:17

**.4200**
2:13

**.5**
30:7

**.5516**
3:13

**.5800**
2:33

**.69**
4:20

**.7**
4:6

**.75**
4:22

**.93**
4:24

**.98**
4:26

## 0

**0000020**
5:23

**0000066**
5:11

**00002**
135:2

**0000201**
5:5

**0000275**
5:20

**0000427**
4:31

**0000497**
4:33

**00836**
245:26

**02**
244:21, 244:22

**020**
226:13

**023**
5:23

**0322**
5:18

**0324**
5:14

**03429**
1:8, 6:7

**06**
63:4

## 1

**1**
108:4

**1,000**
44:13, 44:14,
76:9
**10**
1:28, 4:26,
5:4, 6:9, 12:10,
12:13, 46:5,
46:6, 147:3,
149:5, 149:15,
227:6, 227:13
**100**
43:2, 47:14,
102:14, 112:23
**10001**
33:21
**10018**
2:23, 3:12
**10020**
2:32
**10111**
2:12
**104**
77:8
**11**
5:8, 41:24,
57:17, 60:17,
63:1, 111:1,
135:13, 150:16,
203:23
**1170**
2:24
**12**
5:25, 9:10,
43:2, 52:12,
56:25, 57:6,
62:20, 63:4,
72:14, 72:17,
76:2, 104:13,
143:8, 143:13,
149:6, 152:10,
154:25, 155:12,
172:22, 203:19,
203:20, 204:17,
204:25, 205:3,
205:5, 205:9,
205:11, 205:13,
206:5, 208:10,
209:2, 209:3,

236:18, 237:3
**12,000**
71:16
**1270**
2:30
**129**
22:8, 33:19,
39:3, 52:19,
171:19
**13**
5:9, 116:14,
116:17, 156:15,
159:8
**14**
47:16, 47:22,
64:6, 66:14,
75:6, 98:20,
98:25, 104:13,
106:5, 106:7,
108:4, 116:14,
128:23, 158:10,
158:13, 173:22,
183:14, 183:24,
184:9, 186:12,
188:15, 192:3,
192:8, 192:20,
193:23, 196:18,
197:2, 199:20,
200:2, 203:10,
204:6, 207:10,
210:16, 213:10,
213:19, 214:2,
215:8, 215:13,
215:17, 215:21,
216:2, 217:4,
223:11, 224:6,
224:14, 225:5,
226:2, 228:24,
229:4, 230:9,
236:23
**1430**
2:22
**15**
9:10, 62:20,
135:13, 137:22,
190:6, 190:9
**16**
189:12, 189:13,

190:12, 190:15,
240:18, 240:21
**17**
2:22, 26:22,
189:12, 193:1,
193:4, 244:21
**173**
46:10
**18**
4:28, 4:30,
100:13, 235:23,
236:3
**19**
4:32, 5:13,
104:12, 108:4,
112:15, 114:1,
117:16, 122:20,
126:14, 129:21,
163:21
**1st**
40:10, 40:17

---

**2**
114:1, 158:8,
190:2
**20**
1:8, 1:27,
4:32, 6:7, 6:8,
24:5, 26:22,
29:14, 45:13,
45:19, 46:4,
46:6, 47:17,
85:1, 85:6,
85:13, 88:14,
104:12, 108:4,
112:15, 117:16,
122:20, 129:21,
198:9
**200**
71:25, 173:1,
173:17
**2003**
32:25, 48:7
**2005**
32:24
**2006**
48:7

**2007**
32:25
**201**
2:24, 133:16,
133:25, 138:25
**2010**
5:13
**2016**
40:7, 40:10,
40:17
**2019**
4:24, 4:26,
4:28, 4:32,
4:35, 5:4, 5:6,
5:7, 5:8, 5:9,
5:27, 42:2,
56:6, 89:1,
95:14, 95:17,
95:18, 95:19,
95:22, 97:2,
99:16, 100:13,
101:22, 104:12,
108:4, 112:15,
117:16, 122:20,
129:21, 132:15,
135:13, 139:18,
140:16, 144:14,
147:3, 149:5,
149:15, 150:17,
152:10, 154:25,
156:16, 159:8,
175:16, 179:21,
180:17, 183:12,
242:5, 242:21,
243:11, 243:14,
244:12
**2020**
4:30, 5:10,
5:15, 5:16,
5:17, 5:19,
5:24, 5:25,
5:26, 49:2,
56:6, 64:6,
66:15, 75:6,
106:5, 128:23,
184:9, 186:21,
192:3, 192:8,
193:15, 193:24,

196:18, 197:2,
199:20, 203:10,
204:7, 207:10,
210:16, 213:10,
213:19, 214:2,
215:8, 215:13,
215:17, 215:21,
216:2, 217:4,
223:11, 224:6,
224:14, 225:5,
226:2, 228:25,
229:4, 230:9,
234:16, 235:3,
236:19, 236:23,
237:3

**2021**
40:10, 40:18,
42:3

**2022**
1:27, 6:9,
245:27

**207**
137:8

**208**
135:4

**21**
149:19, 241:7,
241:22, 245:27

**212**
2:24, 5:5,
138:25

**212.360**
3:13

**212.589**
2:13

**212.784**
2:33

**22**
1:27, 138:18,
138:22

**23**
5:27, 40:7,
146:3, 146:8,
242:5

**24**
5:10, 5:19,
135:13, 175:16

**245**
1:33

**25**
4:35, 24:4,
132:15, 151:15,
151:20

**26**
5:6, 139:18,
140:16, 179:21,
180:17, 183:11,
184:2

**27**
1:15, 1:20,
2:16, 6:24,
8:20, 13:5,
22:8, 26:7,
33:19, 35:23,
35:24, 35:25,
38:24, 39:3,
52:19, 77:13,
127:14, 238:12,
238:17

**275**
220:14

**28**
35:23, 35:24,
184:21, 185:1

**281**
5:20

**29**
26:5

---
### 3
---

**3**
126:14, 149:19,
152:10, 190:2

**30**
5:24, 40:18,
76:7, 92:24,
169:3

**305**
3:11

**31**
100:21, 100:24,
100:25, 101:7,
101:11, 101:18,
101:21, 102:3,
102:16, 102:19,
102:25, 105:8,
105:11, 107:5,

112:22, 113:14,
127:13, 127:15,
161:8, 161:14,
161:19, 191:7,
191:11, 191:17

**322**
200:8, 200:13

**323**
5:18

**324**
124:10, 124:14,
161:24, 162:3

**325**
5:14

**330**
3:11

**35**
44:7

**38**
3:11, 147:3

**39**
190:2, 190:6

**3rd**
186:21, 191:1,
191:2

---
### 4
---

**427**
103:4

**428**
111:5

**429**
4:31, 111:10

**44**
126:14, 190:9

**45**
1:28, 2:11,
6:9, 92:24

**46**
4:18, 158:10,
190:2

**47**
116:17, 149:6

**475425**
1:32

**497**
123:10, 123:12,
124:11, 124:14

**4th**
144:14

---
### 5
---

**5**
244:22

**50**
158:8, 172:24,
173:11, 199:25,
204:18, 204:22,
204:25, 205:4,
205:5, 205:8,
205:11, 205:13,
205:17, 206:6,
206:10, 208:14,
209:4, 209:5,
226:9

**50,000**
235:17

**500**
4:33

**501**
2:31

**51**
158:8

**52**
12:10, 152:10,
158:13, 240:18

**53**
114:1

**54**
12:13

**55**
63:1

**5500**
43:18

**57**
240:21

---
### 6
---

**60**
29:15, 30:11

**600**
204:25, 205:5

**66**
158:18

**67**
5:11

**6a**
208:9
**6b**
208:13
**6d**
208:5

---

### 7

**70**
19:2
**713,000**
42:5
**75**
43:2
**7500**
173:11, 173:18,
200:2
**7th**
95:14, 95:22,
97:2, 191:3

---

### 8

**8**
39:7
**8500**
43:15
**8th**
4:18, 95:18,
95:19, 99:16,
193:15, 194:8

---

### 9

**9**
147:3
**90**
81:4
**99**
48:13