# EXHIBIT F



# Transcript of Joseph M. Grill

**Date:** February 15, 2023
**Case:** Community Counseling & Mediation Services -v- Oxford Realty & Holdings LLC

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2
3  ----------------------------x
4  C.C.M.S. d/b/a COMMUNITY
   COUNSELING AND MEDIATION
5  SERVICES,                    Civil Action No.
                                20-cv-03429(NRB)
6
             Plaintiff,
7
        v.
8
9  OXFORD REALTY & HOLDINGS LLC,
   WEST 27TH STREET REALTY, INC.,
   MARC PATURET, JOSEPH GRILL,
10 MAXIME TOUTON, F. MICHAEL
   CONTE, NIGEL SHAMASH, and
11 other similarly situated
   BOARD MEMBERS OF WEST 27th
12 STREET REALTY, INC.,
13             Defendants.
14 ----------------------------x
15
16         DEPOSITION OF:
17        JOSEPH M. GRILL
18       Conducted Virtually
19    Wednesday, February 15, 2023
20         10:00 a.m. EST
21
22
23 Job No. 481380
24 Pages 1 - 124
25 Reported by:  Nancy C. Bendish, CCR, RMR, CRR
```

## Page 2

```
1  A P P E A R A N C E S:
2  (All participated remotely via
    Zoom Videoconference)
3
4  ON BEHALF OF PLAINTIFF CCMS d/b/a COMMUNITY
5  COUNSELING AND MEDIATION SERVICES:
6
7     BAKER HOSTETLER
      BY:  TARA E. TURNER, ESQ.
8     45 Rockefeller Plaza
      New York, New York 10111
9     212.589.4200
10 ON BEHALF OF DEFENDANTS 27TH STREET REALTY,
11 INC., JOSEPH GRILL, MAXIME TOUTON,
   F. MICHAEL CONTE:
12
13    ABRAMS GARFINKEL MARGOLIS BERGSON LLP
      BY:  BARRY G. MARGOLIS, ESQ.
14    1430 Broadway, 17th Floor
      New York, New York 10018
15    212-201-1170
16
17 ON BEHALF OF DEFENDANT MARK PATURET:
18
19    BARCLAY DAMON LLP
      BY:  MICHAEL CASE, ESQ.
20    1270 Avenue of the Americas
      Suite 501
21    New York, New York  10020
      212.784.5800
22
23 ALSO PRESENT:
24
25    JOHN GUGARTY, Planet Depos Technician
```

## Page 3

```
                  I N D E X
WITNESS                        EXAMINATION
JOSEPH M. GRILL
   By Ms. Turner.............................4
```
```
                E X H I B I T S
IDENT.        DESCRIPTION            PAGE
Grill TT   Cooperative Offering Plan.........113
```

## Page 4

1  J O S E P H  M.  G R I L L, having been duly
2  sworn, testified as follows:
3          THE REPORTER:  Please state your
4  full name for the record.
5          THE WITNESS:  Joseph Michael
6  Grill.
7          THE REPORTER:  And where are you
8  presently located?
9          THE WITNESS:  My physical location
10 right now?
11         THE REPORTER:  Yes.
12         THE WITNESS:  In my office at 129
13 West 27th Street, New York City, New York,
14 10001.
15             -  -  -
16 EXAMINATION BY MS. TURNER:
17    Q.    Good morning, Mr. Grill.  My name
18 is Tara Turner and I'm going to be taking your
19 deposition today.
20    **A.    Good morning.**
21    Q.    Good morning.
22         I represent the plaintiff in this
23 action, Community Counseling and Mediation
24 Services.  Right now I'm just going to go over
25 some background information and just general

**5**

1 rules that we should both try to follow.
2       Today we're essentially going to
3 have a conversation, but in question and answer
4 form. I ask that you answer each of my
5 questions truthfully and to the best of your
6 knowledge.
7       Before answering, please wait
8 until I finish asking the question completely,
9 because it is difficult for the court reporter
10 to capture simultaneous conversation.
11       If you do not understand a
12 question, please ask me to repeat or rephrase,
13 and I'll be happy to do so. Your answers must
14 also be audible, so please say yes or no. The
15 transcript won't pick up any head nods or other
16 gestures.
17       And just to go over some
18 definitions for you, I mentioned that I
19 represent Community Counseling and Mediation
20 Services. I may refer to them throughout the
21 deposition as CCMS. Do you understand what that
22 means?
23    **A.**   Yes.
24    **Q.**   Thank you.
25       I may also refer to the defendants

**6**

1 in this matter, which include yourself, Joseph
2 Grill, West 27th Street Realty, Inc., Marc
3 Paturet, Maxime Touton and Michael Conte. If I
4 refer to all defendants, I will use the term
5 "defendants" or "the co-op." And if I refer
6 more specifically to individual board members, I
7 will use their names. Do you understand?
8    **A.**   Yes.
9    **Q.**   Thank you.
10       If you need a break for any
11 reason, please let me know. I just ask that you
12 don't take a break while a question is pending.
13       Finally, Mr. Grill, we're going to
14 be discussing some topics today related to race
15 and ethnicity. I don't mean these questions to
16 be insensitive, and certainly if you don't know
17 the race or ethnicity of an individual, please
18 say that you don't know.
19       Mr. Grill, do you understand that
20 you are now under oath?
21    **A.**   I do.
22    **Q.**   And do you understand that the
23 testimony you are about to give has the same
24 force and effect as if you were testifying in a
25 courtroom?

**7**

1    **A.**   I do.
2    **Q.**   Are you suffering from any medical
3 conditions, mental or physical, that would
4 prevent you from testifying fully and truthfully
5 today?
6    **A.**   No.
7    **Q.**   And are you taking any medications
8 or substances that would prevent you from
9 testifying fully and truthfully today or would
10 otherwise affect your recollection?
11    **A.**   No.
12    **Q.**   Thank you.
13       Is there anything else I should be
14 aware of that would prevent you from testifying
15 fully and truthfully today?
16    **A.**   **I may ask you to repeat questions,**
17 **since I am fully deaf in one ear, and I have**
18 **hearing aids that, with electronic media,**
19 **sometimes don't come in clearly. So I have**
20 **limited hearing in my right ear and total deaf**
21 **in my left.**
22    **Q.**   Understood. Thank you for letting
23 me know, Mr. Grill, and I will try to speak
24 slowly and loudly to avoid any disruptions.
25       Mr. Grill, do you understand that

**8**

1 the parties agreed to conduct this deposition by
2 remote means?
3    **A.**   **Excuse me, say that. Could you**
4 **repeat.**
5    **Q.**   Do you understand that the parties
6 agreed to conduct the deposition by remote means
7 over the --
8    **A.**   **Yes. Yes, ma'am.**
9    **Q.**   And you understand that the court
10 in this action so ordered your deposition for a
11 total of three hours of testimony?
12    **A.**   Yes.
13    **Q.**   Before we jump in, Mr. Grill,
14 attending the deposition with us is John from
15 Planet Depos, and earlier he put up a test
16 exhibit. I may ask John to show exhibits on the
17 screen; so I just wanted to give you that heads
18 up.
19    **A.**   Okay.
20    **Q.**   Mr. Grill, have you ever been
21 deposed before?
22    **A.**   Yes, I have.
23    **Q.**   When were you -- when have you
24 been deposed?
25    **A.**   **I was deposed about a year ago in**

**9**

1 a case of which I was not a party to but was a
2 witness in, of a partner of mine in Miami that
3 was in a business dispute. And I was deposed
4 about 20 years ago in a case in which my company
5 and a number of other model agencies were sued
6 in -- I think it was in the year 2000, 21, 22
7 years ago.
8     Q. Starting with the deposition that
9 was a year ago in Miami, do you recall what
10 action that was in connection with?
11     A. No. It was a business dispute
12 that my business partner was in with a lender,
13 and because I was on an email chain they asked
14 to take my deposition.
15     Q. And can you just describe the
16 business dispute between your partner and the
17 lender?
18     A. Yeah.
19         MR. MARGOLIS: Objection. You can
20 answer.
21         THE WITNESS: I can?
22         MR. MARGOLIS: Yes.
23     A. Okay. It was a, I believe it was
24 about an interest rate that a lender was
25 charging for a building construction loan that

**10**

1 my partner had been involved in, and I was not
2 part of that transaction at all.
3     Q. And what subjects did you testify
4 about in that deposition?
5     A. I testified about the change of
6 the marital status for my partner, who had
7 married her partner and transferred, during that
8 interim period of time that they were in a
9 dispute, her ownership of a property that we
10 owned together into a limited family trust.
11     Q. Okay. The deposition that was
12 roughly 20 years ago, do you recall what action
13 that was?
14     A. I don't recall the name of it.
15     Q. Do you recall what court the
16 action was in?
17     A. Yes, ma'am. It was in Federal
18 Court in New York. I don't remember the name of
19 the case.
20     Q. And can you describe the
21 circumstances of that action?
22     A. Yes. A number of fashion models
23 sued ten of the biggest model agencies in the
24 country, and some of them were the biggest ones
25 in the world, for an antitrust violation of

**11**

1 price, what they claimed to be price fixing on
2 models' commissions.
3     Q. At your deposition for that
4 action, what subjects did you testify about?
5     A. My expertise in the model
6 business.
7     Q. Were you an expert in that action?
8     A. I don't recall if I was an expert,
9 but I was the principal of one of the agencies,
10 Click, that was a defendant in the action.
11     Q. Understood. And I'm going to back
12 up to the deposition that was a year ago. You
13 mentioned you testified regarding transfer of
14 property?
15     A. Yeah. I didn't testify as to the
16 transfer of the property, but as to being on the
17 email chain of the transfers that my partner did
18 with her wife that occurred after a period of
19 time of the action that they were involved.
20     Q. And do you recall what the
21 property was or where it was located?
22     A. No. Well, it was in Miami.
23     Q. Thank you.
24         Besides the two depositions that
25 you mentioned, have you ever given testimony in

**12**

1 connection with an arbitration or mediation?
2     A. No.
3     Q. And besides the two depositions,
4 have you ever given testimony at trial in a
5 case?
6     A. At trial?
7     Q. Yes.
8     A. No.
9     Q. Thank you.
10         Mr. Grill, what did you do, if
11 anything, to prepare for today's deposition?
12     A. I spoke to my attorney for a
13 little while, who --
14         MR. MARGOLIS: Objection. You
15 don't have to discuss what it is that we did in
16 that discussion. But other than that, you could
17 share with Ms. Turner if there was anything else
18 that you did.
19     A. Yeah. I reviewed a transcript of
20 Michael Conte, and I skimmed through a
21 transcript of, I think, Nigel Shamash. I'm not
22 sure how he pronounces his last name. Shamash,
23 I think.
24     Q. Thank you.
25         Again, I don't want to know about

13

1　any specific conversations you had with the
2　attorney, but about how long did you meet with
3　your attorney to prepare?
4　　**A.　Approximately an hour and a half.**
5　　Q.　Thank you.  Did anyone else
6　participate in that call or meeting?
7　　**A.　Could you repeat that?**
8　　Q.　Did anyone else participate in the
9　call or meeting you had with your attorney?
10　**A.　No.**
11　　Q.　Other than your attorney, did you
12　meet or speak with anyone else in preparation
13　for today's deposition?
14　**A.　No.**
15　　Q.　Mr. Grill, do you have any
16　materials in front of you right now?
17　　**A.　I have my cell phone and I have a**
18　**yellow pad, and I have a pencil.**
19　　Q.　Thank you.  And is anyone else in
20　the room with you?
21　**A.　No.**
22　　Q.　Thank you.
23　　　Mr. Grill, have you met or spoken
24　with counsel for defendant Marc Paturet, who is
25　Michael Case on the call with us?

14

1　**A.　No.**
2　　Q.　And have you spoken with any of
3　the individual board members, including Marc
4　Paturet, Michael Conte, Maxime Touton, about
5　today's deposition?
6　**A.　No.**
7　　Q.　Did you speak with Peter Lehr or
8　anyone from Kaled Management about today's
9　deposition?
10　**A.　No.**
11　　Q.　And did you speak with Nigel
12　Shamash or  Saul Tawil?
13　**A.　It's a tricky one.**
14　**　No.**
15　　Q.　Thank you.
16　　　Mr. Grill, I'm just going to ask
17　you some simple questions about your background,
18　education and employment.
19　　　Can you please describe your race
20　and ethnicity for the record.
21　**A.　Human, and I don't know what**
22　**ethnicity.  One grandparent was born in Odessa,**
23　Russia, one was born in La Blanc (phonetic),
24　Poland, one was born on the Austrian border, and
25　one went up, not sure where she was born, but

15

1　somewhere in Poland, I believe.
2　　Q.　Would you self-identify as
3　Caucasian?
4　　　MR. MARGOLIS:  Objection.
5　　**A.　Are you asking me what I identify**
6　**as?**
7　　Q.　Yes.
8　　**A.　A person.**
9　　Q.　You don't identify with any race
10　or ethnicity?
11　**A.　Well, I'm white.**
12　　Q.　Thank you.
13　　　Can you please describe your
14　educational history?
15　**A.　Well, I went to P.S. 150 Queens,**
16　**in Sunnyside Queens.  I went to Woodside Junior**
17　**High School, 125 in Woodside.  I went to William**
18　**Cullen Bryant High School in Astoria; and I went**
19　**to Hunter College of the City of New York in**
20　**Manhattan.**
21　　Q.　Thank you.  And what's your
22　current occupation?
23　**A.　I oversee the operations of a**
24　**model agency and of a talent agency, talent**
25　**management firm.**

16

1　　Q.　What's the name of the model
2　agency and talent management firm?
3　　**A.　The model agency is named Click,**
4　**C-l-i-c-k, Model Management, Inc.; and the**
5　**theatrical management company is Framework**
6　**Entertainment, Inc.**
7　　Q.　And what is your position at each
8　of those companies?
9　　**A.　I'm the president of each of those**
10　**companies.**
11　　Q.　Thank you.
12　　　What did you do before you became
13　president of both of those companies?
14　　　MR. MARGOLIS:  Objection.
15　　**A.　When before?**
16　　Q.　Before you became president.  So
17　starting with your first job before you became
18　president of Click Model Management.
19　　**A.　My first job was I was a messenger**
20　**that delivered EBTs to law firms all over the**
21　**city.  But then I graduated from high school and**
22　**I got another job.  I'm not sure what your time**
23　**frame that you're looking for is.  If you could**
24　**be more specific, it would be helpful.**
25　　Q.　Sure.  I'm working backwards from

**17**

1  when you became president. We'll focus on Click
2  Model first.
3         Working backwards, what was your
4  job immediately before you became president of
5  Click Model?
6     **A.   I was vice president.**
7     Q.    And what was your position before
8  you were a vice president at Click Model?
9     **A.   I oversaw the business affairs of**
10 **the company.**
11    Q.    And when did you become president?
12    **A.   When my mother died.**
13    Q.    Do you know what year that was?
14    **A.   2021. No, I'm wrong. 2019. My**
15 **father died in 2021.**
16    Q.    Thank you.
17         When did you become vice
18 president?
19    **A.   From the start of the company.**
20    Q.    And when was the company formed?
21    **A.   August 12, 1980.**
22    Q.    So, is it fair to say that from
23 roughly 1980 until now you've been working at
24 Click Models as either a vice president or
25 president?

**18**

1     **A.   That is correct.**
2     Q.    And what about the talent
3  management company; when did you become
4  president of that company?
5     **A.   Probably somewhere around 2006,**
6  **yeah, when we started it.**
7     Q.    And did you have another role at
8  the talent management company before you --
9     **A.   No. No.**
10    Q.    Where are the offices located for
11 Click Models?
12    **A.   129 West 27th Street, New York**
13 **City, New York, 10001, 12th floor.**
14    Q.    Thank you. And what about the
15 talent management company; is that operated from
16 the same location?
17    **A.   It is.**
18    Q.    Thank you. And just to keep
19 things simple, going forward if I refer to Click
20 Models, I'm referring to both the model
21 management and the talent management companies,
22 but I think that will just simplify it going
23 forward.
24    **A.   Understood.**
25    Q.    How long has Click Models occupied

**19**

1  the top floor of 129 West 27th Street?
2     **A.   Since 1990 -- April, I think it**
3  **was April 1996.**
4     Q.    And 129 West 27th Street is the
5  same building that is the subject of this
6  action, correct?
7     **A.   Yes.**
8     Q.    Can you describe 129 West 27th
9  Street for me, the logistical layout?
10         MR. MARGOLIS: Objection.
11    **A.   It's a 12-story, middle-of-the-**
12 **block structure. I would say the floors are**
13 **somewhere between 5500 and 6,000 square feet.**
14 **Two elevators, a roof and a basement. I don't**
15 **know...**
16    Q.    Thank you.
17         Going forward, if I refer to 129
18 West 27th Street, and I'm referring to the whole
19 building, I may say "the building."
20    **A.   Understood.**
21    Q.    Mr. Grill, how often do you visit
22 the building?
23         MR. MARGOLIS: Objection.
24    **A.   It depends. I'm in different**
25 **locations, so when I'm in New York City I visit**

**20**

1  **it anywhere between four and five days a week,**
2  **but I may very well work from home. I travel,**
3  **so I'm in and out.**
4     Q.    Understood. And how often are you
5  in New York City, if you could give a percentage
6  of the year?
7     **A.   70 percent.**
8     Q.    And when you do visit the
9  building, how long do you typically stay?
10    **A.   It's varied. There's no typical**
11 **time.**
12    Q.    Understood. Would you say that
13 you typically stay more than one to two hours?
14         MR. MARGOLIS: Objection.
15    **A.   I may stay two hours, I may stay**
16 **two minutes, I may stay six hours. It varies.**
17    Q.    Okay. Thinking back to when the
18 COVID-19 pandemic began in March 2020, prior to
19 that time were you visiting the building about
20 the same number of times per week?
21    **A.   Prior to COVID?**
22    Q.    Yes.
23    **A.   Yes, I would say that that's a**
24 **fair synopsis.**
25    Q.    As we sit here today, besides your

21

1  floor, which is the 12th floor, can you identify
2  the individuals or entities that occupy the
3  remaining floors?
4      A.   I could try.
5      Q.   Okay.
6      A.   Are you asking me to?
7      Q.   Yes, please.
8      A.   Okay.  Hand Held Films has the
9  ground floor, street level and the basement open
10 areas.  The second floor is an artist by the
11 name of Donald Baechler who passed away fairly
12 recently, although I don't know the date and I
13 don't know who his heirs are or what provisions
14 were made for the floor.
15          The third floor is also Hand Held
16 Films at this point.  4 and 5 is a structural
17 engineering firm.  They may have architects
18 also.  That's 4 and 5.  6 is an insurance
19 company, something Conte Pelligrino or something
20 like that, but it's an insurance agency.  7 and
21 8 are empty, as far as I know.  9 and 10 are a
22 wine import/export firm, Touton Limited.  11 was
23 purchased by Touton but I believe it's being
24 renovated now.  I don't believe it's occupied.
25 And 12 is myself.

22

1      Q.   Thank you.
2           You mentioned that the seventh and
3  eighth floors, to your knowledge, are currently
4  empty.  Do you know who owns those floors?
5      A.   I don't know specifically who the
6  actual owner is.  I think it's something called
7  Oxford Realty, but I refer to it as Shamash's
8  floors, Nigel and his father, I think he may
9  have another partner who I don't know.
10     Q.   And the building is organized as a
11 co-op, correct?
12     A.   As a commercial co-op, yes.
13     Q.   And what is your role in
14 connection with the commercial co-op?
15     A.   I am a tenant with a proprietary
16 lease.  I am on the Board of Directors.  I own
17 shares of the co-op; and I am, I believe I'm an
18 officer of the corporation.
19     Q.   Starting with your role as a
20 tenant, have you been a tenant since I believe
21 it was 1996?
22     A.   I purchased the floor in 1996.  I
23 renovated it and we moved in a year later in I
24 think April 20-something, 1997, and we remained
25 here ever since.

23

1      Q.   Thank you.  And your role as a
2  board member, how long have you been a board
3  member of the commercial co-op?
4      A.   I don't remember.
5      Q.   Would you say you've been a board
6  member for more than five years?
7           MR. MARGOLIS:  Objection.
8      A.   I've been a board -- sorry.  I've
9  been a board member on and off at different
10 periods of time.  So, could you repeat the
11 question, please.
12     Q.   Would you say that you have been a
13 board member for more than five years total?
14     A.   Yes.
15     Q.   So, when were you elected for your
16 most recent position as board member?
17     A.   I believe it was at the last
18 annual meeting, which would have been a year
19 ago.
20     Q.   And prior to that, when was the
21 last time you were elected as a board member?
22     A.   I don't recall whether or not we
23 held an election for board members during COVID
24 or we just kept the same board members because
25 most of us were not -- well, I shouldn't say

24

1  most of us -- I certainly wasn't in New York
2  nearly as much as I had been prior to that.
3      Q.   Understood.
4           So, you're currently a board
5  member of the commercial co-op, correct?
6      A.   Correct.
7      Q.   And you served as a board member
8  in 2022?
9      A.   Yes, I did.
10     Q.   Did you serve as that board member
11 in 2021?
12     A.   Yes, I did.
13     Q.   Did you serve as a board member in
14 2020?
15     A.   I believe I did.
16     Q.   Did you serve as a board member in
17 2019?
18     A.   I believe I did.
19     Q.   I'm going to keep going through
20 the years.
21     A.   Okay.
22     Q.   Is there a time prior to 2019
23 where you did not serve as a board member?
24     A.   Prior to 2019?
25     Q.   Yes.

25

1    A.    Yes, there were years that I was
2  not a board member.
3    Q.    Did you serve as a board member in
4  2018?
5    A.    I don't recall.
6    Q.    Did you serve as a board member in
7  2017?
8    A.    I don't recall.
9    Q.    Having served as a board member on
10 and off, would you say that you served as a
11 board member for more than ten years total?
12         MR. MARGOLIS:  Objection.
13    A.    For more than ten years total, is
14 that what you asked?
15    Q.    Yes.
16    A.    Do we have a frozen screen?
17    Q.    I said yes.  Did you hear me?
18    A.    No, I did not.  You were offline
19 for that moment.
20    Q.    Oh, I'm sorry.
21    A.    Yeah, could you repeat the
22 question.  The screen went blank and your audio
23 disappeared.
24         MS. TURNER:  Nancy, if you picked
25 up my audio, could you reread the question for

26

1  Mr. Grill.
2         (The following question was read:
3  "Having served as a board member on and off,
4  would you say that you served as a board member
5  for more than ten years total?")
6    A.    Yes, I would say that I
7  cumulatively have served ten years or more.
8    Q.    Thank you.
9         Have you cumulatively served as a
10 board member for more than 15 years?
11    A.    I don't know.
12    Q.    Did you serve as a board member in
13 2016?
14    A.    I can't recall.
15    Q.    Did you serve as a board member in
16 2015?
17    A.    I don't know.
18    Q.    What was the first year that you
19 served as a board member, if you recall?
20    A.    I don't recall the first year.
21    Q.    Did you serve as a board member
22 when you purchased the 12th floor in 1996?
23    A.    No.
24    Q.    Did you serve as a board member
25 when you moved into the 12th floor in 1997?

27

1    A.    No.
2    Q.    Are board members of the
3  commercial co-op elected during a certain time
4  of the year?
5         MR. MARGOLIS:  Objection.
6    A.    They're nominated and confirmed by
7  the member -- the shareholders of the
8  corporation.
9    Q.    Does that occur at the same time
10 every year?
11    A.    Reasonably around the same time.
12    Q.    And what month does that typically
13 occur in?
14    A.    Well, it changes because we're all
15 busy and travel and we have different schedules.
16 But I would say somewhere between January 21 and
17 March 30.
18    Q.    Thank you.
19    A.    In the first quarter of the year.
20    Q.    Thank you.
21         And you mentioned that you --
22 correct me if I'm misstating -- but do you --
23 actually, strike that.
24         Do you recall if board members
25 were re-elected in 2021?

28

1         MR. MARGOLIS:  Objection.
2    A.    I don't recall.
3    Q.    Do you recall if board members
4  were elected in 2020?
5    A.    No, I don't recall.
6    Q.    And who are the current board
7  members of the commercial co-op for the
8  building?
9    A.    I believe they are currently
10 myself, Michael Conte, Marc Paturet, and Maxime
11 Touton.
12    Q.    Could you just repeat that name
13 for me, please.
14    A.    Sure.  Maxime Touton, I believe is
15 how his name is pronounced.  Marc, who owns Hand
16 Held Films, myself, and Michael Conte.
17    Q.    Thank you.
18         How long has Michael Conte been a
19 board member?
20    A.    I don't know exactly.
21    Q.    Has he been a board member for
22 more than five years?
23    A.    Probably.
24    Q.    How long has, and apologies if I'm
25 mispronouncing, but Maxime Touton, how long has

29

1 he been a board member?
2 **A. We're talking about Marc? Talking**
3 **about Hand Held Films?**
4 Q. Sure, we're talking about Marc.
5 **A. Okay. He's been a board member on**
6 **and off also; it hasn't been a consistent period**
7 **of time, since he travels quite often. He's**
8 **relatively new in the building, all things**
9 **considered. So I don't know when he actually**
10 **joined the board.**
11 Q. Would you say that he's been a
12 board member cumulatively for more than five
13 years?
14 **A. I don't know.**
15 Q. And then the last board member,
16 Maxime Touton; is that how you pronounce it?
17 **A. Touton.**
18 Q. Mr. Touton, how long has he been a
19 board member?
20 **A. I don't know how long Max has been**
21 **a board member, but there's been a member from**
22 **Touton for a long period of time.**
23 Q. Would you say that there's been a
24 board member from Touton Limited for more than
25 ten years cumulatively?

30

1 **A. I don't know about Max, but there**
2 **has been a member of Touton as a board member**
3 **for in excess of ten years.**
4 Q. Thank you.
5 Can you identify the race and
6 ethnicity of each of the existing board members?
7 **A. Again, human, for race. And**
8 **ethnicity, no.**
9 Q. With regards to race, do you know
10 if Mr. Conte identifies as White or Caucasian?
11 **A. I have no idea.**
12 Q. Do you know if Mr. Touton
13 identifies as White or Caucasian?
14 **A. I do not.**
15 Q. And do you know if Marc from Hand
16 Held Films identifies as White or Caucasian?
17 **A. I never had a conversation with**
18 **anybody about how they identify; so the answer**
19 **is no. Marc also.**
20 Q. What do you mean when you say that
21 their race is human?
22 **A. Each one of the board members is a**
23 **member of the human race, so that's how I see**
24 **them.**
25 Q. Do you -- what do you believe that

31

1 race refers to --
2 MR. MARGOLIS: Objection.
3 Q. -- when we use it in this context?
4 MR. MARGOLIS: Objection.
5 **A. Could you rephrase the question.**
6 **I'm not sure how you answer that, how I answer**
7 **that question.**
8 Q. Sure. When I ask you for the race
9 of an individual, what do you think I mean by
10 race?
11 **A. I don't know what you mean by**
12 **race. I know what I mean by race.**
13 Q. Do you know that this action
14 involves a claim of racial discrimination?
15 **A. I heard that, yes.**
16 Q. Do you know what racial
17 discrimination is?
18 **A. I do.**
19 Q. Can you describe what you believe
20 racial discrimination is in your own words?
21 **A. I believe that racial**
22 **discrimination is characterizing human beings by**
23 **differences in their skin color and their**
24 **attitude and where they come from, things like**
25 **that.**

32

1 Q. So when I refer to race, do you
2 understand that I'm referring to skin color?
3 MR. MARGOLIS: Objection, vague.
4 **A. No, I don't understand that unless**
5 **you specify it.**
6 Q. Okay.
7 **A. I identify as human. All people**
8 **are human beings, a member of the same human**
9 **race.**
10 Q. Understood. Do you understand if
11 I was asking for someone's species, that that
12 would be human?
13 MR. MARGOLIS: Objection.
14 **A. I don't know what you're referring**
15 **to.**
16 Q. Does Mr. Conte present as a white
17 man?
18 MR. MARGOLIS: Objection.
19 **A. He projects as a man. His skin**
20 **color is, on the spectrum of skin colors, is to**
21 **the lighter side of the spectrum of skin color.**
22 **I don't know what he identifies as, himself.**
23 Q. Would it be inaccurate to say that
24 Mr. Conte is black?
25 MR. MARGOLIS: Objection.

33

1    A.    You know, if I was blind, the
2  answer would be probably, but I wouldn't know.
3  You know what, I'm not sure what you're trying
4  to get at.  Can you be more specific and just
5  say what you want to say?  Maybe I could get you
6  an answer that might make more sense to you.
7    Q.    I'm just asking if you know the
8  race of the other board members.  I'm not asking
9  for the species, which would be human.  And I'm
10 also trying to establish that through your own
11 eyes you can recognize that none of the board
12 members are black.
13   A.    I don't know that to be the case.
14   Q.    Have there always been four board
15 members of the commercial co-op?
16   A.    No.
17   Q.    When was the last time there were
18 more or less than four board members?
19   A.    Probably in 2021.
20        MR. MARGOLIS:  There's somebody in
21 the background someplace.  I don't know where
22 that is.
23        THE WITNESS:  Not mine.
24        MS. TURNER:  It's not me.
25        MR. MARGOLIS:  Anybody else

34

1  hearing it?
2        THE REPORTER:  Yes.
3        MR. MARGOLIS:  Nancy, you hear it?
4        THE REPORTER:  It was coming from
5  Mr. Case, I believe, his background.
6        MR. MARGOLIS:  Mr. Case...
7        THE REPORTER:  Sorry to rat.
8        MR. MARGOLIS:  You ratted him out.
9        THE REPORTER:  I did.
10        MR. MARGOLIS:  Sorry, Michael.
11        All right.  Sorry for the
12 interruption.  I just wanted to make sure that
13 it wasn't interfering with anything.
14        MS. TURNER:  Thank you.
15 BY MS. TURNER:
16   Q.    Mr. Grill, how many board members
17 of the commercial co-op were there in 2021?
18   A.    There were five.
19   Q.    And who were the board members in
20 2021?
21   A.    Marc, myself, Michael Conte, Max
22 Touton, and Eric Doctormann, I believe.
23   Q.    And why is Mr. Doctormann no
24 longer a board member?
25   A.    He sold his floor and moved out.

35

1    Q.    And how many board members were
2  there in 2020?
3    A.    I believe there were five.
4    Q.    Were they the same individuals as
5  were board members in 2021?
6    A.    I think they were.
7    Q.    And who is currently the board
8  president?
9    A.    Marc from Hand Held Films.
10   Q.    How long had Marc been board
11 president in a consistent -- simultaneous?
12   A.    I would say three years, possibly.
13   Q.    Was Marc board president in 2020?
14   A.    I don't remember.
15   Q.    Was Marc board president in 2021?
16   A.    Yes.
17   Q.    Have you ever been board
18 president?
19   A.    Yes.
20   Q.    When were you board president?
21   A.    A long time ago.  We're in 2023.
22 I don't know the exact dates; somewhere in
23 probably 2012, 2014.
24   Q.    What were your responsibilities
25 when you were board president?

36

1    A.    To open the annual meeting and
2  close the annual meeting.  I was also a
3  signatory on a refi of a mortgage that the
4  building did.  I don't remember the year.
5    Q.    Were there any other
6  responsibilities as board president that are
7  different from being a board member?
8    A.    No.
9    Q.    What are your responsibilities as
10 a board member of a commercial co-op?
11   A.    To oversee the finances of the
12 building, to make sure that it's running in a
13 very clean operating way, to protect the
14 interests of all the shareholders as best as you
15 can, and to meet once a year to discuss and
16 review the quality of repairs and maintenance
17 that are being done.
18   Q.    Do board members have any
19 responsibilities in connection with sublease
20 applicants?
21   A.    Yes.
22   Q.    And what are board members'
23 responsibilities for subleasing at the building?
24   A.    To review applications for -- or
25 an application for a sublease, and to meet with

37

1  the potential tenant.  Although because we're
2  really, I don't know, ten out of twelve floors
3  are owner-occupied, it rarely, if ever, happens,
4  that part of it.
5      Q.    How many applications to sublease
6  have you considered in the elected years you've
7  been a board member?
8      A.    I don't know exactly.
9      Q.    Have you considered more than one
10 sublease applicant?
11     A.    Probably.
12     Q.    But you're not sure of the exact
13 number?
14     A.    No.  I may not have been on the
15 board when there was another application, other
16 than the one we're referring to in this action.
17     Q.    What's the process to consider a
18 sublease applicant?
19     A.    As I understand it, the applicant
20 gives the management company a packet of -- a
21 package of their financials, whatever is
22 requested of them.  It goes to the management
23 company that vests -- that looks over the
24 packages and makes a determination whether or
25 not the board should look at the potential

38

1  sublet tenant, and then pass on the information
2  to the board.
3      Q.    And what does the board do with
4  that information?
5      A.    I guess they analyze it in
6  relation to whether or not it fits with the
7  profile of the building.
8      Q.    And what do they consider -- what
9  factors do they consider to see if the applicant
10 will fit with the profile of the building?
11     A.    Usage, taxing of the
12 infrastructure, numbers of people that will be
13 coming to the building in order to use the
14 facilities, hours of operation, renovations that
15 they would require.  That's pretty much it.
16     Q.    Is there a formal meeting held to
17 consider an applicant?
18     A.    One that I was involved in, yes.
19     Q.    Have you ever been involved in any
20 other meetings to consider a sublease applicant,
21 other than the one that is the subject of this
22 action?
23     A.    I don't believe I have, no.
24     Q.    And where did your understanding
25 of the sublease process come from?

39

1          MR. MARGOLIS:  Objection.
2      A.    I don't quite understand the
3  question.
4      Q.    Did someone tell you about the
5  process for considering sublease applicants?
6      A.    No.
7      Q.    Then where did you learn about the
8  process?
9      A.    I was asked to attend a meeting to
10 determine whether or not a sublet was going to
11 be acceptable to the building, the Board of
12 Directors.
13     Q.    And who asked you to attend that
14 meeting?
15     A.    I think Peter Lehr from the
16 management company.
17     Q.    Did Peter tell you what the
18 process was and the factors to consider for the
19 sublease process?
20     A.    No.
21     Q.    Where did you learn about the
22 factors to consider for the sublease applicant?
23         MR. MARGOLIS:  Objection.
24     A.    Those are my factors.
25     Q.    What did you base those factors

40

1  on?
2      A.    On whether or not the sublet
3  tenant would be acceptable to the building.
4      Q.    Well, were there any documents or
5  anything that described the process for
6  considering a sublease applicant?
7      A.    Not that I have ever seen.
8      Q.    You mentioned Peter Lehr from the
9  management company.  Is that company, and I may
10 be mispronouncing it, Kaled Management?
11     A.    Yes, I believe it is.
12     Q.    And how long has Kaled been the
13 management company for the building?
14     A.    The exact amount of time I don't
15 know.
16     Q.    Would you say that Kaled had been
17 the management company for the building more
18 than five years?
19     A.    Yes, I would say more than five
20 years.
21     Q.    Would you say they've been the
22 management company for more than ten years?
23     A.    No, I don't believe they have.
24     Q.    What kind of responsibilities does
25 Kaled have as the manager of the building?

41

1      A.    They have quite a number of
2  responsibilities.  They're responsible for
3  collecting the maintenance from every floor,
4  keeping the finances and financials of the
5  company in order.  They are responsible for
6  repairs and maintenance on the outsides of the
7  building, meaning the parts that are not the
8  interiors of the individual owners.  So,
9  whatever is common to the building.
10     They oversee the person who works
11 in the building, the super.  They oversee his
12 hours and pay.  They negotiate on behalf of the
13 building with contractors; and they keep track
14 of the work schedules and completion of any
15 contracting and upgrades to the infrastructure
16 and the structure itself that we require.  There
17 may be some other things, but that's pretty much
18 it.
19     Q.    Thank you.
20     Who managed the building before
21 Kaled?
22     A.    Could you repeat that?
23     Q.    Who managed the building before
24 Kaled?
25     A.    A gentleman by the name of

42

1  Israel -- I don't remember his last name.  It
2  was a while ago.
3      Q.    Do you know how long this
4  gentleman Israel managed the building?
5      A.    I don't exactly.
6      Q.    Was Israel the manager when you
7  purchased the top floor in the building?
8      A.    No.
9      Q.    Who managed the building in 1996
10 when you purchased the 12th floor?
11     A.    I believe it was self-managed.
12     Q.    Other than Israel and Kaled, have
13 there been any other management companies
14 involved with the building?
15     A.    I don't think so.
16     Q.    What is Peter Lehr's role in
17 connection with Kaled and the building?
18     MR. MARGOLIS:  Objection.
19     A.    He's the -- as far as -- he's the
20 liaison between the management company and the
21 building at 129 West 27th Street.  I don't know
22 what his relation is to Kaled, but that's my
23 answer.
24     Q.    How often do you interact with
25 Peter Lehr?

43

1      A.    When we have an annual meeting,
2  when there is construction being done on the
3  premises and he comes around to investigate, or
4  to oversee, I should say, and watch out for the
5  contractors doing the job they need to do.  When
6  we have a break-in or a leak of some kind and
7  maintenance is required.
8      So, I might not see him for seven
9  months, and I might see him five days in a row.
10     Q.    Understood.  And is Peter Lehr
11 still the liaison between the management company
12 and the shareholders and board members?
13     A.    He's the only one I've ever spoken
14 to from Lehr -- from Kaled; so, the answer is
15 yes.
16     Q.    Thank you.
17     And did Peter serve any role in
18 connection with the building before Kaled took
19 over management?
20     A.    No.
21     MR. MARGOLIS:  Tara, when it's a
22 good time, could we just take a two,
23 three-minute break?
24     MS. TURNER:  Yes.  Then I can yell
25 at my colleagues out in the hall that are being

44

1  noisy.
2      MR. MARGOLIS:  I don't hear them.
3  Why don't we take a few minutes and then we'll
4  come back, if that's okay.
5      MS. TURNER:  Good.
6      (Recess 10:56-11:00 a.m.)
7  BY MS. TURNER:
8      Q.    Mr. Grill, what type of actions
9  require board approval?
10     A.    Say that again.
11     Q.    What type of actions by the co-op
12 require board approval?
13     A.    Buying and selling of a floor,
14 renting one of the floors, although everybody is
15 owner-occupied besides 7 and 8, so it's only
16 that one time that it would happen.
17 Expenditures, capital expenditures such as
18 painting, roof repair, anything that affects the
19 internal structure of the building.  The hiring
20 or engaging, I should say, of a management
21 company.  Hiring of a -- or approval of a hiring
22 of a consultant who might be working on a
23 furnace.  Things like that nature.
24     Q.    You mentioned buying and selling.
25 What's the process to approve the purchase or

45

1  sale of one of the floors in the building?
2      A.    A prospective buyer would submit
3  their financials to the management company, who
4  would then send it off to the board, and get
5  them -- getting bank approvals if they were
6  purchasing it with a mortgage. Meeting the
7  prospective purchaser in person; understanding
8  the usage of the floor or floors that they were
9  going to purchase. And pretty much that would
10 sum it up.
11     Q.    Is that process different than the
12 process for considering sublease applicants?
13     A.    Well, we've only had one sublease
14 applicant that I'm -- you know. So, and we've
15 had many more purchase and sales than we have
16 sublease applicants.
17     Q.    So is the process the same or
18 different?
19     A.    Well, it's somewhat different.
20 The nature of the relationship is different.
21     Q.    How so?
22     A.    Well, somebody is becoming a
23 partner when they buy shares in the building, in
24 the co-op, I should say. And when they're a
25 tenant, they are not your partner; they have a

46

1  contractual relationship with the person that
2  has the proprietary lease for the floor that
3  they would like to sublet.
4      Q.    You mentioned earlier that Touton
5  Limited purchased the 11th floor.
6      A.    Yes.
7      Q.    Can you describe the process of
8  considering the purchase of that floor, the 11th
9  floor.
10     A.    Well, he owned two floors in the
11 building, 9 and 10. So he submitted a package
12 to the management company and to the board, and
13 then to the board, for the purchase of the 11th
14 floor. He supplied his financials to make sure
15 that he was going to be able to afford the
16 maintenance on three floors, as opposed to two.
17 He was -- he submitted his construction project
18 and renovation ideas, and the board approved it
19 based on what he submitted.
20     Q.    Was there a meeting or interview
21 to consider Touton's purchase of the 11th floor?
22     A.    There was no interview. We knew
23 him very well. In fact, he was in the building
24 when I got here. So, that was not necessary.
25         We did meet about what the

47

1  construction project was going to entail,
2  because we wanted to make sure that -- well, I
3  wanted to make sure that it was not going to
4  be -- have an impact on the 12th floor, in terms
5  of renovation. Demolition in the building can
6  be messy. When you're the floor that is right
7  above or right below, the impact is greater than
8  anywhere else in the building. He owns the
9  floor below, so for him it wasn't an issue; he
10 would figure it out. But we, at the meeting,
11 were pretty clear about what -- how they were
12 going to do the demolition and what facilities
13 they were going to use and at what time to do
14 the construction part of the renovation of the
15 11th floor.
16     Q.    How was Touton's purchase of the
17 11th floor approved?
18         MR. MARGOLIS: Objection.
19     A.    We said okay. I'm not sure what
20 you're referring to.
21     Q.    Did the board members cast a vote
22 to approve or deny?
23     A.    Yes, we voted.
24     Q.    And how many board members voted
25 in total?

48

1      A.    There were four of us that voted
2  because they had to -- well, I actually
3  suggested, and I thought it was the right thing
4  to do, that they recuse themselves from voting
5  since they were on the same side of the trade,
6  and it was unanimous to approve it. They're
7  really good partners and they build beautiful
8  space.
9          So, there was no issue. As soon
10 as they were willing to seal up the -- for the
11 purposes of demolition, make sure that none of
12 the airborne waste would travel up through the
13 elevator shafts, that was the only concern that
14 I had, and it was unanimously approved.
15     Q.    And you said four board members
16 voted. Would that be yourself, Marc, Mr. Conte,
17 and Mr. Doctormann?
18     A.    Yes.
19     Q.    Thank you.
20         Is there a certain number of board
21 members required to attend a meeting to consider
22 the purchase of one of the floors in the
23 building?
24     A.    I don't know.
25     Q.    And is there a certain number of

49

1  votes that are required to approve the purchase
2  of one of the floors in the building?
3      A.    The majority of the board would be
4  required to approve the purchase of one of the
5  floors, although we try to do everything by
6  unanimous consent, and I haven't had an
7  experience where that wasn't the case.
8      Q.    Why does the board try to do
9  everything by unanimous consent?
10     A.    It doesn't have to.  The only
11 thing that's required is majority.  But I like
12 to have unanimous consent because, I mean --
13 it's not required, but I prefer it.
14     Q.    Why do you prefer unanimous
15 consent?
16     A.    Because we're partners and I think
17 that everybody who's a partner has the right to
18 express themselves and to address issues that
19 they may have on an open and free basis.
20     Q.    So if one partner was opposed to a
21 purchase or sale, would you vote in opposition
22 to that purchase?
23     A.    I can't speculate as to what I
24 would do at a time, without having a specific
25 instance to talk about.

50

1      Q.    Has the process to consider
2  purchase or sale of the floors changed over
3  time?
4      A.    The process, no.
5      Q.    How many purchases -- I'll just
6  say purchase because it's both a sale and a
7  purchase.
8      A.    Okay.
9      Q.    How many times have you approved
10 or denied a purchase of one of the floors in the
11 building, as a board member?
12     A.    Probably eight.
13     Q.    And of those eight times, how many
14 times have you denied a purchase of one of the
15 floors?
16     A.    I don't recall.
17     Q.    Have you ever denied the purchase
18 of one of the floors in the building?
19     A.    I don't remember.  Real estate
20 agents bring people to the board, you know.
21 There hasn't been any turnover in a very long
22 time, so I don't recall whether or not we turned
23 anybody down.  I only can tell you that there
24 are eight ones that I approved.  I don't know
25 what you're asking, exactly.

51

1      Q.    I'm sorry, is your testimony that
2  you've approved eight purchases of --
3      A.    I think so.
4      Q.    I just want to make sure I
5  understood.
6      A.    Yeah.
7      Q.    Has anyone in those eight
8  purchases that you've approved, were any of the
9  purchasers unaffiliated with the building, so
10 did not already own a floor in the building?
11     A.    Yes.
12     Q.    Do you recall who the purchasers
13 were?
14     A.    Hand Held Films was not in the
15 building, and they came to the building to
16 purchase.  4 and 5, the structural firm, the
17 engineering firm, was not originally in the
18 building.  They purchased the fourth and fifth
19 floors.  11 was purchased after the original
20 owner when I came in, Mr. Doctormann purchased
21 his floor.  Mr. Conte purchased his.  And also
22 2, actually, Donald Baechler also purchased the
23 floor after I had already come in.
24     Q.    What was the process to approve
25 Hand Held Films's purchase of their floors?

52

1      A.    They, Marc had come in, had a
2  meeting, described what the business that he was
3  going to do in the building.  He had to be
4  pretty specific about it.  He submitted his
5  financials, which were approved.  And I think he
6  actually -- I'm not sure if he had two meetings,
7  but he definitely had one with the board.
8      Q.    And what about Mr. Conte, when he
9  purchased -- when his organization purchased the
10 sixth floor?
11     A.    I don't recall the meeting itself,
12 but he came in also with a -- he had -- I don't
13 know if it was his partner, but a younger fellow
14 who was with him, two of them came together.
15 And they described what they were going to do on
16 the sixth floor and the business that they were
17 in.  They also submitted their financials.
18     Q.    What about the structural
19 engineers, architects, for the fourth and fifth
20 floor, what was that process for approving?
21     A.    Basically the same process.  I
22 think there were two of the principals that came
23 to meet with us.  I don't remember, they've been
24 here for a while, I don't remember it, but they
25 came for a meeting and submitted their

53

1 financials, described what they were going to do
2 in the space. No different than the others.
3     Q.    And was it a similar process with
4 the 11th floor when Mr. Doctormann was
5 purchasing it?
6     A.    Yes.
7     Q.    And how did you learn about the
8 process to approve purchases of floors in the
9 building?
10     A.    I went to a meeting and, you know,
11 there's a learning curve. So, I learned it.
12     Q.    Did someone tell you about the
13 process?
14     A.    There's no class -- I mean, I
15 didn't go to NYU Real Estate for Board Meetings,
16 if that's what you're asking.
17     Q.    Did someone tell you about the
18 process for approving --
19     A.    Yes. Yes.
20     Q.    Who told you?
21     A.    I have no idea.
22     Q.    Was it another board member?
23     A.    I don't recall who told me how it
24 works.
25     Q.    Did you review any documents that

54

1 indicated the process for approving purchases of
2 the building?
3     A.    No.
4     Q.    Do shareholders have any rights as
5 far as approving or denying the purchase of
6 floors in the building?
7     A.    Do they have any rights? Could
8 you define "rights" for me?
9     Q.    Sure. Can they take any action;
10 for example, a vote to approve or deny, you
11 know, voice their opinions.
12     A.    They certainly have the right to
13 express their opinion, like everybody does.
14 It's pretty obvious when somebody is looking to
15 sell their floor.
16     Q.    But can shareholders cast a vote
17 in the process for purchasing floors?
18     A.    It's a Board of Directors'
19 decision as to accept or reject a potential
20 buyer. But I would certainly consider all of my
21 partners' and shareholders' who are not on the
22 board opinion as to what is in the best interest
23 of the building. But they don't have a right.
24     Q.    So they can't vote on whether to
25 approve or deny the purchase of any floors?

55

1     A.    No. No.
2     Q.    I want to shift gears back to the
3 general process to approve or deny sublease
4 applicants.
5         Do you know where the requirement
6 for board approval for sublease, do you know
7 where that requirement is?
8         MR. MARGOLIS:  Objection.
9     A.    Yeah, it's in the docs, the
10 building docs, the operating building documents.
11     Q.    And is board approval the only
12 way, a vote of board approval, is that the only
13 way to approve a sublease applicant?
14     A.    As far as I know.
15     Q.    When does the Board of Directors
16 first get involved when there is a potential
17 sublease applicant?
18     A.    Could you repeat the question,
19 please.
20     Q.    When does the Board of Directors
21 get involved when there is a potential sublease
22 applicant?
23     A.    When we're asked to attend a board
24 meeting to review or meet a potential tenant.
25 Like I said, it's only happened once, so there's

56

1 no regular process that goes on. Happens one
2 time, so the next time we'll have something to
3 base the next process on.
4     Q.    You mentioned that the seventh and
5 eighth floors owned by Oxford are currently
6 unoccupied. Have they ever been occupied by a
7 tenant?
8     A.    Yes.
9     Q.    When?
10     A.    When Oxford bought -- when Oxford
11 bought the floor, they occupied it.
12     Q.    What floor did they occupy, did
13 Oxford occupy?
14     A.    I don't remember. 7 or 8.
15     Q.    Do you know when they purchased
16 the seventh and eighth floors?
17     A.    I don't remember.
18     Q.    Does around 2004 sound right?
19     A.    I would be guessing, and I don't
20 know.
21     Q.    Understood.
22         Do you know how long Oxford
23 occupied either the seventh or eighth floor
24 after purchasing it?
25     A.    I think for a couple of years.

57

1    Q.    Were there any other tenants in
2 the seventh or eighth floor during or after
3 Oxford occupied one of them?
4    A.    Yes.
5    Q.    Who?
6    A.    I don't know the name of the
7 company, but they were a gaming company that
8 were electronic games.
9    Q.    Do you know what floor they --
10    A.    Software. Software.
11    Q.    Do you know what floor the
12 software company occupied?
13    A.    I don't remember.
14    Q.    How long did the software company
15 occupy the seventh or eighth floor in the
16 building?
17    A.    Maybe 18 months.
18    Q.    When did the software company
19 first occupy the seventh or eighth floor in
20 building?
21    A.    Before COVID. Exact period of
22 time I don't remember.
23    Q.    When did the software company
24 leave the seventh or eighth floor in the
25 building?

58

1    A.    I don't know the exact date, but
2 before COVID.
3    Q.    When you say before COVID --
4    A.    Before March 2020 they were gone
5 already.
6    Q.    Were they gone within a year of
7 March 2020?
8    A.    I believe so.
9    Q.    2019?
10    A.    Probably. No, definitely, yes,
11 definitely they were gone before then. Because
12 my mother had died then and they were already
13 gone from the building in 2019.
14    Q.    Was the software company occupying
15 the seventh or eighth floor in March of 2018?
16    A.    I don't remember.
17    Q.    So is it fair to say sometime in
18 2018 or the first quarter of 2019, but before
19 March 2019, the software company was occupying
20 the seventh or eighth floor?
21    A.    No, it was before that.
22    Q.    So when was the software company
23 occupying the seventh or eighth floor?
24    A.    The exact dates I don't know, but
25 it was definitely prior to 2019.

59

1    Q.    Did they occupy the seventh or
2 eighth floor in 2018?
3    A.    I don't recall.
4    Q.    What was the process to approve
5 the software company to rent the seventh or
6 eighth floor?
7    A.    I don't recall specifically, but
8 it was the same thing.
9         See, the thing was that Shamash
10 still had occupancy. So he was on, or at least
11 he claimed he was, operating his business out of
12 that space. So it was still tenant owner-
13 occupied and he sublet the space. We approved
14 it based on the fact that their financials were
15 okay and he was going to be responsible for the
16 daily operations of his subtenant.
17    Q.    Were you a board member when the
18 software company was approved to sublease the
19 seventh or eighth floor?
20    A.    I don't remember if I was.
21    Q.    Was anyone from the software
22 company interviewed as part of their application
23 to sublease the seventh or eighth floor?
24    A.    I never interviewed them. I don't
25 know if the board, other members did, but I did

60

1 not.
2    Q.    Did you ever meet anyone from the
3 software company that rented the seventh or
4 eighth floor?
5    A.    I don't know if I've met any
6 principals. I met people who worked there in
7 the elevator.
8    Q.    Do you know why the software
9 company only occupied the floor, one of the
10 floors for 18 months?
11    A.    I don't know.
12    Q.    Do you recall how long the
13 sublease was to occupy the seventh or eighth
14 floor, the sublease with the software company?
15    A.    I don't. I never saw it.
16    Q.    Would the board typically review a
17 sublease agreement in considering a sublease
18 applicant?
19    A.    The management company would
20 review the package, you know, the filing for an
21 application process. The lease itself, somebody
22 may want to see it. I never have.
23    Q.    We talked a little bit about
24 Kaled's role in the sublease process.
25    Q.    Whose role?

61

1    Q.    Kaled.  I'm sorry.
2    **A.    Oh, Kaled, yes.**
3    Q.    I'm not sure I'm pronouncing it
4  correct.
5    **A.    Kaled, yeah.**
6    Q.    Does Kaled make a recommendation
7  whether to approve or deny a sublease applicant?
8    **A.    We've only had one that required**
9  **it; so, no, they get the finances and whether or**
10  **not, I guess, the construction that they're**
11  **intending to do is compatible with the**
12  **building's infrastructure.  But, no, they don't**
13  **make any recommendation one way or the other, or**
14  **didn't in this case.  Not to me.**
15    Q.    Was Kaled managing the building
16  when the software company subleased the seventh
17  or eighth floor?
18    **A.    I don't remember.**
19    Q.    Did the software company submit a
20  sublease application for the seventh or eighth
21  floor?
22    **A.    I don't know.  I never saw one.**
23    Q.    Did you vote to approve or deny
24  the sublease with the software company?
25          MR. MARGOLIS:  Objection.

62

1    **A.    I did not.  I was not involved.**
2    Q.    Do you know who the board members
3  were when the software company submitted, or
4  when they sought to sublease the seventh or
5  eighth floor?
6    **A.    No.**
7    Q.    Just generally speaking, is it
8  possible for an applicant, a sublease applicant
9  to be approved without a meeting or interview?
10          MR. MARGOLIS:  Objection.
11    **A.    Is it -- did you ask me if it's**
12  **possible?**
13    Q.    Yes.
14    **A.    Anything's possible.  It's not our**
15  **process, but I guess it's possible.**
16    Q.    Is there any written requirement
17  that a meeting or interview of a sublease
18  applicant is required for sublease approval?
19    **A.    I don't know if that, in fact, is**
20  **a written -- somewhere I read that it is, but I**
21  **don't remember where.  Maybe it's in the**
22  **operating docs.  But, no, I don't recall a**
23  **written formula for that.**
24    Q.    Again, generally speaking, for a
25  sublease applicant, would the board be willing

63

1  to conduct a phone interview?
2          MR. MARGOLIS:  Objection.
3    **A.    Would it be willing to?**
4    Q.    Yes.
5    **A.    I can speak for myself.  I**
6  **probably wouldn't.**
7    Q.    Would not?
8    **A.    I would rather meet the person**
9  **that's going to be occupying the space.**
10    Q.    Why would you want to meet the
11  person occupying the space?
12    **A.    I think that it's a better working**
13  **relationship when you've actually met somebody**
14  **in person.  You're sharing facilities.  I think**
15  **that that's, you know, reasonable and**
16  **legitimate.  I would expect somebody to want to**
17  **meet me if I wanted to go into their space.**
18    Q.    Again, speaking generally, not
19  about the specifics in this action, but who
20  attends the meeting or interview to consider a
21  sublease applicant?
22    **A.    Who does?**
23    Q.    Yes.
24    **A.    Well, we've only kind of had one**
25  **really here, so the board members that are**

64

1  **available to meet.  Should be everybody, but not**
2  **everybody is available.  We all, you know, our**
3  **jobs are not about the building.  We all have**
4  **our own successful businesses.  We move around a**
5  **lot.  So coordinating a meeting is not the**
6  **easiest thing to do, but we do it because it's**
7  **our responsibility, we have to, we want to, and**
8  **we try to accommodate our shareholders and**
9  **partners in the building.**
10    Q.    When you say there's only been one
11  sublease applicant, what do you consider the
12  software company that subleased the seventh or
13  eighth floor to be?
14    **A.    Well, not really because Shamash**
15  **was the occupant of the building and he was**
16  **still there when they came in.  And so, as far**
17  **as I was concerned, it was still, you know,**
18  **owner-occupied; and he was going to be**
19  **responsible for the individuals that were there.**
20    **For me, owner-occupied is really**
21  **the primary reason why I wanted to come to this**
22  **building in the first place.**
23    Q.    And do you know if Mr. Shamash, or
24  anyone in connection with Oxford, was affiliated
25  with the software company?

65

1  A.  I don't.  I don't believe so, but
2  I don't know if they were or they weren't.
3      Q.   Generally speaking, for a meeting
4  or interview to consider a sublease applicant,
5  can shareholders who are not board members
6  attend that meeting or interview?
7      A.  Yes, a shareholder can attend the
8  meeting.  They don't have a vote, but they could
9  attend the meeting, sure.  I don't see why not.
10     Q.   And where does the interview or
11 meeting typically take place?
12     A.  Well, again, we've only had one
13 for a sublease, and that took place, I believe
14 it took place on the sixth floor in Mr. Conte's
15 conference room.  Sorry about that.  Conference
16 room.
17     Q.   And what type of questions do the
18 board members ask at the meeting to consider a
19 sublease applicant?
20         MR. MARGOLIS:  Objection.
21         Tara, are you asking about the --
22 we keep sort of -- you keep asking about
23 generally and the witness keeps talking about
24 there being one.  We know which one it was
25 because it's the one that's the subject of this

66

1  case.  So when you ask your questions, are you
2  asking about this case?
3          MS. TURNER:  I'm just trying to
4  establish the process, the general process, not
5  specific to the plaintiff in this case.
6          MR. MARGOLIS:  Okay.  Well, with
7  that framework, Joey, if you can answer the
8  question.
9      A.  Could you repeat the question.
10         MS. TURNER:  Nancy, could you read
11 back from the transcript, please.
12         (The following question was read:
13 "And what type of questions do the board members
14 ask at the meeting to consider a sublease
15 applicant?")
16     A.  Questions that are pertinent to
17 their occupancy.
18     Q.   What type of questions regarding
19 their occupancy?
20     A.  Usage of the floor, hours of
21 operation, numbers of people that will be coming
22 to the building, renovations that would need to
23 be done, whether or not there's manufacturing or
24 chemicals or toxic waste that's going to be
25 produced by whatever it is that they are doing.

67

1  Things that are specific to the other tenants,
2  the comfort and quiet usage for other tenants.
3  Things like that.  Same questions you would ask
4  if you were doing it.
5      Q.   For the sublease approval of the
6  software company, did anyone ask these questions
7  of the software company?
8      A.  I don't know.
9      Q.   Did Mr. Shamash make any
10 recommendations or representations on behalf of
11 the software company regarding their sublease?
12     A.  Not to me.
13     Q.   Once the board votes to approve or
14 deny a sublease, what happens next?
15     A.  After the vote, you mean?
16     Q.   Yes.
17     A.  We would tell the -- I mean, I can
18 speak to the idea of buy and sell, which is we
19 would tell the real estate agent what our
20 decision was, and I guess they would relay it
21 one way or the other to the prospective buyer,
22 seller or sublease tenant.
23     Q.   Generally speaking, when
24 subleasing, is there any way for the applicant
25 to appeal the board's decision to approve or

68

1  deny?
2      A.  I guess they could ask to have it
3  reviewed, you know, to come in and have another
4  meeting about it.  But there's no guarantee that
5  would happen.  There's no process by which an
6  appeal could be made.  If someone called and
7  asked, I'm fine.  I'm always happy to hear about
8  something somebody left off or conditions
9  change.  You know, very hard when you meet
10 somebody for the first time; I don't evaluate
11 anybody when I meet them for the first time.
12 Situations change.  I'm open.
13     Q.   With regards to the software
14 company that subleased the seventh or eighth
15 floor, were there any issues with that
16 subtenant?
17         MR. MARGOLIS:  Objection.
18     A.  There were for us, yes.
19     Q.   Who is "us"?
20     A.  The people who worked on the 12th
21 floor.
22     Q.   And what were your issues with
23 the --
24     A.  Those guys were really big.  I
25 mean, whoever was doing the hiring hired big

69

1 people, and they -- and I don't mean in terms of
2 physical size. They overtaxed the elevator. So
3 instead of following the rules of maximum of
4 six, when it would come up to the floor,
5 sometimes there would be seven.
6          So, they took up more of the space
7 than I was happy with. You know, when you're on
8 the 12th floor, the elevator stops between 2 and
9 11 all the time. So you're the last one off and
10 the last one to get on. So when you have a lot
11 of people on the elevator, it affects the flow
12 of traffic to your own floor; and that bothered
13 me.
14      Q.   Do you know how many employees the
15 software company had?
16      A.   I don't.
17      Q.   Did you regularly see employees
18 going to the seventh or eighth floor to the
19 software company?
20      A.   When I was here, and I'm not here
21 all the time, yes, you did see them more than
22 other floors.
23      Q.   Were there any other issues with
24 the software company when they were subleasing?
25      A.   No. They were very nice.

70

1      Q.   Do you know if any of the other
2 board members or shareholders had issues with
3 the software company?
4      A.   Not that I ever discussed with
5 them, no.
6      Q.   You mentioned that the software
7 company had more people accessing the floor that
8 it was subleasing. We're not sure if it's the
9 seventh or eighth, but do any other occupants of
10 the other floors have employees that regularly
11 visit the building?
12      A.   That have employees that visit the
13 building, is that what you asked?
14      Q.   Employees or just visitors, have
15 visitors to the building.
16      A.   Visitors. I guess they must. Not
17 many.
18      Q.   Does your business Click Models
19 get many visitors to the 12th floor?
20      A.   No.
21      Q.   How many employees work out of the
22 12th floor for Click Models or the talent
23 management company?
24      A.   Currently, eight.
25      Q.   And do they work in the building

71

1 every weekday?
2      A.   We have one person who comes in at
3 8:30; they leave at 4:30. We have one person
4 that comes in at 9; they leave at 5. We have
5 probably four people that come in anywhere
6 between 10 and 6; and I come in when I'm here
7 usually 10:30 to 7. That's pretty much it, on a
8 regular. We do have one person who comes in
9 sometimes around noon and she may stay until 8
10 or 9, because a lot of her work is actually
11 based on clients that live in California. So
12 the three-hour time delay changes the hours that
13 she works. And that's kind of it.
14      Q.   As a model agency, do you have
15 photo shoots on the 12th floor or do models
16 regularly visit the 12th floor?
17      A.   No. We don't have photo shoots
18 here. If somebody comes in and we shoot a
19 digital from an iPhone, that's an occasional
20 thing. But we have studios that we own in New
21 York City and have for 35 years. Any photo
22 shoots or any castings where there's numbers of
23 people, we do it at our photo studio, not here.
24      Q.   And what about Touton's business
25 on the ninth and tenth and potentially future

72

1 11th floor; do they have -- how many employees
2 do they have that come into the building
3 regularly?
4      A.   I don't know.
5      Q.   Do you know if Touton receives
6 visitors at the building?
7      A.   I don't know. They have outdoor,
8 outside salespeople that come in on occasion,
9 and the only reason I know that is because
10 they're carrying -- they have a wine bag. But
11 there's not very many of them, but occasionally
12 they come in. Maybe they have a company testing
13 now and then, tasting, I don't know. But very
14 few.
15      Q.   Okay. Now I'm going to talk
16 specifically about the facts of this action.
17 What's your understanding of the lawsuit against
18 the co-op and the board members?
19      A.   CCMS had come in for an interview
20 with board members after Shamash had negotiated
21 a lease with their organization, prior to having
22 been approved. And my understanding is that
23 Mr. Brooks felt that he was unfairly treated as
24 a result of the information that he had been
25 given by Nigel and that he felt that the reason

73

1    that he had been rejected was because members of
2    the board felt that he was being -- he felt that
3    he was being racially discriminated against when
4    the board rejected his application, after he had
5    gone through all of the motions of getting to
6    that point. I don't know if it's correct, but
7    that's my interpretation of it.
8        Q.   There's no right or wrong answer.
9    We're just talking.
10       A.   Okay. You have very nice teeth,
11   by the way.
12       Q.   When did you personally first
13   learn that CCMS was interested in subleasing a
14   floor at the premises, or the building?
15       A.   Somewhere around Christmas 2019.
16   In that area, right in that period of time.
17       Q.   Do you remember the day?
18       A.   No. The specific day, no, but in
19   and around December 20. It could have been the
20   19th, it could have been anywhere around there,
21   but I think it was closer to Christmas,
22   actually.
23       Q.   How did you first learn that CCMS
24   was seeking a sublease?
25       A.   Peter Lehr put in a call to me and

74

1    said that Nigel was really pushing to get a
2    meeting. He had a tenant that he had worked out
3    a lease with and that he understood that he had
4    to have a board meeting for approval, and he
5    pushed pretty heavily to get it done
6    immediately; and that's when I first heard about
7    it.
8        Q.   And when you say he pushed to have
9    it done immediately, do you mean Mr. Shamash?
10       A.   I assume, yeah. Peter said that
11   Nigel was very -- he didn't use push. I don't
12   recall the word that he said, but in substance
13   that he had a timing issue and really wanted to
14   have a meeting as fast and as soon as possible.
15   A board meeting.
16       Q.   And did Peter ask you about your
17   availability for a meeting?
18       A.   I don't recall the words but, yes,
19   he did ask me if I would be available for a
20   meeting.
21       Q.   Did Peter share anything else
22   about CCMS or --
23       A.   No. No. Only that Nigel was
24   pretty insistent that -- and again, that may not
25   have been his word, but it was, in substance,

75

1    what I was picking up, that he was pretty
2    insistent about having a board meeting, sooner
3    than later.
4        Q.   And prior to that time, had
5    Mr. Shamash ever reached out to you about CCMS
6    and subleasing in the building?
7        A.   He had reached out to me, but not
8    about a specific tenant. He said to me a while
9    before that, and it could have been more than a
10   month but less than two, that he thought he had
11   a tenant for the space, and he was hoping to be
12   able to make a deal with them.
13       Q.   Why did Mr. Shamash reach out to
14   you a month prior regarding the sublease?
15       A.   I have absolutely no idea.
16       Q.   Do you and Mr. Shamash speak?
17       A.   Never. Never. I shouldn't say
18   never. I mean, I maybe have spoken to him a
19   half dozen times since he moved into the
20   building, of which half of those were in the
21   elevator when he had his offices here. We're on
22   different schedules, so... But, no, not -- I
23   have no idea why he reached out to me.
24       Q.   How did he, how did Mr. Shamash
25   reach out to you? Did he call you, email you?

76

1        A.   No, he called me.
2        Q.   How did he have your number?
3        A.   It's not so hard to find Click
4    Models' number. Pretty easy.
5        Q.   Did Mr. Shamash --
6        A.   I --
7        Q.   I don't want to speak over you.
8             Did Mr. Shamash call you at Click
9    Models?
10       A.   I think he did, yes.
11       Q.   So he didn't call you on your cell
12   or your personal phone?
13       A.   I wouldn't know how he would have
14   my number unless -- well, he probably could get
15   my number through Peter Lehr, if Peter gave it
16   to him. But normally he would just call --
17   normally if I'm trying to find somebody I don't
18   call them on their cell phone. I go to the
19   business number. I think it's rude to call
20   somebody on their personal phone, if they didn't
21   give you the number. And I never gave Nigel my
22   personal cell phone number, but I have given it
23   to Peter.
24       Q.   Thank you.
25            Do you have Mr. Shamash's personal

77

1  cell phone number?

2  **A.   No.**

3  Q.   When Peter Lehr first reached out

4  to you in December 2019 about the sublease, what

5  did you know about CCMS's business?

6  **A.   Nothing.**

7  Q.   Did Mr. Lehr tell you anything

8  about CCMS and its business on the call?

9  **A.   No.**

10  Q.   Did CCMS submit any materials in

11  connection with their sublease?

12  **A.   Did they furnish me any, you're**

13  **saying?  Could you repeat it?**

14  Q.   Sure.  Sorry, I've got an itch on

15  my nose.

16       In connection with their sublease

17  for one of the floors in the building, did CCMS

18  submit any materials with their application?

19  **A.   I don't -- I never saw any, but**

20  **I'm assuming that they did, to the management**

21  **company.**

22  Q.   So you never reviewed a sublease

23  application from CCMS?

24  **A.   I never reviewed it, no.**

25  Q.   Why didn't you review a sublease

78

1  application from CCMS?

2  **A.   Because I wasn't in New York.  You**

3  **know, it's Christmastime.  I'm unavailable.  I**

4  **mean, I made him an accommodation, because I**

5  **remember very clearly saying can't this be done**

6  **at the annual meeting?  Can't we just carve out**

7  **a little time for it, you know, March.  I wasn't**

8  **planning on coming back into the city for**

9  **something like this.  So, I never saw it.**

10  Q.   When was the annual meeting

11  scheduled for?

12  **A.   We hadn't scheduled a meeting, but**

13  **it would have been sometime between the end of**

14  **January and March 30th, March 31st, somewhere in**

15  **the first quarter.**

16  Q.   And when did the board end up

17  holding an interview for CCMS and their

18  sublease?

19  **A.   January, mid-January.**

20  Q.   Does January 14th, 2020 --

21  **A.   Could be.**

22  Q.   -- ring a bell?

23  **A.   That sounds about it, mid-January.**

24  Q.   So mid-January?

25  **A.   Yeah.**

79

1  Q.   How long was the interview when

2  CCMS was present, Mr. Brooks?

3  **A.   Probably an hour, maybe less.**

4  Q.   And who was present at Mr. Brooks'

5  interview?

6  **A.   Again, please.**

7  Q.   Who was president -- who was

8  present --

9  **A.   Who was president?  Donald Trump**

10  **was president at the time.**

11  Q.   Who was present at Mr. Brooks'

12  interview?

13  **A.   Mr. Brooks, Nigel Shamash, Eric**

14  **Doctormann, Max on the other side of the table,**

15  **Touton, Mr. Conte next to me, and myself**

16  **opposite Mr. Brooks, or almost opposite.  I**

17  **think that's who was there.**

18  Q.   So there were four board members

19  present at the interview, correct?

20  **A.   Yes.**

21  Q.   And why was Mr. Shamash at the

22  interview of CCMS?

23  **A.   I have no idea, but I assumed he**

24  **was the -- you know, he owned the floor and he**

25  **wanted to, you know -- I don't even know if he**

80

1  **was the broker on his own deal.  I thought that**

2  **might be a possibility when I was sitting there,**

3  **but I have no idea why he was there.**

4  Q.   Did the board invite Mr. Shamash

5  to the interview?

6  **A.   I didn't.  I was surprised, I was**

7  **very surprised he was there.**

8  Q.   Why were you surprised he was

9  there?

10  **A.   Because he's not a member of the**

11  **board.**

12  Q.   Why wasn't Marc, the board

13  president, at Mr. Brooks' interview?

14  **A.   As far as I understood, he was out**

15  **of the country at the time.**

16  Q.   Did it seem strange to you that he

17  wasn't present for the interview?

18  **A.   No, not at all.  I mean, they were**

19  **really -- Shamash was really pushing for this as**

20  **fast as he possibly could and I had said, let's**

21  **just do it in the annual meeting, whenever that**

22  **is, February, March.  But they were insistent --**

23  **they meaning, I guess, Shamash pushing Peter to**

24  **get a board meeting sooner than later.  There**

25  **was no way that Marc was coming back for**

81

1  something like this. I barely wanted to come in
2  to do it.
3      Q.   Understood.
4      A.   But I'll make an accommodation for
5  my partners, so...
6      Q.   Did you ever discuss the interview
7  with Marc?
8      A.   No.
9      Q.   Before the interview had you ever
10 heard of CCMS?
11     A.   No.
12     Q.   Other than when Peter told you
13 they were applying to sublease?
14     A.   He didn't tell me specifically who
15 it was. He told me that Nigel had worked out a
16 deal with a lease with a potential subtenant,
17 and that they wanted to have a meeting.
18     Q.   So when you walked into the
19 interview, that was the first time you had ever
20 heard of CCMS?
21     A.   Yes.
22     Q.   And had you ever heard of
23 Mr. Brooks?
24     A.   No.
25     Q.   Had you ever met Mr. Brooks before

82

1  the interview?
2      A.   No.
3      Q.   When you met Mr. Brooks at the
4  interview, did you understand that he was black?
5          MR. MARGOLIS:  Object.
6      A.   Did I understand he was black?
7      Q.   Yes.
8      A.   I saw a black gentleman sitting
9  across the table from me. I didn't know who he
10 was until he was introduced to me.
11     Q.   Okay. Who conducted the
12 interview?
13     A.   I would say that Mr. Conte led the
14 interview, but everybody was there and free to
15 ask questions and listen to what the responses
16 were.
17     Q.   Did Mr. Conte have a specific role
18 on the board?
19     A.   No.
20     Q.   Is there a vice president of the
21 board?
22     A.   Is there a?
23     Q.   Vice president of the board.
24     A.   No.
25     Q.   Are there any other roles on the

83

1  board besides president or board member?
2      A.   Well, no. The board members are
3  just board members. The corporate officers may
4  or may not be board members, but they're not --
5  they're mutually exclusive, actually. They
6  don't have to be one or the other. I think it's
7  a little confused there.
8          No, the board members are all
9  equal board members. They're also individuals
10 who may be corporate members simultaneously, but
11 not -- they don't have to be.
12     Q.   Understood.
13         Who asked questions at the
14 interview?
15     A.   Anybody.
16     Q.   What was generally discussed at
17 the interview?
18     A.   The usage of the floor,
19 renovations that would need to be made if they
20 were going to have to accommodate any specific
21 types of usage, hours of operation, past
22 experiences with other -- Mr. Brooks describing
23 his operation. Pretty much that's it.
24     Q.   What questions did you
25 specifically ask Mr. Brooks?

84

1      A.   Well, I asked him how long he'd
2  been in the business, whether or not he was a
3  principal of it or he was acting as a corporate
4  liaison for a company, whether or not the
5  company was part of a bigger operation, meaning
6  that they had a corporate owner aside from
7  themselves. I asked him where he learned his
8  skill set. That's pretty much it. There could
9  have been other things, but that's the general
10 gist of what I was interested in. Timing, how
11 long he was going to be there.
12     Q.   At the interview, did anyone
13 discuss the use of the elevators in the building
14 as it related to the sublease?
15     A.   Somebody may have, yes.
16     Q.   Do you recall who?
17     A.   No. But I had a comment of it.
18 You know, when Mr. Brooks was describing the
19 clientele that he has and he was referring to
20 counseling services, those things that we had
21 never been made aware of, we had always thought
22 that it was administrative offices because he
23 had other locations that he described, that were
24 described to us; and when he got into the issue
25 of counseling services that he would be

85

1  providing, both for children, group counseling,
2  mental health counseling, drug and alcohol
3  counseling, I said, when he had said mental
4  health, I said, well, can you describe that for
5  me.  And he said, well, we do counseling for
6  people who have some mental health issues.  And
7  I had said at the time, well, because I have
8  young girls that come up and down in the
9  elevator, how do you propose to accommodate the
10  fact that if you have people with mental health
11  issues, what can you do about that to -- you
12  know, I'm concerned.  And he said, well, we'll
13  provide security for that.  And I thought to
14  myself, well, if you need to have security for
15  mental health in an elevator situation, then
16  that's something -- that's a red flag for me
17  anyway.
18        And then he described how he was
19  going to be open Saturdays.  We had said, you
20  know, predominantly we are a nine to five, nine
21  to six five-day-a-week building.  We don't
22  provide security, we don't have a doorman.  Our
23  super is not here at all on weekends.  I'm not
24  sure how to accommodate all that, but I'd like to
25  hear more of what you have to say.  And he kind

86

1  of got, you know, I think he may have felt that
2  maybe he is in the wrong place.
3      Q.    You mentioned that you thought
4  CCMS would be operating administrative offices?
5      A.    Yes.
6      Q.    Who told you that?
7      A.    I don't recall who said it
8  specifically.  Peter may have.  It could have
9  been him.  It could have been anybody.  I was
10  very surprised when I found out that that wasn't
11  the case.
12      Q.    But you didn't review the sublease
13  application, so you didn't learn that from the
14  sublease application?
15      A.    No, I didn't learn it from the
16  sublease application.  I learned it at the
17  meeting, pretty much at the meeting.
18      Q.    You learned at the meeting that
19  they were intending to use it for admin offices?
20      A.    Say that again.
21      Q.    When did you learn that CCMS would
22  be operating administrative offices in the
23  building?
24      A.    Somewhere before the meeting.  I
25  didn't review the application.

87

1      Q.    So someone must have told you?
2      A.    It could have been Nigel but I
3  don't -- I can't swear that it was Nigel, but it
4  could have been Nigel.  Because he's really the
5  only person I spoke to for a moment, and that
6  was it.
7      Q.    Did you speak to any of the other
8  board members before the interview about CCMS?
9      A.    No.
10      Q.    You mentioned your concerns -- let
11  me back up.  Strike that.
12        At the interview did anyone
13  discuss an attack or an incident that occurred
14  in Monsey, New York involving a man with mental
15  health issues?
16      A.    Not that I heard, no.  I never
17  heard that.
18      Q.    Was there any discussion generally
19  about security or safety with individuals that
20  might have mental health issues?
21      A.    Nothing more than me saying what
22  kind of accommodations are you thinking about;
23  and he responded, well, we'll have security
24  guards.  I don't know if he said security
25  guards, I shouldn't say.  We'll have security.

88

1  And I said, well, we don't have somebody at the
2  front door.  He said, no, no, no, that's
3  something I would provide.
4      Q.    Was there any discussion of CCMS's
5  clients using the freight elevator instead of
6  the normal elevator?
7      A.    Not that I recall.  I mean, we
8  were redoing elevators, so there could have been
9  a period of time where somebody is using a
10  freight elevator when we're -- you know, there's
11  a lot -- you have people in the building who
12  need more than one single access point.  But,
13  no, not so that somebody could use a freight
14  elevator as a regular way of operating, other
15  than with freight.
16        I mean, the third floor sometimes
17  uses it because they move some equipment up and
18  down between the ground floor and the basement,
19  but nobody I know, and certainly not on my floor
20  uses the freight elevator, and I would never
21  allow it for people to be isolated in a freight
22  elevator.  No way, not for me.
23      Q.    Was there any discussion about the
24  race or ethnicity of CCMS's clients?
25      A.    No.

89

```
1     Q.    During the interview while
2  Mr. Brooks was present, did any of the board
3  members express concerns about CCMS subleasing
4  the floor?
5     A.    About CCMS?
6     Q.    Subleasing the floor.
7     A.    I don't know what you mean.
8     Q.    So before --
9     A.    It's not a clear question. I
10 apologize.
11    Q.    While Mr. Brooks was at the
12 interview, did anyone ask Mr. Brooks, or raise
13 any issues that would impact his sublease
14 approval or denial?
15        MR. MARGOLIS:  Objection.
16    A.    Not that I heard, no.
17    Q.    How quickly after Mr. Brooks left
18 the interview did the board consider the
19 sublease?
20    A.    Five minutes, ten minutes, 15
21 minutes.  Relatively soon afterwards.  That's
22 why we were there.  We weren't there for any
23 other reason.
24    Q.    What did the board members discuss
25 with regards to approving or denying the
```

90

```
1  sublease?
2     A.    Oh, we discussed that it didn't
3  fit -- we didn't believe that it fit with the
4  nature of our business.  We're not a 9 -- you
5  know, we're not open on weekends.  Mr. Brooks
6  was very clear that his business runs six days a
7  week, they are there until 9 o'clock in the
8  evening often.  That part of it wasn't going to
9  work.
10        We were a little perturbed that,
11 and we discussed that Nigel had submitted a
12 person who, an organization, not a person, but
13 an organization that is not consistent with the
14 operations of the building's time frame of
15 operation.  We were shocked that he was there,
16 that was the first thing.  What was Nigel doing
17 here?  I mean, I can understand why he would
18 want to escort him in and then introduce him and
19 then leave, but he stayed.  That was the first
20 part of, like, that's odd, but okay.
21        We discussed -- we actually
22 discussed Nigel more than we discussed CCMS.
23    Q.    While the board was deliberating,
24 did anyone express concerns about CCMS's
25 clients?
```

91

```
1     A.    I said, I'm really concerned about
2  Mr. Brooks saying that he needed security -- or
3  not needed, but he would provide security during
4  the time when his clients come in because that,
5  to me -- you know, the building isn't prepared
6  for that kind of thing.  It's not that kind of
7  facility.
8         And I had said, you know, if we
9  were talking about the ground floor where you
10 have your own access or entry, and the building
11 doesn't have to operate to fill the terms of his
12 lease, operate independently, you know, I would
13 be much more open to the idea of CCMS.  But
14 under those terms -- and Mr. Brooks was very
15 honest about it.  He said that's what our
16 business is.  And we said, well, we thought -- I
17 think Mr. Conte said, we thought this was only
18 administrative offices that you were talking
19 about.  And he said, no, no, we will have --
20 we're going to use a couple of the office spaces
21 for administration, for billing and receiving
22 for accounting work but, no, this is for
23 facilities for counseling.
24    Q.    How long did the board, after
25 Mr. Brooks left, how long did the board
```

92

```
1  deliberate before taking a vote on the sublease?
2     A.    On the merits of whether or not we
3  were going to approve CCMS, we came to a vote, I
4  would say ten minutes, maybe less, but we did
5  meet a little bit longer because we didn't quite
6  understand Nigel's position in the entire thing.
7  And Nigel voted no at the thing.  I'm like,
8  Nigel, you don't have a vote, dude, first of
9  all.  It was very confusing, that part of it.
10 We were trying to figure out what was going on.
11 We kind of were side-swiped there.
12    Q.    What did, if you could just go
13 through each of the individuals that were
14 present for the vote, what did each person vote?
15    A.    I'm not understanding this.
16 You're not coming in clear.
17    Q.    Sorry.  How did -- of the
18 individuals that were present for the vote, how
19 did each person vote?
20    A.    We all voted to not approve the
21 sublease.
22    Q.    And you said Mr. Shamash voted no
23 as well?
24    A.    He doesn't have a vote.  He raised
25 his hand when we said -- you know, because we
```

93

1  voted by hand and a yea or nay and it was, you
2  know, I voted not for me, nay, and he voted the
3  same thing. But that's when I said, dude, you
4  don't have a vote, what are you doing? And it
5  didn't matter because the other four members
6  also had voted no at the time.
7      Q.   What did Mr. Shamash respond when
8  you told him he didn't have a vote?
9      A.   He said you're right, I don't.
10     Q.   Did he provide any other context
11 for why he attempted to cast a vote?
12     A.   No.
13     Q.   Was there any other discussion
14 amongst the board members after the vote?
15     A.   What are you doing, you know, how
16 was your Christmas, where are you gonna be for
17 the next couple of months, how are we gonna get
18 another annual meeting scheduled. I was leaving
19 town, trying to schedule that kind of thing out.
20 That was really just all because Shamash had
21 left; and Mr. Doctormann actually had left right
22 after the vote. He didn't stay either.
23     Q.   Who informed CCMS that the
24 sublease was denied?
25     A.   I don't know.

94

1      Q.   Did any of the board members make
2  an attempt to inform CCMS of the denial?
3      A.   I don't know. I'm going to assume
4  Shamash did. He was there when it happened and
5  he was the one who was trying to navigate and
6  shepherd it through to begin with, so I assume
7  he did. But it could have been Mr. Lehr. It
8  would have probably been one or the other, but I
9  don't know. It was not me.
10     Q.   Before the interview, what's your
11 understanding of CCMS's attempt to install
12 telephone lines and furniture in the building?
13     A.   I didn't know about it at all
14 until some furniture was starting to be
15 delivered and I was like, how can that be,
16 there's no approval, there's not a board
17 meeting. That doesn't make any sense. I didn't
18 know anything about it until some furniture --
19 actually, it wasn't even furniture. I think it
20 was a copy machine that was attempting to be
21 delivered and I was like, okay, but I don't
22 think so.
23     Q.   Do you recall when that attempted
24 delivery was?
25     A.   Do I recall who was delivering it?

95

1      Q.   Do you recall when the delivery
2  was, the attempted delivery?
3      A.   No. I don't recall, but it was
4  prior to the meeting.
5      Q.   Was it prior to when Peter Lehr
6  called you about the sublease?
7      A.   Probably not because that would
8  have been a red flag for me. I would have made
9  a call to find out what was going on, so it was
10 probably after that.
11     Q.   You're not sure?
12     A.   I'm not sure, but knowing myself,
13 if somebody tried that I would make a phone call
14 to find out what was going on.
15         MS. TURNER: John, if you could
16 pull up the document in the exhibit link that
17 has already been premarked Shamash KK, I would
18 appreciate it.
19         THE TECHNICIAN: Stand by,
20 counsel. One moment.
21         Exhibit KK is now on screen.
22         MS. TURNER: Thank you.
23     Q.   Mr. Grill, I'll represent to you
24 that this exhibit was used in the deposition of
25 Nigel Shamash. It's been premarked as KK. To

96

1  the extent you want to take a second to review
2  it, and then I have some questions for you.
3      A.   You want me to read it?
4      Q.   Yes, please.
5          MR. MARGOLIS: Read it to
6  yourself.
7          MS. TURNER: Yes.
8      A.   Could you expand the type because
9  it's a little bit small. Thank you.
10     Q.   Just let John know when you need
11 him to scroll down.
12         (Witness reviewing document.)
13     A.   Okay, could you go up.
14         (Witness reviewing document.)
15     A.   Okay, I've read it.
16     Q.   Mr. Grill, do you recognize this
17 document?
18     A.   No, I've never seen it before.
19     Q.   Can you tell from looking at the
20 document who prepared it?
21     A.   I read the name F. Michael Conte,
22 but I don't know who prepared it.
23     Q.   Understood.
24         Is it fair to say that this is a
25 summary of the January 14th, 2020 interview of

97

1 Mr. Brooks in connection with the sublease?
2 **A. I would say that it's a pretty**
3 **good representation of it, yes.**
4 Q. Is there any --
5 **A. It's not complete but, you know,**
6 **it's a pretty good representation.**
7 Q. Is there anything in this summary
8 that isn't -- is inaccurate?
9 MR. MARGOLIS: That isn't or is
10 inaccurate?
11 MS. TURNER: Sorry, I kind of...
12 Q. Is there anything that is not
13 accurate in this summary?
14 **A. No, I'd say it's a fair**
15 **representation and it's correct, as I recall.**
16 Q. If you were preparing a summary of
17 the January 14th, 2020 interview, is there
18 anything you would have included that's not
19 included in this summary?
20 MR. MARGOLIS: Objection.
21 **A. I don't know that. It's three**
22 **years ago.**
23 MS. TURNER: John, if you could
24 just scroll to the top of the document.
25 Q. Mr. Grill, do you see the names at

98

1 the top in the from, to and cc lines?
2 **A. Yes.**
3 Q. Is Michael Conte the board member
4 who was present at the interview on January
5 14th, 2020?
6 **A. Yes.**
7 Q. And are Susan Rubin and Peter Lehr
8 employees of Kaled Management?
9 **A. I don't know Susan Rubin, so I**
10 **don't know who she is, but Peter Lehr is, okay.**
11 Q. And do you recognize this email
12 address in the cc line, the
13 Marc@handheldfilms.com?
14 **A. Could be. I don't know if that's**
15 **the email address -- yeah, that's his email**
16 **address, Marc@handheldfilms.com, yes. The thing**
17 **that threw me is where it says Marc in front and**
18 **then in parentheses, I don't know that I've ever**
19 **seen that, but I have seen Marc@handheld. But,**
20 **whatever.**
21 Q. And Marc@handheldfilms.com, that
22 is Marc who is or was at the time board
23 president for the co-op?
24 **A. Yes, I believe so.**
25 Q. And do you know why Mr. Conte cc'd

99

1 Marc on this summary of the January 14th, 2020
2 interview?
3 **A. No.**
4 Q. Have you ever had any discussions
5 with Marc about the interview or CCMS's sublease
6 application?
7 **A. No.**
8 MS. TURNER: Thanks, John, you can
9 take this document down.
10 If it's okay with opposing counsel
11 and the witness, I would appreciate just a
12 three- or four-minute break to use the restroom,
13 if it's okay with everyone.
14 MR. MARGOLIS: That's fine.
15 (Recess 12:25-12:32 p.m.)
16 BY MS. TURNER:
17 Q. Mr. Grill, now I want to walk
18 through some more documents. We're coming up
19 toward the end here of your deposition.
20 MS. TURNER: John, if you could
21 pull up what has already been marked as Shamash
22 GG.
23 THE TECHNICIAN: Stand by,
24 counsel. One moment.
25 Exhibit GG is now on screen.

100

1 MS. TURNER: John, if you could,
2 again, just blow up so that Mr. Grill can see
3 the text.
4 BY MS. TURNER:
5 Q. And, Mr. Grill, I represent to you
6 that this document was marked Shamash GG in the
7 deposition of Nigel Shamash.
8 **A. Okay.**
9 MR. MARGOLIS: Does he need to
10 review it?
11 MS. TURNER: Yes. Sorry, thanks
12 Barry.
13 Q. If you want to take an opportunity
14 to review and just let John know when he can
15 scroll down.
16 THE WITNESS: You can raise it,
17 please, a little bit.
18 (Witness reviewing document.)
19 THE WITNESS: Could you raise it a
20 little bit. Little further down. Still lower.
21 Lower. Oh, no, no, no, I
22 apologize. Raise. I was using the opposite
23 direction.
24 (Witness reviewing document.)
25 THE WITNESS: Okay. There was one

---

**101**

1  paragraph in the middle that I didn't see.
2       (Witness reviewing document.)
3       THE WITNESS: Okay, I've got it.
4  Thank you.
5       Q.   Thank you, Mr. Grill. Do you
6  recognize this document?
7       A.   **Offhand, no, but it kind of**
8  **confirms for me where I heard that it was a 9 to**
9  **5 business, actually. Must have been from this**
10 **email on the 19th, but I don't have any clear**
11 **recollection of it.**
12      MS. TURNER: John, if you could
13 just scroll up to the top of the document and
14 zoom in a little bit for me. Even my eyes have
15 to struggle.
16      Q.   Mr. Grill, do you see your email
17 address anywhere in the "from" or "to" lines?
18      A.   **Yes. Because it's aol.com and my**
19 **kids are mortified that I still use AOL. So,**
20 **yes.**
21      Q.   And you're referring to
22 joeygrill@aol.com?
23      A.   **That's me.**
24      Q.   Do you recall Mr. Lehr forwarding
25 this email with CCMS's sublease application?

**102**

1       A.   **No.**
2       Q.   And you didn't -- you're sure that
3  you didn't review the sublease application?
4       A.   **I'm sure what? That...**
5       Q.   You did not review the sublease
6  application.
7       A.   **No, I didn't review the**
8  **application.**
9       Q.   And why was that?
10      A.   **I just -- that period of time, I**
11 **wasn't all that interested in doing any business**
12 **regarding this lease. I have a lot of other**
13 **things that I have to take care of. I'm not so**
14 **vain to think that anybody's busier than I am,**
15 **but I'm pretty busy.**
16      Q.   Okay.
17      MS. TURNER: Thank you, John. You
18 can take the document down.
19      John, if you could pull up what
20 was already marked as Exhibit M as in Mary.
21      Q.   Mr. Grill, while John is bringing
22 this up, I'll represent that this is an exhibit
23 that was used at the deposition of my client,
24 Mr. Emory Brooks. So I'm just going to give you
25 a second to review; and let John know when you

**103**

1  need him to scroll.
2       THE WITNESS: Okay, please scroll.
3  Little further up, though. Went too far.
4       (Witness reviewing document.)
5       THE WITNESS: Okay, scroll down.
6  Okay, scroll down.
7  Okay, I got it.
8       Q.   Thank you, Mr. Grill. Do you
9  recognize this document?
10      A.   **No.**
11      MS. TURNER: John, if you could
12 pull up the last email in the chain. Perfect.
13 If you could zoom in on that. Thank you.
14      Q.   Mr. Grill, could you just please
15 read aloud the three sentences starting with,
16 "The board will meet."
17      A.   **"The board will meet on January**
18 **14, 2020 to consider the application. It is**
19 **customary that the applicant appear for an**
20 **interview at that time. According to our**
21 **bylaws, all sublets must be approved. I am not**
22 **sure why anyone would assume otherwise. F.**
23 **Michael Conte CPIA, Honig Conte Porrino**
24 **Insurance Agency, Inc."**
25      Q.   Thank you.

**104**

1       Do you understand that Mr. Conte
2  was referring to CCMS's sublease application in
3  this email?
4       MR. MARGOLIS: Objection.
5       A.   **That his published allegations; is**
6  **that what you said? I didn't hear.**
7       Q.   Do you understand that Mr. Conte
8  was referring to CCMS's sublease application in
9  this email?
10      A.   **That's what makes sense, yeah,**
11 **because Shamash, Nigel, is on there and he's not**
12 **on the board, so it must have been -- yes. The**
13 **answer is yes.**
14      Q.   Do you know why Mr. Conte would
15 have said it was customary that the applicant
16 appear for an interview?
17      A.   **No.**
18      Q.   Would it be customary for an
19 applicant to appear for an interview if there
20 had only ever been one sublease applicant?
21      A.   **I mean, it's just terminology.**
22 **It's, you know, civil writing.**
23      Q.   But this was nothing that was
24 discussed by the board members as requiring an
25 interview?

105

1    A.    No, it required an interview.
2    Q.    What required an interview?
3    A.    A sublease tenant.
4    Q.    And where is that requirement
5 stated?
6    A.    Well, it says it's stated in the
7 bylaws.
8    Q.    If you could just reread the
9 sentence starting with "According to."
10    A.    "According to our bylaws, all
11 sublets must be approved.  I am not sure why
12 anyone would assume otherwise."
13    Q.    Did Mr. Conte state that the
14 bylaws require an interview, or did he just
15 state that the bylaws require all sublets must
16 be approved?
17    A.    The document speaks for itself, it
18 says what it says.  "According to our bylaws,
19 all sublets must be approved." I don't have a
20 comment on that.
21    Q.    Okay.  So you're not sure where
22 Mr. Conte came up with the idea that --
23    A.    No.  I never had any conversation
24 with Mr. Conte about this.
25    Q.    Okay.  And, again, an interview

106

1 wasn't required of the software company that was
2 subleasing the seventh or eighth floor in --
3    A.    I don't know that it wasn't
4 required.  I know that I didn't attend one.
5        MR. MARGOLIS:  Nancy, could you
6 put my objection in.  I think they were
7 talking --
8        THE REPORTER:  There was some
9 overtalk there.  Okay.
10        MR. CASE:  Note my objection as
11 well.
12        MS. TURNER:  John, you can take
13 this document down.
14        John, if you could pull up what
15 was premarked as Exhibit C.
16        THE TECHNICIAN:  Stand by,
17 counsel.
18        Exhibit C is on screen.
19 BY MS. TURNER:
20    Q.    Mr. Grill, I'll represent that
21 this document was used in the deposition of my
22 client, Mr. Emory Brooks.  It was premarked as
23 Defendants' Exhibit C.
24        I'll give you some time to review
25 it.  It is a 36-page document, but just let John

107

1 know when you need him to scroll.
2    A.    You want me to read the whole 36
3 pages?
4        MR. MARGOLIS:  Tara, is there
5 something you want to maybe refer him to?
6        MS. TURNER:  Sure.  I'm only
7 concerned with one section, but I just want to
8 make sure that Mr. Grill feels comfortable that
9 he knows what this document is.
10    A.    Yeah, the document is the
11 proprietary lease between the building and
12 Oxford Realty, which I assume is owned by the
13 Shamash family, or that they have something to
14 do with Oxford Realty.
15    Q.    So you're --
16    A.    I'm fine with that.
17    Q.    Just to confirm, you're familiar
18 with the document?
19    A.    Yeah.  They have 77 shares, yes,
20 that's correct.  That's the document.
21    Q.    Thank you.  And I'm just trying to
22 find the page.
23        MS. TURNER:  John, if you could go
24 to page 12; we're primarily concerned with
25 section 15.

108

1    Q.    Mr. Grill, if you could just read
2 that section to yourself if you need to.  Then I
3 have some questions.
4        (Witness reviewing document)
5    A.    Okay, I've read it.
6    Q.    Mr. Grill, are you familiar with
7 this section of the proprietary lease?
8    A.    Only as having read it when I
9 first came into the building and now.
10    Q.    What do you understand this
11 section on subletting to mean?
12        MR. MARGOLIS:  Objection.
13    A.    I don't exactly know what it
14 means.
15    Q.    Does section 15 discuss the
16 process for considering subleases?
17    A.    The subheading is "Subletting."
18 So the answer is yes to that.  But, you know, I
19 can't form a conclusion as to what it actually
20 means.
21    Q.    Does this section state that a
22 "Lessee shall not sublet the whole or any part
23 of the unit or renew or extend any previously
24 authorized sublease, unless consent thereto
25 shall have been duly authorized by a resolution

109

1  of the directors or given in writing by a
2  majority of the directors"?
3      **A.  That's what the document says,**
4  **yes.**
5      Q.   What do you understand that to
6  mean?
7      **A.  I don't have the -- I mean, the**
8  **document says what it says.  I don't have an**
9  **understanding specifically of what that -- a**
10  **conclusion as to what that actually means.**
11      Q.   Does this mean that board approval
12  is required for subleases?
13      **A.  That's what I would read it as,**
14  **but it may have a reading, it may have a**
15  **conclusion different than that.  I didn't write**
16  **it, and I'm not an attorney, so I can't tell you**
17  **what specifically it says, other than what it**
18  **says.**
19      Q.   Does this section provide that
20  board approval can be given by resolution of the
21  directors or by a majority of the directors in
22  writing?
23      **A.  Okay.  That's fine.**
24      Q.   Is that what you understand it to
25  mean?

110

1          MR. MARGOLIS:  Objection.
2      **A.  I don't have a conclusion of what**
3  **I -- of what it means.  I'm not sure what you're**
4  **getting at here.  I mean, I can't form -- I**
5  **can't form a conclusion as to what that**
6  **subletting statement actually means.  As far as**
7  **I understand it to mean, is that subletting**
8  **requires a majority of the board to approve the**
9  **lease.**
10      Q.   And it can be by a resolution or
11  in writing by a majority of the directors,
12  correct?
13      **A.  Okay.  Are you telling me or am**
14  **I --**
15      Q.   It's a question.  Is that what you
16  understand this to mean?
17          MR. MARGOLIS:  Objection.
18      **A.  Yeah, I don't have a conclusion as**
19  **to what it means.  What it means to me is that**
20  **the board has to be consulted and give its**
21  **consent by majority rule as to allowing a sublet**
22  **to come into the building.  That's what it**
23  **means.**
24      Q.   Does section 15 at all mention a
25  meeting or an interview with the potential

111

1  sublessee?
2      **A.  No.**
3      Q.   Does this section also state
4  that --
5      **A.  But it doesn't -- and it doesn't**
6  **say that it can't.  I mean, it's both -- it**
7  **doesn't address that issue at all.**
8      Q.   Does this section also state that:
9  "A lessee shall not sublet the whole or any part
10  of the unit or renew or extend any previously
11  authorized sublease, unless consent thereto
12  shall have been duly authorized by resolution of
13  the directors or given in writing by a majority
14  of the directors, or if the directors shall have
15  failed or refused to give such consent then by
16  lessee's owning at least 65 percent of the then
17  issued shares of the lessor"?
18          What do you understand that second
19  part of that sentence to mean, the 65 percent?
20      **A.  I understand it to mean there's a**
21  **mathematical calculation by which an alternative**
22  **method of adopting a subletting tenant to come**
23  **into the building.**
24      Q.   Do you understand it to mean that
25  if the board denies a sublease, that

112

1  shareholders representing at least 65 percent of
2  the then issued shares can approve a sublease?
3          MR. MARGOLIS:  Objection.
4      **A.  I don't understand it to mean -- I**
5  **can't form a conclusion as to what it actually**
6  **means.**
7      Q.   So you don't know the process?
8      **A.  I don't, no.**
9      Q.   To approve subleases?
10      **A.  No.  Number one, I've never seen**
11  **it before.  I never had to address it before;**
12  **let's put it that way.**
13      Q.   You've stated multiple times today
14  that there was another subtenant in the seventh
15  or eighth floor.
16      **A.  Yes.  At the time Shamash was**
17  **owner-occupied and he was there, so he took in a**
18  **tenant.  He remained in the space.  That's a**
19  **different situation.**
20      Q.   But it was also a subtenant.  He
21  was not affiliated with the software company?
22      **A.  I don't know that.**
23          MR. MARGOLIS:  Objection.
24          MS. TURNER:  John, we're finished
25  with this document.

113

1    John, I have one more document I
2 want to look at.  If you could pull up what is
3 in the link labeled "Doc 3."
4         THE TECHNICIAN:  Stand by,
5 counsel, one moment.
6         (Exhibit Grill TT marked for
7 identification.)
8         THE TECHNICIAN:  The document is
9 on screen now.  It has been marked as Exhibit
10 TT.
11 BY MS. TURNER:
12    Q.    Mr. Grill, if you could just take
13 a second to see if you're familiar with this
14 document.  It is a lengthy document.  We're only
15 going to be focusing on one section, but I want
16 to make sure that you feel comfortable answering
17 questions.
18         MR. MARGOLIS:  Objection.  What do
19 you want him to do with this in order to be
20 comfortable to be able to answer questions about
21 this document?
22         MS. TURNER:  If he needs to review
23 every page, we can definitely walk through every
24 page.
25         MR. MARGOLIS:  Why don't I suggest

114

1 that maybe John slowly scroll it, start working
2 its way down so that the witness can see what
3 this document is in its generality, and then
4 maybe you could ask him about whether he's ever
5 seen this document before, and then you can
6 proceed from there.
7         MS. TURNER:  Sounds good.  Thanks,
8 Barry.
9         John, if you can just slowly
10 scroll through.
11         (Witness reviewing document.)
12         MR. MARGOLIS:  John, if you could
13 stop for a moment.
14         Joe, do you need anymore for her
15 to show you for her to ask you whether you've
16 seen this document before?
17         THE WITNESS:  No.  You can ask me.
18 BY MS. TURNER:
19    Q.    Mr. Grill, do you recognize this
20 document?
21    A.    The last time I saw this document
22 was prior to 1990- -- well, sometime in 1996.
23 So, do I recognize what it is?  Yes.  Do I
24 recognize it specifically?  No.
25    Q.    Understood.  Just for the record,

115

1 what is this document?
2    A.    I think it's the offering plan.
3 I'm not sure of the wording because I do not
4 have the title page up on my screen, but it
5 looks to be the offering plan for the
6 cooperative at 129-31 West 27th Street.
7         MR. MARGOLIS:  John, you might put
8 the first page up of the document so the witness
9 can see what the first page says.
10         THE WITNESS:  I was pretty close.
11 Yeah, cool.
12    Q.    Good memory.
13    A.    Yeah.
14         MS. TURNER:  John, we're going to
15 focus on pages 39 and 40.  There's a section
16 that overlaps both of those pages.  And it's 39
17 and 40 of the PDF, not the -- perfect.
18         Actually, John, if we could go to
19 page 39 first, just so Mr. Grill can see the
20 title.  Okay.
21    Q.    Mr. Grill, do you recognize this
22 section of the document at all?
23    A.    No, not offhand.
24    Q.    But you understand the title is
25 the "Summary of Principal Terms of Proprietary

116

1 Lease"?
2    A.    Yes.
3         MS. TURNER:  John, can you go back
4 down to Section 2.
5    Q.    If you could just read Section 2
6 to yourself, Mr. Grill.
7         Actually, if you could read it a
8 loud.
9    A.    Sure.  "2. He" -- well, that's
10 pretty sexist -- "may not sell his shares or
11 assign his proprietary lease, nor sublet the
12 unit, without first obtaining the consent of the
13 Board of Directors as provided in the
14 proprietary lease, which consent may not be
15 unreasonably withheld, or (if the board shall
16 have failed or refused to give its consent) by
17 written consent or vote of shareholders owning
18 at least 65 percent of the cooperative
19 corporation's outstanding shares."
20         Shall I continue?
21    Q.    Yes, please.  And you're going to
22 continue one more sentence.
23    A.    "Refusal to give such consent may
24 not be based upon race, color, creed, national
25 origin, sex, age, disability, marital status or

117

1 other grounds proscribed by law.  An assignment
2 is not effective unless the additional
3 requirements of the proprietary lease (see
4 paragraph 16 thereof) are met and, with respect
5 to a subletting, the board or shareholders may
6 impose such conditions as they desire.  In
7 addition, a charge, determined by the Board of
8 Directors, may be collected to cover reasonable
9 legal fees and other expenses of the cooperative
10 corporation (including charges of the managing
11 agent) in connection with such assignment or
12 subletting.  No other transfer fee may be
13 imposed unless approved by the vote of
14 shareholders owning at least 65 and two-thirds
15 percent of the cooperative corporation's
16 outstanding shares."
17        MR. MARGOLIS:  Just for the
18 record, it says 66.  Mr. Grill, can you just
19 look back at that and make sure that you
20 misspoke and said 65 instead of 66?
21    A.   I apologize.  66, dash, and
22 two-thirds.  So, a super majority, I guess.  66
23 and two-thirds.  I apologize, I misread it.
24    Q.   Thank you, Mr. Grill.
25         What do you understand -- or,

118

1 actually, the first part of Section 2 that is on
2 page 34, is this consistent with section 15 that
3 we just looked at in the proprietary lease?
4        MR. MARGOLIS:  Objection.
5    A.   I mean, that calls for a
6 conclusion, legal conclusion, I would think, but
7 it seems to reflect the same terminology.
8    Q.   Thank you.
9         And now we're going to focus on
10 the first sentence of the next page beginning
11 with "Refusal to give such consent."
12         Mr. Grill, what steps does the
13 board take to ensure it doesn't discriminate
14 against sublease applicants?
15    A.   We don't discriminate against
16 anybody.
17    Q.   What proactive steps does the
18 board take to make sure that you don't
19 discriminate?
20        MR. MARGOLIS:  Objection.
21    A.   I live my life not discriminating,
22 so I don't need to take additional steps as a
23 board member to ensure that I'm not going to be
24 discriminating.  I don't discriminate based on
25 any of these things.  I would be out of business

119

1 in five seconds.  Not only that, I would be
2 embarrassed if any of that, for myself, if any
3 of that was in fact.  Disability, I'm disabled.
4 Age, my parents worked with me into their 90s.
5 Sex, I don't care about it.  Origin, national
6 origin, people that I know from everywhere in
7 the world.  Race, color, creed, that's all human
8 attributes.  Fine, great.
9         No.  I'm not sure what you're
10 getting at.  Are you saying -- you know, we take
11 sensitivity training for our company, from a
12 company, so I've taken that also, as a
13 corporate.  As a board member specifically for
14 the cooperative, we're all operating as
15 individuals who adhere to this on a natural and
16 daily basis.  So, I don't know what else I
17 want me to say.
18    Q.   Does the co-op, including the
19 board, have any formal anti-discrimination
20 policy?
21    A.   Yeah, we don't discriminate.
22    Q.   Where is that policy formalized?
23    A.   In my head.
24    Q.   But it's not in writing anywhere?
25    A.   I --

120

1        MR. CASE:  Do you mean other than
2 in the proprietary lease that you're looking at?
3    A.   That's what I'm -- there it is.  I
4 mean --
5    Q.   This isn't --
6    A.   It's right there.
7    Q.   -- proprietary lease.
8        (Reporter clarification.)
9    A.   It's in black and white, it's
10 right there.  "Refusal to give such consent may
11 not be based."  It's formalized.  We also don't
12 do it, but it's also formalized right there.
13        And when we sign on as
14 shareholders, we sign on to the terms and
15 conditions of the operating agreement, of the
16 proprietary leases and of this particular
17 document.  Otherwise, you can't come into the
18 building.  That's the formal document, right
19 there.  Very clear.
20    Q.   Besides this document, is there
21 any other anti-discrimination policy that you
22 know of, formalized --
23    A.   Yes.  We don't discriminate.
24    Q.   And that's in writing somewhere
25 else?

**121**

1    A.    It may be, it may not be.  It
2  doesn't have to be because we agree that we
3  are -- at least I am -- I'm agreeing to the
4  terms and conditions by which I bought into the
5  cooperative; and part of that is this sentence.
6  I also live my life that way.
7          So, no, I don't need to go to look
8  at a formal piece of one word document that says
9  refusal to give such consent may not be based
10 upon race, color, creed, national origin.  One,
11 I've already done that.  And, two, then it
12 becomes a question of do you live your life that
13 way.  And yes, I live my life that way.  So, I
14 don't know what else to tell you.  The document
15 speaks for itself, once again.
16    Q.    Thank you.
17    A.    And I'm entitled to legal fees and
18 expenses for the cooperative to review a sublet
19 assignment.  Oh, that's interesting; I didn't
20 know that.
21    Q.    So, have you ever reviewed this
22 section of the offering plan before?
23    A.    As I said, when I first moved into
24 the building, I looked over the operating
25 agreement and this document, to make sure it was

**122**

1  not in conflict with the business that I wanted
2  to bring into it, which was a modeling agency.
3          You know, when I came into the
4  building, this building was predominantly
5  manufacturing, light manufacturing.  But I
6  wanted to make sure there was nothing in this
7  document, you know, that the building was not
8  allowing us to come for some reason.  But after
9  that, no, I never looked at it again until right
10 now.
11    Q.    Mr. Grill, are board members
12 vetted or interviewed by third parties prior to
13 their nomination and election?
14    A.    No.
15    Q.    As a board member, do you -- are
16 you familiar with local, state and federal laws
17 regarding discrimination?
18    A.    I'm familiar with the laws of
19 discrimination and all the rest, yes.
20    Q.    And just to confirm, you touched
21 on this a little bit, but do board members
22 complete any regular training on
23 anti-discrimination?
24    A.    I don't know that they do, other
25 than for their own businesses, which we do.  But

**123**

1  in terms of doing it for and only exclusively on
2  behalf of the board, no.
3    Q.    As a board member, have you ever
4  had discussions with other board members about
5  ways to prevent possible discrimination when
6  interviewing applicants?
7    A.    We've only had one, so it was
8  never necessary, really, before.  But now that
9  you bring it up, sounds like a good idea.
10    MS. TURNER:  Okay.  John, you can
11 take this document down.
12    Q.    I just have one last question,
13 Mr. Grill.  What was your impression of
14 Mr. Brooks at the January 14th, 2020 interview?
15    MR. MARGOLIS:  Objection.
16    A.    My impression of Mr. Brooks was
17 that he was a professional and a real advocate
18 for his clients, and I appreciated that.
19    MS. TURNER:  Okay.  Thank you.
20 That's all I have.
21    MR. MARGOLIS:  I have nothing for
22 the witness.  Michael?
23    MR. CASE:  I have nothing.
24    (Deposition concluded 1:06 p.m.)
25    -o0o-

**124**

1    REPORTER'S CERTIFICATION
2
3    I, NANCY C. BENDISH, Certified
4  Court Reporter and Notary Public of the States
5  of New York and New Jersey, do hereby certify
6  that, prior to the commencement of the
7  aforementioned examination, JOSEPH M. GRILL was
8  sworn by me to testify the truth, the whole
9  truth and nothing but the truth.
10    I DO FURTHER CERTIFY that the
11 foregoing is a true and accurate transcript of
12 the testimony as taken stenographically by and
13 before me at the time, place, and on the date
14 hereinbefore set forth.
15    I DO FURTHER CERTIFY that I am
16 neither a relative nor employee nor attorney nor
17 counsel of any party in this action and that I
18 am neither a relative nor employee of such
19 attorney or counsel, and that I am not
20 financially interested in the event nor outcome
21 of this action.
22
23    NANCY C. BENDISH, CCR, RMR, CRR
      Realtime Systems Administrator
24    Certificate No. XI00836
25 Dated:  February 20, 2023

## A

**able**
46:15, 75:12,
113:20
**about**
6:23, 8:25,
9:4, 9:24, 10:4,
10:5, 11:4,
12:25, 13:2,
14:4, 14:8,
14:17, 18:2,
18:14, 20:19,
29:2, 29:3,
29:4, 30:1,
30:18, 39:4,
39:7, 39:21,
46:25, 47:11,
49:25, 52:4,
52:8, 52:18,
53:7, 53:12,
53:17, 60:23,
63:19, 64:3,
65:15, 65:21,
65:22, 65:23,
66:2, 68:4,
68:7, 71:24,
72:16, 74:6,
74:16, 74:22,
75:2, 75:5,
75:8, 77:4,
77:5, 77:8,
78:23, 85:11,
87:8, 87:19,
87:22, 88:23,
89:3, 89:5,
90:24, 91:1,
91:9, 91:15,
91:19, 94:13,
94:18, 95:6,
99:5, 105:24,
113:20, 114:4,
119:5, 123:4
**above**
47:7
**abrams**
2:20
**absolutely**
75:15

**accept**
54:19
**acceptable**
39:11, 40:3
**access**
88:12, 91:10
**accessing**
70:7
**accommodate**
64:8, 83:20,
85:9, 85:24
**accommodation**
78:4, 81:4
**accommodations**
87:22
**according**
103:20, 105:9,
105:10, 105:18
**accounting**
91:22
**accurate**
97:13, 124:11
**across**
82:9
**acting**
84:3
**action**
1:7, 4:23,
8:10, 9:10,
10:12, 10:16,
10:21, 11:4,
11:7, 11:10,
11:19, 19:6,
31:13, 37:16,
38:22, 54:9,
63:19, 72:16,
124:17, 124:21
**actions**
44:8, 44:11
**actual**
22:6
**actually**
27:23, 29:9,
48:2, 51:22,
52:6, 63:13,
71:10, 73:22,
83:5, 90:21,
93:21, 94:19,

101:9, 108:19,
109:10, 110:6,
112:5, 115:18,
116:7, 118:1
**addition**
117:7
**additional**
117:2, 118:22
**address**
49:18, 98:12,
98:15, 98:16,
101:17, 111:7,
112:11
**adhere**
119:15
**admin**
86:19
**administration**
91:21
**administrative**
84:22, 86:4,
86:22, 91:18
**administrator**
124:25
**adopting**
111:22
**advocate**
123:17
**affairs**
17:9
**affect**
7:10
**affects**
44:18, 69:11
**affiliated**
64:24, 112:21
**afford**
46:15
**aforementioned**
124:7
**after**
11:18, 51:19,
51:23, 56:24,
57:2, 67:15,
72:20, 73:4,
89:17, 91:24,
93:14, 93:22,
95:10, 122:8

**afterwards**
89:21
**again**
12:25, 30:7,
44:10, 62:24,
63:18, 65:12,
74:24, 79:6,
86:20, 100:2,
105:25, 121:15,
122:9
**against**
72:17, 73:3,
118:14, 118:15
**age**
116:25, 119:4
**agencies**
9:5, 10:23,
11:9
**agency**
15:24, 16:2,
16:3, 21:20,
71:14, 103:24,
122:2
**agent**
67:19, 117:11
**agents**
50:20
**ago**
8:25, 9:4, 9:7,
9:9, 10:12,
11:12, 23:19,
35:21, 42:2,
97:22
**agree**
121:2
**agreed**
8:1, 8:6
**agreeing**
121:3
**agreement**
60:17, 120:15,
121:25
**aids**
7:18
**airborne**
48:12
**alcohol**
85:2

**all**
2:2, 6:4, 10:2,
16:20, 27:14,
29:8, 32:7,
34:11, 36:14,
54:20, 64:2,
64:3, 69:9,
69:21, 73:5,
80:18, 83:8,
85:23, 92:9,
92:20, 93:20,
94:13, 102:11,
103:21, 105:10,
105:15, 105:19,
110:24, 111:7,
115:22, 119:7,
119:14, 122:19,
123:20
**allegations**
104:5
**allow**
88:21
**allowing**
110:21, 122:8
**almost**
79:16
**aloud**
103:15
**already**
51:10, 51:23,
58:5, 58:12,
95:17, 99:21,
102:20, 121:11
**also**
2:36, 5:14,
5:25, 21:15,
21:18, 29:6,
30:19, 33:10,
36:2, 51:21,
51:22, 52:12,
52:17, 83:9,
93:6, 111:3,
111:8, 112:20,
119:12, 120:11,
120:12, 121:6
**alternative**
111:21
**although**
21:12, 37:1,

44:14, 49:5
**always**
33:14, 68:7,
84:21
**americas**
2:30
**amongst**
93:14
**amount**
40:14
**analyze**
38:5
**annual**
23:18, 36:1,
36:2, 43:1,
78:6, 78:10,
80:21, 93:18
**another**
16:22, 18:7,
22:9, 37:15,
53:22, 68:3,
93:18, 112:14
**answer**
5:3, 5:4, 9:20,
30:18, 31:6,
33:2, 33:6,
42:23, 43:14,
66:7, 73:8,
104:13, 108:18,
113:20
**answering**
5:7, 113:16
**answers**
5:13
**anti-discrimination**
119:19, 120:21,
122:23
**antitrust**
10:25
**any**
5:15, 6:10,
7:2, 7:7, 7:24,
13:1, 13:15,
14:2, 15:9,
36:5, 36:18,
38:19, 40:4,
41:14, 42:13,

43:17, 50:21,
51:8, 53:25,
54:4, 54:7,
54:9, 54:25,
57:1, 60:5,
61:13, 62:16,
67:9, 67:24,
68:15, 69:23,
70:1, 70:9,
71:21, 71:22,
77:10, 77:12,
77:18, 77:19,
82:25, 83:20,
87:7, 87:18,
88:4, 88:23,
89:2, 89:13,
89:22, 93:10,
93:13, 94:1,
94:17, 97:4,
99:4, 101:10,
102:11, 105:23,
108:22, 108:23,
111:9, 111:10,
118:25, 119:2,
119:19, 120:21,
122:22, 124:17
**anybody**
30:18, 33:25,
50:23, 68:11,
83:15, 86:9,
118:16
**anybody's**
102:14
**anymore**
114:14
**anyone**
13:5, 13:8,
13:12, 13:19,
14:8, 51:7,
59:21, 60:2,
64:24, 67:6,
84:12, 87:12,
89:12, 90:24,
103:22, 105:12
**anything**
7:13, 12:11,
12:17, 34:13,
40:5, 44:18,

74:21, 77:7,
94:18, 97:7,
97:12, 97:18
**anything's**
62:14
**anyway**
85:17
**anywhere**
20:1, 47:8,
71:5, 73:20,
101:17, 119:24
**aol**
101:18, 101:19
**apologies**
28:24
**apologize**
89:10, 100:22,
117:21, 117:23
**appeal**
67:25, 68:6
**appear**
103:19, 104:16,
104:19
**applicant**
37:10, 37:18,
37:19, 38:9,
38:17, 38:20,
39:22, 40:6,
45:14, 55:13,
55:17, 55:22,
60:18, 61:7,
62:8, 62:18,
62:25, 63:21,
64:11, 65:4,
65:19, 66:15,
67:24, 103:19,
104:15, 104:19,
104:20
**applicants**
36:20, 39:5,
45:12, 45:16,
55:4, 118:14,
123:6
**application**
36:25, 37:15,
59:22, 60:21,
61:20, 73:4,
77:18, 77:23,

78:1, 86:13,
86:14, 86:16,
86:25, 99:6,
101:25, 102:3,
102:6, 102:8,
103:18, 104:2,
104:8
**applications**
36:24, 37:5
**applying**
81:13
**appreciate**
95:18, 99:11
**appreciated**
123:18
**approval**
44:9, 44:12,
44:21, 55:6,
55:11, 55:12,
62:18, 67:5,
74:4, 89:14,
94:16, 109:11,
109:20
**approvals**
45:5
**approve**
44:25, 47:22,
48:6, 49:1,
49:4, 51:24,
53:8, 54:10,
54:25, 55:3,
55:13, 59:4,
61:7, 61:23,
67:13, 67:25,
92:3, 92:20,
110:8, 112:2,
112:9
**approved**
46:18, 47:17,
48:14, 50:9,
50:24, 51:2,
51:8, 52:5,
59:13, 59:18,
62:9, 72:22,
103:21, 105:11,
105:16, 105:19,
117:13
**approving**
52:20, 53:18,

54:1, 54:5,
89:25
**approximately**
13:4
**april**
19:2, 19:3,
22:24
**arbitration**
12:1
**architects**
21:17, 52:19
**area**
73:16
**areas**
21:10
**around**
18:5, 27:11,
43:3, 56:18,
64:4, 71:9,
73:15, 73:19,
73:20
**artist**
21:10
**aside**
84:6
**asked**
9:13, 25:14,
39:9, 39:13,
55:23, 68:7,
70:13, 83:13,
84:1, 84:7
**asking**
5:8, 15:5,
21:6, 32:11,
33:7, 33:8,
50:25, 53:16,
65:21, 65:22,
66:2
**assign**
116:11
**assignment**
117:1, 117:11,
121:19
**assume**
74:10, 94:3,
94:6, 103:22,
105:12, 107:12
**assumed**
79:23

**assuming**
77:20
**astoria**
15:18
**attack**
87:13
**attempt**
94:2, 94:11
**attempted**
93:11, 94:23,
95:2
**attempting**
94:20
**attend**
39:9, 39:13,
48:21, 55:23,
65:6, 65:7,
65:9, 106:4
**attending**
8:14
**attends**
63:20
**attitude**
31:24
**attorney**
12:12, 13:2,
13:3, 13:9,
13:11, 109:16,
124:16, 124:19
**attributes**
119:8
**audible**
5:14
**audio**
25:22, 25:25
**august**
17:21
**austrian**
14:24
**authorized**
108:24, 108:25,
111:11, 111:12
**availability**
74:17
**available**
64:1, 64:2,
74:19
**avenue**
2:30

**avoid**
7:24
**aware**
7:14, 84:21
**away**
21:11

---
**B**
---

**back**
11:11, 20:17,
44:4, 55:2,
66:11, 78:8,
80:25, 87:11,
116:3, 117:19
**background**
4:25, 14:17,
33:21, 34:5
**backwards**
16:25, 17:3
**baechler**
21:11, 51:22
**bag**
72:10
**baker**
2:9
**bank**
45:5
**barclay**
2:28
**barely**
81:1
**barry**
2:21, 100:12,
114:8
**base**
39:25, 56:3
**based**
46:19, 59:14,
71:11, 116:24,
118:24, 120:11,
121:9
**basement**
19:14, 21:9,
88:18
**basically**
52:21
**basis**
49:19, 119:16

**beautiful**
48:7
**became**
16:12, 16:16,
16:17, 17:1,
17:4
**because**
5:9, 9:13,
23:24, 27:14,
37:1, 47:2,
48:2, 49:12,
49:16, 50:6,
58:11, 64:6,
64:14, 65:25,
71:10, 72:9,
73:1, 78:2,
78:4, 80:10,
84:22, 85:7,
87:4, 88:17,
91:4, 92:5,
92:25, 93:5,
93:20, 95:7,
96:8, 101:18,
104:11, 115:3,
121:2
**become**
17:11, 17:17,
18:3
**becomes**
121:12
**becoming**
45:22
**been**
4:1, 8:20,
8:24, 10:1,
17:23, 22:20,
23:2, 23:5,
23:8, 23:9,
23:12, 23:18,
24:2, 28:18,
28:21, 29:1,
29:5, 29:6,
29:11, 29:18,
29:20, 29:21,
29:23, 30:2,
33:14, 35:10,
35:17, 37:7,
37:14, 38:19,

40:12, 40:16,
40:21, 42:13,
50:21, 52:23,
56:6, 64:10,
72:22, 72:24,
73:1, 73:19,
73:20, 74:25,
75:9, 78:13,
84:2, 84:9,
84:21, 86:9,
87:2, 87:4,
88:8, 94:7,
94:8, 95:8,
95:17, 95:25,
99:21, 101:9,
104:12, 104:20,
108:25, 111:12,
113:9
**before**
5:7, 8:13,
8:21, 16:12,
16:15, 16:16,
16:17, 17:4,
17:7, 18:8,
41:20, 41:23,
43:18, 57:21,
58:2, 58:3,
58:4, 58:11,
58:18, 58:21,
75:9, 81:9,
81:25, 86:24,
87:8, 89:8,
92:1, 94:10,
96:18, 112:11,
114:5, 114:16,
121:22, 123:8,
124:13
**began**
20:18
**begin**
94:6
**beginning**
118:10
**behalf**
2:6, 2:16,
2:26, 41:12,
67:10, 123:2
**being**
11:16, 21:23,

36:7, 36:17,
43:2, 43:25,
65:24, 73:2,
73:3
**beings**
31:22, 32:8
**believe**
9:23, 15:1,
21:23, 21:24,
22:17, 22:20,
23:17, 24:15,
24:18, 28:9,
28:14, 30:25,
31:19, 31:21,
34:5, 34:22,
35:3, 38:23,
40:11, 40:23,
42:11, 58:8,
65:1, 65:13,
90:3, 98:24
**bell**
78:22
**below**
47:7, 47:9
**bendish**
1:34, 124:3,
124:24
**bergson**
2:20
**besides**
11:24, 12:3,
20:25, 44:15,
83:1, 120:20
**best**
5:5, 36:14,
54:22
**better**
63:12
**between**
9:16, 19:13,
20:1, 27:16,
42:20, 43:11,
69:8, 71:6,
78:13, 88:18,
107:11
**big**
68:24, 68:25
**bigger**
84:5

**biggest**
10:23, 10:24
**billing**
91:21
**bit**
60:23, 92:5,
96:9, 100:17,
100:20, 101:14,
122:21
**black**
32:24, 33:12,
82:4, 82:6,
82:8, 120:9
**blanc**
14:23
**blank**
25:22
**blind**
33:1
**block**
19:12
**blow**
100:2
**board's**
67:25
**border**
14:24
**born**
14:22, 14:23,
14:24, 14:25
**both**
5:1, 16:13,
18:20, 50:6,
85:1, 111:6,
115:16
**bothered**
69:12
**bought**
56:10, 56:11,
121:4
**break**
6:10, 6:12,
43:23, 99:12
**break-in**
43:6
**bring**
50:20, 122:2,
123:9

**bringing**
102:21
**broadway**
2:22
**broker**
80:1
**brooks**
72:23, 79:2,
79:4, 79:11,
79:13, 79:16,
80:13, 81:23,
81:25, 82:3,
83:22, 83:25,
84:18, 89:2,
89:11, 89:12,
89:17, 90:5,
91:2, 91:14,
91:25, 97:1,
102:24, 106:22,
123:14, 123:16
**bryant**
15:18
**build**
48:7
**building**
9:25, 19:5,
19:19, 19:22,
20:9, 20:19,
22:10, 28:8,
29:8, 36:4,
36:12, 36:23,
38:7, 38:10,
38:13, 39:11,
40:3, 40:13,
40:17, 40:25,
41:7, 41:9,
41:11, 41:13,
41:20, 41:23,
42:4, 42:7,
42:9, 42:14,
42:17, 42:21,
43:18, 44:19,
45:1, 45:23,
46:11, 46:23,
47:5, 47:8,
48:23, 49:2,
50:11, 50:18,
51:9, 51:10,

51:15, 51:18,
52:3, 53:9,
54:2, 54:6,
54:23, 55:10,
57:16, 57:20,
57:25, 58:13,
61:15, 64:3,
64:9, 64:15,
64:22, 66:22,
70:11, 70:13,
70:15, 70:25,
72:2, 72:6,
73:14, 75:6,
75:20, 77:17,
84:13, 85:21,
86:23, 88:11,
91:5, 91:10,
94:12, 107:11,
108:9, 110:22,
111:23, 120:18,
121:24, 122:4,
122:7
**building's**
61:12, 90:14
**busier**
102:14
**business**
9:3, 9:11,
9:12, 9:16,
11:6, 17:9,
52:2, 52:16,
59:11, 70:18,
71:24, 76:19,
77:5, 77:8,
84:2, 90:4,
90:6, 91:16,
101:9, 102:11,
118:25, 122:1
**businesses**
64:4, 122:25
**busy**
27:15, 102:15
**buy**
45:23, 67:18
**buyer**
45:2, 54:20,
67:21
**buying**
44:13, 44:24

**bylaws**
103:21, 105:7,
105:10, 105:14,
105:15, 105:18

---
**C**
---

**c-l-i-c-k**
16:4
**calculation**
111:21
**california**
71:11
**call**
13:6, 13:9,
13:25, 73:25,
75:25, 76:8,
76:11, 76:16,
76:18, 76:19,
77:8, 95:9,
95:13
**called**
22:6, 68:6,
76:1, 95:6
**calls**
118:5
**came**
51:15, 51:20,
52:12, 52:14,
52:22, 52:25,
64:16, 92:3,
105:22, 108:9,
122:3
**can't**
26:14, 49:23,
54:24, 78:5,
78:6, 87:3,
108:19, 109:16,
110:4, 110:5,
111:6, 112:5,
120:17
**capital**
44:17
**capture**
5:10
**care**
102:13, 119:5
**carrying**
72:10

**carve**
78:6
**case**
2:29, 9:1, 9:4,
10:19, 12:5,
13:25, 33:13,
34:5, 34:6,
49:7, 61:14,
66:1, 66:2,
66:5, 86:11,
106:10, 120:1,
123:23
**cast**
47:21, 54:16,
93:11
**castings**
71:22
**caucasian**
15:3, 30:10,
30:13, 30:16
**cc**
98:1, 98:12
**cc'd**
98:25
**ccms**
2:6, 5:21,
72:19, 73:13,
73:23, 74:22,
75:5, 77:8,
77:10, 77:17,
77:23, 78:1,
78:17, 79:2,
79:22, 81:10,
81:20, 86:4,
86:21, 87:8,
89:3, 89:5,
90:22, 91:13,
92:3, 93:23,
94:2
**ccms's**
77:5, 88:4,
88:24, 90:24,
94:11, 99:5,
101:25, 104:2,
104:8
**ccr**
1:34, 124:24
**cell**
13:17, 76:11,

76:18, 76:22,
77:1
**certain**
27:3, 48:20,
48:25
**certainly**
6:16, 24:1,
54:12, 54:20,
88:19
**certificate**
124:26
**certification**
124:1
**certified**
124:3
**certify**
124:5, 124:10,
124:15
**chain**
9:13, 11:17,
103:12
**change**
10:5, 68:9,
68:12
**changed**
50:2
**changes**
27:14, 71:12
**characterizing**
31:22
**charge**
117:7
**charges**
117:10
**charging**
9:25
**chemicals**
66:24
**children**
85:1
**christmas**
73:15, 73:21,
93:16
**christmastime**
78:3
**circumstances**
10:21
**city**
4:13, 15:19,

16:21, 18:13,
19:25, 20:5,
71:21, 78:8
**civil**
1:7, 104:22
**claim**
31:14
**claimed**
11:1, 59:11
**clarification**
120:8
**class**
53:14
**clean**
36:13
**clear**
47:11, 89:9,
90:6, 92:16,
101:10, 120:19
**clearly**
7:19, 78:5
**click**
11:10, 16:3,
16:18, 17:1,
17:5, 17:8,
17:24, 18:11,
18:19, 18:25,
70:18, 70:22,
76:3, 76:8
**client**
102:23, 106:22
**clientele**
84:19
**clients**
71:11, 88:5,
88:24, 90:25,
91:4, 123:18
**close**
36:2, 115:10
**closer**
73:21
**co-op**
6:5, 22:11,
22:12, 22:14,
22:17, 23:3,
24:5, 27:3,
28:7, 33:15,
34:17, 36:10,

44:11, 45:24,
72:18, 98:23,
119:18
**colleagues**
43:25
**collected**
117:8
**collecting**
41:3
**college**
15:19
**color**
31:23, 32:2,
32:20, 32:21,
116:24, 119:7,
121:10
**colors**
32:20
**com**
98:13, 98:16,
98:21, 101:18,
101:22
**come**
7:19, 31:24,
38:25, 44:4,
51:23, 52:1,
64:21, 68:3,
69:4, 71:5,
71:6, 72:2,
72:8, 72:12,
72:19, 81:1,
85:8, 91:4,
110:22, 111:22,
120:17, 122:8
**comes**
43:3, 71:2,
71:4, 71:8,
71:18
**comfort**
67:2
**comfortable**
107:8, 113:16,
113:20
**coming**
34:4, 38:13,
66:21, 78:8,
80:25, 92:16,
99:18

**commencement**
124:6
**comment**
84:17, 105:20
**commercial**
22:12, 22:14,
23:3, 24:5,
27:3, 28:7,
33:15, 34:17,
36:10
**commissions**
11:2
**common**
41:9
**community**
1:5, 2:6, 4:23,
5:19
**companies**
16:8, 16:10,
16:13, 18:21,
42:13
**company**
9:4, 16:5,
17:10, 17:19,
17:20, 18:3,
18:4, 18:8,
18:15, 21:19,
37:20, 37:23,
39:16, 40:9,
40:13, 40:17,
40:22, 41:5,
42:20, 43:11,
44:21, 45:3,
46:12, 57:7,
57:12, 57:14,
57:18, 57:23,
58:14, 58:19,
58:22, 59:5,
59:18, 59:22,
60:3, 60:9,
60:14, 60:19,
61:16, 61:19,
61:24, 62:3,
64:12, 64:25,
67:6, 67:7,
67:11, 68:14,
69:15, 69:19,
69:24, 70:3,

70:7, 70:23,
72:12, 77:21,
84:4, 84:5,
106:1, 112:21,
119:11, 119:12
**compatible**
61:11
**complete**
97:5, 122:22
**completely**
5:8
**completion**
41:14
**concern**
48:13
**concerned**
64:17, 85:12,
91:1, 107:7,
107:24
**concerns**
87:10, 89:3,
90:24
**concluded**
123:24
**conclusion**
108:19, 109:10,
109:15, 110:2,
110:5, 110:18,
112:5, 118:6
**conditions**
7:3, 68:8,
117:6, 120:15,
121:4
**conduct**
8:1, 8:6, 63:1
**conducted**
1:27, 82:11
**conference**
65:15
**confirm**
107:17, 122:20
**confirmed**
27:6
**confirms**
101:8
**conflict**
122:1
**confused**
83:7

**confusing**
92:9
**connection**
9:10, 12:1,
22:14, 36:19,
42:17, 43:18,
64:24, 77:11,
77:16, 97:1,
117:11
**consent**
49:6, 49:9,
49:12, 49:15,
108:24, 110:21,
111:11, 111:15,
116:12, 116:14,
116:16, 116:17,
116:23, 118:11,
120:10, 121:9
**consider**
37:17, 38:8,
38:9, 38:17,
38:20, 39:18,
39:22, 46:21,
48:21, 50:1,
54:20, 63:20,
64:11, 65:4,
65:18, 66:14,
89:18, 103:18
**considered**
29:9, 37:6,
37:9
**considering**
39:5, 40:6,
45:12, 46:8,
60:17, 108:16
**consistent**
29:6, 35:11,
90:13, 118:2
**construction**
9:25, 43:2,
46:17, 47:1,
47:14, 61:10
**consultant**
44:22
**consulted**
110:20
**conte**
1:18, 2:18,

6:3, 12:20,
14:4, 21:19,
28:10, 28:16,
28:18, 30:10,
32:16, 32:24,
34:21, 48:16,
51:21, 52:8,
79:15, 82:13,
82:17, 91:17,
96:21, 98:3,
98:25, 103:23,
104:1, 104:7,
104:14, 105:13,
105:22, 105:24
**conte's**
65:14
**context**
31:3, 93:10
**continue**
116:20, 116:22
**contracting**
41:15
**contractors**
41:13, 43:5
**contractual**
46:1
**conversation**
5:3, 5:10,
30:17, 105:23
**conversations**
13:1
**cool**
115:11
**cooperative**
3:16, 115:6,
116:18, 117:9,
117:15, 119:14,
121:5, 121:18
**coordinating**
64:5
**copy**
94:20
**corporate**
83:3, 83:10,
84:3, 84:6,
119:13
**corporation**
22:18, 27:8,

117:10
**corporation's**
116:19, 117:15
**correct**
18:1, 19:6,
22:11, 24:5,
24:6, 27:22,
61:4, 73:6,
79:19, 97:15,
107:20, 110:12
**could**
8:3, 12:16,
13:7, 16:23,
20:5, 21:4,
23:10, 25:21,
25:25, 28:12,
31:5, 33:5,
41:22, 43:22,
54:7, 55:18,
65:8, 66:9,
66:10, 68:2,
68:6, 73:19,
73:20, 75:9,
76:14, 77:13,
78:21, 80:20,
84:8, 86:8,
86:9, 87:2,
87:4, 88:8,
88:13, 92:12,
94:7, 95:15,
96:8, 96:13,
97:23, 98:14,
99:20, 100:1,
100:19, 101:12,
102:19, 103:11,
103:13, 103:14,
105:8, 106:5,
106:14, 107:23,
108:1, 113:2,
113:12, 114:4,
114:12, 115:18,
116:5, 116:7
**counsel**
13:24, 95:20,
99:10, 99:24,
106:17, 113:5,
124:17, 124:19
**counseling**
1:6, 2:7, 4:23,

5:19, 84:20,
84:25, 85:1,
85:2, 85:3,
85:5, 91:23
**country**
10:24, 80:15
**couple**
56:25, 91:20,
93:17
**court**
1:1, 5:9, 8:9,
10:15, 10:18,
124:4
**courtroom**
6:25
**cover**
117:8
**covid**
20:18, 20:21,
23:23, 57:21,
58:2, 58:3
**cpia**
103:23
**creed**
116:24, 119:7,
121:10
**crr**
1:34, 124:24
**cullen**
15:18
**cumulatively**
26:7, 26:9,
29:12, 29:25
**current**
15:22, 28:6
**currently**
22:3, 24:4,
28:9, 35:7,
56:5, 70:24
**curve**
53:11
**customary**
103:19, 104:15,
104:18
**cv-(nrb**
1:8

**D**

**daily**
59:16, 119:16

**damon**
2:28
**dash**
117:21
**date**
21:12, 58:1,
124:13
**dated**
124:27
**dates**
35:22, 58:24
**day**
73:17, 73:18
**days**
20:1, 43:9,
90:6
**deaf**
7:17, 7:20
**deal**
75:12, 80:1,
81:16
**december**
73:19, 77:4
**decision**
54:19, 67:20,
67:25
**defendant**
2:26, 11:10,
13:24
**defendants**
1:22, 2:16,
5:25, 6:4, 6:5,
106:23
**define**
54:8
**definitely**
52:7, 58:10,
58:11, 58:25,
113:23
**definitions**
5:18
**delay**
71:12
**deliberate**
92:1
**deliberating**
90:23
**delivered**
16:20, 94:15,

94:21
**delivering**
94:25
**delivery**
94:24, 95:1,
95:2
**demolition**
47:5, 47:12,
48:11
**denial**
89:14, 94:2
**denied**
50:10, 50:14,
50:17, 93:24
**denies**
111:25
**deny**
47:22, 54:10,
54:25, 55:3,
61:7, 61:23,
67:14, 68:1
**denying**
54:5, 89:25
**depends**
19:24
**depos**
2:38, 8:15
**deposed**
8:21, 8:24,
8:25, 9:3
**deposition**
1:25, 4:19,
5:21, 8:1, 8:6,
8:10, 8:14, 9:8,
9:14, 10:4,
10:11, 11:3,
11:12, 12:11,
13:13, 14:5,
14:9, 95:24,
99:19, 100:7,
102:23, 106:21,
123:24
**depositions**
11:24, 12:3
**describe**
9:15, 10:20,
14:19, 15:13,
19:8, 31:19,

46:7, 85:4
**described**
40:5, 52:2,
52:15, 53:1,
84:23, 84:24,
85:18
**describing**
83:22, 84:18
**description**
3:14
**desire**
117:6
**determination**
37:24
**determine**
39:10
**determined**
117:7
**died**
17:12, 17:15,
58:12
**differences**
31:23
**different**
19:24, 23:9,
27:15, 36:7,
45:11, 45:18,
45:19, 45:20,
53:2, 75:22,
109:15, 112:19
**difficult**
5:9
**digital**
71:19
**direction**
100:23
**directors**
22:16, 39:12,
54:18, 55:15,
55:20, 109:1,
109:2, 109:21,
110:11, 111:13,
111:14, 116:13,
117:8
**disability**
116:25, 119:3
**disabled**
119:3

**disappeared**
25:23
**discriminate**
118:13, 118:15,
118:19, 118:24,
119:21, 120:23
**discriminated**
73:3
**discriminating**
118:21, 118:24
**discrimination**
31:14, 31:17,
31:20, 31:22,
122:17, 122:19,
123:5
**discuss**
12:15, 36:15,
81:6, 84:13,
87:13, 89:24,
108:15
**discussed**
70:4, 83:16,
90:2, 90:11,
90:21, 90:22,
104:24
**discussing**
6:14
**discussion**
12:16, 87:18,
88:4, 88:23,
93:13
**discussions**
99:4, 123:4
**dispute**
9:3, 9:11,
9:16, 10:9
**disruptions**
7:24
**district**
1:1, 1:2
**doc**
113:3
**docs**
55:9, 55:10,
62:22
**doctormann**
34:22, 34:23,
48:17, 51:20,

53:4, 79:14,
93:21
**document**
95:16, 96:12,
96:14, 96:17,
96:20, 97:24,
99:9, 100:6,
100:18, 100:24,
101:2, 101:6,
101:13, 102:18,
103:4, 103:9,
105:17, 106:13,
106:21, 106:25,
107:9, 107:10,
107:18, 107:20,
108:4, 109:3,
109:8, 112:25,
113:1, 113:8,
113:14, 113:21,
114:3, 114:5,
114:11, 114:16,
114:20, 114:21,
115:1, 115:8,
115:22, 120:17,
120:18, 120:20,
121:8, 121:14,
121:25, 122:7,
123:11
**documents**
40:4, 53:25,
55:10, 99:18
**doing**
43:5, 66:25,
67:4, 68:25,
90:16, 93:4,
93:15, 102:11,
123:1
**donald**
21:11, 51:22,
79:9
**done**
36:17, 43:2,
66:23, 74:5,
74:9, 78:5,
121:11
**door**
88:2
**doorman**
85:22

**down**
50:23, 85:8,
88:18, 96:11,
99:9, 100:15,
100:20, 102:18,
103:5, 103:6,
106:13, 114:2,
116:4, 123:11
**dozen**
75:19
**drug**
85:2
**dude**
92:8, 93:3
**duly**
4:1, 108:25,
111:12
**during**
10:7, 23:23,
27:3, 57:2,
89:1, 91:3

**E**

**each**
5:4, 16:7,
16:9, 30:6,
30:22, 92:13,
92:14, 92:19
**ear**
7:17, 7:20
**earlier**
8:15, 46:4
**easiest**
64:6
**easy**
76:4
**ebts**
16:20
**education**
14:18
**educational**
15:14
**effect**
6:24
**effective**
117:2
**eight**
50:12, 50:13,

50:24, 51:2,
51:7, 70:24
**eighth**
22:3, 56:5,
56:16, 56:23,
57:2, 57:15,
57:19, 57:24,
58:15, 58:20,
58:23, 59:2,
59:6, 59:19,
59:23, 60:4,
60:13, 61:17,
61:20, 62:5,
64:13, 68:14,
69:18, 70:9,
106:2, 112:15
**either**
17:24, 56:23,
93:22
**elected**
23:15, 23:21,
27:3, 28:4, 37:6
**election**
23:23, 122:13
**electronic**
7:18, 57:8
**elevator**
48:13, 60:7,
69:2, 69:8,
69:11, 75:21,
85:9, 85:15,
88:5, 88:6,
88:10, 88:14,
88:20, 88:22
**elevators**
19:14, 84:13,
88:8
**else**
7:13, 12:17,
13:5, 13:8,
13:12, 13:19,
33:25, 47:8,
74:21, 119:16,
120:25, 121:14
**email**
9:13, 11:17,
75:25, 98:11,
98:15, 101:10,

101:16, 101:25,
103:12, 104:3,
104:9
**embarrassed**
119:2
**emory**
102:24, 106:22
**employee**
124:16, 124:18
**employees**
69:14, 69:17,
70:10, 70:12,
70:14, 70:21,
72:1, 98:8
**employment**
14:18
**empty**
21:21, 22:4
**end**
78:13, 78:16,
99:19
**engaging**
44:20
**engineering**
21:17, 51:17
**engineers**
52:19
**ensure**
118:13, 118:23
**entail**
47:1
**entertainment**
16:6
**entire**
92:6
**entities**
21:2
**entitled**
121:17
**entry**
91:10
**equal**
83:9
**equipment**
88:17
**eric**
34:22, 79:13
**escort**
90:18

**esq**
2:10, 2:21,
2:29
**essentially**
5:2
**est**
1:29
**establish**
33:10, 66:4
**estate**
50:19, 53:15,
67:19
**ethnicity**
6:15, 6:17,
14:20, 14:22,
15:10, 30:6,
30:8, 88:24
**evaluate**
68:10
**even**
79:25, 94:19,
101:14
**evening**
90:8
**event**
124:20
**ever**
8:20, 11:25,
12:4, 22:25,
35:17, 37:3,
38:19, 40:7,
43:13, 50:17,
56:6, 60:2,
70:4, 75:5,
81:6, 81:9,
81:19, 81:22,
81:25, 98:18,
99:4, 104:20,
114:4, 121:21,
123:3
**every**
27:10, 41:3,
71:1, 113:23
**everybody**
44:14, 49:17,
54:13, 64:1,
64:2, 82:14
**everyone**
99:13

**everything**
49:5, 49:9
**everywhere**
119:6
**exact**
35:22, 37:12,
40:14, 57:21,
58:1, 58:24
**exactly**
28:20, 37:8,
42:5, 50:25,
108:13
**examination**
3:3, 4:16,
124:7
**example**
54:10
**excess**
30:3
**exclusive**
83:5
**exclusively**
123:1
**excuse**
8:3
**exhibit**
8:16, 95:16,
95:21, 95:24,
99:25, 102:20,
102:22, 106:15,
106:18, 106:23,
113:6, 113:9
**exhibits**
8:16
**existing**
30:6
**expand**
96:8
**expect**
63:16
**expenditures**
44:17
**expenses**
117:9, 121:18
**experience**
49:7
**experiences**
83:22

**expert**
11:7, 11:8
**expertise**
11:5
**export**
21:22
**express**
49:18, 54:13,
89:3, 90:24
**extend**
108:23, 111:10
**extent**
96:1
**eyes**
33:11, 101:14

**F**

**facilities**
38:14, 47:12,
63:14, 91:23
**facility**
91:7
**fact**
46:23, 59:14,
62:19, 85:10,
119:3
**factors**
38:9, 39:18,
39:22, 39:24,
39:25
**facts**
72:16
**failed**
111:15, 116:16
**fair**
17:22, 20:24,
58:17, 96:24,
97:14
**fairly**
21:11
**familiar**
107:17, 108:6,
113:13, 122:16,
122:18
**family**
10:10, 107:13
**far**
21:21, 42:19,

54:5, 55:14,
64:16, 80:14,
103:3, 110:6
**fashion**
10:22
**fast**
74:14, 80:20
**father**
17:15, 22:8
**february**
1:28, 80:22,
124:27
**federal**
10:17, 122:16
**fee**
117:12
**feel**
113:16
**feels**
107:8
**fees**
117:9, 121:17
**feet**
19:13
**fellow**
52:13
**felt**
72:23, 72:25,
73:2, 86:1
**few**
44:3, 72:14
**fifth**
51:18, 52:19
**figure**
47:10, 92:10
**filing**
60:20
**fill**
91:11
**films**
21:8, 21:16,
28:16, 29:3,
30:16, 35:9,
51:14
**films's**
51:25
**finally**
6:13

**finances**
36:11, 41:4,
61:9
**financially**
124:20
**financials**
37:21, 41:4,
45:3, 46:14,
52:5, 52:17,
53:1, 59:14
**find**
76:3, 76:17,
95:9, 95:14,
107:22
**fine**
68:7, 99:14,
107:16, 109:23,
119:8
**finish**
5:8
**finished**
112:24
**firm**
15:25, 16:2,
21:17, 21:22,
51:16, 51:17
**firms**
16:20
**first**
16:17, 16:19,
17:2, 26:18,
26:20, 27:19,
55:16, 57:19,
58:18, 64:22,
68:10, 68:11,
73:12, 73:23,
74:6, 77:3,
78:15, 81:19,
90:16, 90:19,
92:8, 108:9,
115:8, 115:9,
115:19, 116:12,
118:1, 118:10,
121:23
**fit**
38:10, 90:3
**fits**
38:6

**five**
20:1, 23:6,
23:13, 28:22,
29:12, 34:18,
35:3, 40:18,
40:19, 43:9,
85:20, 89:20,
119:1
**five-day-a-week**
85:21
**fixing**
11:1
**flag**
85:16, 95:8
**floor**
2:22, 18:13,
19:1, 21:1,
21:9, 21:10,
21:14, 21:15,
22:22, 26:22,
26:25, 34:25,
41:3, 42:7,
42:10, 44:13,
45:8, 46:2,
46:5, 46:8,
46:9, 46:14,
46:21, 47:4,
47:6, 47:9,
47:15, 47:17,
51:10, 51:21,
51:23, 52:10,
52:16, 52:20,
53:4, 54:15,
56:11, 56:12,
56:23, 57:2,
57:9, 57:11,
57:15, 57:19,
57:24, 58:15,
58:20, 58:23,
59:2, 59:6,
59:19, 59:23,
60:4, 60:9,
60:14, 61:17,
61:21, 62:5,
64:13, 65:14,
66:20, 68:15,
68:21, 69:4,
69:8, 69:12,

69:18, 70:7,
70:19, 70:22,
71:15, 71:16,
72:1, 73:14,
79:24, 83:18,
88:16, 88:18,
88:19, 89:4,
89:6, 91:9,
106:2, 112:15
**floors**
19:12, 21:3,
22:3, 22:4,
22:8, 37:2,
44:14, 45:1,
45:8, 46:10,
46:16, 48:22,
49:2, 49:5,
50:2, 50:10,
50:15, 50:18,
51:19, 51:25,
53:8, 54:6,
54:17, 54:25,
56:5, 56:16,
60:10, 69:22,
70:10, 77:17
**flow**
69:11
**focus**
17:1, 115:15,
118:9
**focusing**
113:15
**follow**
5:1
**following**
26:2, 66:12,
69:3
**follows**
4:2
**force**
6:24
**foregoing**
124:11
**form**
5:4, 108:19,
110:4, 110:5,
112:5
**formal**
38:16, 119:19,

120:18, 121:8
**formalized**
119:22, 120:11,
120:12, 120:22
**formed**
17:20
**formula**
62:23
**forth**
124:14
**forward**
18:19, 18:23,
19:17
**forwarding**
101:24
**found**
86:10
**four**
20:1, 33:14,
33:18, 48:1,
48:15, 71:5,
79:18, 93:5
**four-minute**
99:12
**fourth**
51:18, 52:19
**frame**
16:23, 90:14
**framework**
16:5, 66:7
**free**
49:19, 82:14
**freight**
88:5, 88:10,
88:13, 88:15,
88:20, 88:21
**front**
13:16, 88:2,
98:17
**frozen**
25:16
**full**
4:4
**fully**
7:4, 7:9, 7:15,
7:17
**furnace**
44:23

**furnish**
77:12
**furniture**
94:12, 94:14,
94:18, 94:19
**further**
100:20, 103:3,
124:10, 124:15
**future**
71:25

---
G
---

**games**
57:8
**gaming**
57:7
**garfinkel**
2:20
**gave**
76:15, 76:21
**gears**
55:2
**general**
4:25, 55:3,
66:4, 84:9
**generality**
114:3
**generally**
62:7, 62:24,
63:18, 65:3,
65:23, 67:23,
83:16, 87:18
**gentleman**
41:25, 42:4,
82:8
**gestures**
5:16
**getting**
45:5, 73:5,
110:4, 119:10
**gg**
99:22, 99:25,
100:6
**girls**
85:8
**gist**
84:10
**give**
6:23, 8:17,

20:5, 76:21,
102:24, 106:24,
110:20, 111:15,
116:16, 116:23,
118:11, 120:10,
121:9
**given**
11:25, 12:4,
72:25, 76:22,
109:1, 109:20,
111:13
**gives**
37:20
**go**
4:24, 5:17,
53:15, 63:17,
76:18, 92:12,
96:13, 107:23,
115:18, 116:3,
121:7
**goes**
37:22, 56:1
**going**
4:18, 4:24,
5:2, 6:13,
11:11, 14:16,
18:19, 18:22,
19:17, 24:19,
39:10, 45:9,
46:15, 47:1,
47:3, 47:12,
47:13, 52:3,
52:15, 53:1,
59:15, 63:9,
64:18, 66:24,
69:18, 72:15,
83:20, 84:11,
85:19, 90:8,
91:20, 92:3,
92:10, 94:3,
95:9, 95:14,
102:24, 113:15,
115:14, 116:21,
118:9, 118:23
**gone**
58:4, 58:6,
58:11, 58:13,
73:5

**gonna**
93:16, 93:17
**good**
4:17, 4:20,
4:21, 43:22,
44:5, 48:7,
97:3, 97:6,
114:7, 115:12,
123:9
**graduated**
16:21
**grandparent**
14:22
**great**
119:8
**greater**
47:7
**grill**
1:16, 1:26,
2:17, 3:5, 3:16,
4:6, 4:17, 6:2,
6:13, 6:19,
7:23, 7:25,
8:13, 8:20,
12:10, 13:15,
13:23, 14:16,
19:21, 26:1,
34:16, 44:8,
95:23, 96:16,
97:25, 99:17,
100:2, 100:5,
101:5, 101:16,
102:21, 103:8,
103:14, 106:20,
107:8, 108:1,
108:6, 113:6,
113:12, 114:19,
115:19, 115:21,
116:6, 117:18,
117:24, 118:12,
122:11, 123:13,
124:7
**ground**
21:9, 88:18,
91:9
**grounds**
117:1
**group**
85:1

guarantee
68:4
guards
87:24, 87:25
guess
38:5, 61:10,
62:15, 67:20,
68:2, 70:16,
80:23, 117:22
guessing
56:19
gugarty
2:38
guys
68:24

**H**

half
13:4, 75:19,
75:20
hall
43:25
hand
21:8, 21:15,
28:15, 29:3,
30:15, 35:9,
51:14, 51:25,
92:25, 93:1
happen
44:16, 68:5
happened
55:25, 94:4
happens
37:3, 56:1,
67:14
happy
5:13, 68:7,
69:7
hard
68:9, 76:3
head
5:15, 119:23
heads
8:17
health
85:2, 85:4,
85:6, 85:10,
85:15, 87:15,

87:20
hear
25:17, 34:3,
44:2, 68:7,
85:25, 104:6
heard
31:15, 74:6,
81:10, 81:20,
81:22, 87:16,
87:17, 89:16,
101:8
hearing
7:18, 7:20,
34:1
heavily
74:5
heirs
21:13
held
21:8, 21:15,
23:23, 28:16,
29:3, 30:16,
35:9, 38:16,
51:14, 51:25
helpful
16:24
here
20:25, 22:25,
46:24, 52:24,
63:25, 69:20,
71:6, 71:18,
71:23, 75:21,
85:23, 90:17,
99:19, 110:4
hereby
124:5
hereinbefore
124:14
high
15:17, 15:18,
16:21
himself
32:22
hired
68:25
hiring
44:19, 44:21,
68:25

history
15:14
holding
78:17
holdings
1:14
home
20:2
honest
91:15
honig
103:23
hoping
75:11
hostetler
2:9
hour
13:4, 79:3
hours
8:11, 20:13,
20:15, 20:16,
38:14, 41:12,
66:20, 71:12,
83:21
human
14:21, 30:7,
30:21, 30:23,
31:22, 32:7,
32:8, 32:12,
33:9, 119:7
hunter
15:19

**I**

idea
30:11, 53:21,
67:18, 75:15,
75:23, 79:23,
80:3, 91:13,
105:22, 123:9
ideas
46:18
ident
3:14
identification
113:7
identifies
30:10, 30:13,

30:16, 32:22
identify
15:5, 15:9,
21:1, 30:5,
30:18, 32:7
immediately
17:4, 74:6,
74:9
impact
47:4, 47:7,
89:13
import
21:22
impose
117:6
imposed
117:13
impression
123:13, 123:16
inaccurate
32:23, 97:8,
97:10
inc
1:15, 1:21,
2:17, 6:2, 16:4,
16:6, 103:24
incident
87:13
include
6:1
included
97:18, 97:19
including
14:3, 117:10,
119:18
independently
91:12
indicated
54:1
individual
6:6, 6:17,
14:3, 31:9, 41:8
individuals
21:2, 35:4,
64:19, 83:9,
87:19, 92:13,
92:18, 119:15
inform
94:2

**information**
4:25, 38:1,
38:4, 72:24
**informed**
93:23
**infrastructure**
38:12, 41:15,
61:12
**insensitive**
6:16
**insistent**
74:24, 75:2,
80:22
**install**
94:11
**instance**
49:25
**instead**
69:3, 88:5,
117:20
**insurance**
21:18, 21:20,
103:24
**intending**
61:11, 86:19
**interact**
42:24
**interest**
9:24, 54:22
**interested**
73:13, 84:10,
102:11, 124:20
**interesting**
121:19
**interests**
36:14
**interfering**
34:13
**interim**
10:8
**interiors**
41:8
**internal**
44:19
**interpretation**
73:7
**interruption**
34:12

**interview**
46:20, 46:22,
62:9, 62:17,
63:1, 63:20,
65:4, 65:6,
65:10, 72:19,
78:17, 79:1,
79:5, 79:12,
79:19, 79:22,
80:5, 80:13,
80:17, 81:6,
81:9, 81:19,
82:1, 82:4,
82:12, 82:14,
83:14, 83:17,
84:12, 87:8,
87:12, 89:1,
89:12, 89:18,
94:10, 96:25,
97:17, 98:4,
99:2, 99:5,
103:20, 104:16,
104:19, 104:25,
105:1, 105:2,
105:14, 105:25,
110:25, 123:14
**interviewed**
59:22, 59:24,
122:12
**interviewing**
123:6
**introduce**
90:18
**introduced**
82:10
**investigate**
43:3
**invite**
80:4
**involved**
10:1, 11:19,
38:18, 38:19,
42:14, 55:16,
55:21, 62:1
**involves**
31:14
**involving**
87:14

**iphone**
71:19
**isolated**
88:21
**israel**
42:1, 42:4,
42:6, 42:12
**issue**
47:9, 48:9,
74:13, 84:24,
111:7
**issued**
111:17, 112:2
**issues**
49:18, 68:15,
68:22, 69:23,
70:2, 85:6,
85:11, 87:15,
87:20, 89:13
**itch**
77:14
**itself**
41:16, 52:11,
60:21, 105:17,
121:15

---

**J**

**january**
27:16, 78:14,
78:19, 78:20,
96:25, 97:17,
98:4, 99:1,
103:17, 123:14
**jersey**
124:5
**job**
1:32, 16:17,
16:19, 16:22,
17:4, 43:5
**jobs**
64:3
**joe**
114:14
**joey**
66:7
**joeygrill@aol**
101:22
**john**
2:38, 8:14,

8:16, 95:15,
96:10, 97:23,
99:8, 99:20,
100:1, 100:14,
101:12, 102:17,
102:19, 102:21,
102:25, 103:11,
106:12, 106:14,
106:25, 107:23,
112:24, 113:1,
114:1, 114:9,
114:12, 115:7,
115:14, 115:18,
116:3, 123:10
**joined**
29:10
**joseph**
1:16, 1:26,
2:17, 3:5, 4:5,
6:1, 124:7
**jump**
8:13
**junior**
15:16

---

**K**

**kaled**
14:8, 40:10,
40:12, 40:16,
40:25, 41:21,
41:24, 42:12,
42:17, 42:22,
43:14, 43:18,
61:1, 61:2,
61:5, 61:6,
61:15, 98:8
**kaled's**
60:24
**keep**
18:18, 24:19,
41:13, 65:22
**keeping**
41:4
**keeps**
65:23
**kept**
23:24
**kids**
101:19

kind
40:24, 43:6,
63:24, 71:13,
85:25, 87:22,
91:6, 92:11,
93:19, 97:11,
101:7
kk
95:17, 95:21,
95:25
knew
46:22
knowing
95:12
knowledge
5:6, 22:3
knows
107:9

**L**

la
14:23
labeled
113:3
last
12:22, 23:17,
23:21, 29:15,
33:17, 42:1,
69:9, 69:10,
103:12, 114:21,
123:12
later
22:23, 75:3,
80:24
law
16:20, 117:1
laws
122:16, 122:18
lawsuit
72:17
layout
19:9
leak
43:6
learn
39:7, 39:21,
53:7, 73:13,
73:23, 86:13,

86:15, 86:21
learned
53:11, 84:7,
86:16, 86:18
learning
53:11
lease
22:16, 46:2,
60:21, 72:21,
74:3, 81:16,
91:12, 102:12,
107:11, 108:7,
110:9, 116:1,
116:11, 116:14,
117:3, 118:3,
120:2, 120:7
leases
120:16
least
59:10, 111:16,
112:1, 116:18,
117:14, 121:3
leave
57:24, 71:3,
71:4, 90:19
leaving
93:18
led
82:13
left
7:21, 68:8,
89:17, 91:25,
93:21
legal
117:9, 118:6,
121:17
legitimate
63:16
lehr
14:7, 39:15,
40:8, 42:25,
43:10, 43:14,
73:25, 76:15,
77:3, 77:7,
94:7, 95:5,
98:7, 98:10,
101:24
lehr's
42:16

lender
9:12, 9:17,
9:24
lengthy
113:14
less
33:18, 75:10,
79:3, 92:4
lessee
108:22, 111:9
lessee's
111:16
lessor
111:17
let's
80:20, 112:12
letting
7:22
level
21:9
liaison
42:20, 43:11,
84:4
life
118:21, 121:6,
121:12, 121:13
light
122:5
lighter
32:21
limited
7:20, 10:10,
21:22, 29:24,
46:5
line
98:12
lines
94:12, 98:1,
101:17
link
95:16, 113:3
listen
82:15
little
12:13, 60:23,
78:7, 83:7,
90:10, 92:5,
96:9, 100:17,

100:20, 101:14,
103:3, 122:21
live
71:11, 118:21,
121:6, 121:12,
121:13
llc
1:14
llp
2:20, 2:28
loan
9:25
local
122:16
located
4:8, 11:21,
18:10
location
4:9, 18:16
locations
19:25, 84:23
logistical
19:9
long
13:2, 18:25,
20:9, 23:2,
28:18, 28:24,
28:25, 29:18,
29:20, 29:22,
35:10, 35:21,
40:12, 42:3,
50:21, 56:22,
57:14, 60:12,
79:1, 84:1,
84:11, 91:24,
91:25
longer
34:24, 92:5
look
37:25, 113:2,
117:19, 121:7
looked
118:3, 121:24,
122:9
looking
16:23, 54:14,
96:19, 120:2
looks
37:23, 115:5

**lot**
64:5, 69:10,
71:10, 88:11,
102:12
**loud**
116:8
**loudly**
7:24
**lower**
100:20, 100:21

**M**

**ma'am**
8:8, 10:17
**machine**
94:20
**made**
21:14, 68:6,
78:4, 83:19,
84:21, 95:8
**maintenance**
36:16, 41:3,
41:6, 43:7,
46:16
**majority**
49:3, 49:11,
109:2, 109:21,
110:8, 110:11,
110:21, 111:13,
117:22
**make**
33:6, 34:12,
36:12, 46:14,
47:2, 47:3,
48:11, 51:4,
61:6, 61:13,
67:9, 75:12,
81:4, 94:1,
94:17, 95:13,
107:8, 113:16,
117:19, 118:18,
121:25, 122:6
**makes**
37:24, 104:10
**man**
32:17, 32:19,
87:14
**managed**
41:20, 41:23,

42:4, 42:9
**management**
14:8, 15:25,
16:2, 16:4,
16:5, 16:18,
18:3, 18:8,
18:15, 18:21,
37:20, 37:22,
39:16, 40:9,
40:10, 40:13,
40:17, 40:22,
42:13, 42:20,
43:11, 43:19,
44:20, 45:3,
46:12, 60:19,
70:23, 77:20,
98:8
**manager**
40:25, 42:6
**managing**
61:15, 117:10
**manhattan**
15:20
**manufacturing**
66:23, 122:5
**many**
34:16, 35:1,
37:5, 45:15,
47:24, 50:5,
50:9, 50:13,
69:14, 70:17,
70:19, 70:21,
72:1, 72:11
**marc**
1:16, 6:2,
13:24, 14:3,
28:10, 28:15,
29:2, 29:4,
30:15, 30:19,
34:21, 35:9,
35:10, 35:13,
35:15, 48:16,
52:1, 80:12,
80:25, 81:7,
98:17, 98:22,
99:1, 99:5
**marc@handheld**
98:19

**marc@handheldfil-ms**
98:13, 98:16,
98:21
**march**
20:18, 27:17,
58:4, 58:7,
58:15, 58:19,
78:7, 78:14,
80:22
**margolis**
2:20, 2:21,
9:19, 9:22,
12:14, 15:4,
16:14, 19:10,
19:23, 20:14,
23:7, 25:12,
27:5, 28:1,
31:2, 31:4,
32:3, 32:13,
32:18, 32:25,
33:20, 33:25,
34:3, 34:6,
34:8, 34:10,
39:1, 39:23,
42:18, 43:21,
44:2, 47:18,
55:8, 61:25,
62:10, 63:2,
65:20, 66:6,
68:17, 82:5,
89:15, 96:5,
97:9, 97:20,
99:14, 100:9,
104:4, 106:5,
107:4, 108:12,
110:1, 110:17,
112:3, 112:23,
113:18, 113:25,
114:12, 115:7,
117:17, 118:4,
118:20, 123:15,
123:21
**marital**
10:6, 116:25
**mark**
2:26
**marked**
99:21, 100:6,

102:20, 113:6,
113:9
**married**
10:7
**mary**
102:20
**materials**
13:16, 77:10,
77:18
**mathematical**
111:21
**matter**
6:1, 93:5
**max**
29:20, 30:1,
34:21, 79:14
**maxime**
1:17, 2:17,
6:3, 14:4,
28:10, 28:14,
28:25, 29:16
**maximum**
69:3
**maybe**
33:5, 57:17,
62:21, 72:12,
75:18, 79:3,
86:2, 92:4,
107:5, 114:1,
114:4
**mean**
6:15, 30:20,
31:9, 31:11,
31:12, 49:12,
53:14, 67:15,
67:17, 68:25,
69:1, 74:9,
75:18, 78:4,
80:18, 88:7,
88:16, 89:7,
90:17, 104:21,
108:11, 109:6,
109:7, 109:11,
109:25, 110:4,
110:7, 110:16,
111:6, 111:19,
111:20, 111:24,
112:4, 118:5,

120:1, 120:4

**meaning**
41:7, 80:23,
84:5

**means**
5:22, 8:2, 8:6,
108:14, 108:20,
109:10, 110:3,
110:6, 110:19,
110:23, 112:6

**media**
7:18

**mediation**
1:6, 2:7, 4:23,
5:19, 12:1

**medical**
7:2

**medications**
7:7

**meet**
13:2, 13:12,
36:15, 36:25,
46:25, 52:23,
55:24, 60:2,
63:8, 63:10,
63:17, 64:1,
68:9, 68:11,
92:5, 103:16,
103:17

**meeting**
13:6, 13:9,
23:18, 36:1,
36:2, 38:16,
39:9, 39:14,
43:1, 45:6,
46:20, 47:10,
48:21, 52:2,
52:11, 52:25,
53:10, 55:24,
62:9, 62:17,
63:20, 64:5,
65:3, 65:6,
65:8, 65:9,
65:11, 65:18,
66:14, 68:4,
74:2, 74:4,
74:14, 74:15,
74:17, 74:20,

75:2, 78:6,
78:10, 78:12,
80:21, 80:24,
81:17, 86:17,
86:18, 86:24,
93:18, 94:17,
95:4, 110:25

**meetings**
38:20, 52:6,
53:15

**member**
23:2, 23:3,
23:6, 23:9,
23:13, 23:16,
23:21, 24:5,
24:7, 24:10,
24:13, 24:16,
24:23, 25:2,
25:3, 25:6,
25:9, 25:11,
26:3, 26:4,
26:10, 26:12,
26:15, 26:19,
26:21, 26:24,
27:7, 28:19,
28:21, 29:1,
29:5, 29:12,
29:15, 29:19,
29:21, 29:24,
30:2, 30:23,
32:8, 34:24,
36:7, 36:10,
37:7, 50:11,
53:22, 59:17,
80:10, 83:1,
98:3, 118:23,
119:13, 122:15,
123:3

**members**
1:20, 6:6,
14:3, 23:23,
23:24, 27:2,
27:24, 28:3,
28:7, 30:6,
30:22, 33:8,
33:12, 33:15,
33:18, 34:16,
34:19, 35:1,

35:5, 36:18,
36:22, 43:12,
47:21, 47:24,
48:15, 48:21,
59:25, 62:2,
63:25, 65:5,
65:18, 66:13,
70:2, 72:18,
72:20, 73:1,
79:18, 83:2,
83:3, 83:4,
83:8, 83:9,
83:10, 87:8,
89:3, 89:24,
93:5, 93:14,
94:1, 104:24,
122:11, 122:21,
123:4

**memory**
115:12

**mental**
7:3, 85:2,
85:3, 85:6,
85:10, 85:15,
87:14, 87:20

**mention**
110:24

**mentioned**
5:18, 11:13,
11:25, 22:2,
27:21, 40:8,
44:24, 46:4,
56:4, 70:6,
86:3, 87:10

**merits**
92:2

**messenger**
16:19

**messy**
47:6

**met**
13:23, 60:5,
60:6, 63:13,
81:25, 82:3,
117:4

**method**
111:22

**miami**
9:2, 9:9, 11:22

**michael**
1:17, 2:18,
2:29, 4:5, 6:3,
12:20, 13:25,
14:4, 28:10,
28:16, 28:18,
34:10, 34:21,
96:21, 98:3,
103:23, 123:22

**mid-january**
78:19, 78:23,
78:24

**middle**
101:1

**middle-of-the**
19:11

**might**
33:6, 43:8,
43:9, 44:22,
80:2, 87:20,
115:7

**mine**
9:2, 33:23

**minutes**
20:16, 44:3,
89:20, 89:21,
92:4

**mispronouncing**
28:25, 40:10

**misread**
117:23

**misspoke**
117:20

**misstating**
27:22

**model**
9:5, 10:23,
11:5, 15:24,
16:1, 16:3,
16:4, 16:18,
17:2, 17:5,
17:8, 18:20,
71:14

**modeling**
122:2

**models**
10:22, 11:2,
17:24, 18:11,

18:20, 18:25,
70:18, 70:22,
71:15, 76:4,
76:9
**moment**
25:19, 87:5,
95:20, 99:24,
113:5, 114:13
**monsey**
87:14
**month**
27:12, 75:10,
75:14
**months**
43:9, 57:17,
60:10, 93:17
**more**
6:6, 16:24,
20:13, 23:6,
23:13, 25:11,
25:13, 26:5,
26:7, 26:10,
28:22, 29:12,
29:24, 33:4,
33:6, 33:18,
37:9, 40:17,
40:19, 40:22,
45:15, 69:6,
69:21, 70:7,
75:9, 85:25,
87:21, 88:12,
90:22, 91:13,
99:18, 113:1,
116:22
**morning**
4:17, 4:20,
4:21
**mortgage**
36:3, 45:6
**mortified**
101:19
**most**
23:16, 23:25,
24:1
**mother**
17:12, 58:12
**motions**
73:5

**move**
64:4, 88:17
**moved**
22:23, 26:25,
34:25, 75:19,
121:23
**much**
24:2, 38:15,
41:17, 45:9,
71:7, 83:23,
84:8, 86:17,
91:13
**multiple**
112:13
**must**
5:13, 70:16,
87:1, 101:9,
103:21, 104:12,
105:11, 105:15,
105:19
**mutually**
83:5
**myself**
21:25, 28:10,
28:16, 34:21,
63:5, 79:15,
85:14, 95:12,
119:2

## N

**name**
4:4, 4:17,
10:14, 10:18,
12:22, 16:1,
21:11, 28:12,
28:15, 41:25,
42:1, 57:6,
96:21
**named**
16:3
**names**
6:7, 97:25
**nancy**
1:34, 25:24,
34:3, 66:10,
106:5, 124:3,
124:24
**national**
116:24, 119:5,

121:10
**natural**
119:15
**nature**
44:23, 45:20,
90:4
**navigate**
94:5
**nay**
93:1, 93:2
**nearly**
24:2
**necessary**
46:24, 123:8
**need**
6:10, 43:5,
66:22, 83:19,
85:14, 88:12,
96:10, 100:9,
103:1, 107:1,
108:2, 114:14,
118:22, 121:7
**needed**
91:2, 91:3
**needs**
113:22
**negotiate**
41:12
**negotiated**
72:20
**neither**
124:16, 124:18
**never**
30:17, 59:24,
60:15, 60:22,
61:22, 75:17,
75:18, 76:21,
77:19, 77:22,
77:24, 78:9,
84:21, 87:16,
88:20, 96:18,
105:23, 112:10,
112:11, 122:9,
123:8
**new**
1:2, 2:12,
2:23, 2:32,
4:13, 10:18,

15:19, 18:12,
18:13, 19:25,
20:5, 24:1,
29:8, 71:20,
78:2, 87:14,
124:5
**next**
56:2, 56:3,
67:14, 79:15,
93:17, 118:10
**nice**
69:25, 73:10
**nigel**
1:18, 12:21,
14:11, 22:8,
72:25, 74:1,
74:11, 74:23,
76:21, 79:13,
81:15, 87:2,
87:3, 87:4,
90:11, 90:16,
90:22, 92:7,
92:8, 95:25,
100:7, 104:11
**nigel's**
92:6
**nine**
85:20
**ninth**
71:25
**nobody**
88:19
**nods**
5:15
**noisy**
44:1
**nominated**
27:6
**nomination**
122:13
**none**
33:11, 48:11
**noon**
71:9
**normal**
88:6
**normally**
76:16, 76:17

**nose**
77:15
**notary**
124:4
**note**
106:10
**nothing**
77:6, 87:21, 104:23, 122:6, 123:21, 123:23, 124:9
**number**
9:5, 10:22, 20:20, 37:13, 41:1, 48:20, 48:25, 76:2, 76:4, 76:14, 76:15, 76:19, 76:21, 76:22, 77:1, 112:10
**numbers**
38:12, 66:21, 71:22
**nyu**
53:15

**O**

**o'clock**
90:7
**o0o**
123:25
**oath**
6:20
**object**
82:5
**objection**
9:19, 12:14, 15:4, 16:14, 19:10, 19:23, 20:14, 23:7, 25:12, 27:5, 28:1, 31:2, 31:4, 32:3, 32:13, 32:18, 32:25, 39:1, 39:23, 42:18, 47:18, 55:8, 61:25, 62:10,

63:2, 65:20, 68:17, 89:15, 97:20, 104:4, 106:6, 106:10, 108:12, 110:1, 110:17, 112:3, 112:23, 113:18, 118:4, 118:20, 123:15
**obtaining**
116:12
**obvious**
54:14
**occasion**
72:8
**occasional**
71:19
**occasionally**
72:11
**occupancy**
59:10, 66:17, 66:19
**occupant**
64:15
**occupants**
70:9
**occupation**
15:22
**occupied**
18:25, 21:24, 56:6, 56:11, 56:23, 57:3, 57:12, 59:13, 60:9
**occupy**
21:2, 56:12, 56:13, 57:15, 57:19, 59:1, 60:13
**occupying**
58:14, 58:19, 58:23, 63:9, 63:11
**occur**
27:9, 27:13
**occurred**
11:18, 87:13
**odd**
90:20

**odessa**
14:22
**offering**
3:16, 115:2, 115:5, 121:22
**offhand**
101:7, 115:23
**office**
4:12, 91:20
**officer**
22:18
**officers**
83:3
**offices**
18:10, 75:21, 84:22, 86:4, 86:19, 86:22, 91:18
**offline**
25:18
**often**
19:21, 20:4, 29:7, 42:24, 90:8
**oh**
25:20, 61:2, 90:2, 100:21, 121:19
**okay**
8:19, 9:23, 10:11, 20:17, 21:5, 21:8, 24:21, 29:5, 32:6, 44:4, 47:19, 50:8, 59:15, 66:6, 72:15, 73:10, 82:11, 90:20, 94:21, 96:13, 96:15, 98:10, 99:10, 99:13, 100:8, 100:25, 101:3, 102:16, 103:2, 103:5, 103:6, 103:7, 105:21, 105:25, 106:9, 108:5, 109:23, 110:13,

115:20, 123:10, 123:19
**once**
36:15, 55:25, 67:13, 121:15
**one**
7:17, 11:9, 14:13, 14:22, 14:23, 14:24, 14:25, 20:13, 30:22, 37:9, 37:16, 38:18, 38:21, 43:13, 44:14, 44:16, 45:1, 45:13, 48:22, 49:2, 49:4, 49:20, 50:10, 50:14, 50:18, 52:7, 56:1, 57:3, 60:9, 61:8, 61:13, 61:22, 63:24, 64:10, 65:12, 65:24, 65:25, 67:21, 69:9, 69:10, 71:2, 71:3, 71:8, 77:17, 83:6, 88:12, 94:5, 94:8, 95:20, 99:24, 100:25, 104:20, 106:4, 107:7, 112:10, 113:1, 113:5, 113:15, 116:22, 121:8, 121:10, 123:7, 123:12
**ones**
10:24, 50:24
**only**
43:13, 44:15, 45:13, 48:13, 49:10, 50:23, 55:11, 55:12, 55:25, 60:9, 61:8, 63:24, 64:10, 65:12,

72:9, 74:23,
87:5, 91:17,
104:20, 107:6,
108:8, 113:14,
119:1, 123:1,
123:7
**open**
21:9, 36:1,
49:19, 68:12,
85:19, 90:5,
91:13
**operate**
91:11, 91:12
**operated**
18:15
**operating**
36:13, 55:10,
59:11, 62:22,
86:4, 86:22,
88:14, 119:14,
120:15, 121:24
**operation**
38:14, 66:21,
83:21, 83:23,
84:5, 90:15
**operations**
15:23, 59:16,
90:14
**opinion**
54:13, 54:22
**opinions**
54:11
**opportunity**
100:13
**opposed**
46:16, 49:20
**opposing**
99:10
**opposite**
79:16, 100:22
**opposition**
49:21
**order**
38:13, 41:5,
113:19
**ordered**
8:10
**organization**
52:9, 72:21,

90:12, 90:13
**organized**
22:10
**origin**
116:25, 119:5,
119:6, 121:10
**original**
51:19
**originally**
51:17
**other**
1:19, 5:15,
9:5, 12:16,
13:11, 33:8,
36:5, 37:15,
38:20, 38:21,
41:17, 42:12,
42:13, 57:1,
59:25, 61:13,
67:1, 67:2,
67:21, 69:22,
69:23, 70:1,
70:9, 70:10,
79:14, 81:12,
82:25, 83:6,
83:22, 84:9,
84:23, 87:7,
88:14, 89:23,
93:5, 93:10,
93:13, 94:8,
102:12, 109:17,
117:1, 117:9,
117:12, 120:1,
120:21, 122:24,
123:4
**others**
53:2
**otherwise**
7:10, 103:22,
105:12, 120:17
**out**
20:3, 34:8,
34:25, 37:2,
43:4, 43:25,
47:10, 59:11,
70:21, 74:2,
75:5, 75:7,
75:13, 75:23,

75:25, 77:3,
78:6, 80:14,
81:15, 86:10,
92:10, 93:19,
95:9, 95:14,
118:25
**outcome**
124:20
**outdoor**
72:7
**outside**
72:8
**outsides**
41:6
**outstanding**
116:19, 117:16
**over**
4:24, 5:17,
8:7, 16:20,
37:23, 43:19,
50:2, 76:7,
121:24
**overlaps**
115:16
**oversaw**
17:9
**oversee**
15:23, 36:11,
41:10, 41:11,
43:4
**overtalk**
106:9
**overtaxed**
69:2
**own**
22:16, 31:20,
33:10, 51:10,
64:4, 69:12,
71:20, 80:1,
91:10, 122:25
**owned**
10:10, 46:10,
56:5, 79:24,
107:12
**owner**
22:6, 51:20,
59:12, 84:6
**owner-occupied**
37:3, 44:15,

64:18, 64:20,
112:17
**owners**
41:8
**ownership**
10:9
**owning**
111:16, 116:17,
117:14
**owns**
22:4, 28:15,
47:8
**oxford**
1:14, 22:7,
56:5, 56:10,
56:13, 56:22,
57:3, 64:24,
107:12, 107:14

---

**P**

**package**
37:21, 46:11,
60:20
**packages**
37:24
**packet**
37:20
**pad**
13:18
**page**
3:14, 106:25,
107:22, 107:24,
113:23, 113:24,
115:4, 115:8,
115:9, 115:19,
118:2, 118:10
**pages**
1:33, 107:3,
115:15, 115:16
**painting**
44:18
**pandemic**
20:18
**paragraph**
101:1, 117:4
**parentheses**
98:18
**parents**
119:4

part
10:2, 37:4,
47:14, 59:22,
84:5, 90:8,
90:20, 92:9,
108:22, 111:9,
111:19, 118:1,
121:5
participate
13:6, 13:8
participated
2:2
particular
120:16
parties
8:1, 8:5,
122:12
partner
9:2, 9:12,
9:16, 10:1,
10:6, 10:7,
11:17, 22:9,
45:23, 45:25,
49:17, 49:20,
52:13
partners
48:7, 49:16,
54:21, 64:9,
81:5
parts
41:7
party
9:1, 124:17
pass
38:1
passed
21:11
past
83:21
paturet
1:16, 2:26,
6:3, 13:24,
14:4, 28:10
pay
41:12
pdf
115:17
pelligrino
21:19

pencil
13:18
pending
6:12
people
32:7, 38:12,
50:20, 60:6,
66:21, 68:20,
69:1, 69:11,
70:7, 71:5,
71:23, 85:6,
85:10, 88:11,
88:21, 119:6
percent
20:7, 111:16,
111:19, 112:1,
116:18, 117:15
percentage
20:5
perfect
103:12, 115:17
period
10:8, 11:18,
29:6, 29:22,
57:21, 73:16,
88:9, 102:10
periods
23:10
person
15:8, 41:10,
45:7, 46:1,
63:8, 63:11,
63:14, 71:2,
71:3, 71:8,
87:5, 90:12,
92:14, 92:19
personal
76:12, 76:20,
76:22, 76:25
personally
73:12
pertinent
66:16
perturbed
90:10
peter
14:7, 39:15,
39:17, 40:8,

42:16, 42:25,
43:10, 43:17,
73:25, 74:10,
74:16, 74:21,
76:15, 76:23,
77:3, 80:23,
81:12, 86:8,
95:5, 98:7,
98:10
phone
13:17, 63:1,
76:12, 76:18,
76:20, 76:22,
77:1, 95:13
phonetic
14:23
photo
71:15, 71:17,
71:21, 71:23
physical
4:9, 7:3, 69:2
pick
5:15
picked
25:24
picking
75:1
piece
121:8
place
64:22, 65:11,
65:13, 65:14,
86:2, 124:13
plaintiff
1:10, 2:6,
4:22, 66:5
plan
3:16, 115:2,
115:5, 121:22
planet
2:38, 8:15
planning
78:8
plaza
2:11
please
4:3, 5:7, 5:12,
5:14, 6:11,

6:17, 14:19,
15:13, 21:7,
23:11, 28:13,
55:19, 66:11,
79:6, 96:4,
100:17, 103:2,
103:14, 116:21
point
21:16, 73:6,
88:12
poland
14:24, 15:1
policy
119:20, 119:22,
120:21
porrino
103:23
position
16:7, 17:7,
23:16, 92:6
possibility
80:2
possible
62:8, 62:12,
62:14, 62:15,
74:14, 123:5
possibly
35:12, 80:20
potential
37:1, 37:25,
54:19, 55:16,
55:21, 55:24,
81:16, 110:25
potentially
71:25
predominantly
85:20, 122:4
prefer
49:13, 49:14
premarked
95:17, 95:25,
106:15, 106:22
premises
43:3, 73:14
preparation
13:12
prepare
12:11, 13:3

**prepared**
91:5, 96:20,
96:22
**preparing**
97:16
**present**
2:36, 32:16,
79:2, 79:4,
79:8, 79:11,
79:19, 80:17,
89:2, 92:14,
92:18, 98:4
**presently**
4:8
**president**
16:9, 16:13,
16:16, 16:18,
17:1, 17:4,
17:6, 17:8,
17:11, 17:18,
17:24, 17:25,
18:4, 35:8,
35:11, 35:13,
35:15, 35:18,
35:20, 35:25,
36:6, 79:7,
79:9, 79:10,
80:13, 82:20,
82:23, 83:1,
98:23
**pretty**
38:15, 41:17,
45:9, 47:11,
52:4, 54:14,
71:7, 74:5,
74:24, 75:1,
76:4, 83:23,
84:8, 86:17,
97:2, 97:6,
102:15, 115:10,
116:10
**prevent**
7:4, 7:8, 7:14,
123:5
**previously**
108:23, 111:10
**price**
11:1

**primarily**
107:24
**primary**
64:21
**principal**
11:9, 84:3,
115:25
**principals**
52:22, 60:6
**prior**
20:18, 20:21,
23:20, 24:2,
24:22, 24:24,
58:25, 72:21,
75:4, 75:14,
95:4, 95:5,
114:22, 122:12,
124:6
**proactive**
118:17
**probably**
18:5, 28:23,
33:2, 33:19,
35:23, 37:11,
50:12, 58:10,
63:6, 71:5,
76:14, 79:3,
94:8, 95:7,
95:10
**proceed**
114:6
**process**
37:17, 38:25,
39:5, 39:8,
39:18, 39:19,
40:5, 44:25,
45:11, 45:12,
45:17, 46:7,
50:1, 50:4,
51:24, 52:20,
52:21, 53:3,
53:8, 53:13,
53:18, 54:1,
54:17, 55:3,
56:1, 56:3,
59:4, 60:21,
60:24, 62:15,
66:4, 68:5,

108:16, 112:7
**produced**
66:25
**professional**
123:17
**profile**
38:7, 38:10
**project**
46:17, 47:1
**projects**
32:19
**pronounce**
29:16
**pronounced**
28:15
**pronounces**
12:22
**pronouncing**
61:3
**property**
10:9, 11:14,
11:16, 11:21
**propose**
85:9
**proprietary**
22:15, 46:2,
107:11, 108:7,
115:25, 116:11,
116:14, 117:3,
118:3, 120:2,
120:7, 120:16
**proscribed**
117:1
**prospective**
45:2, 45:7,
67:21
**protect**
36:13
**provide**
85:13, 85:22,
88:3, 91:3,
93:10, 109:19
**provided**
116:13
**providing**
85:1
**provisions**
21:13

**public**
124:4
**published**
104:5
**pull**
95:16, 99:21,
102:19, 103:12,
106:14, 113:2
**purchase**
44:25, 45:9,
45:15, 46:8,
46:13, 46:21,
47:16, 48:22,
49:1, 49:4,
49:21, 49:22,
50:2, 50:6,
50:7, 50:10,
50:14, 50:17,
51:16, 51:25,
54:5, 54:25
**purchased**
21:23, 22:22,
26:22, 42:7,
42:10, 46:5,
51:18, 51:19,
51:20, 51:21,
51:22, 52:9,
56:15
**purchaser**
45:7
**purchasers**
51:9, 51:12
**purchases**
50:5, 51:2,
51:8, 53:8, 54:1
**purchasing**
45:6, 53:5,
54:17, 56:24
**purposes**
48:11
**push**
74:11
**pushed**
74:5, 74:8
**pushing**
74:1, 80:19,
80:23
**put**
8:15, 73:25,

106:6, 112:12,
115:7

**Q**

**quality**
36:16
**quarter**
27:19, 58:18,
78:15
**queens**
15:15, 15:16
**question**
5:3, 5:8, 5:12,
6:12, 23:11,
25:22, 25:25,
26:2, 31:5,
31:7, 39:3,
55:18, 66:8,
66:9, 66:12,
89:9, 110:15,
121:12, 123:12
**questions**
5:5, 6:15,
7:16, 14:17,
65:17, 66:1,
66:13, 66:16,
66:18, 67:3,
67:6, 82:15,
83:13, 83:24,
96:2, 108:3,
113:17, 113:20
**quickly**
89:17
**quiet**
67:2
**quite**
29:7, 39:2,
41:1, 92:5

**R**

**race**
6:14, 6:17,
14:19, 15:9,
30:5, 30:7,
30:9, 30:21,
30:23, 31:1,
31:8, 31:10,
31:12, 32:1,

32:9, 33:8,
88:24, 116:24,
119:7, 121:10
**racial**
31:14, 31:16,
31:20, 31:21
**racially**
73:3
**raise**
89:12, 100:16,
100:19, 100:22
**raised**
92:24
**rarely**
37:3
**rat**
34:7
**rate**
9:24
**rather**
63:8
**ratted**
34:8
**re-elected**
27:25
**reach**
75:13, 75:25
**reached**
75:5, 75:7,
75:23, 77:3
**read**
26:2, 62:20,
66:10, 66:12,
96:3, 96:5,
96:15, 96:21,
103:15, 107:2,
108:1, 108:5,
108:8, 109:13,
116:5, 116:7
**reading**
109:14
**real**
50:19, 53:15,
67:19, 123:17
**really**
37:2, 48:7,
63:25, 64:14,
64:20, 68:24,

74:1, 74:13,
80:19, 87:4,
91:1, 93:20,
123:8
**realtime**
124:25
**realty**
1:14, 1:15,
1:21, 2:16, 6:2,
22:7, 107:12,
107:14
**reason**
6:11, 64:21,
72:9, 72:25,
89:23, 122:8
**reasonable**
63:15, 117:8
**reasonably**
27:11
**recall**
9:9, 10:12,
10:14, 10:15,
11:8, 11:20,
23:22, 25:5,
25:8, 26:14,
26:19, 26:20,
27:24, 28:2,
28:3, 28:5,
50:16, 50:22,
51:12, 52:11,
53:23, 59:3,
59:7, 60:12,
62:22, 74:12,
74:18, 84:16,
86:7, 88:7,
94:23, 94:25,
95:1, 95:3,
97:15, 101:24
**receives**
72:5
**receiving**
91:21
**recent**
23:16
**recently**
21:12
**recess**
44:6, 99:15

**recognize**
33:11, 96:16,
98:11, 101:6,
103:9, 114:19,
114:23, 114:24,
115:21
**recollection**
7:10, 101:11
**recommendation**
61:6, 61:13
**recommendations**
67:10
**record**
4:4, 14:20,
114:25, 117:18
**recuse**
48:4
**red**
85:16, 95:8
**redoing**
88:8
**refer**
5:20, 5:25,
6:4, 6:5, 18:19,
19:17, 22:7,
32:1, 107:5
**referring**
18:20, 19:18,
32:2, 32:14,
37:16, 47:20,
84:19, 101:21,
104:2, 104:8
**refers**
31:1
**refi**
36:3
**reflect**
118:7
**refusal**
116:23, 118:11,
120:10, 121:9
**refused**
111:15, 116:16
**regarding**
11:13, 66:18,
67:11, 75:14,
102:12, 122:17
**regards**
30:9, 68:13,

89:25
**regular**
56:1, 71:8,
88:14, 122:22
**regularly**
69:17, 70:10,
71:16, 72:3
**reject**
54:19
**rejected**
73:1, 73:4
**related**
6:14, 84:14
**relation**
38:6, 42:22
**relationship**
45:20, 46:1,
63:13
**relative**
124:16, 124:18
**relatively**
29:8, 89:21
**relay**
67:20
**remained**
22:24, 112:18
**remaining**
21:3
**remember**
10:18, 23:4,
35:14, 36:4,
42:1, 50:19,
52:23, 52:24,
56:14, 56:17,
57:13, 57:22,
58:16, 59:20,
61:18, 62:21,
73:17, 78:5
**remote**
8:2, 8:6
**remotely**
2:2
**renew**
108:23, 111:10
**renovated**
21:24, 22:23
**renovation**
46:18, 47:5,

47:14
**renovations**
38:14, 66:22,
83:19
**rent**
59:5
**rented**
60:3
**renting**
44:14
**repair**
44:18
**repairs**
36:16, 41:6
**repeat**
5:12, 7:16,
8:4, 13:7,
23:10, 25:21,
28:12, 41:22,
55:18, 66:9,
77:13
**rephrase**
5:12, 31:5
**reported**
1:34
**reporter**
4:3, 4:7, 4:11,
5:9, 34:2, 34:4,
34:7, 34:9,
106:8, 120:8,
124:4
**reporter's**
124:1
**represent**
4:22, 5:19,
95:23, 100:5,
102:22, 106:20
**representation**
97:3, 97:6,
97:15
**representations**
67:10
**representing**
112:1
**requested**
37:22
**require**
38:15, 41:16,

44:9, 44:12,
105:14, 105:15
**required**
43:7, 48:21,
49:1, 49:4,
49:11, 49:13,
61:8, 62:18,
105:1, 105:2,
106:1, 106:4,
109:12
**requirement**
55:5, 55:7,
62:16, 105:4
**requirements**
117:3
**requires**
110:8
**requiring**
104:24
**reread**
25:25, 105:8
**resolution**
108:25, 109:20,
110:10, 111:12
**respect**
117:4
**respond**
93:7
**responded**
87:23
**responses**
82:15
**responsibilities**
35:24, 36:6,
36:9, 36:19,
36:23, 40:24,
41:2
**responsibility**
64:7
**responsible**
41:2, 41:5,
59:15, 64:19
**rest**
122:19
**restroom**
99:12
**result**
72:24

**review**
36:16, 36:24,
53:25, 55:24,
60:16, 60:20,
77:25, 86:12,
86:25, 96:1,
100:10, 100:14,
102:3, 102:5,
102:7, 102:25,
106:24, 113:22,
121:18
**reviewed**
12:19, 68:3,
77:22, 77:24,
121:21
**reviewing**
96:12, 96:14,
100:18, 100:24,
101:2, 103:4,
108:4, 114:11
**right**
4:10, 4:24,
7:20, 13:16,
34:11, 47:6,
47:7, 48:3,
49:17, 54:12,
54:23, 56:18,
73:8, 73:16,
93:9, 93:21,
120:6, 120:10,
120:12, 120:18,
122:9
**rights**
54:4, 54:7,
54:8
**ring**
78:22
**rmr**
1:34, 124:24
**rockefeller**
2:11
**role**
18:7, 22:13,
22:19, 23:1,
42:16, 43:17,
60:24, 60:25,
82:17
**roles**
82:25

**roof**
19:14, 44:18
**room**
13:20, 65:15,
65:16
**roughly**
10:12, 17:23
**row**
43:9
**rubin**
98:7, 98:9
**rude**
76:19
**rule**
110:21
**rules**
5:1, 69:3
**running**
36:12
**runs**
90:6
**russia**
14:23

**S**

**s**
2:1
**safety**
87:19
**said**
25:17, 47:19,
48:15, 55:25,
74:1, 74:10,
74:12, 75:8,
80:20, 85:3,
85:4, 85:5,
85:7, 85:12,
85:19, 86:7,
87:24, 88:1,
88:2, 91:1,
91:8, 91:15,
91:16, 91:17,
91:19, 92:22,
92:25, 93:3,
93:9, 104:6,
104:15, 117:20,
121:23
**sale**
45:1, 49:21,

50:2, 50:6
**sales**
45:15
**salespeople**
72:8
**same**
6:23, 18:16,
19:5, 20:20,
23:24, 27:9,
27:11, 32:8,
35:4, 45:17,
48:5, 52:21,
59:8, 67:3,
93:3, 118:7
**saturdays**
85:19
**saul**
14:12
**saw**
60:15, 61:22,
77:19, 78:9,
82:8, 114:21
**say**
5:14, 6:18,
8:3, 17:22,
19:12, 19:19,
20:12, 20:23,
23:5, 23:12,
23:25, 25:10,
26:4, 26:6,
27:16, 29:11,
29:23, 30:20,
32:23, 33:5,
35:12, 40:16,
40:19, 40:21,
43:4, 44:10,
44:20, 45:24,
50:6, 58:3,
58:17, 64:10,
74:8, 75:17,
82:13, 85:25,
86:20, 87:25,
92:4, 96:24,
97:2, 97:14,
111:6, 119:17
**saying**
77:13, 78:5,
87:21, 91:2,

119:10
**says**
98:17, 105:6,
105:18, 109:3,
109:8, 109:17,
109:18, 115:9,
117:18, 121:8
**schedule**
93:19
**scheduled**
78:11, 78:12,
93:18
**schedules**
27:15, 41:14,
75:22
**school**
15:17, 15:18,
16:21
**screen**
8:17, 25:16,
25:22, 95:21,
99:25, 106:18,
113:9, 115:4
**scroll**
96:11, 97:24,
100:15, 101:13,
103:1, 103:2,
103:5, 103:6,
107:1, 114:1,
114:10
**seal**
48:10
**second**
21:10, 96:1,
102:25, 111:18,
113:13
**seconds**
119:1
**section**
107:7, 107:25,
108:2, 108:7,
108:11, 108:15,
108:21, 109:19,
110:24, 111:3,
111:8, 113:15,
115:15, 115:22,
116:4, 116:5,
118:1, 118:2,

121:22
**security**
85:13, 85:14,
85:22, 87:19,
87:23, 87:24,
87:25, 91:2,
91:3
**see**
30:23, 38:9,
43:8, 43:9,
59:9, 60:22,
65:9, 69:17,
69:21, 97:25,
100:2, 101:1,
101:16, 113:13,
114:2, 115:9,
115:19, 117:3
**seeking**
73:24
**seem**
80:16
**seems**
118:7
**seen**
40:7, 96:18,
98:19, 112:10,
114:5, 114:16
**self-identify**
15:2
**self-managed**
42:11
**sell**
54:15, 67:18,
116:10
**seller**
67:22
**selling**
44:13, 44:24
**send**
45:4
**sense**
33:6, 94:17,
104:10
**sensitivity**
119:11
**sentence**
105:9, 111:19,
116:22, 118:10,

121:5
**sentences**
103:15
**serve**
24:10, 24:13,
24:16, 24:23,
25:3, 25:6,
26:12, 26:15,
26:21, 26:24,
43:17
**served**
24:7, 25:9,
25:10, 26:3,
26:4, 26:7,
26:9, 26:19
**services**
1:7, 2:7, 4:24,
5:20, 84:20,
84:25
**set**
84:8, 124:14
**seven**
43:8, 69:5
**seventh**
22:2, 56:4,
56:16, 56:23,
57:2, 57:15,
57:19, 57:24,
58:15, 58:20,
58:23, 59:1,
59:5, 59:19,
59:23, 60:3,
60:13, 61:16,
61:20, 62:4,
64:12, 68:14,
69:18, 70:9,
106:2, 112:14
**sex**
116:25, 119:5
**sexist**
116:10
**shafts**
48:13
**shall**
108:22, 108:25,
111:9, 111:12,
111:14, 116:15,
116:20

**shamash**
1:18, 12:21,
12:22, 14:12,
59:9, 64:14,
64:23, 67:9,
72:20, 74:9,
75:5, 75:13,
75:16, 75:24,
76:5, 76:8,
79:13, 79:21,
80:4, 80:19,
80:23, 92:22,
93:7, 93:20,
94:4, 95:17,
95:25, 99:21,
100:6, 100:7,
104:11, 107:13,
112:16
**shamash's**
22:7, 76:25
**share**
12:17, 74:21
**shareholder**
65:7
**shareholders**
27:7, 36:14,
43:12, 54:4,
54:16, 54:21,
64:8, 65:5,
70:2, 112:1,
116:17, 117:5,
117:14, 120:14
**shares**
22:17, 45:23,
107:19, 111:17,
112:2, 116:10,
116:19, 117:16
**sharing**
63:14
**shepherd**
94:6
**shift**
55:2
**shocked**
90:15
**shoot**
71:18
**shoots**
71:15, 71:17,

71:22
**should**
5:1, 7:13,
37:25, 43:4,
44:20, 45:24,
64:1
**shouldn't**
23:25, 75:17,
87:25
**show**
8:16, 114:15
**side**
32:21, 48:5,
79:14
**side-swiped**
92:11
**sign**
120:13, 120:14
**signatory**
36:3
**signature-b7fzp**
124:22
**similar**
53:3
**similarly**
1:19
**simple**
14:17, 18:19
**simplify**
18:22
**simultaneous**
5:10, 35:11
**simultaneously**
83:10
**since**
7:17, 19:2,
22:20, 22:25,
29:7, 48:5,
75:19
**single**
88:12
**sit**
20:25
**sitting**
80:2, 82:8
**situated**
1:19
**situation**
85:15, 112:19

**situations**
68:12
**six**
20:16, 69:4,
85:21, 90:6
**sixth**
52:10, 52:16,
65:14
**size**
69:2
**skill**
84:8
**skimmed**
12:20
**skin**
31:23, 32:2,
32:19, 32:20,
32:21
**slowly**
7:24, 114:1,
114:9
**small**
96:9
**software**
57:10, 57:12,
57:14, 57:18,
57:23, 58:14,
58:19, 58:22,
59:5, 59:18,
59:21, 60:3,
60:8, 60:14,
61:16, 61:19,
61:24, 62:3,
64:12, 64:25,
67:6, 67:7,
67:11, 68:13,
69:15, 69:19,
69:24, 70:3,
70:6, 106:1,
112:21
**sold**
34:25
**some**
4:25, 5:17,
6:14, 10:24,
14:17, 41:17,
43:6, 85:6,
88:17, 94:14,

94:18, 96:2,
99:18, 106:8,
106:24, 108:3,
122:8
**somebody**
33:20, 45:22,
54:14, 60:21,
63:13, 63:16,
68:8, 68:10,
71:18, 76:17,
76:20, 84:15,
88:1, 88:9,
88:13, 95:13
**someone**
39:4, 53:12,
53:17, 68:6,
87:1
**someone's**
32:11
**someplace**
33:21
**something**
21:19, 22:6,
22:24, 56:2,
68:8, 78:9,
81:1, 85:16,
88:3, 107:5,
107:13
**sometime**
58:17, 78:13,
114:22
**sometimes**
7:19, 69:5,
71:9, 88:16
**somewhat**
45:19
**somewhere**
15:1, 18:5,
19:13, 27:16,
35:22, 62:20,
73:15, 78:14,
86:24, 120:24
**soon**
48:9, 74:14,
89:21
**sooner**
75:2, 80:24
**sorry**
23:8, 25:20,

34:7, 34:10,
34:11, 51:1,
61:1, 65:15,
77:14, 92:17,
97:11, 100:11
**sort**
65:22
**sought**
62:4
**sound**
56:18
**sounds**
78:23, 114:7,
123:9
**southern**
1:2
**space**
48:8, 53:2,
59:12, 59:13,
63:9, 63:11,
63:17, 69:6,
75:11, 112:18
**spaces**
91:20
**speak**
7:23, 13:12,
14:7, 14:11,
63:5, 67:18,
75:16, 76:7,
87:7
**speaking**
62:7, 62:24,
63:18, 65:3,
67:23
**speaks**
105:17, 121:15
**species**
32:11, 33:9
**specific**
13:1, 16:24,
33:4, 49:24,
52:4, 66:5,
67:1, 73:18,
75:8, 82:17,
83:20
**specifically**
6:6, 22:5,
59:7, 72:16,

81:14, 83:25,
86:8, 109:9,
109:17, 114:24,
119:13
**specifics**
63:19
**specify**
32:5
**spectrum**
32:20, 32:21
**speculate**
49:23
**spoke**
12:12, 87:5
**spoken**
13:23, 14:2,
43:13, 75:18
**square**
19:13
**st**
78:14
**stand**
95:19, 99:23,
106:16, 113:4
**start**
17:19, 114:1
**started**
18:6
**starting**
9:8, 16:17,
22:19, 94:14,
103:15, 105:9
**state**
4:3, 105:13,
105:15, 108:21,
111:3, 111:8,
122:16
**stated**
105:5, 105:6,
112:13
**statement**
110:6
**states**
1:1, 124:4
**status**
10:6, 116:25
**stay**
20:9, 20:13,

20:15, 20:16,
71:9, 93:22
**stayed**
90:19
**stenographically**
124:12
**steps**
118:12, 118:17,
118:22
**still**
43:11, 59:10,
59:12, 64:16,
64:17, 100:20,
101:19
**stop**
114:13
**stops**
69:8
**story**
19:11
**strange**
80:16
**street**
1:15, 1:21,
2:16, 4:13, 6:2,
18:12, 19:1,
19:4, 19:9,
19:18, 21:9,
42:21, 115:6
**strike**
27:23, 87:11
**structural**
21:16, 51:16,
52:18
**structure**
19:12, 41:16,
44:19
**struggle**
101:15
**studio**
71:23
**studios**
71:20
**subheading**
108:17
**subject**
19:5, 38:21,
65:25

**subjects**
10:3, 11:4
**sublease**
36:19, 36:25,
37:5, 37:10,
37:18, 38:20,
38:25, 39:5,
39:19, 39:22,
40:6, 45:12,
45:13, 45:16,
55:3, 55:6,
55:13, 55:17,
55:21, 59:18,
59:23, 60:13,
60:14, 60:17,
60:24, 61:7,
61:20, 61:24,
62:4, 62:8,
62:17, 62:18,
62:25, 63:21,
64:11, 65:4,
65:13, 65:19,
66:14, 67:5,
67:11, 67:14,
67:22, 73:24,
75:14, 77:4,
77:11, 77:16,
77:22, 77:25,
78:18, 81:13,
84:14, 86:12,
86:14, 86:16,
89:13, 89:19,
90:1, 92:1,
92:21, 93:24,
95:6, 97:1,
99:5, 101:25,
102:3, 102:5,
104:2, 104:8,
104:20, 105:3,
108:24, 111:11,
111:25, 112:2,
118:14
**subleased**
61:16, 64:12,
68:14
**subleases**
108:16, 109:12,
112:9

**subleasing**
36:23, 67:24,
69:24, 70:8,
73:13, 75:6,
89:3, 89:6,
106:2
**sublessee**
111:1
**sublet**
38:1, 39:10,
40:2, 46:3,
59:13, 108:22,
110:21, 111:9,
116:11, 121:18
**sublets**
103:21, 105:11,
105:15, 105:19
**subletting**
108:11, 108:17,
110:6, 110:7,
111:22, 117:5,
117:12
**submit**
45:2, 61:19,
77:10, 77:18
**submitted**
46:11, 46:17,
46:19, 52:4,
52:17, 52:25,
62:3, 90:11
**substance**
74:12, 74:25
**substances**
7:8
**subtenant**
59:16, 68:16,
81:16, 112:14,
112:20
**successful**
64:4
**sued**
9:5, 10:23
**suffering**
7:2
**suggest**
113:25
**suggested**
48:3

**suite**
2:31
**sum**
45:10
**summary**
96:25, 97:7,
97:13, 97:16,
97:19, 99:1,
115:25
**sunnyside**
15:16
**super**
41:11, 85:23,
117:22
**supplied**
46:14
**sure**
12:22, 14:25,
16:22, 16:25,
28:14, 29:4,
31:6, 31:8,
33:3, 34:12,
36:12, 37:12,
46:14, 47:2,
47:3, 47:19,
48:11, 51:4,
52:6, 54:9,
61:3, 65:9,
70:8, 77:14,
85:24, 95:11,
95:12, 102:2,
102:4, 103:22,
105:11, 105:21,
107:6, 107:8,
110:3, 113:16,
115:3, 116:9,
117:19, 118:18,
119:9, 121:25,
122:6
**surprised**
80:6, 80:7,
80:8, 86:10
**susan**
98:7, 98:9
**swear**
87:3
**sworn**
4:2, 124:8

**synopsis**
20:24
**systems**
124:25

**T**

**table**
79:14, 82:9
**take**
6:12, 9:14,
43:22, 44:3,
54:9, 65:11,
96:1, 99:9,
100:13, 102:13,
102:18, 106:12,
113:12, 118:13,
118:18, 118:22,
119:10, 123:11
**taken**
119:12, 124:12
**taking**
4:18, 7:7, 92:1
**talent**
15:24, 16:2,
18:2, 18:8,
18:15, 18:21,
70:22
**talk**
49:25, 72:15
**talked**
60:23
**talking**
29:2, 29:4,
65:23, 73:9,
91:9, 91:18,
106:7
**tara**
2:10, 4:18,
43:21, 65:21,
107:4
**tasting**
72:13
**tawil**
14:12
**taxing**
38:11
**technician**
2:38, 95:19,

99:23, 106:16,
113:4, 113:8
**teeth**
73:10
**telephone**
94:12
**tell**
39:4, 39:17,
50:23, 53:12,
53:17, 67:17,
67:19, 77:7,
81:14, 96:19,
109:16, 121:14
**telling**
110:13
**ten**
10:23, 25:11,
25:13, 26:5,
26:7, 29:25,
30:3, 37:2,
40:22, 89:20,
92:4
**tenant**
22:15, 22:20,
37:1, 38:1,
40:3, 45:25,
55:24, 56:7,
59:12, 67:22,
74:2, 75:8,
75:11, 105:3,
111:22, 112:18
**tenants**
57:1, 67:1,
67:2
**tenth**
71:25
**term**
6:4
**terminology**
104:21, 118:7
**terms**
47:4, 69:1,
91:11, 91:14,
115:25, 120:14,
121:4, 123:1
**test**
8:15
**testified**
4:2, 10:5,

11:13
**testify**
10:3, 11:4,
11:15, 124:8
**testifying**
6:24, 7:4, 7:9,
7:14
**testimony**
6:23, 8:11,
11:25, 12:4,
51:1, 124:12
**testing**
72:12
**text**
100:3
**th**
1:15, 1:20,
2:16, 2:22,
4:13, 6:2,
18:12, 18:13,
19:1, 19:4,
19:8, 19:18,
21:1, 26:22,
26:25, 42:10,
42:21, 46:5,
46:8, 46:13,
46:21, 47:4,
47:15, 47:17,
53:4, 68:20,
69:8, 70:19,
70:22, 71:15,
71:16, 72:1,
73:20, 78:14,
78:20, 96:25,
97:17, 98:5,
99:1, 101:10,
115:6, 123:14
**thank**
5:24, 6:9,
7:12, 7:22,
11:23, 12:9,
12:24, 13:5,
13:19, 13:22,
14:15, 15:12,
15:21, 16:11,
17:16, 18:14,
18:18, 19:16,
22:1, 23:1,

26:8, 27:18,
27:20, 28:17,
30:4, 34:14,
41:19, 43:16,
48:19, 76:24,
95:22, 96:9,
101:4, 101:5,
102:17, 103:8,
103:13, 103:25,
107:21, 117:24,
118:8, 121:16,
123:19
**thanks**
99:8, 100:11,
114:7
**theatrical**
16:5
**themselves**
48:4, 49:18,
84:7
**thereof**
117:4
**thereto**
108:24, 111:11
**thing**
48:3, 49:11,
59:8, 59:9,
64:6, 71:20,
90:16, 91:6,
92:6, 92:7,
93:3, 93:19,
98:16
**things**
18:19, 29:8,
31:24, 41:17,
44:23, 67:1,
67:3, 84:9,
84:20, 102:13,
118:25
**think**
9:6, 12:21,
12:23, 18:22,
19:2, 22:6,
22:8, 22:24,
31:9, 35:6,
39:15, 42:15,
49:16, 51:3,
52:5, 52:22,

56:25, 63:12,
63:14, 73:21,
76:10, 76:19,
79:17, 83:6,
86:1, 91:17,
94:19, 94:22,
102:14, 106:6,
115:2, 118:6
**thinking**
20:17, 87:22
**third**
21:15, 88:16,
122:12
**thought**
48:3, 75:10,
80:1, 84:21,
85:13, 86:3,
91:16, 91:17
**three**
8:11, 35:12,
46:16, 97:21,
99:12, 103:15
**three-hour**
71:12
**three-minute**
43:23
**threw**
98:17
**through**
12:20, 24:19,
33:10, 48:12,
73:5, 76:15,
92:13, 94:6,
99:18, 113:23,
114:10
**throughout**
5:20
**time**
10:8, 11:19,
16:22, 20:11,
20:19, 23:10,
23:21, 24:22,
27:3, 27:9,
27:11, 29:7,
29:22, 33:17,
35:21, 40:14,
43:22, 44:16,
47:13, 49:24,

50:3, 50:22,
56:2, 57:22,
68:10, 68:11,
69:9, 69:21,
71:12, 73:16,
75:4, 78:7,
79:10, 80:15,
81:19, 85:7,
88:9, 90:14,
91:4, 93:6,
98:22, 102:10,
103:20, 106:24,
112:16, 114:21,
124:13
**times**
20:20, 50:9,
50:13, 50:14,
75:19, 112:13
**timing**
74:13, 84:10
**title**
115:4, 115:20,
115:24
**today**
4:19, 5:2,
6:14, 7:5, 7:9,
7:15, 20:25,
112:13
**today's**
12:11, 13:13,
14:5, 14:8
**together**
10:10, 52:14
**told**
53:20, 53:23,
81:12, 81:15,
86:6, 87:1, 93:8
**took**
43:18, 65:13,
65:14, 69:6,
112:17
**top**
19:1, 42:7,
97:24, 98:1,
101:13
**topics**
6:14
**total**
7:20, 8:11,

23:13, 25:11,
25:13, 26:5,
47:25
**touched**
122:20
**touton**
1:17, 2:17,
6:3, 14:4,
21:22, 21:23,
28:11, 28:14,
28:25, 29:16,
29:17, 29:18,
29:22, 29:24,
30:2, 30:12,
34:22, 46:4,
72:5, 79:15
**touton's**
46:21, 47:16,
71:24
**toward**
99:19
**town**
93:19
**toxic**
66:24
**track**
41:13
**trade**
48:5
**traffic**
69:12
**training**
119:11, 122:22
**transaction**
10:2
**transcript**
5:15, 12:19,
12:21, 66:11,
124:11
**transfer**
11:13, 11:16,
117:12
**transferred**
10:7
**transfers**
11:17
**travel**
20:2, 27:15,

48:12
**travels**
29:7
**treated**
72:23
**trial**
12:4, 12:6
**tricky**
14:13
**tried**
95:13
**true**
124:11
**trump**
79:9
**trust**
10:10
**truth**
124:8, 124:9
**truthfully**
5:5, 7:4, 7:9,
7:15
**try**
5:1, 7:23,
21:4, 49:5,
49:8, 64:8
**trying**
33:3, 33:10,
66:3, 76:17,
92:10, 93:19,
94:5, 107:21
**tt**
3:16, 113:6,
113:10
**turned**
50:22
**turner**
2:10, 3:6,
4:16, 4:18,
12:17, 25:24,
33:24, 34:14,
34:15, 43:24,
44:5, 44:7,
66:3, 66:10,
95:15, 95:22,
96:7, 97:11,
97:23, 99:8,
99:16, 99:20,

100:1, 100:4,
100:11, 101:12,
102:17, 103:11,
106:12, 106:19,
107:6, 107:23,
112:24, 113:11,
113:22, 114:7,
114:18, 115:14,
116:3, 123:10,
123:19
**turnover**
50:21
**twelve**
37:2
**two**
11:24, 12:3,
19:14, 20:13,
20:15, 20:16,
43:22, 46:10,
46:16, 52:6,
52:14, 52:22,
75:10, 121:11
**two-thirds**
117:14, 117:22,
117:23
**type**
44:8, 44:11,
65:17, 66:13,
66:18, 96:8
**types**
83:21
**typical**
20:10
**typically**
20:9, 20:13,
27:12, 60:16,
65:11

---
**U**
---
**unaffiliated**
51:9
**unanimous**
48:6, 49:6,
49:9, 49:12,
49:14
**unanimously**
48:14
**unavailable**
78:3

**under**
6:20, 91:14
**understand**
5:11, 5:21,
6:7, 6:19, 6:22,
7:25, 8:5, 8:9,
32:2, 32:4,
32:10, 37:19,
39:2, 82:4,
82:6, 90:17,
92:6, 104:1,
104:7, 108:10,
109:5, 109:24,
110:7, 110:16,
111:18, 111:20,
111:24, 112:4,
115:24, 117:25
**understanding**
38:24, 45:7,
72:17, 72:22,
92:15, 94:11,
109:9
**understood**
7:22, 11:11,
18:24, 19:20,
20:4, 20:12,
24:3, 32:10,
43:10, 51:5,
56:21, 74:3,
80:14, 81:3,
83:12, 96:23,
114:25
**unfairly**
72:23
**unit**
108:23, 111:10,
116:12
**united**
1:1
**unless**
32:4, 76:14,
108:24, 111:11,
117:2, 117:13
**unoccupied**
56:6
**unreasonably**
116:15
**until**
5:8, 17:23,

71:9, 82:10,
90:7, 94:14,
94:18, 122:9
**upgrades**
41:15
**usage**
38:11, 45:8,
66:20, 67:2,
83:18, 83:21
**use**
6:4, 6:7, 31:3,
38:13, 47:13,
74:11, 84:13,
86:19, 88:13,
91:20, 99:12,
101:19
**uses**
88:17, 88:20
**using**
88:5, 88:9,
100:22
**usually**
71:7

---
**V**
---

**vague**
32:3
**vain**
102:14
**varied**
20:10
**varies**
20:16
**vests**
37:23
**vetted**
122:12
**via**
2:2
**vice**
17:6, 17:8,
17:17, 17:24,
82:20, 82:23
**videoconference**
2:3
**violation**
10:25
**virtually**
1:27

**visit**
19:21, 19:25,
20:8, 70:11,
70:12, 71:16
**visiting**
20:19
**visitors**
70:14, 70:15,
70:16, 70:19,
72:6
**voice**
54:11
**vote**
47:21, 49:21,
54:10, 54:16,
54:24, 55:12,
61:23, 65:8,
67:15, 92:1,
92:3, 92:8,
92:14, 92:18,
92:19, 92:24,
93:4, 93:8,
93:11, 93:14,
93:22, 116:17,
117:13
**voted**
47:23, 47:24,
48:1, 48:16,
92:7, 92:20,
92:22, 93:1,
93:2, 93:6
**votes**
49:1, 67:13
**voting**
48:4

---
**W**
---

**wait**
5:7
**walk**
99:17, 113:23
**walked**
81:18
**want**
12:25, 33:5,
51:4, 55:2,
60:22, 63:10,
63:16, 64:7,

76:7, 90:18,
96:1, 96:3,
99:17, 100:13,
107:2, 107:5,
107:7, 113:2,
113:15, 113:19,
119:17
**wanted**
8:17, 34:12,
47:2, 47:3,
63:17, 64:21,
74:13, 79:25,
81:1, 81:17,
122:1, 122:6
**waste**
48:12, 66:24
**watch**
43:4
**way**
36:13, 55:12,
55:13, 61:13,
67:21, 67:24,
73:11, 80:25,
88:14, 88:22,
112:12, 114:2,
121:6, 121:13
**ways**
123:5
**we'll**
17:1, 44:3,
56:2, 85:12,
87:23, 87:25
**we're**
5:2, 6:13,
27:14, 29:2,
29:4, 35:21,
37:1, 37:16,
49:16, 55:23,
70:8, 73:9,
75:21, 88:10,
90:4, 90:5,
91:20, 99:18,
107:24, 112:24,
113:14, 115:14,
118:9, 119:14
**we've**
45:13, 45:14,
61:8, 63:24,

65:12, 123:7
**wednesday**
1:28
**week**
20:1, 20:20,
90:7
**weekday**
71:1
**weekends**
85:23, 90:5
**went**
14:25, 15:15,
15:16, 15:17,
15:18, 25:22,
53:10, 103:3
**weren't**
65:2, 89:22
**west**
1:15, 1:20,
4:13, 6:2,
18:12, 19:1,
19:4, 19:8,
19:18, 42:21,
115:6
**whatever**
37:21, 41:9,
66:25, 98:20
**whenever**
80:21
**whether**
23:22, 37:24,
38:6, 39:10,
40:2, 50:22,
54:24, 61:7,
61:9, 66:23,
84:2, 84:4,
92:2, 114:4,
114:15
**white**
15:11, 30:10,
30:13, 30:16,
32:16, 120:9
**whoever**
68:25
**whole**
19:18, 107:2,
108:22, 111:9,
124:8

**wife**
11:18
**william**
15:17
**willing**
48:10, 62:25,
63:3
**wine**
21:22, 72:10
**withheld**
116:15
**within**
58:6
**without**
49:24, 62:9,
116:12
**witness**
3:3, 4:5, 4:9,
4:12, 9:2, 9:21,
33:23, 65:23,
96:12, 96:14,
99:11, 100:16,
100:18, 100:19,
100:24, 100:25,
101:2, 101:3,
103:2, 103:4,
103:5, 108:4,
114:2, 114:11,
114:17, 115:8,
115:10, 123:22
**woodside**
15:16, 15:17
**word**
74:12, 74:25,
121:8
**wording**
115:3
**words**
31:20, 74:18
**work**
20:2, 41:14,
70:21, 70:25,
71:10, 90:9,
91:22
**worked**
60:6, 68:20,
74:2, 81:15,
119:4

**working**
16:25, 17:3,
17:23, 44:22,
63:12, 114:1
**works**
41:10, 53:24,
71:13
**world**
10:25, 119:7
**wouldn't**
33:2, 63:6,
76:13
**write**
109:15
**writing**
104:22, 109:1,
109:22, 110:11,
111:13, 119:24,
120:24
**written**
62:16, 62:20,
62:23, 116:17
**wrong**
17:14, 73:8,
86:2

**X**

**xi**
124:26

**Y**

**yea**
93:1
**yeah**
9:18, 11:15,
12:19, 18:6,
25:21, 51:6,
55:9, 61:5,
74:10, 78:25,
98:15, 104:10,
107:10, 107:19,
110:18, 115:11,
115:13, 119:21
**year**
8:25, 9:6, 9:9,
11:12, 17:13,
20:6, 22:23,
23:18, 26:18,

26:20, 27:4,
27:10, 27:19,
36:4, 36:15,
58:6
**years**
9:4, 9:7,
10:12, 23:6,
23:13, 24:20,
25:1, 25:11,
25:13, 26:5,
26:7, 26:10,
28:22, 29:13,
29:25, 30:3,
35:12, 37:6,
40:18, 40:20,
40:22, 56:25,
71:21, 97:22
**yell**
43:24
**yellow**
13:18
**york**
1:2, 2:12,
2:23, 2:32,
4:13, 10:18,
15:19, 18:12,
18:13, 19:25,
20:5, 24:1,
71:21, 78:2,
87:14, 124:5
**young**
85:8
**younger**
52:13
**yourself**
6:1, 48:16,
96:6, 108:2,
116:6

**Z**

**zoom**
2:3, 101:14,
103:13

**.**

**.113**
3:16
**.4**
3:6

**.4200**
2:13
**.5800**
2:33

---
**0**
---

**00**
1:29, 44:6
**00836**
124:26
**03429**
1:8
**06**
123:24

---
**1**
---

**1**
123:24
**10**
1:29, 21:21,
44:6, 46:11,
71:6, 71:7
**10001**
4:14, 18:13
**10018**
2:23
**10020**
2:32
**10111**
2:12
**11**
21:22, 44:6,
46:5, 46:8,
46:13, 46:21,
47:15, 47:17,
51:19, 53:4,
69:9, 72:1
**1170**
2:24
**12**
17:21, 18:13,
19:11, 21:1,
21:25, 26:22,
26:25, 42:10,
47:4, 68:20,
69:8, 70:19,
70:22, 71:15,
71:16, 99:15,

**107:24**
**124**
1:33
**125**
15:17
**1270**
2:30
**129**
4:12, 18:12,
19:1, 19:4,
19:8, 19:17,
42:21, 115:6
**14**
78:20, 96:25,
97:17, 98:5,
99:1, 103:18,
123:14
**1430**
2:22
**15**
1:28, 26:10,
89:20, 107:25,
108:15, 110:24,
118:2
**150**
15:15
**16**
117:4
**17**
2:22
**18**
57:17, 60:10
**19**
20:18, 73:20,
101:10
**1980**
17:21, 17:23
**1990**
19:2, 114:22
**1996**
19:3, 22:21,
22:22, 26:22,
42:9, 114:22
**1997**
22:24, 26:25

---
**2**
---

**2**
116:9

**20**
1:8, 9:4,
10:12, 22:24,
73:19, 124:27
**2000**
9:6
**2004**
56:18
**2006**
18:5
**201**
2:24
**2012**
35:23
**2014**
35:23
**2015**
26:16
**2016**
26:13
**2017**
25:7
**2018**
25:4, 58:15,
58:18, 59:2
**2019**
17:14, 24:17,
24:22, 24:24,
58:9, 58:13,
58:18, 58:19,
58:25, 73:15,
77:4
**2020**
20:18, 24:14,
28:4, 35:2,
35:13, 58:4,
58:7, 78:20,
96:25, 97:17,
98:5, 99:1,
103:18, 123:14
**2021**
17:14, 17:15,
24:11, 27:25,
33:19, 34:17,
34:20, 35:5,
35:15
**2022**
24:8

**2023**
1:28, 35:21,
124:27
**21**
9:6, 27:16
**212**
2:24
**212.589**
2:13
**212.784**
2:33
**22**
9:6
**23**
124:27
**25**
99:15
**27**
1:15, 1:20,
2:16, 4:13, 6:2,
18:12, 19:1,
19:4, 19:8,
19:18, 42:21,
115:6

---
**3**
---

**30**
27:17, 71:3,
71:7, 78:14
**31**
78:14, 115:6
**32**
99:15
**34**
118:2
**35**
71:21
**36**
106:25, 107:2
**39**
115:15, 115:16,
115:19

---
**4**
---

**4**
71:3
**40**
115:15, 115:17

**45**
2:11
**481380**
1:32

### 5

**501**
2:31
**5500**
19:13
**56**
44:6

### 6

**6**
71:6
**6,000**
19:13
**65**
111:16, 111:19,
112:1, 116:18,
117:14, 117:20
**66**
117:18, 117:20,
117:21, 117:22

### 7

**70**
20:7
**77**
107:19

### 8

**8:**
71:3

### 9

**9**
71:4
**90**
119:4