# EXHIBIT H



# Transcript of Peter Lehr

**Date:** March 28, 2023
**Case:** Community Counseling & Mediation Services -v- Oxford Realty & Holdings LLC et al

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2

3  ------------------------------x

4  C.C.M.S. d/b/a COMMUNITY
   COUNSELING AND MEDIATION
5  SERVICES,                          Civil Action No.
                                      20-cv-03429(NRB)
6

7            Plaintiff,

8       v.

   OXFORD REALTY & HOLDINGS LLC,
9  WEST 27TH STREET REALTY, INC.,
   MARC PATURET, JOSEPH GRILL,
10 MAXIME TOUTON, F. MICHAEL
   CONTE, NIGEL SHAMASH, and
11 other similarly situated
   BOARD MEMBERS OF WEST 27th
12 STREET REALTY, INC.,

13           Defendants.

14 ------------------------------x

15

16              DEPOSITION OF:

17               PETER LEHR

18            Conducted Virtually

19          Tuesday, March 28, 2023

20             12:03 p.m. EST

21

22

23 Job No. 486757

24 Pages 1 - 124

25 Reported by:  Nancy C. Bendish, CCR, RMR, CRR

```
1   A P P E A R A N C E S:

2    (All participated remotely via
      Zoom Videoconference)
3


4
    ON BEHALF OF PLAINTIFF CCMS d/b/a COMMUNITY
5   COUNSELING AND MEDIATION SERVICES:

6
         BAKER HOSTETLER
7        BY:  TARA E. TURNER, ESQ.
         45 Rockefeller Plaza
8        New York, New York 10111
         212.589.4200
9


10
    ON BEHALF OF DEFENDANTS 27TH STREET REALTY,
11  INC., JOSEPH GRILL, MAXIME TOUTON,
    F. MICHAEL CONTE:
12

13       ABRAMS GARFINKEL MARGOLIS BERGSON LLP
         BY:  BARRY G. MARGOLIS, ESQ.
14       1430 Broadway, 17th Floor
         New York, New York 10018
15       212-201-1170

16

17  ON BEHALF OF DEFENDANT MARK PATURET:

18
         BARCLAY DAMON LLP
19       BY:  DANIEL MARTUCCI, ESQ.
         1270 Avenue of the Americas
20       Suite 501
         New York, New York  10020
21       212.784.5800

22


23
    ALSO PRESENT:
24
         HAROLD RODRIGUEZ, Planet Depos Technician
25
```

1                        I N D E X

2

3    WITNESS                          EXAMINATION

4    PETER LEHR

5      By Ms. Turner............................4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    P E T E R   L E H R, having been first duly

2    sworn, testified as follows:

3             THE REPORTER:  Please state your

4    full name for the record.

5             THE WITNESS:  Peter, P-e-t-e-r,

6    Lehr, L-e-h-r.

7             THE REPORTER:  And where are you

8    presently located?

9             THE WITNESS:  I'm in my offices,

10   Kaled Management, 7001 Brush, B-r-u-s-h, Hollow,

11   H-o-l-l-o-w, Road in Westbury, New York.

12                    -   -   -

13   EXAMINATION BY MS. TURNER:

14        Q.    Good afternoon, Mr. Lehr.  My name

15   is Tara Turner and I will be taking your

16   deposition today.  I represent Community

17   Counseling and Mediation Services, which is the

18   plaintiff in the action.  Today we're

19   essentially going to have a conversation, but in

20   question and answer form.  I'm going to ask you

21   a number of questions.  I ask that you answer

22   each truthfully and to the best of your

23   knowledge.

24             Before answering, please make sure

25   I finish asking the question.  It's difficult

1  for the court reporter to capture simultaneous

2  conversation, so only one person should be

3  speaking at a time.

4          If you do not understand my

5  question, please ask me to repeat or rephrase

6  and I'll be happy to do so.

7          The court reporter will be taking

8  down my questions and your answers, so your

9  answers must be audible; you'll to say yes or no

10 rather than nodding your head.  Do you

11 understand?

12     A.    I do.

13     Q.    Thank you.  I mentioned that I

14 represent Community Counseling and Mediation

15 Services.  I may refer to them throughout the

16 deposition as CCMS.  Will you understand what

17 that means?

18     A.    Yes.

19     Q.    Thank you.

20          I may also refer to the defendants

21 in this action, which are West 27th Street

22 Realty, Inc., Marc Paturet, Joseph Grill, Maxime

23 Touton and F. Michael Conte.  If I refer to all

24 defendants, I will use the term "defendants" or

25 "co-op," but I may also refer more specifically

1    to the board members of the co-op, in which case

2    I'll say the Co-op Board.  Do you understand?

3         A.    Yes.

4         Q.    Thank you.

5               Finally, if you need a break for

6    any reason, just let me know.  I only ask that

7    we not take a break while a question is pending.

8               Mr. Lehr, do you understand that

9    you are now under oath?

10        A.    I do.

11        Q.    And do you understand that the

12   testimony you are about to give has the same

13   force and effect as if you were testifying in a

14   courtroom?

15        A.    Yes.

16        Q.    Are you suffering from any medical

17   conditions, mental or physical, that would

18   prevent you from testifying fully and truthfully

19   today?

20        A.    No.

21        Q.    And are you taking any medications

22   or substances that would prevent you from

23   testifying fully and truthfully today or would

24   otherwise affect your recollection?

25        A.    No.

1          Q.     Is there anything else I should be

2     aware of that would prevent you from testifying

3     fully and truthfully today?

4          A.     None.

5          Q.     Mr. Lehr, do you understand that

6     you are here today subject to a subpoena which

7     compels your attendance?

8          A.     Yes.

9          Q.     And do you understand that the

10    parties agreed to conduct this deposition by

11    remote means?

12         A.     Yes.

13         Q.     Thank you.

14                Mr. Lehr, have you ever been

15    deposed before?

16         A.     Yes.

17         Q.     When were you deposed?

18                MR. MARGOLIS:  Objection.  You can

19    answer.

20         A.     The last deposition was probably

21    about a year and a half ago.

22         Q.     And what was that deposition in

23    connection with?

24         A.     A trip and fall case.

25         Q.     Was it in connection with a

1    specific court?

2          A.    I'm sorry, your meaning?

3          Q.    Was there a lawsuit for the trip

4    and fall case?

5          A.    Yes.

6          Q.    And what court was that lawsuit

7    in?

8          A.    Queens.

9          Q.    And what subjects did you testify

10   about in your deposition?

11         A.    Condition of the sidewalk.

12         Q.    And was this in connection with

13   your role at Kaled?

14         A.    Yes.

15         Q.    And where was the trip and fall?

16         A.    Forest Hills.

17         Q.    Was this at a property managed by

18   Kaled?

19         A.    Yes.

20         Q.    What was the outcome of that

21   action?

22         A.    I don't know.

23         Q.    Had you been deposed prior to that

24   deposition?

25         A.    Yes.

1          Q.      When was that?

2          A.      I don't know.

3          Q.      Do you know how many depositions

4     you've been in total?

5          A.      Ten, 12.

6          Q.      And were any of these in your

7     personal capacity?

8          A.      No.

9          Q.      Were they all in connection with

10    your role at Kaled?

11         A.      Yes.

12         Q.      And when would you say the first

13    time you were deposed was?

14         A.      Probably in the '80s.

15         Q.      And then most recently as a year

16    and a half ago?

17         A.      Correct.

18         Q.      Just generally to the extent you

19    can recall, what were the subjects of those

20    actions?

21         A.      They were all accidents or trip

22    and falls.

23         Q.      And these were all accidents at

24    properties managed by Kaled?

25         A.      No, in my other -- Kaled and in my

1    other companies that I've worked for.

2         Q.    Were any of these actions that

3    alleged some form of discrimination?

4         A.    No.

5         Q.    Have you ever given testimony in

6    court?

7         A.    Yes.

8         Q.    When was that?

9         A.    Maybe seven years ago.

10        Q.    Do you recall what the lawsuit was

11   about?

12        A.    It was an accident.

13        Q.    And what type of accident?

14        A.    Slip and fall.

15        Q.    And who were the parties in that

16   action?

17        A.    It was a co-op that we were

18   representing.

19        Q.    And an individual?

20        A.    I believe it was a couple.

21        Q.    And what did you testify about in

22   court?

23        A.    The condition of the work that was

24   done in their apartments.  Their apartment, I

25   should say.

```
 1          Q.      Is that the only time you've

 2   testified in court?

 3          A.      I believe there was one other

 4   time.

 5          Q.      When was that?

 6          A.      In the '80s.

 7          Q.      Do you recall the subject of that

 8   action?

 9          A.      Yes.

10          Q.      What was it about?

11          A.      It was a worker who was hurt on

12   the job.

13          Q.      When you say hurt, how was the

14   worker injured?

15          A.      A shoulder injury.

16          Q.      And who were the parties in that

17   action?

18          A.      It was a building that I

19   represented.

20          Q.      Where was that building?

21          A.      30th Street, Manhattan.

22          Q.      Was Kaled involved in that

23   lawsuit?

24          A.      I did not work for Kaled at that

25   time.
```

1      Q.      Understood.

2              What subject did you testify about

3      in that action?

4      A.      The job that the worker's company

5      was hired for.

6      Q.      What was the outcome of that

7      lawsuit?

8      A.      I believe he lost.

9      Q.      And the trip and fall that you

10     testified in court seven years ago, what was the

11     outcome of that lawsuit?

12     A.      That was a settlement.

13     Q.      And just to confirm, have you ever

14     been deposed or testified in court in your

15     personal capacity?

16     A.      No.

17     Q.      Have you ever given testimony in

18     connection with an arbitration or mediation?

19     A.      I've been to arbitrations, yes.

20     Q.      Do you recall what actions?

21     A.      They were labor, union labor

22     cases.

23     Q.      And I'm sorry, that was union

24     labor cases?

25     A.      Correct.

1        Q.      Thank you.  What subjects did you

2   testify about in arbitration?

3        A.      Reasons for termination.

4        Q.      Were any of these -- did any of

5   these arbitrations involve Kaled?

6        A.      Yes.

7        Q.      When was the most recent one?

8        A.      I don't recall, several years ago.

9        Q.      How many total arbitrations have

10  you testified in?

11       A.      Five, six.

12       Q.      Were all of them involving Kaled?

13       A.      No.

14       Q.      Mr. Lehr, what did you do, if

15  anything, to prepare for today's deposition?

16       A.      I had a conversation with

17  Mr. Margolis yesterday.

18       Q.      Did you speak with anyone else?

19       A.      No.

20       Q.      Without telling me what you and

21  your attorney discussed, how long did you meet

22  with him for?

23       A.      An hour.

24       Q.      Did you review any material to

25  prepare for the deposition?

1          A.      Only had a conversation.

2          Q.      You didn't review any documents?

3          A.      No.

4          Q.      Do you have any materials in front

5     of you today?

6          A.      No.

7          Q.      And is anyone else in the room

8     with you for this virtual deposition?

9          A.      No.

10         Q.      Just to confirm, have you met or

11    spoken with counsel for defendant Marc Paturet

12    before?

13         A.      No.

14         Q.      Have you spoken with any of the

15    individual defendants about today's deposition?

16    And that would be Michael Conte, Marc Paturet,

17    Joseph Grill and Maxime Touton?

18         A.      No.

19         Q.      Have you spoken with anyone from

20    Kaled about today's deposition?

21         A.      Yes.

22         Q.      And who is that?

23         A.      My employer.

24         Q.      And when you say your employer,

25    who specifically?

1          A.      Mr. Kalikow.

2          Q.      And what is Mr. Kalikow's full

3     name?

4          A.      Edward Kalikow.

5          Q.      What is Mr. Kalikow's role with

6     respect to Kaled?

7          A.      He's the owner.

8          Q.      The owner.  And what did you

9     discuss with him?

10          A.      That I would be unavailable

11     between 12 and however long this takes.

12          Q.      Did you discuss anything else

13     regarding the deposition or the action?

14          A.      No.

15          Q.      Mr. Lehr, have you spoken with

16     Nigel Shamash or Saul Tawil about today's

17     deposition?

18          A.      No.

19          Q.      I'm just going to cover some

20     background questions regarding your employment

21     and education.

22               Mr. Lehr, can you please describe

23     your educational history.

24          A.      Bachelor's Degree from Adelphi

25     University and some master's credits from C.W.

1    Post.

2          Q.     Okay.  And, for the record, what's

3    your current occupation?

4          A.     I'm Director of Management for

5    Kaled Management.

6          Q.     And what does that role, what kind

7    of responsibilities does that role have?

8          A.     I supervise the property managers

9    for the company and I also manage property for

10   the company.

11         Q.     And how long have you been in that

12   role?

13         A.     21 years.

14         Q.     And you've always had the same

15   position?

16         A.     No.

17         Q.     What position did you hold

18   previously?

19         A.     Property management.

20         Q.     And when were you property manager

21   for Kaled?

22         A.     From August of 1999 to October of

23   20 -- 2002.

24         Q.     And then from October 2002 until

25   present, you were the Director of Management?

1          A.      Correct.

2          Q.      Did you have any other positions

3    at Kaled besides those two?

4          A.      No.

5          Q.      What were your responsibilities

6    when you were a property manager?

7          A.      Manage the day-to-day business of

8    a building, supervise staff, tend to tenant

9    complaints and issues.

10         Q.      Did that job include visiting the

11   property that you managed?

12         A.      Yes.

13         Q.      Did you ever work from the

14   properties that you managed?

15                 MR. MARGOLIS:  Objection.  If you

16   understand you can answer.

17         A.      I actually don't understand the

18   question.

19         Q.      Sure.  Did you have an office at

20   any of the properties that you managed?

21         A.      No.

22         Q.      Or any other type of work space at

23   the properties you managed?

24         A.      I'd make phone calls from a

25   superintendent's desk, if need be.

1       Q.      How many properties did you manage

2   when you were property manager?

3       A.      Anywhere from 12 to 20.

4       Q.      And how many properties do you

5   manage now as director?

6       A.      Three.

7       Q.      Where are those 3 properties?

8       A.      The one in question, 129 West 27th

9   Street, and one in Brooklyn and one in Queens.

10      Q.      What kind of properties are those?

11      A.      129 West 27th is a commercial

12  co-op.  The one in Brooklyn is a residential

13  rental; and the one in Queens is a residential

14  rental.

15      Q.      And how many property managers do

16  you oversee?

17      A.      Six.

18      Q.      And how many properties do each of

19  those property managers oversee?

20      A.      Some -- I have one person managing

21  four properties, and I have one person managing

22  18 rentals, and the rest are anywhere from five

23  to seven.

24      Q.      And why do you personally manage

25  three properties?

1          MR. MARGOLIS:  Objection.  You can

2     answer.

3          THE WITNESS:  I'm sorry, Barry?

4          MR. MARGOLIS:  You can answer.

5     When I object it's just to preserve an objection

6     on the record.  Unless I tell you not to answer,

7     you're free to answer the question.

8        A.     I only manage three properties

9     because I have to spend most of my time as a

10    supervisor for the other managers here.

11       Q.     Who decided that you would manage

12    those three properties?

13          MR. MARGOLIS:  Objection.  You can

14    answer.

15       A.     I did.

16       Q.     And why did you choose those

17    three?

18       A.     I never gave it any rhyme or

19    reason.  Those are the ones that I selected.

20       Q.     And how long have you been

21    managing those three properties?

22       A.     July of '16 is when I started

23    managing West 27th Street and November 1st, 2019

24    is when I started managing those two others.

25       Q.     Of the six property managers that

1    you oversee, how many of those properties are

2    commercial co-op?

3         A.     None.

4         Q.     What type of properties do your

5    property managers manage then?

6         A.     Cooperatives, residential

7    cooperatives, residential condos.  I do have one

8    (indiscernible) and I have rental properties and

9    a retail property.

10        Q.     So is the property at 129 West

11   27th Street, is that the only commercial co-op

12   that falls under your management?

13        A.     Yes.

14        Q.     Why is that?

15               MR. MARGOLIS:  Objection.  You can

16   answer.

17        A.     They came, sought an estimate and

18   a proposal from my company to manage their

19   property, and we were the successful bidder.

20        Q.     Does anyone else at Kaled manage

21   commercial co-ops?

22        A.     Only me.

23        Q.     Do you oversee all of the

24   properties that Kaled manages?

25        A.     I do.

1      Q.      I just want to backtrack for a

2   second.  What did you do before you started

3   working at Kaled?

4      A.      I worked at another property

5   management firm.

6      Q.      What's the name of that firm?

7      A.      Alexander Wolf & Company.

8      Q.      And how long did you work there?

9      A.      Early '96 to '99.

10      Q.      And what was your position?

11      A.      Senior property manager at

12   Alexander Wolf.

13      Q.      Were your responsibilities similar

14   to that once you joined Kaled as a property

15   manager?

16      A.      Yes.

17      Q.      Did you manage any commercial

18   co-ops while you were with that firm?

19      A.      No.

20      Q.      Did you have any other positions

21   before that firm?

22      A.      Yes.

23      Q.      What were those?

24      A.      I worked for a commercial real

25   estate management company.

1      Q.      What's the name of the company?

2      A.      No longer exists.

3      Q.      What was the name of it when it

4   existed?

5      A.      30s Group Management.

6      Q.      And how long did you work there?

7      A.      Three years I think.

8      Q.      I'm sorry, that was three years?

9      A.      Three years, I think.

10      Q.      Thank you.  What was your position

11   there?

12      A.      I was a property manager.

13      Q.      Again, is it similar

14   responsibilities to your other property manager

15   roles?

16      A.      Yes.

17      Q.      And any other places of

18   employment?

19      A.      Uh-huh.

20      Q.      Could you just describe, with

21   respect to your role at Kaled as a director,

22   what you do to manage the other property

23   managers.

24      A.      I monitor their emails, I ask for

25   weekly reports from them to see the things that

1  they are working on.  I read the minutes from

2  Co-op Board meetings.  I'm involved in capital

3  improvements.  I help my property managers

4  develop the scope of work for those capital

5  work, and help secure and review the estimates

6  that come in.  Talk to them about their staff,

7  help them with staff issues.

8       Q.     When you say capital improvements,

9  what do you mean?

10      A.     Work to the exterior of the

11 property, brick work, elevators, roof

12 installations, boiler work.

13      Q.     So any physical upkeep of the

14 property?

15      A.     Correct.

16      Q.     How much of your day do you spend

17 managing the three properties that you oversee

18 personally?

19      A.     Varies from day to day.  Could be

20 as little as an hour; could be two hours.

21      Q.     So would you say that the majority

22 of your day is spent managing other property

23 managers?

24      A.     Correct.

25      Q.     And where do you primarily work

1    from?

2        A.      7001 Brush Hollow Road.

3        Q.      How often do you visit the three

4    properties that you manage?

5        A.      One time a week.

6        Q.      How did you determine to visit one

7    time a week?

8                MR. MARGOLIS:  Objection.  You can

9    answer.

10       A.      That's payroll day; it's when we

11   deliver the payrolls to the buildings.

12       Q.      Is that the same day across all

13   three properties?

14       A.      It's the same day across the

15   entire portfolio.

16       Q.      And what day of the week is that?

17       A.      It's Thursday.

18       Q.      So you visit the three properties

19   you manage every Thursday?

20       A.      Yes.

21       Q.      And generally how much time do you

22   spend at each of those three properties?

23       A.      Could be an hour, could be two

24   hours.  It depends upon what's going on at any

25   of those locations.

1          Q.      Do you ever visit them on other

2     days of the week?

3          A.      Depends if there's a project going

4     on or some situation that requires my assistance

5     or my presence.

6          Q.      But typically you visit each

7     property every Thursday?

8          A.      Yes.

9          Q.      I want to talk more specifically

10    about the building at 129 West 27th Street.  If

11    I refer to it as "the building," will you

12    understand what I mean?

13         A.      Yes.

14         Q.      129 West 27th Street is the

15    building that is the subject of this action,

16    correct?

17         A.      Yes.

18         Q.      And can you describe the building

19    for me?

20         A.      It's a 12-story commercial office

21    building.  The individual shareholders are the

22    owners of each floor.

23         Q.      Do you know the size of each floor

24    in the building?

25         A.      Not offhand, no.

1          Q.     Does the building have an elevator

2     system?

3          A.     Yes.

4          Q.     Does the building have a doorman?

5          A.     No.

6          Q.     Does the building have an intercom

7     system?

8          A.     Yes.

9          Q.     When was that intercom system

10    installed?

11         A.     Recently.  Last spring.

12         Q.     So, a year ago?

13         A.     I believe so, yes.

14         Q.     And can you tell me how the

15    intercom system works.

16         A.     It's a video intercom system.  So

17    people would scroll at the directory placed at

18    the front entrance.  It's all touch screen.

19    They touch on that; it rings to a cell phone or

20    a tablet.  The person is then identified and

21    they then enter the building, once they swipe

22    them in.

23         Q.     So, if I'm looking at the intercom

24    system, do I have to select which floor or

25    business I'm visiting?

1      A.      Yes.

2      Q.      And then it connects the visitor

3  to someone on that floor or at that --

4      A.      Yes.

5      Q.      -- to let them in?

6      A.      Yes, that is correct.

7      Q.      Why did Kaled install the intercom

8  system?

9              MR. MARGOLIS:  Objection.

10     A.      At the direction of the Board of

11 Directors.

12     Q.      Why did the board want to install

13 an intercom system?

14     A.      They were looking to secure the

15 building better.

16     Q.      Is the intercom system working?

17     A.      Yes.

18     Q.      Would you say it's enhanced

19 security at the building?

20     A.      Yes.

21     Q.      For the other properties that you

22 manage, as well as those that are managed by

23 your property managers, how many of those have

24 some type of intercom system?

25     A.      Most.  Most, if not all.

1      Q.      Would you say over 80 percent?

2      A.      Yes.

3      Q.      And that increases security at all

4  of those buildings?

5      A.      Yes.

6      Q.      In your experience, when did

7  buildings start installing these intercom

8  systems?

9              MR. MARGOLIS:  Objection.

10     A.      I couldn't answer that question.

11     Q.      Do you think they were installing

12  them in 2015, which was eight years ago?

13             MR. MARGOLIS:  Objection.

14     A.      I don't understand your question,

15  actually.

16     Q.      I'm just trying to understand when

17  some of the buildings that you manage first

18  began installing these types of intercom system.

19  So, was this within the last year or have the

20  buildings been installing these for the past

21  five to ten years?

22     A.      Well, most of my buildings already

23  have an intercom system; so usually out of the

24  ground they build them with an intercom system.

25     Q.      Okay.  So any building built in

1   the last ten years is likely built with an

2   integrated intercom system?

3          MR. MARGOLIS:  Objection.

4      A.      Yes.

5      Q.      Mr. Lehr, can you identify

6   individuals or entities that occupy each floor

7   in the building as of today?

8      A.      Yes.

9      Q.      Can you walk me through each floor

10  and who occupies it?

11     A.      From the top down, Click Models

12  occupies 12.  11, 10 and 9th floors are owned

13  and occupied by the Touton wine merchants.  8

14  and 7 are owned by Nigel Shamash.  6 is occupied

15  by Honig Conte Insurance.  5 and 4 are owned and

16  occupied by GMS.  They are an engineering firm.

17  The third floor is occupied by Hand Held Films.

18  The second floor is an art studio; and the

19  ground floor store is also occupied by Hand Held

20  Films.

21     Q.      When you said is Click Models,

22  that would be owned by Joseph Grill?

23     A.      Correct.

24     Q.      And Hand Held Films would be owned

25  by Marc Paturet?

1          A.      Correct.

2          Q.      You mentioned that the building is

3    a commercial co-op.  Can you just explain to me

4    how that works?

5                  MR. MARGOLIS:  Objection.

6          A.      It's a cooperative form of

7    ownership, meaning that the shareholders own the

8    building.

9          Q.      And how many shareholders are

10   there, currently?

11         A.      Let's see.  One, two, three, four.

12                 MR. MARGOLIS:  Peter, why don't

13   you think in your head, without saying it out

14   loud, so that the reporter doesn't transcribe

15   what you're thinking.

16                 THE WITNESS:  Okay.  As she's

17   smiling at me.

18         A.      I believe it's six or seven.

19   Seven, I believe.

20         Q.      How many shares per floor does

21   each shareholder have?

22         A.      There are a thousand shares in the

23   cooperation and I believe, except for I think

24   the second floor, which is a little smaller,

25   it's 70 some odd shares, 72 shares to 70 shares,

1    somewhere in that area, per floor.

2         Q.    How long has the building been a

3    commercial co-op?

4         A.    I don't know.

5         Q.    Has it been a commercial co-op for

6    as long as you've managed it?

7         A.    Yes.

8         Q.    How does the co-op make decisions

9    with respect to the building?

10        A.    The board meets.

11        Q.    And when you say the board, how

12   many board members are there in the co-op?

13        A.    There are five.

14        Q.    Currently there are five?

15        A.    Yes.

16        Q.    Have there always been five board

17   members?

18        A.    Yes.

19        Q.    So, since you started managing the

20   building in 2016, there have always been five

21   board members for the co-op?

22        A.    Yes.

23        Q.    How does the co-op determine who's

24   a board member?

25        A.    At their annual meeting, they'll

1    meet and if someone wants to step off the board,

2    they'll ask someone to step on the board.

3         Q.     When is that annual meeting held?

4         A.     It was just recently held two

5    weeks ago.

6         Q.     Were you present at the annual

7    meeting two weeks ago?

8         A.     Yes.

9         Q.     What was discussed at the annual

10   meeting?

11        A.     I brought them up to speed on the

12   recent -- well, the ongoing capital improvement

13   project with their boiler, and converting that

14   to gas.  I discussed with them their Local Law

15   11, which is their exterior facade requirement,

16   and the need to get that inspection work

17   finished.

18             I also discussed with them Local

19   Law 87, which is their energy audit and

20   retro-commissioning report, which is due at the

21   end of this year, and whatever impact that

22   report will have on their Local Law 97, which is

23   a greenhouse gas emissions report that takes

24   effect in 2024.

25        Q.     Is there an agenda for the annual

1    meeting?

2         A.    No, those are just my notes.

3         Q.    Are there meeting minutes?

4         A.    Yes.

5         Q.    And who prepares the meeting

6    minutes?

7         A.    I do.

8         Q.    And do you keep copies of all of

9    the meeting minutes?

10        A.    Yes.

11        Q.    How do you prepare the minutes?

12        A.    I make hand notes, which I then

13   type into my computer.

14        Q.    When do you type up the notes?

15        A.    I try to do it the next day.  If

16   not, within a couple days of the meeting.

17        Q.    And are you present for all annual

18   meetings?

19        A.    Since I've been managing the

20   property, yes.

21        Q.    Was anyone elected at the most

22   recent annual meeting?

23        A.    The current slate, the current

24   officers.

25        Q.    And who are the current board

1    members?

2         A.    Marc Paturet, Joe Grill, Mike

3    Conte, Maxime Touton and Gary Steficek.

4         Q.    And what floor does Gary Steficek

5    represent?

6         A.    4, 5.

7         Q.    And that's the architecture firm?

8         A.    Engineering firm, yes.

9         Q.    I'm sorry, engineering firm.

10             I believe you said that the

11   electors are officers.  Do the board members

12   hold individual roles as officers?

13        A.    Yes.

14        Q.    And what are those?

15        A.    President, treasurer, vice

16   president.

17        Q.    And who's the current president of

18   the board?

19        A.    Marc Paturet.

20        Q.    Who's the vice president of the

21   board currently?

22        A.    Joe Grill.

23        Q.    And who's the treasurer?

24        A.    Mike Conte.

25        Q.    I'm going to walk through each

1    board member, quickly.  How long has Marc

2    Paturet been a board member for the co-op?

3         A.    Since I've been there.

4         Q.    And so at least 2016?

5         A.    Correct.

6         Q.    And how long has he been board

7    president?

8         A.    Since I've been there.

9         Q.    How long has Joseph Grill been a

10   board member for the co-op?

11        A.    Same answer, since I've been

12   there.

13        Q.    How long has he been vice

14   president of the board?

15        A.    Since I've been there.

16        Q.    And what about Mr. Conte, how long

17   has he been a board member?

18        A.    Same, since I've been there.

19        Q.    And how long has he been treasurer

20   of the board?

21        A.    Since I've been there.

22        Q.    And what about Mr. Touton; how

23   long has he been a board member?

24        A.    I think Max joined in '18,

25   '17-'18, I believe.

1      Q.      And has he ever held a specific

2  role on the board?

3      A.      Director, I believe.

4      Q.      And what about Mr. Steficek, when

5  did he become a board member?

6      A.      He came on in the last year.

7      Q.      So was he elected at last year's

8  annual meeting?

9      A.      Yes.

10      Q.      And he's also just a director?

11      A.      Yes.

12      Q.      When did the engineering firm take

13  over the fourth and fifth floor?

14      A.      I don't know.

15      Q.      Have they been there as long as

16  you've been managing the property?

17      A.      Yes.

18      Q.      Do you know if Mr. Steficek has

19  ever been a board member prior to when you began

20  managing the property?

21      A.      I don't remember.

22      Q.      Going back to the annual meeting

23  when board members are elected, is there a

24  nomination process for board members?

25      A.      Generally it's the slate that is

1    currently sitting, that is what's presented.

2         Q.    And do the shareholders attend the

3    annual meeting?

4         A.    Yes.

5         Q.    At the meeting two weeks ago, was

6    a representative from Oxford at the annual

7    meeting?

8         A.    Yes.

9         Q.    Has anyone else ever volunteered

10   to be a board member besides the five that are

11   currently board members?

12        A.    No.

13        Q.    Once an individual states their

14   interest to become a board member, is there a

15   vote?

16        A.    No.  It's very informal when it

17   comes to that.

18        Q.    So as long as the current board

19   members want to continue for an additional year,

20   they just continue being a director?

21        A.    Yes.

22        Q.    Do you know who managed the

23   building before Kaled?

24        A.    His name was Izzy, CMS something.

25        Q.    How long did they manage the

1  property for?

2       A.    I don't know.

3       Q.    Why was the co-op looking for a

4  new property manager?

5             MR. MARGOLIS:  Objection.

6       A.    From what they told me, they

7  didn't think he was doing a very good job.

8       Q.    And why wasn't he doing a good

9  job?

10            MR. MARGOLIS:  Objection.

11      A.    I don't know.

12      Q.    Did they share any examples with

13  you?

14      A.    The biggest project that I had to

15  take on when I got there was they had a stalled

16  elevator modernization project because they felt

17  it wasn't handled correctly.

18      Q.    How wasn't it handled correctly?

19            MR. MARGOLIS:  Objection.

20      A.    The company that was retained went

21  out of business.  The elevator consultant that

22  they hired was charging exorbitant fees, and it

23  didn't seem as the manager before me had a

24  handle on what to do next.

25      Q.    Were you able to complete the

1    elevator modernization project?

2            A.      Yes, I was.

3            Q.      When was that completed?

4            A.      I think in 2018.

5            Q.      What did that involve?

6            A.      We had to replace the controllers,

7    machines, the motors, all the electric, the

8    hoist cables, the governor cables on three

9    elevators.  Then the fourth elevator was a

10   conversion from a manual elevator car to an

11   automatic car, which required the relocation of

12   the machine to the roof from the basement.

13           Q.      So there are four elevators in the

14   building that can go to all 12 floors?

15           A.      That is correct.  Oh, excuse me.

16   Oh, that's correct, yes, that is correct.

17           Q.      What about when you're on the

18   first floor and you're going to choose an

19   elevator; is it just an up or down button, or

20   can you select which floor?

21           A.      It's an up or down button.

22           Q.      Then once you're in the elevator

23   you can select the floor?

24           A.      That is correct.

25           Q.      What kind of things do you do for

1    the building in your role as director at Kaled?

2         A.    You mean when I'm on-site?

3         Q.    Or off-site.

4         A.    I -- if I'm on-site I'll walk

5    through the property to make sure that things

6    are repaired, things are neat and clean.  I'll

7    talk with the superintendent, we'll go over

8    anything -- any issue that he may be having with

9    any of the building components.  Paperwork in

10   the office, review of invoices, and if I have to

11   answer an email from a shareholder occupant,

12   I'll handle that.

13        Q.    And who is the super for the

14   building currently?

15        A.    His name is Anthony Valecenti.

16        Q.    How long has he been the super for

17   the building?

18        A.    He predates me.  I don't know how

19   long by.

20        Q.    And is he employed by the co-op?

21        A.    He is.

22        Q.    What kind of -- you mentioned

23   paperwork.  What kind of paperwork is there

24   related to the building?

25        A.    Invoices, estimates.

1        Q.       Invoices for what?

2        A.       Work that has been done.

3        Q.       So third-party contractors?

4        A.       Yes.

5        Q.       How do you determine -- actually,

6    strike that.

7                 Does part of your role include

8    making recommendations to the board for

9    improvement projects?

10       A.       Yes.

11       Q.       How do you determine what needs to

12   be repaired or improved at the building?

13       A.       When -- well, the most important

14   thing is the Local Law 11 inspection.  That's

15   done every five years, so that helps set up work

16   that needs to be done.  It also, you know, it

17   gives us a schedule as to when that work should

18   be done, and generally we can then build upon

19   what -- how much that will cost, after you

20   engage an engineer.

21                As far as, you know, looking

22   around the building, if there are things like

23   the lighting system is not working, or there's a

24   staircase on the exterior of the building that

25   needs to be painted, I will look at that,

1    determine it's time to get back out, scrape it,

2    make any welding repairs that need to be done,

3    and recommend that to the board.

4         Q.    So it's a combination of preparing

5    for this inspection as well as just what you

6    visually observe at the building?

7         A.    Yes.

8         Q.    And what kind of things are looked

9    at during the inspection?

10        A.    Looking at anything that needs

11   repair, anything that could be improved upon, to

12   save money.  Changing light fixtures from

13   incandescent or fluorescent bulbs to LEDs.

14        Q.    And does the inspection include

15   looking at each floor of the building?

16        A.    Common areas only.

17        Q.    And what about when you visit the

18   building in person; do you ever access each

19   floor?

20        A.    I will stop from time to time,

21   yes.

22        Q.    How often, would you say?

23        A.    As needed.

24        Q.    How many times a month?

25        A.    I'm in the building four times a

1    month, so as needed when I look in on a tenant.

2          Q.      When you say as needed, is that at

3    the request of the tenant?

4          A.      Yes.

5          Q.      And do you ever enter the various

6    floors on your own without being requested?

7          A.      If my superintendent is alerting

8    me to an issue, like a pipe that may need to be

9    repaired or sprinkler head that maybe needed to

10   be replaced, that's when we would access the

11   place.

12         Q.      But generally you're only

13   accessing the 12 floors at the request of the

14   tenant or the owner?

15         A.      Yes.

16         Q.      What are your responsibilities as

17   far as board meetings?

18         A.      I make a report on the work that

19   I'm handling for them, and I keep the minutes

20   for them.

21         Q.      And that's for the annual meeting?

22         A.      Yes.

23         Q.      What about other types of board

24   meetings?

25         A.      Same.

1          Q.      How many board meetings are there

2     per year, besides the annual meeting?

3          A.      Try to meet -- they try to meet

4     quarterly, if their schedules allow for it.

5          Q.      And do you always attend those

6     meetings?

7          A.      Yes.

8          Q.      And you prepare the meeting

9     minutes for the quarterly meetings?

10         A.      Yes.

11         Q.      What type of things are discussed

12     at the non-annual meetings?

13         A.      The budget and, you know, capital

14     work and/or repairs that are needed to the

15     location.

16         Q.      Do board members ever discuss a

17     potential tenant for an empty floor at those

18     meetings?

19         A.      No.

20         Q.      How often do you receive emails

21     from -- or how often do shareholders correspond

22     with you?

23         A.      I couldn't even put a number on

24     it.

25         Q.      Let's say in the last year, how

1  many times has a shareholder from this building

2  reached out to you about something?

3      A.     Probably no more than a dozen

4  times.

5      Q.     And what kind of issues do

6  shareholders typically raise with you?

7      A.     Violation, me showing up at the

8  building, it should have come to the office, it

9  will be scanned to me.  The 11th floor is under

10 renovation, so I've had a lot of correspondence

11 with the architect, the engineer for that

12 project.  Plus the liaison from Touton's

13 property, you know, his liaison who's working on

14 the project.  That's about it.

15     Q.     How often do you reach out and

16 correspond with shareholders?

17     A.     If I need to.

18     Q.     Does Kaled sent out the

19 maintenance bills, or what's their role in

20 connection with that?

21     A.     We prepare the maintenance invoice

22 and it's sent to a printer and the printer mails

23 it from his location.

24     Q.     And do you resolve any disputes

25 over the maintenance invoice?

1            MR. MARGOLIS:  Objection.

2       A.      There have never been disputes.

3       Q.      Is there anyone else employed by

4  Kaled who's responsible for the building?

5       A.      Nope, just me.

6       Q.      Who is Susan Rubin?

7       A.      She's our transfer agent.

8       Q.      What does she do as a transfer

9  agent?

10       A.      If there are sales applications,

11  sublet applications, she collects the

12  information, collates the information and

13  forwards it to the board.

14       Q.      And how many properties does she

15  do that for?

16       A.      All of our co-op and condominiums.

17       Q.      Is there anyone else from Kaled

18  who performs jobs for the building, for the

19  co-op?

20       A.      Financial people, CFO.  His AR and

21  AP people.

22       Q.      But generally you're the main

23  point of contact for the building?

24       A.      Yes.

25       Q.      At Kaled.

1          A.      Yes.

2          Q.      How often do you speak with the

3    board members of the co-op?

4          A.      On an as-needed basis.

5          Q.      In a month, how often would you

6    speak to one of them?

7          A.      Mr. Paturet, maybe one, maybe two

8    times, depending upon what we're dealing with,

9    as far as repairs.  Mr. Conte, I would speak to

10   him.  He might have some questions about the

11   budget.

12         Q.      So, is it fair to say you would

13   speak to the officers of the board more often

14   than the general directors?

15         A.      Yes.

16         Q.      And what is the board president's

17   role with respect to the co-op?

18         A.      He's the Chief Executive Officer

19   of the co-op.

20         Q.      So are there certain things that

21   he makes decisions for?

22         A.      He generally always looks to, when

23   it comes to spending money, he always looks for

24   the consensus of the other people on the board.

25         Q.      So when it comes to spending

1    money, does that require a vote for approval, or

2    can the board president approve it?

3         A.    Mr. Paturet always looks for the

4    consensus of the board before we spend a lot of

5    money.

6         Q.    So is a vote taken?

7         A.    Yes.

8         Q.    And when would that vote occur?

9         A.    It could be at a meeting.  They

10   could have a telephone conversation, or it could

11   be an email.

12        Q.    So the board can vote for things

13   just by approving it in writing?

14        A.    Yes.

15             MR. MARTUCCI:  Objection.

16        Q.    What's the difference between a

17   shareholder and a board member?

18        A.    Shareholder owns shares in the

19   corporation and a board member is a director of

20   the corporation.

21        Q.    Is there anything that requires

22   shareholder approval, do you recall?

23        A.    I'm sorry, can you say that again.

24        Q.    Are there any actions with respect

25   to the co-op where shareholder approval is

1  required?

2         A.     Shareholder approval is required.

3  Can't think of any.

4         Q.     So largely the board is

5  responsible for approving actions with respect

6  to the building?

7         A.     Yes.

8         Q.     I want to talk a little more

9  specifically about board approval.  When

10  something requires board approval, is a vote

11  taken?

12         A.     Yes.

13         Q.     Are a certain number of votes

14  required to approve the action?

15         A.     With the board members, I guess

16  it's just an affirmative vote.

17         Q.     But if there are five board

18  members, is a majority of yes votes required,

19  or...

20         A.     No.  Just an affirmative vote.

21         Q.     So how do you determine whether

22  the board has approved something?

23         A.     So, if they vote on it and it's

24  four to one or three to two, that's generally

25  the affirmative vote, and then I'm told to move

1   forward with a project.

2          Q.     So a majority of the board members

3   have to approve something in order for you to

4   move forward?

5          A.     Yes.

6          Q.     Has the board ever voted three to

7   one to approve something?

8                 MR. MARGOLIS:  Objection.

9                 MR. MARTUCCI:  Objection.

10         A.     I don't know.  I can't recall.

11         Q.     Are you ever told what the vote

12  breakdown is of what each board member voted?

13         A.     On a project?

14         Q.     Yes.

15         A.     No.

16         Q.     So, how does the board communicate

17  to you whether they've approved or disapproved

18  an action?

19         A.     I'm either told that they've

20  approved it, or I was in the room when they

21  voted on it.

22         Q.     And how are you told when the

23  board has approved something?  Do they email

24  you?

25         A.     Yeah, sometimes I get an email;

1    sometimes I get a call.  Depends.

2         Q.    How often are things approved in

3    writing via email versus at a board meeting?

4         A.    I couldn't -- I don't know the

5    answer to that question.

6         Q.    At a normal board meeting, how

7    many items are typically on the agenda that

8    require approval?

9              MR. MARGOLIS:  Objection.

10        A.    Depends on what's needed to be

11   done.

12        Q.    At the average board meeting is

13   there always an item on the agenda that requires

14   approval, or are there times when nothing

15   requires approval?

16             MR. MARGOLIS:  Objection.

17        A.    Sometimes there's an item that

18   requires approval and sometimes there aren't

19   any.

20        Q.    And then besides those four times

21   that the board meets per year, how often does

22   the board take action that don't include a

23   meeting?

24             MR. MARGOLIS:  Objection.

25        A.    I don't know.

1      Q.      Would you say it's 50 percent of

2  the time?

3              MR. MARGOLIS:  Objection.

4      A.      I don't know.

5      Q.      Since the COVID-19 pandemic began

6  in March 2020, has the board still been meeting

7  in person quarterly?

8      A.      No.  They met via Zoom.

9      Q.      So sometimes the board meets over

10  Zoom?

11     A.      Yes.

12     Q.      How often are board meetings held

13  over Zoom?

14     A.      Up until the recent annual meeting

15  they've been meeting on Zoom.

16     Q.      For every meeting?

17     A.      Yes.

18     Q.      Did they ever meet on Zoom prior

19  to the pandemic?

20     A.      No.

21     Q.      Would they ever meet over a

22  conference call for a board meeting?

23     A.      Not that I recall, no.

24     Q.      And when the board meetings are

25  held on Zoom, are you present on Zoom as well?

1      A.      Yes.

2      Q.      You mentioned that the board

3  president tries to get a consensus on board

4  actions.  What did you mean by that?

5      A.      The approval to move forward with

6  projects.

7      Q.      Is it your experience that

8  typically the board members all vote the same to

9  approve or disapprove a project?

10     A.      I would say they usually vote in

11 approval.

12     Q.      They typically all vote the same

13 way?

14             MR. MARTUCCI:  Objection.

15     A.      Yes.

16     Q.      Now I'm going to talk specifically

17 about the sublease process.  Can you walk me

18 through the process for sublease approval.

19     A.      There's an application that has to

20 be processed, or filled out and then sent into

21 the office and then it's sent up to the board

22 for their review.

23     Q.      And when does the board first get

24 involved in the sublease process?

25     A.      When they receive the application.

1         Q.      Is the board or any of the board

2    members ever involved in the sublease

3    negotiation?

4         A.      No.

5         Q.      Does the board ever get questions

6    from shareholders about subtenants?

7         A.      Not that I'm aware of.

8         Q.      And what about Kaled; what is your

9    role in connection with the sublease process?

10        A.      We collect the information and we

11   forward the information to the board.

12        Q.      And does Kaled do a credit check

13   or background check of any type?

14        A.      If we're asked to, yes.

15        Q.      Does Kaled make a recommendation

16   as far as whether the subtenant is approved?

17        A.      No.

18        Q.      What about if a background check

19   is required; does Kaled make a recommendation

20   with respect to that background check?

21        A.      No.

22        Q.      Who created the sublease

23   application?

24        A.      I think it was Mike Conte, I

25   think.

1         Q.      When did Mr. Conte create the

2    sublease application?

3         A.      Don't recall when.

4         Q.      You mentioned that Susan Rubin was

5    the transfer agent?

6         A.      Um-hum.

7         Q.      For all properties.  Does she use

8    a sublease application with other properties?

9         A.      I believe each sublease

10   application is pertinent to the location.

11        Q.      So the application is unique to

12   each property?

13        A.      That is correct.

14        Q.      There's no universal application

15   used by Kaled?

16        A.      Not that I'm aware of.

17        Q.      Did you work with Mr. Conte to

18   create the sublease application for the

19   building?

20        A.      No.

21        Q.      What's required in the sublease

22   application for the building?

23        A.      I don't know.

24        Q.      Once a prospective tenant submits

25   a sublease application and it's given to the

1  board, what's the next step?

2          A.      The board discusses it and then

3  gives us what they want to do with it.

4          Q.      And how do they discuss?

5          A.      I don't know.

6          Q.      Is there a vote taken on the

7  sublease applicant?

8          A.      I don't know.

9          Q.      Do they conduct an interview of

10  the sublease applicant?

11          A.      If they want.

12          Q.      But largely Kaled is hands-off

13  when it comes to the sublease application?

14          A.      Yes.

15          Q.      How many subtenants have there

16  been at the building since Kaled began managing

17  it?

18          A.      I believe there were two when we

19  got there.

20          Q.      Who were those subtenants?

21          A.      The 11th floor and I believe the

22  seventh or eighth floor.

23          Q.      Who was subleasing the 11th floor?

24          A.      That was Eric Doctormann's

25  company.

1          Q.      And which shareholder was

2     Mr. Doctormann subleasing from?

3          A.      No.  He was the sublessor.  It was

4     his floor.

5          Q.      Okay.  His company was the

6     subtenant?

7          A.      The company that was the

8     subtenant, which I believe it was an electrical

9     submetering company.

10         Q.      How long did they sublease the

11    11th floor?

12         A.      They left, I'd say, the end of

13    last year.

14         Q.      And that's 2022?

15         A.      Yes.

16         Q.      Why did they leave?

17         A.      Their lease was up and the Toutons

18    purchased the floor from Mr. Doctormann.

19         Q.      And they were subleasing from 2016

20    when Kaled took over managing the property until

21    2022?

22         A.      Yes.

23         Q.      And was Mr. Doctormann a board

24    member at any time?

25         A.      Yes.

1        Q.      How long was he a board member?

2        A.      From when I got there until the

3   time he sold his shares to the Toutons.

4        Q.      And what was the process to

5   approve his subtenant for the 11th floor?

6        A.      I don't know.

7        Q.      Do you know if the submetering

8   company filled out a sublease application?

9        A.      I do not know.

10       Q.      Did you ever see the lease

11  agreement between Mr. Doctormann and the

12  electrical company?

13       A.      No.

14       Q.      But you know that it always

15  existed because his lease was up in 2022?

16       A.      Yes.

17       Q.      Do you know if the board voted to

18  approve the subtenant for the 11th floor?

19       A.      I do not know.

20       Q.      Were there any issues with the

21  subtenant on the 11th floor?

22       A.      I had none.

23       Q.      Did any other occupants,

24  shareholders, board members, have issues with

25  the subtenant on the 11th floor?

1    A.    None that I'm aware of.

2    Q.    You said there was another

3  subtenant on the seventh or eighth floor.  Who

4  was that subtenant?

5    A.    It was a media firm.

6    Q.    Do you recall the name?

7    A.    No.

8    Q.    How long were they a subtenant?

9    A.    Two years maybe.  I don't even

10  remember.

11    Q.    When did they begin subleasing the

12  seventh or eighth floor?

13    A.    I don't remember.

14    Q.    Were they subleasing when you took

15  over management of the property in 2016?

16    A.    I believe so, yes.

17    Q.    And did the lease end or,

18  actually, strike that.

19          Did they stop subleasing around

20  2018?

21    A.    I believe so, yeah.

22    Q.    Were there any issues with that

23  subtenant?

24    A.    No.

25    Q.    None of the shareholders, board

1    members, occupants, had issues with the

2    subtenant on the seventh or eighth floor?

3           A.    No.

4           Q.    Do you know when they stopped

5    subleasing?

6           A.    No.

7           Q.    Did you help arrange for them to

8    move out of the building?

9           A.    No.

10          Q.    How would they have moved out?

11                MR. MARGOLIS:  Objection.

12          A.    They would have spoken to my super

13    and said we're moving out on this date.

14          Q.    And would Kaled have required a

15    certificate of insurance or anything?

16          A.    I don't think we did.

17          Q.    So it's not Kaled's policy that

18    certificates of insurance are required for

19    movers?

20                MR. MARGOLIS:  Objection.

21          A.    I'd like to see them, yes.  I

22    don't think we asked for one at this time.

23          Q.    Did this media firm that was

24    subleasing the seventh or eighth floor, did they

25    submit a sublease application?

1      A.      Not that I'm aware of.

2      Q.      Did they have a sublease agreement

3  with Oxford, who owned the seventh and eighth

4  floor?

5      A.      I guess so.

6      Q.      Did you ever see the sublease

7  agreement?

8      A.      No.

9      Q.      Do you know if the board approved

10  them as a subtenant?

11      A.      No.

12      Q.      But there have been at least two

13  subtenants in the building since Kaled took over

14  managing the property in 2016?

15      A.      Yes.

16      Q.      Were there any other subtenants

17  that you're aware of?

18      A.      No.

19      Q.      Even prior to when Kaled took over

20  management?

21      A.      No.

22      Q.      I want to go back to just the

23  process to approve a sublease.  How does the

24  board approve a sublease?

25              MR. MARGOLIS:  Objection.

1          A.       I don't know.

2          Q.       That was I don't know?

3          A.       That is correct.

4          Q.       Sorry, I couldn't hear you.

5          A.       Oh, sorry.

6          Q.       You're not aware of any policies

7    or procedures for the board to consider a

8    sublease applicant?

9          A.       No.

10         Q.       Why is that?

11                  MR. MARGOLIS:   Objection.

12         A.       It's up for them to decide.  We

13   don't get involved.

14         Q.       So if they wanted to have a

15   five-minute phone call to discuss a sublease

16   applicant and emailed you that the applicant was

17   approved, that would be sufficient?

18         A.       If they say it was approved, then

19   it would be sufficient, yes.

20         Q.       So there is no requirement for the

21   board to hold an interview or meet in person to

22   consider a sublease applicant?

23         A.       It's up to them.

24         Q.       Have any of the board members

25   discussed the process for approving sublease

1    applicants with you?

2         A.     No.

3         Q.     And how did Mr. Conte share the

4    sublease application with you?

5         A.     I'm not sure what you mean.

6         Q.     You stated earlier that Mr. Conte

7    created the sublease application.  How did he

8    share it with you?

9         A.     I think he sent back the

10   application the way he wanted it.

11        Q.     And when was that?

12        A.     I don't remember.

13        Q.     Would it have been prior to CCMS's

14   sublease application?

15        A.     I don't remember.

16        Q.     Were there any other sublease

17   applicants in the time period of 2016 up until

18   2020 when CCMS applied?

19        A.     No.

20        Q.     So, is it fair to say that the

21   sublease application would have been created

22   around the time that CCMS applied?

23        A.     I don't know.

24        Q.     Are there any requirements for

25   board members to attend a meeting to approve a

1  sublease applicant?

2      A.    No.

3      Q.    What about any minimum number of

4  board members that must approve a sublease?

5      A.    No.

6      Q.    Is there any requirement that an

7  interview take place in person?

8      A.    No.

9      Q.    And what about preparing meeting

10 minutes for an interview to approve a sublease

11 applicant; who would be responsible for that?

12     A.    Not me.

13     Q.    Is there any requirement about

14 preparing meeting minutes?

15     A.    Not that I'm aware of.

16     Q.    What about informing the applicant

17 of the decision; who's responsible for that?

18     A.    That would come back to us, and I

19 guess we would have to inform the prospective

20 applicant.

21     Q.    How would you do that?

22     A.    I would imagine via email.

23     Q.    And does Kaled have any policies

24 about informing applicants in a certain amount

25 of time?

1      A.      Generally I think we do it as soon
2  as we're aware of it.
3      Q.      But there's no official policy?
4      A.      No.
5      Q.      Is there a process to appeal a
6  sublease denial?
7      A.      Not that I'm aware of.
8      Q.      Is there any formal notice that's
9  issued to an applicant regarding a sublease?
10          MR. MARGOLIS:  Objection.
11      A.      I believe it's just an email,
12  letting them know.
13      Q.      And is there any way for a
14  sublease applicant to contact the board
15  regarding their application?
16      A.      No.
17      Q.      And just to clarify, during the
18  time period that Kaled has been managing the
19  property, how many interviews of sublease
20  applicants have there been?
21      A.      Only one, I believe.
22      Q.      And is that interview the subject
23  of this action?
24      A.      Yes.
25      Q.      With respect to the seventh and

1    eighth floor, have there been any other sublease

2    applicants since CCMS?

3         A.    No.

4         Q.    Have other prospective tenants

5    visited the building to view the seventh and

6    eighth floors?

7         A.    Not that I'm aware of.

8         Q.    And is anyone currently using the

9    seventh and eighth floor?

10        A.    Yes.

11        Q.    Who is currently using the seventh

12   and eighth floor?

13        A.    Oxford moved back into the eighth

14   floor.

15        Q.    When did they move back into the

16   eighth floor?

17        A.    A week ago.

18        Q.    Did they tell you why?

19        A.    No.

20        Q.    How do you know that they moved

21   back in a week ago?

22        A.    They told us at the annual

23   meeting.

24        Q.    Did they give any explanation?

25        A.    No.

1          Q.      Did they hire movers to move their

2     office furniture in?

3          A.      No.

4          Q.      How did they get their office

5     furniture back in the eighth floor?

6          A.      There was furniture already on the

7     floor.

8          Q.      How long had that furniture been

9     there?

10         A.      For as long as I can recall.

11         Q.      Have you seen any Oxford employees

12    coming to or from the building since they moved

13    back in?

14         A.      Yes.

15         Q.      Do you know who they were?

16         A.      Nigel.

17         Q.      When did you see Nigel at the

18    building?

19         A.      Last Thursday.

20         Q.      Did you speak with him?

21         A.      Yes.

22         Q.      What did you discuss?

23         A.      What he wants to paint in the

24    place.

25         Q.      And is he occupying the floor in

1    connection with Oxford or another company?

2          A.    Oxford.

3          Q.    Is that what he told you?

4          A.    Yes.

5          Q.    What about Saul Tawil, have you

6    seen him at the building?

7          A.    No.

8          Q.    Does he attend board meetings?

9          A.    No.

10          Q.    Does he attend any type of meeting

11    of shareholders?

12          A.    He may have, but I don't recall.

13          Q.    Is it typically Nigel who attends

14    meetings in connection with the property?

15          A.    At the annual his father did.

16          Q.    And who is his father?

17          A.    Mr. Shamash.

18          Q.    Do you know his first name?

19          A.    No.

20          Q.    What's his role in connection with

21    Oxford?

22          A.    I don't know.

23          Q.    Have you seen anyone else using

24    the seventh or eighth floor in the past few

25    weeks?

1          A.      No.

2          Q.      I have a few more questions about

3     the entities and individuals who occupy each

4     floor, so I'm going to try to go floor by floor.

5               Mr. Lehr, have you ever visited

6     the first floor space?

7          A.      Yes.

8          Q.      Can you generally describe it.

9          A.      Hand Held Films, it is a -- it's

10    almost like a warehouse, filled with film

11    equipment.

12         Q.      And Hand Held Films has occupied

13    that space for as long as Kaled has managed it?

14         A.      Yes.

15         Q.      How many people work in the first

16    floor space daily?

17         A.      Don't know.

18         Q.      Do you know how many employees

19    Hand Held Films has?

20         A.      No.

21         Q.      When you visit on Thursdays, do

22    you typically see people on the first floor?

23         A.      Yes.

24         Q.      How many?

25         A.      I've never counted.

1          Q.      More than one?

2          A.      Yes.

3          Q.      Do you know the operating hours

4     for Hand Held Films?

5          A.      No.

6          Q.      And what kind of business is Hand

7     Held Films operating?

8          A.      They rent film equipment.

9          Q.      Where do they store the film

10    equipment?

11         A.      On the first floor and in the

12    basement.

13         Q.      So they have employees who have to

14    bring the film equipment up to the first floor?

15         A.      Well, the first floor is the

16    ground floor, so it just rolls in off the

17    street.

18         Q.      But for the equipment that's kept

19    in the basement, how will they get that up to

20    the first floor?

21         A.      They have an internal elevator.

22         Q.      And that requires employees to

23    operate it?

24         A.      Yes.

25         Q.      For the remaining floors, the

1    second through the 12th floor, generally do they

2    have a similar layout?

3         A.    Yes.

4         Q.    Could you just generally describe

5    it.

6         A.    The second floor is an art studio.

7    It's generally an open space.  Third floor is

8    also occupied by Hand Held Films, and that is

9    where they keep their cameras and lenses and

10   that is where they service the lenses, and then

11   I guess test them to make sure that they are in

12   focus.

13              Fourth and fifth floors are open

14   spaces with cubicles.  Sixth floor is a bullpen

15   area with cubicles and private offices.  Seventh

16   floor I don't remember.  Eighth floor is

17   cubicles with private offices.  The ninth floor

18   is open floor plan with private offices.  The

19   tenth floor is the same; and when the 11th is

20   finished, it will be the same.  And the 12th

21   floor is open layout with private offices.

22        Q.    So besides the first, second and

23   third floors, generally the remaining floors are

24   organized as office space?

25        A.    Yes.

1          Q.      When you visit the building on

2    Thursday, do you see -- who do you normally see?

3          A.      I don't understand your question.

4          Q.      When you visit on Thursdays, do

5    you ever see Mr. Conte or anyone from his

6    business?

7          A.      If I need to, I will go and visit

8    him.

9          Q.      Is he generally there when you

10   visit on Thursdays?

11         A.      Yes.

12         Q.      What about employees that work at

13   Touton, do you generally see them on Thursdays

14   when you visit?

15         A.      If I need to speak to the person

16   who's in charge of their 11th floor restoration,

17   yes, I will see employees.

18         Q.      And what about for the 12th floor?

19         A.      No.  Very rarely.

20         Q.      And do you often see Mr. Grill at

21   the building?

22         A.      I usually see Joey on the street.

23         Q.      Why do you see him on the street?

24         A.      He's going to lunch usually when I

25   land there.

1          Q.      And for the past few years, how

2     often have you seen Mr. Shamash, Mr. Tawil or

3     anyone affiliated with Oxford?

4          A.      At an annual meeting.

5          Q.      But you don't typically see them

6     on Thursday when you visit the building?

7          A.      Correct.

8          Q.      Up until a week ago?

9          A.      Correct.

10         Q.      What about in 2016 through 2018,

11    how often did you see employees of that

12    subtenant on the seventh or eighth floor?

13         A.      I don't know.

14         Q.      And there were never any issues

15    with the subtenant that was occupying the

16    seventh or eighth floor during that time?

17         A.      None that I'm aware of.

18         Q.      If a tenant was having an issue

19    with another tenant in the building, would they

20    reach out to you with those issues?

21         A.      I guess if they were having one,

22    yes, they would reach out.

23         Q.      Has that happened in the seven

24    years you've been managing the building?

25         A.      No.

1           Q.      So, if water was leaking from the

2      space -- say water was leaking from the 12th

3      floor onto the 11th floor, would someone from

4      the 11th floor reach out?

5                   MR. MARGOLIS:  Objection.

6           A.      They would probably tell my

7      superintendent before I even heard about it.

8           Q.      And the super would resolve the

9      issue?

10          A.      Yes.

11          Q.      To the extent he could?

12          A.      Yes.

13          Q.      And how often do you talk to the

14     super?

15          A.      I see him at least once a week

16     and, you know, if we need to communicate, we

17     speak.

18          Q.      And how does he communicate with

19     you?

20          A.      Text or call.

21          Q.      Does he ever email?

22          A.      No.

23          Q.      Do you ever visit the building on

24     the weekends?

25          A.      No.

1       Q.      Why not?

2       A.      Because I don't.

3       Q.      Would any representative of Kaled

4   visit the building on the weekends?

5       A.      No.

6       Q.      Is the building open on weekends?

7       A.      It's open to residents if they

8   choose -- well, the occupants, if they chose to

9   go in.

10      Q.      But Kaled doesn't have any rules

11  about who can enter the building on weekends?

12      A.      No.

13              MS. TURNER:  I'm at a good

14  stopping point if we want to take a 10 or

15  15-minute break.

16              MR. MARGOLIS:  I think that would

17  be a good idea.  It's 1:35.  Do you want to

18  resume at 1:45?

19              MS. TURNER:  Sure.  Does that work

20  for everyone else?

21              MR. MARTUCCI:  That's fine for me.

22              (Recess taken.)

23  BY MS. TURNER:

24      Q.      Welcome back, Mr. Lehr.

25              During the break did you have any

1    conversations with your attorney?

2         A.    Yes.

3         Q.    What did you discuss?

4         A.    How much longer I should be

5    expecting to be in this deposition.

6         Q.    How much longer did he say?

7         A.    He said to figure another hour.

8         Q.    Did you discuss anything else?

9         A.    No.

10        Q.    We spent the first half talking

11   about the building and the co-op generally, but

12   I want to focus on the events that led up to

13   this action.  What's your understanding of the

14   lawsuit against the co-op?

15        A.    It's a discrimination case from

16   what I understand.

17        Q.    Have you ever been involved in a

18   discrimination case at any time?

19        A.    No.

20        Q.    Do you know anything about

21   discrimination when it comes to leasing office

22   space?

23        A.    Yes.

24        Q.    What do you know about it?

25        A.    Just what I memorized for my

1    licensing exam.

2         Q.      What did you have to memorize for

3    your licensing exam?

4         A.      I don't recall.

5         Q.      When did you take the licensing

6    exam?

7         A.      Many years ago.

8         Q.      Does Kaled have any policies

9    regarding, you know, preventing discrimination

10   in lease applications?

11        A.      Yes.

12        Q.      What are those policies?

13        A.      Every policy is -- every lease is

14   looked at as a blank canvas, for lack of a

15   better term.  So they come in, they're looked at

16   to make sure that we meet -- the rentals meet

17   the financial requirements, and they are

18   approved.

19        Q.      And is that for the residential

20   co-ops and rentals that Kaled manages?

21        A.      Residential rental properties that

22   we own and manage.

23        Q.      But for both commercial and

24   residential co-ops, it would be up to the co-op

25   to determine whether to rent --

1          A.      That is correct.

2          Q.      Is there, for your residential

3   rentals that you manage, is there an interview

4   process for applicants?

5          A.      No.

6          Q.      Do you receive a photo of the

7   applicant?

8          A.      After they sign a lease, yes.

9          Q.      What's the purpose of the photo?

10         A.      So we can match up when we hand

11  off the keys.

12         Q.      How do you ensure that you're not

13  discriminating against a person based on their

14  photo?

15              MR. MARGOLIS:  Objection.

16              MR. MARTUCCI:  Objection.

17         A.      That is handled by my leasing

18  department, so I don't know the answer to that

19  question.

20         Q.      And is the leasing department

21  different than Susan Rubin's role?

22         A.      Yes.

23         Q.      What factors does the leasing

24  department consider when they're renting to

25  applicants?

1          A.      Credit score.

2          Q.      Any other factors?

3          A.      I believe also income ratio to

4   rent.

5          Q.      What about rental history?

6          A.      I don't know.

7          Q.      Do you consider how many visitors

8   someone might have to their rental unit?

9          A.      No.

10         Q.      You're mainly just concerned with

11  the financial fitness of the applicant?

12         A.      Yes.

13         Q.      And does Kaled have any policies

14  with respect to lease applicants where the

15  property is a co-op, whether commercial or

16  residential?

17         A.      It's all determined by the co-op

18  itself.

19         Q.      Do you understand that this

20  lawsuit concerns attempted sublease of the

21  eighth floor?

22         A.      Yes.

23         Q.      At the building.

24                 And when did Oxford take over the

25  eighth floor?

1      A.      I don't know.

2      Q.      Was it before you began managing

3  the property?

4      A.      I guess so.

5      Q.      Have you ever seen a copy of

6  Oxford's lease for the eighth floor?

7      A.      No.

8      Q.      Would you typically see -- have

9  copies of leases for each of the floors in the

10  building?

11      A.      You mean the proprietary lease?

12      Q.      Yes.  Or a sublease.

13      A.      That's all kept at the building.

14      Q.      I think you mentioned earlier that

15  you've visited the eighth floor before; is that

16  correct?

17      A.      Yes.

18      Q.      Does it have a reception area?

19      A.      Yes.

20      Q.      Does it have a bathroom?

21      A.      Yes.

22      Q.      Does it have windows?

23      A.      Yes.

24      Q.      Elevator access?

25      A.      Yes.

1        Q.      Have offices?

2        A.      Yes.

3        Q.      Do you know how many private

4   offices are on the eighth floor?

5        A.      No.

6        Q.      Would you say it's more than ten?

7        A.      Ten sounds about right.

8        Q.      Do you recall when CCMS applied to

9   sublease the eighth floor?

10       A.      No.

11       Q.      Does December 2019 sound familiar?

12       A.      Yes, I guess so.

13       Q.      But you don't recall the exact

14   date?

15       A.      No.

16       Q.      During that time, December 2019,

17   how many floors were occupied in the building?

18       A.      All the floors except the seventh

19   and eighth floors.

20       Q.      And Mr. Paturet was still

21   occupying the first floor, the basement and the

22   third floor at that time?

23       A.      Yes.

24       Q.      And Mr. Conte's business was

25   occupying the sixth floor at that time?

1        A.      Yes.

2        Q.      At that time Touton was only

3   occupying the ninth and tenth floors, correct?

4        A.      Yes.

5        Q.      And I believe we mentioned

6   Mr. Doctormann earlier.  He owned the 11th floor

7   but was not occupying it at that time?

8        A.      Correct.

9        Q.      And Joseph Grill with Click Models

10  was occupying the 12th floor at that time,

11  correct?

12       A.      Yes.

13       Q.      And what about the second floor;

14  was anyone occupying that floor at that time?

15       A.      That is an art studio that was

16  occupied, yes.

17       Q.      The same art studio that occupies

18  it today?

19       A.      Yes.

20       Q.      And what about the fourth and

21  fifth floor, who was occupying those floors?

22       A.      The engineering firm.

23       Q.      Same engineering firm that

24  occupies those floors today?

25       A.      Yes.

1          Q.      And who were the board members at

2     the time that CCMS decided to sublease the

3     eighth floor?

4          A.      Mr. Paturet, Mr. Grill, Mr. Conte,

5     Mr. Touton and Mr. Doctormann.

6          Q.      Do you know the race or ethnicity

7     for those five individuals?

8          A.      Yes.

9          Q.      What are their races?

10         A.      They're white.

11         Q.      Are they all white?

12         A.      Yes.

13         Q.      Prior to CCMS submitting a

14    sublease application, had you ever heard of it?

15         A.      Heard of what?

16         Q.      Heard of CCMS.

17         A.      No.

18         Q.      Had you ever heard of its

19    president, Mr. Emory Brooks?

20         A.      No.

21         Q.      What kind of business did you

22    think CCMS would be operating in the building?

23         A.      I don't know.

24         Q.      And CCMS submitted a sublease

25    application for the building?

```
1          A.     Yes.

2          Q.     Do you recall when that was

3    submitted?

4          A.     I'm sorry?

5          Q.     Do you recall when that was

6    submitted?

7          A.     No.

8          Q.     Did you review the application?

9          A.     No.

10         Q.     Who reviewed it?

11         A.     It was, the information was

12   collected and it was forwarded to the board.

13         Q.     Did Susan Rubin review it?

14         A.     Susan collected the information

15   and forwarded it to the board.

16         Q.     And what happened after the

17   application was forwarded to the board?

18         A.     Don't know.

19         Q.     Was an interview scheduled?

20         A.     Yes.

21         Q.     When was that interview scheduled

22   for?

23         A.     I don't know.

24         Q.     Do you know where the interview

25   was?
```

1      A.      It was at the building.

2      Q.      Do you know how long the interview

3  was?

4      A.      No.

5      Q.      Who was present at the interview?

6      A.      Don't know.

7      Q.      Following the interview, did

8  anyone discuss CCMS with you?

9      A.      No.

10      Q.      How did you learn that CCMS had

11  been denied their sublease?

12      A.      Received an email from Mr. Conte.

13      Q.      And what did Mr. Conte say?

14      A.      That they were denied.

15      Q.      And did anyone from Kaled inform

16  CCMS of the denial?

17      A.      I don't know, actually.

18      Q.      Should anyone from Kaled have

19  informed CCMS of the denial?

20          MR. MARTUCCI:  Objection.

21          MR. MARGOLIS:  Objection.

22      A.      If anything, we went back to

23  Oxford.

24      Q.      And who on the board voted to deny

25  the sublease?

1        A.     Don't know.

2        Q.     Before CCMS submitted this

3  application, was anyone from Oxford in contact

4  with you?

5        A.     I don't recall.

6        Q.     About the building.

7        A.     Don't recall.

8        Q.     What about any other board

9  members?

10       A.     Don't recall.

11       Q.     Do you recall if CCMS attempted to

12  move furniture or office equipment into the

13  building?

14       A.     They did.

15       Q.     Can you tell me about that?

16       A.     My superintendent let me know that

17  they were moving furniture into the floor.

18       Q.     When was that?

19       A.     I don't remember the date.

20       Q.     Was that before CCMS submitted a

21  sublease application?

22       A.     Think so.

23       Q.     What was your response to that?

24       A.     I think we told them to stop.

25       Q.     Why?

1          A.      Because they weren't authorized to

2    occupy the floor.

3          Q.      And who was going to authorize

4    whether they could occupy the floor?

5          A.      The Board of Directors, after they

6    reviewed their application.

7          Q.      How did you know that they weren't

8    yet authorized?

9          A.      Because I'd never heard of them.

10         Q.      Did you reach out to anyone from

11   the board to confirm whether they were

12   authorized?

13         A.      I don't remember.

14         Q.      Do you recall when CCMS attempted

15   to move furniture in, the exact date?

16         A.      I don't.

17         Q.      Was it sometime in December 2019?

18         A.      I don't remember.

19         Q.      Was there any discussion that CCMS

20   needed a certificate of insurance in order to

21   move furniture in?

22         A.      No, I don't remember.

23         Q.      If there was already furniture on

24   the eighth floor, why was CCMS moving in their

25   own furniture?

1          A.      I don't know.

2                  MS. TURNER:  Harold, if you could

3     pull up Exhibit GG, which has been premarked and

4     was used in the deposition of Nigel Shamash.

5                  THE TECHNICIAN:  Sure.  Stand by,

6     please.

7          Q.      Mr. Lehr, if you could just take a

8     second to quickly review this document and then

9     I have a couple questions about it.  And you can

10    let Harold know when to scroll down.

11                 (Witness reviewing document.)

12                 THE WITNESS:  You can scroll down.

13    Okay, you can stop.

14                 (Witness reviewing document.)

15                 THE WITNESS:  You can scroll down.

16    Stop.

17                 (Witness reviewing document.)

18         A.      Okay.

19         Q.      Mr. Lehr, do you recognize this

20    document?

21         A.      No, not really.

22         Q.      Looking at the center of the

23    document, is that your email address, Peter

24    Lehr, peter@kaled.com?

25         A.      It is.

1          Q.     Do you have any reason to believe

2     you didn't receive this email on December 19th,

3     2019?

4          A.     I did receive it.

5          Q.     You just don't recall the

6     specifics of it?

7          A.     That is correct.

8          Q.     Mr. Lehr, why did you forward

9     Mr. Shamash's email to Mr. Paturet, Mr. Conte,

10    Mr. Grill, Mr. Touton and Mr. Doctormann on

11    December 19, 2019?

12         A.     I was alerting them to a new

13    sublet.

14         Q.     Was that standard procedure to

15    inform them of the sublease?

16         A.     Yes.

17         Q.     Did any of the board members who

18    you sent the email to respond?

19         A.     I don't recall.

20         Q.     Why did you cc Susan Rubin on the

21    email when you forwarded it?

22         A.     She's our transfer agent.

23         Q.     Did Susan respond to this email?

24         A.     I don't recall.

25         Q.     Did you read Mr. Shamash's email?

1        A.      At the time?

2        Q.      Yes.

3        A.      Most likely.

4        Q.      Did you have any opinions about

5   the sublease?

6        A.      No.

7        Q.      Based on his email?

8        A.      No.

9                MS. TURNER:  Harold, you can take

10  that document down.  If you can pull up Exhibit

11  H, it's been premarked as Exhibit H and was used

12  in the deposition of Emory Brooks.

13       Q.      Mr. Lehr, if you could just take a

14  second to review this document and let me know

15  when you're ready.  You can ask Harold to scroll

16  down.

17               (Witness reviewing document.)

18               THE WITNESS:  Okay.  Stop.

19               You can move it down.  Okay.

20               MS. TURNER:  Harold, we're going

21  to focus on the end of the document.  Next page,

22  please.  Right there.

23       Q.      Mr. Lehr, do you recognize this

24  email?

25       A.      No.

1          Q.      Is that your email address, Peter

2     Lehr, peter@kaled.com?

3          A.      Yes.

4          Q.      Was this email sent December 23rd,

5     2019?

6          A.      Yes.

7          Q.      You just don't recall the

8     specifics of the email right now?

9          A.      Correct.

10          Q.      What's your understanding of

11     Susan's email to Mr. Shamash?

12                  MR. MARGOLIS:  Objection.

13          A.      To have the applicant complete the

14     application.

15          Q.      Why is Ms. Rubin sending the

16     application to Mr. Shamash four days after

17     Mr. Shamash emailed you about the sublease?

18          A.      I don't know.

19          Q.      Is it normal for it to take four

20     days to provide the sublease application?

21          A.      I don't know.

22          Q.      Is it possible that in those four

23     days Mr. Conte created the sublease application

24     and provided it to you?

25          A.      Don't know.

1      Q.      But is it possible?

2      A.      I don't know.

3              MR. MARGOLIS:  Objection.

4      Q.      You don't know if it's possible?

5              MR. MARGOLIS:  Objection.

6      Anything is possible.  It's not a proper

7      question.

8              MS. TURNER:  Barry, I'm just going

9      to ask that you don't have any speaking

10     objections.

11             MR. MARGOLIS:  Well, you repeated

12     the question two times and so the witness

13     answered your question.

14     Q.      Mr. Lehr, did you ask Ms. Rubin to

15     send the sublease application to Mr. Shamash?

16     A.      I don't recall.

17     Q.      Did you forward the email we were

18     just looking at premarked GG to Ms. Rubin?

19     A.      Yes.

20     Q.      And what did you say in your email

21     to her?

22     A.      I don't remember.

23     Q.      But somehow Ms. Rubin knew to send

24     the sublease application to Mr. Shamash?

25     A.      Yes.

1        Q.      And you don't know when the

2    sublease application was created?

3        A.      No.

4        Q.      Or how you received it?

5        A.      No.

6        Q.      But it was not a document created

7    by Kaled?

8        A.      No.

9                MS. TURNER:  Okay, Harold, you can

10   take that document down.

11               Harold, if you can pull up Exhibit

12   Q2 which was premarked -- actually, strike that.

13               If you could pull up Exhibit G,

14   please.

15       Q.      And Mr. Lehr, this exhibit was

16   used in the deposition of Emory Brooks and has

17   been premarked.  If you would take a second to

18   quickly scroll through the six pages.

19               (Witness reviewing document.)

20       A.      Okay.

21       Q.      Mr. Lehr, do you recognize this

22   document?

23       A.      No.

24       Q.      Is this the sublease application

25   Kaled would have received from CCMS?

1          A.     I don't know.

2                 MS. TURNER:  If you go to the

3     first page, Harold.

4          Q.     Do you see here that it's

5     described as sublet application, West 27th

6     Street Realty, Inc., 129-31 West 27th Street?

7          A.     Yes.

8          Q.     Does that appear to be a sublease

9     application for the building?

10         A.     Yes.

11         Q.     And Kaled did not create this

12    application?

13         A.     We created the document, yes.

14         Q.     Mr. Lehr, didn't you testify

15    earlier today that you didn't create the

16    sublease application?

17         A.     I did.  We printed the document

18    and sent it.

19         Q.     You printed the sublease

20    application and sent it?

21         A.     Yes.

22         Q.     Where?

23         A.     I guess to Mr. Shamash.

24         Q.     But you were not the original

25    author of the sublease application?

1      A.      That is correct.

2      Q.      And who was the original author of

3  the sublease application?

4      A.      Mr. Conte, I believe.

5      Q.      And Mr. Conte added Susan Rubin

6  and Kaled Management's contact information to

7  this first page of the sublease information?

8      A.      Yes.

9      Q.      But you didn't review the sublease

10 application when it was completed by my client?

11     A.      No.

12             MR. MARGOLIS:  Objection.

13             MS. TURNER:  Harold, if you could

14 scroll to the last page.  Thank you.

15     Q.      Did Kaled complete a credit or

16 background check for CCMS or Mr. Brooks?

17     A.      I don't know.

18     Q.      But Mr. Brooks provided his

19 authorization to complete that credit check?

20     A.      I see that.

21     Q.      But you're not aware if any credit

22 check was performed?

23     A.      No, I'm not.

24             MS. TURNER:  Harold, if you could

25 go to the second page.

1            Actually, I'm sorry, Harold, it's

2    the third page of this document, second page of

3    the sublease application.

4        Q.    Mr. Lehr, could you please read

5    for me at the top of the document number 6,

6    starting with "Please give description of daily

7    operation."

8            MR. MARGOLIS:  Objection.

9            MR. MARTUCCI:  Please note my

10    objection as well.

11        A.    "At the 129 West 27th Street

12    office, we will operate a licensed out-patient

13    clinic providing psychotherapist services."

14        Q.    Mr. Lehr, were you aware that CCMS

15    intended to operate an out-patient clinic at the

16    building?

17        A.    No.

18        Q.    Is there any reason why they

19    wouldn't have been allowed to operate an

20    out-patient clinic at the building?

21            MR. MARGOLIS:  Objection.

22        A.    None that I am aware of.

23        Q.    Do you think the eighth floor,

24    thinking about the physical space, would have

25    worked for an out-patient clinic?

1          MR. MARGOLIS:  Objection.

2          MR. MARTUCCI:  Objection.

3     A.     I don't know.

4     Q.     Did you testify earlier that there

5     were about ten private offices on the eighth

6     floor?

7     A.     Yes.

8     Q.     Could those have been used to

9     serve patients in an out-patient clinic?

10          MR. MARGOLIS:  Objection.

11          MR. MARTUCCI:  Objection.

12     A.     I don't know how a

13     psychotherapist's office works, so I have no

14     opinion or understanding on that.

15     Q.     Understood.

16          MS. TURNER:  Harold, you can take

17     that document down.

18     Q.     Did anyone from Kaled forward the

19     sublease application to the board?

20     A.     I think Susan Rubin did.

21     Q.     And why did she do that?

22     A.     Because we would have collected

23     the information and forwarded it to the board.

24     Q.     Did one of the board members ask

25     someone from Kaled to forward the application to

1    them?

2         A.    Not that I'm aware of.

3              MS. TURNER:  Harold, if you could

4    pull up Exhibit M, please.

5              THE TECHNICIAN:  I'm sorry,

6    counsel, you said M?

7              MS. TURNER:  M as in Mary.

8         Q.    Mr. Lehr, this document is

9    premarked as Exhibit M and was used in the

10   deposition of Emory Brooks.  If you could just

11   take a second to review it and let us know when

12   you're ready.

13             (Witness reviewing document.)

14             THE WITNESS:  Okay, you can

15   scroll.  You can scroll.  Okay.

16        Q.    Mr. Lehr, do you recognize this

17   document?

18        A.    No.

19             MS. TURNER:  Harold, if you could

20   scroll to the bottom so we can get the first

21   chunk of the exchange.  Right there.

22        Q.    Mr. Lehr, is that your email

23   address, Peter Lehr, peter@kaled.com in the cc

24   box?

25        A.    It is.

1          Q.      And was this email sent on

2    December 26, 2019?

3          A.      Yes.

4          Q.      And who's the sender?

5          A.      Mike Conte.

6          Q.      And is there anyone else on the

7    email that you recognize?

8          A.      Susan Rubin.  And Shamash.

9          Q.      I'm sorry, did you say Nigel

10   Shamash?

11         A.      Mr. Shamash, yes.

12         Q.      Can you read the email aloud for

13   me please?

14                 MR. MARTUCCI:  Objection.

15                 MR. MARGOLIS:  Objection.

16         A.      "The board will meet on January

17   14, 2020 to consider this application.  It is

18   customary that the applicant appear for an

19   interview at that time.  According to our

20   bylaws, all sublets must be approved.  I am not

21   sure why anyone would assume otherwise."

22         Q.      Mr. Lehr, what did you understand

23   Mr. Conte to mean by that email?

24                 MR. MARGOLIS:  Objection.

25                 MR. MARTUCCI:  Objection.

1      A.      That an interview is part of the

2   process.

3      Q.      Do you know why January 14, 2020

4   was chosen for the interview?

5      A.      No.

6      Q.      When Mr. Conte says it is

7   customary that the applicant appear for an

8   interview, what do you think he meant?

9              MR. MARGOLIS:  Objection.

10             MR. MARTUCCI:  Objection.

11     A.      I don't know what he meant.

12     Q.      In your experience of managing the

13   property since 2016, was it customary to

14   interview sublease applicants?

15     A.      I don't know.

16     Q.      Did you testify earlier that no

17   other sublease applicants had been interviewed

18   from the time you took over managing the

19   property?

20     A.      That is correct.

21             MR. MARGOLIS:  Objection.

22     Q.      So why would Mr. Conte think that

23   it was customary for the applicant to appear for

24   an interview?

25     A.      I don't know.

1      Q.     When Mr. Conte referenced the

2    bylaws that required sublets must be approved,

3    what was your understanding of the bylaws?

4      A.     I don't understand your question.

5      Q.     Have you ever looked at the bylaws

6    for the building?

7      A.     I have.

8      Q.     What do they say with respect to

9    subleases?

10     A.     I've never looked at that.

11     Q.     So you don't have any knowledge of

12   whether the bylaws state that sublease

13   applications require approval?

14     A.     I have no knowledge of that.

15     Q.     Why did Mr. Conte cc you on this

16   email?

17     A.     Don't know.

18            MR. MARGOLIS:  Objection.

19     Q.     What do you think Mr. Conte meant

20   by his statement, "I am not sure why anyone

21   would assume otherwise"?

22            MR. MARTUCCI:  Objection.

23            MR. MARGOLIS:  Objection.

24     A.     I don't know.

25            MS. TURNER:  Harold, you can take

1    that document down.

2              Harold, if you could pull up

3    Exhibit RR, please.

4              MR. MARGOLIS:  Conte RR?

5              MS. TURNER:  Yes, please.

6              MR. MARGOLIS:  Thank you.

7         Q.    Mr. Lehr, this document has been

8    premarked RR and it was used at the deposition

9    of Michael Conte.  If you could just take a

10   second to scroll and let us know when you're

11   ready.

12             (Witness reviewing document.)

13             THE WITNESS:  Okay.  Stop.

14             (Witness reviewing document.)

15             MS. TURNER:  Harold, we're going

16   to focus on the end of the email chain.  Up a

17   little bit.

18        Q.    Mr. Lehr, do you recognize this

19   document?

20        A.    I don't think I've ever seen this

21   document.

22        Q.    Does this appear to be an email

23   from Susan Rubin regarding the sublease

24   interview set for January 14th, 2020?

25        A.    Yes, it appears to be.

1          Q.      Why did Ms. Rubin email

2   Mr. Shamash and CCMS's broker regarding the

3   interview?

4                  MR. MARGOLIS:  Objection.

5                  MR. MARTUCCI:  Objection.

6          A.      I don't know.

7          Q.      Did you instruct her to interview

8   Mr. Shamash and the broker?

9          A.      No.

10         Q.      Do you know where she got the

11  email addresses for CCMS's broker, Mr. Brooks,

12  and CCMS's attorney?

13         A.      No.

14                 MS. TURNER:  Harold, if you could

15  scroll up to the first page, bottom of the first

16  page starting with "From Susan Rubin."

17         Q.      Mr. Lehr, what's your

18  understanding of Ms. Rubin's response?

19                 MR. MARGOLIS:  Objection.

20         A.      There were no board -- they were

21  not available at this time.

22         Q.      Were there any discussions between

23  you and the board regarding their availability

24  for an interview?

25         A.      No.

1        Q.      Are board members often traveling

2   during this time of year?

3        A.      I don't know.

4        Q.      When Ms. Rubin stated, "Also this

5   is a commercial co-op and all approvals are

6   tendered in writing," what do you think she

7   meant?

8                MR. MARGOLIS:  Objection.

9                MR. MARTUCCI:  Objection.

10       A.      I don't know.

11       Q.      Did she mean that board approval

12  could be tendered in writing for the sublease?

13       A.      I don't know.

14       Q.      Do you know where she got that

15  language from?

16       A.      No.

17               MR. MARGOLIS:  Objection.

18               MS. TURNER:  Harold, you can take

19  that document down, thank you.

20       Q.      Mr. Lehr, after CCMS submitted the

21  sublease application and it was forwarded to the

22  board, what was Kaled's involvement in the

23  process?

24               MR. MARGOLIS:  Objection.

25       A.      Collected the information and we

1    forwarded it to the board.

2            Q.    And after you forwarded it, did

3    Kaled have any contact with the board members

4    regarding the sublease?

5            A.    Other than trying to set up a

6    date, Susan was trying to set up a date.  That

7    would be the only involvement.

8            Q.    Did you or anyone from Kaled have

9    any contact with Mr. Shamash regarding the

10   sublease after the materials were forwarded?

11           A.    Not that I'm aware of.

12               MS. TURNER:  Harold, if you could

13   pull up Exhibit KK.  It's named Shamash KK.

14           Q.    Mr. Lehr, this document was

15   premarked KK and was used in the deposition of

16   Nigel Shamash.  If you could just take a second

17   to look it over and let me know when you're

18   ready.

19               (Witness reviewing document.)

20               THE WITNESS:  Can you scroll to

21   the top, please.  Okay.

22               Okay, you can scroll down.  Okay.

23           Q.    Mr. Lehr, do you recognize this

24   document?

25           A.    Yes.

1      Q.      Looking at the top, do you see
2  your email address anywhere?
3      A.      Yes.
4      Q.      When did you receive this email?
5      A.      This came in on January 15th.
6      Q.      Do you know why the date isn't
7  listed on this document?
8      A.      No.
9      Q.      But you're sure that it came in
10 January 15th, 2020?
11     A.      I'm not sure.
12     Q.      So where did you get the date
13 January 15th, 2020?
14     A.      Because it talks about the
15 interview on January 14th.
16     Q.      So how do you know that you
17 received it on January 15th, 2020?
18     A.      I don't.
19     Q.      And this letter was sent to you
20 and Ms. Rubin?
21     A.      Yes.
22     Q.      And who was cc'd on this email?
23     A.      Marc Paturet.
24     Q.      Why was he cc'd on the email?
25             MR. MARGOLIS:  Objection.

1                    MR. MARTUCCI:  Objection.

2         A.    He's the board president.

3         Q.    Was he present at the interview?

4         A.    No, he was not.

5         Q.    So then why was he cc'd?

6                    MR. MARGOLIS:  Objection.

7                    MR. MARTUCCI:  Objection.

8         A.    I don't know why.

9         Q.    Has Mr. Conte ever sent you

10   meeting notes or minutes like this before?

11        A.    No.

12        Q.    Did you think it was strange that

13   he sent you this?

14                   MR. MARGOLIS:  Objection.

15        A.    No.

16        Q.    Did you read it at the time?

17        A.    I probably did, yes.

18        Q.    Did you respond to Mr. Conte?

19        A.    No.

20        Q.    Did Ms. Rubin respond to

21   Mr. Conte?

22        A.    I don't know.

23        Q.    Did Marc Paturet respond to

24   Mr. Conte?

25        A.    I don't know.

1          Q.      Was there any further follow-up

2    based on this email from Mr. Conte?

3                  MR. MARGOLIS:  Objection.

4          A.      I don't recall.

5          Q.      Based on Mr. Conte's email, what

6    was your understanding of the January 14th, 2020

7    interview with CCMS?

8                  MR. MARGOLIS:  Objection.

9                  MR. MARTUCCI:  Objection.

10         A.      The application was denied.

11                 MS. TURNER:  Harold, if you could

12   just scroll to the bottom of this page.

13         Q.      Mr. Lehr, do you see what says

14   "Submitted and sworn to be true, F. Michael

15   Conte, 1/14/2020"?

16         A.      Yes.

17         Q.      Do you know why Mr. Conte would

18   have included that language in the email?

19                 MR. MARGOLIS:  Objection.

20                 MR. MARTUCCI:  Objection.

21         Q.      Going back up to the top of the

22   document.  Mr. Lehr, were there any attachments

23   to this email?

24         A.      I don't remember.

25         Q.      Do you see attachment

1    doc046914.PDF?

2         A.    Yes.

3         Q.    What was that document?

4         A.    I don't know.

5         Q.    Did you review it?

6         A.    I don't remember.

7         Q.    What's your understanding of why

8    the board members voted to deny the sublease?

9              MR. MARGOLIS:  Objection.

10             MR. MARTUCCI:  Objection.

11        A.    I don't know.

12        Q.    You don't know why they denied the

13   sublease?

14        A.    Nope.

15             MR. MARTUCCI:  Objection.

16             MR. MARGOLIS:  Objection.

17        Q.    Do you know if anyone from Oxford

18   received a copy of these meeting minutes?

19        A.    I don't know.

20        Q.    Did you save a copy of these

21   meeting minutes?

22        A.    I don't remember.

23        Q.    Do you typically keep copies of

24   meeting minutes for annual meetings or quarterly

25   meetings?

1          A.     I do.

2          Q.     Do you store them in a certain

3    place?

4          A.     A minute book.

5          Q.     And are these meeting minutes

6    stored in that same place?

7          A.     Don't remember.

8                 MS. TURNER:  Harold, you can take

9    this document down.

10         Q.     Mr. Lehr, in your opinion, why

11   wasn't Oxford able to sublease the eighth floor?

12                MR. MARGOLIS:  Objection.

13                MR. MARTUCCI:  Objection.

14         A.     I have no opinion.

15         Q.     Given your 20 plus years of

16   experience in property management, you don't

17   have any opinions as to why a tenant can't

18   sublease their space?

19                MR. MARTUCCI:  Objection.

20                MR. MARGOLIS:  Objection.

21         A.     I have no opinion.

22         Q.     Since CCMS applied to sublease the

23   eighth floor, have there been any other sublease

24   applicants for any floors?

25         A.     No.

1          Q.     Mr. Lehr, after the board

2    interview, did you speak with any of the board

3    members?

4          A.     No.

5          Q.     About the interview?

6          A.     No.

7          Q.     Did you speak to any of the

8    shareholders regarding the interview?

9          A.     No.

10          Q.     In that three plus years since the

11   interview, you haven't had any conversations

12   with any board members or shareholders --

13               MR. MARTUCCI:  Objection.

14          Q.     -- regarding the interview?

15          A.     No, not that I recall.

16          Q.     Have you spoken with anyone at

17   Kaled Management about the sublease interview?

18          A.     No.

19               MS. TURNER:  Harold, if you could

20   pull up Exhibit BB.  The file is named Shamash

21   BB, B as in boy.

22          Q.     Mr. Lehr, if you could just take a

23   second to review this and let Harold know when

24   he needs to scroll.

25               (Witness reviewing document.)

1          A.      Done.  Okay.

2          Q.      Mr. Lehr, we're going to focus on

3     the middle of the first page of this document.

4          A.      Okay.

5          Q.      To start, do you recognize this

6     document?

7          A.      No.

8          Q.      Is there a date of this document

9     on it?

10          A.      November 26th, 2019.

11          Q.      And do you recognize any names on

12     the document?

13          A.      Nigel.

14          Q.      Nigel Shamash, and he represents

15     Oxford?

16               MR. MARGOLIS:  Objection.

17          Q.      Which owns the seventh and eighth

18     floor?

19          A.      Yes.

20          Q.      Do you see in the center of the

21     document, Mr. Lehr, when Nigel Shamash writes:

22     "Yes, attorneys should be talking, spoke to

23     president of board.  Working on it.  All good."

24          A.      Yes, I see that.

25          Q.      What do you think Mr. Shamash

1   meant --

2                 MR. MARTUCCI:  Objection.

3        Q.      -- by "spoke to president of

4   board"?

5                 MR. MARGOLIS:  Objection.

6        A.      I don't know.

7        Q.      Is it possible he was referring to

8   Marc Paturet?

9                 MR. MARGOLIS:  Objection.

10                MR. MARTUCCI:  Objection.

11       A.      I don't know.

12       Q.      Would there be any reason for

13  Mr. Shamash to speak to Marc Paturet?

14                MR. MARGOLIS:  Objection.

15                MR. MARTUCCI:  Objection.

16       A.      I don't know.

17       Q.      If Mr. Shamash was seeking

18  approval of the sublease for the eighth floor,

19  would he reach out to Marc Paturet as the

20  president of the board?

21       A.      I don't know.

22       Q.      Is there any reason for

23  Mr. Shamash to lie about speaking with the

24  president of the board?

25                MR. MARGOLIS:  Objection.

1           MR. MARTUCCI:  Objection.

2      A.      I don't know.

3           MS. TURNER:  Harold, you can take

4    that document down.

5           The next document we're going to

6    look at is Shamash DD, as in dog.

7      Q.      Mr. Lehr, again this document is

8    premarked as DD and was used in the deposition

9    of Nigel Shamash.  If you could just take a

10   second to review.

11     A.      Okay, you can scroll.

12           (Witness reviewing document.)

13           Okay.

14     Q.      Are you ready, Mr. Lehr?

15     A.      Yeah.

16           MS. TURNER:  Harold, if you could

17   scroll to the middle of the second page.

18   Perfect, right there.

19     Q.      Mr. Lehr, do you recognize this

20   document?

21     A.      No.

22     Q.      Do you recognize any names on it?

23     A.      Yes.

24     Q.      What names?

25     A.      Nigel and Saul.

1          Q.      Have you ever met Saul?

2          A.      I may have.

3          Q.      Have you ever corresponded with

4    him?

5          A.      I may have.

6          Q.      But you understood that he's

7    affiliated with Oxford which owns the seventh

8    and eighth floor?

9          A.      Yes.

10          Q.      On December 10th, 2019 Saul wrote

11    "vote status?"  What do you think Saul meant?

12              MR. MARGOLIS:  Objection.

13              MR. MARTUCCI:  Objection.

14          A.      I don't know.

15          Q.      Is it possible Mr. Tawil was

16    referring to board approval for the sublease?

17              MR. MARGOLIS:  Objection.

18              MR. MARTUCCI:  Objection.

19          A.      I don't know.

20              MS. TURNER:  Harold, if you could

21    just scroll up to the next response.  Scroll

22    down a little bit.

23          Q.      Mr. Lehr, that same day Nigel

24    writes back to Saul, December 10, 2019 and says,

25    "Still waiting."  And the next day Saul responds

1   on December 11, 2019 and says, "Any sense of

2   when?"  Do you know what Nigel and Saul are

3   referring to there?

4               MR. MARTUCCI:  Objection.

5               MR. MARGOLIS:  Objection.

6       A.    No.

7       Q.    Is it possible that one of them

8   was communicating with members of the board in

9   an attempt to seek approval for the sublease?

10              MR. MARGOLIS:  Objection.

11              MR. MARTUCCI:  Objection.

12      A.    I don't know.

13              MS. TURNER:  Harold, you can take

14  that document down.  If you can pull up Shamash

15  EE, as in egg.

16      Q.    Mr. Lehr, again this document was

17  used in the deposition of Nigel Shamash and was

18  premarked EE.

19              When you're ready, if you can just

20  take a second to review.

21              (Witness reviewing document.)

22      A.    Okay.

23      Q.    Mr. Lehr, do you recognize this

24  document?

25      A.    No.

```
1        Q.      Do you recognize any names on it?

2        A.      Yes.

3        Q.      What are those names?

4        A.      Nigel, Saul.

5        Q.      Do you see on December 12th, 2019

6   Saul wrote, "status on vote"?

7        A.      Yes.

8        Q.      What do you think he was referring

9   to?

10              MR. MARTUCCI:  Objection.

11              MR. MARGOLIS:  Objection.

12       A.      I don't know.

13              MS. TURNER:  Harold, if you could

14   scroll up to the bottom of the next page.

15       Q.      Mr. Lehr, in response, Mr. Shamash

16   wrote on December 12th, 2019, "I'm sending

17   signed lease to Kaled.  Joey completely MIA."

18              Is Mr. Shamash referring to Kaled,

19   which is your employer?

20              MR. MARGOLIS:  Objection.

21              MR. MARTUCCI:  Objection.

22       A.      Yes.

23       Q.      And when Mr. Shamash wrote "Joey

24   completely MIA," who was he referring to?

25              MR. MARGOLIS:  Objection.
```

```
 1              MR. MARTUCCI:  Objection.

 2      A.      I don't know.

 3      Q.      Is it possible he was referring to

 4  Joseph Grill who owned the 12th floor?

 5              MR. MARGOLIS:  Objection.

 6              MR. MARTUCCI:  Objection.

 7      A.      I don't know.

 8      Q.      Do you know why Kaled didn't

 9  receive a copy of the signed lease until

10  December 19th?

11      A.      I don't know.

12      Q.      A week after this email was sent?

13      A.      I don't know.

14      Q.      And by December 12th, did you know

15  that CCMS was applying to sublease the eighth

16  floor?

17      A.      I don't know.

18      Q.      You don't recall the first time

19  you found out that there was a subtenant for the

20  eighth floor?

21              MR. MARTUCCI:  Objection.

22              MR. MARGOLIS:  Objection.

23      A.      I don't recall.

24              MS. TURNER:  Harold, you can take

25  that document down.
```

1      Q.      Mr. Lehr, is it possible that

2    Mr. Shamash was seeking approval for the

3    sublease in writing without the need for an

4    interview?

5              MR. MARGOLIS:  Objection.

6              MR. MARTUCCI:  Objection.

7      A.      I don't know.

8      Q.      Would that be permitted under the

9    terms of the proprietary lease?

10             MR. MARGOLIS:  Objection.

11     A.      I don't know.

12     Q.      Would that be consistent with

13   board approval you've received in the past?

14             MR. MARGOLIS:  Objection.

15             MR. MARTUCCI:  Objection.

16     A.      We didn't have any applications

17   prior to this.

18     Q.      But the board did sometimes

19   approve things related to the co-op by signing

20   on via email?

21             MR. MARTUCCI:  Objection.

22             MR. MARGOLIS:  Objection.

23     A.      I don't understand your question.

24     Q.      In the past I believe you

25   testified earlier that the board has given its

1  approval simply by emailing you without holding

2  a meeting; is that correct?

3        A.      Yes.

4        Q.      Is it possible they could have

5  approved CCMS's sublease simply by emailing you,

6  stating in writing that it was approved?

7              MR. MARTUCCI:  Objection.

8              MR. MARGOLIS:  Objection.

9        A.      It is possible.

10        Q.      Thank you.

11              And Mr. Lehr, you're not aware of

12  any conversations between Marc Paturet and

13  anyone at Oxford regarding the sublease?

14        A.      No, I'm not.

15        Q.      You understand that you're still

16  under oath?

17              MR. MARTUCCI:  Objection.

18              MR. MARGOLIS:  Objection.

19        A.      Yes.

20        Q.      Are you sure that there were no

21  conversations between Mr. Paturet and anyone at

22  Oxford regarding the sublease?

23              MR. MARGOLIS:  Objection.

24              MR. MARTUCCI:  Objection.  Asked

25  and answered.

1          Q.      Mr. Lehr, are you aware of any

2     issues Mr. Conte had with the prior subtenants

3     for the seventh or eighth floor?

4          A.      I'm not aware of any.

5          Q.      Are you aware of any issues any

6     board member had with visitors or employees

7     using the elevators in the building?

8          A.      No.

9          Q.      Going back to the intercom system

10    that was installed in the last year in the

11    building, whose idea was it to install an

12    intercom system?

13         A.      It came from Mr. Touton.  A series

14    of people had entered the property, got on the

15    elevators and were going up to his floor in

16    particular.

17         Q.      Who were those people that entered

18    the property?

19         A.      Random people off the street.

20         Q.      And did the decision to install an

21    intercom system, did that require board

22    approval?

23         A.      Yes.

24         Q.      And how did the board members

25    vote?

1           MR. MARGOLIS:  Objection.

2      A.      I believe they voted unanimously

3 for it.

4      Q.      Do you know why the intercom

5 system wasn't installed earlier?

6      A.      No.

7           MR. MARGOLIS:  Objection.

8      Q.      If CCMS's sublease had been

9 approved and they were operating their clinic,

10 could they have used the intercom system to let

11 in patients?

12          MR. MARGOLIS:  Objection.

13          MR. MARTUCCI:  Objection.

14     A.      Their name, the company name would

15 have been put on the directory and they could

16 have used it, yes.

17     Q.      And the intercom system would have

18 allowed only CCMS's patients to enter the

19 building, and no one else?

20          MR. MARGOLIS:  Objection.

21          MR. MARTUCCI:  Objection.

22     A.      The intercom system was for

23 everyone's use.

24     Q.      It would allow the occupant of

25 each floor to make sure that only their visitors

1   or employees had access to the building?

2        A.     That is correct.

3               MS. TURNER:  I think that's all I

4   have for today.

5               MR. MARGOLIS:  I have nothing for

6   the witness.

7               MR. MARTUCCI:  I have nothing.

8               (Deposition concluded 2:48 p.m.)

9               -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                REPORTER'S CERTIFICATION

 2

 3           I, NANCY C. BENDISH, Certified

 4   Court Reporter and Notary Public of the States

 5   of New York and New Jersey, do hereby certify

 6   that, prior to the commencement of the

 7   aforementioned examination, PETER LEHR was sworn

 8   by me to testify the truth, the whole truth and

 9   nothing but the truth.

10               I DO FURTHER CERTIFY that the

11   foregoing is a true and accurate transcript of

12   the testimony as taken stenographically by me at

13   the time, place, and on the date hereinbefore

14   set forth.

15               I DO FURTHER CERTIFY that I am

16   neither a relative nor employee nor attorney nor

17   counsel of any party in this action and that I

18   am neither a relative nor employee of such

19   attorney or counsel, and that I am not

20   financially interested in the event nor outcome

21   of this action.

22

23               NANCY C. BENDISH, CCR, RMR, CRR
                 Realtime Systems Administrator
24               Certificate No. XI00836

25   Dated:  April 6, 2023
```

| A | | | |
|---|---|---|---|

**able**
38:25, 110:11

**about**
6:12, 7:21,
8:10, 10:11,
10:21, 11:10,
12:2, 13:2,
14:15, 14:20,
15:16, 23:6,
25:10, 35:16,
35:22, 36:4,
39:17, 42:17,
43:23, 45:2,
45:14, 47:10,
49:9, 53:17,
54:6, 54:8,
54:18, 64:3,
64:9, 64:13,
64:16, 64:24,
68:5, 69:2,
72:12, 72:18,
73:10, 74:7,
75:11, 76:11,
76:20, 76:24,
79:5, 81:7,
82:13, 82:20,
86:6, 86:8,
86:15, 88:9,
90:4, 91:17,
96:24, 97:5,
106:14, 111:5,
111:17, 113:23

**abrams**
2:20

**access**
42:18, 43:10,
80:24, 123:1

**accessing**
43:13

**accident**
10:12, 10:13

**accidents**
9:21, 9:23

**according**
99:19

**accurate**
124:11

**across**
24:12, 24:14

**action**
1:7, 4:18,
5:21, 8:21,
10:16, 11:8,
11:17, 12:3,
15:13, 25:15,
49:14, 50:18,
51:22, 65:23,
76:13, 124:17,
124:21

**actions**
9:20, 10:2,
12:20, 48:24,
49:5, 53:4

**actually**
17:17, 28:15,
41:5, 59:18,
85:17, 93:12,
96:1

**added**
95:5

**additional**
37:19

**address**
88:23, 91:1,
98:23, 106:2

**addresses**
103:11

**adelphi**
15:24

**administrator**
124:25

**affect**
6:24

**affiliated**
73:3, 115:7

**affirmative**
49:16, 49:20,
49:25

**aforementioned**
124:7

**after**
41:19, 78:8,
84:16, 87:5,
91:16, 104:20,
105:2, 105:10,

**allowed**
96:19, 122:18

**almost**
69:10

**aloud**
99:12

**already**
28:22, 67:6,
87:23

**also**
2:36, 5:20,
5:25, 16:9,
29:19, 32:18,
36:10, 41:16,
71:8, 79:3,
104:4

**always**
16:14, 31:16,
31:20, 44:5,
47:22, 47:23,
48:3, 51:13,
58:14

**americas**
2:30

**amount**
64:24

**annual**
31:25, 32:3,
32:6, 32:9,
32:25, 33:17,
33:22, 36:8,
36:22, 37:3,
37:6, 43:21,
44:2, 52:14,
66:22, 68:15,
73:4, 109:24

**another**
21:4, 59:2,
68:1, 73:19,
76:7

**answer**
4:20, 4:21,
7:19, 17:16,
19:2, 19:4,
19:6, 19:7,
19:14, 20:16,
24:9, 28:10,
35:11, 40:11,

**111:1, 118:12**

**afternoon**
4:14

**again**
22:13, 48:23,
114:7, 116:16

**against**
76:14, 78:13

**agenda**
32:25, 51:7,
51:13

**agent**
46:7, 46:9,
55:5, 89:22

**ago**
7:21, 9:16,
10:9, 12:10,
13:8, 26:12,
28:12, 32:5,
32:7, 37:5,
66:17, 66:21,
73:8, 77:7

**agreed**
7:10

**agreement**
58:11, 61:2,
61:7

**alerting**
43:7, 89:12

**alexander**
21:7, 21:12

**all**
2:2, 5:23, 9:9,
9:21, 9:23,
13:12, 20:23,
24:12, 26:18,
27:25, 28:3,
33:8, 33:17,
39:7, 39:14,
46:16, 53:8,
53:12, 55:7,
79:17, 80:13,
81:18, 83:11,
99:20, 104:5,
112:23, 123:3

**alleged**
10:3

**allow**
44:4, 122:24

51:5, 78:18
**answered**
92:13, 120:25
**answering**
4:24
**answers**
5:8, 5:9
**anthony**
40:15
**any**
6:6, 6:16,
6:21, 9:6, 10:2,
13:4, 13:24,
14:2, 14:4,
14:14, 17:2,
17:20, 17:22,
19:18, 21:17,
21:20, 22:17,
23:13, 24:24,
28:25, 38:12,
40:8, 40:9,
42:2, 45:24,
48:24, 49:3,
51:19, 54:1,
54:13, 57:24,
58:20, 58:23,
59:22, 61:16,
62:6, 62:24,
63:16, 63:24,
64:3, 64:6,
64:13, 64:23,
65:8, 65:13,
66:1, 66:24,
67:11, 68:10,
73:14, 75:3,
75:10, 75:25,
76:18, 77:8,
79:2, 79:13,
86:8, 87:19,
89:1, 89:17,
90:4, 92:9,
95:21, 96:18,
101:11, 103:22,
105:3, 105:9,
108:1, 108:22,
110:17, 110:23,
110:24, 111:2,
111:7, 111:11,

111:12, 112:11,
113:12, 113:22,
114:22, 116:1,
117:1, 119:16,
120:12, 121:1,
121:4, 121:5,
124:17
**anyone**
13:18, 14:7,
14:19, 20:20,
33:21, 37:9,
46:3, 46:17,
66:8, 68:23,
72:5, 73:3,
82:14, 85:8,
85:15, 85:18,
86:3, 87:10,
97:18, 99:6,
99:21, 101:20,
105:8, 109:17,
111:16, 120:13,
120:21
**anything**
7:1, 13:15,
15:12, 40:8,
42:10, 42:11,
48:21, 60:15,
76:8, 76:20,
85:22, 92:6
**anywhere**
18:3, 18:22,
106:2
**ap**
46:21
**apartment**
10:24
**apartments**
10:24
**appeal**
65:5
**appear**
94:8, 99:18,
100:7, 100:23,
102:22
**appears**
102:25
**applicant**
56:7, 56:10,

62:8, 62:16,
62:22, 64:1,
64:11, 64:16,
64:20, 65:9,
65:14, 78:7,
79:11, 91:13,
99:18, 100:7,
100:23
**applicants**
63:1, 63:17,
64:24, 65:20,
66:2, 78:4,
78:25, 79:14,
100:14, 100:17,
110:24
**application**
53:19, 53:25,
54:23, 55:2,
55:8, 55:10,
55:11, 55:14,
55:18, 55:22,
55:25, 56:13,
58:8, 60:25,
63:4, 63:7,
63:10, 63:14,
63:21, 65:15,
83:14, 83:25,
84:8, 84:17,
86:3, 86:21,
87:6, 91:14,
91:16, 91:20,
91:23, 92:15,
92:24, 93:2,
93:24, 94:5,
94:9, 94:12,
94:16, 94:20,
94:25, 95:3,
95:10, 96:3,
97:19, 97:25,
99:17, 104:21,
108:10
**applications**
46:10, 46:11,
77:10, 101:13,
119:16
**applied**
63:18, 63:22,
81:8, 110:22

**applying**
118:15
**approval**
48:1, 48:22,
48:25, 49:2,
49:9, 49:10,
51:8, 51:14,
51:15, 51:18,
53:5, 53:11,
53:18, 101:13,
104:11, 113:18,
115:16, 116:9,
119:2, 119:13,
120:1, 121:22
**approvals**
104:5
**approve**
48:2, 49:14,
50:3, 50:7,
53:9, 58:5,
58:18, 61:23,
61:24, 63:25,
64:4, 64:10,
119:19
**approved**
49:22, 50:17,
50:20, 50:23,
51:2, 54:16,
61:9, 62:17,
62:18, 77:18,
99:20, 101:2,
120:5, 120:6,
122:9
**approving**
48:13, 49:5,
62:25
**april**
124:27
**ar**
46:20
**arbitration**
12:18, 13:2
**arbitrations**
12:19, 13:5,
13:9
**architect**
45:11
**architecture**
34:7

**area**
31:1, 71:15,
80:18
**areas**
42:16
**aren't**
51:18
**around**
41:22, 59:19,
63:22
**arrange**
60:7
**art**
29:18, 71:6,
82:15, 82:17
**as-needed**
47:4
**asked**
54:14, 60:22,
120:24
**asking**
4:25
**assistance**
25:4
**assume**
99:21, 101:21
**attachment**
108:25
**attachments**
108:22
**attempt**
116:9
**attempted**
79:20, 86:11,
87:14
**attend**
37:2, 44:5,
63:25, 68:8,
68:10
**attendance**
7:7
**attends**
68:13
**attorney**
13:21, 76:1,
103:12, 124:16,
124:19
**attorneys**
112:22

**audible**
5:9
**audit**
32:19
**august**
16:22
**author**
94:25, 95:2
**authorization**
95:19
**authorize**
87:3
**authorized**
87:1, 87:8,
87:12
**automatic**
39:11
**availability**
103:23
**available**
103:21
**avenue**
2:30
**average**
51:12
**aware**
7:2, 54:7,
55:16, 59:1,
61:1, 61:17,
62:6, 64:15,
65:2, 65:7,
66:7, 73:17,
95:21, 96:14,
96:22, 98:2,
105:11, 120:11,
121:1, 121:4,
121:5

**B**

**b-r-u-s-h**
4:10
**bachelor's**
15:24
**back**
36:22, 42:1,
61:22, 63:9,
64:18, 66:13,
66:15, 66:21,

67:5, 67:13,
75:24, 85:22,
108:21, 115:24,
121:9
**background**
15:20, 54:13,
54:18, 54:20,
95:16
**backtrack**
21:1
**baker**
2:9
**barclay**
2:28
**barry**
2:21, 19:3,
92:8
**based**
78:13, 90:7,
108:2, 108:5
**basement**
39:12, 70:12,
70:19, 81:21
**basis**
47:4
**bathroom**
80:20
**bb**
111:20, 111:21
**because**
19:9, 38:16,
58:15, 75:2,
87:1, 87:9,
97:22, 106:14
**become**
36:5, 37:14
**been**
4:1, 7:14,
8:23, 9:4,
12:14, 12:19,
16:11, 19:20,
28:20, 31:2,
31:5, 31:16,
31:20, 33:19,
35:2, 35:3,
35:6, 35:8,
35:9, 35:11,
35:13, 35:15,

35:17, 35:18,
35:19, 35:21,
35:23, 36:15,
36:16, 36:19,
40:16, 41:2,
46:2, 52:6,
52:15, 56:16,
61:12, 63:13,
63:21, 65:18,
65:20, 66:1,
67:8, 73:24,
76:17, 85:11,
88:3, 90:11,
93:17, 96:19,
97:8, 100:17,
102:7, 110:23,
122:8, 122:15
**before**
4:24, 7:15,
14:12, 21:2,
21:21, 37:23,
38:23, 48:4,
74:7, 80:2,
80:15, 86:2,
86:20, 107:10
**began**
28:18, 36:19,
52:5, 56:16,
80:2
**begin**
59:11
**behalf**
2:6, 2:16, 2:26
**being**
37:20, 43:6
**believe**
10:20, 11:3,
12:8, 26:13,
30:18, 30:19,
30:23, 34:10,
35:25, 36:3,
55:9, 56:18,
56:21, 57:8,
59:16, 59:21,
65:11, 65:21,
79:3, 82:5,
89:1, 95:4,
119:24, 122:2

bendish
1:34, 124:3,
124:24
bergson
2:20
besides
17:3, 37:10,
44:2, 51:20,
71:22
best
4:22
better
27:15, 77:15
between
15:11, 48:16,
58:11, 103:22,
120:12, 120:21
bidder
20:19
biggest
38:14
bills
45:19
bit
102:17, 115:22
blank
77:14
boiler
23:12, 32:13
book
110:4
both
77:23
bottom
98:20, 103:15,
108:12, 117:14
box
98:24
boy
111:21
break
6:5, 6:7,
75:15, 75:25
breakdown
50:12
brick
23:11
bring
70:14

broadway
2:22
broker
103:2, 103:8,
103:11
brooklyn
18:9, 18:12
brooks
83:19, 90:12,
93:16, 95:16,
95:18, 98:10,
103:11
brought
32:11
brush
4:10, 24:2
budget
44:13, 47:11
build
28:24, 41:18
building
11:18, 11:20,
17:8, 25:10,
25:11, 25:15,
25:18, 25:21,
25:24, 26:1,
26:4, 26:6,
26:21, 27:15,
27:19, 28:25,
29:7, 30:2,
30:8, 31:2,
31:9, 31:20,
37:23, 39:14,
40:1, 40:9,
40:14, 40:17,
40:24, 41:12,
41:22, 41:24,
42:6, 42:15,
42:18, 42:25,
45:1, 45:8,
46:4, 46:18,
46:23, 49:6,
55:19, 55:22,
56:16, 60:8,
61:13, 66:5,
67:12, 67:18,
68:6, 72:1,
72:21, 73:6,

73:19, 73:24,
74:23, 75:4,
75:6, 75:11,
76:11, 79:23,
80:10, 80:13,
81:17, 83:22,
83:25, 85:1,
86:6, 86:13,
94:9, 96:16,
96:20, 101:6,
121:7, 121:11,
122:19, 123:1
buildings
24:11, 28:4,
28:7, 28:17,
28:20, 28:22
built
28:25, 29:1
bulbs
42:13
bullpen
71:14
business
17:7, 26:25,
38:21, 70:6,
72:6, 81:24,
83:21
button
39:19, 39:21
bylaws
99:20, 101:2,
101:3, 101:5,
101:12

**C**

cables
39:8
call
51:1, 52:22,
62:15, 74:20
calls
17:24
came
20:17, 36:6,
106:5, 106:9,
121:13
cameras
71:9

can't
49:3, 50:10,
110:17
canvas
77:14
capacity
9:7, 12:15
capital
23:2, 23:4,
23:8, 32:12,
44:13
capture
5:1
car
39:10, 39:11
case
6:1, 7:24, 8:4,
76:15, 76:18
cases
12:22, 12:24
cc
89:20, 98:23,
101:15
cc'd
106:22, 106:24,
107:5
ccms
2:6, 5:16,
63:18, 63:22,
66:2, 81:8,
83:2, 83:13,
83:16, 83:22,
83:24, 85:8,
85:10, 85:16,
85:19, 86:2,
86:11, 86:20,
87:14, 87:19,
87:24, 93:25,
95:16, 96:14,
104:20, 108:7,
110:22, 118:15
ccms's
63:13, 103:2,
103:11, 103:12,
120:5, 122:8,
122:18
ccr
1:34, 124:24

**cell**
26:19
**center**
88:22, 112:20
**certain**
47:20, 49:13,
64:24, 110:2
**certificate**
60:15, 87:20,
124:26
**certificates**
60:18
**certification**
124:1
**certified**
124:3
**certify**
124:5, 124:10,
124:15
**cfo**
46:20
**chain**
102:16
**changing**
42:12
**charge**
72:16
**charging**
38:22
**check**
54:12, 54:13,
54:18, 54:20,
95:16, 95:19,
95:22
**chief**
47:18
**choose**
19:16, 39:18,
75:8
**chose**
75:8
**chosen**
100:4
**chunk**
98:21
**civil**
1:7
**clarify**
65:17

**clean**
40:6
**click**
29:11, 29:21,
82:9
**client**
95:10
**clinic**
96:13, 96:15,
96:20, 96:25,
97:9, 122:9
**cms**
37:24
**co-op**
5:25, 6:1, 6:2,
10:17, 18:12,
20:2, 20:11,
23:2, 30:3,
31:3, 31:5,
31:8, 31:12,
31:21, 31:23,
35:2, 35:10,
38:3, 40:20,
46:16, 46:19,
47:3, 47:17,
47:19, 48:25,
76:11, 76:14,
77:24, 79:15,
79:17, 104:5,
119:19
**co-ops**
20:21, 21:18,
77:20, 77:24
**collates**
46:12
**collect**
54:10
**collected**
84:12, 84:14,
97:22, 104:25
**collects**
46:11
**com**
88:24, 91:2,
98:23
**combination**
42:4
**come**
23:6, 45:8,

64:18, 77:15
**comes**
37:17, 47:23,
47:25, 56:13,
76:21
**coming**
67:12
**commencement**
124:6
**commercial**
18:11, 20:2,
20:11, 20:21,
21:17, 21:24,
25:20, 30:3,
31:3, 31:5,
77:23, 79:15,
104:5
**common**
42:16
**communicate**
50:16, 74:16,
74:18
**communicating**
116:8
**community**
1:5, 2:6, 4:16,
5:14
**companies**
10:1
**company**
12:4, 16:9,
16:10, 20:18,
21:7, 21:25,
22:1, 38:20,
56:25, 57:5,
57:7, 57:9,
58:8, 58:12,
68:1, 122:14
**compels**
7:7
**complaints**
17:9
**complete**
38:25, 91:13,
95:15, 95:19
**completed**
39:3, 95:10
**completely**
117:17, 117:24

**components**
40:9
**computer**
33:13
**concerned**
79:10
**concerns**
79:20
**concluded**
123:8
**condition**
8:11, 10:23
**conditions**
6:17
**condominiums**
46:16
**condos**
20:7
**conduct**
7:10, 56:9
**conducted**
1:27
**conference**
52:22
**confirm**
12:13, 14:10,
87:11
**connection**
7:23, 7:25,
8:12, 9:9,
12:18, 45:20,
54:9, 68:1,
68:14, 68:20
**connects**
27:2
**consensus**
47:24, 48:4,
53:3
**consider**
62:7, 62:22,
78:24, 79:7,
99:17
**consistent**
119:12
**consultant**
38:21
**contact**
46:23, 65:14,

86:3, 95:6,
105:3, 105:9
**conte**
1:18, 2:18,
5:23, 14:16,
29:15, 34:3,
34:24, 35:16,
47:9, 54:24,
55:1, 55:17,
63:3, 63:6,
72:5, 83:4,
85:12, 85:13,
89:9, 91:23,
95:4, 95:5,
99:5, 99:23,
100:6, 100:22,
101:1, 101:15,
101:19, 102:4,
102:9, 107:9,
107:18, 107:21,
107:24, 108:2,
108:15, 108:17,
121:2
**conte's**
81:24, 108:5
**continue**
37:19, 37:20
**contractors**
41:3
**controllers**
39:6
**conversation**
4:19, 5:2,
13:16, 14:1,
48:10
**conversations**
76:1, 111:11,
120:12, 120:21
**conversion**
39:10
**converting**
32:13
**cooperation**
30:23
**cooperative**
30:6
**cooperatives**
20:6, 20:7

**copies**
33:8, 80:9,
109:23
**copy**
80:5, 109:18,
109:20, 118:9
**corporation**
48:19, 48:20
**correct**
9:17, 12:25,
17:1, 23:15,
23:24, 25:16,
27:6, 29:23,
30:1, 35:5,
39:15, 39:16,
39:24, 55:13,
62:3, 73:7,
73:9, 78:1,
80:16, 82:3,
82:8, 82:11,
89:7, 91:9,
95:1, 100:20,
120:2, 123:2
**correctly**
38:17, 38:18
**correspond**
44:21, 45:16
**corresponded**
115:3
**correspondence**
45:10
**cost**
41:19
**could**
22:20, 23:19,
23:20, 24:23,
42:11, 48:9,
48:10, 71:4,
74:11, 87:4,
88:2, 88:7,
90:13, 93:13,
95:13, 95:24,
96:4, 97:8,
98:3, 98:10,
98:19, 102:2,
102:9, 103:14,
104:12, 105:12,
105:16, 108:11,

111:19, 111:22,
114:9, 114:16,
115:20, 117:13,
120:4, 122:10,
122:15
**couldn't**
28:10, 44:23,
51:4, 62:4
**counsel**
14:11, 98:6,
124:17, 124:19
**counseling**
1:6, 2:7, 4:17,
5:14
**counted**
69:25
**couple**
10:20, 33:16,
88:9
**court**
1:1, 5:1, 5:7,
8:1, 8:6, 10:6,
10:22, 11:2,
12:10, 12:14,
124:4
**courtroom**
6:14
**cover**
15:19
**covid**
52:5
**create**
55:1, 55:18,
94:11, 94:15
**created**
54:22, 63:7,
63:21, 91:23,
93:2, 93:6,
94:13
**credit**
54:12, 79:1,
95:15, 95:19,
95:21
**credits**
15:25
**crr**
1:34, 124:24
**cubicles**
71:14, 71:15,

71:17
**current**
16:3, 33:23,
33:25, 34:17,
37:18
**currently**
30:10, 31:14,
34:21, 37:1,
37:11, 40:14,
66:8, 66:11
**customary**
99:18, 100:7,
100:13, 100:23
**cv-(nrb**
1:8

### D

**daily**
69:16, 96:6
**damon**
2:28
**daniel**
2:29
**date**
60:13, 81:14,
86:19, 87:15,
105:6, 106:6,
106:12, 112:8,
124:13
**dated**
124:27
**day**
23:16, 23:19,
23:22, 24:10,
24:12, 24:14,
24:16, 33:15,
115:23, 115:25
**day-to-day**
17:7
**days**
25:2, 33:16,
91:16, 91:20,
91:23
**dd**
114:6, 114:8
**dealing**
47:8
**december**
81:11, 81:16,

87:17, 89:2,
89:11, 91:4,
99:2, 115:10,
115:24, 116:1,
117:5, 117:16,
118:10, 118:14
**decide**
62:12
**decided**
19:11, 83:2
**decision**
64:17, 121:20
**decisions**
31:8, 47:21
**defendant**
2:26, 14:11
**defendants**
1:22, 2:16,
5:20, 5:24,
14:15
**degree**
15:24
**deliver**
24:11
**denial**
65:6, 85:16,
85:19
**denied**
85:11, 85:14,
108:10, 109:12
**deny**
85:24, 109:8
**department**
78:18, 78:20,
78:24
**depending**
47:8
**depends**
24:24, 25:3,
51:1, 51:10
**depos**
2:38
**deposed**
7:15, 7:17,
8:23, 9:13,
12:14
**deposition**
1:25, 4:16,

5:16, 7:10,
7:20, 7:22,
8:10, 8:24,
13:15, 13:25,
14:8, 14:15,
14:20, 15:13,
15:17, 76:5,
88:4, 90:12,
93:16, 98:10,
102:8, 105:15,
114:8, 116:17,
123:8
**depositions**
9:3
**describe**
15:22, 22:20,
25:18, 69:8,
71:4
**described**
94:5
**description**
96:6
**desk**
17:25
**determine**
24:6, 31:23,
41:5, 41:11,
42:1, 49:21,
77:25
**determined**
79:17
**develop**
23:4
**difference**
48:16
**different**
78:21
**difficult**
4:25
**direction**
27:10
**director**
16:4, 16:25,
18:5, 22:21,
36:3, 36:10,
37:20, 40:1,
48:19
**directors**
27:11, 47:14,

87:5
**directory**
26:17, 122:15
**disapprove**
53:9
**disapproved**
50:17
**discriminating**
78:13
**discrimination**
10:3, 76:15,
76:18, 76:21,
77:9
**discuss**
15:9, 15:12,
44:16, 56:4,
62:15, 67:22,
76:3, 76:8, 85:8
**discussed**
13:21, 32:9,
32:14, 32:18,
44:11, 62:25
**discusses**
56:2
**discussion**
87:19
**discussions**
103:22
**disputes**
45:24, 46:2
**district**
1:1, 1:2
**doc**
109:1
**doctormann**
57:2, 57:18,
57:23, 58:11,
82:6, 83:5,
89:10
**doctormann's**
56:24
**document**
88:8, 88:11,
88:14, 88:17,
88:20, 88:23,
90:10, 90:14,
90:17, 90:21,
93:6, 93:10,

93:19, 93:22,
94:13, 94:17,
96:2, 96:5,
97:17, 98:8,
98:13, 98:17,
102:1, 102:7,
102:12, 102:14,
102:19, 102:21,
104:19, 105:14,
105:19, 105:24,
106:7, 108:22,
109:3, 110:9,
111:25, 112:3,
112:6, 112:8,
112:12, 112:21,
114:4, 114:5,
114:7, 114:12,
114:20, 116:14,
116:16, 116:21,
116:24, 118:25
**documents**
14:2
**dog**
114:6
**doing**
38:7, 38:8
**done**
10:24, 41:2,
41:15, 41:16,
41:18, 42:2,
51:11, 112:1
**doorman**
26:4
**down**
5:8, 29:11,
39:19, 39:21,
88:10, 88:12,
88:15, 90:10,
90:16, 90:19,
93:10, 97:17,
102:1, 104:19,
105:22, 110:9,
114:4, 115:22,
116:14, 118:25
**dozen**
45:3
**due**
32:20

**duly**
4:1
**during**
42:9, 65:17,
73:16, 75:25,
81:16, 104:2

**E**

**each**
4:22, 18:18,
24:22, 25:6,
25:22, 25:23,
29:6, 29:9,
30:21, 34:25,
42:15, 42:18,
50:12, 55:9,
55:12, 69:3,
80:9, 122:25
**earlier**
63:6, 80:14,
82:6, 94:15,
97:4, 100:16,
119:25, 122:5
**early**
21:9
**education**
15:21
**educational**
15:23
**edward**
15:4
**ee**
116:15, 116:18
**effect**
6:13, 32:24
**egg**
116:15
**eight**
28:12
**eighth**
56:22, 59:3,
59:12, 60:2,
60:24, 61:3,
66:1, 66:6,
66:9, 66:12,
66:13, 66:16,
67:5, 68:24,
71:16, 73:12,

73:16, 79:21,
79:25, 80:6,
80:15, 81:4,
81:9, 81:19,
83:3, 87:24,
96:23, 97:5,
110:11, 110:23,
112:17, 113:18,
115:8, 118:15,
118:20, 121:3
**either**
50:19
**elected**
33:21, 36:7,
36:23
**electors**
34:11
**electric**
39:7
**electrical**
57:8, 58:12
**elevator**
26:1, 38:16,
38:21, 39:1,
39:9, 39:10,
39:19, 39:22,
70:21, 80:24
**elevators**
23:11, 39:9,
39:13, 121:7,
121:15
**else**
7:1, 13:18,
14:7, 15:12,
20:20, 37:9,
46:3, 46:17,
68:23, 75:20,
76:8, 99:6,
122:19
**email**
40:11, 48:11,
50:23, 50:25,
51:3, 64:22,
65:11, 74:21,
85:12, 88:23,
89:2, 89:9,
89:18, 89:21,
89:23, 89:25,

90:7, 90:24,
91:1, 91:4,
91:8, 91:11,
92:17, 92:20,
98:22, 99:1,
99:7, 99:12,
99:23, 101:16,
102:16, 102:22,
103:1, 103:11,
106:2, 106:4,
106:22, 106:24,
108:2, 108:5,
108:18, 108:23,
118:12, 119:20
**emailed**
62:16, 91:17
**emailing**
120:1, 120:5
**emails**
22:24, 44:20
**emissions**
32:23
**emory**
83:19, 90:12,
93:16, 98:10
**employed**
40:20, 46:3
**employee**
124:16, 124:18
**employees**
67:11, 69:18,
70:13, 70:22,
72:12, 72:17,
73:11, 121:6,
123:1
**employer**
14:23, 14:24,
117:19
**employment**
15:20, 22:18
**empty**
44:17
**end**
32:21, 57:12,
59:17, 90:21,
102:16
**energy**
32:19

**engage**
41:20
**engineer**
41:20, 45:11
**engineering**
29:16, 34:8,
34:9, 36:12,
82:22, 82:23
**enhanced**
27:18
**ensure**
78:12
**enter**
26:21, 43:5,
75:11, 122:18
**entered**
121:14, 121:17
**entire**
24:15
**entities**
29:6, 69:3
**entrance**
26:18
**equipment**
69:11, 70:8,
70:10, 70:14,
70:18, 86:12
**eric**
56:24
**esq**
2:10, 2:21,
2:29
**essentially**
4:19
**est**
1:29
**estate**
21:25
**estimate**
20:17
**estimates**
23:5, 40:25
**ethnicity**
83:6
**even**
44:23, 59:9,
61:19, 74:7
**event**
124:20

events
76:12
ever
7:14, 10:5,
12:13, 12:17,
17:13, 25:1,
36:1, 36:19,
37:9, 42:18,
43:5, 44:16,
50:6, 50:11,
52:18, 52:21,
54:2, 54:5,
58:10, 61:6,
69:5, 72:5,
74:21, 74:23,
76:17, 80:5,
83:14, 83:18,
101:5, 102:20,
107:9, 115:1,
115:3
every
24:19, 25:7,
41:15, 52:16,
77:13
everyone
75:20
everyone's
122:23
exact
81:13, 87:15
exam
77:1, 77:3,
77:6
examination
3:3, 4:13,
124:7
examples
38:12
except
30:23, 81:18
exchange
98:21
excuse
39:15
executive
47:18
exhibit
88:3, 90:10,

90:11, 93:11,
93:13, 93:15,
98:4, 98:9,
102:3, 105:13,
111:20
existed
22:4, 58:15
exists
22:2
exorbitant
38:22
expecting
76:5
experience
28:6, 53:7,
100:12, 110:16
explain
30:3
explanation
66:24
extent
9:18, 74:11
exterior
23:10, 32:15,
41:24

**F**

facade
32:15
factors
78:23, 79:2
fair
47:12, 63:20
fall
7:24, 8:4,
8:15, 10:14,
12:9
falls
9:22, 20:12
familiar
81:11
far
41:21, 43:17,
47:9, 54:16
father
68:15, 68:16
fees
38:22

felt
38:16
few
68:24, 69:2,
73:1
fifth
36:13, 71:13,
82:21
figure
76:7
file
111:20
filled
53:20, 58:8,
69:10
film
69:10, 70:8,
70:9, 70:14
films
29:17, 29:20,
29:24, 69:9,
69:12, 69:19,
70:4, 70:7, 71:8
finally
6:5
financial
46:20, 77:17,
79:11
financially
124:20
fine
75:21
finish
4:25
finished
32:17, 71:20
firm
21:5, 21:6,
21:18, 21:21,
29:16, 34:7,
34:8, 34:9,
36:12, 59:5,
60:23, 82:22,
82:23
first
4:1, 9:12,
28:17, 39:18,
53:23, 68:18,

69:6, 69:15,
69:22, 70:11,
70:14, 70:15,
70:20, 71:22,
76:10, 81:21,
94:3, 95:7,
98:20, 103:15,
112:3, 118:18
fitness
79:11
five
13:11, 18:22,
28:21, 31:13,
31:14, 31:16,
31:20, 37:10,
41:15, 49:17,
83:7
five-minute
62:15
fixtures
42:12
floors
29:12, 39:14,
43:6, 43:13,
66:6, 70:25,
71:13, 71:23,
80:9, 81:17,
81:18, 81:19,
82:3, 82:21,
82:24, 110:24
fluorescent
42:13
focus
71:12, 76:12,
90:21, 102:16,
112:2
follow-up
108:1
following
85:7
follows
4:2
force
6:13
foregoing
124:11
forest
8:16

| form | G | 102:15, 108:21, | handling |
|------|---|------------------|----------|
| 4:20, 10:3, | **garfinkel** | 112:2, 114:5, | 43:19 |
| 30:6 | 2:20 | 121:9, 121:15 | **hands-off** |
| **formal** | **gary** | **good** | 56:12 |
| 65:8 | 34:3, 34:4 | 4:14, 38:7, | **happened** |
| **forth** | **gas** | 38:8, 75:13, | 73:23, 84:16 |
| 124:14 | 32:14, 32:23 | 75:17, 112:23 | **happy** |
| **forward** | **gave** | **governor** | 5:6 |
| 50:1, 50:4, | 19:18 | 39:8 | **harold** |
| 53:5, 54:11, | **general** | **greenhouse** | 2:38, 88:2, |
| 89:8, 92:17, | 47:14 | 32:23 | 88:10, 90:9, |
| 97:18, 97:25 | **generally** | **grill** | 90:15, 90:20, |
| **forwarded** | 9:18, 24:21, | 1:16, 2:17, | 93:9, 93:11, |
| 84:12, 84:15, | 36:25, 41:18, | 5:22, 14:17, | 94:3, 95:13, |
| 84:17, 89:21, | 43:12, 46:22, | 29:22, 34:2, | 95:24, 96:1, |
| 97:23, 104:21, | 47:22, 49:24, | 34:22, 35:9, | 97:16, 98:3, |
| 105:1, 105:2, | 65:1, 69:8, | 72:20, 82:9, | 98:19, 101:25, |
| 105:10 | 71:1, 71:4, | 83:4, 89:10, | 102:2, 102:15, |
| **forwards** | 71:7, 71:23, | 118:4 | 103:14, 104:18, |
| 46:13 | 72:9, 72:13, | **ground** | 105:12, 108:11, |
| **found** | 76:11 | 28:24, 29:19, | 110:8, 111:19, |
| 118:19 | **gg** | 70:16 | 111:23, 114:3, |
| **four** | 88:3, 92:18 | **group** | 114:16, 115:20, |
| 18:21, 30:11, | **give** | 22:5 | 116:13, 117:13, |
| 39:13, 42:25, | 6:12, 66:24, | **guess** | 118:24 |
| 49:24, 51:20, | 96:6 | 49:15, 61:5, | **head** |
| 91:16, 91:19, | **given** | 64:19, 71:11, | 5:10, 30:13, |
| 91:22 | 10:5, 12:17, | 73:21, 80:4, | 43:9 |
| **fourth** | 55:25, 110:15, | 81:12, 94:23 | **hear** |
| 36:13, 39:9, | 119:25 | | 62:4 |
| 71:13, 82:20 | **gives** | H | **heard** |
| **free** | 41:17, 56:3 | **h-o-l-l-o-w** | 74:7, 83:14, |
| 19:7 | **gms** | 4:11 | 83:15, 83:16, |
| **front** | 29:16 | **half** | 83:18, 87:9 |
| 14:4, 26:18 | **go** | 7:21, 9:16, | **held** |
| **full** | 39:14, 40:7, | 76:10 | 29:17, 29:19, |
| 4:4, 15:2 | 61:22, 69:4, | **hand** | 29:24, 32:3, |
| **fully** | 72:7, 75:9, | 29:17, 29:19, | 32:4, 36:1, |
| 6:18, 6:23, 7:3 | 94:2, 95:25 | 29:24, 33:12, | 52:12, 52:25, |
| **furniture** | **going** | 69:9, 69:12, | 69:9, 69:12, |
| 67:2, 67:5, | 4:19, 4:20, | 69:19, 70:4, | 69:19, 70:4, |
| 67:6, 67:8, | 15:19, 24:24, | 70:6, 71:8, | 70:7, 71:8 |
| 86:12, 86:17, | 25:3, 34:25, | 78:10 | **help** |
| 87:15, 87:21, | 36:22, 39:18, | **handle** | 23:3, 23:5, |
| 87:23, 87:25 | 53:16, 69:4, | 38:24, 40:12 | 23:7, 60:7 |
| **further** | 72:24, 87:3, | **handled** | **helps** |
| 108:1, 124:10, | 90:20, 92:8, | 38:17, 38:18, | 41:15 |
| 124:15 | | 78:17 | **here** |
| | | | 7:6, 19:10, |

94:4
**hereby**
124:5
**hereinbefore**
124:13
**hills**
8:16
**hire**
67:1
**hired**
12:5, 38:22
**history**
15:23, 79:5
**hoist**
39:8
**hold**
16:17, 34:12,
62:21
**holding**
120:1
**holdings**
1:14
**hollow**
4:10, 24:2
**honig**
29:15
**hostetler**
2:9
**hour**
13:23, 23:20,
24:23, 76:7
**hours**
23:20, 24:24,
70:3
**however**
15:11
**hurt**
11:11, 11:13

**I**

**idea**
75:17, 121:11
**identified**
26:20
**identify**
29:5
**imagine**
64:22

**impact**
32:21
**important**
41:13
**improved**
41:12, 42:11
**improvement**
32:12, 41:9
**improvements**
23:3, 23:8
**inc**
1:15, 1:21,
2:17, 5:22, 94:6
**incandescent**
42:13
**include**
17:10, 41:7,
42:14, 51:22
**included**
108:18
**income**
79:3
**increases**
28:3
**individual**
10:19, 14:15,
25:21, 34:12,
37:13
**individuals**
29:6, 69:3,
83:7
**inform**
64:19, 85:15,
89:15
**informal**
37:16
**information**
46:12, 54:10,
54:11, 84:11,
84:14, 95:6,
95:7, 97:23,
104:25
**informed**
85:19
**informing**
64:16, 64:24
**injured**
11:14

**injury**
11:15
**inspection**
32:16, 41:14,
42:5, 42:9,
42:14
**install**
27:7, 27:12,
121:11, 121:20
**installations**
23:12
**installed**
26:10, 121:10,
122:5
**installing**
28:7, 28:11,
28:18, 28:20
**instruct**
103:7
**insurance**
29:15, 60:15,
60:18, 87:20
**integrated**
29:2
**intended**
96:15
**intercom**
26:6, 26:9,
26:15, 26:16,
26:23, 27:7,
27:13, 27:16,
27:24, 28:7,
28:18, 28:23,
28:24, 29:2,
121:9, 121:12,
121:21, 122:4,
122:10, 122:17,
122:22
**interest**
37:14
**interested**
124:20
**internal**
70:21
**interview**
56:9, 62:21,
64:7, 64:10,
65:22, 78:3,

84:19, 84:21,
84:24, 85:2,
85:5, 85:7,
99:19, 100:1,
100:4, 100:8,
100:14, 100:24,
102:24, 103:3,
103:7, 103:24,
106:15, 107:3,
108:7, 111:2,
111:5, 111:8,
111:11, 111:14,
111:17, 119:4
**interviewed**
100:17
**interviews**
65:19
**invoice**
45:21, 45:25
**invoices**
40:10, 40:25,
41:1
**involve**
13:5, 39:5
**involved**
11:22, 23:2,
53:24, 54:2,
62:13, 76:17
**involvement**
104:22, 105:7
**involving**
13:12
**issue**
40:8, 43:8,
73:18, 74:9
**issued**
65:9
**issues**
17:9, 23:7,
45:5, 58:20,
58:24, 59:22,
60:1, 73:14,
73:20, 121:2,
121:5
**item**
51:13, 51:17
**items**
51:7

**itself**
79:18
**izzy**
37:24

### J

**january**
99:16, 100:3,
102:24, 106:5,
106:10, 106:13,
106:15, 106:17,
108:6
**jersey**
124:5
**job**
1:32, 11:12,
12:4, 17:10,
38:7, 38:9
**jobs**
46:18
**joe**
34:2, 34:22
**joey**
72:22, 117:17,
117:23
**joined**
21:14, 35:24
**joseph**
1:16, 2:17,
5:22, 14:17,
29:22, 35:9,
82:9, 118:4
**july**
19:22

### K

**kaled**
4:10, 8:13,
8:18, 9:10,
9:24, 9:25,
11:22, 11:24,
13:5, 13:12,
14:20, 15:6,
16:5, 16:21,
17:3, 20:20,
20:24, 21:3,
21:14, 22:21,
27:7, 37:23,

40:1, 45:18,
46:4, 46:17,
46:25, 54:8,
54:12, 54:15,
54:19, 55:15,
56:12, 56:16,
57:20, 60:14,
61:13, 61:19,
64:23, 65:18,
69:13, 75:3,
75:10, 77:8,
77:20, 79:13,
85:15, 85:18,
93:7, 93:25,
94:11, 95:6,
95:15, 97:18,
97:25, 105:3,
105:8, 111:17,
117:17, 117:18,
118:8
**kaled's**
60:17, 104:22
**kalikow**
15:1, 15:4
**kalikow's**
15:2, 15:5
**keep**
33:8, 43:19,
71:9, 109:23
**kept**
70:18, 80:13
**keys**
78:11
**kind**
16:6, 18:10,
39:25, 40:22,
40:23, 42:8,
45:5, 70:6,
83:21
**kk**
105:13, 105:15
**knew**
92:23
**knowledge**
4:23, 101:11,
101:14

### L

**l-e-h-r**
4:6

**labor**
12:21, 12:24
**lack**
77:14
**land**
72:25
**language**
104:15, 108:18
**largely**
49:4, 56:12
**last**
7:20, 26:11,
28:19, 29:1,
36:6, 36:7,
44:25, 57:13,
67:19, 95:14,
121:10
**law**
32:14, 32:19,
32:22, 41:14
**lawsuit**
8:3, 8:6,
10:10, 11:23,
12:7, 12:11,
76:14, 79:20
**layout**
71:2, 71:21
**leaking**
74:1, 74:2
**learn**
85:10
**lease**
57:17, 58:10,
58:15, 59:17,
77:10, 77:13,
78:8, 79:14,
80:6, 80:11,
117:17, 118:9,
119:9
**leases**
80:9
**leasing**
76:21, 78:17,
78:20, 78:23
**least**
35:4, 61:12,
74:15
**leave**
57:16

**led**
76:12
**leds**
42:13
**left**
57:12
**lehr**
1:26, 3:5, 4:6,
4:14, 6:8, 7:5,
7:14, 13:14,
15:15, 15:22,
29:5, 69:5,
75:24, 88:7,
88:19, 88:24,
89:8, 90:13,
90:23, 91:2,
92:14, 93:15,
93:21, 94:14,
96:4, 96:14,
98:8, 98:16,
98:22, 98:23,
99:22, 102:7,
102:18, 103:17,
104:20, 105:14,
105:23, 108:13,
108:22, 110:10,
111:1, 111:22,
112:2, 112:21,
114:7, 114:14,
114:19, 115:23,
116:16, 116:23,
117:15, 119:1,
120:11, 121:1,
124:7
**lenses**
71:9, 71:10
**let's**
30:11, 44:25
**letter**
106:19
**letting**
65:12
**liaison**
45:12, 45:13
**licensed**
96:12
**licensing**
77:1, 77:3,

77:5
**lie**
113:23
**light**
42:12
**lighting**
41:23
**likely**
29:1, 90:3
**listed**
106:7
**little**
23:20, 30:24,
49:8, 102:17,
115:22
**llc**
1:14
**llp**
2:20, 2:28
**local**
32:14, 32:18,
32:22, 41:14
**located**
4:8
**location**
44:15, 45:23,
55:10
**locations**
24:25
**long**
13:21, 15:11,
16:11, 19:20,
21:8, 22:6,
31:2, 31:6,
35:1, 35:6,
35:9, 35:13,
35:16, 35:19,
35:23, 36:15,
37:18, 37:25,
40:16, 40:19,
57:10, 58:1,
59:8, 67:8,
67:10, 69:13,
85:2
**longer**
22:2, 76:4,
76:6
**look**
41:25, 43:1,

105:17, 114:6
**looked**
42:8, 77:14,
77:15, 101:5,
101:10
**looking**
26:23, 27:14,
38:3, 41:21,
42:10, 42:15,
88:22, 92:18,
106:1
**looks**
47:22, 47:23,
48:3
**lost**
12:8
**lot**
45:10, 48:4
**loud**
30:14
**lunch**
72:24

### M

**machine**
39:12
**machines**
39:7
**mails**
45:22
**main**
46:22
**mainly**
79:10
**maintenance**
45:19, 45:21,
45:25
**majority**
23:21, 49:18,
50:2
**make**
4:24, 17:24,
31:8, 33:12,
40:5, 42:2,
43:18, 54:15,
54:19, 71:11,
77:16, 122:25
**makes**
47:21

**making**
41:8
**manage**
16:9, 17:7,
18:1, 18:5,
18:24, 19:8,
19:11, 20:5,
20:18, 20:20,
21:17, 22:22,
24:4, 24:19,
27:22, 28:17,
37:25, 77:22,
78:3
**managed**
8:17, 9:24,
17:11, 17:14,
17:20, 17:23,
27:22, 31:6,
37:22, 69:13
**management**
4:10, 16:4,
16:5, 16:19,
16:25, 20:12,
21:5, 21:25,
22:5, 59:15,
61:20, 110:16,
111:17
**management's**
95:6
**manager**
16:20, 17:6,
18:2, 21:11,
21:15, 22:12,
22:14, 38:4,
38:23
**managers**
16:8, 18:15,
18:19, 19:10,
19:25, 20:5,
22:23, 23:3,
23:23, 27:23
**manages**
20:24, 77:20
**managing**
18:20, 18:21,
19:21, 19:23,
19:24, 23:17,
23:22, 31:19,

33:19, 36:16,
36:20, 56:16,
57:20, 61:14,
65:18, 73:24,
80:2, 100:12,
100:18
**manhattan**
11:21
**manual**
39:10
**many**
9:3, 13:9,
18:1, 18:4,
18:15, 18:18,
20:1, 27:23,
30:9, 30:20,
31:12, 42:24,
44:1, 45:1,
46:14, 51:7,
56:15, 65:19,
69:15, 69:18,
69:24, 77:7,
79:7, 81:3,
81:17
**marc**
1:16, 5:22,
14:11, 14:16,
29:25, 34:2,
34:19, 35:1,
106:23, 107:23,
113:8, 113:13,
113:19, 120:12
**march**
1:28, 52:6
**margolis**
2:20, 2:21,
7:18, 13:17,
17:15, 19:1,
19:4, 19:13,
20:15, 24:8,
27:9, 28:9,
28:13, 29:3,
30:5, 30:12,
38:5, 38:10,
38:19, 46:1,
50:8, 51:9,
51:16, 51:24,
52:3, 60:11,

60:20, 61:25,
62:11, 65:10,
74:5, 75:16,
78:15, 85:21,
91:12, 92:3,
92:5, 92:11,
95:12, 96:8,
96:21, 97:1,
97:10, 99:15,
99:24, 100:9,
100:21, 101:18,
101:23, 102:4,
102:6, 103:4,
103:19, 104:8,
104:17, 104:24,
106:25, 107:6,
107:14, 108:3,
108:8, 108:19,
109:9, 109:16,
110:12, 110:20,
112:16, 113:5,
113:9, 113:14,
113:25, 115:12,
115:17, 116:5,
116:10, 117:11,
117:20, 117:25,
118:5, 118:22,
119:5, 119:10,
119:14, 119:22,
120:8, 120:18,
120:23, 122:1,
122:7, 122:12,
122:20, 123:5
**mark**
2:26
**martucci**
2:29, 48:15,
50:9, 53:14,
75:21, 78:16,
85:20, 96:9,
97:2, 97:11,
99:14, 99:25,
100:10, 101:22,
103:5, 104:9,
107:1, 107:7,
108:9, 108:20,
109:10, 109:15,
110:13, 110:19,

111:13, 113:2,
113:10, 113:15,
114:1, 115:13,
115:18, 116:4,
116:11, 117:10,
117:21, 118:1,
118:6, 118:21,
119:6, 119:15,
119:21, 120:7,
120:17, 120:24,
122:13, 122:21,
123:7
**mary**
98:7
**master's**
15:25
**match**
78:10
**material**
13:24
**materials**
14:4, 105:10
**max**
35:24
**maxime**
1:17, 2:17,
5:22, 14:17,
34:3
**maybe**
10:9, 43:9,
47:7, 59:9
**mean**
23:9, 25:12,
40:2, 53:4,
63:5, 80:11,
99:23, 104:11
**meaning**
8:2, 30:7
**means**
5:17, 7:11
**meant**
100:8, 100:11,
101:19, 104:7,
113:1, 115:11
**media**
59:5, 60:23
**mediation**
1:6, 2:7, 4:17,

5:14, 12:18
**medical**
6:16
**medications**
6:21
**meet**
13:21, 32:1,
44:3, 52:18,
52:21, 62:21,
77:16, 99:16
**meeting**
31:25, 32:3,
32:7, 32:10,
33:1, 33:3,
33:5, 33:9,
33:16, 33:22,
36:8, 36:22,
37:3, 37:5,
37:7, 43:21,
44:2, 44:8,
48:9, 51:3,
51:6, 51:12,
51:23, 52:6,
52:14, 52:15,
52:16, 52:22,
63:25, 64:9,
64:14, 66:23,
68:10, 73:4,
107:10, 109:18,
109:21, 109:24,
110:5, 120:2
**meetings**
23:2, 33:18,
43:17, 43:24,
44:1, 44:6,
44:9, 44:12,
44:18, 52:12,
52:24, 68:8,
68:14, 109:24,
109:25
**meets**
31:10, 51:21,
52:9
**member**
31:24, 35:1,
35:2, 35:10,
35:17, 35:23,
36:5, 36:19,

37:10, 37:14,
48:17, 48:19,
50:12, 57:24,
58:1, 121:6
**members**
1:20, 6:1,
31:12, 31:17,
31:21, 34:1,
34:11, 36:23,
36:24, 37:11,
37:19, 44:16,
47:3, 49:15,
49:18, 50:2,
53:8, 54:2,
58:24, 60:1,
62:24, 63:25,
64:4, 83:1,
86:9, 89:17,
97:24, 104:1,
105:3, 109:8,
111:3, 111:12,
116:8, 121:24
**memorize**
77:2
**memorized**
76:25
**mental**
6:17
**mentioned**
5:13, 30:2,
40:22, 53:2,
55:4, 80:14,
82:5
**merchants**
29:13
**met**
14:10, 52:8,
115:1
**mia**
117:17, 117:24
**michael**
1:17, 2:18,
5:23, 14:16,
102:9, 108:14
**middle**
112:3, 114:17
**might**
47:10, 79:8

mike
34:2, 34:24,
54:24, 99:5
minimum
64:3
minute
75:15, 110:4
minutes
23:1, 33:3,
33:6, 33:9,
33:11, 43:19,
44:9, 64:10,
64:14, 107:10,
109:18, 109:21,
109:24, 110:5
models
29:11, 29:21,
82:9
modernization
38:16, 39:1
money
42:12, 47:23,
48:1, 48:5
monitor
22:24
month
42:24, 43:1,
47:5
more
5:25, 25:9,
45:3, 47:13,
49:8, 69:2,
70:1, 81:6
most
9:15, 13:7,
19:9, 27:25,
28:22, 33:21,
41:13, 90:3
motors
39:7
move
49:25, 50:4,
53:5, 60:8,
66:15, 67:1,
86:12, 87:15,
87:21, 90:19
moved
60:10, 66:13,

66:20, 67:12
movers
60:19, 67:1
moving
60:13, 86:17,
87:24
much
23:16, 24:21,
41:19, 76:4,
76:6
must
5:9, 64:4,
99:20, 101:2

**N**

name
4:4, 4:14,
15:3, 21:6,
22:1, 22:3,
37:24, 40:15,
59:6, 68:18,
122:14
named
105:13, 111:20
names
112:11, 114:22,
114:24, 117:1,
117:3
nancy
1:34, 124:3,
124:24
neat
40:6
need
6:5, 17:25,
32:16, 42:2,
43:8, 45:17,
72:7, 72:15,
74:16, 119:3
needed
42:23, 43:1,
43:2, 43:9,
44:14, 51:10,
87:20
needs
41:11, 41:16,
41:25, 42:10,
111:24

negotiation
54:3
neither
124:16, 124:18
never
19:18, 46:2,
69:25, 73:14,
87:9, 101:10
new
1:2, 2:12,
2:23, 2:32,
4:11, 38:4,
89:12, 124:5
next
33:15, 38:24,
56:1, 90:21,
114:5, 115:21,
115:25, 117:14
nigel
1:18, 15:16,
29:14, 67:16,
67:17, 68:13,
88:4, 99:9,
105:16, 112:13,
112:14, 112:21,
114:9, 114:25,
115:23, 116:2,
116:17, 117:4
ninth
71:17, 82:3
nodding
5:10
nomination
36:24
non-annual
44:12
none
7:4, 20:3,
58:22, 59:1,
59:25, 73:17,
96:22
nope
46:5, 109:14
normal
51:6, 91:19
normally
72:2
notary
124:4

note
96:9
notes
33:2, 33:12,
33:14, 107:10
nothing
51:14, 123:5,
123:7, 124:9
notice
65:8
november
19:23, 112:10
number
4:21, 44:23,
49:13, 64:3,
96:5

**O**

o0o
123:9
oath
6:9, 120:16
object
19:5
objection
7:18, 17:15,
19:1, 19:5,
19:13, 20:15,
24:8, 27:9,
28:9, 28:13,
29:3, 30:5,
38:5, 38:10,
38:19, 46:1,
48:15, 50:8,
50:9, 51:9,
51:16, 51:24,
52:3, 53:14,
60:11, 60:20,
61:25, 62:11,
65:10, 74:5,
78:15, 78:16,
85:20, 85:21,
91:12, 92:3,
92:5, 95:12,
96:8, 96:10,
96:21, 97:1,
97:2, 97:10,
97:11, 99:14,

99:15, 99:24,
99:25, 100:9,
100:10, 100:21,
101:18, 101:22,
101:23, 103:4,
103:5, 103:19,
104:8, 104:9,
104:17, 104:24,
106:25, 107:1,
107:6, 107:7,
107:14, 108:3,
108:8, 108:9,
108:19, 108:20,
109:9, 109:10,
109:15, 109:16,
110:12, 110:13,
110:19, 110:20,
111:13, 112:16,
113:2, 113:5,
113:9, 113:10,
113:14, 113:15,
113:25, 114:1,
115:12, 115:13,
115:17, 115:18,
116:4, 116:5,
116:10, 116:11,
117:10, 117:11,
117:20, 117:21,
117:25, 118:1,
118:5, 118:6,
118:21, 118:22,
119:5, 119:6,
119:10, 119:14,
119:15, 119:21,
119:22, 120:7,
120:8, 120:17,
120:18, 120:23,
120:24, 122:1,
122:7, 122:12,
122:13, 122:20,
122:21
**objections**
92:10
**observe**
42:6
**occupant**
40:11, 122:24
**occupants**
58:23, 60:1,

75:8
**occupation**
16:3
**occupied**
29:13, 29:14,
29:16, 29:17,
29:19, 69:12,
71:8, 81:17,
82:16
**occupies**
29:10, 29:12,
82:17, 82:24
**occupy**
29:6, 69:3,
87:2, 87:4
**occupying**
67:25, 73:15,
81:21, 81:25,
82:3, 82:7,
82:10, 82:14,
82:21
**occur**
48:8
**october**
16:22, 16:24
**odd**
30:25
**off-site**
40:3
**offhand**
25:25
**office**
17:19, 25:20,
40:10, 45:8,
53:21, 67:2,
67:4, 71:24,
76:21, 86:12,
96:12, 97:13
**officer**
47:18
**officers**
33:24, 34:11,
34:12, 47:13
**offices**
4:9, 71:15,
71:17, 71:18,
71:21, 81:1,
81:4, 97:5

**official**
65:3
**often**
24:3, 42:22,
44:20, 44:21,
45:15, 47:2,
47:5, 47:13,
51:2, 51:21,
52:12, 72:20,
73:2, 73:11,
74:13, 104:1
**oh**
39:15, 39:16,
62:5
**okay**
16:2, 28:25,
30:16, 57:5,
88:13, 88:18,
90:18, 90:19,
93:9, 93:20,
98:14, 98:15,
102:13, 105:21,
105:22, 112:1,
112:4, 114:11,
114:13, 116:22
**on-site**
40:2, 40:4
**once**
21:14, 26:21,
37:13, 39:22,
55:24, 74:15
**one**
5:2, 11:3,
13:7, 18:8,
18:9, 18:12,
18:13, 18:20,
18:21, 20:7,
24:5, 24:6,
30:11, 47:6,
47:7, 49:24,
50:7, 60:22,
65:21, 70:1,
73:21, 97:24,
116:7, 122:19
**ones**
19:19
**ongoing**
32:12

**only**
5:2, 6:6, 11:1,
14:1, 19:8,
20:11, 20:22,
42:16, 43:12,
65:21, 82:2,
105:7, 122:18,
122:25
**open**
71:7, 71:13,
71:18, 71:21,
75:6, 75:7
**operate**
70:23, 96:12,
96:15, 96:19
**operating**
70:3, 70:7,
83:22, 122:9
**operation**
96:7
**opinion**
97:14, 110:10,
110:14, 110:21
**opinions**
90:4, 110:17
**order**
50:3, 87:20
**organized**
71:24
**original**
94:24, 95:2
**other**
1:19, 9:25,
10:1, 11:3,
17:2, 17:22,
19:10, 21:20,
22:14, 22:17,
22:22, 23:22,
25:1, 27:21,
43:23, 47:24,
55:8, 58:23,
61:16, 63:16,
66:1, 66:4,
79:2, 86:8,
100:17, 105:5,
110:23
**others**
19:24

otherwise
6:24, 99:21,
101:21
out
28:23, 30:13,
38:21, 42:1,
45:2, 45:15,
45:18, 53:20,
58:8, 60:8,
60:10, 60:13,
73:20, 73:22,
74:4, 87:10,
113:19, 118:19
out-patient
96:12, 96:15,
96:20, 96:25,
97:9
outcome
8:20, 12:6,
12:11, 124:20
over
28:1, 36:13,
40:7, 45:25,
52:9, 52:13,
52:21, 57:20,
59:15, 61:13,
61:19, 79:24,
100:18, 105:17
oversee
18:16, 18:19,
20:1, 20:23,
23:17
own
30:7, 43:6,
77:22, 87:25
owned
29:12, 29:14,
29:15, 29:22,
29:24, 61:3,
82:6, 118:4
owner
15:7, 15:8,
43:14
owners
25:22
ownership
30:7
owns
48:18, 112:17,

115:7
oxford
1:14, 37:6,
61:3, 66:13,
67:11, 68:1,
68:2, 68:21,
73:3, 79:24,
85:23, 86:3,
109:17, 110:11,
112:15, 115:7,
120:13, 120:22
oxford's
80:6

**P**

p-e-t-e-r
4:5
page
90:21, 94:3,
95:7, 95:14,
95:25, 96:2,
103:15, 103:16,
108:12, 112:3,
114:17, 117:14
pages
1:33, 93:18
paint
67:23
painted
41:25
pandemic
52:5, 52:19
paperwork
40:9, 40:23
part
41:7, 100:1
participated
2:2
particular
121:16
parties
7:10, 10:15,
11:16
party
124:17
past
28:20, 68:24,
73:1, 119:13,

119:24
patients
97:9, 122:11,
122:18
paturet
1:16, 2:26,
5:22, 14:11,
14:16, 29:25,
34:2, 34:19,
35:2, 47:7,
48:3, 81:20,
83:4, 89:9,
106:23, 107:23,
113:8, 113:13,
113:19, 120:12,
120:21
payroll
24:10
payrolls
24:11
pdf
109:1
pending
6:7
people
26:17, 46:20,
46:21, 47:24,
69:15, 69:22,
121:14, 121:17,
121:19
percent
28:1, 52:1
perfect
114:18
performed
95:22
performs
46:18
period
63:17, 65:18
permitted
119:8
person
5:2, 18:20,
18:21, 26:20,
42:18, 52:7,
62:21, 64:7,
72:15, 78:13

personal
9:7, 12:15
personally
18:24, 23:18
pertinent
55:10
peter
1:26, 3:5, 4:5,
30:12, 88:23,
91:1, 98:23,
124:7
peter@kaled
88:24, 91:2,
98:23
phone
17:24, 26:19,
62:15
photo
78:6, 78:9,
78:14
physical
6:17, 23:13,
96:24
pipe
43:8
place
43:11, 64:7,
67:24, 110:3,
110:6, 124:13
placed
26:17
places
22:17
plaintiff
1:10, 2:6, 4:18
plan
71:18
planet
2:38
plaza
2:11
please
4:3, 4:24, 5:5,
15:22, 88:6,
90:22, 93:14,
96:4, 96:6,
96:9, 98:4,
99:13, 102:3,

102:5, 105:21
**plus**
45:12, 110:15,
111:10
**point**
46:23, 75:14
**policies**
62:6, 64:23,
77:8, 77:12,
79:13
**policy**
60:17, 65:3,
77:13
**portfolio**
24:15
**position**
16:15, 16:17,
21:10, 22:10
**positions**
17:2, 21:20
**possible**
91:22, 92:1,
92:4, 92:6,
113:7, 115:15,
116:7, 118:3,
119:1, 120:4,
120:9
**post**
16:1
**potential**
44:17
**predates**
40:18
**premarked**
88:3, 90:11,
92:18, 93:12,
93:17, 98:9,
102:8, 105:15,
114:8, 116:18
**prepare**
13:15, 13:25,
33:11, 44:8,
45:21
**prepares**
33:5
**preparing**
42:4, 64:9,
64:14

**presence**
25:5
**present**
2:36, 16:25,
32:6, 33:17,
52:25, 85:5,
107:3
**presented**
37:1
**presently**
4:8
**preserve**
19:5
**president**
34:15, 34:16,
34:17, 34:20,
35:7, 35:14,
48:2, 53:3,
83:19, 107:2,
112:23, 113:3,
113:20, 113:24
**president's**
47:16
**prevent**
6:18, 6:22, 7:2
**preventing**
77:9
**previously**
16:18
**primarily**
23:25
**printed**
94:17, 94:19
**printer**
45:22
**prior**
8:23, 36:19,
52:18, 61:19,
63:13, 83:13,
119:17, 121:2,
124:6
**private**
71:15, 71:17,
71:18, 71:21,
81:3, 97:5
**probably**
7:20, 9:14,
45:3, 74:6,

107:17
**procedure**
89:14
**procedures**
62:7
**process**
36:24, 53:17,
53:18, 53:24,
54:9, 58:4,
61:23, 62:25,
65:5, 78:4,
100:2, 104:23
**processed**
53:20
**project**
25:3, 32:13,
38:14, 38:16,
39:1, 45:12,
45:14, 50:1,
50:13, 53:9
**projects**
41:9, 53:6
**proper**
92:6
**properties**
9:24, 17:14,
17:20, 17:23,
18:1, 18:4,
18:7, 18:10,
18:18, 18:21,
18:25, 19:8,
19:12, 19:21,
20:1, 20:4,
20:8, 20:24,
23:17, 24:4,
24:13, 24:18,
24:22, 27:21,
46:14, 55:7,
55:8, 77:21
**property**
8:17, 16:8,
16:9, 16:19,
16:20, 17:6,
17:11, 18:2,
18:15, 18:19,
19:25, 20:5,
20:9, 20:10,
20:19, 21:4,

21:11, 21:14,
22:12, 22:14,
22:22, 23:3,
23:11, 23:14,
23:22, 25:7,
27:23, 33:20,
36:16, 36:20,
38:1, 38:4,
40:5, 45:13,
55:12, 57:20,
59:15, 61:14,
65:19, 68:14,
79:15, 80:3,
100:13, 100:19,
110:16, 121:14,
121:18
**proposal**
20:18
**proprietary**
80:11, 119:9
**prospective**
55:24, 64:19,
66:4
**provide**
91:20
**provided**
91:24, 95:18
**providing**
96:13
**psychotherapist**
96:13
**psychotherapist's**
97:13
**public**
124:4
**pull**
88:3, 90:10,
93:11, 93:13,
98:4, 102:2,
105:13, 111:20,
116:14
**purchased**
57:18
**purpose**
78:9
**put**
44:23, 122:15

## Q

**q2**
93:12

**quarterly**
44:4, 44:9,
52:7, 109:24
**queens**
8:8, 18:9,
18:13
**question**
4:20, 4:25,
5:5, 6:7, 17:18,
18:8, 19:7,
28:10, 28:14,
51:5, 72:3,
78:19, 92:7,
92:12, 92:13,
101:4, 119:23
**questions**
4:21, 5:8,
15:20, 47:10,
54:5, 69:2, 88:9
**quickly**
35:1, 88:8,
93:18

**R**

**race**
83:6
**races**
83:9
**raise**
45:6
**random**
121:19
**rarely**
72:19
**rather**
5:10
**ratio**
79:3
**rd**
91:4
**reach**
45:15, 73:20,
73:22, 74:4,
87:10, 113:19
**reached**
45:2
**read**
23:1, 89:25,

96:4, 99:12,
107:16
**ready**
90:15, 98:12,
102:11, 105:18,
114:14, 116:19
**real**
21:24
**really**
88:21
**realtime**
124:25
**realty**
1:14, 1:15,
1:21, 2:16,
5:22, 94:6
**reason**
6:6, 19:19,
89:1, 96:18,
113:12, 113:22
**reasons**
13:3
**recall**
9:19, 10:10,
11:7, 12:20,
13:8, 48:22,
50:10, 52:23,
55:3, 59:6,
67:10, 68:12,
77:4, 81:8,
81:13, 84:2,
84:5, 86:5,
86:7, 86:10,
86:11, 87:14,
89:5, 89:19,
89:24, 91:7,
92:16, 108:4,
111:15, 118:18,
118:23
**receive**
44:20, 53:25,
78:6, 89:2,
89:4, 106:4,
118:9
**received**
85:12, 93:4,
93:25, 106:17,
109:18, 119:13

**recent**
13:7, 32:12,
33:22, 52:14
**recently**
9:15, 26:11,
32:4
**reception**
80:18
**recess**
75:22
**recognize**
88:19, 90:23,
93:21, 98:16,
99:7, 102:18,
105:23, 112:5,
112:11, 114:19,
114:22, 116:23,
117:1
**recollection**
6:24
**recommend**
42:3
**recommendation**
54:15, 54:19
**recommendations**
41:8
**record**
4:4, 16:2, 19:6
**refer**
5:15, 5:20,
5:23, 5:25,
25:11
**referenced**
101:1
**referring**
113:7, 115:16,
116:3, 117:8,
117:18, 117:24,
118:3
**regarding**
15:13, 15:20,
65:9, 65:15,
77:9, 102:23,
103:2, 103:23,
105:4, 105:9,
111:8, 111:14,
120:13, 120:22
**related**
40:24, 119:19

**relative**
124:16, 124:18
**relocation**
39:11
**remaining**
70:25, 71:23
**remember**
36:21, 59:10,
59:13, 63:12,
63:15, 71:16,
86:19, 87:13,
87:18, 87:22,
92:22, 108:24,
109:6, 109:22,
110:7
**remote**
7:11
**remotely**
2:2
**renovation**
45:10
**rent**
70:8, 77:25,
79:4
**rental**
18:13, 18:14,
20:8, 77:21,
79:5, 79:8
**rentals**
18:22, 77:16,
77:20, 78:3
**renting**
78:24
**repair**
42:11
**repaired**
40:6, 41:12,
43:9
**repairs**
42:2, 44:14,
47:9
**repeat**
5:5
**repeated**
92:11
**rephrase**
5:5
**replace**
39:6

| | | | |
|---|---|---|---|
| **replaced** | 70:22 | 23:5, 40:10, | **rr** |
| 43:10 | **residential** | 53:22, 84:8, | 102:3, 102:4, |
| **report** | 18:12, 18:13, | 84:13, 88:8, | 102:8 |
| 32:20, 32:22, | 20:6, 20:7, | 90:14, 95:9, | **rubin** |
| 32:23, 43:18 | 77:19, 77:21, | 98:11, 109:5, | 46:6, 55:4, |
| **reported** | 77:24, 78:2, | 111:23, 114:10, | 84:13, 89:20, |
| 1:34 | 79:16 | 116:20 | 91:15, 92:14, |
| **reporter** | **residents** | **reviewed** | 92:18, 92:23, |
| 4:3, 4:7, 5:1, | 75:7 | 84:10, 87:6 | 95:5, 97:20, |
| 5:7, 30:14, | **resolve** | **reviewing** | 99:8, 102:23, |
| 124:4 | 45:24, 74:8 | 88:11, 88:14, | 103:1, 103:16, |
| **reporter's** | **respect** | 88:17, 90:17, | 104:4, 106:20, |
| 124:1 | 15:6, 22:21, | 93:19, 98:13, | 107:20 |
| **reports** | 31:9, 47:17, | 102:12, 102:14, | **rubin's** |
| 22:25 | 48:24, 49:5, | 105:19, 111:25, | 78:21, 103:18 |
| **represent** | 54:20, 65:25, | 114:12, 116:21 | **rules** |
| 4:16, 5:14, | 79:14, 101:8 | **rhyme** | 75:10 |
| 34:5 | **respond** | 19:18 | |
| **representative** | 89:18, 89:23, | **right** | **S** |
| 37:6, 75:3 | 107:18, 107:20, | 81:7, 90:22, | **s** |
| **represented** | 107:23 | 91:8, 98:21, | 2:1, 9:14, 11:6 |
| 11:19 | **responds** | 114:18 | **said** |
| **representing** | 115:25 | **rings** | 29:21, 34:10, |
| 10:18 | **response** | 26:19 | 59:2, 60:13, |
| **represents** | 86:23, 103:18, | **rmr** | 76:7, 98:6 |
| 112:14 | 115:21, 117:15 | 1:34, 124:24 | **sales** |
| **request** | **responsibilities** | **road** | 46:10 |
| 43:3, 43:13 | 16:7, 17:5, | 4:11, 24:2 | **same** |
| **requested** | 21:13, 22:14, | **rockefeller** | 6:12, 16:14, |
| 43:6 | 43:16 | 2:11 | 24:12, 24:14, |
| **require** | **responsible** | **rodriguez** | 35:11, 35:18, |
| 48:1, 51:8, | 46:4, 49:5, | 2:38 | 43:25, 53:8, |
| 101:13, 121:21 | 64:11, 64:17 | **role** | 53:12, 71:19, |
| **required** | **rest** | 8:13, 9:10, | 71:20, 82:17, |
| 39:11, 49:1, | 18:22 | 15:5, 16:6, | 82:23, 110:6, |
| 49:2, 49:14, | **restoration** | 16:7, 16:12, | 115:23 |
| 49:18, 54:19, | 72:16 | 22:21, 36:2, | **saul** |
| 55:21, 60:14, | **resume** | 40:1, 41:7, | 15:16, 68:5, |
| 60:18, 101:2 | 75:18 | 45:19, 47:17, | 114:25, 115:1, |
| **requirement** | **retail** | 54:9, 68:20, | 115:10, 115:11, |
| 32:15, 62:20, | 20:9 | 78:21 | 115:24, 115:25, |
| 64:6, 64:13 | **retained** | **roles** | 116:2, 117:4, |
| **requirements** | 38:20 | 22:15, 34:12 | 117:6 |
| 63:24, 77:17 | **retro-commission-** | **rolls** | **save** |
| **requires** | **ing** | 70:16 | 42:12, 109:20 |
| 25:4, 48:21, | 32:20 | **roof** | **say** |
| 49:10, 51:13, | **review** | 23:11, 39:12 | 5:9, 6:2, 9:12, |
| 51:15, 51:18, | 13:24, 14:2, | **room** | 10:25, 11:13, |
| | | 14:7, 50:20 | |

14:24, 23:8,
23:21, 27:18,
28:1, 31:11,
42:22, 43:2,
44:25, 47:12,
48:23, 52:1,
53:10, 57:12,
62:18, 63:20,
74:2, 76:6,
81:6, 85:13,
92:20, 99:9,
101:8
**saying**
30:13
**says**
100:6, 108:13,
115:24, 116:1
**scanned**
45:9
**schedule**
41:17
**scheduled**
84:19, 84:21
**schedules**
44:4
**scope**
23:4
**score**
79:1
**scrape**
42:1
**screen**
26:18
**scroll**
26:17, 88:10,
88:12, 88:15,
90:15, 93:18,
95:14, 98:15,
98:20, 102:10,
103:15, 105:20,
105:22, 108:12,
111:24, 114:11,
114:17, 115:21,
117:14
**second**
21:2, 29:18,
30:24, 71:1,
71:6, 71:22,

82:13, 88:8,
90:14, 93:17,
95:25, 96:2,
98:11, 102:10,
105:16, 111:23,
114:10, 114:17,
116:20
**secure**
23:5, 27:14
**security**
27:19, 28:3
**see**
22:25, 30:11,
58:10, 60:21,
61:6, 67:17,
69:22, 72:2,
72:5, 72:13,
72:17, 72:20,
72:22, 72:23,
73:5, 73:11,
74:15, 80:8,
94:4, 95:20,
106:1, 108:13,
108:25, 112:20,
112:24, 117:5
**seek**
116:9
**seeking**
113:17, 119:2
**seem**
38:23
**seen**
67:11, 68:6,
68:23, 73:2,
80:5, 102:20
**select**
26:24, 39:20,
39:23
**selected**
19:19
**send**
92:15, 92:23
**sender**
99:4
**sending**
91:15, 117:16
**senior**
21:11

**sense**
116:1
**sent**
45:18, 45:22,
53:20, 53:21,
63:9, 89:18,
91:4, 94:18,
94:20, 99:1,
106:19, 107:9,
107:13, 118:12
**series**
121:13
**serve**
97:9
**service**
71:10
**services**
1:7, 2:7, 4:17,
5:15, 96:13
**set**
41:15, 102:24,
105:5, 105:6,
124:14
**settlement**
12:12
**seven**
10:9, 12:10,
18:23, 30:18,
30:19, 73:23
**seventh**
56:22, 59:3,
59:12, 60:2,
60:24, 61:3,
65:25, 66:5,
66:9, 66:11,
68:24, 71:15,
73:12, 73:16,
81:18, 112:17,
115:7, 121:3
**several**
13:8
**shamash**
1:18, 15:16,
29:14, 68:17,
73:2, 88:4,
91:11, 91:16,
91:17, 92:15,
92:24, 94:23,

99:8, 99:10,
99:11, 103:2,
103:8, 105:9,
105:13, 105:16,
111:20, 112:14,
112:21, 112:25,
113:13, 113:17,
113:23, 114:6,
114:9, 116:14,
116:17, 117:15,
117:18, 117:23,
119:2
**shamash's**
89:9, 89:25
**share**
38:12, 63:3,
63:8
**shareholder**
30:21, 40:11,
45:1, 48:17,
48:18, 48:22,
48:25, 49:2,
57:1
**shareholders**
25:21, 30:7,
30:9, 37:2,
44:21, 45:6,
45:16, 54:6,
58:24, 59:25,
68:11, 111:8,
111:12
**shares**
30:20, 30:22,
30:25, 48:18,
58:3
**should**
5:2, 7:1,
10:25, 41:17,
45:8, 76:4,
85:18, 112:22
**shoulder**
11:15
**showing**
45:7
**sidewalk**
8:11
**sign**
78:8

**signature-p1kal**
124:22
**signed**
117:17, 118:9
**signing**
119:19
**similar**
21:13, 22:13,
71:2
**similarly**
1:19
**simply**
120:1, 120:5
**simultaneous**
5:1
**since**
31:19, 33:19,
35:3, 35:8,
35:11, 35:15,
35:18, 35:21,
52:5, 56:16,
61:13, 66:2,
67:12, 100:13,
110:22, 111:10
**sitting**
37:1
**situated**
1:19
**situation**
25:4
**six**
13:11, 18:17,
19:25, 30:18,
93:18
**sixth**
71:14, 81:25
**size**
25:23
**slate**
33:23, 36:25
**slip**
10:14
**smaller**
30:24
**smiling**
30:17
**sold**
58:3

**some**
10:3, 15:19,
15:25, 18:20,
25:4, 27:24,
28:17, 30:25,
47:10
**somehow**
92:23
**someone**
27:3, 32:1,
32:2, 74:3,
79:8, 97:25
**something**
37:24, 45:2,
49:10, 49:22,
50:3, 50:7,
50:23
**sometime**
87:17
**sometimes**
50:25, 51:1,
51:17, 51:18,
52:9, 119:18
**somewhere**
31:1
**soon**
65:1
**sorry**
8:2, 12:23,
19:3, 22:8,
34:9, 48:23,
62:4, 62:5,
84:4, 96:1,
98:5, 99:9
**sought**
20:17
**sound**
81:11
**sounds**
81:7
**southern**
1:2
**space**
17:22, 69:6,
69:13, 69:16,
71:7, 71:24,
74:2, 76:22,
96:24, 110:18

**spaces**
71:14
**speak**
13:18, 47:2,
47:6, 47:9,
47:13, 67:20,
72:15, 74:17,
111:2, 111:7,
113:13
**speaking**
5:3, 92:9,
113:23
**specific**
8:1, 36:1
**specifically**
5:25, 14:25,
25:9, 49:9,
53:16
**specifics**
89:6, 91:8
**speed**
32:11
**spend**
19:9, 23:16,
24:22, 48:4
**spending**
47:23, 47:25
**spent**
23:22, 76:10
**spoke**
112:22, 113:3
**spoken**
14:11, 14:14,
14:19, 15:15,
60:12, 111:16
**spring**
26:11
**sprinkler**
43:9
**staff**
17:8, 23:6,
23:7
**staircase**
41:24
**stalled**
38:15
**stand**
88:5

**standard**
89:14
**start**
28:7, 112:5
**started**
19:22, 19:24,
21:2, 31:19
**starting**
96:6, 103:16
**state**
4:3, 101:12
**stated**
63:6, 104:4
**statement**
101:20
**states**
1:1, 37:13,
124:4
**stating**
120:6
**status**
115:11, 117:6
**steficek**
34:3, 34:4,
36:4, 36:18
**stenographically**
124:12
**step**
32:1, 32:2,
56:1
**still**
52:6, 81:20,
115:25, 120:15
**stop**
42:20, 59:19,
86:24, 88:13,
88:16, 90:18,
102:13
**stopped**
60:4
**stopping**
75:14
**store**
29:19, 70:9,
110:2
**stored**
110:6
**story**
25:20

strange
107:12
street
1:15, 1:21,
2:16, 5:21,
11:21, 18:9,
19:23, 20:11,
25:10, 25:14,
70:17, 72:22,
72:23, 94:6,
96:11, 121:19
strike
41:6, 59:18,
93:12
studio
29:18, 71:6,
82:15, 82:17
subject
7:6, 11:7,
12:2, 25:15,
65:22
subjects
8:9, 9:19, 13:1
sublease
53:17, 53:18,
53:24, 54:2,
54:9, 54:22,
55:2, 55:8,
55:9, 55:18,
55:21, 55:25,
56:7, 56:10,
56:13, 57:10,
58:8, 60:25,
61:2, 61:6,
61:23, 61:24,
62:8, 62:15,
62:22, 62:25,
63:4, 63:7,
63:14, 63:16,
63:21, 64:1,
64:4, 64:10,
65:6, 65:9,
65:14, 65:19,
66:1, 79:20,
80:12, 81:9,
83:2, 83:14,
83:24, 85:11,
85:25, 86:21,

89:15, 90:5,
91:17, 91:20,
91:23, 92:15,
92:24, 93:2,
93:24, 94:8,
94:16, 94:19,
94:25, 95:3,
95:7, 95:9,
96:3, 97:19,
100:14, 100:17,
101:12, 102:23,
104:12, 104:21,
105:4, 105:10,
109:8, 109:13,
110:11, 110:18,
110:22, 110:23,
111:17, 113:18,
115:16, 116:9,
118:15, 119:3,
120:5, 120:13,
120:22, 122:8
subleases
101:9
subleasing
56:23, 57:2,
57:19, 59:11,
59:14, 59:19,
60:5, 60:24
sublessor
57:3
sublet
46:11, 89:13,
94:5
sublets
99:20, 101:2
submetering
57:9, 58:7
submit
60:25
submits
55:24
submitted
83:24, 84:3,
84:6, 86:2,
86:20, 104:20,
108:14
submitting
83:13

subpoena
7:6
substances
6:22
subtenant
54:16, 57:6,
57:8, 58:5,
58:18, 58:21,
58:25, 59:3,
59:4, 59:8,
59:23, 60:2,
61:10, 73:12,
73:15, 118:19
subtenants
54:6, 56:15,
56:20, 61:13,
61:16, 121:2
successful
20:19
suffering
6:16
sufficient
62:17, 62:19
suite
2:31
super
40:13, 40:16,
60:12, 74:8,
74:14
superintendent
40:7, 43:7,
74:7, 86:16
superintendent's
17:25
supervise
16:8, 17:8
supervisor
19:10
sure
4:24, 17:19,
40:5, 63:5,
71:11, 75:19,
77:16, 88:5,
99:21, 101:20,
106:9, 106:11,
120:20, 122:25
susan
46:6, 55:4,

78:21, 84:13,
84:14, 89:20,
89:23, 95:5,
97:20, 99:8,
102:23, 103:16,
105:6
susan's
91:11
swipe
26:21
sworn
4:2, 108:14,
124:7
system
26:2, 26:7,
26:9, 26:15,
26:16, 26:24,
27:8, 27:13,
27:16, 27:24,
28:18, 28:23,
28:24, 29:2,
41:23, 121:9,
121:12, 121:21,
122:5, 122:10,
122:17, 122:22
systems
28:8, 124:25

**T**

tablet
26:20
take
6:7, 36:12,
38:15, 51:22,
64:7, 75:14,
77:5, 79:24,
88:7, 90:9,
90:13, 91:19,
93:10, 93:17,
97:16, 98:11,
101:25, 102:9,
104:18, 105:16,
110:8, 111:22,
114:3, 114:9,
116:13, 116:20,
118:24
taken
48:6, 49:11,

56:6, 75:22,
124:12
**takes**
15:11, 32:23
**taking**
4:15, 5:7, 6:21
**talk**
23:6, 25:9,
40:7, 49:8,
53:16, 74:13
**talking**
76:10, 112:22
**talks**
106:14
**tara**
2:10, 4:15
**tawil**
15:16, 68:5,
73:2, 115:15
**technician**
2:38, 88:5,
98:5
**telephone**
48:10
**tell**
19:6, 26:14,
66:18, 74:6,
86:15
**telling**
13:20
**ten**
9:5, 28:21,
29:1, 81:6,
81:7, 97:5
**tenant**
17:8, 43:1,
43:3, 43:14,
44:17, 55:24,
73:18, 73:19,
110:17
**tenants**
66:4
**tend**
17:8
**tendered**
104:6, 104:12
**tenth**
71:19, 82:3

**term**
5:24, 77:15
**termination**
13:3
**terms**
119:9
**test**
71:11
**testified**
4:2, 11:2,
12:10, 12:14,
13:10, 119:25
**testify**
8:9, 10:21,
12:2, 13:2,
94:14, 97:4,
100:16, 124:8
**testifying**
6:13, 6:18,
6:23, 7:2
**testimony**
6:12, 10:5,
12:17, 124:12
**text**
74:20
**th**
1:15, 1:20,
2:16, 2:22,
5:21, 11:21,
18:8, 18:11,
19:23, 20:11,
25:10, 25:14,
45:9, 56:21,
56:23, 57:11,
58:5, 58:18,
58:21, 58:25,
71:1, 71:19,
71:20, 72:16,
72:18, 74:2,
74:3, 74:4,
82:6, 82:10,
89:2, 94:5,
94:6, 96:11,
102:24, 106:5,
106:10, 106:13,
106:15, 106:17,
108:6, 112:10,
115:10, 117:5,

117:16, 118:4,
118:10, 118:14
**thank**
5:13, 5:19,
6:4, 7:13, 13:1,
22:10, 95:14,
102:6, 104:19,
120:10
**thing**
41:14
**things**
22:25, 39:25,
40:5, 40:6,
41:22, 42:8,
44:11, 47:20,
48:12, 51:2,
119:19
**think**
22:7, 22:9,
28:11, 30:13,
30:23, 35:24,
38:7, 39:4,
49:3, 54:24,
54:25, 60:16,
60:22, 63:9,
65:1, 75:16,
80:14, 83:22,
86:22, 86:24,
96:23, 97:20,
100:8, 100:22,
101:19, 102:20,
104:6, 107:12,
112:25, 115:11,
117:8, 123:3
**thinking**
30:15, 96:24
**third**
29:17, 71:7,
71:23, 81:22,
96:2
**third-party**
41:3
**thousand**
30:22
**three**
18:6, 18:25,
19:8, 19:12,
19:17, 19:21,

22:7, 22:8,
22:9, 23:17,
24:3, 24:13,
24:18, 24:22,
30:11, 39:8,
49:24, 50:6,
111:10
**through**
29:9, 34:25,
40:5, 53:18,
71:1, 73:10,
93:18
**throughout**
5:15
**thursday**
24:17, 24:19,
25:7, 67:19,
72:2, 73:6
**thursdays**
69:21, 72:4,
72:10, 72:13
**time**
5:3, 9:13,
11:1, 11:4,
11:25, 19:9,
24:5, 24:7,
24:21, 42:1,
42:20, 52:2,
57:24, 58:3,
60:22, 63:17,
63:22, 64:25,
65:18, 73:16,
76:18, 81:16,
81:22, 81:25,
82:2, 82:7,
82:10, 82:14,
83:2, 90:1,
99:19, 100:18,
103:21, 104:2,
107:16, 118:18,
124:13
**times**
42:24, 42:25,
45:1, 45:4,
47:8, 51:14,
51:20, 92:12
**today**
4:16, 4:18,

6:19, 6:23, 7:3,
7:6, 14:5, 29:7,
82:18, 82:24,
94:15, 123:4
**today's**
13:15, 14:15,
14:20, 15:16
**told**
38:6, 49:25,
50:11, 50:19,
50:22, 66:22,
68:3, 86:24
**took**
57:20, 59:14,
61:13, 61:19,
100:18
**top**
29:11, 96:5,
105:21, 106:1,
108:21
**total**
9:4, 13:9
**touch**
26:18, 26:19
**touton**
1:17, 2:17,
5:23, 14:17,
29:13, 34:3,
35:22, 72:13,
82:2, 83:5,
89:10, 121:13
**touton's**
45:12
**toutons**
57:17, 58:3
**transcribe**
30:14
**transcript**
124:11
**transfer**
46:7, 46:8,
55:5, 89:22
**traveling**
104:1
**treasurer**
34:15, 34:23,
35:19
**tries**
53:3

**trip**
7:24, 8:3,
8:15, 9:21, 12:9
**true**
108:14, 124:11
**truth**
124:8, 124:9
**truthfully**
4:22, 6:18,
6:23, 7:3
**try**
33:15, 44:3,
69:4
**trying**
28:16, 105:5,
105:6
**tuesday**
1:28
**turner**
2:10, 3:6,
4:13, 4:15,
75:13, 75:19,
75:23, 88:2,
90:9, 90:20,
92:8, 93:9,
94:2, 95:13,
95:24, 97:16,
98:3, 98:7,
98:19, 101:25,
102:5, 102:15,
103:14, 104:18,
105:12, 108:11,
110:8, 111:19,
114:3, 114:16,
115:20, 116:13,
117:13, 118:24,
123:3
**two**
17:3, 19:24,
23:20, 24:23,
30:11, 32:4,
32:7, 37:5,
47:7, 49:24,
56:18, 59:9,
61:12, 92:12
**type**
10:13, 17:22,
20:4, 27:24,

33:13, 33:14,
44:11, 54:13,
68:10
**types**
28:18, 43:23
**typically**
25:6, 45:6,
51:7, 53:8,
53:12, 68:13,
69:22, 73:5,
80:8, 109:23

## U

**uh-huh**
22:19
**um-hum**
55:6
**unanimously**
122:2
**unavailable**
15:10
**under**
6:9, 20:12,
45:9, 119:8,
120:16
**understand**
5:4, 5:11,
5:16, 6:2, 6:8,
6:11, 7:5, 7:9,
17:16, 17:17,
25:12, 28:14,
28:16, 72:3,
76:16, 79:19,
99:22, 101:4,
119:23, 120:15
**understanding**
76:13, 91:10,
97:14, 101:3,
103:18, 108:6,
109:7
**understood**
12:1, 97:15,
115:6
**union**
12:21, 12:23
**unique**
55:11
**unit**
79:8

**united**
1:1
**universal**
55:14
**university**
15:25
**unless**
19:6
**until**
16:24, 52:14,
57:20, 58:2,
63:17, 73:8,
118:9
**upkeep**
23:13
**use**
5:24, 55:7,
122:23
**using**
66:8, 66:11,
68:23, 121:7
**usually**
28:23, 53:10,
72:22, 72:24

## V

**valecenti**
40:15
**varies**
23:19
**various**
43:5
**versus**
51:3
**via**
2:2, 51:3,
52:8, 64:22,
119:20
**vice**
34:15, 34:20,
35:13
**video**
26:16
**videoconference**
2:3
**view**
66:5
**violation**
45:7

**virtual**
14:8
**virtually**
1:27
**visit**
24:3, 24:6,
24:18, 25:1,
25:6, 42:17,
69:21, 72:1,
72:4, 72:7,
72:10, 72:14,
73:6, 74:23,
75:4
**visited**
66:5, 69:5,
80:15
**visiting**
17:10, 26:25
**visitor**
27:2
**visitors**
79:7, 121:6,
122:25
**visually**
42:6
**volunteered**
37:9
**vote**
37:15, 48:1,
48:6, 48:8,
48:12, 49:10,
49:16, 49:20,
49:23, 49:25,
50:11, 53:8,
53:10, 53:12,
56:6, 115:11,
117:6, 121:25
**voted**
50:6, 50:12,
50:21, 58:17,
85:24, 109:8,
122:2
**votes**
49:13, 49:18

**W**

**waiting**
115:25

**walk**
29:9, 34:25,
40:4, 53:17
**want**
21:1, 25:9,
27:12, 37:19,
49:8, 56:3,
56:11, 61:22,
75:14, 75:17,
76:12
**wanted**
62:14, 63:10
**wants**
32:1, 67:23
**warehouse**
69:10
**water**
74:1, 74:2
**way**
53:13, 63:10,
65:13
**we'll**
40:7
**we're**
4:18, 47:8,
54:14, 60:13,
65:2, 90:20,
102:15, 112:2,
114:5
**week**
24:5, 24:7,
24:16, 25:2,
66:17, 66:21,
73:8, 74:15,
118:12
**weekends**
74:24, 75:4,
75:6, 75:11
**weekly**
22:25
**weeks**
32:5, 32:7,
37:5, 68:25
**welcome**
75:24
**welding**
42:2
**went**
38:20, 85:22

**weren't**
87:1, 87:7
**west**
1:15, 1:20,
5:21, 18:8,
18:11, 19:23,
20:10, 25:10,
25:14, 94:5,
94:6, 96:11
**westbury**
4:11
**whatever**
32:21
**whether**
49:21, 50:17,
54:16, 77:25,
79:15, 87:4,
87:11, 101:12
**white**
83:10, 83:11
**whole**
124:8
**windows**
80:22
**wine**
29:13
**within**
28:19, 33:16
**without**
13:20, 30:13,
43:6, 119:3,
120:1
**witness**
3:3, 4:5, 4:9,
19:3, 30:16,
88:11, 88:12,
88:14, 88:15,
88:17, 90:17,
90:18, 92:12,
93:19, 98:13,
98:14, 102:12,
102:13, 102:14,
105:19, 105:20,
111:25, 114:12,
116:21, 123:6
**wolf**
21:7, 21:12
**work**
10:23, 11:24,

17:13, 17:22,
21:8, 22:6,
23:4, 23:5,
23:10, 23:11,
23:12, 23:25,
32:16, 41:2,
41:15, 41:17,
43:18, 44:14,
55:17, 69:15,
72:12, 75:19
**worked**
10:1, 21:4,
21:24, 96:25
**worker**
11:11, 11:14
**worker's**
12:4
**working**
21:3, 23:1,
27:16, 41:23,
45:13, 112:23
**works**
26:15, 30:4,
97:13
**wouldn't**
96:19
**writes**
112:21, 115:24
**writing**
48:13, 51:3,
104:6, 104:12,
119:3, 120:6
**wrote**
115:10, 117:6,
117:16, 117:23

**X**

**xi**
124:26

**Y**

**yeah**
50:25, 59:21,
114:15
**year**
7:21, 9:15,
26:12, 28:19,
32:21, 36:6,

37:19, 44:2,
44:25, 51:21,
57:13, 104:2,
121:10
**year's**
36:7
**years**
10:9, 12:10,
13:8, 16:13,
22:7, 22:8,
22:9, 28:12,
28:21, 29:1,
41:15, 59:9,
73:1, 73:24,
77:7, 110:15,
111:10
**yesterday**
13:17
**york**
1:2, 2:12,
2:23, 2:32,
4:11, 124:5

**Z**

**zoom**
2:3, 52:8,
52:10, 52:13,
52:15, 52:18,
52:25

**.**

**.4**
3:6
**.4200**
2:13
**.5800**
2:33

**0**

**00836**
124:26
**02**
16:23
**03**
1:29
**03429**
1:8
**046914**
109:1

**1**

**1**
75:17, 75:18
**10**
29:12, 75:14,
115:10, 115:24
**10018**
2:23
**10020**
2:32
**10111**
2:12
**11**
29:12, 32:15,
41:14, 45:9,
56:21, 56:23,
57:11, 58:5,
58:18, 58:21,
58:25, 71:19,
72:16, 74:3,
74:4, 82:6,
116:1
**1170**
2:24
**12**
1:29, 9:5,
15:11, 18:3,
25:20, 29:12,
39:14, 43:13,
71:1, 71:20,
72:18, 74:2,
82:10, 117:5,
117:16, 118:4,
118:14
**124**
1:33
**1270**
2:30
**129**
18:8, 18:11,
20:10, 25:10,
25:14, 94:6,
96:11
**14**
99:17, 100:3,
102:24, 106:15,
108:6, 108:15

**1430**
2:22
**15**
75:15, 106:5,
106:10, 106:13,
106:17
**16**
19:22
**17**
2:22, 35:25
**18**
18:22, 35:24,
35:25
**19**
52:5, 89:2,
89:11, 118:10
**1999**
16:22
**1st**
19:23

**2**

**2**
123:8
**20**
1:8, 16:23,
18:3, 89:11,
110:15
**2002**
16:23, 16:24
**201**
2:24
**2015**
28:12
**2016**
31:20, 35:4,
57:19, 59:15,
61:14, 63:17,
73:10, 100:13
**2018**
39:4, 59:20,
73:10
**2019**
19:23, 81:11,
81:16, 87:17,
89:3, 89:11,
91:5, 99:2,
112:10, 115:10,

115:24, 116:1,
117:5, 117:16
**2020**
52:6, 63:18,
99:17, 100:3,
102:24, 106:10,
106:13, 106:17,
108:6, 108:15
**2022**
57:14, 57:21,
58:15
**2023**
1:28, 124:27
**2024**
32:24
**21**
16:13
**212**
2:24
**212.589**
2:13
**212.784**
2:33
**23**
91:4
**26**
99:2, 112:10
**27**
1:15, 1:20,
2:16, 5:21,
18:8, 18:11,
19:23, 20:11,
25:10, 25:14,
94:5, 94:6,
96:11
**28**
1:28

**3**

**30**
11:21, 22:5
**31**
94:6
**35**
75:17

**4**

**45**
2:11, 75:18

**48**
123:8
**486757**
1:32

| 5 |

**50**
52:1
**501**
2:31

| 7 |

**70**
30:25
**7001**
4:10, 24:2
**72**
30:25

| 8 |

**80**
9:14, 11:6,
28:1
**87**
32:19

| 9 |

**96**
21:9
**97**
32:22
**99**
21:9
**9th**
29:12