**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

C.C.M.S. d/b/a COMMUNITY COUNSELING
AND MEDIATION SERVICES,

        Plaintiff,

        v.

OXFORD REALTY & HOLDINGS LLC, WEST
27TH STREET REALTY, INC., MARC PATURET,
JOSEPH GRILL, MAXIME TOUTON, F.
MICHAEL CONTE, NIGEL SHAMASH, and
other similarly situated BOARD MEMBERS OF
WEST 27TH STREET REALTY, INC.,

        Defendants.

No. 20-cv-03429 (NRB)

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF CCMS'S MEMORANDUM OF LAW IN OPPOSITION TO THE CO-OP
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Plaintiff C.C.M.S. d/b/a
Community Counseling and Mediation
Services*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ....................................................................................................................4

      I.      CCMS ..................................................................................................................4

      II.     The Co-Op, Co-op Board, and Premises ...................................................................4

      III.    The Sublease ...............................................................................................................6

      IV.    The Sublet Application ................................................................................................7

ARGUMENT ........................................................................................................................10

      I.      SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE MATERIAL
             FACTS ARE IN DISPUTE ........................................................................................10

            A.     Legal Standard ...............................................................................................10

            B.     CCMS Has Established a Prime Facie Case of Discrimination................11

            C.     The Co-op Defendants' Non-Discriminatory Reasons for Rejecting
                  CCMS's Sublease were Pretext for Racial Discrimination .....................21

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

*Abdu–Brisson v. Delta Air Lines*, Inc.,
239 F.3d 456 (2d Cir. 2001)……………………………………………………………12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) …………………………………………………………………10

*Ayissi-Etoh v. Fannie Mae*,
712 F.3d 572(D.C. Cir. 2013) …………………………………………………………11

*Byrnie v. Town of Cromwell*,
243 F.3d 93 (2d Cir. 2001) …………..………..………………………………..……12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………………………………10

*Chertkova v. Conn. Gen. Life Ins. Co.*,
92 F.3d 81 (2d Cir. 1996) ……………………………………………………………13

*Chambers v. TRM Copy Centers Corp.*,
43 F.3d 29 (2d Cir. 1994)……………………………………………………………12

*Costello v. Town of Huntington*,
No. 14-CV-2061, 2015 WL 1396448 (E.D.N.Y. Mar. 25, 2015) ………………………………11

*Feacher v. Intercontinental Hotels Grp.*,
563 F. Supp. 2d 389 (N.D.N.Y. 2008)…………………………………………………12

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
22 F.3d 1219 (2d Cir. 1994)……………………………………………………………15

*Graham v. Long Island Rail Road*,
230 F.3d 34 (2d Cir. 2000) ……………………………………………………………19

*Howard v. MTA Metro–North Commuter R.R.*,
866 F. Supp. 2d 196 (S.D.N.Y. 2011)……………………………………………………13

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ……………………………………………………………11

*Johnson v. Killian*,
680 F.3d 234 (2d Cir. 2012) ……………………………………………………………10

*Koumantaros v. City Univ. of N.Y.*,

No. 03 CIV10170GEL, 2007 WL 840115 (S.D.N.Y. Mar. 19, 2007)............................12

*Lizardo v. Denny's, Inc.*,
    270 F.3d 94 (2d Cir. 2001)...................................................................................20

*Lucente v. Int'l Bus. Machs. Corp.*,
    310 F.3d 243 (2d Cir. 2002) ...............................................................................10

*Mario v. P & C Food Markets, Inc.*,
    313 F.3d 758 (2d Cir. 2002) ...............................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................................10

*McClellan v. Smith*,
    439 F.d 137 (2d Cir. 2006) .................................................................................18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................................................12, 13, 21

*McPherson v. N.Y.C. Dep't of Educ.*,
    457 F.3d 211 (2d Cir. 2006)...............................................................................12

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    7 F.3d 1085 (2d Cir. 1993) ................................................................................11

*Perez Rivera v.* Hertz Corp.,
    990 F. Supp. 234, 236–37 (S.D.N.Y. 1997).......................................................12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................................…................20

*Rosen v. Thornburgh*,
    928 F.2d 528 (2d Cir. 1991)...............................................................................12

*Saji v. Nassau Univ. Med. Ctr.*,
    724 F. App'x 11 (2d Cir. 2018) .........................................................................13

*Sash v. United States*,
    674 F. Supp. 2d 531 (S.D.N.Y. 2009) ...............................................................18

*Shannon v. Fireman's Fund Ins. Co.*,
    156 F.Supp.2d 279, 291 (S.D.N.Y. 2001) .........................................................21

*Silva v. Farri*
    47 F.4th 78 (2d Cir. 2022) .................................................................................11

*Toussaint v. NY Dialysis Servs., Inc.*,
   706 F. App'x 44 (2d Cir. 2017) .............................................................19

*Williams v. R.H. Donnelley, Corp.*,
   368 F.3d 123 (2d Cir. 2004)……………………………………………12

*Zimmermann v. Assocs. First Capital Corp.*,
   251 F.3d 376 (2d Cir. 2001)……………………………………………12

Plaintiff C.C.M.S. d/b/a Community Counseling and Mediation Services ("CCMS") respectfully submits this memorandum of law in opposition to defendants West 27th Street Realty Inc. ("Co-op"), Joseph Grill, Maxime Touton, and F. Michael Conte (collectively, "Co-op Defendants") motion for summary judgment under Fed. R. Civ. P. 56 dismissing CCMS's complaint.  The facts underlying CCMS's opposition are set forth in CCMS's Responses, Objections, and Counterstatement to the Co-op Defendants' Statement of Material Facts and the Declarations of Emory X. Brooks ("Brooks Decl."), Tara E. Turner ("Turner Decl."), and Robert King ("King Decl.").

## PRELIMINARY STATEMENT

CCMS negotiated a sublease for commercial office space on the 8th floor of 129 West 27th Street for months before learning, 15 days *after* it was supposed to vacate its existing Manhattan office, that defendants denied CCMS's sublease application.  The Co-op Defendants forced CCMS to jump through administrative hoops at the eleventh hour after CCMS had already signed a sublease with the 8th floor owner and provided a security deposit and first month's rent.  First, the Co-op Defendants required CCMS to complete an application that defendant F. Michael Conte created on his own specifically for CCMS.  Second, the Co-op Defendants insisted on an in person interview with CCMS's president under the guise of "considering" CCMS's application, stating that these procedures were "customary."  Yet, CCMS was the only subtenant applicant in the history of the building required to submit an application and interview with the Co-op Defendants, both of which were not required under the proprietary lease or by-laws.  Indeed, the 8th floor owner acknowledged that there were other, previous subtenants in the building, including on the 7th and 8th floors.  Plainly put, the Co-op Defendants treated CCMS differently than other applicants, and they did so based on the race of

CCMS's President Emory X. Brooks and CCMS's clients.  This is racial discrimination in violation of 42 U.S.C. §§ 1981 and 1982.

The Co-op Defendants had no intention of approving CCMS's sublease after they learned, by researching CCMS's website, that Brooks and many of CCMS's employees were Black and/or racially diverse.  Brooks' race was confirmed when the Co-op Defendants insisted on meeting him in person for the interview.  At that interview, the Co-op Defendants' racial animus came through when they raised concerns about an attack by a Black man and asked whether CCMS's clients, presumed to be Black as well, would make other visitors to the building feel unsafe.

Despite treating CCMS differently and making racially-motivated comments, the Co-op defendants now claim that they rejected CCMS's sublease for four non-discriminatory reasons. First, the Co-op Defendants claim they rejected CCMS because it did not intend to use the 8th floor for administrative office space, like all other businesses in the building.  But in the same breath that the Co-op Defendants questioned Brooks about his visitors to the building, defendant, board member, and 12th floor owner, Joseph Grill, stated that he was concerned for the young models that visit his offices.  Indeed, more recently, the Co-op installed an intercom system that allows visitors to enter at all hours provided someone inside the building grants them access or they have a code on their phone.  If there were truly only administrative offices in the building, the Co-op would have no need for the intercom system.  Second, the Co-op Defendants claim they rejected CCMS's sublease due to the "increased risk of violence and other problematic behaviors presented by CCMS's mentally ill clientele."  Setting aside that CCMS provides *mental health treatment* to patients (which does not mean its patients are *mentally ill*), this is just one more excuse in an attempt to manufacture a reason for rejecting the sublease.  Indeed, the

day after the interview, the 8th floor owner informed CCMS that its sublease was rejected because Brooks stated at the interview with the Co-op Defendants that CCMS intended to provide substance abuse counseling.  The 8th floor owner was present for Brook's interview and the Co-op Defendants' deliberation, however, once defendants realized the sublease expressly excluded this type of treatment (and CCMS subsequently provided documents showing it was not certified to conduct that type of treatment at the building), the Co-op Defendants changed their story again.  The Co-op Defendants' final two reasons, that CCMS would have a high volume of patients to the building and that CCMS's hours of operation were outside normal operating hours for the building, make little sense when this Court considers that CCMS disclosed these facts in the sublet application, which the Co-op Defendants created and reviewed, yet they still went through with the interview for CCMS weeks after CCMS submitted the application.  In its application, CCMS disclosed the exact number of patients that would visit its office and the operating hours the Co-op Defendants now complain about.  If these were reasons to reject CCMS's sublease, the Co-op Defendants would have informed CCMS after receiving its application, or, at minimum, when CCMS's attorney informed the Co-op Defendants that CCMS's existing lease would expire December 31, 2019.  The only reasonable explanation for why the Co-op Defendants went through with the interview was to confirm Brooks' race and manufacture reasons to reject the sublease.  Thus, the Co-op Defendants' "legitimate, non-discriminatory" reasons for rejecting CCMS's sublease were pretext for racial discrimination in violation of 42 U.S.C. §§ 1981 and 1982.

As CCMS has raised genuine issues of material facts as to whether the Co-op Defendants rejected CCMS's sublease based on race, the Co-op Defendants' summary judgment motion should be denied.

## BACKGROUND

### I.   CCMS

CCMS is a minority-led non-profit health organization that provides a wide range of social support, counseling, health, mental health, education and supportive housing services with its principal place of business at 25 Elm Street, 2nd Floor, Brooklyn, New York 11201.  Brooks Decl. ¶ 6; Co-op Defendants' Stmt. of Material Facts ("Stmt.") ¶ 15, ECF No. 98.[1]  CCMS operates various outpatient mental health clinics and supporting housing facilities that serve underrepresented racial and ethnic groups, including Black patients, in Brooklyn and Manhattan. Plaintiff's Resps. & Counterstatement of Facts ("Counterstmt.") ¶ 2.  For over 40 years, CCMS has been led by President and Chief Executive Officer Emory X. Brooks, who is a licensed social worker and graduate of Columbia University School of Social Work.  Id. ¶ 3; Stmt. ¶ 16.  Brooks is a Black man.  Counterstmt. ¶ 4.

For thirty years, CCMS's Manhattan office was located at 115 West 31st Street, New York, New York.  Stmt. ¶ 19.  CCMS's Manhattan office provided counseling and mental health services for adult clients.  Counterstmt. ¶ 6.  In early Fall 2019, CCMS received notice that it had to vacate its Manhattan office by December 31, 2019 because the building was being converted to a different use.  Id. ¶ 7.  CCMS engaged a commercial real estate broker, Robert King, to assist CCMS in locating a new space for its Manhattan location.  Id. ¶ 8.

### II.   The Co-Op, Co-op Board, and Premises

In August 2019, with the assistance of King, CCMS viewed commercial space available for sublease on the 8th floor ("8th Floor") of the building located at 129 West 27th Street, New York, New York ("Premises").  Stmt. ¶ 20; Counterstmt. ¶ 9.  The Premises is a 12-story

---

[1] Unless otherwise noted, all ECF references herein shall refer to the above-captioned case.

commercial cooperative building owned by the defendant Co-op and maintained by non-party Kaled Management Corp. ("Kaled") as the property manager.  Stmt. ¶¶ 1–2; Counterstmt. ¶ 10. The Co-op is comprised of 12 units corresponding to the Premises' 12 floors.  Stmt. ¶ 6; Counterstmt. ¶ 11. The 8th Floor of the Premises consists of approximately 7,500 rentable square feet and was divided into approximately 15 smaller offices.  Counterstmt. ¶ 12; *see also* Turner Decl., Ex. I (Sublease Agreement, Ex. B) at 74.  The 8th Floor is owned by dismissed defendant Oxford Realty & Holdings LLC ("Oxford"), a New York limited liability company.  Stmt. ¶ 11. Oxford has owned the 7th and 8th floors of the Premises since 2004 and is a shareholder of the Co-op.  Counterstmt. ¶ 13.  Oxford previously subleased the 7th and/or 8th floors of the Premises to various technology, software, or gaming companies.  *Id*. ¶ 14.

The Co-op is governed by an offering plan, proprietary lease, and by-laws which set forth the responsibilities and election of a board of directors that manage the Co-op.  Stmt. ¶ 3; Counterstmt. ¶ 15. At the time of the relevant events, there were five Co-op board of directors, including defendants Marc Paturet ("Paturet"), F. Michael Conte ("Conte"), Joseph Grill ("Grill"), and Maxime Touton ("Touton"), as well as Erik Dochtermann[2] (collectively, "Co-op Board").  Stmt. ¶ 32; Counterstmt. ¶ 16.  Paturet is the President and Conte is the Vice President of the Co-op Board.  Counterstmt. ¶ 17. The proprietary lease and by-laws state that all subleases for the Premises must be approved by the Co-op Board or shareholders.  *Id*. ¶ 18. Neither the proprietary lease nor the by-laws require an interview of a sublease applicant or completion of an application.  *Id*. ¶ 19. Instead, there are three situations in which a sublease can be approved. First, by resolution of a majority of the Co-op Board at a meeting where a quorum (majority of the Co-op Board) is present.  *Id*. ¶ 20. Second, by resolution of a majority of the Co-op Board

---

[2] Erik Dochtermann, a former Co-op shareholder and board member, is not individually named in this action.

given in writing, without a meeting.  *Id.* Third, if the Co-op Board does not approve a sublease,

by vote of a 65% supermajority of the total shares issued by the Co-op.  *Id.*

## III.    The Sublease

In November 2019, CCMS submitted an offer to sublease the 8th Floor for a period of 10

years.  *Id.* ¶ 21. In its initial offer, CCMS listed "Mental Health Counseling" as its "use."  *Id.* ¶

22. Through December 2019, CCMS continued to negotiate with Oxford the terms of a sublease

for the 8th Floor.  *Id.* ¶ 23. During negotiations, Oxford stated that the sublease was subject to

approval by the Co-op.  *Id.* ¶ 24. When CCMS's broker, King, asked Oxford about the process to

gain approval from the Co-op, Oxford stated it controlled five floors of the 12 floors in the

Building and the Co-op Board President would vote with Oxford to approve the sublease.  *Id.* ¶

25; *see also* Stmt. ¶ 26. Oxford never mentioned that approval of the sublease required (i) an

application; (ii) a Co-op Board meeting; and/or (iii) the Co-op Board's interview of CCMS.

Counterstmt. ¶ 26.  On multiple occasions during negotiations, Oxford represented that it was in

contact with the Co-op Board President regarding CCMS's sublease.  *Id.* ¶ 27.

On December 18, 2019, CCMS signed and hand-delivered the sublease to Oxford with

two checks for the security deposit and first month's rent.[3]  *Id.* ¶ 28.  On December 19, 2019,

Oxford emailed Kaled regarding CCMS's sublease:

> Good Morning
>
> We have signed a lease and are ready to put this tenant up for vote.
> We've had a lot of movement with tech companies on this floor over
> the years. We're looking forward to the stability of a more
> conventional user.
>
> I believe they are a good use for the building as they are low traffic,
> and conformant with the traffic nature of the building, a place for
> business and very 9-5. Should they be operating after building hours

---

[3] Oxford later cashed the checks on December 30, 2019.  Brooks Decl. ¶ 27.

for any reason, as with our other tenants, they have to pay for a
doorman[.]

*** 

Nice, Stable, long term, Quiet tenancy with a full floor, without a
division plan and minimal construction. I would like to get them in
for the new year.

NIGEL

Stmt. ¶ 31; Counterstmt. ¶ 29.  Peter Lehr, the property manager for the Premises and Director of
Management for Kaled, forwarded Shamash's email to the Co-op's Board, including the Co-op
Board's President Paturet.  Stmt. ¶ 32; Counterstmt. ¶ 30.

## IV.    The Sublet Application

On December 19 and 22, 2019, King asked Oxford about sublease approval, and finally
on December 23, 2019, after CCMS attempted to gain access to the 8th Floor to begin moving
furniture, Oxford responded that "there are emails flooding around [that] possession hasn't been
granted yet," but the "[b]oard vote is set imminently."  Counterstmt. ¶ 31.  However, later that
day, Oxford completely reversed course and asked CCMS to fill out a sublet application so that
Oxford could "get the package out ASAP so I can get it approved ASAP."[4]  Id. ¶ 32.  Oxford
stated that "Peter [Lehr] said he sees no issue with this tenant," referring to CCMS.  Id. ¶ 33.
Unbeknownst to CCMS, Co-op Board member Conte created the sublet application prior to
Oxford sharing it with CCMS.  Id. ¶ 23. CCMS is the only sublease applicant for the Premises
that was asked to fill out an application for sublease approval.  Id. ¶ 35.

---

[4] There is a genuine dispute of fact as to what occurred between December 19, 2019 and December 23, 2019
amongst the Co-op Board and Oxford, including who forwarded the sublease application to Shamash in order for
CCMS to complete it.  Notably, the Co-op Defendants did not produce any internal email correspondence between
themselves, or between themselves and Oxford, although it is highly unlikely that no correspondence exists given
that the Co-op Board otherwise communicates via email regarding Co-op business. *See, e.g.*, Turner Decl., Ex. P
(December 19, 2019 Email).

On December 24, 2019, CCMS submitted the sublet application where CCMS disclosed that it would "operate a licensed outpatient clinic, providing psychotherapeutic [sic] services," with approximately 50 clients daily and 200 weekly, operating Monday through Thursday from 9 a.m. to 8 p.m. and Friday and Saturday from 9 a.m. to 5 p.m.  Stmt. ¶ 34.  Two days later, on December 26, 2019, Conte, the Co-op Board vice president copied King on an email stating "the board will meet on Jan 14, 2020 to consider this application. It is customary that the applicant appear for an interview at that time. According to our bylaws all sublets must be approved. I am not sure why anyone would assume otherwise."  Counterstmt. ¶ 37.  On December 27, 2019, Kaled contacted CCMS directly to schedule an interview with the Co-op Board for January 14, 2020.  Stmt. ¶ 36; Counterstmt. ¶ 38.  CCMS is the only sublease applicant for the Premises asked to interview in person with the Co-op Board for sublease approval.  Counterstmt. ¶ 39.

On January 14, 2020, CCMS's President Brooks was interviewed by defendants Conte, Grill, Touton, and Dochtermann at Conte's offices on the 6th floor of the Premises ("Interview").[5]  Id. ¶ 40. Oxford's representative, Nigel Shamash, also attended the Interview. Id. ¶ 41. Prior to the Interview, at least one member of the Co-op Board researched CCMS, including printing its "Who We Are" webpage which shows photos of CCMS's President and staff, many of whom are Black or racially diverse.  Id. ¶ 42. At the Interview, Brooks discussed CCMS's history and its plan for the Premises, which included adding psychoanalytic treatment of children ages two to seven years old.  Id. ¶ 43.  During the Interview, Conte asked Brooks about a highly publicized attack by a Black man with a machete on a group of people in the home of a Hasidic rabbi in Monsey, New York.  Id. ¶ 44. Grill asked Brooks whether Grill's

---

[5] Following discovery, CCMS does not dispute that Defendant Marc Paturet ("Paturet") was not present at the Interview; however, for the reasons discussed in CCMS's opposition to Defendant Paturet's motion for summary judgment, there is a genuine dispute of material fact as to whether Paturet rejected CCMS's sublease prior to the interview.

clients, including young models who visited his office on the 12th floor of the Premises, would be at risk from CCMS's clients.  *Id.* ¶ 45.

      After the Interview, Conte emailed Kaled and defendant Paturet to memorialize the Interview.[6]  *Id.* ¶ 46.  Notably, Conte stated that "all had [an] opportunity to review tenant['s] application," before the Interview.  *Id.* ¶ 47.  Conte described that CCMS:

> Would se[e] patients ranging in age from 2 year ol[d] to adult, counseling in many behavioral aspects. Including those describe on his Company web page . . . (attached here). Mr. Brooks confirmed that there would be 12 therapists on staff and would see about 50 patients a day, mostly children who would be accompanied by their care giver. He also mentioned that this would be only one aspect of the patients viewed.[7]

*Id.* ¶ 48. Finally, Conte claimed that "[t]hose in attendance voted unanimously, not to approve this application. (Nigel Sham[a]sh voted not to approve this application as well)."  *Id.* ¶ 49.  On January 15, 2020, Oxford informed CCMS's broker that the Co-op Board denied CCMS's sublease application for the 8th Floor and that Brooks was an "idiot."  *Id.* ¶ 50; *see also* Turner Decl., Ex. X (January 15, 2020 Email). Subsequently, Oxford's real estate attorney informed CCMS that the Co-op Board rejected CCMS's sublease because Brooks insisted on conducting substance abuse counseling at the Premises.  Counterstmt. ¶ 51; *see also* Turner Decl., Ex. Z (January 30, 2020 Email).

      On May 1, 2020, CCMS brought this action against the Co-op Defendants, Paturet, Oxford, and Shamash for racial discrimination under 42 U.S.C. §§ 1981 and 1982.  Compl., ECF

---

[6] The email produced by the Co-op was undated and Conte could not recall when he wrote it, despite the "Submitted and sworn to be True. F Michael Conte 1/14/2020" language added to the end of the email.  *See* Turner Decl., Ex. Y (Conte Interview Notes);

[7] Conte's description of CCMS was inaccurate.  CCMS was treating adult clients at its Manhattan office but intended to begin treating children, in addition to adults, once it moved to the 8th Floor.  Brooks Decl. ¶¶ 36–40. Conte also incorrectly stated that CCMS treated clients with criminal backgrounds.  *Id.* ¶ 38. CCMS does not receive referrals from criminal courts.  *Id.*

No. 1.  On July 31, 2020, the Co-op Defendants and Paturet answered the Complaint.  Answer,

ECF No. 33.  On October 12, 2020, Oxford and Shamash filed a motion to dismiss the

Complaint.  ECF No. 36.  On July 12, 2021, this Court granted Oxford's motion to dismiss.

Memorandum and Order, ECF No. 45.  From August 13, 2021 through December 6, 2021, the

parties engaged in settlement discussions but were unable to resolve the matter.  *See* Joint Letter,

ECF No. 46; Letter, ECF No. 48; Letter, ECF No. 52; Letter, ECF No. 54.  Thereafter, the

parties engaged in fact discovery, which was completed on March 28, 2023.  Letter, ECF No. 86.

## ARGUMENT

## I.   SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE MATERIAL FACTS ARE IN DISPUTE

### A.  Legal Standard

Rule 56(a) provides "[a] party claiming relief may move, with or without supporting

affidavits."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party meets its

burden, the nonmoving party "must come forward with 'specific facts showing that there is a

*genuine issue for trial*'" in order to avoid summary judgment.  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).  A genuine

issue exists where "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," while a fact is material if it "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining

whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all

ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation

omitted).  The Court's job is not to "weigh the evidence or resolve issues of fact."  *Lucente v.

Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).  "Assessments of credibility and

choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (citation omitted).

### B.   CCMS Has Established a Prime Facie Case of Discrimination

Section 1981 of the Civil Rights Act of 1866 establishes that "all persons have equal right to make and enforce contracts," and Section 1982 "establishes that all persons have equal right to purchase, lease, sell, hold, and convey real and personal property." *Costello v. Town of Huntington*, No. 14-CV-2061, 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015) (citing 42 U.S.C. §§ 1981–82). To state a prima facie claim under either provision, a plaintiff must show: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  To survive summary judgment, the plaintiff should produce enough evidence for a reasonable jury to find that the defendants intentionally discriminated against the plaintiff based on race. *Silva v. Farrish*, 47 F.4th 78, 90 (2d Cir. 2022) (citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013)).

There is no genuine dispute that CCMS satisfies the first and third elements.  Mot. at n.3, ECF No. 99.  First, CCMS is a predominantly Black organization run by a Black president and Chief Executive Officer, that serves Black clients.  Counterstmt. ¶¶ 2, 4, 42. CCMS's sublease of the 8th Floor was denied by the Co-op Defendants which prevented CCMS from making a contract or lease with Oxford under Section 1981 and inhibited its right to lease real property under Section 1982. *Id.* ¶ 50.

The only remaining issue is whether the Co-op Defendants intended to discriminate on the basis of race when they rejected CCMS's sublease.  The Co-Op Defendants argue that they did not deny the sublease because of Brooks' or CCMS's clients' race but instead because of legitimate, non-discriminatory reasons.  In response, "[w]ith regard to the intent element, plaintiff must show that defendant's actions were purposefully discriminatory and racially motivated."  *Perez Rivera v. Hertz Corp.*, 990 F. Supp. 234, 236–37 (S.D.N.Y. 1997).  As is the case here, plaintiffs rarely have "a smoking gun," or direct evidence of discrimination.  *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991); *see also Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) ("[A] victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.").  When claims under Sections 1981 and 1982 are based on circumstantial evidence, like CCMS's claims here, courts apply the burden shifting framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Koumantaros v. City Univ. of N.Y.*, No. 03 CIV10170GEL, 2007 WL 840115, at *7 (S.D.N.Y. Mar. 19, 2007); *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 402 (N.D.N.Y. 2008).

Under this approach, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).  A plaintiff's burden in presenting prima facie evidence of discriminatory treatment is minimal, and de minimis.  *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 101 (2d Cir. 2001); *Abdu–Brisson v. Delta Air Lines*, Inc., 239 F.3d 456, 467 (2d Cir. 2001)). The requirement of producing evidence to support an inference of discrimination "is a flexible [standard] that can be satisfied differently in differing factual

scenarios." *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination."  *Chertkova*, 92 F.3d at 91.

Indeed, this burden is so minimal in the first step of the *McDonnell Douglas* framework that an increasing number of courts in this Circuit assume, without deciding, for purposes of a motion for summary judgment only, that plaintiffs have established a prima facie case.  *See, e.g.*, *Howard v. MTA Metro–North Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) ("Despite the elaborate process set up in *McDonnell Douglas*, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the [defendant] has articulated a legitimate, non-discriminatory reason for the . . . action.").

Here, the Co-op Defendants' actions and statements were purposefully discriminatory and racially motivated.  First, at the Interview, completely unprompted, Conte asked Brooks about a Black man who had recently attacked a gathering of people in a Hasidic rabbi's home in Monsey, New York.  Counterstmt. ¶ 44; *see also* 5 Wounded in Stabbing at Rabbi's Home in N.Y. Suburb, N.Y. Times (Dec. 28, 2019).  The Monsey attack had nothing to do with CCMS's sublease application or its clients.  CCMS is a professional not-for-profit organization that has provided counseling and mental health services to clients for over 40 years and has no connection to the Monsey attacker.  The only thing in common between the Monsey attack and the sublease was the race of the attacker and the race of the sublease applicant—Brooks—and CCMS's clients.  That Conte equated the Monsey attack, which was very prominent in local news at the time, with the CCMS sublet application is indicative of the racially-motivated bias of

his action as a Co-op Board member and probative of his race-based consciousness.  Similarly, Grill raised safety concerns about CCMS's clients, presumed to be Black, visiting the Premises at the same time as his visitors, including young models.  Counterstmt. ¶ 45.

The statements indicating racial animus continued in the Co-Op Defendants' depositions when the Co-Op Board Vice President Conte referred to CCMS as providing "counseling for two year olds who are the children of crack addicts."  Turner Decl., Ex. C (Dep. of F. Michael Conte ("Conte Depo. Tr.") at 79:3–13. Conte's use of the term "crack addict" was particularly illustrative of his feelings towards Black people given that the term is connected to the crack cocaine epidemic that afflicted Black communities in the 1980s.  Deonna S. Turner, *Crack Epidemic*, Britannica Encyclopedia Online, https://www.britannica.com/topic/crack-epidemic (last viewed July 27, 2023). When asked if Brooks referred to his clients as "crack addicts" in the Interview, Conte conceded that Brooks "used narcotics or substance abuse. He probably used a nicer word than that," meaning Conte understood the negative connotations surrounding the phrase.  Conte Depo. Tr. at 79:3–13. Conte also expressed concern that CCMS's clients included people with "criminal backgrounds."  Conte Dep. Tr. at 81:12–19, 78:13–20 ("I've got my wife here, I have my employees here, I have two sons here. I have to be concerned I think, if I'm letting someone in who has criminal backgrounds all day long.").  Black people are incarcerated at nearly five times the rate of Caucasian people.  Criminal Justice Fact Sheet, NAACP, https://naacp.org/resources/criminal-justice-fact-sheet (last visited July 30, 2023).  Statements such as "crack addicts," "safety concerns," "criminal backgrounds," and calling Brooks an "idiot," by Oxford's Tawil, when considered individually might not indicate racial animus but taken together, the statements are a parade of the most notorious and offensive race-based tropes in American history.  This language is not race neutral; each of these phrases has been used to

describe Black people throughout this country's history with racism.  "[A]ffidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

In addition to their statements, the Co-op Defendants' actions also demonstrate their intent to deny CCMS's sublease based on race.  The Co-op Defendants claim that they only became involved in the sublease process when Kaled emailed them on December 19, 2019, but the record says otherwise.  CCMS negotiated the sublease with Oxford for months before the sublease was signed.  Counterstmt. ¶¶ 21–27.  Throughout those negotiations, Oxford told King that it was in contact with the Co-op Board regarding the sublease.  *Id.*; *see also* Turner Decl., Exs. K (September 5, 2019 Email), M (November 26, 2019 Email), N (December 15, 2019 Email), AC (December 10, 2019 Email); AD (December 12, 2019 Email), D (Dep. of Joseph Grill ("Grill Depo. Tr.") at 75:4–12. On November 26, 2019, Shamash told King that he "spoke to president of [Co-op] board," and he was "working on" obtaining sublease approval.  Turner Decl., Ex. M (November 26, 2019 Email).  On December 10, 2019, Tawil asked Shamash about the "vote status?" and Shamash replied he was "[s]till waiting," but that he would "work on it this afternoon."  Turner Decl., Ex. AC (December 10, 2019 Email). On December 12, 2019, Tawil again emailed Shamash to ask for the "status on vote," suggesting that there was some plan to vote on the sublease approval before CCMS was asked to submit a sublease application. Turner Decl., Ex. AD (December 12, 2019 Email). In response, Shamash answered "Joey [Grill] completely MIA," suggesting Shamash was having trouble contacting Grill to vote on the sublease.[8]  *Id.* On December 15, 2019, Shamash asked King which locations of CCMS to tour

---

[8] Shamash did eventually speak with Grill regarding CCMS's sublease. *See* Grill Depo. Tr. at 75:4–12 (Q. And prior to that time, had Mr. Shamash ever reached out to you about CCMS and subleasing in the building? A. He had

because "[w]e are trying to get the logistics done now." Turner Decl., Ex. N (December 15, 2019 Email). Shamash stated "[t]he president of the board needs to see an existing location," meaning Paturet intended to visit one of CCMS's locations. *Id.* But the next day, December 16, 2019, the Premises' superintendent told King that Paturet was out of town.[9] King Decl. ¶ 13. Despite this, on December 18, 2019 when King submitted the signed sublease, Shamash told King that he would scan and send the sublease to the Co-op Board President, who would then send it to all shareholders, suggesting that Shamash intended to obtain approval for the sublease by vote of *all shareholders*, not by vote of the Co-op Board. *Id.*

On December 19, 2019, Shamash sent the sublease to Kaled for approval stating "we are ready to put this tenant up for vote," and Kaled forwarded it to the Co-op Board, including Paturet. Stmt. ¶ 31; Turner Decl., Ex. P (December 19, 2019 Email). On the morning of December 23, 2019, Oxford told King that the "[b]oard vote is set imminently." Turner Decl., Ex. R (December 23, 2019 Email). However, a few hours later, Oxford reversed course and asked CCMS to submit the sublease application. Turner Decl., Ex. S (December 23, 2019 Email). Indeed, all of Oxford's actions and communications indicate there was a plan to obtain sublease approval in time for CCMS to move in before the end of 2019, and that the Co-op Board, specifically Paturet, was aware of the sublease. King Decl. ¶¶ 11–18. Yet once the Co-op Board learned who the subtenant—CCMS—was on December 19, 2019, the process to obtain sublease approval drastically changed. The Co-op Defendants claim they didn't know about the sublease until December 19, 2019 but what is more likely, and borne out of the evidence, is that

---

reached out to me, but not about a specific tenant. He said to me a while before that, and it could have been more than a month but less than two, that he thought he had a tenant for the space, and he was hoping to be able to make a deal with them.").

[9] This is consistent with Paturet's declaration that he flew to Europe on December 15, 2019. Paturet Decl. ¶ 3.

the Co-op Board intervened in the process to obtain sublease approval by creating the application and insisting on the Interview with Brooks in order to reject CCMS's sublease based on Brooks' and its clients' race.

After the Interview was scheduled, on January 3, 2020, Shamash told King he had "a plan and a call in to speed up, and will be working on it [M]onday/[T]uesday," again suggesting he was in contact with someone on the Co-op Board.  Turner Decl., Ex. W (January 2, 2020 Email). Despite the Co-op Defendants' suggestion that an application and interview were "customary" procedure, the by-laws actually provided that Oxford could obtain approval of the sublease with CCMS by votes given in writing without a meeting.  Turner Decl., Ex. U (December 26, 2019 Email). Further, had Oxford failed to obtain a majority of written votes from the Co-op Board, Oxford could have asked for votes from all shareholders, and because it owned the 7th and 8th floors, Oxford would have had two votes towards the 65% supermajority required under the sublease.  Turner Decl., Ex. H (Proprietary Lease); *see also* Stmt. ¶ 11. Indeed, seeing as CCMS was the only sublease applicant required to have an interview, all other, prior subtenants must have been approved through some other process, likely by votes given in writing or by supermajority vote of the shareholders.  *See* Turner Decl., Ex. B (Dep. of Nigel Shamash ("Shamash Depo. Tr.") at 37:10–15, 39:4–23, 40:15–41:8, 48:14–21, 49:10–50:18; Grill Depo. Tr. at 37:5–16, 38:16–23, 57:1–59:8, 59:21–60:1, 61:19–22; Conte Depo. Tr. at 36:9–19, 103:24–104:4, 108:16–21. The facts and testimony support that Oxford attempted to obtain approval from the Co-op Board in writing or by shareholder vote and the Co-op Board, at the board members' direction, refused.  There is no other explanation for the sharp turn of events on December 23, 2019 when CCMS was told for the first time that it would need to submit a sublease application and interview with the Co-op Board.  These actions demonstrate that the

Co-op Board intended to reject CCMS's sublease, and together with the statements about race, did so because of Brooks' and CCMS's clients' race.

In response, the Co-op Defendants will argue that Shamash's promises about Co-op Board approval, including his email correspondence stating he spoke to the Co-op Board, are simply "puffery" contradicted by Shamash's later testimony that he did not recall speaking to any members of the Co-op Board.  The statements in Shamash's deposition testimony taken three years after the sublease negotiations do not explain numerous emails from Shamash stating that he had spoken to Co-op Board members about the sublease and had secured "votes" to approve the sublease.  Turner Decl., Exs. K (September 5, 2019 Email), M (November 26, 2019 Email), N (December 15, 2019 Email), AC (December 10, 2019 Email), AD (December 12, 2019 Email). If anything, this conflicting evidence presents a genuine issue of material fact—whether the Co-op Board had knowledge of CCMS's sublease prior to Shamash's December 19, 2019 email correspondence, and whether they took any actions to approve or reject the sublease prior to the Interview, including by rejecting the sublease in writing.  Any determination of Shamash's credibility based on conflicting testimony (or the testimony of others) with his prior email correspondence should be made by a jury.  *See Sash v. United States*, 674 F. Supp. 2d 531, 541 (S.D.N.Y. 2009) ("[I]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" (quoting *McClellan v. Smith*, 439 F.d 137, 144 (2d Cir. 2006)).

What the Co-op Defendants' conveniently leave out of their papers is that CCMS was not Oxford's first subtenant.  Shamash, Conte, and Grill testified that software, technology, and companies previously occupied the 7th and 8th floors, including as recently as 18 months before

18

CCMS applied to sublease the 8th Floor.  Shamash Depo. Tr. at 37:10–15, 39:4–23, 40:15–41:8, 48:14–21, 49:10–50:18; Conte Depo. Tr. at 103:24–104:4; Grill Depo. Tr. at 57:1–59:8. When asked what the process was to approve the software company to rent the 7th or 8th floor, Conte admitted he never interviewed the company or reviewed a sublease application.[10]  Conte Depo. Tr. at 36:9–19, 103:24–104:4, 108:16–21. Similarly, Conte did not vote to approve or reject the software company's sublease.  *Id.*  Likewise, Grill was not aware of any interviews of other sublease applicants in his time as a board member.  Grill Depo. Tr. at 37:5–16, 38:16–23, 59:21–60:1, 61:19–22. When asked if a subtenant could be approved without a meeting or interview, Grill testified that it was not the "process, but I guess it's possible," yet until CCMS, not one sublease applicant had ever been interviewed.  Grill Depo. Tr. at 62:7–15.  The process Grill referred to was of his and Conte's own making because, as Grill testified, he would "rather meet the person that's going to be occupying the space."  Grill Depo. Tr. at 63:3–9.  Indeed, Lehr of Kaled Management later confirmed that Conte created the sublease application, with no assistance from anyone at Kaled.  Turner Decl., Ex. F ("Lehr Depo. Tr.") at 54:22–25 ("Q. Who created the sublease application? A. I think it was Mike Conte.")

Evidence that the plaintiff was treated differently than other sublease applicants supports that the Co-op Board purposefully discriminated against CCMS.  An inference of discrimination can be drawn from circumstances, including, without limitation, by showing that the defendant treated the plaintiff "less favorably than a similarly situated [person] outside his[/her] protected group."  *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000)).  "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material

---

[10] Conte also admitted to creating the sublease application himself.  Conte Depo. Tr. at 104:11–15.

respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (citation omitted).

Finally, following the Interview, Oxford informed CCMS that its sublease had been rejected because Brooks was an "idiot" who insisted on providing substance abuse counseling or "drug treatment" in the Interview.  Counterstmt. ¶ 50. Oxford had direct knowledge of the reason for rejecting CCMS's sublease because its representative, Shamash, attended the Interview and participated in the Co-op Board's deliberations, including the vote to reject the sublease.[11] Counterstmt. ¶¶ 41–49; Turner Decl. Ex. X (January 15, 2020 Email). Shamash had no reason to lie to CCMS regarding the reason for rejecting the sublease, except and until CCMS reminded Oxford that the agreed upon sublease explicitly excluded substance abuse counseling and provided Oxford with documents showing CCMS was not licensed to provide that type of treatment at the Premises.  Brooks Decl. ¶ 40. "[E]vidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 154 (2000) (Ginsburg, J., concurring)).

The Co-op Defendants' statements, actions manufacturing a "process" for sublease approval in the eleventh hour after it already knew about CCMS's sublease and Brooks' race, and proffered false reason for rejecting the sublease, when taken together, create a presumption of discrimination by the Co-op Board.  CCMS has made a prima facie showing of intentional

---

[11] Shamash, who all parties now agree is not a Co-op board member, but represented Oxford as a shareholder, voted against CCMS's sublease at the Interview, to the surprise of other attendees.  Turner Decl., Ex. Y (Conte Interview Notes).

discrimination and demonstrated a genuine dispute of material fact such that summary judgment should be denied.

### C. The Co-op Defendants' Non-Discriminatory Reasons for Rejecting CCMS's Sublease were Pretext for Racial Discrimination

After a plaintiff demonstrates its prima facie case of racial discrimination, under the *McDonnell Douglas* framework, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason that motivated the adverse action. *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002). If a defendant can proffer this reason, to survive summary judgment the plaintiff must then point to evidence that the proffered reason "was a pretext or discriminatory in its application." *McDonnell Douglas*, 411 U.S. at 1827. It is well-settled that a plaintiff, in conjunction with other evidence, may demonstrate pretext in a discrimination case by pointing to "weaknesses, implausibilities, inconsistencies, or contradictions in the [defendant's] proffered legitimate, non-discriminatory reason for its action." *Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 291 (S.D.N.Y. 2001).

The Co-op Defendants offer four reasons for rejecting CCMS's sublease: (1) CCMS's outpatient mental health clinic is not a business that would use the 8th Floor for administrative office space; (2) the "increased risk of violence and other problematic behaviors presented by CCMS' mentally ill clientele;" (3) the high volume of CCMS's patients that would visit the Premises; and (4) CCMS's hours of operation, including weekdays after 5 p.m. and Saturdays. Each of the proffered reasons were pretext for the Co-op Defendants' racial discrimination against CCMS.

First, the Co-op Defendants claim CCMS's would not use the 8th Floor for "administrative" office space but would instead receive visitors daily. CCMS does not dispute that it intended to conduct mental health counseling at the Premises and would receive up to 200

visitors per week.  Indeed, this was disclosed to the Co-op Board in CCMS's sublease application, which they received on December 24, 2019.  Turner Decl., Ex. J (Sublet Application). Oxford was similarly aware of this fact, including suggesting that CCMS's patients could use the Premises' freight elevator to access to the 8th Floor.  Compl. ¶ 26. Yet the Co-op Board continued forward with Brooks' interview three weeks after receiving the sublease application which clearly described CCMS's anticipated use for the space.  Stmt. ¶ 34.

The Co-op Defendants' further suggest that the current occupants of the Premises use the rest of the floors for "administrative" offices or "storage" but this is not true.  The Co-op Board President Paturet, who owns the first and third floors, runs a film equipment company.  Stmt. ¶ 7. Many Co-op Board members described this space as "retail" space with "people . . . always carrying stuff in and out, big boxes and pipes and all kinds of stuff."  Conte Dep. Tr. at 48:16–49:4. Similarly, Grill testified that the 10th and 11th floor owner, represented by Touton on the Co-op Board, receives visitors from "outside salespeople" and for company wine tastings, as does the 4th and 5th floor architecture and engineering firm.  Grill Dep. Tr. at 72:5–14; *see also* Stmt. ¶¶ 9, 12. At the Interview, Grill also expressed concern about the visitors to his 12th floor, including young models, sharing elevators with CCMS's patients.  Counterstmt. ¶ 45. Grill also testified that the software company that formerly occupied the 7th or 8th floor had more employees than the other floors and they frequently used the Premises' elevators.  Grill Dep. Tr. at 68:13–69:13. Indeed, there are so many visitors to the Premises that the Co-op recently installed an intercom system at the front entry so that visitors can contact the floor they intend to visit and be buzzed into the Premises.  Turner Decl., Ex. E (Dep. of Maxime Touton ("Touton Depo. Tr.") at 30:11–31:20. This system also allows employees to enter the locked Premises with an application on their phone. *Id.* at 32:4–10. Thus, the Co-op Defendants' reason for

rejecting CCMS because it would not be using the 8th Floor for administrative space was pretext, especially when other businesses in the Premises receive visitors at a rate so high that the Co-op installed an intercom system.

In order to show pretext at the summary judgment stage, the plaintiff must point to some fact suggesting "the falsity of the explanation" from which "the trier of fact can reasonably infer . . . that the [defendant] is dissembling to cover up a discriminatory purpose." *Schnabel v. Abramson*, 232 F.3d 83, 89 (2d Cir. 2000). For example, in *Wentworth v. Hedson*, a tenant running a vocal studio out of her apartment sued her landlord claiming that the landlord made statements and initiated eviction proceedings against her because of the race of the tenant's students. 493 F. Supp. 2d 559, 560–64 (E.D.N.Y. 2007). On a motion for summary judgment, the landlord offered as a non-discriminatory reason for her actions the tenant's alleged breach of the lease by running a vocal studio in her apartment. *Id.* at 570. The Court, however, found defendant's reason pretextual because facts showed that "virtually all" the harassment occurred after voice lessons with Black students. *Id.* In other words, the Court was presented with a fact—the timing of the landlord's harassment—that rendered the proffered non-discriminatory reason less likely. The Co-op Defendants attempt to do the same here by claiming that the fact that CCMS would not use the 8th Floor for office space only, but would instead receive visitors or patients, was the real reason for rejecting the sublease, when over half of the current occupants at the Premises use their space for more than just "office space" or only for their employees.

The Co-op Defendants' second, third, and fourth reasons for rejecting CCMS's sublease are flawed for similar reasons. CCMS disclosed it was a mental health clinic providing psychotherapeutic services and the number of patients visiting the Premises daily and weekly in its sublet application that the Co-op Board received on December 24, 2019. Stmt. ¶ 34. CCMS

also stated that it would operate from 9 a.m. to 8 p.m. on Mondays through Thursdays and 9 a.m. to 5 p.m. on Fridays and Saturdays. *Id.*  The Co-op Defendants could have rejected the sublease based on the application alone, yet they moved forward with the Interview, despite Conte stating that "[i]t was hard enough to get people to agree to a meeting."  Conte Dep. Tr. at 102:17–18. This makes it less likely that the Co-op Defendants rejected the sublease for reasons already know to them weeks before the Interview.  Indeed, Conte conceded that when he received the sublet application, he understood that CCMS would receive up to 200 visitors weekly at the Premises and operate after the hours of 9 a.m. to 5 p.m. and on Saturdays.  Conte Depo. Tr. at 70:24–71:1, 71:12–18, 102:2–7, 125:8–13.

Finally, as to the second reason offered by the Co-op Defendants for why they rejected CCMS's sublease—that they were concerned about CCMS's "mentally ill" patients who posed an increased risk of violence or "other problematic behaviors"—these concerns are manufactured by the Co-op Defendants and do not at all reflect CCMS's patients or how it conducts its business.  At Conte's deposition, he stated that Brooks told him CCMS would employ 12 security guards at the Premises, yet CCMS has never employed security guards at any of its locations.  Indeed, CCMS's serves individuals and families seeking mental health counseling, including Black individuals.  Brooks Decl. ¶¶ 6–7, 9–10.  The Co-op Defendants attempt to distort the types of treatment CCMS provides and its patients in an effort to provide a legitimate, non-racially motivated reason to discriminate, but they cannot point to anything that indicated CCMS's patients would pose "an increased risk of violence" or had "other problematic behaviors."

## <u>CONCLUSION</u>

For the foregoing reasons, CCMS respectfully requests that the Court deny the Co-op

Defendants' motion for summary judgment.

Dated: August 1, 2023
      New York, New York               **BAKER & HOSTETLER LLP**

                                        By: <u>*/s/ Tara E. Turner*</u>
                                        Tara E. Turner
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone:  212.589.4603
                                        Facsimile: 212.589.4201
                                        Email: tturner@bakerlaw.com

                                        *Attorney for the Plaintiff*