**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

C.C.M.S. d/b/a COMMUNITY COUNSELING
AND MEDIATION SERVICES,

        Plaintiff,

        v.

OXFORD REALTY & HOLDINGS LLC, WEST
27TH STREET REALTY, INC., MARC PATURET,
JOSEPH GRILL, MAXIME TOUTON, F.
MICHAEL CONTE, NIGEL SHAMASH, and
other similarly situated BOARD MEMBERS OF
WEST 27TH STREET REALTY, INC.,

        Defendants.

No. 20-cv-03429 (NRB)

---

**AFFIDAVIT OF EMORY X. BROOKS IN SUPPORT OF PLAINTIFF CCMS'S**
**OPPOSITIONS TO THE MOTIONS FOR SUMMARY JUDGMENT SUBMITTED BY**
**THE CO-OP DEFENDANTS AND DEFENDANT MARC PATURET**

I, Emory X. Brooks, declare the following:

1.      For the past forty (40) years, I have served as the President and Chief Executive

Officer of the plaintiff, C.C.M.S. d/b/a Community Counseling and Mediation Services

("CCMS").  On behalf of CCMS, I respectfully submit this affidavit in support of CCMS's

oppositions to the motions for summary judgment submitted by defendants West 27th Street

Realty Inc. ("Co-op"), Joseph Grill, Maxime Touton, and F. Michael Conte (collectively, "Co-op

Defendants") and defendant Marc Paturet ("Paturet").  I have personal knowledge of the events

described herein and they are supported by evidence submitted in the declarations of Tara E.

Turner, dated August 1, 2023 ("Turner Decl.") and Robert King, dated August 1, 2023 ("King

Decl.").

2.      I am a licensed clinical social worker and a graduate of Columbia University School of Social Work.  In 1998, I received a certificate from the Harvard Business School's executive management and leadership course in nonprofit management.  I am also a graduate of Columbia University's Nonprofit Management Program and I have attended post-graduate studies at Teachers College (Doctoral Program) and the William Allison White Institute.  In 1997, I received the Rudin Award from New York University for dedication and leadership in the field of mental health.

3.      I am a member of the Black Agency Executives, a board member of Black Equity Alliance, and a member of the Supportive Housing Network of New York State.  Previously, I was a board member of the Coalition of Behavioral Health Agencies, and a former member of the Council of Voluntary Childcare Agencies

4.      I was born and raised in San Angelo, Texas and previously served as an officer in the U.S. army.  I am a Black man.

5.      I created CCMS in 1982 in response to the overwhelming problems facing poor, minority, and disadvantaged children and families in New York City.  At the time, CCMS was one of the first minority-led agencies in New York City.

6.      Today, CCMS is a leading minority-led not-for-profit New York corporation that provides assistance to individuals and families seeking mental health counseling as well as a wide range of social support, education, and supportive housing services in Brooklyn.

7.      CCMS is committed to addressing the root causes and problems associated with mental illness and substance and alcohol abuse by creating a network of support to promote healthy, stable, and enriched lives and communities.  CCMS is one of a handful of organizations

in New York City providing culturally sensitive mental health services with a range of educational, health, and social activities.

8.      CCMS's organization includes of a network of four outpatient mental health clinics in Brooklyn and Manhattan, ten youth development and after school programs, and four supportive housing facilities for formerly homeless adults, lower income veterans, and seniors in Brooklyn.  CCMS has leased and renovated space for a fifth clinic in Brooklyn, New York, that is expected to open in two months.  Additionally, CCMS has two housing facilities planned in Brooklyn, New York, as well as one senior housing facility planned for China.

9.      Each year, CCMS provides vital services to over 100,000 individuals and families, including 108,000 counseling sessions.  Beginning in late 2019 through today, approximately 40% of CCMS's clients participate in telehealth receiving counseling or treatment by phone or video, not in CCMS's clinic offices.

10.     CCMS's employees and clients are racially and ethnically diverse, although most are Black.

11.     In or around early Fall 2019, CCMS received notice that it needed to vacate its 115 West 31st Street, New York, New York clinic by the end of December 2019 because the building was being converted to another use.  Compl. ¶ 20, ECF No. 1.[1]  The 115 West 31st Street clinic provided counseling and mental health services to adult clients.

12.     I, along with other CCMS staff, began looking for new office space in Manhattan for CCMS.  I hired Robert King ("King") to represent CCMS as its real estate broker.  *See* King Decl. ¶ 3. King is affiliated with S. Charatan Realty, Inc. and at the time, had 30 years' experience as a broker.  *Id.* ¶ 2.

---

[1] Unless otherwise noted, all ECF references refer to the case captioned herein.

13.     In August 2019, CCMS staff viewed a space available for sublease on the eighth floor ("8th Floor") of an office building at 129 West 27th Street ("Building").  The 8th Floor was owned by dismissed defendant Oxford Realty & Holdings LLC ("Oxford"). Turner Decl., Ex. H (Oxford Proprietary Lease). The 8th Floor had 7,500 rentable square feet and was divided into approximately 15 smaller offices.  Turner Decl., Ex. I (Sublease Agreement, Ex. B).  The sublease was available from December 15, 2019 through December 31, 2029.

14.     I liked the 8th Floor space because it fit CCMS's needs for a clinic.  The 8th Floor was already divided into 15 separate offices that CCMS could use as therapy rooms.  Turner Decl., Ex. I (Sublease Agreement, Ex. B). It also had a waiting area for clients. *Id.* I had my architect prepare renderings of the 8th Floor to confirm there was enough space to fit CCMS's needs. *See* Turner Decl., Ex. Z (Architect Invoice).

15.     At the time, I understood, and King explained, that the Building was owned by a commercial cooperative, defendant West 27th Street Realty, Inc. *See* King Decl. ¶ 4; Turner Decl., Ex. G (Co-op Offering Plan). Oxford told CCMS and King that any sublease of the 8th Floor would need to be approved by the Co-op.  King Decl. ¶ 7.

16.     The Building had 12 floors with a central elevator connecting each floor.  Oxford also owned the 7th floor and I understood that it was not occupied at the time CCMS sought to sublease the 8th floor.  Turner Decl., Ex. H (Oxford Proprietary Lease).

17.     Through our broker, in November 2019, CCMS made an offer to sublease the 8th Floor for a period of roughly 10 years.  Turner Decl., Ex. L (Sublease Term Sheet). In the sublease offer, I listed "Mental Health Counseling" as the intended use for the space. *Id.*; *see also* Compl. ¶ 22.  CCMS planned to operate an outpatient Article 31 licensed mental health clinic to be staffed by licensed child and adult psychiatrists, psychologists, and clinical social

workers.  Compl. ¶ 5. The terms of CCMS's offer were accepted and then CCMS began sublease

negotiations with Oxford.

18.     King often dealt directly with Nigel Shamash ("Shamash"), a representative of

Oxford, regarding the sublease; however, King occasionally spoke to Saul Tawil ("Tawil") who

owned Oxford. *See generally* King Decl. King would forward me communications between him,

Shamash, and Tawil.

19.     Throughout sublease negotiations, my real estate attorney and King asked

Shamash and his attorney about obtaining Co-op approval for the sublease.  King Decl. ¶¶ 15–

16, 21–22.  Shamash told King that the sublease would be approved, based on support from the

Co-op board President.  King Decl. ¶¶ 7, 9, 11, 14, 18; Compl. ¶ 22.

20.     At one point, Shamash told King that Oxford controlled 5 floors or votes in the

Building, and that Shamash was in communication with the Co-op board President, now known

to be defendant Paturet, who would also vote to approve the sublease.  King Decl. ¶ 7.

21.     Shamash told King multiple times that he was in contact with the Co-op,

including the Co-op President, regarding CCMS's potential sublease.  King Decl. ¶¶ 7, 9–11. At

the time, I assumed that Shamash was on the Co-op board of directors but I know now that

Oxford was only a shareholder of the Co-op.

22.     During sublease negotiations, Shamash never mentioned a formal process to seek

Co-op approval.  King Decl. ¶ 10.  Shamash never mentioned that I would have to interview with

the Co-op board of directors.  *Id.*  Until December 23, 2020, Shamash never mentioned a

sublease application.  *Id.*

23.     In addition, during sublease negotiations, I proposed adding substance abuse

counseling in the lease even though CCMS did not have current plans or funding to operate a

substance abuse counseling clinic. Compl. n.1. Instead, I wanted to have the flexibility to add substance abuse counseling if there was future funding. *Id.* CCMS did not previously conduct that type of counseling at its Manhattan Office. In order to actually conduct substance abuse counseling in the new 8th Floor space, CCMS would have had to inform the New York Office of Mental Health and New York Office of Alcoholism and Substance Abuse. As such, CCMS proposed the following use language to be included in the sublease with Oxford:

> Tenant shall use and occupy the demised premises for general offices, executive and administrative offices and for Tenant's counseling programs, including but not limited to mental health and substance abuse counseling, all of the foregoing in connection with and in furtherance of Tenant's purposes and activities.

Compl. ¶ 24.

24.     Shortly thereafter, Oxford asked that the use language be changed to remove "substance abuse counseling" but stated the rest of the use was acceptable. Compl. ¶ 25. CCMS agreed. *Id.* ¶ 27.

25.     On December 15, 2019, Shamash asked King which CCMS location he should tour because "[w]e are trying to get the logistics done now." Turner Decl., Ex N (December 15, 2019 Email). Shamash told King "[t]he president of the board needs to see an existing location," in order to approve the sublease. *Id.*

26.     On December 15, 2019, some of CCMS's staff went to the 8th Floor to begin disassembling the existing furniture in the space. From December 16 through 18, 2019, CCMS had staff or contractors at the 8th Floor installing equipment for CCMS. At that point, I believed the sublease would begin imminently.

27.     On December 18, 2019, CCMS reached agreement with Oxford on the sublease. I signed the sublease and gave King two checks for the security deposit and first month's rent.

King Decl. ¶ 14.  King told me he delivered the signed sublease and checks to Oxford on December 18, 2019.  *Id.*  Subsequently, on December 30, 2019, Oxford cashed the checks.

28.    On December 19, 2019, I understand that Oxford submitted the sublease to the Co-op Board.  Turner Decl., Ex. P (December 19, 2019 Email).  That day and later on December 22, 2019, King asked Oxford about the status of the sublease approval so that CCMS could finish moving into the space.  King Decl. ¶¶ 15–16; Turner Decl., Exs. O (December 19, 2019 Email), Q (December 22, 2019 Email).

29.    On December 23, 2019, Oxford asked CCMS to fill out a sublet application for the Building.  Turner Decl., Ex. S (December 23, 2019 Email).  At the time, I thought this was odd because we had been working for four months to finalize the sublease and no one mentioned that I needed to fill out an application.  My real estate attorney also raised concerns with Oxford because the sublet application appeared to be for residential use, not commercial.  *Id.* at 3.

30.    On December 24, 2019, I completed the sublet application and submitted it directly to Kaled Management, who I learned was the property manager for the Building.  Turner Decl., Exs. T (December 24, 2019 Email), J (Sublet Application).

31.    In the sublet application, I stated that CCMS would "operate a licensed outpatient clinic, providing psychotherapeutic [sic] services," with approximately 50 clients daily and 200 weekly.  Turner Decl., Ex. J (Sublet Application).  I stated that CCMS would operate Monday through Thursday from 9 a.m. to 8 p.m. and Friday and Saturday from 9 a.m. to 5 p.m.  *Id.* at 2.  This was consistent with CCMS's existing operations at its Manhattan office.

32.    On December 26, 2019, a member of the Co-op Board emailed King to tell him that the Co-op Board would meet on January 14, 2020 to consider the application and that I

would have to appear for an interview.  Turner Decl., Ex. U (December 26, 2019 Email); King

Decl. ¶ 20.  King forwarded the email to me.  Turner Decl., Ex. U (December 26, 2019 Email).

33.     On December 27, 2019, Kaled Management contacted me directly to schedule the

interview with the Co-op Board for January 14, 2020.  Turner Decl., Ex. V (December 27, 2019

Email).

34.     Between the time that the interview was scheduled on December 27, 2019 and the

interview on January 14, 2020, I was able to work with the landlord for the existing Manhattan

office to allow us to holdover our lease until the new sublease was approved.  CCMS had to pay

the holdover rate of 1.5 times the monthly rent of $17,500.00 for the month of January 2020.

35.     On January 14, 2020, I went to the Building for the interview with the Co-op

Board.  At the time, I believed all five Co-op Board members, including defendants Paturet, F.

Michael Conte, Maxime Touton, Joey Grill, and non-party Erik Dochtermann were present at the

interview.  I now know defendant Paturet was not present.  Nigel Shamash attended the

interview on behalf of Oxford.  I believe that all of the Co-op Board members who attended the

interview were Caucasian and/or Jewish.

36.     At the interview, I discussed my early work as a psychotherapist in Westchester

and my work with predominantly Jewish Orthodox adolescent boys, which led me to establish

CCMS.  I also discussed CCMS's new plan for the 8th Floor, which would include

psychoanalytic treatment of children ages two to seven years old.

37.     During the interview, completely unprompted, Co-op board member F. Michael

Conte raised the December 28, 2019 attack by a Black man on a group a people celebrating

Hanukkah in Monsey, New York.  The alleged attacker in Monsey was reported in the news as a

Black man who attacked individuals with a machete.  Similarly, another board member raised the

concern that CCMS's clientele may subject the building owner to lawsuits from other tenants and clients if anyone gets injured by clients of CCMS, like what happened in Monsey.  Co-op Board member Joseph Grill added that his clients (young models who come to his office) would be at risk from clients of CCMS.

38.     At the interview, I never stated nor implied that CCMS would conduct substance abuse counseling in the Building.  I knew substance abuse counseling was excluded from the sublease agreement.  Turner Decl., Ex. Ex. I (Sublease Agreement).  Further, I never stated that I would hire security guards for my clients or that criminal courts referred clients directly to me.

39.     I was caught off guard by the Co-op Board's comments and was concerned that they raised the Monsey, New York attack because CCMS is a minority-led organization, run by a Black man, that predominantly treats Black clients in Black communities.  The incident in Monsey, New York had nothing to do with CCMS's sublet application.  The only commonality was the race of the Monsey attacker and the race of the sublet applicant and CCMS's clients.

40.     The next day, on January 15, 2020, King informed me that CCMS has been rejected by the Co-op Board.  King Decl. ¶ 24; *see also* Turner Decl., Ex. X (January 15, 2020 Email).  Tawil told King that I was an "idiot." *Id.*  Later, Oxford's real estate attorney stated that CCMS was rejected because I had insisted on conducting substance abuse counseling or "drug treatment" during the interview.  Turner Decl., Ex. Y (January 30, 2020 Email).  I found this explanation extremely strange because I had previously agreed to exclude that type of treatment from the sublease agreement.  Turner Decl., Ex. I (Sublease Agreement).  Further, I had already informed the New York Office of Mental Health that CCMS may be relocating to the Building and would begin administering counseling for children ages two to seven and adults.  Based on my experience in the field, I know that you cannot administer counseling for children in the same

9

location as substance abuse treatment.  Due to this, I believe Oxford's explanation for why the sublease was rejected by the Co-op Board was intended to hide the real reason CCMS was rejected.

41.     After reflecting back on the series of events that led to the sublease rejection, the Co-op Board, including Paturet, created the sublet application and asked me to interview with the Co-op Board in order to reject the sublease and make it appear as though they were rejecting CCMS for legitimate reasons.  I cannot think of any other reason why Oxford and CCMS would negotiate the sublease for four months, with Oxford stating multiple times that the Co-op would approve of the sublease, only to be told after the sublease was signed and checks written that an application and interview were required.  Oxford intended to have the sublease approved by shareholder vote or by approval of the majority of the Co-op Board (in writing) with Paturet's support and those plans were thwarted by members of the Co-op Board when they learned what kind of organization CCMS was and the clients it served.

42.     Additionally, I have been a Black man in America for over 90 years.  I have worked for 40-plus years on the front lines of urban poverty and the mental health conditions it causes and exacerbates.  I have seen and experienced my unfair share of prejudice and discrimination.  But I have never before brought a lawsuit alleging racial discrimination.  In this case, I had no choice when a Co-op Board invented procedures no one else faced to erect a hurdle to my sublet application, when the Co-op Board interview included comment about the Monsey attack that had nothing to do with CCMS except the race of the alleged perpetrator, and when the Co-op Board's questions and comments then and since are a veritable parade of the most invidious racial tropes in American history—concern for the "safety" of the Building's tenants, CCMS's clients being children of "crack addicts" and having "criminal backgrounds,"

and that I was referred to as an "idiot" by Oxford's owner Tawil. None of the statements are true. None of the statements have a legitimate non-discriminatory basis. All together, they evidence the race-based nature of the denial of CCMS's sublet application.

43. As a result of the Co-op Board's denial, CCMS could not sublease the 8th Floor. CCMS had to negotiate with its Manhattan office landlord to holdover its existing space. CCMS was forced to pay the holdover rate of one and a half times the monthly rent of $17,500.000 for January 2020 and two times the monthly rent from February 2020 going forward. In total, CCMS paid $26,250.00 for January 2020, $35,000.00 for February 2020, $35,000.00 for March 2020, and $35,000.00 for April 2020. If the Co-op Board had approved CCMS's sublease, it would have only paid $25,000.00 per month to Oxford.

44. CCMS also incurred expenses for attorney's fees negotiating the sublease of at least $15,368.00, expenses installing phone and data services of at least $8,124.00, expenses in hiring an architect to prepare a floorplan of at least $4,919.75, and expenses in storing furniture specifically ordered for the 8th Floor of at least $1,153.70.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August 1, 2023
      New York, New York

Emory X. Brooks