**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

C.C.M.S. d/b/a COMMUNITY COUNSELING
AND MEDIATION SERVICES,

      Plaintiff,

      v.

OXFORD REALTY & HOLDINGS LLC, WEST
27TH STREET REALTY, INC., MARC PATURET,
JOSEPH GRILL, MAXIME TOUTON, F.
MICHAEL CONTE, NIGEL SHAMASH, and
other similarly situated BOARD MEMBERS OF
WEST 27TH STREET REALTY, INC.,

      Defendants.

No. 20-cv-03429 (NRB)

---

**AFFIDAVIT OF ROBERT KING IN SUPPORT OF PLAINTIFF CCMS'S**
**OPPOSITIONS TO THE MOTIONS FOR SUMMARY JUDGMENT SUBMITTED BY**
**THE CO-OP DEFENDANTS AND DEFENDANT MARC PATURET**

I, Robert King, declare the following:

1.     I respectfully submit this affidavit in support of Community Counseling and Mediation Services' ("CCMS") oppositions to the motions for summary judgment filed by defendants West 27th Street Realty, Inc., F. Michael Conte, Joseph Grill, Maxime Touton, and Marc Paturet in this action. I have personal knowledge of the following facts and they are supported by the evidence submitted in the declaration of Tara E. Turner, dated August 1, 2023 ("Turner Decl.").

2.     I am a real estate broker with S. Charatan Realty, Inc. I have over 30 years of experience brokering commercial real estate in New York City and Long Island. I have helped many clients lease or sublease commercial space in New York City, including from commercial cooperatives.

3.      In or around August 2019, CCMS asked me to help it find commercial space for lease in Manhattan to replace its existing office located at 115 West 31st Street, New York, New York.

4.      In August 2019, I located commercial space available for sublease on the 8th floor ("8th Floor") of the building located at 129 West 27th Street, New York, New York ("Building").  The Building had 12 floors and was a commercial cooperative managed by Kaled Management Corp. ("Kaled") as the property manager.

5.      The 8th Floor had approximately 7,500 square feet of rentable space and was divided into approximately 15 offices.  Turner Decl., Ex. I (Sublease Agreement, Ex. B). I showed CCMS the 8th Floor space because I knew that CCMS had until the end of December 2019 to find a new space and the floor plan of the 8th Floor would work for CCMS's needs with slight modifications.  CCMS's President, Emory X. Brooks ("Brooks") liked the 8th Floor space because it did not require CCMS to make significant alterations or renovations prior to move in.

6.      The 8th Floor was owned by Oxford Realty & Holdings LLC ("Oxford"), which I understand was previously a defendant in this case but has been dismissed.  Oxford also owned the 7th floor in the Building.  My point of contact from day one regarding the 8th Floor sublease was Oxford's representative, Nigel Shamash ("Shamash"), although I occasionally spoke to Saul Tawil ("Tawil") who owned Oxford.  In my initial conversations with Shamash regarding the 8th Floor, I told him that CCMS would be operating a health clinic.  He did not have any issues with that type of use.

7.      When I discussed the sublease with Shamash, he told me that once CCMS and Oxford reached agreement on a term sheet, the sublease would need to be approved by the board of directors for the commercial cooperative that managed the Building ("Co-op Board").

2

Shamash specifically stated that the Co-op Board President would want to visit CCMS's existing location.  Shamash stated that CCMS would be approved because Shamash had five floors of the 12 floors in the Building that voted with Oxford and the Co-op Board President would be the final vote to approve the sublease.  Turner Decl., Ex. K (September 5, 2019 King Email).

8.      On November 5, 2019, I helped CCMS submit an offer to Oxford to sublease the 8th Floor for a period of roughly 10 years.  Turner Decl., Ex. L (November 5, 2019 CCMS Offer).  In its offer, CCMS listed "Mental Health Counseling" as its "use."  *Id.*  Oxford accepted CCMS's initial terms and the parties continued to negotiate the sublease agreement through December 2019 with their real estate attorneys.

9.      During ongoing negotiations, Shamash again stated that Co-op approval would not be an issue because he was in contact with the Co-op Board President.  He reiterated this on multiple occasions when I inquired about the status of Co-op approval, including on November 26, 2019 when I emailed him about the sublease.  Shamash responded that he "spoke to president of board. Working on it. All good."  Turner Decl., Ex. M (November 26, 2019 King Email).

10.      In all my communications with Shamash and Tawil, they never mentioned that approval of the sublease required (i) CCMS to fill out an application, (ii) that the Co-op Board meet to decide the sublease, and/or (iii) that CCMS interview with the Co-op Board.

11.      During sublease negotiations, CCMS asked to include language in the sublease that it could conduct "substance abuse counseling."  Oxford rejected the inclusion of that language and CCMS agreed to removed it.  The final sublease expressly excluded substance abuse counseling:

> Tenant shall use and occupy demises premises for general, executive
> and administrative offices and for Tenant's counseling programs,
> including but not limited to mental health, all of the foregoing in

3

> connection with and in furtherance of Tenant's purposes and
> activities, but *excluding substance abuse counseling*.

Turner Decl., Ex. I (Sublease Agreement) at 1.

12.     On December 15, 2019, Shamash emailed me to ask "Which locations should I be touring? We are trying to get the logistics done now." I asked Shamash if the email was meant for me. Shamash responded that "Yes. The president of the board needs to see an existing location. They don't want to show them the location on 31st street if it is not the same treatment." Turner Decl., Ex. N (December 15, 2019 Shamash Email).

13.     The next day, December 16, 2019, I heard from the Building superintendent that the Co-op Board President was out of town.

14.     Between December 16 and 18, 2019, Oxford allowed CCMS up to the 8th Floor to install telephone lines, data, and IT services.

15.     On December 18, 2019, CCMS signed the sublease and provided me with two checks to Oxford in the amounts of $100,000.00 for the security deposit and $25,000.00 for the first month's rent. I hand-delivered the signed sublease and checks to Shamash that day. Shamash told me he would scan and send the sublease to the Co-op Board President, who would then send it to all shareholders.

16.     On December 19, 2019, I emailed Shamash and Tawil asking about the status with the Co-op Board and informing them that CCMS had deliveries coming that day. Shamash responded that "We sent everything off this morning. There is an email coming out this afternoon. I hope to have status for you tomorrow morning or afternoon." Turner Decl., Ex. O (December 19, 2019 King Email).

17.　　On December 22, 2019, I again emailed Shamash and Tawil asking if CCMS has Co-op approval.  Tawil responded "patience, we are at the finish line."  Turner Decl., Ex. Q (December 22, 2019 King Email).

18.　　On December 23, 2019, at around 11 a.m., Shamash contacted me because CCMS was attempting to move some of the existing furniture out of the 8th Floor.  Shamash stated that CCMS could not move in without a certificate of insurance and that "Checks haven't cleared yet. Board vote is set imminently."  Turner Decl., Ex. R (December 23, 2019 Email).  Shamash stated that "there are emails flooding around in possession hasn't been granted yet[.] [Y]ou have to wait." *Id.*

19.　　However, that same day (December 23, 2019) at around 11:50 a.m., Shamash forwarded a "sublet application" to me and asked that CCMS fill it out because he "need[ed] to get this email to the board this minute."  Turner Decl., Ex. S (December 23, 2019 Email).  I forwarded to Brooks and CCMS's real estate attorney.  CCMS's real estate attorney asked Shamash where he received the sublet application from because it was a sublet application for a residential apartment.  *Id.* at 3.  Shamash responded that "The goal is to get the package out ASAP so I can get it approved ASAP. Peter said he sees no issue with this tenant. So please fill in the document and any non-conforming questions simply leave blank or write not applicable." *Id.* at 2.  CCMS's real estate attorney responded: "We seem to be caught in the Kaled residential red-tape. Can't the Co-op Board President tell Kaled it's not necessary [to fill out the application] in this situation? In the meantime, CCM[S] is trying to fill it out." *Id.* at 1. Shamash responded that he "d[id] not believe that there will be red tape. There are two parties involved right now. Myself and the president with K[]aled in between [sic]." *Id.*  This was the first time I heard of a sublet application for the Building.

20.     On December 24, 2019, Brooks submitted the sublet application on behalf of CCMS.  Turner Decl., Ex T (December 24, 2019 Brooks Email), Ex. J (CCMS Sublet Application).  On December 26, 2019, Susan Rubin from Kaled responded that they would "start to process" the application.  Turner Decl., Ex. T (December 24, 2019 Brooks Email).  Shamash replied that "everyone is out of the office and unable to process checks today. However we are in a rush."  *Id.* at 2.  Susan then confirmed she would "start the process and then submit to the Board."  *Id.* at 1.  I responded to Shamash, copying Susan Rubin and Peter Lehr of Kaled, stating that "CCM[S] need[s] to be out of their current Manhattan office this week. . . . The lone elevator is due to be shut down next week."  *Id.*

21.     Also on December 26, 2019, I was copied on an email from F. Michael Conte, who I now know to be a Co-op Board member, to Susan Rubin, Peter Lehr, and Shamash, stating that "the board will meet on Jan 14, 2020 to consider this application. It is customary that the applicant appear for an interview at that time. According to our bylaws all sublets must be approved. I am not sure why anyone would assume otherwise."  Turner Decl., Ex. U (December 26, 2019 Conte Email).  This was the first time I heard of an interview with the Co-op Board.

22.     On December 27, 2019, Susan Rubin of Kaled scheduled a tentative interview with Brooks, set for January 14, 2020.  Turner Decl., Ex. V (December 27, 2019 Rubin Email).  In response, CCMS's real estate attorney asked Susan Rubin that

> the Board interview our client CCMS, the proposed tenant for the 8th of the building at 129 West 27th Street as soon as possible before year end. They cannot wait until January 14, 2020 since they are the last tenant at 115 West 31st Street, where they have had offices on the fifth floor for approx. 30 years. . . . We have been negotiating this sublease for the 8th floor owned by Oxford Realty & Holdings LLC since mid November and was presented with the execution of the form of sublease on Dec. 16.  *All along we understood Oxford has been consulting with the Board and that the sublease was*

*approved. . . .* Given the circumstances, we would so greatly appreciate your bringing this to the attention of the Board.

*Id.* at 3–4 (emphasis added).

23.     On January 2, 2020, I emailed Shamash and Tawil to ask "Is there any advice you can give us for the upcoming board meeting on Jan 14th?"  Turner Decl., Ex. W (January 2, 2020 King Email).  Shamash responded that "we have a plan and a call in to speed up, and will be working on it [M]onday/[T]uesday."  *Id.* at 2.  Shamash did not speed things up and Brooks' interview remained set for January 14, 2020.

24.     On January 14, 2020, Brooks was interviewed by the Co-op Board.

25.     On January 15, 2020, Shamash contacted me and told me that the Co-op Board denied CCMS's sublease.  When I emailed Tawil about the Co-op Board's decision, he responded that "YOUR TENANTS REP WAS AN IDIOT."  Turner Decl., Ex. X (January 15, 2020 King Email).

26.     On January 30, 2019, I was copied on an email from Etan Harris, the real estate attorney who represented Oxford in negotiating the sublease.  Turner Decl., Ex. Z (January 30, 2020 Harris Email).  Harris stated that "The issue we have is that CCMS' representative expressly stated during a nearly hour-long board meeting that it would be conducting substance abuse counseling at the premises."  *Id.* at 2.  I knew this must be false because CCMS had previously negotiated with Oxford to exclude substance abuse counseling from the sublease.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  August 1, 2023
        New York, New York

*Robert King*

_____
        Robert King

7