```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
C.C.M.S. d/b/a COMMUNITY
COUNSELING AND MEDIATION
SERVICES,

        Plaintiff,

            - against -

OXFORD REALTY & HOLDINGS LLC,
WEST 27TH STREET REALTY INC.,
MARC PATURET, JOSEPH GRILL,
MAXIME TOUTON, F. MICHAEL
CONTE, NIGEL SHAMASH, and other
similarly situated Board
Members of West 27th Street
Realty, Inc.,

        Defendants.

------------------------------X
```

**MEMORANDUM AND ORDER**

20 Civ. 3429 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff C.C.M.S. d/b/a Community Counseling and Mediation Services ("CCMS") sued Oxford Realty & Holdings, LLC ("Oxford"), its agent Nigel Shamash (together with Oxford, the "Oxford Defendants"), West 27th Street Realty, Inc. (the "Co-Op"), its board members Marc Paturet, Joseph Grill, Maxime Touton, F. Michael Conte, and other similarly situated board members (together, the "Co-Op Defendants") alleging that their refusal to sublet the 8th floor of 129 West 27th Street in New York, New York to CCMS was the result of race-based discrimination in violation of 42 U.S.C. §§ 1981 and 1982.

This is the second opinion by this Court assessing CCMS's allegations that it was denied a sublease on the basis on race. <u>See</u> ECF No. 45 ("MTD Op."). Specifically, on July 12, 2021, the Court granted the Oxford Defendants' motion to dismiss CCMS's claims against them, holding that CCMS "d[id] not adequately allege that the Oxford Defendants," the owners of the specific premises that CCMS wished to sublease, "acted with the requisite intent to discriminate based on race." <u>Id.</u> at 16. Following the completion of discovery, the Co-Op Defendants, the only remaining defendants, with Paturet filing separately, moved for summary judgment seeking dismissal of CCMS's claims. For the following reasons, the Court grants both motions in full.

**BACKGROUND**

**A.   Factual Background[1]**

Given the Court's prior opinion, we assume familiarity with the factual background of the case and state here only those facts

---

[1] The following facts are drawn primarily from the parties' Local Civil Rule 56.1 Statements and admissible materials submitted by the parties in connection with the present motions. The Co-Op Defendants and Paturet filed separate Rule 56.1 Statements of Material Facts in support of their respective motions for summary judgment. <u>See</u> Co-Op Def. Local Rule 56.1 Statement ("Def. 56.1"), ECF No. 98; Paturet Local Rule 56.1 Statement ("Paturet 56.1"), ECF No. 106. For its part, CCMS filed responses to each of those Local Rule 56.1 Statements as well as its own Local Rule 56.1 Counterstatement ("Pl. 56.1"), which is contained in the same documents as its responses. <u>See</u> ECF No. 111, 115. For purposes of clarity, the Court cites only the Co-Op Defendants' Rule 56.1 statement when the facts are not in dispute.

necessary to resolve this motion, all of which are undisputed unless otherwise noted. As described in our earlier opinion, CCMS is a not-for-profit organization based in New York, which provides various outpatient mental health clinics that serve underrepresented racial and ethnic groups, including Black patients. Def. 56.1 ¶ 15; Pl. 56.1 ¶¶ 1-2. Emory X. Brooks, a Black man, was, at all relevant times, CCMS's President and Chief Executive Officer. Def. 56.1 ¶ 16; Pl. 56.1 ¶¶ 3-4. The Co-Op owns the building located at 129 West 27th Street in New York City (the "Building"), which is operated as a commercial cooperative. Def. 56.1 ¶¶ 1, 6. The Co-Op operates through its board (the "Board"), which is comprised of five directors, four of whom are the individually named Co-Op Defendants.[2] Id. ¶ 2. Oxford Realty is a shareholder of the Co-Op, owning the shares allocated to the 8th floor (the "Premises"). Id. ¶¶ 19, 23.

In August 2019, CCMS began pursuing the prospect of subleasing the Premises from Oxford Realty because the lease for one of its nearby clinics, which served approximately 330 patients, was set to expire at the end of the year. Id. ¶ 19. From the outset, the contemplated sublease contained a provision stating that it was

---

[2] Erik Dochtermann, a former Co-Op shareholder and Board member, is not individually named in this action. Pl. 56.1 ¶ 16.

contingent upon the consent of the Board and Brooks was aware that any sublease was subject to Board approval.  Id. ¶¶ 16, 23-24.

Over the ensuing weeks and months, CCMS and Oxford engaged in negotiations to sublease the Premises.  Id. ¶ 25.  Based on statements made by Oxford's principals during those negotiations, CCMS was under the impression that it had the Board's support for the sublease.  Id. ¶¶ 25-29.  However, the Co-Op Defendants assert that the Board had no real time knowledge of CCMS's negotiations with Oxford and that none of Board members had even considered CCMS's sublease until the Board interviewed Brooks in January 2020. Id. ¶¶ 25-29.  Nonetheless, all parties agree that prior to that interview, Brooks had no sublease-related communications with any member of the Board.  Id. ¶ 29.

On December 18, 2019, Brooks signed the sublease with Oxford. Id. ¶ 30.  The following day, on December 19, 2019, Oxford's principal sent the following statement to the Co-Op's managing agent by email:

> We've had a lot of movement with tech companies on this floor over the years. We're looking forward to the stability of a more conventional user. I believe they are a good use for the building as they are low traffic, and conformant with the traffic nature of the building, a place for business and very 9-5. Should they be operating after building hours for any reason, as with our other tenants, they have to pay for a doorman.

> [CCMS] is a 30+ Year old organization which has around 10 satellite locations around the city. This location is their new HQ and we have been very clear in the lease. THERE IS NO SUBSTANCE ABUSE TREATMENT, no questionable traffic to the building, it is exactly as the use clause states in the lease agreement: "the administrative offices for their programs including but not limited to . . . ."
>
> They're moving headquarters from 535 Clinton Ave, Brooklyn, NY and I have toured the location, it's fine, if anyone would like to come with us to do a second tour they are welcome to. Nice, Stable, long term, Quiet tenancy with a full floor, without a division plan and minimal construction. I would like to get them in for the new year.

Id. ¶ 31 (emphasis in original). The Co-Op's managing agent forwarded that email to the Board members later that day. Id. ¶ 32.

On December 24, 2019, Brooks submitted a sublease application to the Co-Op's managing agent. Id. ¶ 34. The application describes, among other things, CCMS's daily operations as a "licensed outpatient clinic providing psychotherapeutic services," with 12 employees, 50 customers daily, 200 customers weekly, and hours of operation of Monday through Thursday 9am-8pm, and Friday through Saturday 9am-5pm. Id. Upon receiving the sublease application, the Co-Op's managing agent responded that she "will start the process and then submit to the Board." Id. ¶ 36. On December 27, 2019, the Co-Op's managing agent advised Brooks by email that the Board would interview him on January 14, 2020. Id.

Later the same day, December 27, 2019, CCMS's real estate broker wrote to Oxford's principals: "YOU NEED TO SPEED THIS UP. CANT WAIT TILL JAN 14, and then the board might deny them. . . . You both misled me . . . . no, you lied. Yep. flat out lied. I asked many times about the process of board approval. You both knew damn well how it works."  Id. ¶ 37 (emphasis in original).

On January 13, 2020, the day before Brooks' interview with the Board, CCMS's broker asked Oxford's principals to provide advice to Brooks.  Id. ¶ 38.  In response, one of the principals advised Brooks to tell the Board that CCMS is "[l]ow traffic office use" and that "you're the same as the location on Clinton Avenue," which houses CCMS's headquarters, even though CCMS planned to "mov[e] an adult clinic from 31st Street four blocks away" to the Premises.  Id.

The following day, on January 14, 2020, Brooks was interviewed by Board members Conte, Grill, Touton, and non-defendant Dochtermann.[3]  Pl. 56.1 ¶ 40.  Notably, defendant Paturet was traveling overseas at the time and did not attend the interview. Paturet 56.1 ¶¶ 17-18, 22-24.  During the interview, Brooks discussed CCMS's plans to use the Premises as an outpatient mental

---

[3] One of Oxford's principals also attended the interview.  Pl. 56.1 ¶ 41.

health clinic staffed with psychiatrists licensed to provide medication to a client roster of approximately 300 mentally ill adult patients.  Def. 56.1 ¶ 40 (citing Affidavit of F. Michael Conte ("Conte Aff."); Declaration of Barry G. Margolis ("Margolis Decl."), Ex. C ("Brooks Dep.") 74:15-78:9, 252:19-21).  Brooks also stated, as one Board member recalled, that CCMS would provide security for the safety of the other Co-Op shareholders, the businesses in the Co-Op, and their employees.  Id. ¶ 43.  Brooks further explained that CCMS would operate in the Premises on Monday through Friday from 9am-8pm and on Saturdays from 9am-5pm.[4]  Brooks Dep. 224:4-10.

According to Brooks, during the interview, one of the Board members raised a December 28, 2019 incident involving a mentally ill Black man who attacked a group of people celebrating Hanukkah with a machete in Monsey, New York (the "Monsey Incident").  Pl. 56.1 ¶ 44; ECF No. 1 ("Compl.") ¶¶ 2, 56.  Another Board member asked whether his clients, who include young models, would be at risk from attack by CCMS's clients.  Pl. 56.1 ¶ 45.

---

[4] The Court notes that Brooks' testimony in this respect differs from the sublease application, which stated that CCMS would operate Fridays and Saturdays from 9am-5pm.  Margolis Decl., Ex. N.

Following the interview, the Board members in attendance voted unanimously to not approve the proposed sublease.[5]  Def. 56.1 ¶ 48.  One Board member's notes, which were written at some point after the interview, state that the meeting convened "at about 4:15 after all had opportunity to review tenants [sic] application" and that "[t]hose in attendance deliberated and reviewed and reiterated that this firm [CCMS] was not simply operating as an administrative office as we were told, but as an outpatient clinic as described in their application for tenancy."  Margolis Decl., Ex. R.

## B.  Procedural History

CCMS filed its complaint against defendants on May 1, 2020.  ECF No. 1.  On July 31, 2020, the Co-Op Defendants filed their answer to the complaint, while the Oxford Defendants filed a letter requesting a pre-motion conference to discuss their anticipated motion to dismiss.  ECF Nos. 31, 33.  As discussed above, the Oxford Defendants eventually filed a motion to dismiss, which the Court granted on the basis that the two comments allegedly made by

---

[5] CCMS does not dispute that Paturet did not vote on CCMS's sublease application but nonetheless suggest that Paturet took "adverse actions with respect to CCMS's sublease."  Pl. Response to Paturet 56.1 ¶ 27.  For support, CCMS cites representations made by Oxford stating that its principals were in contact with Paturet about the sublease and had his support.  See id.  However, as discussed below, such representations are insufficient to support CCMS's theory that Paturet engaged in any adverse action concerning CCMS's sublease application.

the Oxford Defendants failed to plausibly allege racial animus
because the comments were "no more consistent with racial
discrimination that they are with general concerns about [CCMS]
serving clients suffering from mental illness." MTD Op. at 10.
In reaching this conclusion, the Court further held:

> Even comments made by members of the Board during the
> interview . . . are entirely consistent with Board members
> having concerns for issues of behavior, and were not
> presumptively a matter of race. This is not to say that the
> Board's concerns were valid, nor, of course, does the Court
> condone bias against those suffering from mental illness.
> However, the social stigma surrounding mental illness is not
> interchangeable with racial animus, and [CCMS] cannot sustain
> their racial discrimination claims merely by pointing to
> conduct suggesting bias against mental illness.

Id. at 11-12 (internal citations omitted).

After the Oxford Defendants were dismissed from the case,
leaving the Co-Op Defendants as the only remaining defendants, the
parties proceeded to discovery, which concluded at some point in
March 2023. ECF No. 86. On June 30, 2023, the Co-Op Defendants,
save Paturet, filed a joint motion for summary judgment. ECF Nos.
92-99. Paturet filed a separate motion for summary judgment
because he, unlike the other Board members, did not attend the
Board's interview with Brooks or vote on the sublease application.
ECF No. 101-09. CCMS opposed both motions on August 1, 2023, ECF
Nos. 110-17, and the Co-Op Defendants and Paturet filed separate

-9-

replies in further support of their respective motions on August 31, 2023, ECF Nos. 118-19.

## LEGAL STANDARD

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The movant "always bears the initial responsibility of informing the district court of the basis for its motion," as well as the basis for any absence of material fact in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant must satisfy this burden by pointing to the absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996). Courts must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."

Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

If the moving party makes a showing that it is entitled to summary judgment, "[t]hen the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). The non-moving party "may not merely rest on the allegations or denials of his pleading; rather his response . . . must set forth 'specific facts' demonstrating there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). A "scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991).

## DISCUSSION

CCMS asserts claims under 42 U.S.C. §§ 1981 and 1982 against the Co-Op Defendants alleging that their refusal to sublet the

Premises to CCMS was the product of racial discrimination. "Section 1981 provides that all persons have equal right to make and enforce contracts, and § 1982 establishes that all persons have equal right to purchase, lease, sell, hold, and convey real and personal property." Silva v. Farrish, 47 F.4th 78, 89 (2d Cir. 2022) (internal quotation marks omitted). CCMS's discrimination claims are analyzed pursuant to the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (citing cases); Haber v. ASN 50th St. LLC, 847 F. Supp. 2d 578, 588 (S.D.N.Y. 2012) (citing cases).

Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie claim under either provision by showing "(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination covered one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." Silva, 47 F.4th at 90; see also Burgin v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015) ("To state a discrimination claim under . . . § 1981, plaintiffs must sufficiently allege that defendants acted

with discriminatory intent."). To survive summary judgment on the second element, which is the only element at issue here,[6] the plaintiff must "produce enough evidence for a reasonable jury to find that the defendants intentionally discriminated against the plaintiff[] based on race." Silva, 47 F.4th at 90. "A plaintiff can prove intentional discrimination through either direct or circumstantial evidence." Brannon v. Delta Airlines, Inc., 434 F. Supp. 3d 124, 134 (S.D.N.Y. 2020).

If plaintiff is able to make out a prima facie case of discrimination, "the burden shifts to the [Co-Op Defendants] to set forth a legitimate, nondiscriminatory reason for their actions." Id. (internal quotation marks omitted). If the Co-Op Defendants do so, "then the burden shifts back to Plaintiff to demonstrate that the reasons offered by [the Co-Op Defendants] are pre-textual and that [their] action was actually motivated by race." Id. (internal quotation marks omitted). Because the two motions differ in minor but important respects, we will first address the Co-Op Defendants' motion for summary judgment before turning to Paturet's motion.

---

[6] The Co-Op Defendants do not dispute that CCMS satisfies the first and third elements, and therefore we focus only on the second element. ECF No. 99 ("Mot.") at 6 n.3.

**A. Co-Op Defendants' Motion**

We first address CCMS's initial burden of proving a prima facie case of discrimination and find that it has failed to meet that burden because there is no evidence, direct or circumstantial, that the Co-Op Defendants' decision to reject CCMS's application to sublet the Premises was racially motivated.  CCMS would have the Court infer racial animus in this decision from (1) two comments made by Board members during the interview; (2) statements made by one Board member during his deposition; and (3) the fact that the Board required CCMS to submit a sublease application and sit for an interview with the Board.[7]  See ECF No. 110 ("Opp.") at 13-20.  Whether taken together or in isolation, these circumstances do not give rise to an inference of discriminatory intent.

To begin, CCMS focuses on two comments made by Board members during the interview.  First, CCMS claims that at the interview, one Board member asked Brooks "completely unprompted" about the Monsey Incident -- an attack by a Black man who was mentally ill

---

[7] CCMS also points to a comment made by an Oxford principal, Opp. at 20, but that comment cannot establish racial animus on the part of the Co-Op Defendants, and, in any event, the Court already found in its prior Memorandum and Order that Oxford's comment was insufficient to show racial animus.

that occurred the month before the interview.[8]  Id. at 13.  Second, CCMS contends that another Board member raised safety concerns about CCMS's clients visiting the Premises at the same time as the Board members' clients.  Id. at 13-14.  Based on these comments, Brooks "thought that perhaps the reason they raised the issue was because CCMS is a predominately African American organization, run by an African American President and CEO, and treats African American clients who have mental illness."  Compl. ¶ 57.  Without minimizing Brooks' subjective opinion or emotional response to hearing these comments, the Court is unwilling now as it was before to infer racial animus from them.

As the Court previously explained, these comments "voice[] serious concerns with [CCMS] serving mentally ill patients and the potential for those patients to harm the Board members' clients," MTD Op. at 15 n.6, which "are entirely consistent with Board members having concerns for issues of behavior, and were not presumptively a matter of race," id. at 11.  Once again, the Court passes no judgment on the validity of these concerns and reemphasizes that there is no place for bias against those suffering from mental illness.  However, as a matter of law, "the

---

[8] This Board member denies commenting on this incident, Margolis Decl., Ex. E ("Paturet Dep.") 77:9-12, 82:10-19, but we will assume, for purposes of this motion, that he in fact made this comment.

social stigma surrounding mental illness is not interchangeable with racial animus, and [CCMS] cannot sustain [its] racial discrimination claims merely by pointing to conduct suggesting bias against mental illness." Id. at 12.  As such, these comments do not supply CCMS a basis for establishing discriminatory intent.

Next, CCMS points to the deposition testimony of one Board member who referred to CCMS as providing "counseling for two year olds who are the children of crack addicts" and as having clients with "criminal backgrounds."  Opp. at 14 (quoting Margolis Decl., Ex. E ("Conte Dep.") 79:3-13, 81:12-18).  In CCMS's view, these comments are "illustrative" of this Board member's "feelings toward Black people" given that these phrases -- "crack addicts" and "criminals" -- "have been used to describe Black people throughout this country's history."  Id. at 14-15.  To be sure, the Court certainly recognizes that these types of phrases can be and have been associated with insidious racial stereotypes.  See Harden v. Hillman, 993 F.3d 465, 483 (6th Cir. 2021) (explaining how "crack" came to be racialized).  However, counsel's argument is hyperbole.  Crack has not existed throughout history and Black people are not the only group to be described as criminals.  And, as with divining the meaning of any speech, context is critical, and here it is determinative.

When placed in proper context, it is evident that the Board members' statements were not racial stereotypes but were instead fact-based, race-neutral concerns that the Board had about subleasing the Premises to CCMS.  For example, the backdrop for the "criminal background" comment was the Board member's explanation that "everyone was a little concerned because you're going to have . . . people with criminal background[s]" visiting the Building and that, in his opinion, it was "[not] unreasonable to have that concern."  Conte Dep. 81:12-19.  As is clear, the Board member was not characterizing CCMS's clients as "criminals" because of their race.  Rather, he characterized CCMS's clients as such because Brooks himself told the Board that CCMS in fact serves clients with criminal histories, which presented a legitimate concern for the Board.  Id. 75:7-9 ("[Brooks] described that he has a clinic whereby he treats people with criminal, ex-criminal backgrounds.").  While the Board member perhaps could have used more sensitive language to describe CCMS's clientele, the Court finds that these statements from his deposition, when viewed in the broader context, do not give rise to an inference of discriminatory intent.

Finally, CCMS claims that the Board was planning to approve Oxford's proposed subtenant but that as soon as it learned that

the proposed subtenant was CCMS, the Board "creat[ed]" the sublease application and "insist[ed]" on interviewing Brooks specifically to reject CCMS's subtenancy. Opp. at 16-17. This theory, however, finds no support in the record. Indeed, the record shows that the first time the Board learned that Oxford had found <u>any</u> sublease applicant for the Premises was on December 19, 2019, when Oxford first emailed the Board about CCMS, describing it as a "conventional" subtenant that is "low traffic," "very 9-5," and would be using the Premises solely for administrative offices. Def. 56.1 ¶ 31. Prior to that date, there is no evidence that the Board was imminently prepared to vote on and approve a subtenant for the Premises, as CCMS suggests, much less that the Board even <u>knew</u> Oxford had found an applicant to sublease Premises.

The best evidence CCMS cites in support of its theory is the deposition testimony of one Board member who, prior to December 19, stated that an Oxford principal had "reached out" to tell him that "he thought he had a tenant for the [Premises], and he was hoping to be able to make a deal with them." Pl. 56.1 ¶ 27 (quoting Margolis Decl., Ex. F ("Grill Dep.") 75:4-12). But one Board member's knowledge that Oxford "thought" it had a potential subtenant with whom Oxford "hoped" to strike a deal does not remotely support the notion, advanced by CCMS, that the Board was

ready and willing to approve Oxford's potential subtenant had the subtenant not been CCMS.

To be sure, the record amply demonstrates that CCMS reasonably believed that Board approval was imminent, but as CCMS concedes, this belief was based solely on the repeated assurances of Board approval from Oxford, not from the Board itself.  Opp. at 16 ("[A]ll of Oxford's actions and communications indicate there was a plan to obtain sublease approval.").  In fact, after CCMS learned that it would have to interview before obtaining Board approval, CCMS's own broker pointed the finger exclusively at Oxford, accusing Oxford's principals of lying to him throughout the course of their negotiations about the likelihood of Board approval.  Def. 56.1 ¶ 37 ("You both [Oxford's principals] misled me . . .  no, you lied. Yep. [F]lat out lied.  I asked many times about the process of board approval.  You both knew damn well how it works.").  Given Oxford's strong incentive to find a subtenant for the Premises, it is perhaps unsurprising that its principals repeatedly assured CCMS of Board approval even if they could not in fact offer any guarantees of such approval.  At bottom, Oxford's own representations about its communications with the Board about approval is insufficient to support CCMS's theory that the Board

was prepared to approve Oxford's potential subtenant before
discovering that the subtenant was in fact CCMS.

The record similarly belies CCMS's contention that it was
"treated differently" from prior sublessees of the Premises by
having to submit a sublease application and interview with the
Board. Opp. at 19. As with Oxford's prior sublessees, the Board
required of CCMS a signed lease, application, meeting, and formal
approval. Indeed, Oxford's principal himself testified that a
formal Board meeting is "[a]lways" required for approval and that
"[he] do[esn't] believe" that approval has ever been given without
a Board meeting in the approximately twenty years Oxford has been
subleasing the Premises. Margolis Decl., Ex. D (Shamash Dep.)
82:16-85:17. In support of its "treated differently" argument,
CCMS relies on the testimony of two Board members, but neither
raises a triable issue of fact. The first fails because that Board
member testified that he was not actually involved with the
approvals of Oxford's prior subtenants, Conte Dep. 103:24-104:4,
and the second fails because that Board member simply could not
recall other instances of considering subtenancies for the
Premises, Grill Dep. 37:9-16. On this record, we cannot say that
the Board treated CCMS any differently than Oxford's prior
subtenants, and even if the process differed in some respects, as

CCMS suggests it did, we certainly cannot say that the approval process the Board followed here was infected in any way with racial animus.  As such, the Court concludes that CCMS has not established a prima facie case of racial discrimination.

Even assuming CCMS could establish a prima facie case, CCMS fails to show that the Co-Op Defendant's nondiscriminatory reasons for rejecting the sublease were pretextual.  The Co-Op Defendants offer four legitimate, nondiscriminatory reasons for their decision: (1) CCMS's clinic is not a business that would use the Premises for administrative office space as is the case with all other businesses in the Building; (2) there would be an increased risk of violence presented by the mentally ill clientele visiting the Building; (3) a comparatively high volume of patients would be visiting CCMS on a daily and weekly basis; and (4) CCMS's hours of operations would exceed the working hours of the other businesses in the Building and the Building's functional hours of operation.[9]  ECF No. 99 ("Mot.") at 13; see also Def. 56.1 ¶¶ 42-47.  To show

---

[9] CCMS disputes that its proposed working hours exceeded the building's functional hours of operation because there was an intercom system at the front entry of the building so that visitors could be buzzed into the Premises at any time.  CCMS Counterstatement ¶ 44.  However, CCMS does not dispute that the superintendent, who is the Building's lone staff member, only works Monday through Friday, 9am-5pm, which does not come close to covering all the hours CCMS would have been open and operating in the Premises.  Id. ¶ 45.  Indeed, as noted, CCMS's sublease application disclosed that its hours would run until 8pm from Monday through Thursday and 9am-5pm on Friday and Saturday.  Margolis Decl., Ex. N.

pretext at the summary judgment stage, the plaintiff must point to some fact suggesting "the falsity of the explanation from which the trier of fact can reasonably infer . . . that the [defendant] is dissembling to cover up a discriminatory purpose." Haber, 847 F. Supp. 2d at 587 (internal quotation marks omitted). CCMS cannot carry this burden.

CCMS first contends that, contrary to the Co-Op Defendants' explanation, other floors of the Building are used for non-administrative purposes and businesses on those floors regularly accept visitors. Opp. at 22. However, the Co-Op Defendants have never suggested that the Building adopts a no visitors policy. Rather, the Co-Op Defendants have consistently maintained that the particular issue with CCMS's potential subtenancy was that CCMS would have hundreds of clients coming in and out of the building on a weekly basis. See Def. 56.1 ¶¶ 46-47; ECF No. 119 ("Reply Br.") at 9-10. It was this comparatively high volume of visitors that the Board concluded was inconsistent with the nature of the other businesses in the Building, which is well supported by the record, and therefore, CCMS fails to show that this nondiscriminatory reason was pretextual.

CCMS next argues that the Co-Op Defendants' concerns about the violent tendencies of CCMS's "mentally ill" patients were

"manufactured."   Opp. at 24.   However, Brooks' own testimony
directly undercuts this argument.   For example, Brooks testified
that CCMS has seen "an increase in the number of suicide patients"
it treats and that such individuals are "similar to people who
would maybe be violent to other people."   Brooks Dep. 223:4-21.
Moreover, it bears repeating that to establish pretext, CCMS must
point to evidence that would show the Co-Op Defendants concocted
this explanation as a means of concealing a <u>racially</u> discriminatory
motive.   <u>See</u> <u>Haber</u>, 847 F. Supp. 2d at 587.   However, the Co-Op
Defendants' stated concerns about CCMS's clientele may suggest a
bias against individuals with mental illness, but that, as
discussed above, is not equivalent to evidence of <u>racial</u> animus.
As such, CCMS cannot demonstrate that this reason was pretextual.

Finally, CCMS claims that all four of the proffered reasons
are pretextual because the Co-Op Defendants could have rejected
the sublease based on CCMS's application alone yet decided to go
forward with the interview anyway.   Opp. at 22-24.   This argument
is unpersuasive for several reasons.   First, the interview was a
useful, if not essential, opportunity for the Board to clarify and
understand how exactly CCMS would be using the Premises given that
its sublease application conflicted in critical respects with
prior representations that Oxford made to the Board about CCMS's

-23-

subtenancy.   Indeed, as discussed above, Oxford stated in its December 19 email to the Board that CCMS would be a "low traffic," "very 9-5" subtenant using the Premises solely for "administrative offices."   Def. 56.1 ¶ 31.   Yet, in its sublease application submitted to the Board on December 24, CCMS stated that it would be using the Premises as a "licensed outpatient clinic providing psychotherapeutic services" from 9am to 8pm on most weekdays, from 9am to 5pm on Friday and Saturday, and with 200 clients visiting on a weekly basis.   See Margolis Decl., Ex. N.   Given the considerable daylight between these two descriptions, it is entirely reasonable that the Board would desire to interview Brooks to better understand which of these two disparate accounts was accurate.

Second, the interview was necessary because the sublease application submitted to the Board can hardly be described as comprehensive.   See id.   While the application accurately states CCMS's proposed use, hours of operation, and number of clients, the substantive portion of the application is a mere two pages of fill-in-the-blank questions and answers seeking basic information, such as emergency contacts and references.   Id.   Thus, by bringing Brooks in for an interview, the Board allowed him to more fully explain CCMS's intended use of the Premises and allay any potential

concerns the Board may have had about CCMS's subtenancy.  Indeed, denying CCMS the sublease on the basis of its sparse sublease application alone, as CCMS suggests would have been the better course, may have been more problematic than proceeding to an interview, as the Board opted to do.  In short, simply because the Board ultimately rejected CCMS's subtenancy for reasons that could have arguably been gleaned from CCMS's barebones application does not mean the interview was unnecessary or somehow evidence of discriminatory intent.

Third, there is no evidence that the Board made a decision on CCMS's sublease application prior to the interview such that conducting the interview was pretextual or itself discriminatory. In fact, two of the Board members testified that they did not even review CCMS's application until the day the interview was held, see Grill Dep. 77:16-24; Margolis Decl., Ex. G (Touton Dep.) 49:1-11, and the contemporaneous notes of another Board member state that the interview "convened at about 4:15 after all had [the] opportunity to review tenants [sic] application," suggesting that many (if not all) of the Board members first reviewed CCMS's sublease application shortly before the interview commenced, Margolis Decl., Ex. R.  Therefore, CCMS cannot show pretext merely because the Co-Op Defendants decided to interview Brooks before

rejecting CCMS's sublease application.  And, because none of the Co-Op Defendants' proffered reasons have been shown to be pretextual, CCMS's claims of racial discrimination fail and the Co-Op Defendants' motion for summary judgment is granted in full.

**B. Paturet's Motion**

As discussed above, Paturet separately moves for summary judgment based on the undisputed fact that he was not in attendance at the Board's interview with Brooks.  See ECF No. 107 ("Paturet Mot.") at 1-9.  CCMS argues that Paturet was nonetheless involved in the decision to reject CCMS's subtenancy based on representations made by Oxford that it was in contact with Paturet about CCMS's application.  ECF No. 116 at 13-16.  Yet, as discussed above, there is no evidence that Oxford had in fact contacted Board members, including Paturet, about CCMS prior to December 19. Moreover, even if Paturet was somehow involved in the Board's decision-making process, the same analysis that has been applied to the other Co-Op Defendants applies with equal force to Paturet: CCMS cannot show that racial animus motivated the Board's refusal to sublease the Premises to CCMS or that the Co-Op Defendants' legitimate, nondiscriminatory reasons for rejecting CCMS's

subtenancy were pretextual.    Accordingly, the Court grants Paturet's motion in full.[10]

## CONCLUSION

For the foregoing reasons, the Court grants both the Co-Op Defendants' and Paturet's motions for summary judgment and dismisses CCMS's claims.  The Court respectfully directs the Clerk of Court to terminate the motions pending at ECF Nos. 89, 92, 98, and 105 and close this case.

**SO ORDERED.**

Dated:     New York, New York
           March 20, 2024

           _____
           NAOMI REICE BUCHWALD
           UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that CCMS has represented in an earlier conference that it ultimately found a new lease for which it is paying less than it would have had it subleased the Premises from Oxford.  While the Court recognizes that CCMS had to overstay its existing lease in order to find a new sublet, its damages would have been limited.